ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HOWARD WELGUS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| TRINET GROUP, INC., BURTON M. GOLDFIELD and WILLIAM PORTER, | ) ) ) | |
| Defendants. | ) ) | DEMAND FOR JURY TRIAL |

1   Plaintiff, individually and on behalf of all the other persons similarly situated, by plaintiff's
2   undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and
3   plaintiff's own acts, and upon information and belief as to all other matters based on the
4   investigation conducted by and through plaintiff's attorneys, which included, among other things, a
5   review of U.S. Securities and Exchange Commission ("SEC") filings by TriNet Group, Inc.
6   ("TriNet" or the "Company"), as well as conference call transcripts and media and analyst reports
7   about the Company.  Plaintiff believes that substantial evidentiary support will exist for the
8   allegations set forth herein after a reasonable opportunity for discovery.

9                              **SUMMARY OF THE ACTION**

10          1.      This is a securities class action on behalf of all persons who purchased or otherwise
11   acquired the common stock of TriNet between May 5, 2014 and August 3, 2015, inclusive (the
12   "Class Period"), against TriNet and certain of its officers and/or directors for violations of the
13   Securities Exchange Act of 1934 ("1934 Act"), including the Company's President and Chief
14   Executive Officer ("CEO"), Burton M. Goldfield ("Goldfield"), and its Chief Financial Officer
15   ("CFO"), William Porter ("Porter").  Plaintiff alleges that defendants violated the securities laws by
16   disseminating materially false and misleading statements and concealing material adverse facts
17   regarding TriNet's current financial condition and growth prospects.

18                            **BACKGROUND AND OVERVIEW**

19          2.      TriNet describes itself as a leading provider of a comprehensive human resources
20   solution for small to medium-sized businesses, enabling clients to outsource their human resources,
21   or HR, function to one strategic partner.

22          3.      The Company's HR solutions include services such as payroll processing, human
23   capital consulting, employment law compliance and employee benefits, including health insurance,
24   retirement plans and workers compensation insurance.

25          4.      The Company offers what it calls a bundled solution, enabling customers to outsource
26   their HR functions.  The Company sells its products through a direct sales force and targets vertical
27   markets, including the technology, life sciences, property management, professional, banking and
28   financial, retail, manufacturing and hospitality services.  In 2012, TriNet acquired SOI Holdings, Inc.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                            - 1 -

1  and in 2013, Ambrose Employer Group, LLC.  The Company held its initial public offering on

2  March 27, 2014, offering 15 million shares of common stock at $16.00 per share.

3          5.      The Company states that its revenues consist of professional service revenues and

4  insurance service revenues: "We earn professional service revenues by processing HR transactions,

5  such as payroll and employment tax withholding, and providing labor and benefit law compliance

6  services, on behalf of our clients.  We earn insurance service revenues by providing risk-based,

7  third-party plans to our clients, primarily employee health benefit plans and workers compensation

8  insurance."

9          6.      For professional service revenues, the Company recognizes revenues as fees earned

10 for processing HR transactions, not including the payroll paid in by the client and paid out to

11 WorkSite employees ("WSEs") or remitted as taxes.  The Company recognizes as insurance service

12 revenues all insurance-related billings and administrative fees collected from clients and withheld

13 from WSEs for risk-based insurance plans provided through third-party insurance carriers, including

14 employee health insurance and workers compensation insurance.  TriNet in turn pays premiums to

15 third-party insurance carriers for these insurance benefits, as well as reimbursements for claim

16 payments within an insurance deductible layer.  These premiums and reimbursements are classified

17 as insurance costs on statements of operations.

18         7.      During the Class Period, defendants issued materially false and misleading statements

19 regarding the Company's current financial condition and quarterly and year-end revenue and

20 earnings outlook for fiscal 2014 and 2015.

21         8.      Defendants' statements during the Class Period alleged herein concerning TriNet's

22 current financial condition and outlook for fiscal 2014 and 2015 were each false and misleading,

23 because defendants knew or deliberately disregarded and failed to disclose the following facts:

24                 (a)     The Company's processes and methodologies for analyzing and accruing

25 claims failed to properly account for historical claims trends;

26                 (b)     The Company's forecasting process failed to properly incorporate relevant

27 historical and current claims trends;

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                              - 2 -

1        (c)     The Company was experiencing growing claims trends in medical and

2 workers compensation that negatively affected the Company's current and future business prospects;

3 and

4        (d)     In light of the above, the Company's publicly stated financial outlook did not

5 have a reasonable basis.

6        9.     As a result of these misrepresentations and omissions, TriNet stock traded at

7 artificially inflated prices during the Class Period, reaching a high of $37.88 per share on March 3,

8 2015.

9                                 **JURISDICTION AND VENUE**

10       10.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims

11 asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and

12 Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

13       11.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because TriNet is

14 headquartered in this District and many of the acts and practices complained of herein occurred in

15 substantial part in this District.

16                                       **PARTIES**

17       12.     Plaintiff Howard Welgus purchased or otherwise acquired TriNet common stock as

18 described in the attached certification and was damaged by the conduct alleged herein.

19       13.     Defendant TriNet is incorporated in Delaware and trades on the New York Stock

20 Exchange ("NYSE") under the ticker symbol "TNET."  The Company's corporate headquarters are

21 located at 1100 San Leandro Boulevard, Suite 400, San Leandro, California 94577.

22       14.     Defendant Goldfield is, and was at all relevant times during the Class Period,

23 President, CEO and a director of the Company.

24       15.     Defendant Porter is, and was at all relevant times during the Class Period, Vice

25 President and CFO of the Company.

26       16.     The defendants named in ¶¶14-15 are referred to herein as the "Individual

27 Defendants."

28

**CONTROL PERSONS**

17.    As officers and controlling persons of a publicly held company whose common stock was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.    The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with TriNet, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about TriNet and its business or adopted by the Company materially false and misleading.

19.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

20.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TriNet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding TriNet's business, operations, management and the intrinsic value of TriNet common stock; and (ii) caused plaintiff and other members of the Class to purchase TriNet common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

21.     On May 5, 2014, the Company issued a press release announcing its first quarter fiscal 2014 financial results.  The press release stated as follows:

**TriNet Announces First Quarter Fiscal 2014 Results**

\*          \*          \*

- Total revenues increased 45% to $508.9 million and Net Service Revenues increased 31% to $127.8 million.

\*          \*          \*

- Net income for the first quarter was $1.5 million, or $0.03 per diluted share, compared to net income of $10.5 million, or $0.20 per diluted share, in the same period last year.

- Adjusted Net Income for the first quarter was $17.6 million, or $0.24 per diluted share on a pro forma basis, compared to Adjusted Net Income of $18.2 million, or $0.27 per diluted share, in the same period last year.

- Adjusted EBITDA was $44.3 million, a 23% increase from $36.1 million for the first quarter last year.

"Our strong first quarter results demonstrate the success of our differentiated strategy for growth, centered on our bundled suite of HR products, multiple offerings tailored to customer needs, and our vertical go-to-market strategy executed by our growing salesforce," said Burton M. Goldfield, TriNet's President and CEO. . . .

Results for the first quarter of 2014 reflect the 30% growth in WSEs as TriNet continued to leverage its growing salesforce to increase penetration of targeted customer verticals.  TriNet's total revenues increased 45% to $508.9 million, while Net Service Revenues increased 31% to $127.8 million in the first quarter of 2014.  Net Service Revenues are comprised of professional services revenues of $82.9 million and Net Insurance Service Revenues of $44.9 million.  Net Insurance Service Revenues consist of insurance service revenues of $426.0 million, less insurance costs of $381.2 million.  Professional service revenues increased 40% and Net Insurance Service Revenues increased 18% over the first quarter of 2013.

22.     After the release of TriNet's first quarter fiscal 2014 results, TriNet's stock price traded at artificially inflated prices, increasing from a close of $21.87 per share on May 5, 2014 to a close of $22.87 per share on May 6, 2014, on high trading volume.

23.     On August 4, 2014, the Company issued a press release announcing its second quarter fiscal 2014 financial results.  The press release stated as follows:

**TriNet Announces Second Quarter Fiscal 2014 Results**

*        *        *

- Total revenues for the second quarter increased 44% to $525.0 million and Net Service Revenues increased 32% to $124.8 million from the same period last year.

*        *        *

- Net income for the second quarter was $6.2 million, or $0.09 per diluted share, compared to net income of $4.3 million, or $0.08 per diluted share, in the same period last year.

- Adjusted Net Income for the second quarter was $17.4 million, or $0.24 per diluted share on a pro forma basis, compared to Adjusted Net Income of $12.1 million, or $0.18 per diluted share, in the same period last year.

- Adjusted EBITDA for the second quarter was $39.4 million, a 38% increase the same period last year.

"We generated robust growth during the second quarter, highlighting the strength of our bundled product offering and vertical go-to-market strategy," said Burton M. Goldfield, TriNet's President and CEO. . . .

Results for the second quarter of 2014 reflect the 31% growth in WSEs as TriNet continued to leverage its growing salesforce to increase penetration of targeted customer verticals.  TriNet's total revenues increased 44% to $525.0 million, while Net Service Revenues increased 32% to $124.8 million in the second quarter of 2014.  Net Service Revenues consisted of professional services revenues of $82.3 million and Net Insurance Service Revenues of $42.5 million.  Net Insurance Service Revenues consisted of insurance service revenues of $442.7 million, less insurance costs of $400.2 million.  Professional service revenues increased 35% and Net Insurance Service Revenues increased 28% over the second quarter of 2013.

24.     After the release of TriNet's second quarter fiscal 2014 results, TriNet's stock price traded at artificially inflated prices, increasing from a close of $24.72 per share on August 4, 2014 to a close of $27.08 per share on August 5, 2014, on high trading volume.

25.     On September 11, 2014, the Company issued a press release announcing that it had priced a secondary offering of 12 million shares of TriNet common stock at $25.50 per share:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 6 -

**TriNet Prices Secondary Offering**

. . . TriNet Group, Inc. today announced the pricing of an underwritten registered public offering of 12,000,000 shares of common stock at a price of $25.50 per share.  In addition, the underwriters have been granted a 30-day option to purchase up to an additional 1,800,000 shares of common stock from the selling stockholders.  All of the shares in the offering are being offered by entities affiliated with General Atlantic LLC. TriNet will not receive any proceeds from the sale of the shares.

J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC and Deutsche Bank Securities Inc. are acting as joint book-running managers of the offering and as representatives of the underwriters. Stifel, Nicolaus & Company, Incorporated and William Blair & Company, L.L.C. are acting as co-managers of the offering.

26.     On November 4, 2014, the Company issued a press release announcing its third quarter fiscal 2014 financial results. The press release stated as follows:

**TriNet Announces Third Quarter Fiscal 2014 Results**

\*       \*       \*

- Total revenues for the third quarter increased 24% to $556.0 million and Net Service Revenues increased 22% to $127.8 million from the same period last year.

\*       \*       \*

- Net income for the third quarter was $0.7 million, or $0.01 per diluted share, compared to a net loss of $7.7 million, or $(0.60) per diluted share, in the same period last year.

- Adjusted Net Income for the third quarter was $20.2 million, or $0.28 per diluted share on a pro forma basis, compared to Adjusted Net Income of $9.3 million, or $0.13 per diluted share, in the same period last year.

- Adjusted EBITDA for the third quarter was $41.5 million, a 50% increase from the same period last year.

"Our third quarter results highlight the unique value delivered by our bundled HR solution and continued strong execution of our strategic plan," said Burton M. Goldfield, TriNet's President and CEO.  "The momentum generated in the first half of the year has continued into the third quarter as our growing professional salesforce drives client adoption of our solutions across our target verticals.  *With a strong sales engine, disciplined operating strategy and proven solution offering*, we believe we're well positioned to drive robust returns in a large, underpenetrated market of small and medium-sized businesses facing increasing HR complexities."

. . . TriNet's total revenues increased 24% to $556.0 million, while Net Service Revenues increased 22% to $127.8 million in the third quarter of 2014.  Net Service Revenues consisted of professional service revenues of $86.9 million and Net Insurance Service Revenues of $40.9 million. *Net Insurance Service Revenues consisted of insurance service revenues of $469.1 million, less insurance costs of*

*$428.2 million*.  Professional service revenues increased 15% and Net Insurance Service Revenues increased 41% over the third quarter of 2013.

27.     On November 4, 2014, the Company held a conference call for analysts and investors to discuss the Company's third quarter fiscal 2014 financial results and outlook.  The call was hosted by Goldfield and Porter.  During the call, defendants discussed demand for the Company's products and services and assured investors that the prospect and potential for higher claims costs was already built into TriNet's forecasting process:

> [Goldfield]:  *I am pleased to report that the market demand we saw in the first half of 2014 for our products continue unabated in Q3*.

> \*        \*        \*

> [Porter]:  ***Our third-quarter financial and operating results reflect continued execution of our strategy, and growth across all of the key metrics used to measure the financial and operating health of our business***.

> Net services revenues grew 22% organically during the third quarter to $127.8 million . . . .

> Professional services revenues, which represent approximately two-thirds of our net service revenues in Q3, increased 15% to $86.9 million, while our net insurance service revenues, which represent the remaining one-third of our net service revenues, increased 41% to $40.9 million during the third quarter.

> Total adjusted EBITDA increased to $41.5 million during the third quarter, compared to $27.7 million for the prior-year period.  For the first nine months, our adjusted EBITDA margin was 32.9%.  ***We're well on track in pursuing our target margin level of 33% to 34%***.

> \*        \*        \*

> For our financial guidance for Q4, we expect net service revenue in the range of $137 million to $139 million, which represents organic growth of 13% to 14%; adjusted EBITDA in the range of $51 million to $53 million for the same period; and adjusted net income in the range of $25 million to $27 million, or $0.35 to $0.37 per share.

> Based on our year-to-date performance and our Q4 guidance, we expect net service revenue in the range of $517 million to $519 million for 2014, which represents organic growth of 18% to 19%, with adjusted EBITDA in the range of $176 million to $178 million for the same period, in line with our target range of 33% to 34%, and adjusted net income in the range of $80 million to $82 million, or $1.10 to $1.13 per share.

28.     During the call, analysts had specific questions regarding the Company's insurance costs during the quarter:

[Analyst]:  Maybe a quick one on insurance costs.  I know Q3 is seasonably high, but maybe to what extent it came in higher or lower than your expectations?  Thanks.

[Porter]:  . . . We did see slightly higher claims activity than we were expecting in Q3.  And, as we have described, it is our seasonally higher activity for claims.  And what we saw, which we're playing close attention to, is just higher pharmacy costs. . . .  *So we're watching that.  It is built into our forecast going forward.  And ultimately, if it increases our trend, it will get covered by our premium increases*.

29.   On November 4, 2014, Jefferies issued a report discussing the Company's third quarter fiscal 2014 financial results and its increase to its fiscal 2014 revenue and earnings per share ("EPS") guidance:

Impressive Execution In 3Q; Guidance Raised

\*        \*        \*

*Earlier, TNET posted solid F3Q results (with revs/EPS beat vs. Street) on the back of healthy demand environment, which also led to F14 revs/EPS guidance raise.  Sales force growth execution was also impressive and gives us confidence in TNET's near-term revs growth expectations*. . . .

**An [sic] pretty solid quarter**.  . . . TNET reported F3Q14 results and net revenues of $127.8M (22% y/y organic growth), beat Street and guidance range at $125.8M and $124-$126M, respectively. . . .  Adjusted EBITDA margin for the quarter was 32.5%, +90bps vs. JEFe, which largely led to an adjusted EPS beat ($0.28 vs. JEFe/Street/guidance range at $0.27/$0.26/$0.25-$0.27). . . .

**F14 guidance raised**.  On the back of solid F3Q print, and healthy demand environment, TNET raised its F14 net revs guidance range from $512-$516M to $517-$519M (vs. Street/JEFe at $516.7M/$518.3M). . . .  TNET also raised its F14 adjusted EPS guidance to $1.10-$1.13 (JEFe/Street at $1.11) from $1.09-$1.11 before, but maintained its F14 adjusted EBITDA margin target range of 33-34%.  In addition, TNET provided F4Q net revenues guidance range of $137-$139M (JEFe/Street at $137-$138.2M), adjusted EBITDA guidance range of $51-$53M and adjusted EPS guidance range of $0.35- $0.37 (JEFe/Street at $0.36/$0.35).

30.   After the November 4, 2014 release of the Company's financial results and the conference call, the Company's stock price continued to trade at artificially inflated prices of above $29.00 per share.

31.   On November 12, 2014, William Blair published a report on TriNet entitled "Analysis of Workers' Comp Trends Reinforces Confidence That Issues Seen at Competitors Will not be Replicated."  The report directly addressed concerns that TriNet's competitors may not have

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                - 9 -

1  adequately accrued for workers compensation costs and thus would need to increase reserves,

2  thereby reducing profits:

3          **Summary**.  Over the last few months, we have received questions from
   investors about the implication for TriNet of a "short report" about Barrett Business
4  Services (BBSI $23.10). While there are some parts of the report that are not even
   relevant for TriNet (i.e., changes in regulations for self-insured workers'
5  compensation insurance policies in California – TriNet is fully insured in its workers'
   comp insurance), the report correctly alleged that Barrett had been under-accruing
6  claims expenses related to its workers' compensation policies, and therefore would
   need to recognize catch-up expenses at some point. This assumption was confirmed
7  in the third quarter, as Barrett recorded an $80 million increase in its workers'
   compensation reserve, which essentially erased the profits earned by Barrett over the
8  last two to three years.

9          Volatility in claims accruals is normally a hot button issue for investors
   regarding PEOs, and the recent charge by Barrett has brought even more scrutiny to
10 this issue when analyzing the sector. ***TriNet's third-quarter results showed no signs
   of similar issues and management expressed confidence on its conference call in
11 its workers' compensation accruals***.

12         32.    On November 12, 2014, Goldfield and Porter attended the JP Morgan Ultimate

13 Service Investor Conference.  During the conference, defendants addressed TriNet's workers

14 compensation reserve in light of the recent increase in workers compensation reserves by one of its

15 competitors, Barrett Business Services.    The Company assured investors that its workers

16 compensation business was stable:

17         [Question]:  One of your publicly traded peers announced a pretty big
   increase in their working – workers' comp reserves the other week . . . can you just
18 help me understand how they're different . . . ?

19                               *        *        *

20         [Porter]:  Sure.  So I think the first thing to keep in mind is that ***we have a
   very stable, fully insured workers' comp program*** that we've had for multiple years.
21 I think the example that you're referencing was a self-insured model that they're
   moving to try to get some kind of a fully insured.  ***So for us it's been a very stable
22 program on all of our products.  It's something that we look at very carefully every
   quarter, and we adjust the reserves as necessary every quarter***.

23         We have assistance, obviously, from our outside actuaries, from our inside
24 team, and we also have an independent view from outside actuaries at our accounting
   firm.  So we look at it from multiple angles.  We adjust as we go.  ***We do not expect
25 any significant reserve adjustments like you're referencing***.

26         33.    Defendants' statements above concerning TriNet's current financial condition and

27 outlook for fiscal 2014 were each false and misleading, because defendants knew or deliberately

28 disregarded and failed to disclose the following facts:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                           - 10 -

1          (a)      The Company's processes and methodologies for analyzing and accruing

2   claims failed to properly account for historical claims trends;

3          (b)      The Company's forecasting process failed to properly incorporate relevant

4   historical and current claims trends;

5          (c)      The Company was experiencing growing claims trends in medical and

6   workers compensation that negatively affected the Company's current and future business prospects;

7   and

8          (d)      In light of the above, the Company's publicly stated financial outlook did not

9   have a reasonable basis.

10         34.      On March 3, 2015, the Company issued a press release announcing its fourth quarter

11  fiscal 2014 financial results.  The Company's financial results missed insurance revenue and income

12  expectations, due in particular to an increase in large medical claims.  The press release stated as

13  follows:

14  **TriNet Announces Fourth Quarter, Fiscal Year 2014 Results**

15                              *        *        *

16  Fourth quarter highlights include:

17  •      Total revenues increased 25% to $603.7 million and Net Service
18         Revenues increased 4% to $126.9 million from the same period last
        year.

19                              *        *        *

20  •      Net income was $7.0 million, or $0.10 per diluted share, compared to
21         net income of $6.0 million, or $0.11 per diluted share, in the same
22         period last year.

23  •      Adjusted Net Income was $19.2 million, or $0.26 per diluted share on
        a pro forma basis, compared to Adjusted Net Income of $17.1
24         million, or $0.24 per diluted share on a pro forma basis, in the same
        period last year.

25  •      Adjusted EBITDA was $40.1 million, an 8% decrease from the same
26         period last year.

27  Full year highlights include:

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 11 -

- Total revenues increased 33% to $2.2 billion and Net Service Revenues increased 21% to $507.2 million from fiscal 2013.

- Net income was $15.5 million, or $0.22 per diluted share, compared to net income of $13.1 million, or $0.24 per diluted share, in fiscal 2013.

- Adjusted Net Income for fiscal 2014 was $74.4 million, or $1.03 per diluted share on a pro forma basis, compared to Adjusted Net Income of $57.5 million, or $0.81 per diluted share on a pro forma basis, in fiscal 2013.

- Adjusted EBITDA was $165.3 million, a 22% increase from the same period last year.

"Capitalizing on the tremendous market opportunity, we leveraged our vertical go-to-market strategy to achieve a 25% organic increase in our WSE base," said Burton M. Goldfield , TriNet's President and CEO. . . .  "*Based on our strong momentum in the market and with January firmly in the books, we remain confident in our business outlook and believe we can achieve Net Service Revenue growth in excess of 15% for 2015*."

. . . "*Notwithstanding strong fundamentals in our underlying business, our Q4 Net Insurance Service Revenues were below our estimate as a result of higher than expected large medical claims.  We are working closely with our health insurance partners to identify these large claims earlier in the process to improve our ability to more accurately forecast our Net Insurance Services Revenues*."

. . . TriNet's total revenues for the fourth quarter of 2014 increased 25% from the fourth quarter of 2013 to $603.7 million, while Net Service Revenues increased 4% from the fourth quarter of 2013 to $126.9 million.  Net Service Revenues consisted of professional service revenues of $90.1 million and Net Insurance Service Revenues of $36.8 million.  Net Insurance Service Revenues consisted of insurance service revenues of $513.6 million, less insurance costs of $476.8 million.  Professional service revenues for the fourth quarter of 2014 increased 18% and Net Insurance Service Revenues decreased 19% from the fourth quarter of 2013. . . .

Results for full year 2014 reflect an increase of 57,109 WSEs, to a total of 288,312 WSEs as of December 31, 2014, representing 25% growth since December 31, 2013.  TriNet's total revenues increased 33% to $2.2 billion, while Net Service Revenues increased 21% to $507.2 million for the full year.  Net Service Revenues consisted of professional service revenues of $342.1 million and Net Insurance Service Revenues of $165.1 million.  Net Insurance Service Revenues consisted of insurance service revenues of $1.9 billion, less insurance costs of $1.7 billion.  Professional service revenues increased 26% and Net Insurance Service Revenues increased 14% over the full year of 2013.

35.     On March 3, 2015, the Company held a conference call for analysts and investors to discuss the fourth quarter fiscal 2014 financial results.  During the call, which was hosted by defendants Goldfield and Porter, they assured investors that the Company's current claims

experience, which had adversely affected TriNet's fourth quarter fiscal 2014 results, would not affect the Company's 2015 financial outlook:

> [Goldfield]:  While the underlying fundamentals of our business remain strong, I am disappointed that our Q4 net insurance service revenue was below our estimate.  This resulted from higher than expected large medical claims.

> Our net service revenue of $126.9 million was $11.1 million below the midpoint of our net service revenue guidance of $138 million.  In order to improve our ability to forecast large medical claims, we're working closely with our health insurance partners to obtain more data on these type[s] of large claims much earlier in the medical treatment pipeline. . . .

> . . . With January firmly in the books, we're confident in our ability to execute the year ahead and believe we can achieve the net service revenue growth in excess of 15% for 2015.

> **We have also looked carefully at our claims experience and remain confident in the quality of our forecast of net insurance service revenue in 2015**.

> [Porter]:  During the fourth quarter, net services revenue grew 4% to $126.9 million.  We grew WSEs by 15,466 in Q4, or 6% since the end of the third quarter, to finish 2014 with a total WSE count of 288,312, up 25% from 230,203 WSEs at the end of 2013.

> Professional service revenue increased 18% to $90.1 million, **while our net insurance service revenue decreased 19% to $36.8 million during the fourth quarter.  Net insurance service revenue was adversely affected by an unexpected impact of large medical claims**.

> The nature of these claims is that they develop over a number of months, and there is usually a lag before they're reported to the carriers by the providers.  We had a number of large claims develop during the second half of 2014 that we were not aware of until after the close of the year.  **The result was these claims were not included in our trend as we forecast our fourth-quarter medical claims**.

> . . . Our experience, when we're aware of these large claims, is that we can usually forecast them close to their ultimate cost outcome.  In order to improve our ability to more accurately forecast these large claims, we are working with our carrier partners to gain visibility into potential large claims much earlier in the treatment process, including access to diagnostic codes and estimated length of stay data.

> **Our 2015 forecast takes new account a similar frequency of large claims as we experienced in 2014.  The result is that our Q4 experience does not have an adverse impact on our 2015 outlook**.

*       *       *

> Turning now to our 2015 full-year financial guidance, we expect net service revenue in the range of $590 million to $600 million, which represents growth of 16% to 18%; adjusted EBITDA in the range of $192 million to $202 million, in line with our target margin range of 33% to 34%; and adjusted net income in the range of $98 million to $104 million, or $1.32 to $1.40 per share.  Based on our 2015 full-year guidance, we expect our first-quarter net service revenue in the range of $142 million

1    to $147 million, which represents growth of 11% to 15%; adjusted EBITDA in the
2    range of $44 million to $49 million; and adjusted net income in the range of $22
     million to $25 million or $0.30 to $0.34 per share.

3                              *        *        *

4        [Goldfield]:  ***Clearly, we've some work to do in improving our ability to
     forecast our insurance revenue***.  We are highly focused on it, and we are making the
5    right steps to improve visibility into this metric.

6                              *        *        *

7        [Analyst]:  Okay.

8        And then you had warned us, in general, about seeing bumps from quarter to
     quarter, suggesting that you would absorb[] the higher cost over the course of the
9    year.  This one sounds, obviously, a bit larger, probably, than what you were
     referring to.  So is the difference, this time, just the sheer quantity of these one-time
10   claims coming in?

11       [Porter]:  Yes, by their nature, the larger claims are a little bit harder to
     predict.  What we had seen earlier in the year was a lower level of large claims.  And
12   what we do need to be able to do better is to see these claims developing in the
     provider pipeline so that we can see them and build them into our forecast.

13
         When we step back for the year, we were actually fairly close to our annual
14   estimate.  We just didn't get it right between – there were lower claims in the first
     half, and we didn't have enough visibility into the claims that we're developing in
15   the second half to be able to build them into our Q4 forecast.

16                             *        *        *

17       [Goldfield]:  I just wanted to add – to be very specific, I have said in the past
     that variability would be $2 million to $3 million per quarter, and I was clearly
18   wrong.  This was a larger number.

19       What happened with this spike in large claims make[s] us reevaluate how
     we're analyzing the large claims and separating them from the general business and
20   the trend.

21       36.    On March 4, 2015, JP Morgan published a report entitled "4Q Recap: Miss on

22   Medical Claims but 2015 Guidance Intact."  The report discussed the spike in medical claims that

23   caused the Company to miss its fourth quarter fiscal 2014 financial estimates and affirmed

24   confidence in management's ability to improve:

25       *TriNet reported disappointing 4Q results, as an unusual spike in large
     medical claims drove a revenue/EPS miss of (9%)/(29%), masking strong
26   underlying unit growth of 25%*. . . .  We consider this claims issue to be a benign
     growing pain rather than an alarming systemic issue, and believe management will
27   learn from it and improve procedures to improve forecasting going forward. . . .

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                      - 14 -

- **What happened?** *4Q missed our estimate by $14M and fell below guidance primarily due to an unforeseen jump in large medical claims* (*e.g.*, complex births, chemotherapy) that became known after the year closed. As such, TriNet missed the trend in claims, which in hindsight was running better than expected in 1H, but more than corrected itself in 2H, resulting in the miss. . . .

- . . . Looking ahead, we believe this risk is captured in guidance, as (1) FY15 guidance assumes the same elevated claims level in 2014, and (2) management said it has changed its forecasting approach, separating large from normal claims . . . .

- **FY15 revenue guidance in line with JPM/consensus, EPS guidance a touch below Street**. TNET's FY15 revenue guidance of $590M-$600M is in line with JPM/Street expectations of $594M/$598M and reflects 16-18% growth vs. the 17-18% growth in the initial FY14 guide. EPS of $1.32-$1.40 is in line with prior JPMe of $1.37 but below Street expectations of $1.42.

37.  Following the disclosures on March 3, 2015, TriNet's stock price declined from a close of $37.88 per share on March 3, 2015 to a close of $33.93 per share on March 4, 2015, on high trading volume.

38.  On May 5, 2015, the Company issued a press release announcing its first quarter fiscal 2015 financial results. The Company's financial results again missed expectations. This time the Company reported that it would in fact have to accrue for workers compensation costs, which it had previously assured investors had been properly accounted for. The press release stated as follows:

**TriNet Announces First Quarter Fiscal 2015 Results**

\*   \*   \*

First quarter highlights include:

- Total revenues increased 23% to $625.6 million and Net Service Revenues increased 11% to $142.4 million compared to the same period last year.

\*   \*   \*

- Net income was $15.8 million, or $0.22 per diluted share . . . .

- Adjusted Net Income was $25.4 million, or $0.35 per diluted share on a pro forma basis . . . .

- Adjusted EBITDA was $50.1 million, a 13% increase from the same period last year.

"During the first quarter we continued to experience robust demand for our unique HR solutions," said Burton M. Goldfield, TriNet's President and CEO. . . .

. . . TriNet's total revenues for the first quarter of 2015 increased 23% from the first quarter of 2014 to $625.6 million, while Net Service Revenues increased 11% from the first quarter of 2014 to $142.4 million.  Net Service Revenues consisted of professional service revenues of $97.0 million and Net Insurance Service Revenues of $45.4 million.  Net Insurance Service Revenues consisted of insurance service revenues of $528.6 million, less insurance costs of $483.2 million. Professional service revenues for the first quarter of 2015 increased 17%, and Net Insurance Service Revenues were relatively flat, compared to the first quarter of 2014.

39.     On May 5, 2015, the Company held a conference call for analysts and investors. During the conference call, defendants explained that the workers compensation accruals negatively affected the Company's results and would continue through the third and fourth quarters of 2015, and that the Company was thus reducing its annual outlook by $10 million:

[Porter]:   Net insurance service revenues increased 1% to $45.4 million during the first quarter.  ***Net insurance service revenues were affected by higher than expected workers compensation costs in our blue- and gray-collar book for older years***.

*       *       *

Turning to our outlook.  Excluding these seasonal items, ***we expect Q2 net service revenues in the range of $135 million to $140 million, which represents growth of 10%***.  Adjusted EBITDA in the range of $37 million to $42 million.  And adjusted net income in the range of $18 million to $21 million, or $0.24 to $0.28 per share.  ***Based on the impact of the higher worker's comp costs, we are reducing our annual outlook by $10 million.  And we now expect net services revenues in the range of $580 million to $590 million for 2015, which represent organic growth of 14% to 16%***.  We expect adjusted EBITDA in the range of $188 million to $198 million for the same period, in line with our target EBITDA margin range of 33% to 34%.  And adjusted net income in the range of $94 million to $100 million, or $1.27 to $1.35 per share.

40.     During the question and answer session, Goldfield and Porter made the following statements:

[Porter]:   [A]s I mentioned on the last call . . . and we did change our forecast methodology, so we have separated out our claims between run rate claims, pharmacy and large medical claims.

*       *       *

So to your question on workers comp, we have seen growth in our blue and gray book, particularly in higher cost states.  So one of the things that we instituted for Q1 was just a more detailed analysis as part of our actuarial review that we received in April.

The result of that was that we had an increase in our blue and gray book of approximately $4 million. That was higher than our Q1 forecast.

*Looking at that going forward, we would expect that that will spill over into Q2 and Q3 and Q4. And so we have increased our claims forecast for worker's comp for the next three quarters by approximately $6 million to cover the higher cost of those claims.*

\*       \*       \*

[Goldfield]: *I'm expecting that we're going to do a better job of forecasting.* . . .

. . . I think what it really means is a tighter look at the older years and making sure that we're 'ticked and tied as they come through the system.

\*       \*       \*

[Analyst]: And then just one more thing on the workers comp. You talked about older claims. Does that imply that the issue that arose was in businesses that you would acquire that perhaps the accrual and the methods for the accrual were different than perhaps what you are using today?

Or is that reading too much into it?

[Goldfield]: No. I think your intuition is correct. It is the blue and gray collar book, which we have not had for obviously as many years as we have had the Passport book.

So the more experience we have, the more we see the reports, the better we understand what's happening. And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen. So it is something I think we have got the right analysis now, which we've tried to incorporate into our forecast for 2015.

41.   After the May 5, 2015 disclosure of the Company's first quarter fiscal 2015 financial results, TriNet's stock price declined sharply, from a close of $34.43 per share on May 5, 2015 to a close of $28.76 per share on May 6, 2015, on high trading volume.

42.   Defendants' statements above concerning TriNet's current financial condition and outlook for fiscal 2015 were each false and misleading, because defendants knew or deliberately disregarded and failed to disclose the following facts:

(a)   The Company's processes and methodologies for analyzing and accruing claims failed to properly account for historical claims trends;

(b)   The Company's forecasting process failed to properly incorporate relevant historical and current claims trends;

1           (c)     The Company was experiencing growing claims trends in medical and

2    workers compensation that negatively affected the Company's current and future business prospects;

3    and

4           (d)     In light of the above, the Company's publicly stated financial outlook did not

5    have a reasonable basis.

6           43.     On August 3, 2015, the Company issued a press release announcing its second quarter

7    fiscal 2015 financial results.  The Company reported financial results that missed both revenue and

8    EPS estimates by a wide margin due to another increase in high-volume medical claims:

9    **TriNet Announces Second Quarter Fiscal 2015 Results**

10                 *      *      *

11   •    Total revenues increased 22% to $640.0 million, while Net Service Revenues

12        decreased 2% to $122.0 million compared to the same period last year, due
     primarily to unexpected large medical claims during the quarter.

13                 *      *      *

14   •    Net loss was $1.3 million, or $0.02 per diluted share, compared to net income

15        of $6.2 million, or $0.09 per diluted share, in the same period last year.

16   •    Adjusted Net Income was $10.5 million, or $0.14 per diluted share on a pro
     forma basis, compared to Adjusted Net Income of $17.4 million, or $0.24 per

17        diluted share on a pro forma basis, in the same period last year.

18   •    Adjusted EBITDA was $24.7 million, *a 37% decrease from the same period
     last year*.

19        "We delivered double digit growth in our WSE base and professional service
     revenues during the second quarter, as our bundled HR product offering continues to

20   resonate with a wide range of companies across our target verticals," said Burton M.
     Goldfield, TriNet's President and CEO. . . .

21        Mr. Goldfield added, "While our growth momentum remains robust, our

22   results were ***impacted this quarter by a higher than expected number of large
     medical claims***. . . ."

23        Results for the second quarter of 2015 reflect a net increase of 43,390 WSEs

24   since June 30, 2014 representing 17% growth, as TriNet continued to utilize its
     growing salesforce to increase penetration of targeted customer verticals.  TriNet's

25   total revenues for the second quarter of 2015 increased 22% from the second quarter
     of 2014 to $640.0 million, while Net Service Revenues decreased 2% from the

26   second quarter of 2014 to $122.0 million.  Net Service Revenues consisted of
     professional service revenues of $97.8 million and Net Insurance Service Revenues

27   of $24.2 million.  Net Insurance Service Revenues consisted of insurance service
     revenues of $542.2 million, less insurance costs of $518.0 million.  Professional

28   service revenues for the second quarter of 2015 increased 19%, and Net Insurance

1    Service Revenues decreased 43%, compared to the second quarter of 2014. TriNet
2    ended the second quarter with 486 Total Sales Representatives, up from 388 at the
     end of the second quarter of 2014, an increase of 25%.

3        44.    On August 3, 2015, the Company held a conference call with analysts and investors

4    to discuss the disappointing results:

5        [Goldfield]:  Now while the fundamentals of our business remain strong, I am
6    disappointed that our second-quarter financial performance was negatively impacted
     by a higher than usual number of large medical claims.  These claims were well in
7    excess of our expected and historical claims volatility.

                           *        *        *

8
9    **As a result, our 2015 forecast, which Bill will summarize shortly, now assumes that
     the higher claims level continues**. . . .

10       I will strengthen my internal team.  This includes the recruitment of a senior
11   insurance services executive reporting directly to me, as well as additional actuarial
     and analytical capabilities.

12                         *        *        *

13       [Porter]:  Run rate medical claims and pharmacy claims came in as expected,
14   with premium being slightly under our forecast.  The result in Q2 was an
     approximate $20 million reduction in our net insurance service revenues compared to
15   our forecast.

16       Our revised 2015 forecast assumes the higher claims level continues and is
     included in our trend.  The result is, in addition to the Q2 impact, we are reducing our
17   net insurance service revenues by an additional $10 million for the remainder of the
     year compared to our prior guidance.

18       **Total adjusted EBITDA for the second quarter declined 37%** to $24.7
19   million, compared to $39.4 million for the prior-year period.  **Our Q2 adjusted
     EBITDA margin was 20.3%.  Adjusted net income for the second quarter declined
20   40%, to $10.5 million or $0.14 per share**, compared to $17.4 million or $0.24 per
     share in the same quarter last year.

21                         *        *        *

22       [Analyst]:  . . . [Y]ou mentioned that you had improved the visibility of the
23   medical claims, but clearly the guidance you gave last quarter didn't contemplate
     these medical claims coming in.  So could you just please clarify what aspect of the
24   visibility you've now gotten more comfort with and what's left to do?

                           *        *        *
25
26       [Goldfield]:  So, absolutely, any and all things are on the table.  But
     addressing the issue around this medical claims volatility and the impact in the P&L
27   is my top priority.  So, I'm going to strengthen the internal team with our senior
     insurance executive who is right by my side.  I'm going to increase the in-house
28   actuarial and analytical capabilities, and I need to explore ways to dampen that.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 19 -

1

2

Up till now, reducing the pooling did not seem like a viable option from a cost standpoint.  And frankly, our pooling levels vary, but they go up to about $1 million for some carriers.

3

\*          \*          \*

4

5

6

7

I need to directly address this medical claims volatility, number one, and I need to address the visibility to those medical claims.  So number one is, we need clean data from the carriers.  I believe we are well on our way to getting that.  This does not seem to be a data issue.  Number two is, we rely on outside actuaries and consultants.  I need to bring in some expertise in house that I can really get aligned with on the overall service model and how it works within TriNet.  So that includes a senior executive reporting to me, additional actuarial and analytical capabilities.

8

45.     Following the Company's disclosure of its second quarter fiscal 2015 financial

9

results, the Company's stock price declined a whopping 38%, from a close of $26.69 per share on

10

August 3, 2015 to a close of $16.33 per share on August 4, 2015, on high trading volume.

11

**LOSS CAUSATION/ECONOMIC LOSS**

12

46.     During the Class Period, as detailed herein, defendants made false and misleading

13

statements by misrepresenting the Company's business and prospects and engaged in a scheme to

14

deceive the market and a course of conduct that artificially inflated the price of TriNet common

15

stock and operated as a fraud or deceit on Class Period purchasers of TriNet common stock.  Later,

16

when these defendants' prior misrepresentations and fraudulent conduct became apparent to the

17

market, the price of TriNet common stock fell precipitously, as the prior artificial inflation came out

18

of the price over time.  As a result of their purchases of TriNet common stock during the Class

19

Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the

20

federal securities laws.

21

**CLASS ACTION ALLEGATIONS**

22

47.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

23

of Civil Procedure on behalf of all persons who purchased or otherwise acquired TriNet common

24

stock during the Class Period (the "Class").  Excluded from the Class are defendants and their family

25

members, directors and officers of TriNet and their families and affiliates.

26

48.     The members of the Class are so numerous that joinder of all members is

27

impracticable.  The disposition of their claims in a class action will provide substantial benefits to

28

1   the parties and the Court.  TriNet has more than 70 million shares of stock outstanding, owned by

2   hundreds or thousands of persons.

3       49.    There is a well-defined community of interest in the questions of law and fact

4   involved in this case.  Questions of law and fact common to the members of the Class that

5   predominate over questions that may affect individual Class members include:

6               (a)    Whether the 1934 Act was violated by defendants;

7               (b)    Whether defendants omitted and/or misrepresented material facts;

8               (c)    Whether defendants' statements omitted material facts necessary in order to

9   make the statements made, in light of the circumstances under which they were made, not

10  misleading;

11              (d)    Whether defendants knew or recklessly disregarded that their statements were

12  false and misleading;

13              (e)    Whether the price of TriNet common stock was artificially inflated; and

14              (f)    The extent of damage sustained by Class members and the appropriate

15  measure of damages.

16      50.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

17  sustained damages from defendants' wrongful conduct.

18      51.    Plaintiff will adequately protect the interests of the Class and has retained counsel

19  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

20  with those of the Class.

21      52.    A class action is superior to other available methods for the fair and efficient

22  adjudication of this controversy.

23                          **NO SAFE HARBOR**

24      53.    TriNet's verbal "Safe Harbor" warnings accompanying its oral forward-looking

25  statements ("FLS") issued during the Class Period were ineffective to shield those statements from

26  liability.

27      54.    The defendants are also liable for any false or misleading FLS pleaded because, at the

28  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

authorized and/or approved by an executive officer of TriNet who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

<b>APPLICABILITY OF PRESUMPTION OF RELIANCE:<br>FRAUD ON THE MARKET</b>

55.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased TriNet common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

56.     At all relevant times, the market for TriNet common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, TriNet filed periodic public reports with the SEC; and

(b)     TriNet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

57.    Plaintiff incorporates ¶¶1-56 by reference.

58.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TriNet common stock during the Class Period.

60.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TriNet common stock.  Plaintiff and the Class would not have purchased TriNet common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

61.    Plaintiff incorporates ¶¶1-60 by reference.

62.    The Individual Defendants acted as controlling persons of TriNet within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of TriNet stock, the Individual Defendants had the power and authority to cause TriNet to engage in the

1  wrongful conduct complained of herein.  TriNet controlled the Individual Defendants and all of its

2  employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff and the members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 7, 2015                    ROBBINS GELLER RUDMAN
                                                             & DOWD LLP
                                                      SHAWN A. WILLIAMS


                                                                 s/ Shawn A. Williams
                                                      SHAWN A. WILLIAMS

                                                      Post Montgomery Center
                                                      One Montgomery Street, Suite 1800
                                                      San Francisco, CA  94104
                                                      Telephone:  415/288-4545
                                                      415/288-4534 (fax)

                                                      HOLZER & HOLZER, LLC
                                                      COREY D. HOLZER
                                                      1200 Ashwood Parkway, Suite 410
                                                      Atlanta, GA  30338
                                                      Telephone:  770/392-0090
                                                      770/392-0029 (fax)

                                                      Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\CPT TriNet.docx