ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
KENNETH J. BLACK (291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
kennyb@rgrdlaw.com

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HOWARD WELGUS, Individually and on Behalf of All Others Similarly Situated, <br><br>                 Plaintiff, <br><br>     vs. <br><br> TRINET GROUP, INC., BURTON M. GOLDFIELD, WILLIAM PORTER, MARTIN BABINEC, H. RAYMOND BINGHAM, DAVID C. HODGSON and GENERAL ATLANTIC LLC, <br><br>                 Defendants. | Case No. 5:15-cv-03625-BLF <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

1099199_1

1.   Plaintiff Howard Welgus ("plaintiff"), individually and on behalf of all the other persons similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by TriNet Group, Inc. ("TriNet" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

2.   This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of TriNet between May 5, 2014 and August 3, 2015, inclusive (the "Class Period"), against TriNet and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"), including the Company's President and Chief Executive Officer ("CEO"), Burton M. Goldfield ("Goldfield"), and its Chief Financial Officer ("CFO"), William Porter ("Porter"), as well as the Company's controlling stockholder, General Atlantic LLC ("General Atlantic"), a private equity firm.  Plaintiff alleges that defendants violated the securities laws by disseminating materially false and misleading statements and concealing material adverse facts regarding TriNet's current financial condition and growth prospects.

## BACKGROUND AND OVERVIEW

3.   TriNet is a professional employer organization ("PEO") that offers outsourced human resources ("HR") to its client companies, including functions like payroll processing, employment law compliance, health insurance and workers' compensation insurance.  Complexities in administering HR have made outsourcing of these functions attractive to potential clients, particularly in TriNet's target small/medium business market.  TriNet claimed to offer large-company options, flexibility and management tools to these smaller companies in a bundled solution.  TriNet uses a co-employment model, in which employees of its client are considered co-employed (or worksite employees ("WSEs")) by TriNet.  As of 2Q15 TriNet had more than 300,000 WSEs.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

4.     Defendants portrayed TriNet as a growth story in an under-penetrated PEO market. That growth was driven by acquisitions.  In June 2009, the Company added 92,000 WSEs through the acquisition of Gevity HR Inc.  In April 2012, the Company added 14,000 WSEs in the hospitality and manufacturing industries through the acquisition of Accord.  In July 2013, it added 13,000 WSEs in the finance industry throughout the acquisition of Ambrose Employer Group, LLC.  And, in October 2012, it added 66,000 WSEs in the property management and food services industries through the acquisition of SOI Holdings, Inc.[1]  This growth-through-acquisition strategy drove a steady increase in TriNet's revenues as transactions like payroll were funneled through TriNet and counted as Company revenue.  It also came with substantial debt, as the Company had more than $800 million in outstanding debt as of December 31, 2013.

5.     TriNet's revenue falls into two segments:  Professional Services and Insurance Services.  For Professional Services, the Company acts as a pass-through and receives a flat or percentage-based fee – this includes functions like processing HR transactions or withholding state or federal income tax.  For Insurance Services, some function the same way, *i.e.*, TriNet collects insurance premiums from WSEs and passes those premiums on to the insurance company.  However, for a portion of TriNet's Insurance Services, the Company takes on a deductible layer of risk.  In these instances, when a WSE makes a health care or workers' compensation claim, the insurance company has the first layer of exposure.  If the claim exceeds the insurance company policy limit (as negotiated between TriNet and the insurance company) then TriNet is responsible for the excess.

6.     Taking on this deductible layer offered TriNet potential upside – *i.e.*, the "insurance spread" – which it attempted to capture by pooling WSEs from multiple small business into a single large insurance plan and by negotiating lower administration rates with insurance companies.  Capturing the insurance spread (or what the Company referred to as its "performance fee") is essential to TriNet's business model and allowed the Company to report higher margins – 33%-34%,

---

[1]    Following the acquisitions of Ambrose and SOI, TriNet continued to market those companies' products under the names "TriNet Ambrose" and "TriNet SOI."  However, in communications with analysts and investors, defendants often used the same shorthand (*i.e.* "Ambrose" and "SOI") to refer to either to the acquired company or its respective platform.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

1   versus 30% for the strictly pass-through model.  Other PEOs that had implemented the same risk-

2   based approach had failed, but defendants assured analysts and investors that TriNet's approach to

3   underwriting was "***radically different***."

4          7.       On March 27, 2014, TriNet conducted its initial public offering ("IPO"), selling 15

5   million shares to the public for $16 a share.[2]  The Registration Statement and Prospectus falsely

6   stated that that the Company was proficient in its risk management capabilities and that TriNet's

7   agreements limited the Company's aggregate exposure in any given policy year.  These statements

8   included:

9        &bull;   ***Risk management is a core competency of our company***.

10       &bull;   ***Our programs are fully insured*** by top-rated insurance carriers, ***which limits our***
11            ***ultimate exposure or potential losses.***

12       &bull;   Our agreements with our health insurance carriers with respect to these policies
        typically include limits to our exposure for individual claims, which we refer to as
13            pooling limits, ***and limits to our maximum aggregate exposure for claims in a given***
        ***policy year, which we refer to as stop losses*** . . . .
14

15       &bull;   ***Following our initial pricing of these policies, we analyze claims data for each***
        ***client on an ongoing basis*** . . . .
16

17  These statements which were repeated during the Class Period while defendants continued to

18  conceal the truth, were critical to analysts and investors because the industry was "littered with

19  companies that have blown up . . . because of poor risk management" and retreated to the less-

20  profitable pass-through model or simply ceased to exist.  Defendants assured the market that TriNet

    was different.

21         8.       At the start of the Class Period, May 5, 2014, the Company announced financial

22  results for its 1Q14, including year-over-year revenue growth, and issued annual financial guidance

23  for net service revenue of $504-$511 million.  The Company would increase financial guidance the

24  next two consecutive quarters: on August 4, 2014, it raised to $512-$516 million; on November 4,

25  2014, it raised again to $517-$519 million.  On each occasion defendants reiterated that they were on

26

27      [2]    The IPO was conducted pursuant to the prospectus supplement filed that day as an exhibit to the
        Company's Form S-1 Registration Statement dated November 20, 2013 (later amended on January 7,
28  February 13, and March 4, 2014) and signed by Goldfield, Porter, Bingham, Babinec and Hodgson.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                      - 3 -

1  track to meet their margin guidance of 33%-34%. Defendants' message to investors throughout the

2  Class Period was consistent: TriNet's business operations created growth, stability, predictability and

3  visibility through careful selection of clients and strong risk management. CEO Goldfield described

4  his position as "*the easiest job I have ever had*."

5        9.    Through a series of misrepresentations to investors and analysts, defendants

6  reinforced the theme throughout the Class Period that TriNet offered stability, predictability and

7  visibility, which assured analysts and investors that defendants had figured out the risk-based PEO

8  model:

9        •    [TriNet offers] A large, addressable market; *predictable revenue; visibility into the future; and a company that is growing and satisfying an important need in HR*.

10

11        •    *[W]e are able to predict pretty accurately* on an annual basis *exactly how we are going to do* . . . .

12        •    [W]e get *state-of-the-art analytics on all of our claims*. So every month we are able to get claims data so we can see how our clients are performing.

13

14        •    *We have good visibility from a medical insurance and even better from a Workers' Comp*.

15        10.    As part of its purported basis for claims of strong risk management, defendants

16  falsely boasted that TriNet had a new – and game-changing – advantage of access to detailed and

17  timely claims information from insurance carriers unavailable to those failed PEOs that came before

18  them:

19        •    The underwriting process is – and the lens we put on these companies – *is radically different*. . . . *The key to the risk portion of the business is the data*. . . . And having the right data . . . is a *true breakthrough that was not available* . . . *three or four years ago*.

20

21

22        11.    On September 11, 2014, the Company issued a press release announcing that it had

23  priced a secondary offering of 12 million shares of TriNet common stock at $25.50 per share. On

24  September 17, 2014, defendants General Atlantic, a private equity investor in TriNet and David C.

25  Hodgson, Managing Director of General Atlantic and a Director of TriNet, sold 13,800,000 shares

26  and cashed in for more than $336 million. General Atlantic was not the only insider that profited by

27  unloading TriNet shares during the Class Period, as detailed in the following chart. In just over eight

28  months, insiders sold more than $426 million worth of TriNet shares:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                         - 4 -

| INSIDER | DATE RANGE | AMOUNT | PROCEEDS ($) | % OF HOLDINGS |
|---|---|---|---|---|
| Babinec | 10/8/14 - 4/7/15 | 360,000 | 10,719,558 | 6.63% |
| Bingham | 10/1/14 - 7/7/15 | 136,000 | 4,243,274 | 24.58% |
| General Atlantic/Hodgson | 9/17/14 - 12/23/14 | 15,724,396 | 394,963,738 | 43.90% |
| Goldfield | 10/1/14 - 7/1/15 | 300,000 | 8,706,602 | 15.70% |
| Porter | 10/1/14 - 6/12/15 | 120,000 | 3,773,174 | 11.40% |
| TOTALS | | 16,780,396 | **426,783,985** | |

12.     On October 28, 2014, a competitor, Barrett Business Services Inc., ("Barrett") announced that a review by an outside actuary resulted in an $80 million increase to its workers' compensation reserves.   When questioned by analysts, defendants took another opportunity to explain – falsely – how their "fully insured" plans insulated them from any similar risk:

> [W]e have a ***very stable, fully insured*** workers' comp program that we've had for multiple years. . . . .  I think the example that you're referencing [*i.e.* Barrett] was a self-insured model that they're moving to try to get some kind of a fully insured.

13.     Based on defendants' false and misleading reassurances about the Company's stability, profitability and visibility, the Company's stock price increased to a Class Period high of $38.00.

14.     The truth about TriNet's business was revealed through a series of three consecutive quarters of highly adverse disclosures that:

(i)     TriNet's risk management processes were woefully inadequate and the Company did not have executive or actuarial staff sufficient to assess risk and claim trends;

(ii)     TriNet's business operations were neither stable nor predictable and defendants did not have visibility into the Company's current or future financial performance, as they had claimed;

(iii)     The Company's insurance programs were not all fully insured as investors were led to believe, subjecting the Company to risks similar to the workers' compensation risks experienced by Barrett – which materialized for TriNet as well; and

(iv)     The Company failed to conduct appropriate due diligence on workers' compensation insurance plans acquired from SOI and expected to drive revenues, and the resulting change to earnings caused millions in liability and missed financial projections.

1   As detailed herein, these among other true facts, were known to defendants or deliberately

2   disregarded throughout the Class Period and were ultimately admitted.

3        15.   On March 3, 2015, the Company stunned investors, announcing an "unexpected" $10

4   million spike in large medical claims – the very type of volatility that defendants claimed TriNet to

5   be immune from – causing the Company to miss its 4Q14 earnings per share ("EPS") forecasts

6   (which it had raised in November 2014) by a whopping 29%.  Contrary to their claims of "radically

7   different" underwriting and a "breakthrough" in data acquisition, TriNet admitted that the data from

8   insurance carriers was neither timely nor sufficiently detailed.  The Company received data only on

9   catastrophic claims – *i.e.*, claims greater than $300,000 – and even it was subject to "a lag before

10   they're reported to the carriers."  Thus, according to defendants, large claims "***develop[ed] during***

11   ***the second half of 2014 that we were not aware of until after the close of the year.***"  In addition,

12   contrary to their prior claims of stability and predictability, defendants conceded that the Company

13   lacked "***enough visibility***" into developing claims.

14        16.   These March 3, 2015 disclosures caused TriNet's stock price to decline from $37.88

15   to $33.93, but defendants assured analysts and investors that this was an aberrant, one-time event

16   and would have no impact going forward and no effect on the Company's FY15 financial outlook.

17        17.   On May 5, 2015, the Company announced its 1Q15 results and another unexpected

18   charge.  In a virtual repeat of Barrett, TriNet announced that it would be increasing workers'

19   compensation reserves by $10 million, negatively affecting the Company's financial outlook going

20   forward.  Their prior assurances that TriNet utilized a completely different approach from Barrett

21   was a sham.  Although defendants claimed risk management as a "core competency" and that it

22   analyzed claims on an "ongoing basis," the reserve increase was for its SOI blue and gray collar

23   policies that it had acquired more than two years prior.  The Company had failed to conduct a state-

24   by-state analysis of these insurance policies and would later admit that they had short-changed their

25   due diligence on this acquisition.

26        18.   The May 5, 2015 disclosure caused the stock price to decline from $34.43 to $28.76

27   per share, though it remained artificially inflated by defendants' false assurances that the two misses

28   were unrelated and that their forecast was solid: "***we have got the right analysis now.***"

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

1      19.     On May 18, 2015 at an investor conference, defendants admitted that instead of predictability or visibility into its insurance business, there was "*inherent volatility*" in their large medical claims and that the Company "*did not have enough visibility into those claims as they were developing*." Nevertheless, defendants continued falsely assuring investors that the problems TriNet experienced in 4Q14 and 1Q15 were unrelated and behind the Company.

20.     Finally, on August 3, 2015, the Company announced its 2Q15 financial results, posting yet another earnings charge – *this time a $20 million accrual for medical claims* – exposing defendants' claims of stability, predictability and visibility were simply false. The Company missed both its revenue and EPS estimates for 2Q15 by a wide margin and cut net revenue by $25 million, *which eliminated the entire healthcare performance fee* for FY15. The Company was forced to admit that it lacked the ability to forecast risk and was prone to the same volatility and lack of visibility that had taken down risk-based PEOs before them, and that they lacked any "predictability in the system." As opposed to risk management being a core competency, TriNet would have to hire "a senior insurance services executive . . . as well as additional actuarial and analytical capabilities." Following the Company's disclosure the stock price declined 38%, from $26.69 to $16.33.

21.     On August 4, 2015, William Blair issued a report downgrading the Company's stock noting that there were "*management credibility concerns*" and concluding that the issues the Company had experienced in 4Q14, 1Q15, and now 2Q15 were related and significant: "*We suspect there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business*. . . ."

22.     Class members suffered significant economic losses when the true condition of the Company was revealed, as illustrated by the following chart:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF



## JURISDICTION AND VENUE

23.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

24.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because TriNet is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

25.     Plaintiff Howard Welgus purchased or otherwise acquired TriNet common stock and was damaged by the conduct alleged herein.

26.     Defendant TriNet is incorporated in Delaware and trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TNET."  The Company's corporate headquarters are located at 1100 San Leandro Boulevard, Suite 400, San Leandro, California 94577.

27.     Defendant Goldfield is, and was at all relevant times during the Class Period, President, CEO and a director of the Company.

28.     Defendant Porter is, and was at all relevant times during the Class Period, Vice President and CFO of the Company.

29.     Defendant Martin Babinec ("Babinec") served as a director of TriNet and signed or authorized the signing of the false and misleading Registration Statement.  Babinec owned 7.9% of the Company's shares following the IPO (down from 10.2% before).

30.     Defendant H. Raymond Bingham ("Bingham") served as a director of TriNet and signed or authorized the signing of the false and misleading Registration Statement.  He is also an Advisory Director of General Atlantic, a private equity firm that was the Company's majority owner at the beginning of the Class Period. He formerly served as a Managing Director at General Atlantic from September 2006 to December 2010.

31.     Defendant David C. Hodgson ("Hodgson") served as a director of TriNet and signed or authorized the signing of the false and misleading Registration Statement.  He is also a Managing Director of General Atlantic.  Hodgson owned 56.2% of the Company's shares following the IPO (down from 72% before).

32.     Defendant General Atlantic, a Delaware limited liability company, is TriNet's largest stockholder which had the ability to exert control over TriNet.  General Atlantic owned 55.7% of TriNet's common stock after Company's March 2014 IPO (down from 71.4% before) and had two directors on its Board.  General Atlantic has been an investor in the Company since June 2005, when GA TriNet, LLC, an investment entity affiliated with General Atlantic, acquired approximately $59.3 million in shares of TriNet's Series G convertible preferred stock.  In June 2009, GA TriNet, LLC and HR Acquisitions, LLC, both affiliated with General Atlantic, acquired approximately $68.8 million in shares of TriNet's Series H convertible preferred stock.  General Atlantic more than recouped these investments during the Class Period, when the Company priced, but did not receive

1  the proceeds from, a secondary offering of 13.8 million shares on September 12, 2014.  General

2  Atlantic (and its affiliates) sold all 13.8 million shares on September 17, 2014, for more than $336

3  million.  Hodgson, a member of the Company's board of directors, is a Managing Director of

4  General Atlantic, an affiliate of GA TriNet, LLC and HR Acquisitions, LLC.  Bingham is a former

5  Managing Director of General Atlantic and remained an Advisory Director during the Class Period.

6  General Atlantic's control over TriNet was so substantial that it was properly conceded in the

7  Company's Form 10-K filed with the SEC for FY14, which stated that General Atlantic is "able to

8  determine substantially all matters requiring stock holder approval."

9      33.    Intentionally left blank.

10     34.    Intentionally left blank.

11     35.    Intentionally left blank.

12     36.    Intentionally left blank.

13     37.    The defendants named in ¶¶26-33 are referred to herein as the "Individual

14  Defendants."

15                          **CONTROL PERSONS**

16     38.    As officers and controlling persons of a publicly held company whose common stock

17  was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the

18  Individual Defendants each had a duty to promptly disseminate accurate and truthful information

19  with respect to the Company's financial condition, performance, growth, operations, financial

20  statements, business, markets, management, earnings and present and future business prospects, and

21  to correct any previously issued statements that had become materially misleading or untrue, so that

22  the market price of the Company's common stock would be based upon truthful and accurate

23  information.  The Individual Defendants' misrepresentations and omissions during the Class Period

24  violated these specific requirements and obligations.

25     39.    The Individual Defendants participated in the drafting, preparation and/or approval of

26  the various public, shareholder and investor reports and other communications complained of herein

27  and were aware of, or recklessly disregarded, the misstatements contained therein and omissions

28  therefrom, and were aware of their materially false and misleading nature.  Because of their Board

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                   - 10 -

membership and/or executive and managerial positions with TriNet, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about TriNet and its business or adopted by the Company materially false and misleading.

40.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

41.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TriNet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding TriNet's business, operations, management and the intrinsic value of TriNet common stock; and (ii) caused plaintiff and other members of the Class to purchase TriNet common stock at artificially inflated prices.

**FALSE AND MISLEADING STATEMENTS**
**ISSUED DURING THE CLASS PERIOD**

42.     <u>False and Misleading Statement</u>:  On May 5, 2014, the Company issued a press release announcing its 1Q14 financial results.  The press release reported year-over-year growth and strong financial performance in insurance revenues and net income.  The press release stated as follows:

**TriNet Announces First Quarter Fiscal 2014 Results**

\*          \*          \*

- Total revenues increased 45% to $508.9 million and Net Service Revenues increased 31% to $127.8 million.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF                                                                                          - 11 -

1                                    *          *          *

2      •      Net income for the first quarter was $1.5 million, or $0.03 per diluted share . . . .

3      •      Adjusted Net Income for the first quarter was $17.6 million, or $0.24 per diluted
              share on a pro forma basis . . . .

4
5      •      Adjusted EBITDA was $44.3 million, a 23% increase from $36.1 million for the first
              quarter last year.

6          43.    On May 5, 2014, Goldfield and Porter participated in an analyst conference call to

7    discuss the 1Q14 financial results.  During the call, defendants falsely claimed to have stable and

8    predictable revenues, current visibility into the Company's future financial performance, and that the

9    Company was also currently on track to meet projected earnings before interest, taxes, depreciation

10   and amortization ("EBITDA") margin forecasts and guidance for the remainder of 2014:

11          [Goldfield:] *[O]ur vertical channel strategy continues to strengthen our visibility*
            and impact on the chosen verticals.

12
            . . . . Our first quarter adjusted EBITDA margin was 34.7%, *which puts us*
13          *well on track to achieve our target margin level of 33% to 34% over the medium*
            *term*.

14
15                                   *          *          *

16          [Porter:]   Turning to our financial guidance for 2014, based on our Q1
            performance, we expect net service revenue in the range of $504 million to $511
            million for 2014, which represents organic growth of 15% to 17%, with adjusted
17          EBITDA in the range of $171 million to $174 million for the same period, in line
            with our target rate of 33% to 34% and adjusted net income in the range of $75
18          million to $77 million, or $1.03 to $1.06 per share.

19                                   *          *          *

20          44.    In addition, in response to analyst inquiries, defendants also assured investors that at

21   that time, the sales and revenue mix of products was stable and each segment was individually

22   performing well:

23          [Analyst:]  And could you make some comments on the relative growth rates of the
            three products?

24
            [Goldfield:] *I think the mix is pretty stable now that we've got all three products*
25          *and most of the operational integration complete.  So I would expect it to be fairly*
            *stable.*

26
27
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                              - 12 -

45.     On May 6, 2014, Jefferies issued a report titled "TriNet (TNET), Initiate At Hold: Well-Positioned In Attractive End Market; Full Valuation."  Echoing defendants' representations, Jefferies reported that "Stable, Recurring Revenues Provide High Visibility":

> In addition to the stable recurring revenue base from existing clients, the **revenue mix between professional services and insurance services also remains very predictable**.

46.     On May 6, 2014, William Blair issued a report titled "TriNet Group, Inc., Growing Market and Market Share Gains Should Drive Strong Growth," which substantially repeated defendants' statements that TriNet had solid visibility into future revenue due in part to high retention rates:

> **Solid visibility provided by highly recurring revenue**. . . .  Because of the high retention rates and the largely non-discretionary nature of its solutions, about 85%-90% of the company's revenue has historically been generated from existing clients, **so TriNet has solid visibility into forward-looking revenue, particularly after the peak selling season ends in January**.

47.     On May 6, 2014, Deutsche Bank issued a report titled "Making HR easier for SMBs is a good ROI; Buy," which repeated defendants' assurances that TriNet was different than some competitors in the PEO space and that it did not assume the business risks that their competitors do that write workers' compensation policies.  According to the Deutsche Bank report, TriNet mitigated those risks through the Company's robust risk management:

> TriNet does take worker's comp risk for their clients, but only about 15% of their co-employees are not working in an office environment.
>
> *              *              *
>
> **We are not overly concerned about the worker's comp issues, which have plagued the PEO industry, as 1) TriNet's exposure to more risky blue collar employees is relatively minor, 2) due to strong risk management policies** . . . .

48.     After the release of TriNet's 1Q14 results, TriNet's stock price traded at artificially inflated prices, increasing from a close of $21.87 per share on May 5, 2014 to a close of $22.87 per share on May 6, 2014, on high trading volume.

49.     <u>False and Misleading Statements</u>:   On May 19, 2014, Goldfield and Porter participated in the JPMorgan Global Technology, Media and Telecom Conference to discuss the Company's financial results and profitability prospects.  During the conference, defendants assured

1  investors that the Company would achieve growth in its client base without sacrificing profitability

2  (*i.e.*, avoiding writing contracts with lower premiums to gain market share) or stability (*i.e.*, because

3  the Company had strong risk management and good visibility into claims risk):

> [Goldfield:]  We are selling the three different solutions, which has helped us from a pricing standpoint.
>
> *       *       *
>
> [W]e have the growth and the profitability at the same time, and I will continue to do that.  ***I'm not going to sacrifice growth for profitability or vice versa.***
>
> *       *       *
>
> So as part of our bundled offering, we offer a bundled medical insurance as well as Workers' Comp.  ***We use fully insured plans.  We're using large group plans for our medical, so we are not buffeted by the same factors that buffet small business***. . . .
>
> We have over 200,000 people on our medical plan.  ***The 200,000 people give us a level of stability and visibility.  I have a department that is always looking at those insurance constructs to make sure that, ultimately, there's a stability around those plans***.

14      50.     In addition to misrepresentations regarding profitability and stability as a result of its

15  risk management proficiency, the Company was specifically asked by analysts about visibility into

16  the risks associated with the insurance side of the business to which defendants again understated the

17  risk and claimed visibility was good:

> [Analyst:]  How much visibility do you have on the insurance risk side?
>
> [Goldfield:]  We don't have . . . tremendous risk on the insurance side.  ***We have good visibility from a medical insurance and even better from a Workers' Comp***.

21      51.     On August 4, 2014, the Company issued a press release announcing its 2Q14

22  financial results.  The Company reported strong growth in each of its key business segments.  The

23  press release stated as follows:

**TriNet Announces Second Quarter Fiscal 2014 Results**

*       *       *

> •       Total revenues for the second quarter increased 44% to $525.0 million and Net Service Revenues increased 32% to $124.8 million . . . .

*       *       *

1      •     Net income for the second quarter was $6.2 million, or $0.09 per diluted share . . . .

2      •     Adjusted Net Income for the second quarter was $17.4 million, or $0.24 per diluted share on a pro forma basis . . . .

3

4      •     Adjusted EBITDA for the second quarter was $39.4 million, a 38% increase the same period last year.

5      52.   <u>False and Misleading Statements</u>:   On August 4, 2014, the Company held a

6 conference call with analysts and investors to discuss the 2Q14 results.  During the call, Goldfield

7 and Porter stated, among other things, that the Company was currently well on track to meet

8 forecasted EBITDA margins of 33%-34%, continued to boast of the Company's financial

9 performance to date and ability to grow profitably going forward and significantly raised FY14 net

10 revenue guidance from $504-$511 million to $512-$516 million and FY14 EPS guidance from

11 $1.03-$1.06 to $1.09-$1.11.  Defendants again assured investors that pricing was stable across

12 geographies and products, that the Company was experiencing strong trends in higher cost, high-risk

13 markets in California and New York and was not being pressured to compromise on price in order to

14 drive growth:

15      [Goldfield:] ***We saw healthy trends across multiple business segments and multiple geographies, with particular strength in California, New York, Massachusetts and Florida***.

16

17                      \*      \*      \*

18      [Porter:] ***We are well on track in pursuing our target margin level of 33% to 34%***.

19                        \*      \*      \*

20      Turning to our financial guidance for 2014.  Based on our performance for the first half of the year, we expect net service revenue in the range of $512 million

21 to $516 million for 2014, which represents organic growth of 17% to 18%, with adjusted EBITDA in the range of $174 million to $176 million, for the same period,

22 in line with our target range of 33% to 34%.  And adjusted net income in the range of $79 million to $81 million, or 1.09 to $1.11 per share.

23      53.   After the release of TriNet's 2Q14 results and the false and misleading statements,

24 TriNet's stock price traded at artificially inflated prices, increasing from a close of $24.72 per share

25 on August 4, 2014 to a close of $27.08 per share on August 5, 2014, on high trading volume.

26      54.   On August 12, 2014, Morgan Stanley issued a report titled "Takeaways from

27 management meetings," which largely parroted defendants' false and misleading statements and

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

1  explained that it understood "fully insured" meant plans for which TriNet was not liable for claims

2  or other variable costs, and that risk should "disappear" so long as the Company continued to grow

3  its WSE base:

4  > Mgmt also gave some risk-sharing figures – the deductible layer on benefits can
range from 60% of risk for larger carriers to ***nothing (fully insured)*** for smaller

5  > carriers.

6  55.     On September 11, 2014, the Company issued a press release announcing that it had

7  priced a secondary offering of 12 million shares of TriNet common stock at $25.50 per share:

8  **TriNet Prices Secondary Offering**

9  > TriNet Group, Inc. today announced the pricing of an underwritten registered
public offering of 12,000,000 shares of common stock at a price of $25.50 per share.

10  > In addition, the underwriters have been granted a 30-day option to purchase up to an
additional 1,800,000 shares of common stock from the selling stockholders.  All of

11  > the shares in the offering are being offered by entities affiliated with General Atlantic
LLC.  TriNet will not receive any proceeds from the sale of the shares.

12

13  56.     <u>False and Misleading Statements</u>: On September 12, 2014, defendants filed a

prospectus supplement as an exhibit to the Company's Form S-1 Registration Statement dated

14

15  August 22, 2014[3] and signed by Goldfield, Porter, Bingham, Babinec and Hodgson, which repeated

the false statements that the Company was in fact proficient in its risk management capabilities and

16

17  that TriNet's agreements limited the Company's aggregate exposure in any given policy year, a

representation that analysts and investors relied upon to differentiate TriNet from its competitors.

18

19  *See*, *e.g.* ¶¶66-67.  These statements included:

20  > ***Risk management is a core competency of our company. . . . Our programs
are fully insured*** by top-rated insurance carriers, ***which limits our ultimate exposure
or potential losses.  We assess all workers compensation and medical benefits***

21  > ***risks*** . . . .

22  > . . . Our agreements with our health insurance carriers with respect to these
policies typically include limits to our exposure for individual claims, which we refer

23  > to as pooling limits, ***and limits to our maximum aggregate exposure for claims in a
given policy year, which we refer to as stop losses.*** . . .  ***Following our initial***

24  > ***pricing of these policies***, ***we analyze claims data for each client on an ongoing
basis*** and seek to adjust our prices as appropriate.

25

26

27  [3]   The August 22, 2014 Form S-1 Registration Statement, as well as the amended Form S-1
Registration Statement filed on September 11, 2014, each contained the same false and misleading

28  statements appearing in the Prospectus Supplement, as reproduced below.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

1    57.    In the September 17, 2014 secondary offering, controlling shareholders General

2    Atlantic and Hodgson, and their affiliates, sold all 13,800,000 shares authorized for sale at a price of

3    $24.42, for more than $336 million.

4    58.    <u>Reasons Why Statements in ¶¶42-56 Were Knowingly False and Misleading</u>:  Each of

5    the above statements including those regarding: (i) TriNet's purported revenue growth without

6    sacrificing profitability; (ii) stability, predictability and visibility into its insurance risk; (iii) being

7    currently on track to meet margin forecasts and on overall financial performance prospects; and (iv)

8    that the Company used fully insured insurance plans and analyzed claims data for each client on an

9    ongoing basis which stabilized risk, were materially false and misleading, as defendants knew or

10   deliberately disregarded and failed to disclose the following facts:

11        (a)    Risk management was not among the Company's core competencies and it did

12   not have sufficient policies, procedures, and personnel in place to support defendants' claims of risk

13   management proficiency or that it was a "core competency" as stated in its offering materials and

14   reiterated by securities analysts.  ¶¶7, 47, 69.  Nor did defendants have a basis to claim the Company

15   had either stability or predictability with respect to the performance of the Company's insurance

16   businesses.  In fact, defendants knew but failed to disclose (and later admitted) that the Company did

17   not have adequate insurance executives or in-house actuarial staff to effectively analyze risk in

18   connection with the Company's historical or current claims experience and exposure.  ¶¶49, 93-94,

19   101-102, 107, 109-110.

20        (b)    The Company did not have visibility into current or future financial

21   performance because, in addition to the reasons set forth above in subsection (a), defendants knew

22   the Company had not done the necessary or required due diligence on key acquisitions to support

23   claims that its revenue and earnings were predictable and without significant risk (particularly the

24   2012 SOI acquisition of 66,000 workers' compensation plans).  After the Class Period, and after

25   investors had suffered hundreds of millions in losses due to the alleged misrepresentations,

26   defendants admitted that the Company had not performed its typical due diligence for such an

27   acquisition, such as not reviewing the book of acquired insurance plans at the claims level, and that

28   failure contributed to poor financial performance.  ¶¶85-88, 93, 97, 108.  Had they done so, or

1  disclosed that they had not done so, the Company and/or investors would have known that SOI's

2  reserve practices were "not industry best practice[s]," and the defendants' statements concerning risk

3  associated with its insurance business were false and could not be relied upon.  *See* ¶108.

4          (c)      The Company did not have the stability or current visibility into the business

5  performance of its insurance plans because contrary to defendants' statements that it analyzed claims

6  data for each of its clients, defendants knew but failed to disclose that the data, to the extent it was

7  received, was limited to "catastrophic" claims (*i.e.*, claims over $300,000).  The Company had not

8  even sought detailed information on all claims below that threshold.  *See* ¶80.  However, the limited

9  data that was provided was not timely and thus did not to support defendants' claims that their

10  analysis allowed them to accurately predict the Company's financial performance.  These facts are

11  admitted.  *See* ¶75, 77, 93, 102.  In addition, the data the Company received from insurance carriers

12  was subject to significant lag due to reporting from the service provider to the carrier and again from

13  the carrier to TriNet.   ¶¶75, 93.   In fact, as the Company's financial performance began to

14  consistently fall below promised expectations due to the purportedly unexpected increase in claims

15  impacting the financials, defendants admitted that TriNet simply did not have the visibility from the

16  carriers necessary to provide the predictability they had so boldly assured.  *See* ¶¶75, 77, 87, 93, 102,

17  108.  Thus, as opposed to the predictability and good visibility that the defendants bragged about,

18  they would later admit that in truth, there was "***inherent volatility***" in large medical claims.  ¶93.

19          (d)      Contrary to defendants' claims that all three product lines (*i.e.*, Ambrose,

20  Passport and SOI) were stable and very predictable, defendants knew or deliberately disregarded that

21  the Company was experiencing adverse claims trends in both medical and workers' compensation

22  that would negatively affect the Company's current and future business prospects – particularly

23  adverse trends in its SOI book of business, acquired in 2012.  Moreover, defendants knew that

24  because claims data it purportedly analyzed was limited and not timely, defendants had no basis to

25  state that all product lines were doing well.

26          (e)      In addition, defendants knew but failed to disclose that TriNet's insurance

27  plans were not fully insured and it did not have aggregate stop loss limits that would sufficiently cap

28  the Company's exposure to large spikes in claims, as they assured investors both before and during

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                                    - 18 -

1  the Class Period.  As defendants would later admit, only 40% of the Company's plans were fully

2  insured, while 60% were high deductible.  ¶¶80-81, 109-110.  Contrary to the Company's statements

3  that led the market to believe that it was the "fully insured," stable and immune from the volatility

4  that had negatively impacted competitors like Barrett, TriNet had exposure to similar risk.  *See* ¶¶84-

5  86.

6         (f)    Rather than pricing products such that premiums would better cover claims,

7  the Company was in fact prioritizing growth (increasing the number of clients and revenue without

8  raising premiums) at the expense of profitability, including the underpricing of premiums in higher

9  risk markets like New York and California.  As later admitted by Goldfield, defendants intended to

10  capitalize on what they viewed as a historic market opportunity.  ¶108.

11         (g)    Because of the known or deliberately disregarded facts set forth above, the

12  Company was not currently "on track" to meet margin forecasts of 33%-34% and its revenue and

13  earnings forecasts for FY14 lacked a reasonable basis.

14  <u>TriNet Competitor, Barrett Announces $80 Million Workers' Compensation Reserve Increase;</u>
<u>TriNet Assures It Does Not Face Similar Risk</u>

15

16       59.    After trading hours on October 28, 2014, Barrett, a workers' compensation PEO

17  company and TriNet competitor, announced its quarterly financial results.  As part of its announced

18  results, Barrett disclosed that Barrett had recorded an additional increase to its self-insured workers'

19  compensation reserve of $80 million, effectively erasing two to three years of profits.  While

20  Barrett's announcement surprised some investors, only one month prior, a business analyst at

21  Seeking Alpha had issued a report titled "Barrett Business Services (BBSI): A Tick-Tick-Ticking

22  Time Bomb," which correctly predicted that Barrett "has systematically under reserved, which has

23  resulted in materially overstated earnings and a high probability of a massive reserve charge."[4]  The

24  announcement sent Barrett's stock plummeting more than 58%, from a close of $43.03 on October

25  28, 2014, to a close of $17.69 on October 29, 2014 and generated speculation into whether TriNet's

26

27  [4]   *Barrett Business Services (BBSI): A Tick-Tick-Ticking Time Bomb*, Seeking Alpha (Sept. 16,
2014, 12:41 PM), http://seekingalpha.com/instablog/890075-copperfield-research/3269815-barrett-

28  business-services-bbsi-a-tick-tick-ticking-time-bomb.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

would suffer the same fate.  It was thus imperative for TriNet to distinguish itself from Barrett and convince investors that TriNet's business was materially different from Barrett.

60.     On November 4, 2014, the Company issued a press release announcing its 3Q14 financial results which beat consensus revenue and earnings expectations, and which included additional false and misleading statements.  The press release stated as follows:

**TriNet Announces Third Quarter Fiscal 2014 Results**

\*          \*          \*

- Total revenues for the third quarter increased 24% to $556.0 million and Net Service Revenues increased 22% to $127.8 million . . .

\*          \*          \*

- Net income for the third quarter was $0.7 million, or $0.01 per diluted share . . . .

- Adjusted Net Income for the third quarter was $20.2 million, or $0.28 per diluted share on a pro forma basis . . . .

- Adjusted EBITDA for the third quarter was $41.5 million, a 50% increase from the same period last year.

\*          \*          \*

Net Service Revenues consisted of professional service revenues of $86.9 million and Net Insurance Service Revenues of $40.9 million.  Net Insurance Service Revenues consisted of insurance service revenues of $469.1 million, less insurance costs of $428.2 million.

61.     <u>False and Misleading Statement</u>:  On November 4, 2014, the Company held a conference call for analysts and investors to discuss the Company's 3Q14 financial results and outlook.  During the call, which was hosted by Goldfield and Porter, defendants addressed demand for the Company's products and services, assured investors that the Company was currently and still on track to meet revenue and margin targets, that the potential for higher claims costs was already built into TriNet's forecasting process, *raised* FY14 net revenue guidance from $512-$516 million to $517-$519 million and *raised* FY14 EPS from $1.09-$1.11, to $1.10-$1.13:

[Porter:] *We are well on track in pursuing our target margin level of 33% to 34%*.

\*          \*          \*

For our financial guidance for Q4, we expect net service revenue in the range of $137 million to $139 million, which represents organic growth of 13% to 14%; adjusted EBITDA in the range of $51 million to $53 million for the same period; and

adjusted net income in the range of $25 million to $27 million, or $0.35 to $0.37 per share.

Based on our year-to-date performance and our Q4 guidance, we **expect net service revenue in the range of $517 million to $519 million for 2014, which represents organic growth of 18% to 19%**, with adjusted EBITDA in the range of $176 million to $178 million for the same period, in line with our target range of 33% to 34%, and adjusted net income in the range of $80 million to $82 million, or $1.10 to $1.13 per share.

62.    <u>False and Misleading Statements</u>:  During the call analysts questioned defendants on whether TriNet had similar risks as Barrett associated with its workers' compensation policies and defendants falsely assured investors that TriNet was fundamentally different because its programs were consistent and "fully insured":

[Analyst:]  Just – there is a competitor . . . that had a pretty significant Worker's Comp charge and issue this quarter.  Just wondering can you comment on – I guess – I'm sure a lot of people have been speculating on the risk of that to you, and I guess, to what extent is there risk, of any sort of similar issues?  Or what type of checks do you have that make it unlikely that you would see some sort of similar issue here?

[Porter:]  We do have a **very consistent fully-insured high deductible plan, which hasn't changed**, and **we carefully review that, and adjust the reserves every quarter**.

So we play [sic] close attention to it, we have multiple sets of eyes look at it, and we make adjustments as we see them, which is ongoing.  So net, I don't expect any significant increases to that in terms of reserves.

63.    On November 4, 2014, Jefferies issued a report discussing the Company's 3Q14 financial results and its increase to its fiscal 2014 revenue and EPS guidance:

**Impressive Execution In 3Q; Guidance Raised**

\*        \*        \*

Earlier, TNET posted solid F3Q results (with revs/EPS beat vs. Street) on the back of healthy demand environment, which also led to F14 revs/EPS guidance raise.

. . . Adjusted EBITDA margin for the quarter was 32.5%, +90bps vs. JEFe, which largely led to an adjusted EPS beat ($0.28 vs. JEFe/Street/guidance range at $0.27/$0.26/$0.25-$0.27). . . .

**F14 guidance raised**. On the back of solid F3Q print, and healthy demand environment, TNET raised its F14 net revs guidance range from $512-$516M to $517-$519M (vs. Street/JEFe at $516.7M/$518.3M). . . . **TNET also raised its F14 adjusted EPS guidance to $1.10-$1.13 (JEFe/Street at $1.11) from $1.09-$1.11 before**, but maintained its F14 adjusted EBITDA margin target range of 33-34%. In addition, TNET provided F4Q net revenues guidance range of $137-$139M (JEFe/Street at $137-$138.2M), adjusted EBITDA guidance range of $51-$53M and adjusted EPS guidance range of $0.35- $0.37 (JEFe/Street at $0.36/$0.35).

64.     After the November 4, 2014 release of the Company's financial results and the conference call, the Company's stock price continued to trade at artificially inflated prices of above $29.00 per share.

65.     <u>False and Misleading Statements</u>:  On November 12, 2014, Goldfield and Porter participated in the JPMorgan Ultimate Services Investor Conference.  During the conference, in response to analyst's inquiries, defendants stated that TriNet was not exposed to the same claims volatility as their self-insured competitors, specifically Barrett, which had recently increased reserves for under accrued claims (¶59), and assured investors that the Company maintained visibility into 85% of its future revenue – in part because business models were "fully insured":

> [Goldfield:]  The important thing to understand is . . . ***I have visibility to 85% of my revenue.  85% of my revenue is from the existing 10,000-plus companies.  I have to find 15% a year***.
>
> *          *          *
>
> [Audience Member:]   One of your publicly traded peers announced a pretty big increase in their working – workers' comp reserves the other week.  I know your models are different, but can you just help me understand how they're different and how you – what your reserve policies are, etc.?
>
> *          *          *
>
> [Porter:]  [W]e have a ***very stable, fully insured workers' comp program that we've had for multiple years. . . .  I think the example that you're referencing was a self-insured model that they're moving to try to get some kind of a fully insured.  So for us it's been a very stable program on all of our products.  It's something that we look at very carefully every quarter, and we adjust the reserves as necessary every quarter***.
>
> ***We have assistance, obviously, from our outside actuaries, from our inside team, and we also have an independent view from outside actuaries at our accounting firm.  So we look at it from multiple angles.  We adjust as we go.  We do not expect any significant reserve adjustments like you're referencing***.

66.     On November 12, 2014, William Blair issued a report on TriNet titled "TriNet Group, Inc., Analysis of Workers' Comp Trends Reinforces Confidence That Issues Seen at Competitors Will Not Be Replicated."  The report directly addressed concerns that TriNet, like Barrett, might not be adequately accruing for workers compensation costs and thus would need to increase reserves, thereby reducing profits.  The risk from not insuring for claims risk was a "hot button issue" and

1    therefore a plainly material issue for investors, in particular because Barrett had just seen two to

2    three years' profits "erased":

> **Summary**.  Over the last few months, we have received questions from investors about the implication for TriNet of a "short report" about Barrett Business Services (BBSI $23.10). . . .  [T]he report correctly alleged that Barrett had been under-accruing claims expenses related to its workers' compensation policies, and therefore would need to *recognize catch-up expenses at some point*.  This assumption was confirmed in the third quarter, as Barrett recorded an $80 million increase in its workers' compensation reserve, which essentially erased the profits earned by Barrett over the last two to three years.
>
> . . . *TriNet's third-quarter results showed no signs of similar issues and management expressed confidence on its conference call in its workers' compensation accruals*.

67.    Morgan Stanley, in a November 14, 2014 report titled "TriNet Group, Inc., Takeaways from mgmt meetings positive; TNET 'just getting started,'" explained that defendants had assured Morgan Stanley and others that the Company had internal actuaries that they employed to underwrite risk:

> •    **Increased emphasis on underwriting risk and reserve accounting:** Investors honed in on the processes and controls involved in TNET's underwriting process.  Although mgmt still expects some quarterly volatility in claims costs (+/- $3mn per quarter is typical), it notes that clients have quarterly open enrollment so premiums are adjusted relatively frequently, which is a key reason the annual variance is much more limited.  *For our clarity (and comfort), mgmt noted that TNET's reserves are audited by three different entities: by internal actuaries, by the independent auditor's actuaries, and by insurance carriers' actuaries*.

68.    <u>False and Misleading Statements</u>:  On December 17, 2014, Goldfield and Porter participated in the Bernstein Technology Innovation Summit to discuss the Company's financial results and future prospects.  During the call, defendants stated that TriNet was proficient at managing workers' compensation risk and forecasting deductible risk on medical claims.  Defendants also told analysts and investors that they simply do not take on "high-risk exposures":

> [Goldfield:] *We have a business model that calls for 15% top-line revenue growth, with 33% to 34% EBITDA margins each and every year for the next three years*.
>
> *       *       *
>
> [Analyst:] So why don't you first just describe what the nature is of the risk that you are taking on; and then, obviously, what TriNet does to mitigate that?
>
> *       *       *

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

[Porter:]   There's about 40% of our insurance revenues which are administrative fees that our clients pay us for providing them a top-tier technology platform to do open enrollment as well as first-line support.  There is no claims element at all to that.  So 40% is a service fee . . . .

\*       \*       \*

And the final set of our net insurance is 40% is for managing workers' comp.  There, we offer fully insured programs.  They are high deductible.  *It is a very predictable portion of the business, as long as you manage the type of businesses that you write, which really gets to the question of how we manage the components of both the benefits and the comp.  What we do is we look at every client that comes in the door, and we price it to risk.*

*. . . We don't take high-risk exposures.  And we look at the demographics and the benefits so we know exactly how that should be priced.*

*[W]e get state-of-the-art analytics on all of our claims.  So every month we are able to get claims data so we can see how our clients are performing.*

*. . . So we make sure that we are always pricing the premiums to the experience that our clients have.*

69.   <u>False and Misleading Statements</u>:  Defendants also falsely assured investors who were concerned about how TriNet's risk management processes provided confidence in the predictability their financial performance that the Company's combination of actuarial review and risk management capability allowed them to accurately predict *exactly* how the business would perform again repeating that the Company begins the year with 85% revenue in the bag and recurring revenue allows predictable profits of 33%-34%:

[Analyst:]  [B]eing successful, then, in the PEO business *is essentially having your risk management capability or your actuarial capability like a core competency, essentially, then, of TriNet*?

[Porter:]  *Absolutely. . . .  [W]e are able to predict pretty accurately on an annual basis exactly how we are going to do on each of those programs.*

\*       \*       \*

[Goldfield:]  *I start each and every year with 85% of my revenue in the bank. . . . This makes this the easiest job I have ever had.*  As opposed to starting with zero on January 1, *I start January 1 with 85% of my revenue. . . . And the recurring revenue model allows me to have predictable growth with strong profits of 33% to 34%.*

\*       \*       \*

*To me, it's a great outcome to be able to have predictable 15% organic growth, and to have 33%, 34% profits, and the cash flow to back that up.*

70.     In addition to assuring investors about the Company's proficiency over risk management, defendants took the opportunity to directly explain to investors why they should invest in TriNet shares:

[Analyst:]  If you are the investors out there now, like, why now with TriNet?

[Goldfield:]  A large, addressable market; *predictable revenue; visibility into the future*; and a company that is growing and satisfying an important need in HR.

71.     Finally, defendants assured investors during the December 17, 2014 Bernstein Technology Innovation Summit, that TriNet was fundamentally different from PEOs that came before them.  They explained that the Company took not just a different, but a "***radically different***," approach to underwriting risk, which was based upon data that constituted a "true breakthrough" that minimized variability and ensured stable returns:

[Goldfield:]  The underwriting process is – and the lens we put on these companies – *is radically different*.

\*          \*          \*

[Analyst:]  And before we just move off of the risk thing – this industry, I guess, is a bit ***littered with companies that have blown*** up one way or the other over the years ***because of poor risk management***.  Can you describe, like, ***how does the investor base get confident that TriNet is different?***  Or that it's different this time around?

[Goldfield:]  . . .***The key to the risk portion of the business is the data***. . . .

. . . And having the right data, which we get in a HIPAA-compliant way from the insurance companies, is ***a true breakthrough*** that was not available to the bundled solution providers at three or four years ago.  So I believe to be really comfortable, you need to really understand that, A, what the overall intention and the growth of the Company is; and, B, is that the data is available to react to as the landscape changes.

72.     <u>Reasons Why Statements in ¶¶61-71 Were Knowingly False and Misleading</u>:  Each of defendants' statements set forth above including statements that (i) the Company was not exposed to the same types of risk as Barrett; (ii) all of the Company's insurance products were fully insured[5]

---

[5]   Fully insured means not responsible for variable costs.  *See* Christina Merhar, *Fully-Insured vs. Self-Insured (Self-Funded) Health Plans*, zanebenefits.com (Feb. 25, 2014, 2:00 PM), http://www.zanebenefits.com/blog/fully-insured-vs-self-insured-self-funded-health-plans. *See also* Emily Dusablon, *8 Considerations When Selecting a Professional Employer Organization*, insperity.com (June 12, 2014), http://www.insperity.com/blog/8-considerations-when-selecting-a-professional-employer-organization/ ("Under a fully-insured group health plan . . . [t]he employer has no financial risk other than to pay the premium.").

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

1    making them consistent and stable; (iii) the Company had visibility into 85% of the its annual

2    revenue at the outset of the year; (iv) that the Company was on track to meet its EBITDA margins

3    target of 33%-34%; and (v) the Company was able to accurately predict how it would perform,

4    including achieving its increased financial guidance of $517-$519 million in net service revenues,

5    because of its risk management capabilities and access to state-of-the-art analytics on all claims.

6    Defendants knew or deliberately disregarded and failed to disclose the following:

7            (a)     Risk management was not among the Company's core competencies and it did

8    not have sufficient policies, procedures and personnel in place to support defendants' claims of risk

9    management proficiency or that it was a "core competency" as stated in its offering materials and

10   reiterated by securities analysts.  ¶¶7, 47, 56, 69.  Nor did defendants have a basis to claim the

11   Company had either stability or predictability with respect to the performance of the Company's

12   insurance businesses.  In fact, defendants knew but failed to disclose (and later admitted) that the

13   Company did not have adequate insurance executives or in-house actuarial staff to effectively

14   analyze risk in connection with the Company's historical or current claims experience and exposure.

15   ¶¶49, 93-94, 101-102, 107, 109-110.  Notwithstanding these facts, defendants told analysts and

16   investors that the Company had "a department" that looks at the performance of the insurance plans

17   very closely and provided defendants with assurance in the stability of the Company's business

18   operations.

19           (b)     The Company did not have visibility into current or future financial

20   performance because, in addition to the reasons set forth above in subsection (a), defendants knew

21   the Company had not done the necessary or required due diligence on key acquisitions to support

22   claims that its revenue and earnings were predictable and without significant risk (particularly the

23   2012 SOI acquisition of 66,000 workers' compensation plans).  After the Class Period, and after

24   investors had suffered hundreds of millions in losses due to the alleged misrepresentations,

25   defendants admitted that the Company had not performed its typical due diligence for such an

26   acquisition, such as not reviewing the book of acquired insurance plans, and that failure contributed

27   to poor financial performance.  ¶¶85-88, 93, 97, 108.  Had they done so, or disclosed that they had

28   not done so, the Company and/or investors would have known that SOI's reserve practices were "not

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                                                    - 26 -

1  industry best practice[s]," and the defendants' statements concerning risk associated with its

2  insurance business were false and could not be relied upon.  *See* ¶108.

3        (c)       The Company did not have the stability or current visibility into the business

4  performance of its insurance plans because contrary to defendants' statements that it analyzed claims

5  data from each of its clients, defendants knew but failed to disclose that the data, to the extent it was

6  received, was limited to "catastrophic" claims (*i.e.*, claims over $300,000).  The Company had not

7  even sought detailed information on all claims below that threshold.  *See* ¶80.  However, the limited

8  data that was provided was not timely and thus did not to support defendants' claims that their

9  analysis allowed them to accurately predict the Company's financial performance.  These facts are

10 admitted.  *See* ¶¶75, 77, 93, 102.  In addition, the data the Company received from insurance carriers

11 was subject to significant lag due to reporting from the service provider to the carrier and again from

12 the carrier to TriNet.   ¶¶75, 93.   In fact, as the Company's financial performance began to

13 consistently fall below promised expectations due to the purportedly unexpected increase in claims

14 impacting the financials, defendants admitted that TriNet simply did not have the visibility from the

15 carriers necessary to provide the predictability they had so boldly assured.  *See* ¶¶75, 77, 87, 93, 102,

16 108.  Thus, as opposed to the predictability and good visibility that the defendants bragged about,

17 they would later admit that in truth, there was "***inherent volatility***" in large medical claims.  ¶93.

18       (d)       In addition, defendants knew but failed to disclose that TriNet's insurance

19 plans were not fully insured and it did not have aggregate stop loss limits that would sufficiently cap

20 the Company's exposure to large spikes in claims, as they assured investors both before and during

21 the Class Period.  As defendants would later admit, only 40% of the Company's plans were fully

22 insured, while 60% were high deductible.  ¶¶80-81, 109-110.  Contrary to the Company's statements

23 that led the market to believe that it was the "fully insured," stable and immune from the volatility

24 that had negatively impacted competitors like Barrett, TriNet had exposure to similar risk.  *See* ¶¶84-

25 86.

26       (e)       Rather than pricing products such that premiums would better cover claims,

27 the Company was in fact prioritizing growth (increasing the number of clients and revenue without

28 raising premiums) at the expense of profitability, including the underpricing of premiums in higher

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                                  - 27 -

1   risk markets like New York and California.  As later admitted by Goldfield, defendants intended to

2   capitalize on what they viewed as a historic market opportunity.  ¶108.

3           (f)        Because of the known or deliberately disregarded facts set forth above, the

4   Company was not currently "on track" to meet margin forecasts of 33%-34% and its revenue and

5   earnings forecasts for 4Q14 and FY14 were without reasonable basis, as the Company's forecasting

6   process failed to properly incorporate relevant historical and current claims trends due to the

7   Company's failure to obtain timely data or analyze its risk exposure.

8   <u>Defendants Report 4Q14 Revenue Shortfall Caused by Spike in Health Claims; Falsely Assure</u>
    <u>Investors that Problems Are Non-Systemic, that Liability for Claims Remained Limited and</u>
9   <u>Reiterate False Risk Management Statements and FY15 Guidance</u>

10          73.     By February 27, 2015, when J.P. Morgan issued a report titled "TriNet 4Q14

11   Earnings Preview," a number of TriNet's competitors had already announced strong results for

12   1Q15, indicating favorable market conditions.  As J.P. Morgan reported, the market expected the

13   same from TriNet, writing that "[f]undamentally, ***TNET shouldn't disappoint***, as peers (ADP, NSP

14   and PAYX) reported stable to improving growth in PEO."  On this PEO industry strength, and the

15   belief that TriNet was unique within that industry and had robust risk management practices,

16   TriNet's stock hit a Class Period high of $38.00 on March 3, 2014, the day that TriNet issued (after

17   hours) 4Q14 and FY14 financial results.

18          74.     But when on March 3, 2015, the Company issued a press release announcing its 4Q14

19   financial results, the report revealed a 19% year-over-year decrease in net Insurance Service

20   revenues and that 4Q14 EPS forecasts missed by a whopping 29%.  Defendants attributed the miss to

21   a $10 million increase in large medical claims – the very type of volatility defendants assured

22   investors and analysts that their risk management and actuarial reviews protected them from.  *See*

23   ¶¶47, 49, 56.  The decrease in net Insurance Service revenues in turn caused a more than $10 million

24   miss in forecasted net service revenues; defendants nevertheless then assured 15% revenue growth

25   for FY15.  The press release stated as follows:

26        **TriNet Announces Fourth Quarter, Fiscal Year 2014 Results**

27                      *   *   *

28       Fourth quarter highlights include:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                             - 28 -

- Total revenues increased 25% to $603.7 million and Net Service Revenues increased 4% to $126.9 million from the same period last year.

*     *     *

- Net income was $7.0 million, or $0.10 per diluted share, compared to net income of $6.0 million, or $0.11 per diluted share, in the same period last year.

- Adjusted Net Income was $19.2 million, or $0.26 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.1 million, or $0.24 per diluted share on a pro forma basis, in the same period last year.

- Adjusted EBITDA was $40.1 million, an 8% decrease from the same period last year.

Full year highlights include:

- Total revenues increased 33% to $2.2 billion and Net Service Revenues increased 21% to $507.2 million from fiscal 2013.

- Net income was $15.5 million, or $0.22 per diluted share, compared to net income of $13.1 million, or $0.24 per diluted share, in fiscal 2013.

- Adjusted Net Income for fiscal 2014 was $74.4 million, or $1.03 per diluted share on a pro forma basis, compared to Adjusted Net Income of $57.5 million, or $0.81 per diluted share on a pro forma basis, in fiscal 2013.

- Adjusted EBITDA was $165.3 million, a 22% increase from the same period last year.

"Based on our strong momentum in the market and with January firmly in the books, *we remain confident in our business outlook and believe we can achieve Net Service Revenue growth in excess of 15% for 2015*."

. . . "*Q4 Net Insurance Service Revenues were below our estimate as a result of higher than expected large medical claims. We are working closely with our health insurance partners to identify these large claims earlier in the process to improve our ability to more accurately forecast our Net Insurance Services Revenues*."

75. <u>False and Misleading Statements</u>: On March 3, 2015, the Company held a conference call for analysts and investors to discuss the 4Q14 financial results. During the call, which was hosted by defendants Goldfield and Porter, defendants sought to shift the blame for the revenue miss on their insurance carriers, revealing for the first time that their data was subject to significant lag time. However, defendants told investors that they had carefully analyzed the Company's current claims experience, which had adversely affected TriNet's 4Q14 results, and assured analysts and investors that it was a one-time event that would not affect the Company's 2015 financial outlook and was not evidence of a systemic, business-wide problem:

[Goldfield:] *We have also looked carefully at our claims experience and remain confident in the quality of our forecast of net insurance service revenue in 2015*.

*        *        *

[Porter:] *Net insurance service revenue was adversely affected by an unexpected impact of large medical claims*.

The nature of these claims is that they develop over a number of months, and there is usually a lag before they're reported to the carriers by the providers. *We had a number of large claims develop during the second half of 2014 that we were not aware of until after the close of the year. The result was these claims were not included in our trend as we forecast our fourth-quarter medical claims*.

76.     After explaining what reportedly caused the shortfall in FY14, defendants specifically stated that the Company had already taken into account the frequency of large claims and there was no current risk of a reoccurrence, nor would FY15 be adversely affected:

[Porter:] *Our 2015 forecast takes into account a similar frequency of large claims as we experienced in 2014. The result is that our Q4 experience does not have an adverse impact on our 2015 outlook*.

*        *        *

Turning now to our 2015 full-year financial guidance, we expect net service revenue in the range of $590 million to $600 million, which represents growth of 16% to 18%; adjusted EBITDA in the range of $192 million to $202 million, in line with our target margin range of 33% to 34%; and adjusted net income in the range of $98 million to $104 million, or $1.32 to $1.40 per share. Based on our 2015 full-year guidance, we expect our first-quarter net service revenue in the range of $142 million to $147 million, which represents growth of 11% to 15%; adjusted EBITDA in the range of $44 million to $49 million; and adjusted net income in the range of $22 million to $25 million or $0.30 to $0.34 per share.

77.     In addition to reporting financial results and missed expectations, defendants admitted that TriNet did not have the visibility that they previously assured investors provided predictable financial outcomes. Moreover, while defendants had previously bragged of visibility into financial results, when asked how many large claims had been received that caused the EPS miss, defendants were mysteriously at a loss, stating that they could not determine how many large claims were received:[6]

[Goldfield:] *Clearly, we've some work to do in improving our ability to forecast our insurance revenue*.

---

[6]     Remarkably, later in the Class Period after the recurrence of a similar large claims being reported, defendants said they were able to and in fact sifting through each claim. ¶102.

1                                    *        *        *

2   [Porter:] *[W]e didn't have enough visibility into the claims that we're developing
    in the second half to be able to build them into our Q4 forecast.*

3                                    *        *        *

4
5   When we step back and look at what our experience was for these large claims, we
    don't expect it will impact our trend on a significant basis. . . .

6   *So our pricing, we expect to be fairly stable.  But we look at that every quarter.*

7                                    *        *        *

8           [Analyst:]  And were these large medical claims – were they isolated to any
    one of your three technology platforms?

9
10          [Porter:]  They're primarily Passport, as we've indicated in the past.  SOI –
    generally, only 25% of their work-site employees are covered with medical.  And
11  with Ambrose, it's a smaller population that's on a guaranteed cost arrangement.  So
    this is, really, the white-collar book.

12                                   *        *        *

13  [Analyst:]  And . . . how many claims would that have been?

14  [Porter:]  *It's really difficult to determine how many claims.*

15          78.    On March 4, 2015, J.P. Morgan issued a report titled "TriNet, 4Q Recap: Miss on

16  Medical Claims but 2015 Guidance Intact; Remain OW."  The report discussed the spike in medical

17  claims that caused the Company to miss its fourth quarter fiscal 2014 financial estimates but parroted

18  defendants' talking points and false and misleading statements:

19          *TriNet reported disappointing 4Q results, as an unusual spike in large
        medical claims drove a revenue/EPS miss of (9%)/(29%), masking strong
20      underlying unit growth of 25%. . . .*

21  •       **What happened?**  *4Q missed our estimate by $14M and fell below guidance
        primarily due to an unforeseen jump in large medical claims* . . . .

22
23          79.    Following the disclosures on March 3, 2015, TriNet's stock price declined from a

    close of $37.88 per share on March 3, 2015 to a close of $33.93 per share on March 4, 2015, on high
24
    trading volume.   The price remained inflated, however, by defendants' false and misleading
25
    statements and omissions which continued to conceal the full truth about the financial condition of
26
    the Company.
27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                              - 31 -

80.   <u>False and Misleading Statements</u>:   On March 5, 2015, Goldfield and Porter participated in the Morgan Stanley Technology, Media and Telecom Conference to discuss the Company's financial results and prospects.   During the call, analysts sought an explanation of how the Company reconciled the risks in its insurance business particularly in light losses recently reported.   Shockingly, defendants admitted that to the extent they previously requested claims data from carriers, that was only data for claims over $300,000.   Defendants also stated that they had not negotiated aggregate stop-loss limits, as previously claimed (¶¶7, 56), but instead sought lower pricing from the insurance carriers in exchange for taking on "modest" deductible risk.   Defendants nevertheless defended the Company's business model and claims forecasting procedures:

[Analyst:]  A few days ago, you reported a much larger loss, driven by some large one-time claims.  Can you talk us through how to get comfort with the risks that you are taking on the insurance line and your expectations for claims variability going forward?

*       *       *

[Porter:]  So what we're doing is we're separating it out in our forecast so we can actually track each component, large versus run rate.  And then separately, ***we're going to our carrier partners and historically, we've asked them for information on any what we call catastrophic claims.  That's historically been claims over $300,000 that could potentially be in their pipeline***.

***So what we've asked them to do now is to tell us for any claim that they expect to be greater than $50,000, give that to us on a monthly basis so that we can track these through their pipeline***.

*       *       *

[Analyst:]  Are there other ways to cap your losses to specific carriers or regions other than the per-claim limits?

[Porter:]  The most practical way to do it is what's called a pooling limit, which is a per-claim limit.  And again, on our larger carriers, it's up to $1 million.  On others, it's below that.

But it's really an economic decision.  We look at the pricing that we get from our carriers for these pooling limits and we can choose to bring those down.  But effectively what you do is you are just going to be paying that higher premium to the carriers.

And for the – ***I think the modest amount of deductible risk we take, I think it makes sense for us to have a limited or reasonable return on that***.  Just to quantify, in our insurance revenue, only about 20% historically has been in this deductible.  We call it performance fees.  So it's not a large amount, but it is a number.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                                          - 32

*We've also can [but did not] do aggregate stop-loss*, but again, when you look at that, the cost really isn't outweighing the benefit of doing it.

\*　　　\*　　　\*

[Porter:] *[W]e just did not have the visibility that we really should have to be able to track those large claims on a more granular and basically a monthly basis.*  So that's the real experience that we picked out of that.

81.  On March 6, 2015, Morgan Stanley issued a report titled "TriNet Group, Inc., Key Takeaways from TMT Conference," which explained that, contrary to the Company's prior assertions that agreements with carriers would limit the Company's maximum aggregate exposure, TriNet apparently had not negotiated stop-loss limits on the insurance claims it was liable to third party carriers for:

> In considering the level of claims risk it takes, TNET believes it is appropriately balancing risk and costs, and has no intention to broadly lower its deductible limit with carriers.  To further limit the likelihood of a large claims miss, TNET notes that *in theory it could establish an "aggregate stop loss" with carriers, but believes the cost is not worth the benefit*.

82.  <u>False and Misleading Statements</u>:  On March 30, 2015,  defendants filed with the SEC its Form 10-K for FY14, which repeated the same false and misleading claims about risk management and limits to exposure and potential losses:

> *Risk management is a core competency of our company*.  We leverage the insight that we have gained over our 25-year operating history as well as our *robust risk management capabilities* to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.  *Our programs are fully insured which limits our ultimate exposure or potential losses.  We assess all workers compensation and medical benefits risks on an individual client basis* . . . .

> . . . Our agreements with our health insurance carriers with respect to these policies typically include limits to our exposure for individual claims, which we refer to as pooling limits, *and limits to our maximum aggregate exposure for claims in a given policy year, which we refer to as stop losses*. . . . [W]e analyze claims data *for each client on an ongoing basis* and seek to adjust our prices as appropriate.

83.  <u>Reasons Why Statements in ¶¶75-82 Were Knowingly False and Misleading</u>: Each of defendants' statements above including the statements that: (i) defendants looked carefully at the Company's disappointing claims experience from 4Q14 and earlier; (ii) based on a review of the 4Q14 experience, defendants had determined that those or similar claims would not impact 1Q15 or FY15 results; (iii) the Company's financial forecast; and (iv) claims of risk management as a core

1   competency of the Company were each materially false and misleading as defendants knew, or

2   recklessly disregarded and failed to disclose, the following facts:

3         (a)    Risk management was not among the Company's core competencies and it did

4   not have sufficient policies, procedures, and personnel in place to support defendants' claims of risk

5   management proficiency or that it was a "core competency" as stated in its offering materials and

6   reiterated by securities analysts.  ¶¶7, 47, 56, 69.  Nor did defendants have a basis to claim the

7   Company had either stability or predictability with respect to the performance of the Company's

8   insurance businesses.  In fact, defendants knew but failed to disclose (and later admitted) that the

9   Company did not have adequate insurance executives or in-house actuarial staff to effectively

10   analyze risk in connection with the Company's historical or current claims experience and exposure.

11   ¶¶49, 93-94, 101-102, 107, 109-110.

12         (b)    The Company did not have visibility into current or future financial

13   performance because, in addition to the reasons set forth above in subsection (a), defendants knew

14   the Company had not done the necessary or required due diligence on key acquisitions to support

15   claims that its revenue and earnings were predictable and without significant risk (particularly the

16   2012 SOI acquisition of 66,000 workers' compensation plans).  After the Class Period, and after

17   investors had suffered hundreds of millions in losses due to the alleged misrepresentations,

18   defendants admitted that the Company had not performed its typical due diligence for such an

19   acquisition, such as not reviewing the book of acquired insurance plans, and that failure contributed

20   to poor financial performance.  ¶¶85-88, 93, 97, 108.  Had they done so, or disclosed that they had

21   not done so, the Company and/or investors would have known that SOI's reserve practices were "not

22   industry best practice[s]," and the defendants' statements concerning risk associated with its

23   insurance business were false and could not be relied upon.  *See* ¶108.

24         (c)    In addition, defendants knew but failed to disclose that TriNet's insurance

25   plans were not fully insured and it did not have aggregate stop loss limits that would sufficiently cap

26   the Company's exposure to large spikes in claims, as they assured investors both before and during

27   the Class Period.  As defendants would later admit, only 40% of the Company's plans were fully

28   insured, while 60% were high deductible.  ¶¶80-81, 109-110.  Contrary to the Company's statements

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

1    that led the market to believe that it was the "fully insured," stable, and immune from the volatility

2    that had negatively impacted competitors like Barrett, TriNet had exposure to similar risk. *See* ¶¶84-

3    86.

4    (d)    Because of the known or deliberately disregarded facts set forth above, the

5    Company's earnings forecasts and its reiteration of them, did not have a reasonable basis.

6    84.    On May 5, 2015, TriNet issued a press release announcing TriNet's 1Q15 financial

7    results.   The Company again reported disappointing earnings; though quarterly results were

8    generally in line with the Company's conservative guidance, defendants were forced to reduce FY15

9    guidance.   This time the Company reported that it would in fact have to accrue for an extra $10

10   million in workers compensation costs in 2015, which it had previously assured investors were

11   stable, fully insured and – unlike in Barrett's case – had been properly accounted for.  ¶¶62, 65.  The

12   press release stated as follows:

13   **TriNet Announces First Quarter Fiscal 2015 Results**

14                                    *        *        *

15   First quarter highlights include:

16   •      Total revenues increased 23% to $625.6 million and Net Service Revenues increased
              11% to $142.4 million . . .

17                                    *        *        *

18   •      Net income was $15.8 million, or $0.22 per diluted share, compared to net income of
19           $1.5 million, or $0.03 per diluted share . . .

20   •      Adjusted Net Income was $25.4 million, or $0.35 per diluted share on a pro forma
21           basis, compared to Adjusted Net Income of $17.6 million, or $0.24 per diluted
              share . . .

22                                    *        *        *

23           . . . TriNet's total revenues for the first quarter of 2015 increased 23% from
24   the first quarter of 2014 to $625.6 million, while Net Service Revenues increased
       11% from the first quarter of 2014 to $142.4 million.   Net Service Revenues
25   consisted of professional service revenues of $97.0 million and Net Insurance
       Service Revenues of $45.4 million.   Net Insurance Service Revenues consisted of
26   insurance service revenues of $528.6 million, less insurance costs of $483.2 million.
       Professional service revenues for the first quarter of 2015 increased 17%, and Net
27   Insurance Service Revenues were relatively flat, compared to the first quarter of
       2014.

28

85.    <u>False and Misleading Statements</u>:  On May 5, 2015, the Company held a conference call for analysts and investors.  During the conference call, defendants revealed that the workers' compensation costs and trends previously claimed to have been stable and predictable had in fact not been properly forecasted for a number of preceding years, negatively affecting the Company's financial results and, more importantly, would continue above forecasts ***through the third and fourth quarters of 2015***.  Accordingly, the Company was reducing its annual outlook by $10 million:

> [Porter]:  ***Net insurance service revenues were affected by higher than expected workers compensation costs in our blue- and gray-collar book for older years***.

*        *        *

> ***[W]e expect Q2 net service revenues in the range of $135 million to $140 million, which represents growth of 10%. . . .  Based on the impact of the higher worker's comp costs, we are reducing our annual outlook by $10 million.  And we now expect net services revenues in the range of $580 million to $590 million for 2015, which represent organic growth of 14% to 16%***.

86.    <u>False and Misleading Statements</u>:  During the question and answer session, Goldfield and Porter admitted that new facts were not the cause of the additional accrual in workers' compensation, but instead it was the result of recently commissioned actuarial review (which defendants previously indicated had been done regularly and that its workers' compensation book was among its most stable) of the SOI book of business – which was acquired in 2012.  That review revealed that the Company was under-accrued, affecting earnings for the next two quarters:

> [Porter:]  So to your question on workers comp, we have seen growth in our blue and gray book, particularly in higher cost states.  ***So one of the things that we instituted for Q1 was just a more detailed analysis as part of our actuarial review that we received in April.***
>
> ***The result of that was that we had an increase in our blue and gray book of approximately $4 million.  That was higher than our Q1 forecast***.
>
> ***Looking at that going forward, we would expect that that will spill over into Q2 and Q3 and Q4.  And so we have increased our claims forecast for worker's comp for the next three quarters by approximately $6 million to cover the higher cost of those claims***.

87.    Defendants further admitted that its forecasting process was ***not*** as robust as previously represented and its risk management processes and historical accrual methodologies did not provide stability and visibility defendants promised.  Instead, more analysis had been necessary:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                      - 36 -

1    [Goldfield:]  But I think that we need to continue to get better at the forecasting.

2                               *        *        *

3    *I'm expecting that we're going to do a better job of forecasting*. . . .

4         . . . *I think what it really means is a tighter look at the older years and making sure that we're ticked and tied as they come through the system*.

5

6    88.    Defendants conceded that they had not done a sufficient analysis of their blue and gray collar book (*i.e.*, SOI) including failing to perform a state-by-state analysis, but assured investors that it had the proper analysis in place going forward:

7

8        [Analyst:]  And then just one more thing on the workers comp.  You talked about older claims.  Does that imply that the issue that arose was in businesses that you would acquire that perhaps the accrual and the methods for the accrual were different than perhaps what you are using today?

9

10

11    Is that reading too much into it?

12        [Goldfield:]  No.  I think your intuition is correct.  It is the blue and gray collar book, which we have not had for obviously as many years as we have had the Passport book.

13

14    So the more experience we have, the more we see the reports, the better we understand what's happening.  *And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen.*  So it is something *I think we have got the right analysis now*, which we've tried to incorporate into our forecast for 2015.

15

16

17    89.    On May 5, 2015, William Blair issued a report titled "TriNet Group, Inc., *Company's Credibility Is Dented*, but Sticking With Story as a Result of Long-Term Growth Potential," that explained although some investors were skeptical of defendants' explanations and ability to manage risk, the fundamentals of the Company, combined with defendants' new efforts to mitigate risk, were still sufficiently strong to maintain the analyst's outperform rating:

18

19

20

21

22        Instead of higher-than-expected health care claims (which was the issue last quarter), management said that it is increasing its workers' compensation claim accruals by $10 million ($0.08 per share) in 2015, including about $4 million of extra accruals in the first quarter (partly to reflect an adjustment to prior-year periods).  These higher accruals were deemed appropriate after a more detailed state-by-state analysis showed higher-than-expected claims trends in certain areas (New York and California) of the company's blue-collar-focused SOI product.  *Given this issue, management lowered its annual revenue and EPS projections*.

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

90.     In fact, as described further by the William Blair report, TriNet's findings would require the same type of "*catch up charges*" for prior years that Barrett was required to make which defendants virtually assured investors that TriNet was immune to (¶¶62. 65):

> Management said that the company did a more detailed actuarial review in April for its workers' compensation *plans and slightly changed the accrual methodology, which led to some catch-up charges for prior years* which will be realized *throughout 2015*.

91.     On May 6, 2015, Deutsche Bank, issued a report titled "Workers' comp & slower WSE growth will pressure shares; remains Buy," that explained the poor 1Q15 results and questioned whether defendants needed to change their pricing, and lamented defendants' failure to disclose more information explaining what caused the revenue impairment:

> **Workers' comp an issue, but it doesn't derail the story completely**
>
> It is hard to measure how significant the $10m worker's comp reserve write up is as we do not know how many employee's it is based on or the total current reserve. *TriNet is partially blaming the SOI acquisition plus more detailed analysis of WSE growth, which is largely in higher worker's comp states like NYC and CA. Revenue per WSE for both service fees and net insurance fees has been trending down for the last two years*. We hope that this second issue on the insurance side pushes mgmt to raise pricing more aggressively.
>
> *        *        *
>
> **Key takeaways, new information from the results**
>
> **Insurance costs were higher than expected for second straight quarter**
>
> Insurance costs came in $4m higher than expected in 1Q after coming $10-14m higher in 4Q. . . . [W]orkers compensation costs were up due to a reserve write up and new analysis of growth coming from high cost states.

92.     After the May 5, 2015 disclosure of the truth of the Company's 1Q15 financial results, TriNet's stock price declined sharply, from a close of $34.43 per share on May 5, 2015 to a close of $28.76 per share on May 6, 2015, on high trading volume but remained artificially inflated by defendants' continued false and misleading statements.

93.     <u>False and misleading statements</u>: On May 18, 2015, defendants participated in the JPMorgan Global Technology, Media and Telecom Conference.  During the call, defendants admitted that the Company did not, in fact, have visibility and risk management capability into large claims which had "inherent volatility" and had not been collecting the sufficient data necessary to

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

1   support its confidently stated visibility into forecasted results despite prior reassurance to the

2   contrary. Defendants nevertheless continued to falsely assure investors that the problems TriNet

3   experienced in 1Q15 were unrelated to those in 4Q14, and had been resolved, (or did not require

4   resolution because there was no need to change TriNet's underwriting standards, which were fine,

5   and the problems originated only in acquired businesses):

> [Porter:] In Q1, we had $4 million of higher workers comp costs than we were forecasting. And the genesis of it, it came out of our blue and gray color book. We did see some increased development as we were closing out the fourth quarter, and it looked like it was coming from some of the ***higher cost states that we were doing business and expecting to grow***. ***So what we did is we took our actuarial, outside actuarial view down to do a state-by-state analysis***. . . .

> . . . [W]*e need to do a better job of getting headlights from our own perspective* on looking at how those claims are developing and building that into our outlook. . . . ***We are building some increased capability internally*** to do that.

*     *     *

> ***So separate in Q4 [i.e. from 1Q15], what we did see was that there is inherent volatility in large medical claims***. . . . So what we did is we took our forecast, we broke it down from just claims and premiums to run rate claims, large claims . . . .

> . . . There's ***inherent lags*** when you have large complex claims at a carrier, and what we saw was ***we did not have enough visibility into those claims as they were developing***. And it could take up to six months for a claim to be incurred before it's paid. So we went out to all of our carriers and asked them to provide us with large claims pipelines greater than $50,000. So ***now*** every month, they are giving us a report that tells us for claims that are not yet paid, that are above $50,000, how many of them are there and what's their estimated type of diagnostic there is. ***So we are getting that now*** from all of our large carriers.

19       94.    One analyst asked defendants directly about the Company's risk methodology

20   because he had seen prior instances where other companies used low pricing to induce growth

21   compromising good risk management:

> [Analyst:] So Burton, I guess maybe just around it out, big picture question around sort of your philosophy on risk. It sounds like a lot of this is more methodology, more sort of business process as opposed to, say, a pricing issue. Because I know we've seen in the past pricing being used as a tool to drive growth. It doesn't sound like it's the case here but maybe if you can just broadly talk about philosophy around risk, we can then move on to some of the funner stuff.

> [Goldfield:] So ***we need to accurately forecast our business***, both in terms of the risk side of the business and in terms of the service fee side of the business. So I believe that ***there's methodology aspects to this***, there's other aspects to it, but the bottom line is we need to do better in the future. So my feeling is ***we have the systems. We're evolving the processes. We are adding in-house actuarial support***. And ultimately this is not what drives the business and ***it is not a pricing issue***. And

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                          - 39

the workers comp issue had to do with a book that we acquired in the past.  In fact, the claims were all – *none of those claims were underwritten by us.  We've still got to forecast them*, but that's not part of our pricing methodology or ongoing business methodology.

95.     In light of defendants' statements and 1Q15 earnings coming in more or less in line (Net insurance revenue of $142.4 million on guidance of $142-$147 million), J.P. Morgan, in a May 18, 2015 report, providing takeaways from that analyst's conference, concluded that the prior 4Q14 miss was due in part to increasing FY14 guidance throughout 2014 without having visibility, but that defendants had already improved their forecasting:

- **Methodology tweaked for medical claims**.  F4Q saw a miss on higher-than-expected medical claims, partially due to increased guidance given lighter medical claims throughout the beginning of FY14.  Because of this, TNET broke out its medical claim forecasting methodology into large claims, run rate claims and pharmacy claims, *which has improved its forecasting (1Q in line)*.  The company also is working to get better data visibility from its medical insurance carriers, establishing a large claims (>$50k) pipeline that gives insight into upcoming costs.

96.     Following the May 18, 2015 JPMorgan Global Technology Conference, the Company's stock price continued to trade at artificially inflated levels above $25.00.

97.     <u>False and Misleading Statement</u>:  On June 10, 2015, Goldfield and Porter participated in the William Blair Annual Growth Stock Conference where they discussed the Company's financial results and prospects, and reassured investors that defendants had taken adequate steps and were already receiving sufficient information from carriers to manage TriNet's claims risk:

[Porter:]  So over the past three years 85% of our revenue comes from our installed base as we enter a year.  *So it's a fairly predictable revenue stream*.

*We have an experienced risk management team and we manage the insurance element of our business*.

\*       \*       \*

*We also do have some variability on this part of the business as I mentioned because there is a deductible element to it.  We see that particularly on the medical side in large medical claims*.  That is where there is some element of variability.

And also as we saw in Q1 we did have some variability because we had to realign our Workers' Comp. book from an acquisition that we did back in October 2012 for SOI and the blue and gray collar.  And that's because some of the severity of claims that we acquired in 2012 were running a bit higher than we had been forecasting and the actuaries had estimated.  So we trued that up in the first quarter and then estimated what that would be for the rest of 2015.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

1  ***When we look at our risk management the thing that we do I think fairly
2  well is our whole philosophy is to price to risk and to manage that and annually
   reprice it based on our clients' experience both on the medical side and on the
   Workers' Comp. side.  On the medical side we use state-of-the-art analytics***.  It's
3  through a service that's called Truven.

4      98.    On June 12, 2015, William Blair issued a report titled "TriNet Group, Inc., Highlights

5  From William Blair's 35th Annual Growth Stock Conference," which explained that "[t]he issues

6  over the last two quarters highlight the risk inherent in the business and put a dent in management's

7  credibility with the Street."  William Blair nevertheless maintained an outperform rating for the

8  Company, based in part on management's stated confidence from recent claim trends and additional

9  investments in "claims management/prediction capabilities."

10     99.    <u>Reasons Why Statements in ¶¶85-97 Were Knowingly False and Misleading</u>:

11 Defendants' statements above, including those concerning: (i) the purported forecasting

12 improvements the Company had made, reaffirming not only fiscal year guidance but the ability to

13 grow revenue at 15% and maintain 33%-34% EBITDA in the long run; (ii) claims that 1Q15

14 workers' compensation insurance problems were unrelated to the medical benefits insurance

15 problems of 4Q14; and (iii) statements that "we have an experienced risk management team and we

16 manage the insurance element of our business" with access to "state-of-the-art analytics" were each

17 materially false and misleading when made as defendants knew, or recklessly disregarded and failed

18 to disclose, the following facts (which are discussed in greater detail at ¶¶58, 72, 83):

19         (a)    The adverse medical claims experience reported in 4Q14 and the adverse

20 workers' compensation claims experience reported in 1Q15 both stemmed from the same

21 deficiencies in risk management and timely data acquisition, which defendants – despite their

22 statements to the contrary – still had not remedied.

23         (b)    The Company had been prioritizing growth at the expense of profitability and

24 stability, including pursuing growth opportunities in high-risk markets like California and New York

25 in an attempt to capitalize on what defendants claimed to be a historic market opportunity.

26         (c)    Defendants had neither the limited exposure nor the purported stability of

27 fully insured plans, as represented.  The Company did not have sufficient risk management policies,

28 procedures and personnel in place to manage risk effectively and failed to perform sufficient due

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                      - 41 -

1   diligence and risk assessment on prior acquisitions (in particular the SOI book of business acquired

2   in 2012).

3              (d)    The Company's forecasting process failed to properly incorporate relevant

4   historical and current claims trends due to the Company's failure to obtain timely data or analyze its

5   risk exposure and thus the Company's financial forecast lacked a reasonable basis.

6   <u>TriNet Announces Third Consecutive Revenue and Earnings Miss, Reveals Systemic and
Continuing Inability to Forecast, Stock Plummets</u>

7

8       100.    On August 3, 2015, the Company issued a press release announcing its 2Q15

9   financial results, which missed both revenue and EPS estimates by a wide margin due to another

10  increase in large medical claims, and demonstrated once and for all that Company did not have

11  stability, predictability or visibility but in fact had a systemic problem in their inability to manage

12  risk and forecast claim costs.  In particular, net Insurance Service revenues for the quarter were

13  down $20 million compared to forecast, or 43% year-over-year:

**TriNet Announces Second Quarter Fiscal 2015 Results**

&ast;        &ast;        &ast;

- Total revenues increased 22% to $640.0 million, while Net Service Revenues decreased 2% to $122.0 million . . . due primarily to unexpected large medical claims.

&ast;        &ast;        &ast;

- Net loss was $1.3 million, or $0.02 per diluted share, compared to net income of $6.2 million, or $0.09 per diluted share, in the same period last year.

- Adjusted Net Income was $10.5 million, or $0.14 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.4 million, or $0.24 per diluted share on a pro forma basis, in the same period last year.

- Adjusted EBITDA was $24.7 million, a 37% decrease from the same period last year.

&ast;        &ast;        &ast;

Mr. Goldfield added, "While our growth momentum remains robust, our results were ***impacted this quarter by a higher than expected number of large medical claims***. . . ."

. . . TriNet's total revenues for the second quarter of 2015 increased 22% from the second quarter of 2014 to $640.0 million, while Net Service Revenues decreased 2% from the second quarter of 2014 to $122.0 million.  Net Service Revenues consisted of professional service revenues of $97.8 million and Net

1    Insurance Service Revenues of $24.2 million.  Net Insurance Service Revenues
     consisted of insurance service revenues of $542.2 million, less insurance costs of
2    $518.0 million.  Professional service revenues for the second quarter of 2015
     increased 19%, and ***Net Insurance Service Revenues decreased 43%, compared to
3    the second quarter of 2014***.

4        101.    On August 3, 2015, the Company held a conference call with analysts and investors

5    to discuss the disappointing results, as well as the net revenue guidance cut of $25 million, which

6    eliminated for FY15 the entire healthcare performance fee (from which TriNet typically generates

7    20% of net insurance revenue).  The Company also conceded that it did not have appropriate internal

8    risk management staff or expertise to effectively manage the Company's risk profile as it would hire

9    actuaries and senior insurance executives to help.  These were not one-time costs, as the Company

10   admitted they expected higher claims rate going forward:

11       [Goldfield]:  I am disappointed that our second-quarter financial performance was
         negatively impacted by a higher than usual number of large medical claims.  ***These
12       claims were well in excess of our expected and historical claims volatility.***

13       . . .  [T]***he large claims have been driven by clients joining prior to 2013***.

14                                           *       *       *

15       ***I will strengthen my internal team.  This includes the recruitment of a senior
         insurance services executive reporting directly to me, as well as additional
16       actuarial and analytical capabilities***.

17                                           *       *       *

18       [Porter:]  ***Net insurance service revenues declined 43% to $24.2 million*** . . .
         ***Net insurance service revenues were affected by a significantly higher number of
19       large medical claims than we had anticipated***.

20       . . .  The result in Q2 was an approximate $20 million reduction in our net
         insurance service revenues compared to our forecast.
21
         ***Our revised 2015 forecast assumes the higher claims level continues and is
22       included in our trend***. . . .   The result is, in addition to the Q2 impact, we are
         reducing our net insurance service revenues by an additional $10 million for the
23       remainder of the year compared to our prior guidance.

24       102.    In addition, analysts challenged defendants' prior statements concerning improved

25   visibility into medical claims noting that guidance issued in 1Q15 whiffed on building these risks

26   into the forecast.  Defendants gave explanations starkly at odds with each other: they said their

27   "system is working," only to say "I need to get the predictability into the system" and that "any and

28   all [changes] are on the table"; they said that they were "getting the reports from the carriers in a

1   timely fashion " and that "[t]he reports are working," only to explain that "our carriers… need to

2   give us a visibility" and that "we need clean data from the carriers"; and they alternately blamed

3   "large claims" and "a lot of medium size claims":

4       [Analyst:]  [Y]ou mentioned that you had improved the visibility of the medical
        claims, but clearly the guidance you gave last quarter didn't contemplate these
5       medical claims coming in.  So could you just please clarify what aspect of the
        visibility you've now gotten more comfort with and what's left to do?

6

7           . . . [Goldfield:]  So the increase in medical expenses was largely driven by
        higher than expected and large claims.  So that our system is working, which is
        getting the reports from the carriers in a reasonable timely fashion.

8

9           . . . So, my issue was a bunching of large claims in  Q2.  They were not old
        claims that were flushed through the system. The reports are working.

10                          *        *        *

11          *[W]e need to find ways to a, get better visibility and b, to dampen the spike
        because it's not acceptable, the variability I saw in Q2.*

12
        [Analyst:]  Understood.  But at this point, would you consider reevaluating
13      reinsurance options, for example, that give you – *maybe where you give up some net
        revenue but dramatically improve the predictability of the revenue model going*
14      *forward*?

15          [Goldfield:]  *So, absolutely, any and all things are on the table. . . .  I'm
        going to strengthen the internal team with a senior insurance executive who is*
16      *right by my side.  I'm going to increase the in-house actuarial and analytical
        capabilities*. . . .  [U]p till now, reducing the pooling did not seem like a viable option
17      from a cost standpoint.  And frankly, our pooling levels vary, but they go up to about
        $1 million for some carriers.

18                          *        *        *

19      *I need to get the predictability in the system*.

20                          *        *        *

21
        We worked with our carriers directly with the Senior Executives . . . .  *They need to*
22      *give us a visibility*.

23          . . . [The claims] were mostly from Passport, many from California, a lot of
        people on high-end medical plans.

24
            . . . *And I'm still digging claim by claim to understand*. . . .  *It was a lot of*
25      *medium size claims*.

26                          *        *        *

27      The clients that drove these large claims in Q2 were here prior to 2013.  And again,
        they were out of the passport book of business, which has been around for 25 years
28      in the technology vertical and the majority were in California. . . .

To turn to your question, what do I do about this?  I need to directly address this medical claims volatility, number one.  And I need to address the visibility to those medical claims.  So number one is, *we need clean data from the carriers*. . . . Number two is, we rely on outside actuaries and consultants.  I need to bring in some expertise in-house that I can really get aligned with on the overall service model and how it works within TriNet.  *So that includes a senior executive reporting to me additional actuarial and analytical capabilities*.

103.   On August 3, 2015, William Blair downgraded TriNet in a report that concluded that the issues the Company had experienced in 4Q14, 1Q15, and now 2Q15 were related and significant. The report titled, "TriNet Group, Inc., Strike Three on Insurance Claims; Market Probably Ascribing Minimal Value to Insurance Side of Business; Lowering Rating to Market Perform," explained that the "higher-than-expected number of large medical claims in the second quarter negatively impacted net insurance revenue growth by over 50 percentage points," and called into question the viability of the Company's business model and defendants' ability to properly manage risk:

*We suspect there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business* . . . .

. . . *We think that the third straight quarter with issues related to insurance claims costs will cause many investors to effectively put minimal or no value on the company's ability to generate profits from the risk-bearing portion of their insurance plans*.

\*      \*      \*

Similar to the healthcare claims issues in the fourth quarter, management said that most of the issues pertained to the midlevel Passport product.  We think the increase in claims costs was *particularly significant in the month of June and in the state of California*.  Management said that the increase in claims late in the quarter was much bigger than they have seen in their history, so they are assuming the increased claims in the second quarter drive a *permanent increase in the annual claims trends for the company (negatively impacted guidance for the second half of the year by about $10 million*, on top of the negative impact to the second quarter).  Given this assumption, the company is now projecting a medical loss ratio (MLR) of about 85% in 2015, up from its normal target of about 82%, *which essentially puts the healthcare insurance business on pace for a break-even net revenue year (i.e., revenue offsets the costs)*.

104.   William Blair also explained that, although management claimed that a carrier of theirs had experienced a similar spike in claims, TriNet's competitors had not experienced similar issues, reporting that TriNet's negative net revenue growth (down 2% year-over-year, 11% from 1Q15, 4% from 4Q14, and 19%-22% from the prior three quarters) "rate compares with 9% growth

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF                                                                                           - 45 -

1    at Insperity, 16% growth in ADP's PEO segment, and 13% growth at Barrett Business Services'

2    PEO segment."

3         105.    On August 4, 2015, J.P. Morgan issued a report explaining the analyst's surprise that

4    after reducing fiscal year and quarterly guidance during the last earnings call, defendants had

5    nevertheless failed to clear that low bar.  The report concluded that defendants' credibility had been

6    tarnished and that TriNet's stock price was likely to stay depressed as a result:

7              TriNet missed 2Q expectations by a wide margin due to higher than expected
               medical claims, ***the third claims-related miss in a row***, and ***very disappointing as we***
8              ***thought guidance was set conservatively***. TNET fell short of the low-end of its
               EBITDA target by $12M (or 33%) and net service revenue by the same dollar
9              amount or 10% primarily due to an unforeseen spike in frequency of large medical
               claims. On a brighter note, WSE/unit growth was up 17% (JPMe 14%) and sales rep
10             count reached 486 to exceed its 470 target. EBITDA guidance was cut 15% for the
               year at the mid-point, and ***we expect the stock to be down more than that given***
11             ***management credibility concerns***.

12        106.    Following the Company's disclosure of its 2Q15 financial results, the Company's

13   stock price declined a whopping 38%, from a close of $26.69 per share on August 3, 2015 to a close

14   of $16.33 per share on August 4, 2015, on high trading volume of more than 12 million shares.

15                              **POST CLASS PERIOD ADMISSIONS**

16        107.    On August 14, 2015, William Blair issued a report titled "TriNet Group, Inc.,

17   Conclusions From Meetings With Management" that explained the Company's plans to improve its

18   risk management and forecasting, including hiring for the first time internal actuaries and dedicated

19   positions for health benefits and workers' compensation, were as yet unrealized:

20             As it noted on its second-quarter conference call, the company is hiring an internal
               insurance executive who will report directly to the CEO, ***which is not a position that***
21             ***it has previously had***.  TriNet previously had one person who was in charge of both
               workers' compensation and healthcare insurance (this person previously reported to
22             the CFO), but the company is dividing that responsibility among two people now,
               both of whom will report to the new head of insurance.  The company also is adding
23             internal actuaries (***which it did not have in the past***) for both sides of the insurance
               business.

24        108.    On September 16, 2015, Goldfield and Porter participated in the Deutsche Bank

25   Technology Conference to discuss the aftermath of the Company's disastrous 4Q14, 1Q15 and 2Q15

26   as well as the yet unfinished efforts to create internal risk management capabilities and gain visibility

27   into the Company's business.  During the call, defendants admitted that they did not have the

1    forecasting tools or data necessary to underwrite their health insurance business, and that the

2    Company had deliberately sacrificed profitability to market share growth by taking higher risk

3    accounts, especially in New York and California, without increasing reserves or raising prices, in

4    order to grow the business:

5        [Goldfield:]  So our inability to forecast Q2 is absolutely unacceptable, I
         agree with that . . . .

6                                *        *        *

7
8        [Porter:]  So if we're referring to the situation that we saw in the first quarter,
         what we did see with it, we had acquired a book in the blue and gray market, **and as
         part of our diligence, we didn't go down probably one layer more than we**

9        **traditionally have been.**  We always bring in new actuarial work in sizing potential
         variability around any comp book that we acquire.

10
11       **In this situation, what we've learned is we probably actually should've gone
         back to the TPA and tested at a claims level what type of reserves were being put
         on at the TPA.**

12                               *        *        *

13
14       It was the open claims.  This is, again, it's an acquired book.  So this was a
         book that we had acquired back in October 2012 and their practice was that **they did
         not reserve is what we would determine to be industry best practice**, and so even

15       though we did sensitivity around all the loss triangles, **what we should have done is
         gone one layer back and found out that the loss triangles probably were skewed**

16       **based on the reserving practices.**

17       Now those claims actually developed at a higher rate over time than what we
         had expected them to be, and that's why we made the adjustment in the first quarter

18       because what we did is we had our outside actuaries go back and do a state-level
         analysis because we can get a more accurate read on which claims were developing

19       at a higher rate, and it ended up being **those states that generally you would expect
         to have higher costs, which would be California and New York.  But those also are**

20       **the opportunity states where we see a lot of business.**

21                               *        *        *

22       [Goldfield:]  **I don't want to sacrifice the growth opportunity right now.  I
         think that's what this is about.**

23                               *        *        *

24
25       I want to do that without sacrificing the growth rate.  **So I would sacrifice a
         few hundred basis points of profitability to maintain control over the plans because
         I think pricing is one aspect.**

26                               *        *        *

27
28       **A lot of folks are saying, well, slow your growth and take care of these
         issues.  I believe that the market opportunity won't exist forever.**  I've never seen

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                    - 47 -

one like this and I want to see if I can prove out that this is as wide open as I believe it is.  So that is sort of the product.

109.    On November 2, 2015, Goldfield and Porter participated in a conference call with analysts and investors to discuss the Company's 3Q15 financial results.  Goldfield was clearly relieved that 3Q15 financial results had come in more or less in line with substantially reduced guidance.  During the call, defendants again admitted that TriNet did not have fully insured plans, had not yet enacted the changes necessary to improve their forecasting, did not have internal actuaries during the Class Period and were still bringing in new talent, did not have and had not had aggregate pooling limits and were unprepared to say whether they could correct the Company's business model so as to be profitable.  Defendants also ignored a direct question about whether Blue Shield and other carriers had experienced similar spikes in claims:

[Goldfield:]  *We are bringing in new talent.  I have met with excellent candidates as part of the search* for the Senior VP of Insurance Services.  Additionally, *our team is in the advanced stages of selecting from a number of strong candidates for our Chief Medical Actuary position*.

\*          \*          \*

*We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business*.

The second area is new insurance constructs.  Either on one end of the spectrum would be more fully insured plans, *today 40% of our plans are fully insured, 60% of our plans are high deductible plans.  And whether we should move more towards the fully insured side of the plans*.

The opposite end of that spectrum is reinsurance.  Which would be a combination of either reducing pooling limits, today the pooling limits are somewhere between $350,000 and $1 million by carrier.  Reducing those pooling limits and *or putting an aggregate pooling limit in place [i.e. stop loss protection]*, meaning a total limit on the entire claims activity in any one quarter to dampen that volatility.

\*          \*          \*

[Analyst:]  I know you have a process of reevaluating the strategy.  However, if you're breaking even on that business this year, and you're contemplating changes for next year, *is there any reason for us to think that even if you do pass through some of that lift, that effort or that initiative, would be at least margin breakeven* if not accretive if properly executed?

[Porter:]  *I think we'll wait to really give our outlook for Q4 once we've finished the work. . . .  And we'll have a lot more to talk about once we have the construct and the team further in place in Q4*.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:15-cv-03625-BLF

1                                    *       *       *

2      [Analyst:]  Based on your past experience, typically, does the step up in worker's
       comp expense in year one typically translate into another step up in worker's comp
3      expense [in] year two given how actuarial accruals are calculated based on past
       claims experience?

4
           [Porter:]  That something that as we work with our actuaries and **now that we**
5      **actually have our own actuary in house**, we will continue to look at.

6      110.    As of November 10, 2015 defendants were still describing the need to create an

7  internal risk management and forecasting team.  Speaking at the JPMorgan Ultimate Services

8  Investor Conference, defendants explained that only now was it time to bring that capacity in-house,

9  then explained that internal actuaries are critical even under a fully insured model (which they now

10 conceded they do not have on most plans), explaining that whatever the construct of the insurance

11 plans they were offering, defendants needed actuaries and other risk management experts to have

12 enough visibility to manage the Company's liability:

13     [Goldfield:]  [W]e're hiring in-house actuarial talent.  We rely on great external
       talent, but **it's time to bring those models in-house and have more visibility and**
14     **focus around them**.

15         As I previously reported, we have a Chief Actuary on the workers' comp side
       and we're closing on a Chief Actuary on the medical side.  And then, additionally,
16     looking at different processes and services around how we are forecasting the
       medical and addressing the issues around the volatility associated with it.  And then,
17     finally, we're completing a study with a large outside consulting firm.

18                                   *       *       *

19     [Analyst:]  [M]aybe it would be helpful if you can just go through the spectrum of
       potential changes that you might make to call it out or hedge out the risk around
20     claims volatility.  What could that look like and what would the impact be on the
       P&L?

21
           [Porter:]  So if we start at what guaranteed costs looks like and guaranteed
22     costs or **some people would call it fully insured**.  So that's effectively a pass through.
       So if we and we are going through and exploring that possibility with the carriers, in
23     that situation effectively there is no performance fee, it's complete pass through and
       that would have a P&L impact on EBITDA margin of around 30%, because
24     performance fees would go away.

25                                   *       *       *

26     [Goldfield:]  [O]n a fully-insured plan . . . you would still want to get a really great
       set of tools and actuaries to understand the performance of the book . . . you would
27     take the volatility out of it, but you would still want that data.

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                            - 49 -

**LOSS CAUSATION**

111.   Plaintiff incorporates ¶¶1-110 above and allege that during the Class Period defendants materially misrepresented TriNet's true financial condition by issuing false statements concerning the Company's true financial condition, including the current predictability and visibility of the Company's future financial prospects, the proficiency of its risk management processes and the stability of its business resulting from the above, and purportedly fully insured plans and the data available to the Company.   In truth, defendants knew and/or deliberately disregarded that the Company, as a result of known or deliberately disregarded shortcomings forecasting and obtaining data, was experiencing adverse trends in medical and workers' compensation that affected the Company's current and future business prospects.

112.   Defendants' false and misleading statements had their intended effect and caused TriNet stock to trade at artificially inflated prices throughout the Class Period and to reach a Class Period high of $38.00 per share on March 3, 2015.

113.   On March 3, 2015, the true state of the Company's operations was partially revealed when defendants announced (after market hours) 4Q14 earnings, in particular a 19% decline in net Insurance Service revenue due to medical costs.   *See* ¶¶74-77.   This disclosure and follow on disclosures caused TriNet's stock price to decline as some of the prior artificial inflation came out of TriNet's stock price and investors absorbed the significance of the new information and its relationship to the alleged misrepresentations.

114.   The March 3, 2015 disclosures consisted of new information which was directly related to and inconsistent with defendants' prior misrepresentations.   Indeed, the disclosures revealed that defendants had not effectively limited the Company's liability by offering fully insured plans or negotiating stop loss limits to the liability, but in fact had assumed significant liability susceptible to volatility.   ¶¶78, 80-81.   As a result, the Company's stock price declined from a close of $37.88 on March 3, 2015, to a close of $33.93 on March 3, 2015, on substantially increased volume.   *See* ¶79.

115.   However, defendants mitigated the decline by falsely reassuring investors and analysts that the disappointing financial results were due to a one-time spike in medical claims which

1 | would not recur and which was not indicative of systemic failings in the Company's ability to

2 | forecast.  *See* ¶¶75-76.

3 |      116.    Investment analysts indeed attributed the stock price decline on March 3, 2015, to this

4 | new information but also reported that the problems the Company experienced in the quarter were

5 | non-systemic and did not implicate defendants' ability to forecast.  J.P. Morgan, for example,

6 | maintained an overweight rating on TriNet and repeated defendants' claims that the 4Q14 revenue

7 | miss was caused by a one-time spike in medical claims that were non-systemic.  *See* ¶78.

8 |      117.    On May 5, 2015, the true state of the Company's operations was further, but still only

9 | partially, revealed when defendants announced (after market hours) 1Q15 earnings, in particular a

10 | meager increase of only 1% in net Insurance Service revenue due to workers' compensation costs,

11 | and a corresponding $10 million reduction in FY15 outlook due to the need to accrue for workers

12 | compensation claims which had not been predicted by risk management processes or trend analyses.

13 | ¶¶84-85.  This disclosure and follow on disclosures caused TriNet's stock price to decline as more of

14 | the prior artificial inflation came out of TriNet's stock price and investors absorbed the significance

15 | of the new information and its relationship to the alleged misrepresentations.

16 |      118.    The May 5, 2015 disclosures consisted of new information which was directly related

17 | to, and sharply inconsistent with, defendants' prior misrepresentations.  ¶¶86-89.  Indeed, the

18 | disclosures revealed that defendants' inability to manage risk and forecast claims might be systemic,

19 | and not limited to one-time spike in medical claims.  As a result, the Company's stock price declined

20 | from a close of $34.43 on May 5, 2015, to a close of $28.76 on May 6, 2015, on substantially

21 | increased volume.  *See* ¶92.

22 |      119.    However, defendants mitigated the decline by falsely reassuring investors and

23 | analysts that the impairment was due to one-time spike in workers' compensation claims from a

24 | previously acquired book, which was unrelated to the previous quarter's medical claims miss, and

25 | that defendants had already taken and were currently taking the steps necessary to improve their

26 | forecasting and pay any "catch-up" charges necessary.  *See* ¶¶90, 93.  They also restated the false

27 | claim that risk management was a core competency.  ¶97.

28 |

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

1    120.    Investment analysts indeed attributed the stock price decline on May 5, 2015, to this

2    new information but also accepted defendants' representations that the Company had improved its

3    forecasting processes and should be able to deliver more stable financial results in the future.  For

4    example, on May 5, 2015, William Blair issued a report titled "TriNet Group, Inc., Company's

5    Credibility Is Dented, but Sticking With Story as a Result of Long-Term Growth Potential."  The

6    report explained that the problems at TriNet existed throughout the business (*i.e.*, were systemic),

7    but concluded that they were fixable, and that the Company was making the catch-up charges

8    necessary to set the Company back on a profitable trajectory.  ¶¶89-90.

9    121.    On August 3, 2015, the true state of the Company's operations was more fully

10   revealed when defendants announced (after market hours) 2Q15 earnings, in particular a 43%

11   decline in net Insurance Service revenue due to medical costs.  ¶¶100-102.  This disclosure caused

12   TriNet's stock price to decline as the (remaining) prior artificial inflation came out of TriNet's stock

13   price and investors absorbed the significance of the new information and its relationship to the

14   alleged misrepresentations.

15   122.    The August 3, 2015 disclosures consisted of new information which was directly

16   related to and sharply inconsistent with defendants' prior misrepresentations.  Indeed, the disclosures

17   revealed that defendants' inability to manage risk and forecast claims was certainly systemic, was

18   more severe than previously stated, and that defendants had not improved or fixed their ability to

19   forecast and manage risk.  Defendants could no longer mitigate the damage by claiming that the

20   problems were unrelated, one-off events, or that they were fixable in the short to medium term.  As a

21   result, the Company's stock price declined from a close of $26.69 on August 3, 2015, to a close of

22   $16.33 on August 4, 2015, on substantially increased volume.  *See* ¶106.

23   123.    Investment analysts indeed attributed the stock price decline on August 3, 2015 to this

24   new information.  William Blair, for example, downgraded TriNet in a report titled "Strike Three on

25   Insurance Claims; Market Probably Ascribing Minimal Value to Insurance Side of Business;

26   Lowering Rating to Market Perform."

27

28

1    124.    Like other members of the class of purchasers of TriNet stock who purchased at

2 artificially inflated prices during the Class Period, plaintiff suffered an economic loss, *i.e.*, damages,

3 when TriNet's stock prices declined upon the disclosures correcting the alleged misrepresentations.

4    125.    The timing and magnitude of TriNet's stock price declines negates any inference that

5 the loss suffered by plaintiff and other class members was caused by changed market conditions,

6 macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent

7 conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the class, was

8 a direct result of defendants' fraudulent scheme and misrepresentations to artificially inflate TriNet's

9 stock price and the subsequent significant decline in the value of TriNet stock when the true state of

10 the Company's operations was revealed to the market correcting the misrepresentations.

11                                  **CLASS ACTION ALLEGATIONS**

12    126.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

13 of Civil Procedure on behalf of all persons who purchased or otherwise acquired TriNet common

14 stock during the Class Period (the "Class").  Excluded from the Class are defendants and their family

15 members, directors and officers of TriNet and their families and affiliates.

16    127.    The members of the Class are so numerous that joinder of all members is

17 impracticable.  The disposition of their claims in a class action will provide substantial benefits to

18 the parties and the Court.  TriNet has more than 70 million shares of stock outstanding, owned by

19 hundreds or thousands of persons.

20    128.    There is a well-defined community of interest in the questions of law and fact

21 involved in this case.  Questions of law and fact common to the members of the Class that

22 predominate over questions that may affect individual Class members include:

23             (a)    Whether the 1934 Act was violated by defendants;

24             (b)    Whether defendants omitted and/or misrepresented material facts;

25             (c)    Whether defendants' statements omitted material facts necessary in order to

26 make the statements made, in light of the circumstances under which they were made, not

27 misleading;

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                                      - 53 -

1          (d)     Whether defendants knew or recklessly disregarded that their statements were

2 false and misleading;

3          (e)     Whether the price of TriNet common stock was artificially inflated; and

4          (f)     The extent of damage sustained by Class members and the appropriate

5 measure of damages.

6          129.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

7 sustained damages from defendants' wrongful conduct.

8          130.    Plaintiff will adequately protect the interests of the Class and has retained counsel

9 who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

10 with those of the Class.

11          131.    A class action is superior to other available methods for the fair and efficient

12 adjudication of this controversy.

13 **NO SAFE HARBOR**

14          132.    TriNet's verbal "Safe Harbor" warnings accompanying its oral forward-looking

15 statements ("FLS") issued during the Class Period were ineffective to shield those statements from

16 liability.

17          133.    The defendants are also liable for any false or misleading FLS pleaded because, at the

18 time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

19 authorized and/or approved by an executive officer of TriNet who knew that the FLS was false.

20 None of the historic or present tense statements made by defendants were assumptions underlying or

21 relating to any plan, projection or statement of future economic performance, as they were not stated

22 to be such assumptions underlying or relating to any projection or statement of future economic

23 performance when made, nor were any of the projections or forecasts made by defendants expressly

24 related to or stated to be dependent on those historic or present tense statements when made.

25 **APPLICABILITY OF PRESUMPTION OF RELIANCE:**<br>**FRAUD ON THE MARKET**

26

27          134.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

28 market doctrine in that, among other things:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

1    (a)    Defendants made public misrepresentations or failed to disclose material facts

2 during the Class Period;

3    (b)    The omissions and misrepresentations were material;

4    (c)    The Company's stock traded in an efficient market;

5    (d)    The misrepresentations alleged would tend to induce a reasonable investor to

6 misjudge the value of the Company's stock; and

7    (e)    Plaintiff and other members of the Class purchased TriNet common stock

8 between the time defendants misrepresented or failed to disclose material facts and the time the true

9 facts were disclosed, without knowledge of the misrepresented or omitted facts.

10    135.    At all relevant times, the market for TriNet common stock was efficient for the

11 following reasons, among others:

12    (a)    As a regulated issuer, TriNet filed periodic public reports with the SEC; and

13    (b)    TriNet regularly communicated with public investors via established market

14 communication mechanisms, including through regular dissemination of press releases on the major

15 news wire services and through other wide-ranging public disclosures, such as communications with

16 the financial press, securities analysts and other similar reporting services.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

136.    Plaintiff incorporates ¶¶1-135 by reference.

137.    During the Class Period, defendants disseminated or approved the false statements

specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading.

138.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

1         (b)     Made untrue statements of material facts or omitted to state material facts

2  necessary in order to make the statements made, in light of the circumstances under which they were

3  made, not misleading; or

4         (c)     Engaged in acts, practices and a course of business that operated as a fraud or

5  deceit upon plaintiff and others similarly situated in connection with their purchases of TriNet

6  common stock during the Class Period.

7      139.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

8  the market, they paid artificially inflated prices for TriNet common stock.  Plaintiff and the Class

9  would not have purchased TriNet common stock at the prices they paid, or at all, if they had been

10  aware that the market prices had been artificially and falsely inflated by defendants' misleading

11  statements.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

12

13

14

15      140.    Plaintiff incorporates ¶¶1-139 by reference.

16      141.    The Individual Defendants acted as controlling persons of TriNet within the meaning

17  of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of TriNet

18  stock, the Individual Defendants had the power and authority to cause TriNet to engage in the

19  wrongful conduct complained of herein.  TriNet controlled the Individual Defendants and all of its

20  employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

21

22      WHEREFORE, plaintiff prays for judgment and relief as follows:

23      A.    Determining that this action is a proper class action, designating plaintiff as Lead

24  Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil

25  Procedure and plaintiff's counsel as Lead Counsel;

26      B.    Awarding plaintiff and the members of the Class damages and interest;

27      C.    Awarding plaintiff and the members of the Class their reasonable costs and expenses

28  incurred in this action, including counsel fees and expert fees; and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

1        D.        Such other and further relief as the Court may deem just and proper.

2    **JURY DEMAND**

3        Plaintiff hereby demands a trial by jury.

4    DATED: February 1, 2016                ROBBINS GELLER RUDMAN
5                                                &amp; DOWD LLP
                                SHAWN A. WILLIAMS
                                DANIEL J. PFEFFERBAUM
6                                    KENNETH J. BLACK

7

8                                          s/ Shawn A. Williams
9                                      SHAWN A. WILLIAMS

10                                 Post Montgomery Center
                              One Montgomery Street, Suite 1800
11                                 San Francisco, CA  94104
                              Telephone:  415/288-4545
12                                 415/288-4534 (fax)

13                                 Lead Counsel for Plaintiff

14                                 HOLZER & HOLZER, LLC
                              COREY D. HOLZER
15                                 1200 Ashwood Parkway, Suite 410
                              Atlanta, GA  30338
16                                 Telephone:  770/392-0090
                              770/392-0029 (fax)

17                                 Additional Counsel for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF                                                    - 57 -

1

<u>CERTIFICATE OF SERVICE</u>

2  I hereby certify that on February 1, 2016, I authorized the electronic filing of the foregoing

3 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4 the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5 caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7  I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on February 1, 2016.

9
          s/ Shawn A. Williams
          SHAWN A. WILLIAMS

10

11
          ROBBINS GELLER RUDMAN
            & DOWD LLP

12
          Post Montgomery Center
          One Montgomery Street, Suite 1800

13
          San Francisco, CA  94104
          Telephone:  415/288-4545

14
          415/288-4534 (fax)
          E-mail: shawnw@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:15-cv-03625-BLF

- 1 -

Case 5:15-cv-03625-BLF   Document 26   Filed 02/01/16   Page 60 of 60

# Mailing Information for a Case 5:15-cv-03625-BLF Welgus v. Trinet Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com

- **Richard L. Gallagher**
  richard.gallagher@ropesgray.com,kevin.daly@ropesgray.com,courtalert@ropesgray.com

- **Anne Johnson Palmer**
  anne.johnsonpalmer@ropesgray.com,courtalert@ropesgray.com

- **Brian O. O'Mara**
  bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Matthew Austen Tolve**
  matthew.tolve@ropesgray.com,courtalert@ropesgray.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,dpfefferbaum@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)