1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    DANIEL J. PFEFFERBAUM (248631)
3   NADIM G. HEGAZI (264841)
    KENNETH J. BLACK (291871)
4   Post Montgomery Center
    One Montgomery Street, Suite 1800
5   San Francisco, CA  94104
    Telephone:  415/288-4545
6   415/288-4534 (fax)
    shawnw@rgrdlaw.com
7   dpfefferbaum@rgrdlaw.com
    nhegazi@rgrdlaw.com
8   kennyb@rgrdlaw.com

9   Lead Counsel for Plaintiff

10  [Additional counsel appear on signature page.]

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14  HOWARD WELGUS, Individually and on      )   Case No. 5:15-cv-03625-BLF
    Behalf of All Others Similarly Situated, )
15                                           )   CLASS ACTION
                          Plaintiff,         )
16                                           )   ~~[PROPOSED]~~ FIRST AMENDED
            vs.                              )   COMPLAINT FOR VIOLATION OF THE
17                                           )   FEDERAL SECURITIES LAWS
    TRINET GROUP, INC., BURTON M.            )
18  GOLDFIELD, WILLIAM PORTER,               )   DEMAND FOR JURY TRIAL
    KATHERINE AUGUST-DEWILDE,                )
19  MARTIN BABINEC, H. RAYMOND               )
    BINGHAM, DAVID C. HODGSON,               )
20  KENNETH GOLDMAN, JOHN H. KISPERT, )
    WAYNE B. LOWELL, GENERAL                 )
21  ATLANTIC LLC, J.P. MORGAN                )
    SECURITIES LLC, MORGAN STANLEY &         )
22  CO., LLC, DEUTSCHE BANK SECURITIES )
    INC., JEFFERIES LLC, STIFEL, NICOLAUS )
23  & COMPANY, INCORPORATED, AND             )
    WILLIAM BLAIR & COMPANY, L.L.C,          )
24                                           )
                          Defendants.        )
25  _____ )

26

27

28

1129552_1

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ...................................................................1

BACKGROUND AND OVERVIEW ...........................................................2

    TriNet's True Financial Condition Begins to Be Disclosed in a Series of Partial
    Disclosures Resulting in Significant Stock Price Declines...................................7

    Defendants Admit that TriNet Did Not Have Risk Management Capability or
    Data to Adequately Assess Risk or Forecast Financials ...................................9

JURISDICTION AND VENUE ...............................................................16

PARTIES ....................................................................................16

CONTROL PERSONS .........................................................................19

FALSE AND MISLEADING STATEMENTS  ISSUED DURING THE CLASS
PERIOD ....................................................................................21

TRINET'S IPO REGISTRATION STATEMENT AND SECONDARY OFFERING
REGISTRATION STATEMENT WERE MATERIALLY MISSTATED IN
VIOLATION OF SEC DISCLOSURE RULES................................................71

    Defendants Failed to Disclose Critical Accounting Estimate...........................74

    Defendants Failed to Disclose Significant Trends........................................76

    Defendants Failed to Disclose Significant Uncertainties................................77

    Defendants Failed to  Disclose Critical Accounting Estimate ..........................77

LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS .................78

CLASS ACTION ALLEGATIONS ............................................................83

NO SAFE HARBOR ..........................................................................84

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ...........84

COUNT I ....................................................................................85

COUNT II ...................................................................................86

CLAIMS FOR VIOLATIONS OF SECTIONS 11, 12 AND 15 OF THE SECURITIES
ACT OF 1933 ...............................................................................87

    False and Misleading Statements and Omissions in the IPO Registration
    Statement...................................................................................88

    False and Misleading Statements and Omissions in the Secondary Offering
    Registration Statement ...................................................................89

1

2                                                                                      **Page**

3

4          Claims Volatility and Revenue Shortfalls Reveal Systemic Inability to Manage
           Risk ................................................................................................................92

5    COUNT III...............................................................................................................100

6    COUNT IV...............................................................................................................103

7    COUNT V................................................................................................................104

8    SAFE HARBOR IS INAPPLICABLE TO INITIAL PUBLIC OFFERINGS ...........................105

9    CLASS ACTION ALLEGATIONS ...............................................................................105

10   PRAYER FOR RELIEF ..............................................................................................106

11   JURY DEMAND .......................................................................................................107

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      1.      Lead Plaintiff Howard Welgus ("plaintiff"), individually and on behalf of all the other

2   persons similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon

3   personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all

4   other matters based on the investigation conducted by and through plaintiff's attorneys, which

5   included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings

6   by TriNet Group, Inc. ("TriNet" or the "Company"), as well as conference call transcripts and media

7   and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will

8   exist for the allegations set forth herein after a reasonable opportunity for discovery.

9                                   **SUMMARY OF THE ACTION**

10      2.      This is a securities class action on behalf of all persons who purchased or otherwise

11   acquired the common stock of TriNet between March 27, 2014 and February 29, 2016, inclusive (the

12   "Class Period"), against TriNet and certain of its officers and/or directors for violations of the

13   Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act"), including the Company's

14   President and Chief Executive Officer ("CEO"), Burton M. Goldfield ("Goldfield"), and its Chief

15   Financial Officer ("CFO"), William Porter ("Porter"), as well as the Company's controlling

16   stockholder, General Atlantic LLC ("General Atlantic"), a private equity firm.  Plaintiff also seeks

17   remedies against Goldfield, Porter, seven of the Company's directors and six of the Company's

18   underwriters under §§11, 12 and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act")

19   on behalf of persons who purchased or otherwise acquired shares of TriNet's common stock

20   pursuant or traceable to the Company's false and misleading Registration Statements and

21   Prospectuses issued pursuant to the Company's March 27, 2014, Initial Public Offering (the "IPO")

22   and September 11, 2014, Secondary Offering (the "Secondary Offering") (collectively, the

23   "Offerings").

24      3.      Plaintiff alleges that defendants violated the securities laws by disseminating

25   materially false and misleading statements and concealing material adverse facts regarding TriNet's

26   current financial condition and growth prospects.

27

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                                      - 1 -

**BACKGROUND AND OVERVIEW**

4.      TriNet, founded in 1988, is a professional employer organization ("PEO") that offers outsourced human resources ("HR") to its client companies, including functions like payroll processing, employment law compliance, health insurance and workers' compensation insurance. Defendants portrayed TriNet as a growth story in an under-penetrated PEO market.  According to the Company, complexities in administering HR have made outsourcing of these functions attractive to potential clients, particularly in TriNet's target small/medium business market.  TriNet claims to offer large-company options, flexibility and management tools to these smaller companies in a bundled solution.  TriNet uses a co-employment model, in which employees of its client are considered co-employed (or worksite employees ("WSEs")) by TriNet.  As of 2Q15 TriNet had more than 300,000 WSEs.

5.      TriNet generates revenue from the Company's platforms in two categories, Professional Services and Insurance Services:

(a)     Professional Services:  The Company's Professional Services segment generates revenue by charging fees for processing HR transactions, such as payroll and employment tax withholding (not including the payroll paid in by the client and paid out to WSEs or remitted as taxes), and by providing labor and benefit law compliance services.  More specifically, the Company acts as a pass-through and receives a flat or percentage-based fee on functions like processing HR transactions or withholding state or federal income tax.

(b)     Insurance Services:  The Company's Insurance Services segment generates revenue by providing risk-based, third-party plans to clients, primarily employee health benefit plans and workers' compensation insurance.  More specifically, TriNet collects insurance premiums from WSEs and passes those premiums on to the insurance company.  However, for a portion of TriNet's Insurance Services, the Company takes on a deductible layer of risk.  In these instances, when a WSE makes a health care or workers' compensation claim, the insurance company has the first layer of exposure.  If the claim exceeds the insurance company policy limit (as negotiated between TriNet and the insurance company) then TriNet is responsible for the excess.  Taking on this deductible layer offered TriNet potential upside – *i.e.*, the "insurance spread" – which it attempted to capture by

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                          - 2 -

pooling WSEs from multiple small business into a single large insurance plan and by negotiating lower administration rates with insurance companies.  During the Class Period, the Company explained this process as follows:

- [If] you have a zero deductible, you pay a higher price.  So we take a deductible layer; the way insurance is priced in the industry, for every $1 of premium, $0.85 goes to claims; $0.15 effectively goes to the carriers for their profit and admin.

- Because we drive great volume and are very sticky apart from the carriers, we are able to negotiate a lower admin fee.  So we are able to capture a bit of the spread of the admin fee.  And that allows us to have very competitive medical benefit plans.

6.  Prior to the Class Period, TriNet's growth was primarily driven by acquisitions.  For example, in June 2009, the Company added 92,000 WSEs through the acquisition of a company called Gevity HR, Inc.  In April 2012, the Company added 14,000 WSEs in the hospitality and manufacturing industries through the acquisition of AccordHR.  In July 2013, it added 13,000 WSEs in the finance industry through the acquisition of Ambrose Employer Group, LLC.  And finally, in October 2012, it added 66,000 WSEs in the property management and food services industries through the acquisition of SOI Holdings, Inc.[1]

7.  TriNet's growth-through-acquisition strategy drove a steady increase in TriNet's revenues as transactions like insurance-related billings and fees were funneled through TriNet and counted as Company revenue, even though such revenue was passed on to third-party insurance carriers.  It also came with substantial debt, as the Company had accumulated more than $800 million in outstanding debt as of December 31, 2013.  Therefore, capturing the insurance spread (or what the Company referred to as its "performance fee") was and is essential to TriNet's business model and allowed the Company to report higher margins – 33%-34%, versus 30% or less for the strictly pass-through model.

8.  On March 27, 2014, TriNet conducted its IPO, selling 15 million shares to the public for $16 a share.  The IPO was conducted pursuant to a Form S-1 Registration Statement initially

---

[1]    Following the acquisitions of Ambrose and SOI, TriNet continued to market those companies' products under the names "TriNet Ambrose" and "TriNet SOI."  However, in communications with analysts and investors, defendants often used the same shorthand (*i.e.* "Ambrose" and "SOI") to refer to either to the acquired company or its respective platform.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF                                                                                      - 3 -

filed November 21, 2013 (later amended on January 7, February 13, March 4, and March 14, 2014), and Prospectus filed with the SEC on March 27, 2014 (the "IPO Registration Statement"). The IPO Registration Statement was signed by Goldfield and Porter and Company directors H. Raymond Bingham ("Bingham"), Martin Babinec ("Babinec"), Kenneth Goldman ("Goldman"), David C. Hodgson ("Hodgson"), Wayne B. Lowell ("Lowell") and Katherine August-deWilde ("August-deWilde"). The IPO Registration Statement falsely stated that the Company was proficient in its risk management capabilities and that TriNet's agreements limited the Company's aggregate exposure in any given policy year. These statements included:

- ***Risk management is a core competency of our company***.

- ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

- Our agreements with our health insurance carriers with respect to these policies typically include limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year, which we refer to as stop losses*** . . . .

- Following our initial pricing of these policies, ***we analyze claims data for each client on an ongoing basis*** . . . .

9.   The Company based its purported risk management competency, in part, on the claim that TriNet had access to detailed and timely claims information from insurance carriers. According to defendants, TriNet's access to this data was "[t]he key to the risk portion of the business" and a "***true breakthrough that was not available*** . . . ***three or four years ago***." The Company assured investors that, although the PEO industry was "***littered with companies that have blown up*** one way or the other over the years ***because of poor risk management***," TriNet's underwriting process was "***radically different***."

10.   Based on its purported risk management proficiency and breakthrough in data, defendants repeatedly asserted throughout the Class Period that TriNet offered stability, predictability and visibility, which assured analysts and investors that defendants had figured out the risk-based PEO model:

- [TriNet offers] A large, addressable market; ***predictable revenue; visibility into the future***; and a company that is growing and satisfying an important need in HR.

- [W]e are able to predict pretty accurately on an annual basis *exactly* how we are going to do . . . .

- We don't take high-risk exposures . . . we know *exactly* how that should be priced.

- [W]e look at every client that comes in the door, and we price it to risk.

- [W]e get state-of-the-art analytics on all of our claims. So every month we are able to get claims data so we can see how our clients are performing.

- We have good visibility from a medical insurance and even better from a Workers' Comp.

11. Defendants reiterated these misrepresentations while repeatedly increasing financial guidance throughout 2014. For example, on May 5, 2014, the Company announced its 1Q14 financial results, including year-over-year revenue growth, and issued annual financial guidance for net service revenue of $504-$511 million. The Company would increase its FY14 financial guidance the next two consecutive quarters: on August 4, 2014, it raised FY14 financial guidance to $512-$516 million; on November 4, 2014, it raised its guidance again to $517-$519 million. On each occasion defendants reiterated that TriNet was currently on track to meet margin guidance of 33%-34%.

12. Based on defendants' false and misleading reassurances about the Company's stability, profitability and visibility, on March 3, 2015, the Company's stock price reached a Class Period high of $38.00.

13. Each of the statements set forth above and repeated throughout the Class Period, including those concerning the Company's quarterly and annually reported financial results, forecasting accuracy and exposure to liability for claims, and adequacy of the Company's internal controls (which defendants certified pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), and Rules 13a-15(e) and 15d-15(e) under the Exchange Act, were materially false and misleading as defendants knew or deliberately disregarded and failed to disclose the following:

(i) TriNet's risk management processes were woefully inadequate and the Company did not have executive or actuarial staff sufficient to assess risk and claim trends;

1    (ii)    TriNet's business operations were neither stable nor predictable and

2   defendants did not have visibility into the Company's current or future financial performance, as

3   they had claimed;

4    (iii)    The Company's insurance programs were not all fully insured as

5   investors were led to believe, subjecting the Company to risks similar to the workers' compensation

6   risks experienced by Barrett – which materialized for TriNet as well;

7    (iv)    The Company's insurance programs did not carry aggregate stop-loss

8   limits to liability, exposing the Company to significant risk from spikes in claims;

9    (v)    The Company failed to conduct appropriate due diligence on workers'

10   compensation insurance plans acquired from SOI and expected to drive revenues, and the resulting

11   change to earnings caused millions in liability and missed financial projections; and

12    (vi)    TriNet had widespread material weaknesses in its internal control over

13   financial reporting relating to ineffective information technology general controls and ineffective

14   controls in key business processes.

15    14.    On September 11, 2014, the Company issued a press release announcing that it had

16   priced a Secondary Offering of 12 million shares of TriNet common stock at $25.50 per share.  The

17   Registration Statement and Prospectus for the Secondary Offering ("Secondary Offering

18   Registration Statement") were signed by Goldfield, Porter, August-deWilde, Babinec, Bingham,

19   Goldman, Hodgson, John H. Kispert ("Kispert") and Lowell and contained the same untrue

20   statements of material facts made in the IPO Registration Statement.

21    15.    On September 17, 2014, through the Secondary Offering, defendants General Atlantic

22   and Hodgson, Managing Director of General Atlantic and a Director of TriNet, sold 13,800,000

23   shares and cashed in for more than $336 million at prices as high as $24.42.[2]

24    16.    On October 28, 2014, a competitor, Barrett Business Services, Inc. ("Barrett"),

25   announced that a review by an outside actuary resulted in an $80 million increase to its workers'

26

27   [2]    General Atlantic was not the only insider that profited by unloading TriNet shares during the
     Class Period, as detailed herein.  In just over eight months as a public company, insiders sold more

28   than $426 million worth of TriNet shares.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                                        - 6 -

compensation reserves.  When asked by analysts whether TriNet faced some of the same business risks that had impacted Barrett, defendants rejected any such notion – explaining falsely that TriNet's very stable, "fully insured" plans insulated them from any such risk.

TriNet's True Financial Condition Begins to Be Disclosed in a Series of Partial Disclosures Resulting in Significant Stock Price Declines

17.     On March 3, 2015, the Company stunned investors, announcing an "unexpected" $10 million spike in large medical claims – the very type of volatility that defendants claimed TriNet was immune from – causing the Company to miss its 4Q14 earnings per share ("EPS") forecasts (which it had raised in November 2014) by a whopping 29%.  Contrary to defendants' claims of "radically different" underwriting and a "breakthrough" in data acquisition, TriNet conceded that the data collected from insurance carriers was neither timely nor sufficiently detailed, but instead limited and late:

- Q4 Net Insurance Service Revenues were below our estimate as a result of higher than expected large medical claims.

- We had a number of large claims develop during the second half of 2014 that we were not aware of until after the close of the year.  The result was these claims were not included in our trend as we forecast our fourth-quarter medical claims.

- [W]e didn't have enough visibility into the claims that we're developing . . . .

18.     These March 3, 2015 disclosures caused TriNet's stock price to decline from $37.88 to $33.93, but defendants assured analysts and investors that this was an aberrant, one-time event and would have no impact going forward and no effect on the Company's FY15 financial outlook:

- We have also looked carefully at our claims experience and remain confident in the quality of our forecast of net insurance service revenue in 2015.

- ***Our 2015 forecast takes into account a similar frequency of large claims as we experienced in 2014.  The result is that our Q4 experience does not have an adverse impact on our 2015 outlook***.

19.     On May 5, 2015, the Company announced its 1Q15 financial results and another unexpected charge to earnings.  This time the Company revealed an increase to workers' compensation reserves by $10 million and a reduction to the Company's annual EPS projection due

to high workers' compensation claims for which it had failed to accrue.  The reserve increase was for older policies for which the Company had failed to conduct a state-by-state risk analysis:

- Net insurance service revenues were affected by higher than expected workers compensation costs in our blue- and gray-collar book for older years.

- Based on the impact of the higher worker's comp costs, we are reducing our annual outlook by $10 million.

- I think what it really means is a tighter look at the older years and making sure that we're ticked and tied as they come through the system.

- And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen.

20.     The May 5, 2015 disclosures caused the stock price to decline from $34.43 to $28.76, but TriNet continued to trade at artificially inflated levels and the Company again claimed that the fiscal year forecast remained solid and that defendants had resolved TriNet's problems: "[W]e have got the right analysis now."

21.     As late as June 10, 2015, defendants told investors that the Company had an experienced risk management team and that risk management (of both workers' compensation and medical plans) was something that the Company did fairly well:

- *We have an experienced risk management team and we manage the insurance element of our business.*

- *When we look at our risk management the thing that we do I think fairly well is . . . to  manage [risk] . . . based on our clients' experience both on the medical side and on the Workers' Comp. side.*

22.     On August 3, 2015, the Company announced its 2Q15 financial results, posting yet another earnings charge – this time a $20 million accrual for medical claims – exposing defendants' claims of stability, predictability and visibility as simply false.  As a result, the Company missed both its revenue and EPS estimates for 2Q15 by a wide margin and cut net revenue by $25 million, *which eliminated the entire healthcare performance fee* for FY15.  The Company was forced to admit that it lacked the ability to forecast risk and was prone to the same volatility and lack of visibility that had taken down previous risk-based PEOs:

- Net insurance service revenues declined 43% to $24.2 million . . . .

- Net insurance service revenues were affected by a significantly higher number of large medical claims than we had anticipated.

- Our revised 2015 forecast assumes the higher claims level continues and is included in our trend.

23.     On August 3, 2015, William Blair issued a report downgrading the Company's stock and concluding that the issues the Company had experienced in 4Q14, 1Q15, and now 2Q15 were related and significant:

"*We suspect that there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business* . . . ."

24.     On August 4, 2015, J.P. Morgan issued a report suggesting that management credibility had been called into question and expected the Company's stock price to trade lower as a result of the disclosure:

"*[T]he third claims-related miss in a row* [was] *very disappointing as we thought guidance was set conservatively* . . . we expect the stock to be down . . . *given management credibility concerns*."

25.     Following the Company's August 3, 2015 disclosure, the stock price declined 38%, from a close of $26.69 on August 3, 2015, to a close of $16.33 on August 4, 2015.

26.     On November 2, 2015, the Company announced its 3Q15 financial results, which more or less came in in-line with substantially reduced guidance and explained that the Company would "be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business."

Defendants Admit that TriNet Did Not Have Risk Management Capability or Data to Adequately Assess Risk or Forecast Financials

27.     Notwithstanding repeated assurances about the predictability and visibility of its recurring revenues and financial results and TriNet's acumen for assessing risk, the Company ultimately admitted (through a combination of disclosures) that none of these assertions were true. *See, e.g.*,:

- The result was these claims were not included in our trend as we forecast our fourth-quarter medical claims.

- [W]e didn't have enough visibility into the claims that we're developing . . . .

- We've also can [but did not] do aggregate stop-loss . . . .

- [W]e just did not have the visibility that we really should have to be able to track those large claims . . . .

- I'm expecting that we're going to do a better job of forecasting.

- And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen.

- I will strengthen my internal team.  This includes the recruitment of a senior insurance services executive reporting directly to me, as well as additional actuarial and analytical capabilities.

- I need to directly address this medical claims volatility, number one. . . .  So that includes a senior executive reporting to me additional actuarial and analytical capabilities.

- We are bringing in new talent.  I have met with excellent candidates as part of the search for the Senior VP of Insurance Services.  Additionally, our team is in the advanced stages of selecting from a number of strong candidates for our Chief Medical Actuary position.

- We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business.

- [W]e're [still] closing on a Chief Actuary on the medical side.

28.     On February 29, 2016, the Company announced its 4Q15 and FY15 financial results, and reported that it had hired some of the internal actuarial and other talent necessary to forecast and manage risk, but conceded that it was still an open question as to whether TriNet "can arrive at the right balance of risk mitigation and cost."  The Company also reported that it was unprepared to file its Form 10-K and had sought an extension from the SEC due to the identification of material weaknesses in its internal controls over financial reporting relating to "IT" controls and controls in "key business processes."

29.     Following the February 29, 2016 disclosures, the stock price declined 6%, from $13.09 to $12.28.

30.     On March 15, 2016, the Company announced that TriNet was still not able to file its Form 10-K for FY15, and could not say when it would be able to do so.

31.     On April 1, 2016, the Company filed its Form 10-K for the period ending December 31, 2015.  The Form 10-K had been delayed due to the identification of material weaknesses in internal controls over financial reporting and resulted in an SEC Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing ("Delisting Notice") that was filed on March 17, 2016.  The Form 10-K identified and discussed in detail the material weakness over financial reporting which further corroborate the allegations set forth herein, establishing the materially false and misleading nature of the alleged misstatements and stated as follows:

> **We have identified material weaknesses in our internal control over financial reporting that could, if not remediated, result in material misstatements in our financial statements.**
>
> In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2015, we have identified material weaknesses relating to our internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. As described in Item 9A. Controls and Procedures, we have concluded that our internal control over financial reporting was not effective as of December 31, 2015 due to material weaknesses.  Specifically, we identified material weaknesses relating to:
>
> (i)      ineffective information technology general controls, primarily with respect to computer operations, access controls and change management,
>
> (ii)     ineffective control environment and risk assessment,
>
> (iii)    ineffective management review controls and controls over system-generated reports,
>
> (iv)    ineffective controls over payroll operations,
>
> (v)     ineffective controls over health and workers compensation liabilities and related expenses,
>
> (vi)    ineffective controls over validating accuracy of payroll tax liabilities, and
>
> (vii)   ineffective authorization controls over procurement processes.

32.     In further discussing the control weaknesses, the Company explained that they could not be immediately corrected:

As further described in Part II, Item 9A "Controls and Procedures" below, we are taking specific steps to remediate the material weaknesses that we identified; however, *the material weaknesses will not be remediated until the necessary controls have been implemented and we have determined the controls to be operating effectively*.  Because the reliability of the internal control process requires repeatable execution, the successful remediation of these material weaknesses will require review and evidence of effectiveness prior to concluding that the controls are effective.  In addition, *we may need to take additional measures to address the material weaknesses or modify the remediation steps*, and we cannot be certain that the measures we have taken, and expect to take, to improve our internal controls will be sufficient to address the issues identified, to ensure that our internal controls are effective or to ensure that the identified material weaknesses will not result in a material misstatement of our annual or interim consolidated financial statements.

\*       \*       \*

**Ineffective information technology (IT) general controls**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our IT general controls (ITGCs) for certain of our key information systems, including our enterprise resource planning (ERP) systems and payroll systems, that are relevant to the preparation of our consolidated financial statements and system of internal control over financial reporting.  In addition, these deficiencies also impact the ability to rely on related interfaces, application controls and reports generated by the systems with ineffective ITGCs.  *The ineffective design and operation of our ITGCs impacts all of our significant financial statement accounts and disclosures*. The deficiencies related to the design and operating effectiveness of our ITGCs fell into the three main categories listed below:

- *Computer Operations*

Design and operating effectiveness of our system of controls related to the monitoring of batch processing and system interfaces to ensure the completeness and accuracy of data movement involving our ERP system and certain payroll systems that process revenue transactions were identified as having deficiencies.

- *Access Controls*

Design and operating effectiveness of our controls to ensure that access to applications and data were adequately restricted to appropriate personnel were identified as having deficiencies.  These deficiencies impact a number of our systems that process internal and revenue-generating payroll transactions, fixed assets, stock option and restricted stock unit information, procurement authorizations, insurance expenses, insurance reserves and payroll taxes.

- *Change Management*

Design and operating effectiveness of controls to monitor program change management procedures, including monitoring the activities of individuals who have authority and have been granted access to make changes to programs, were identified as having deficiencies.  These deficiencies impacted systems that process procurement authorizations and accumulate claims data that is utilized to estimate worker's compensation liabilities.

1

**Ineffective control environment and risk assessment**

2

Our management determined that a material weakness exists due *to a lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training commensurate with our structure, internal control, and financial reporting requirements*.   Additionally, we did not have an adequate process in place to complete our testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner.

3

4

5

**Ineffective management review controls and controls over system-generated reports**

6

7

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to ensure that key spreadsheets and system-generated reports were properly reviewed for completeness and accuracy.  For certain management review controls, controls verifying the accuracy of underlying data used to perform these reviews were not performed or adequately documented.  In addition, certain management review controls were not performed at a sufficiently precise level to identify errors that could aggregate to a material misstatement of the financial statements.  These deficiencies impact substantially all of our significant financial statement accounts.

8

9

10

11

12

**Ineffective controls over payroll operations**

13

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls over the accuracy of certain information that we manually input into the payroll systems and that is used in the processing of payroll for customers.  Manually input information includes contractual terms, bill rates, benefit elections and other wage data.  Controls identified to prevent or detect inappropriate changes to payroll information and resolve payroll processing errors were not effectively designed to detect material errors.  Additionally, management identified deficiencies related to the design and operating effectiveness of controls over the reconciliation of benefit enrollment data between the Company's payroll systems and the insurance carriers' records.  *The deficiencies impact amounts recorded as professional and insurance service revenues, operating expenses, accrued* corporate wages, and worksite employee related assets and liabilities.

14

15

16

17

18

19

20

**Ineffective controls over health and workers compensation liabilities and related expenses**

21

22

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the completeness and accuracy of data utilized in calculating health and workers compensation liabilities and related expenses, including premium expenses and administrative fees.  Data utilized includes enrollment counts, cost rates, wage data, claim counts and incurred and paid claim amounts.   Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were not operating effectively.  Additionally, controls over the review of health premium expenses did not operate at a level of precision that would detect material errors.  These deficiencies impact insurance costs, workers compensation receivables, workers compensation liabilities, and worksite employee related assets and liabilities.

23

24

25

26

27

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

1

**Ineffective controls over validating accuracy of payroll tax liabilities**

2

3

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the accuracy and completeness of tax rates input into our payroll systems, including reconciliation to the general ledger of the payroll taxes payable account at a sufficient level of detail.  In addition, due to the ineffective ITGCs over the system that calculates payroll tax withholdings, compensating controls identified are not sufficiently precise to prevent or detect errors in the amounts recorded as payroll tax liabilities for internal employees and WSEs.

4

5

6

**Ineffective authorization controls over procurement processes**

7

8

Our management determined that a material weakness exists related to the design and operating effectiveness of our controls over the initial set up and changes to designated approvers over corporate purchases, including purchasing card limits, expense reimbursements or approving new vendors added to the procurement system.

9

10

11

33.    Class members suffered significant economic losses when the true condition of the

12

Company was revealed, as illustrated by the following chart:

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                                          - 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1

**JURISDICTION AND VENUE**

2          34.      Jurisdiction is conferred by §22 of the Securities Act [15 U.S.C. §77v], §27 of the

3   Exchange Act [15 U.S.C. §77aa] and 28 U.S.C. §§1331 and 1337 .  The claims asserted herein arise

4   under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5

5   promulgated thereunder [17 C.F.R. §240.10b-5].

6          35.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because TriNet is

7   headquartered in this District and many of the acts and practices complained of herein occurred in

8   substantial part in this District.

9

**PARTIES**

10          36.      Lead Plaintiff Howard Welgus purchased or otherwise acquired TriNet common

11   stock as set forth in the attached certification and was damaged by the conduct alleged herein.

12          37.      Defendant TriNet is incorporated in Delaware and trades on the New York Stock

13   Exchange ("NYSE") under the ticker symbol "TNET."  The Company's corporate headquarters are

14   located at 1100 San Leandro Boulevard, Suite 400, San Leandro, California 94577.

15          38.      Defendant Goldfield is, and was at all relevant times during the Class Period,

16   President, CEO and a director of TriNet.  As CEO, Goldfield spoke on TriNet's behalf in press

17   releases, conference calls and SEC filings.  Goldfield signed the IPO Registration Statement and the

18   Secondary Offering Registration Statement.  Pursuant to §§302 and 906 of Sarbanes-Oxley and

19   Rules 13a-15(e) and 15d-15(e) under the Exchange Act, Goldfield signed and certified the

20   Company's Form 10-K filed with the SEC on March 30, 2015.  Goldfield also certified the

21   Company's Forms 10-Q during the Class Period.

22          39.      Defendant Porter is, and was at all relevant times during the Class Period, Vice

23   President and CFO of TriNet.  Porter signed the IPO Registration Statement and the Secondary

24   Offering Registration Statement.  As CFO, Porter spoke on TriNet's behalf in press releases,

25   conference calls and SEC filings.  Pursuant to §302 and §906 of Sarbanes-Oxley and Rules 13a-

26   15(e) and 15d-15(e) under the Exchange Act, Porter signed and certified the Company's Form 10-K

27   filed with the SEC on March 30, 2015.  Porter also certified the Company's Forms 10-Q during the

28   Class Period.

40.     Defendant Martin Babinec is a director of TriNet and signed the IPO Registration Statement and the Secondary Offering Registration Statement.  At the time of the IPO Babinec owned 10.2% of the Company's shares and following the IPO owned 7.9% of the Company's shares. Babinec founded the Company in 1988.

41.     Defendant H. Raymond Bingham is a director of TriNet and signed the IPO Registration Statement and the Secondary Offering Registration Statement.  Bingham is also an Advisory Director of General Atlantic, a private equity firm that was the Company's majority owner at the beginning of the Class Period.  He formerly served as a Managing Director at General Atlantic from September 2006 to December 2010.

42.     Defendant David C. Hodgson is a director of TriNet and signed the IPO Registration Statement and the Secondary Offering Registration Statement.  Hodgson is also a Managing Director of General Atlantic.  At the time of the IPO, General Atlantic and Hodgson owned 72% of the Company's shares.  Following the IPO, General Atlantic and Hodgson owned 56%.

43.     Defendant Katherine August-deWilde is a director of TriNet and signed the IPO Registration Statement and the Secondary Offering Registration Statement.

44.     Defendant Kenneth Goldman is a director of TriNet and signed the IPO Registration Statement and the Secondary Offering Registration Statement.

45.     Defendant John H. Kispert is a director of TriNet and signed the Secondary Offering Registration Statement.

46.     Defendant Wayne B. Lowell is a director of TriNet and signed the IPO Registration Statement and the Secondary Offering Registration Statement.

47.     Defendants referenced above in ¶¶38-39 are referred to herein as "Officer Defendants."

48.     Defendants referenced above in ¶¶40-46 are referred to herein as "Director Defendants."

49.     Defendant General Atlantic, a Delaware limited liability company, is TriNet's largest stockholder, and had the ability to exert control over TriNet.  General Atlantic had two directors on its Board.  General Atlantic has been an investor in the Company since June 2005, when GA TriNet,

1    LLC ("GA TriNet"), an investment entity affiliated with General Atlantic, acquired approximately

2    $59.3 million in shares of TriNet's Series G convertible preferred stock.  In June 2009, GA TriNet

3    and HR Acquisitions, LLC ("HR Acquisitions"), both affiliated with General Atlantic, acquired

4    approximately $68.8 million in shares of TriNet's Series H convertible preferred stock.  General

5    Atlantic owned 72% of TriNet's common stock at the time of the Company's IPO and 56%

6    thereafter.   On September 14, 2014 General Atlantic executed the Prospectus Supplement in

7    connection with the Secondary Offerings and sold all 13.8 million shares on September 17, 2014, for

8    more than $336 million.  Hodgson, a member of the Company's board of directors, is a Managing

9    Director of General Atlantic, an affiliate of GA TriNet and HR Acquisitions.  Bingham is a former

10   Managing Director of General Atlantic and remained an Advisory Director during the Class Period.

11   General Atlantic's control over TriNet was so substantial that it was properly conceded in the

12   Company's Form 10-K filed with the SEC for FY14, which stated that General Atlantic is "able to

13   determine substantially all matters requiring stock holder approval."

14        50.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is the United States

15   investment banking arm of financial giant J.P. Morgan Chase.  J.P. Morgan provides debt and equity

16   underwriting, mergers and acquisition, and corporate restructuring advisory, securities dealing and

17   brokerage, and trade execution services for large-market companies and institutional investors.  J.P.

18   Morgan participated and served as underwriters to the IPO and the Secondary Offering.

19        51.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a multinational

20   financial services corporation.  Morgan Stanley provides securities underwriting and distribution;

21   financial advisory services, including advice on mergers and acquisitions, restructurings, real estate

22   and project finance; and sales, trading, financing and market-making activities in equity securities

23   and related  products, and fixed income securities and related products including foreign exchange

24   and investment activities.  Morgan Stanley participated in and served as underwriters to the IPO and

25   the Secondary Offering.

26        52.    Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank.  Deutsche

27   Bank provides trade execution services for a broad range of domestic and international clients and

28   provides securities brokerage and investment advisory services to private clients and institutions.

1   Deutsche Bank also provides a variety of capital raising, market making and brokerage services for

2   its government, financial institution and corporate clients, including fixed income and equity sales

3   and trading, emerging markets activities, equity market research and investment banking. Deutsche

4   Bank participated and served as underwriters to the IPO and the Secondary Offering.

5   53.    Jefferies LLC ("Jefferies") is a global investment bank and institutional securities

6   firm headquartered in New York City, New York. Jefferies provides capital markets and financial

7   advisory services, institutional brokerage, securities research, and asset management. Jefferies

8   participated and served as underwriters to the IPO.

9   54.    Stifel, Nicolaus & Company, Incorporated ("Stifel") is a boutique investment banking

10  firm that offers financial advisory services. Stifel offers financial planning, merger and acquisition,

11  capital restructuring, retirement planning, equity sales, public financing, private placement,

12  underwriting and trust services. Stifel also provides listed option, annuities, insurance, and industrial

13  research services. Stifel was founded in 1890, is based in St. Louis, Missouri and operates as a

14  subsidiary of Stifel Financial Corp. Stifel participated and served as underwriters to the IPO and the

15  Secondary Offering.

16  55.    William Blair & Company, LLC ("William Blair") is a financial services firm that

17  offers investment banking, equity research, institutional and private brokerage and asset management

18  to individual, institutional and issuing clients. William Blair's services include portfolio

19  management, sales and trading, investment banking services, mutual funds, and venture capital

20  financing. William Blair participated and served as underwriters to the IPO and the Secondary

21  Offering.

22  56.    The defendants referenced above in ¶¶50-55 are referred to herein as "Underwriter

23  Defendants."

24                              **CONTROL PERSONS**

25  57.    As officers and controlling persons of a publicly held company whose common stock

26  was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the

27  Officer and Director Defendants each had a duty to promptly disseminate accurate and truthful

28  information with respect to the Company's financial condition, performance, growth, operations,

1  financial statements, business, markets, management, earnings and present and future business

2  prospects, and to correct any previously issued statements that had become materially misleading or

3  untrue, so that the market price of the Company's common stock would be based upon truthful and

4  accurate information.   The Officer and Director Defendants' misrepresentations and omissions

5  during the Class Period violated these specific requirements and obligations.

6       58.   General Atlantic, as a controlling stockholder and by virtue of its control over

7  directors Bingham and Hodgson, also exercised control over the Company and had a duty to

8  promptly disseminate accurate and truthful information and to correct any previously issued

9  statements that had become materially misleading or untrue.  As the Company disclosed in the IPO

10  Registration Statement:

11       Upon the closing of this offering, funds affiliated with General Atlantic will beneficially own approximately 55.7% of our outstanding common stock, and all of

12  our directors, officers and their affiliates will beneficially own, in the aggregate, approximately 70.5% of our outstanding common stock, in each case, assuming no

13  exercise of the underwriters' option to purchase additional shares.  As a result, *these stockholders will be able to determine substantially all matters requiring*

14  *stockholder approval*, including the election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets.

15  This concentration of ownership could limit the ability of other stockholders to influence corporate matters and may have the effect of delaying or preventing a third

16  party from acquiring control over us.

17       59.   And even after General Atlantic, Hodgson and their affiliates sold 13.8 million shares

18  in the Company's Secondary Offering, General Atlantic still maintained the same control.  As the

19  Company disclosed in the Company's FY14 Form 10-K:

20       As of December 31, 2014, funds affiliated with General Atlantic, our largest stockholder, beneficially own approximately 26.2% of our outstanding common

21  stock, and all of our directors, officers and their affiliates, including the funds affiliated with General Atlantic, beneficially own, in the aggregate, approximately

22  42.1% of our outstanding common stock.  As a result, *these stockholders will be able to determine substantially all matters requiring stockholder approval*, including the

23  election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets.  This concentration of ownership

24  could limit the ability of other stockholders to influence corporate matters and may have the effect of delaying or preventing a third party from acquiring control over us.

25       60.   The Officer and Director Defendants and General Atlantic participated in the drafting,

26  preparation and/or approval of the various public, shareholder and investor reports and other

27  communications complained of herein and were aware of, or recklessly disregarded, the

28

1   misstatements contained therein and omissions therefrom, and were aware of their materially false

2   and misleading nature.  Because of their Board membership, executive and managerial positions

3   with TriNet and/or stock ownership, each of the Officer and Director Defendants and General

4   Atlantic had access to the adverse undisclosed information about the Company's financial condition

5   and performance and knew (or recklessly disregarded) that these adverse facts rendered the positive

6   representations made by or about TriNet and its business or adopted by the Company materially false

7   and misleading, as detailed herein.

8       61.    The Officer and Director Defendants, because of their positions of control and

9   authority as officers and/or directors of the Company, and General Atlantic, because of its stock

10  ownership and control of TriNet directors, were able to and did control the content of the various

11  SEC filings, press releases and other public statements pertaining to the Company during the Class

12  Period.  Each defendant was provided with copies of the documents alleged herein to be misleading

13  prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their

14  issuance or cause them to be corrected.  Accordingly, each of the Officer and Director Defendants

15  and General Atlantic is responsible for the accuracy of the public reports and releases detailed herein

16  and is therefore primarily liable for the representations contained therein.

17      62.    The Company, the Officer Defendants, the Director Defendants and General Atlantic

18  are liable as participants in a fraudulent scheme and course of business that operated as a fraud or

19  deceit on purchasers of TriNet common stock by disseminating materially false and misleading

20  statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public

21  regarding TriNet's business, operations, management and the intrinsic value of TriNet common

22  stock; and (ii) caused plaintiff and other members of the Class to purchase TriNet common stock at

23  artificially inflated prices.

24  **FALSE AND MISLEADING STATEMENTS**
    **ISSUED DURING THE CLASS PERIOD**

25      63.    <u>False and Misleading Statements</u>: On March 27, 2014, TriNet conducted its IPO,

26  selling 15 million shares to the public for $16 a share.  The IPO Registration Statement falsely stated

27  that the Company was in fact proficient in its risk management capabilities and that TriNet's

28

agreements limited the Company's aggregate exposure in any given policy year, a representation that analysts and investors relied upon to differentiate TriNet from its competitors. *See, e.g.*, ¶¶90-91. These statements included:

- Risk management is a core competency of our company.

- We leverage . . . our ***robust risk management capabilities*** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

- We assess all workers compensation and medical benefits risks on ***an individual client basis*** and annually adjust pricing to reflect their ***current risk*** based on HIPAA-compliant analytics.

- Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***.

- Following our initial pricing of these policies, ***we analyze claims data for each client on an ongoing basis*** and seek to adjust our prices as appropriate.

64. The Company's IPO raised approximately $240 million.

65. After the IPO, TriNet's stock price traded at artificially inflated prices, closing on March 27, 2014 at $19.10 on high trading volume.

66. <u>False and Misleading Statements</u>: On May 5, 2014, the Company issued a press release announcing its 1Q14 financial results. The press release reported year-over-year growth and strong financial performance in insurance revenues and net income. The press release stated as follows:

**TriNet Announces First Quarter Fiscal 2014 Results**

\*       \*       \*

- Total revenues increased 45% to $508.9 million and Net Service Revenues increased 31% to $127.8 million.

\*       \*       \*

- Net income for the first quarter was $1.5 million, or $0.03 per diluted share . . . .

1       •      Adjusted Net Income for the first quarter was $17.6 million, or $0.24 per diluted share on a pro forma basis . . . .

2

3       •      Adjusted EBITDA was $44.3 million, a 23% increase from $36.1 million for the first quarter last year.

4       67.     On May 5, 2014, Goldfield and Porter participated in an earnings conference call to

5 discuss the 1Q14 financial results.  During the call, defendants falsely claimed to have stable and

6 predictable revenues, current visibility into the Company's future financial performance, and that the

7 Company was also currently on track to meet projected earnings before interest, taxes, depreciation

8 and amortization ("EBITDA") margin forecasts and guidance for the remainder of 2014:

9       [Goldfield:] ***[O]ur vertical channel strategy continues to strengthen our visibility*** and impact on the chosen verticals.

10

11       . . . . Our first quarter adjusted EBITDA margin was 34.7%, ***which puts us well on track to achieve our target margin level of 33% to 34% over the medium term***.

12                              *       *       *

13

14       [Porter:] Turning to our financial guidance for 2014, based on our Q1 performance, we expect net service revenue in the range of $504 million to $511 million for 2014, which represents organic growth of 15% to 17%, with adjusted EBITDA in the range of $171 million to $174 million for the same period, in line with our target rate of 33% to 34% and adjusted net income in the range of $75 million to $77 million, or $1.03 to $1.06 per share.

15

16

17       68.     In addition, in response to analyst inquiries, defendants also assured investors that at

18 that time the sales and revenue mix of products was stable and each segment was individually

19 performing well:

20       [Analyst:] And could you make some comments on the relative growth rates of the three products? . . .

21

22       [Goldfield:] ***I think the mix is pretty stable now that we've got all three products and most of the operational integration complete.  So I would expect it to be fairly stable.***

23

24       69.     On May 6, 2014, Jefferies issued a report titled "Initiate At Hold: Well-Positioned In

Attractive End Market; Full Valuation."  Echoing defendants' representations, Jefferies reported that

25 "Stable, Recurring Revenues Provide High Visibility":

26

27       In addition to the stable recurring revenue base from existing clients, the ***revenue mix between professional services and insurance services also remains very predictable***.

28

70.   On May 6, 2014, William Blair issued a report titled "Growing Market and Market Share Gains Should Drive Strong Growth," which substantially repeated defendants' statements that TriNet had solid visibility into future revenue due in part to high retention rates:

> **Solid visibility provided by highly recurring revenue**. . . .  Because of the high retention rates and the largely non-discretionary nature of its solutions, about 85%-90% of the company's revenue has historically been generated from existing clients, *so TriNet has solid visibility into forward-looking revenue, particularly after the peak selling season ends in January*.

71.   On May 6, 2014, Deutsche Bank issued a report titled "Making HR easier for SMBs is a good ROI; Buy," which repeated defendants' assurances that the Company was different than some competitors in the PEO space and that TriNet did not assume the business risks as their competitors that write workers' compensation policies.  According to the Deutsche Bank report, TriNet mitigated those risks through the Company's robust risk management:

> TriNet does take worker's comp risk for their clients, but only about 15% of their co-employees are not working in an office environment.
>
> *               *               *
>
> *We are not overly concerned about the worker's comp issues, which have plagued the PEO industry, as 1) TriNet's exposure to more risky blue collar employees is relatively minor, 2) due to strong risk management policies* . . . .

72.   After the release of TriNet's 1Q14 results, TriNet's stock price traded at artificially inflated prices, increasing from a close of $21.87 per share on May 5, 2014, to a close of $22.87 per share on May 6, 2014, on high trading volume.

73.   <u>False and Misleading Statements:</u> On May 19, 2014, Goldfield and Porter participated in the JPMorgan Global Technology, Media and Telecom Conference to discuss the Company's financial results and profitability prospects.  During the conference, defendants assured investors that the Company would achieve growth in its client base without sacrificing profitability (*i.e.*, avoiding writing contracts with lower premiums to gain market share) or stability (*i.e.*, because the Company had strong risk management and good visibility into claims risk):

> [Goldfield:] We are selling the three different solutions, which has helped us from a pricing standpoint.
>
> *               *               *

1   [W]e have the growth and the profitability at the same time, and I will continue to do
2   that. *I'm not going to sacrifice growth for profitability or vice versa.*

3                               *        *        *

4   So as part of our bundled offering, we offer a bundled medical insurance as well as
    Workers' Comp. *We use fully insured plans. We're using large group plans for*
5   *our medical, so we are not buffeted by the same factors that buffet small business.*

6   . . . We have over 200,000 people on our medical plan. *The 200,000 people*
    *give us a level of stability and visibility. I have a department that is always looking*
7   *at those insurance constructs to make sure that, ultimately, there's a stability*
    *around those plans*.

8          74.    In addition to misrepresentations regarding profitability and stability as a result of its

9   risk management proficiency, the Company was specifically asked by analysts about visibility into

10  the risks associated with the insurance side of the business to which defendants again understated the

11  risk and claimed visibility was good:

12         [Analyst:] How much visibility do you have on the insurance risk side?

13         [Goldfield:] We don't have . . . tremendous risk on the insurance side. *We*
           *have good visibility from a medical insurance and even better from a Workers'*
14         *Comp*.

15         75.    <u>False and Misleading Statements</u>: On August 4, 2014, the Company issued a press

16  release announcing its 2Q14 financial results. The Company reported strong growth in each of its

17  key business segments. The press release stated as follows:

18  **TriNet Announces Second Quarter Fiscal 2014 Results**

19                              *        *        *

20  •      Total revenues for the second quarter increased 44% to $525.0 million and
           Net Service Revenues increased 32% to $124.8 million . . . .
21
                                *        *        *
22
23  •      Net income for the second quarter was $6.2 million, or $0.09 per diluted
           share . . . .

24  •      Adjusted Net Income for the second quarter was $17.4 million, or $0.24 per
           diluted share on a pro forma basis . . . .
25
26  •      Adjusted EBITDA for the second quarter was $39.4 million, a 38% increase
           the same period last year.

27         76.    <u>False and Misleading Statements</u>: On August 4, 2014, the Company held a conference

28  call with analysts and investors to discuss the 2Q14 results. During the call, Goldfield and Porter

stated, among other things, that the Company was currently well on track to meet forecasted EBITDA margins of 33%-34%, continued to boast of the Company's financial performance to date and ability to grow profitably going forward and significantly raised FY14 net revenue guidance from $504-$511 million to $512-$516 million and FY14 EPS guidance from $1.03-$1.06 to $1.09-$1.11. Defendants again assured investors that pricing was stable across geographies and products, that the Company was experiencing strong trends in higher cost, high-risk markets in California and New York and was not being pressured to compromise on price in order to drive growth:

> [Goldfield:] ***We saw healthy trends across multiple business segments and multiple geographies, with particular strength in California, New York, Massachusetts and Florida***.

> \*       \*       \*

> [Porter:] ***We are well on track in pursuing our target margin level of 33% to 34%***.

> \*       \*       \*

> Turning to our financial guidance for 2014.  Based on our performance for the first half of the year, we expect net service revenue in the range of $512 million to $516 million for 2014, which represents organic growth of 17% to 18%, with adjusted EBITDA in the range of $174 million to $176 million, for the same period, in line with our target range of 33% to 34%.  And adjusted net income in the range of $79 million to $81 million, or $1.09 to $1.11 per share.

77.     After the release of TriNet's 2Q14 results and the false and misleading statements, TriNet's stock price traded at artificially inflated prices, increasing from a close of $24.72 per share on August 4, 2014, to a close of $27.08 per share on August 5, 2014, on high trading volume.

78.     On August 12, 2014, Morgan Stanley issued a report titled "Takeaways from management meetings," which largely parroted defendants' false and misleading statements and explained that it understood "fully insured" meant plans for which TriNet was not liable for claims or other variable costs, and that risk should "disappear" so long as the Company continued to grow its WSE base:

> Mgmt also gave some risk-sharing figures – the deductible layer on benefits can range from 60% of risk for larger carriers to ***nothing (fully insured)*** for smaller carriers.

79.     On September 11, 2014, the Company issued a press release announcing that it had priced a secondary offering of 12 million shares of TriNet common stock, all of which would be jointly offered by defendants General Atlantic and Hodgson and their affiliates, at $25.50 per share:

**TriNet Prices Secondary Offering**

TriNet Group, Inc. today announced the pricing of an underwritten registered public offering of 12,000,000 shares of common stock at a price of $25.50 per share. In addition, the underwriters have been granted a 30-day option to purchase up to an additional 1,800,000 shares of common stock from the selling stockholders.  All of the shares in the offering are being offered by entities affiliated with General Atlantic LLC.  TriNet will not receive any proceeds from the sale of the shares.

80.     <u>False and Misleading Statements</u>: On September 12, 2014, defendants filed the Secondary Offering Registration Statement with the SEC.  The Secondary Offering Registration Statement was signed by Goldfield, Porter, August-deWilde, Babinec, Bingham, Goldman, Hodgson, Kispert and Lowell.  The Secondary Offering Registration Statement repeated the false statements that the Company was in fact proficient in its risk management capabilities and that TriNet's agreements limited the Company's aggregate exposure in any given policy year, a representation that analysts and investors relied upon to differentiate TriNet from its competitors. *See, e.g.*, ¶¶90-91.  These statements included:

- *Risk management is a core competency of our company.*

- We leverage . . . our *robust risk management capabilities* to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- *Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses*.

- We assess all workers compensation and medical benefits risks on *an individual client basis* and annually adjust pricing to reflect their *current risk* based on HIPAA-compliant analytics.

- Our agreements with our health insurance carriers with respect to these policies typically *include* limits to our exposure for individual claims, which we refer to as pooling limits, and *limits to our maximum aggregate exposure for claims in a given policy year*, which we refer to as *stop losses*.

- Following our initial pricing of these policies, we analyze claims data *for each client on an ongoing basis* and seek to adjust our prices as appropriate.

1    81.    Pursuant to the Secondary Offering on September 17, 2014, controlling shareholders

2    General Atlantic and Hodgson and their affiliates, sold all 13,800,000 shares authorized for sale at a

3    price of $24.42, for more than $336 million.

4    82.    <u>Reasons Why Statements in ¶¶63-80 Were Knowingly False and Misleading</u>: Each of

5    the above statements including those regarding: (i) TriNet's purported revenue growth without

6    sacrificing profitability; (ii) stability, predictability and visibility into its insurance risk; (iii) being

7    currently on track to meet margin forecasts and on overall financial performance prospects; and

8    (iv) that the Company used fully insured[3] insurance plans and analyzed claims data for each client on

9    an ongoing basis which stabilized risk, were materially false and misleading, as defendants knew or

10   deliberately disregarded and failed to disclose the following facts:

11   (a)    Risk management was not among the Company's core competencies *i.e.*,

12   among the Company's primary and unique strengths giving TriNet a competitive advantage, and

13   TriNet did not have sufficient policies, procedures and personnel in place to support claims of risk

14   management proficiency as the Company stated in both the IPO Registration Statement and the

15   Secondary Offering Registration Statement.  ¶¶63, 80.  Nor did defendants have a basis to claim the

16   Company had either stability or predictability with respect to the performance of the Company's

17   insurance businesses.  In fact, defendants knew but failed to disclose (and later admitted) that the

18   Company did not have adequate insurance executives or in-house actuarial staff to effectively

19   analyze risk in connection with the Company's historical or current claims experience and exposure.

20   ¶¶119-120, 127-128, 134, 136, 139.

21   (b)    The Company did not have visibility into current or future financial

22   performance because, in addition to the reasons set forth above in subsection (a), defendants knew

23   the Company had not done the necessary or required due diligence on key acquisitions to support

24

---

[3]    Fully insured means not responsible for variable costs.  *See* Christina Merhar, *Fully-Insured vs.*
25   *Self-Insured (Self-Funded) Health Plans*, zanebenefits.com (Feb. 25, 2014, 2:00 PM),
http://www.zanebenefits.com/blog/fully-insured-vs-self-insured-self-funded-health-plans.  *See also*
26   Emily Dusablon, *8 Considerations When Selecting a Professional Employer Organization*,
insperity.com (June 12, 2014), http://www.insperity.com/blog/8-considerations-when-selecting-a-
27   professional-employer-organization/ ("Under a fully-insured group health plan . . . [t]he employer
has no financial risk other than to pay the premium.").
28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                                    - 28 -

1   claims that its revenue and earnings were predictable and without significant risk (particularly the

2   2012 SOI acquisition of 66,000 workers' compensation plans).   After investors had suffered

3   hundreds of millions in losses due to the alleged misrepresentations, defendants admitted that the

4   Company had not performed its typical due diligence for such an acquisition, such as not reviewing

5   the book of acquired insurance plans at the claims level, and that failure contributed to poor financial

6   performance.  ¶¶110-112, 119, 123, 135.  Had they done so, or disclosed that they had not done so,

7   the Company and/or investors would have known that SOI's reserve practices were "not industry

8   best practice[s]," and the defendants' statements concerning risk associated with its insurance

9   business were false and could not be relied upon.  *See* ¶135.

10          (c)      The Company did not have the stability or current visibility into the business

11   performance of its insurance plans because contrary to defendants' statements that it analyzed claims

12   data for each of its clients, defendants knew but failed to disclose that the data, to the extent it was

13   received at all, was limited to "catastrophic" claims (*i.e.*, claims over $300,000).  The Company had

14   not even sought detailed information on all claims below that threshold.  *See* ¶104.  However, the

15   limited data that was provided was not timely and thus did not to support defendants' claims that

16   their analysis allowed them to accurately predict the Company's financial performance.  In addition,

17   the data the Company received from insurance carriers was subject to significant lag due to reporting

18   from the service provider to the carrier and again from the carrier to TriNet.  ¶¶99, 101, 119, 128.  In

19   fact, as the Company's financial performance began to consistently fall below promised expectations

20   due to the purportedly unexpected increase in claims impacting the financials, defendants admitted

21   that TriNet simply did not have the visibility from the carriers necessary to provide the predictability

22   they had so boldly assured.  *See* ¶¶99, 101, 112, 119, 128, 135.  Thus, as opposed to the

23   predictability and good visibility that the defendants bragged about, they would later admit that in

24   truth, there was "***inherent volatility***" in large medical claims.  ¶119.

25          (d)      Contrary to defendants' claims that all three product lines (*i.e.*, Ambrose,

26   Passport and SOI) were stable and very predictable, defendants knew or deliberately disregarded that

27   the Company was experiencing adverse claims trends in both medical and workers' compensation

28   that would negatively affect the Company's current and future business prospects – particularly

1  adverse trends in its SOI book of business, acquired in 2012.  Moreover, defendants knew that

2  because claims data it purportedly analyzed was limited and not timely, defendants had no basis to

3  state that all product lines were performing well.

4          (e)     TriNet's insurance plans were not fully insured.  As defendants would later

5  admit, only 40% of the Company's plans were fully insured, while 60% were high deductible.

6  ¶¶104-105, 136, 139, 142.  And contrary to defendants' statements that their insurance plans were

7  fully insured, and therefore stable and immune from the volatility that had negatively impacted

8  competitors, such as Barret ¶83, TriNet was exposed to similar risk.  *See* ¶¶110-111.

9          (f)     TriNet did not have aggregate stop-loss limits at all, or did not have such

10  limits that would sufficiently cap the Company's exposure to large spikes in claims.  *See* ¶¶110-111,

11  142.

12          (g)     Rather than pricing products such that premiums would better cover claims,

13  the Company was in fact prioritizing growth (increasing the number of clients and revenue without

14  raising premiums) at the expense of profitability, including the underpricing of premiums in higher

15  risk markets like New York and California.  As later admitted by Goldfield, defendants intended to

16  capitalize on what they viewed as a historic market opportunity.  ¶135.

17          (h)     The Company's internal controls suffered from wide spread material

18  weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and

19  collectively impaired the Company's ability to ensure accuracy and control over financial reporting.

20  In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs,

21  workers' compensation and liabilities.  *See e.g.*, ¶¶148-149.

22        •     Certain reconciliations of claim payments per the Company's actuarial analyses to
             actual amounts paid were  not operating effectively.

23

24        •     [C]ontrols over the review of health premium expenses did not operate at a level of
             precision that would detect material errors.

25

26        •     [L]ack of a sufficient complement of personnel with an appropriate level of
             knowledge, experience and training . . . .

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(i)     Because of the known or deliberately disregarded facts set forth above, the Company was not currently "on track" to meet margin forecasts of 33%-34% and its revenue and earnings forecasts for FY14 lacked a reasonable basis.

<u>TriNet Competitor Barrett Announces $80 Million Workers' Compensation Reserve Increase;
TriNet Falsely Assures Investors It Does Not Face Similar Risk</u>

83.     After trading hours on October 28, 2014, Barrett, a workers' compensation PEO company and TriNet competitor, announced its quarterly financial results.  As part of its announced results, Barrett disclosed that Barrett had recorded an additional increase to its self-insured workers' compensation reserve of $80 million, effectively erasing two to three years of profits.  While Barrett's announcement surprised some investors, only one month prior, a business analyst at Seeking Alpha issued a report titled "Barrett Business Services (BBSI): A Tick-Tick-Ticking Time Bomb," which correctly predicted that Barrett "has systematically under reserved, which has resulted in materially overstated earnings and a high probability of a massive reserve charge."[4]  The announcement sent Barrett's stock plummeting more than 58%, from a close of $43.03 on October 28, 2014, to a close of $17.69 on October 29, 2014, and generated speculation into whether TriNet's stock would suffer the same fate.  It was thus imperative for TriNet to distinguish itself from Barrett and convince investors that TriNet's business was materially different from Barrett.

84.     On November 4, 2014, the Company issued a press release announcing its 3Q14 financial results which beat consensus revenue and earnings expectations, and which included additional false and misleading statements.  The press release stated as follows:

**TriNet Announces Third Quarter Fiscal 2014 Results**

*        *        *

- Total revenues for the third quarter increased 24% to $556.0 million and Net Service Revenues increased 22% to $127.8 million . . . .

*        *        *

- Net income for the third quarter was $0.7 million, or $0.01 per diluted share . . . .

---

[4]   *Barrett Business Services (BBSI): A Tick-Tick-Ticking Time Bomb*, Seeking Alpha (Sept. 16, 2014, 12:41 PM), http://seekingalpha.com/instablog/890075-copperfield-research/3269815-barrett-business-services-bbsi-a-tick-tick-ticking-time-bomb.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                            - 31

- Adjusted Net Income for the third quarter was $20.2 million, or $0.28 per diluted share on a pro forma basis . . . .

- Adjusted EBITDA for the third quarter was $41.5 million, a 50% increase from the same period last year.

\*       \*       \*

Net Service Revenues consisted of professional service revenues of $86.9 million and Net Insurance Service Revenues of $40.9 million.  Net Insurance Service Revenues consisted of insurance service revenues of $469.1 million, less insurance costs of $428.2 million.

85.    Underline False and Misleading Statements: On November 4, 2014, the Company held a conference call for analysts and investors to discuss the Company's 3Q14 financial results and outlook.  During the call, which was hosted by Goldfield and Porter, defendants addressed demand for the Company's products and services, assured investors that the Company was currently on track to meet revenue and margin targets, that the potential for higher claims costs was already built into TriNet's forecasting process, *raised* FY14 net revenue guidance from $512-$516 million to $517-$519 million and *raised* FY14 EPS from $1.09-$1.11, to $1.10-$1.13:

[Porter:] *We are well on track in pursuing our target margin level of 33% to 34%*.

\*       \*       \*

For our financial guidance for Q4, we expect net service revenue in the range of $137 million to $139 million, which represents organic growth of 13% to 14%; adjusted EBITDA in the range of $51 million to $53 million for the same period; and adjusted net income in the range of $25 million to $27 million, or $0.35 to $0.37 per share.

Based on our year-to-date performance and our Q4 guidance, we expect *net service revenue in the range of $517 million to $519 million for 2014, which represents organic growth of 18% to 19%*, with adjusted EBITDA in the range of $176 million to $178 million for the same period, in line with our target range of 33% to 34%, and adjusted net income in the range of $80 million to $82 million, or $1.10 to $1.13 per share.

86.    Underline False and Misleading Statements: During the call analysts questioned defendants on whether TriNet had risks associated with its workers' compensation policies similar to Barrett and defendants falsely assured investors that TriNet was fundamentally different because its programs were consistent and "fully insured":

[Analyst:]  Just – there is a competitor . . . that had a pretty significant Worker's Comp charge and issue this quarter.  Just wondering can you comment on – I guess – I'm sure a lot of people have been speculating on the risk of that to you, and I guess,

to what extent is there risk, of any sort of similar issues?  Or what type of checks do you have that make it unlikely that you would see some sort of similar issue here?

. . . [Porter:] We do have a *very consistent fully-insured high deductible plan, which hasn't changed,* and *we carefully review that, and adjust the reserves every quarter*.

*So we play [sic] close attention to it, we have multiple sets of eyes look at it, and we make adjustments as we see them, which is ongoing.  So net, I don't expect any significant increases to that in terms of reserves*.

87.     On November 4, 2014, Jefferies issued a report discussing the Company's 3Q14 financial results and its increase to its fiscal 2014 revenue and EPS guidance:

**Impressive Execution In 3Q; Guidance Raised**

\*        \*        \*

Earlier, TNET posted solid F3Q results (with revs/EPS beat vs. Street) on the back of healthy demand environment, which also led to F14 revs/EPS guidance raise.

. . . Adjusted EBITDA margin for the quarter was 32.5%, +90bps vs. JEFe, which largely led to an adjusted EPS beat ($0.28 vs. JEFe/Street/guidance range at $0.27/$0.26/$0.25-$0.27). . . .

**F14 guidance raised**. On the back of solid F3Q print, and healthy demand environment, TNET raised its F14 net revs guidance range from $512-$516M to $517-$519M (vs. Street/JEFe at $516.7M/$518.3M). . . . *TNET also raised its F14 adjusted EPS guidance to $1.10-$1.13 (JEFe/Street at $1.11) from $1.09-$1.11 before*, but maintained its F14 adjusted EBITDA margin target range of 33-34%.  In addition, TNET provided F4Q net revenues guidance range of $137-$139M (JEFe/Street at $137-$138.2M), adjusted EBITDA guidance range of $51-$53M and adjusted EPS guidance range of $0.35- $0.37 (JEFe/Street at $0.36/$0.35).

88.     After the November 4, 2014 release of the Company's financial results and conference call, the Company's stock price continued to trade at artificially inflated prices of above $29.00 per share.

89.     <u>False and Misleading Statements</u>: On November 12, 2014, Goldfield and Porter participated in the JPMorgan Ultimate Services Investor Conference.  During the conference, in response to analysts' inquiries, defendants stated that TriNet was not exposed to the same claims volatility as their self-insured competitors, specifically Barrett, which had recently increased reserves for under accrued claims (¶83), and assured investors that the Company maintained visibility into 85% of its future revenue – in part because business models were "fully insured":

1    [Goldfield:]  The important thing to understand is . . . *I have visibility to 85% of my revenue.  85% of my revenue is from the existing 10,000-plus companies.  I have to find 15% a year*.

2

3                                    *         *         *

4    [Audience Member:] One of your publicly traded peers announced a pretty big increase in their working – workers' comp reserves the other week.  I know your models are different, but can you just help me understand how they're different and how you – what your reserve policies are, etc.?

5

6

7                                    *         *         *

8    [Porter:]  [W]e have a *very stable, fully insured workers' comp program that we've had for multiple years. . . .  I think the example that you're referencing was a self-insured model that they're moving to try to get some kind of a fully insured.  So for us it's been a very stable program on all of our products.  It's something that we look at very carefully every quarter, and we adjust the reserves as necessary every quarter*.

9

10

11          *We have assistance, obviously, from our outside actuaries, from our inside team, and we also have an independent view from outside actuaries at our accounting firm.  So we look at it from multiple angles.  We adjust as we go.  We do not expect any significant reserve adjustments like you're referencing*.

12

13

14          90.     On November 12, 2014, William Blair issued a report on TriNet titled "Analysis of Workers' Comp Trends Reinforces Confidence That Issues Seen at Competitors Will Not Be Replicated."   The report directly addressed concerns that TriNet, like Barrett, might not be adequately accruing for workers' compensation costs and thus would need to increase reserves, thereby reducing profits.  The risk from not insuring for claims risk was a "hot button issue" and therefore a plainly material issue for investors, in particular because Barrett had just seen two to three years' profits "erased":

15

16

17

18

19

20          **Summary**.  Over the last few months, we have received questions from investors about the implication for TriNet of a "short report" about Barrett Business Services (BBSI $23.10). . . .  [T]he report correctly alleged that Barrett had been under-accruing claims expenses related to its workers' compensation policies, and therefore would need to *recognize catch-up expenses at some point*.   This assumption was confirmed in the third quarter, as Barrett recorded an $80 million increase in its workers' compensation reserve, which essentially erased the profits earned by Barrett over the last two to three years.

21

22

23

24

25          . . . *TriNet's third-quarter results showed no signs of similar issues and management expressed confidence on its conference call in its workers' compensation accruals*.

26

27

28

91.     Morgan Stanley, in a November 14, 2014 report titled "Takeaways from mgmt meetings positive; TNET 'just getting started,'" explained that defendants had assured Morgan Stanley and others that the Company had internal actuaries that they employed to underwrite risk:

- **Increased emphasis on underwriting risk and reserve accounting**: Investors honed in on the processes and controls involved in TNET's underwriting process. Although mgmt still expects some quarterly volatility in claims costs (+/- $3mn per quarter is typical), it notes that clients have quarterly open enrollment so premiums are adjusted relatively frequently, which is a key reason the annual variance is much more limited. ***For our clarity (and comfort), mgmt noted that TNET's reserves are audited by three different entities: by internal actuaries, by the independent auditor's actuaries, and by insurance carriers' actuaries***.

92.     <u>False and Misleading Statements</u>: On December 17, 2014, Goldfield and Porter participated in the Bernstein Technology Innovation Summit to discuss the Company's financial results and future prospects.  During the call, defendants stated that TriNet was proficient at managing workers' compensation risk and forecasting deductible risk on medical claims. Defendants also told analysts and investors that they simply do not take on "high-risk exposures":

[Goldfield:] ***We have a business model that calls for 15% top-line revenue growth, with 33% to 34% EBITDA margins each and every year for the next three years***.

*        *        *

[Analyst:] So why don't you first just describe what the nature is of the risk that you are taking on; and then, obviously, what TriNet does to mitigate that?

*        *        *

[Porter:] There's about 40% of our insurance revenues which are administrative fees that our clients pay us for providing them a top-tier technology platform to do open enrollment as well as first-line support.  There is no claims element at all to that.  So 40% is a service fee . . . .

*        *        *

And the final set of our net insurance is 40% is for managing workers' comp.  There, we offer fully insured programs.  They are high deductible.  ***It is a very predictable portion of the business***, as long as you manage the type of businesses that you write, which really gets to the question of how we manage the components of both the benefits and the comp.  What we do is we look at every client that comes in the door, and we price it to risk.

. . . ***We don't take high-risk exposures.  And we look at the demographics and the benefits so we know exactly how that should be priced***.

***[W]e get state-of-the-art analytics on all of our claims.  So every month we are able to get claims data so we can see how our clients are performing*** . . . .

*. . . So we make sure that we are always pricing the premiums to the experience that our clients have*.

93.     <u>False and Misleading Statements</u>: Defendants also falsely assured investors who were concerned about how TriNet's risk management processes provided confidence in the predictability of their financial performance that the Company's combination of actuarial review and risk management capability allowed them to accurately predict *exactly* how the business would perform. Defendants also repeated that the Company begins the year with 85% revenue in the bag and recurring revenue allows predictable profits of 33%-34%:

[Analyst:] [B]eing successful, then, in the PEO *business is essentially having your risk management capability or your actuarial capability like a core competency, essentially, then, of TriNet?*

[Porter:] *Absolutely. . . . [W]e are able to predict pretty accurately on an annual basis exactly how we are going to do on each of those programs*.

\*     \*     \*

[Goldfield:] *I start each and every year with 85% of my revenue in the bank. . . . This makes this the easiest job I have ever had.*  As opposed to starting with zero on January 1, *I start January 1 with 85% of my revenue. . . .  And the recurring revenue model allows me to have predictable growth with strong profits of 33% to 34%*.

\*     \*     \*

*To me, it's a great outcome to be able to have predictable 15% organic growth, and to have 33%, 34% profits, and the cash flow to back that up*.

94.     In addition to assuring investors about the Company's proficiency over risk management, defendants took the opportunity to directly explain to investors why they should invest in TriNet shares:

[Analyst:] If you are the investors out there now, like, why now with TriNet?

[Goldfield:] A large, addressable market; *predictable revenue; visibility into the future*; and a company that is growing and satisfying an important need in HR.

95.     Finally, defendants assured investors during the December 17, 2014 Bernstein Technology Innovation Summit, that TriNet was fundamentally different from PEOs that came before them.  They explained that the Company took not just a different, but a "*radically different*," approach to underwriting risk, which was based upon data that constituted a "true breakthrough" that minimized variability and ensured stable returns:

1    [Goldfield:]  The underwriting process is – and the lens we put on these companies –
2    *is radically different*.

         *       *       *

3
4    [Analyst:] And before we just move off of the risk thing – this industry, I
     guess, is a bit *littered with companies that have blown* up one way or the other over
     the years *because of poor risk management*.  Can you describe, like, *how does the*
5    *investor base get confident that TriNet is different?*  Or that it's different this time
     around?

6
7    . . . [Goldfield:] The key to the risk portion of the business is the data. . . .

     . . . And having the right data, which we get in a HIPAA-compliant way from
8    the insurance companies, is *a true breakthrough* that was not available to the
     bundled solution providers at three or four years ago.  So I believe to be really
9    comfortable, you need to really understand that, A, what the overall intention and the
     growth of the Company is; and, B, is that the data is available to react to as the
10   landscape changes.

11       96.    <u>Reasons Why Statements in ¶¶84-95 Were Knowingly False and Misleading</u>: Each of

12   defendants' statements set forth above including statements that (i) the Company was not exposed to

13   the same types of risk as Barrett; (ii) all of the Company's insurance products were fully insured

14   making them consistent and stable; (iii) the Company had visibility into 85% of the its annual

15   revenue at the outset of the year; (iv) that the Company was on track to meet its EBITDA margins

16   target of 33%-34%; and (v) the Company was able to accurately predict how it would perform,

17   including achieving its increased financial guidance of $517-$519 million in net service revenues,

18   because of its risk management capabilities and access to state-of-the-art analytics on all claims.

19   Defendants knew or deliberately disregarded and failed to disclose the following:

20       (a)    Risk management was not among the Company's core competencies and it did

21   not have sufficient policies, procedures and personnel in place to support defendants' claims of risk

22   management proficiency or that it was a "core competency" as stated.  ¶¶63, 80.  Nor did defendants

23   have a basis to claim the Company had either stability or predictability with respect to the

24   performance of the Company's insurance businesses.  In fact, defendants knew but failed to disclose

25   (and later admitted) that the Company did not have adequate insurance executives or in-house

26   actuarial staff to effectively analyze risk in connection with the Company's historical or current

27   claims experience and exposure.  ¶¶119-120, 127-128, 134, 136, 139.  Notwithstanding these facts,

28   defendants told analysts and investors that the Company had "a department" that looks at the

1   performance of the insurance plans very closely and provided defendants with assurance in the

2   stability of the Company's business operations.

3        (b)    The Company did not have visibility into current or future financial

4   performance because, in addition to the reasons set forth above in subsection (a), defendants knew

5   the Company had not done the necessary or required due diligence on key acquisitions to support

6   claims that its revenue and earnings were predictable and without significant risk (particularly the

7   2012 SOI acquisition of 66,000 workers' compensation plans).   After investors had suffered

8   hundreds of millions in losses due to the alleged misrepresentations, defendants admitted that the

9   Company had not performed its typical due diligence for such an acquisition, such as not reviewing

10  the book of acquired insurance plans, and that failure contributed to poor financial performance.

11  ¶¶110-112, 119, 123, 135.  Had they done so, or disclosed that they had not done so, the Company

12  and/or investors would have known that SOI's reserve practices were "not industry best practice[s],"

13  and the defendants' statements concerning risk associated with its insurance business were false and

14  could not be relied upon.  *See* ¶135.

15       (c)    The Company did not have the stability or current visibility into the business

16  performance of its insurance plans because contrary to defendants' statements that it analyzed claims

17  data from each of its clients, defendants knew but failed to disclose that the data, to the extent it was

18  received at all, was limited to "catastrophic" claims (*i.e.*, claims over $300,000).  The Company had

19  not even sought detailed information on all claims below that threshold.  *See* ¶104.  However, the

20  limited data that was provided was not timely and thus did not to support defendants' claims that

21  their analysis allowed them to accurately predict the Company's financial performance.     In

22  addition, the data the Company received from insurance carriers was subject to significant lag due to

23  reporting from the service provider to the carrier and again from the carrier to TriNet.  *See* ¶¶99,

24  101, 119, 128.  In fact, as the Company's financial performance began to consistently fall below

25  promised expectations due to the purportedly unexpected increase in claims impacting the financials,

26  defendants admitted that TriNet simply did not have the visibility from the carriers necessary to

27  provide the predictability they had so boldly assured.  *See* ¶¶99, 101, 112, 119, 128, 135.  Thus, as

28

1  opposed to the predictability and good visibility that the defendants bragged about, they would later

2  admit that in truth, there was "***inherent volatility***" in large medical claims.  ¶119.

3         (d)  Defendants knew but failed to disclose that TriNet's insurance plans were not

4  fully insured.  As defendants would later admit, only 40% of the Company's plans were fully

5  insured, while 60% were high deductible.  ¶¶104-105, 136, 139, 142.  And contrary to defendants'

6  statements that their insurance plans were fully insured, and therefore stable and immune from the

7  volatility that had negatively impacted competitors, such as Barret (¶81), TriNet was exposed to

8  similar risk.  *See* ¶¶110-111.

9         (e)  Defendants knew but failed to disclose that TriNet did not have aggregate

10  stop-loss limits at all, or did not have such limits that would sufficiently cap the Company's

11  exposure to large spikes in claims.  *See* ¶¶110-111, 142.

12         (f)  Rather than pricing products such that premiums would better cover claims,

13  the Company was in fact prioritizing growth (increasing the number of clients and revenue without

14  raising premiums) at the expense of profitability, including the underpricing of premiums in higher

15  risk markets like New York and California.  As later admitted by Goldfield, defendants intended to

16  capitalize on what they viewed as a historic market opportunity.  ¶135.

17         (g)  The Company's internal controls suffered from wide spread material

18  weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and

19  collectively impaired the Company's ability to ensure accuracy and control over financial reporting.

20  In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs,

21  workers' compensation and liabilities.  *See e.g.*, ¶¶148-149.

22  •  Certain reconciliations of claims payments per the Company's actuarial analyses to
23      actual amounts paid were  not operating effectively.

24  •  Controls over the review of health premium expenses did not operate at a level that
25      would detect material errors.

26  •  Lacked the sufficient compliment of personnel with an appropriate level of
    knowledge and training.

27         (h)  Because of the known or deliberately disregarded facts set forth above, the

28  Company was not currently "on track" to meet margin forecasts of 33%-34% and its revenue and

1  earnings forecasts for 4Q14 and FY14 were without reasonable basis, as the Company's forecasting

2  process failed to properly incorporate relevant historical and current claims trends due to the

3  Company's failure to obtain timely data or analyze its risk exposure.

4  <u>TriNet Reports 4Q14 Revenue Shortfall Caused by Spike in Health Claims; Falsely Assures</u>
   <u>Investors that Problems Are Non-Systemic, that Liability for Claims Remained Limited and</u>
5  <u>Reiterates False Risk Management Statements and FY15 Guidance</u>

6         97.    By February 27, 2015, when J.P. Morgan issued a report titled "4Q14 Earnings

7  Preview," a number of TriNet's competitors had already announced strong results for 1Q15,

8  indicating favorable market conditions.  As J.P. Morgan reported, the market expected the same

9  from TriNet, writing that "[f]undamentally, ***TNET shouldn't disappoint***, as peers (ADP, NSP and

10  PAYX) reported stable to improving growth in PEO."  On this PEO industry strength, and the belief

11  that TriNet was unique within that industry and had robust risk management practices, TriNet's

12  stock hit a Class Period high of $38.00 on March 3, 2014, the day that TriNet issued (after hours)

13  4Q14 and FY14 financial results.

14         98.    But when on March 3, 2015, the Company issued a press release announcing its 4Q14

15  financial results, the report revealed a 19% year-over-year decrease in net Insurance Service

16  revenues and that 4Q14 EPS forecasts missed by a whopping 29%.  Defendants attributed the miss to

17  a $10 million increase in large medical claims – the very type of volatility defendants assured

18  investors and analysts that their risk management and actuarial reviews protected them from.  *See*

19  ¶¶63, 71, 73, 80.  The decrease in net Insurance Service revenues in turn caused a more than $10

20  million miss in forecasted net service revenues; defendants nevertheless then assured 15% revenue

21  growth for FY15.  The press release stated as follows:

22         **TriNet Announces Fourth Quarter, Fiscal Year 2014 Results**

23                              *       *       *

24         Fourth quarter highlights include:

25  •       Total revenues increased 25% to $603.7 million and Net Service Revenues
            increased 4% to $126.9 million from the same period last year.
26
                              *       *       *
27

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                    - 40 -

1   • Net income was $7.0 million, or $0.10 per diluted share, compared to net income of $6.0 million, or $0.11 per diluted share, in the same period last year.

2

3   • Adjusted Net Income was $19.2 million, or $0.26 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.1 million, or $0.24 per diluted share on a pro forma basis, in the same period last year.

4

5   • Adjusted EBITDA was $40.1 million, an 8% decrease from the same period last year.

6

Full year highlights include:

7

8   • Total revenues increased 33% to $2.2 billion and Net Service Revenues increased 21% to $507.2 million from fiscal 2013.

9   • Net income was $15.5 million, or $0.22 per diluted share, compared to net income of $13.1 million, or $0.24 per diluted share, in fiscal 2013.

10

11   • Adjusted Net Income for fiscal 2014 was $74.4 million, or $1.03 per diluted share on a pro forma basis, compared to Adjusted Net Income of $57.5 million, or $0.81 per diluted share on a pro forma basis, in fiscal 2013.

12

13   • Adjusted EBITDA was $165.3 million, a 22% increase from the same period last year.

14   "Based on our strong momentum in the market and with January firmly in the books, *we remain confident in our business outlook and believe we can achieve Net Service Revenue growth in excess of 15% for 2015*."

15

16   . . . "*Q4 Net Insurance Service Revenues were below our estimate as a result of higher than expected large medical claims. We are working closely with our health insurance partners to identify these large claims earlier in the process to improve our ability to more accurately forecast our Net Insurance Services Revenues*."

17

18

19   99. <u>False and Misleading Statements</u>: On March 3, 2015, the Company held a conference

20   call for analysts and investors to discuss the 4Q14 financial results. During the call, which was

21   hosted by defendants Goldfield and Porter, defendants sought to shift the blame for the revenue miss

22   on their insurance carriers, revealing for the first time that their data was subject to significant lag

23   time. However, defendants told investors that they had carefully analyzed the Company's current

24   claims experience, which had adversely affected TriNet's 4Q14 results, and assured analysts and

25   investors that it was a one-time event that would not affect the Company's 2015 financial outlook

26   and was not evidence of a systemic, business-wide problem:

27   [Goldfield:] *We have also looked carefully at our claims experience and remain confident in the quality of our forecast of net insurance service revenue in 2015*.

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

- 41 -

1                    *      *      *

2      [Porter:] ***Net insurance service revenue was adversely affected by an unexpected
       impact of large medical claims***.

3

4          The nature of these claims is that they develop over a number of months, and
       there is usually a lag before they're reported to the carriers by the providers.  ***We had
       a number of large claims develop during the second half of 2014 that we were not
5      aware of until after the close of the year.  The result was these claims were not
       included in our trend as we forecast our fourth-quarter medical claims***.

6

7      100.    After explaining what reportedly caused the shortfall in FY14, defendants specifically

       stated that the Company had already taken into account the frequency of large claims and there was
8
       no current risk of a recurrence, nor would FY15 be adversely affected:
9

10         [Porter:] ***Our 2015 forecast takes into account a similar frequency of large
       claims as we experienced in 2014.  The result is that our Q4 experience does not
       have an adverse impact on our 2015 outlook***.

11                   *      *      *

12
           Turning now to our 2015 full-year financial guidance, we expect net service
13     revenue in the range of $590 million to $600 million, which represents growth of
       16% to 18%; adjusted EBITDA in the range of $192 million to $202 million, in line
14     with our target margin range of 33% to 34%; and adjusted net income in the range of
       $98 million to $104 million, or $1.32 to $1.40 per share.  Based on our 2015 full-year
15     guidance, we expect our first-quarter net service revenue in the range of $142 million
       to $147 million, which represents growth of 11% to 15%; adjusted EBITDA in the
16     range of $44 million to $49 million; and adjusted net income in the range of $22
       million to $25 million or $0.30 to $0.34 per share.

17
       101.    In addition to reporting financial results and missed expectations, defendants admitted
18
       that TriNet did not have the visibility that they previously assured investors provided predictable
19
       financial outcomes.  Moreover, while defendants had previously bragged of visibility into financial
20
       results, when asked how many large claims had been received that caused the EPS miss, defendants
21
       were mysteriously at a loss, stating that they could not determine how many large claims were
22
       received:[5]
23
           [Goldfield:] ***Clearly, we've some work to do in improving our ability to
24     forecast our insurance revenue***.

25                   *      *      *

26

27     ─────────────
       [5]    Remarkably, later in the Class Period, and after the recurrence of similar large claims being
28     reported, defendants said they were both able to, and did in fact, sift through each claim.  ¶104.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
       LAWS – 5:15-cv-03625-BLF                                                    - 42

1    [Porter:] *[W]e didn't have enough visibility into the claims that we're developing in
2    the second half to be able to build them into our Q4 forecast*.

3                                    *      *      *

4    When we step back and look at what our experience was for these large claims, we
     don't expect it will impact our trend on a significant basis. . . .

5           *So our pricing, we expect to be fairly stable.  But we look at that every
6    quarter*.

7                                    *      *      *

8           [Analyst:]  And were these large medical claims – were they isolated to any
     one of your three technology platforms?

9           [Porter:] They're primarily Passport, as we've indicated in the past.  SOI –
10   generally, only 25% of their work-site employees are covered with medical.  And
     with Ambrose, it's a smaller population that's on a guaranteed cost arrangement.  So
11   this is, really, the white-collar book.

12                                   *      *      *

13          [Analyst:] And . . . how many claims would that have been?

14          [Porter:] *It's really difficult to determine how many claims*.

15          102.    On March 4, 2015, J.P. Morgan issued a report titled "TriNet, 4Q Recap: Miss on

16   Medical Claims but 2015 Guidance Intact; Remain OW."  The report discussed the spike in medical

17   claims that caused the Company to miss its fourth quarter fiscal 2014 financial estimates but parroted

18   defendants' talking points and false and misleading statements:

19          *TriNet reported disappointing 4Q results, as an unusual spike in large
     medical claims drove a revenue/EPS miss of (9%)/(29%), masking strong
20   underlying unit growth of 25%*. . . .

21       • **What happened?  *4Q missed our estimate by $14M and fell below
            guidance primarily due to an unforeseen jump in large medical claims* . . . .**

22          103.    Following the March 3, 2015 disclosures, the stock price declined from a close of

23   $37.88 per share on March 3, 2015, to a close of $33.93 per share on March 4, 2015, on high trading

24   volume.  The price remained inflated, however, by defendants' false and misleading statements and

25   omissions which continued to conceal the full truth about the financial condition of the Company.

26          104.    <u>False and Misleading Statements</u>: On March 5, 2015, Goldfield and Porter

27   participated in the Morgan Stanley Technology, Media and Telecom Conference to discuss the

28   Company's financial results and prospects.  During the call, analysts sought an explanation of how

1   the Company reconciled the risks in its insurance business particularly in light of the losses recently

2   reported.  Shockingly, defendants admitted that to the extent they previously requested claims data

3   from carriers, that was only data for claims over $300,000.  Defendants also stated that they had not

4   negotiated aggregate stop-loss limits, as previously claimed (¶¶63, 80), but instead sought lower

5   pricing from the insurance carriers in exchange for taking on "modest" deductible risk.  Defendants

6   nevertheless defended the Company's business model and claims forecasting procedures:

> [Analyst:] A few days ago, you reported a much larger loss, driven by some large one-time claims.  Can you talk us through how to get comfort with the risks that you are taking on the insurance line and your expectations for claims variability going forward?

> *       *       *

> [Porter:] So what we're doing is we're separating it out in our forecast so we can actually track each component, large versus run rate.  And then separately, *we're going to our carrier partners and historically, we've asked them for information on any what we call catastrophic claims.  That's historically been claims over $300,000 that could potentially be in their pipeline*.

> *So what we've asked them to do now is to tell us for any claim that they expect to be greater than $50,000, give that to us on a monthly basis so that we can track these through their pipeline*.

> *       *       *

> [Analyst:] Are there other ways to cap your losses to specific carriers or regions other than the per-claim limits?

> [Porter:] The most practical way to do it is what's called a pooling limit, which is a per-claim limit.  And again, on our larger carriers, it's up to $1 million.  On others, it's below that.

> But it's really an economic decision.  We look at the pricing that we get from our carriers for these pooling limits and we can choose to bring those down.  But effectively what you do is you are just going to be paying that higher premium to the carriers.

> And for the – *I think the modest amount of deductible risk we take, I think it makes sense for us to have a limited or reasonable return on that*.  Just to quantify, in our insurance revenue, only about 20% historically has been in this deductible.  We call it performance fees.  So it's not a large amount, but it is a number.

> *We've also can [but did not] do aggregate stop-loss*, but again, when you look at that, the cost really isn't outweighing the benefit of doing it.

> *       *       *

1     [Porter:] *[W]e just did not have the visibility that we really should have to be able to track those large claims on a more granular and basically a monthly basis*. So
2     that's the real experience that we picked out of that.

3        105.   On March 6, 2015, Morgan Stanley issued a report titled "Key Takeaways from TMT

4 Conference," which explained that, contrary to the Company's prior assertions that agreements with

5 carriers would limit the Company's maximum aggregate exposure, TriNet apparently had not

6 negotiated stop-loss limits on the insurance claims it was liable to third party carriers for:

7        In considering the level of claims risk it takes, TNET believes it is
8     appropriately balancing risk and costs, and has no intention to broadly lower its deductible limit with carriers. To further limit the likelihood of a large claims miss, TNET notes that *in theory it could establish an "aggregate stop loss" with carriers,*
9     *but believes the cost is not worth the benefit*.

10        106.   <u>False and Misleading Statements</u>: On March 30, 2015, defendants filed its FY14

11 Form 10-K with the SEC, which repeated the same false and misleading claims about risk

12 management and limits to exposure and potential losses:[6]

13     •    *Risk management is a core competency of our company.*

14     •    We leverage . . . our *robust risk management capabilities* to mitigate the risks
15     associated with providing workers compensation and employee benefit plans to our clients.

16     •    *Our programs are fully insured by top-rated insurance carriers, which limits our*
17     *ultimate exposure or potential losses*.

18     •    We assess all workers compensation and medical benefits risks on *an individual*
19     *client basis* and annually adjust pricing to reflect their *current risk* based on HIPAA-compliant analytics.

20     •    Our agreements with our health insurance carriers with respect to these policies
21     typically *include* limits to our exposure for individual claims, which we refer to as pooling limits, and *limits to our maximum aggregate exposure for claims in a given*
22     *policy year*, which we refer to as *stop losses*.

23     •    Following our initial pricing of these policies, we analyze claims data *for each client*
24     *on an ongoing basis* and seek to adjust our prices as appropriate.

25

26

27 _____
  [6]   The March 30, 2015 Form 10-K was signed by Goldfield, Porter, August-deWilde, Babinec,
28 Bingham, Goldman, Hodgson, Kispert and Lowell.

  [PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF           - 45 -

107.   <u>False and Misleading Statements</u>: The FY14 Form 10-K filed with the SEC on March 30, 2015, was signed and certified pursuant to Sarbanes-Oxley by Goldfield and Porter, whose certifications stated:

1.   I have reviewed this annual report on Form 10-K of TriNet Group, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us*** by others within those entities, particularly during the period in which this report is being prepared;

(b)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

1    (b)    any fraud, whether or not material, that involves management or other
2           employees who have a significant role in the registrant's internal
           control over financial reporting.[7],[8]

3    108.   Reasons Why Statements in ¶¶98-107 Were Knowingly False and Misleading: Each

4    of defendants' statements above including the statements that: (i) defendants looked carefully at the

5    Company's disappointing claims experience from 4Q14 and earlier; (ii) based on a review of the

6    4Q14 experience, defendants had determined that those or similar claims would not impact 1Q15 or

7    FY15 results; (iii) the Company's financial forecast; and (iv) claims of risk management as a core

8    competency of the Company were each materially false and misleading as defendants knew, or

9    recklessly disregarded and failed to disclose, the following facts:

10                  (a)    Risk management was not among the Company's core competencies and it did

11   not have sufficient policies, procedures, and personnel in place to support defendants' claims of risk

12   management proficiency or that it was a "core competency" as stated in the IPO Registration

13   Statement and the Secondary Offering Registration Statement and reiterated by securities analysts.

14   ¶¶63, 80.  Nor did defendants have a basis to claim the Company had either stability or predictability

15   with respect to the performance of the Company's insurance businesses.  In fact, defendants knew

16   but failed to disclose (and later admitted) that the Company did not have adequate insurance

17   executives or in-house actuarial staff to effectively analyze risk in connection with the Company's

18   historical or current claims experience and exposure.  ¶¶119-120, 127-128, 134, 136, 139.

19

20

---

21   [7]   During the Class Period, Goldfield and Porter executed substantially identical false Sarbanes-
     Oxley certifications on May 8, 2015 (¶118), August 6, 2015 (¶133), and November 6, 2015 (¶138).

22   [8]   As a newly publicly traded company, TriNet was a non-accelerated filer for reporting purposes
23   with the SEC during the first year following its initial public offering.  Therefore, TriNet was exempt
     from the requirement, under section 404(a) of Sarbanes Oxley, to include a Management Report on
24   the Effectiveness of Internal Controls Over Financial Reporting in its first Form 10-K for the year
     ending December 31, 2014.  TriNet was also exempt from having that report attested to by its
25   registered public accountant under section 404(b).  TriNet was also allowed to exclude introductory
     language from paragraph 4 and all of paragraph 4(b) from the certification signed by Goldfield and
26   Porter, respectively, as required under section 302.  All of these exemptions are inapplicable
     beginning with TriNet's second Form 10-K for the year ending December 31, 2015.

27   Notwithstanding these exemptions, the statements contained in each signed certification alleged
28   herein were materially false and misleading.

1     (b)  The Company did not have visibility into current or future financial

2 performance because, in addition to the reasons set forth above in subsection (a), defendants knew

3 the Company had not done the necessary or required due diligence on key acquisitions to support

4 claims that its revenue and earnings were predictable and without significant risk (particularly the

5 2012 SOI acquisition of 66,000 workers' compensation plans).  After the Class Period, and after

6 investors had suffered hundreds of millions in losses due to the alleged misrepresentations,

7 defendants admitted that the Company had not performed its typical due diligence for such an

8 acquisition, such as not reviewing the book of acquired insurance plans, and that failure contributed

9 to poor financial performance.  ¶¶110, 112, 119, 123, 135.  Had they done so, or disclosed that they

10 had not done so, the Company and/or investors would have known that SOI's reserve practices were

11 "not industry best practice[s]," and the defendants' statements concerning risk associated with its

12 insurance business were false and could not be relied upon.  *See* ¶135.

13     (c)  Defendants knew but failed to disclose that TriNet's insurance plans were not

14 fully insured.  As defendants would later admit, only 40% of the Company's plans were fully

15 insured, while 60% were high deductible.  ¶¶104-105, 136, 139, 142.  And contrary to defendants'

16 statements that their insurance plans were fully insured, and therefore stable and immune from the

17 volatility that had negatively impacted competitors, such as Barret (¶83), TriNet was exposed to

18 similar risk.  *See* ¶¶110-111.

19     (d)  Defendants knew but failed to disclose that TriNet did not have aggregate

20 stop-loss limits at all, or did not have such limits that would sufficiently cap the Company's

21 exposure to large spikes in claims.  *See* ¶¶110-111, 142.

22     (e)  The Company's internal controls suffered from wide spread material

23 weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and

24 collectively impaired the Company's ability to ensure accuracy and control over financial reporting.

25 In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs,

26 workers' compensation and liabilities.  *See e.g.*, ¶148.

27    •  Certain reconciliations of claim payments per the Company's actuarial analyses to
       actual amounts paid were  not operating effectively.

28

- [C]ontrols over the review of health premium expenses did not operate at a level of precision that would detect material errors.

- [L]ack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training . . . .

(f)   Because of the known or deliberately disregarded facts set forth above, the Company's earnings forecasts and its reiteration of them, did not have a reasonable basis.

Defendants Report Disappointing 1Q15 Revenue and Reduced FY15 Guidance Caused by Need to Accrue $10 Million Extra in Workers' Compensation Costs; Falsely Assure Investors that Problems Not Related to Previous Quarter's Problems and that Problems from Both 4Q14 and 1Q15 Had Already Been Addressed and Would Not Recur

109.   On May 5, 2015, TriNet issued a press release announcing TriNet's 1Q15 financial results.   The Company again reported disappointing earnings; though quarterly results were generally in line with the Company's conservative guidance, defendants were forced to reduce FY15 guidance.   This time the Company reported that it would in fact have to accrue for an extra $10 million in workers' compensation costs in 2015, despite having previously assured investors that its insurance plans were stable, fully insured and – unlike in Barrett's case – had been properly accounted for.   ¶¶86, 89.   The press release stated as follows:

**TriNet Announces First Quarter Fiscal 2015 Results**

*          *          *

First quarter highlights include:

- Total revenues increased 23% to $625.6 million and Net Service Revenues increased 11% to $142.4 million . . . .

*          *          *

- Net income was $15.8 million, or $0.22 per diluted share, compared to net income of $1.5 million, or $0.03 per diluted share . . . .

- Adjusted Net Income was $25.4 million, or $0.35 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.6 million, or $0.24 per diluted share . . . .

*          *          *

. . . TriNet's total revenues for the first quarter of 2015 increased 23% from the first quarter of 2014 to $625.6 million, while Net Service Revenues increased 11% from the first quarter of 2014 to $142.4 million.   Net Service Revenues consisted of professional service revenues of $97.0 million and Net Insurance Service Revenues of $45.4 million.   Net Insurance Service Revenues consisted of

insurance service revenues of $528.6 million, less insurance costs of $483.2 million. Professional service revenues for the first quarter of 2015 increased 17%, and Net Insurance Service Revenues were relatively flat, compared to the first quarter of 2014.

110.    <u>False and Misleading Statements</u>: On May 5, 2015, the Company held a conference call for analysts and investors.  During the conference call, defendants revealed that the workers' compensation costs and trends previously claimed to have been stable and predictable had in fact not been properly forecasted for a number of preceding years, negatively affecting the Company's financial results and, more importantly, would continue above forecasts ***through the third and fourth quarters of 2015***.  Accordingly, the Company was reducing its annual outlook by $10 million:

> [Porter]: ***Net insurance service revenues were affected by higher than expected workers compensation costs in our blue- and gray-collar book for older years***.
>
> *        *        *
>
> ***[W]e expect Q2 net service revenues in the range of $135 million to $140 million, which represents growth of 10%. . . .  Based on the impact of the higher worker's comp costs, we are reducing our annual outlook by $10 million.  And we now expect net services revenues in the range of $580 million to $590 million for 2015, which represent organic growth of 14% to 16%***.

111.    <u>False and Misleading Statements</u>: During the question and answer session, Goldfield and Porter admitted that new facts were not the cause of the additional accrual in workers' compensation, but instead it was the result of recently commissioned actuarial review of the SOI book of business (which defendants previously indicated had been done regularly and that its workers' compensation book was among its most stable), which was acquired in 2012.  That review revealed that the Company was under-accrued, affecting earnings for the next two quarters:

> [Porter:]  So to your question on workers comp, we have seen growth in our blue and gray book, particularly in higher cost states. ***So one of the things that we instituted for Q1 was just a more detailed analysis as part of our actuarial review that we received in April.***
>
> ***The result of that was that we had an increase in our blue and gray book of approximately $4 million.  That was higher than our Q1 forecast***.
>
> ***Looking at that going forward, we would expect that that will spill over into Q2 and Q3 and Q4.  And so we have increased our claims forecast for worker's comp for the next three quarters by approximately $6 million to cover the higher cost of those claims***.

112.    Defendants further admitted that its forecasting process was *not* as robust as previously represented and its risk management processes and historical accrual methodologies did not provide stability and visibility defendants promised.  Instead, more analysis had been necessary:

[Goldfield:] But I think that we need to continue to get better at the forecasting.

*          *          *

*I'm expecting that we're going to do a better job of forecasting*. . . .

. . . *I think what it really means is a tighter look at the older years and making sure that we're ticked and tied as they come through the system*.

113.    Defendants conceded that they had not done a sufficient analysis of their blue and gray collar book (*i.e.*, SOI) including failing to perform a state-by-state analysis, but assured investors that it had the proper analysis in place going forward:

[Analyst:] And then just one more thing on the workers comp.  You talked about older claims.  Does that imply that the issue that arose was in businesses that you would acquire that perhaps the accrual and the methods for the accrual were different than perhaps what you are using today?

Is that reading too much into it?

[Goldfield:] No.  I think your intuition is correct.  It is the blue and gray collar book, which we have not had for obviously as many years as we have had the Passport book.

So the more experience we have, the more we see the reports, the better we understand what's happening.  *And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen*.  So it is something *I think we have got the right analysis now*, which we've tried to incorporate into our forecast for 2015.

114.    On May 5, 2015, William Blair issued a report titled "*Company's Credibility Is Dented*, but Sticking With Story as a Result of Long-Term Growth Potential," that explained although some investors were skeptical of defendants' explanations and ability to manage risk, the fundamentals of the Company, combined with defendants' new efforts to mitigate risk, were still sufficiently strong to maintain the analyst's outperform rating:

Instead of higher-than-expected health care claims (which was the issue last quarter), management said that it is increasing its workers' compensation claim accruals by $10 million ($0.08 per share) in 2015, including about $4 million of extra accruals in the first quarter (partly to reflect an adjustment to prior-year periods).  These higher accruals were deemed appropriate after a more detailed state-by-state analysis showed higher-than-expected claims trends in certain areas (New York and

California) of the company's blue-collar-focused SOI product. ***Given this issue, management lowered its annual revenue and EPS projections***.

115.    In fact, as described further by the William Blair report, TriNet's findings would require the same type of "***catch up charges***" for prior years that Barrett was required to make which defendants virtually assured investors that TriNet was immune to (¶¶86, 89):

> Management said that the company did a more detailed actuarial review in April for its workers' compensation ***plans and slightly changed the accrual methodology, which led to some catch-up charges for prior years*** which will be realized ***throughout 2015***.

116.    On May 6, 2015, Deutsche Bank, issued a report titled "Workers' comp & slower WSE growth will pressure shares; remains Buy," that explained the poor 1Q15 results and questioned whether defendants needed to change their pricing, and lamented defendants' failure to disclose more information explaining what caused the revenue impairment:

> **Workers' comp an issue, but it doesn't derail the story completely**
>
> It is hard to measure how significant the $10m worker's comp reserve write up is as we do not know how many employee's it is based on or the total current reserve. ***TriNet is partially blaming the SOI acquisition plus more detailed analysis of WSE growth, which is largely in higher worker's comp states like NYC and CA. Revenue per WSE for both service fees and net insurance fees has been trending down for the last two years***. We hope that this second issue on the insurance side pushes mgmt to raise pricing more aggressively.
>
> \*       \*       \*
>
> **Key takeaways, new information from the results**
>
> **Insurance costs were higher than expected for second straight quarter**
>
> Insurance costs came in $4m higher than expected in 1Q after coming $10-14m higher in 4Q. . . . [W]orkers compensation costs were up due to a reserve write up and new analysis of growth coming from high cost states.

117.    After the May 5, 2015 disclosure of the truth of the Company's 1Q15 financial results, TriNet's stock price declined sharply, from a close of $34.43 per share on May 5, 2015, to a close of $28.76 per share on May 6, 2015, on high trading volume, but remained artificially inflated by defendants' continued false and misleading statements.

118.    <u>False and Misleading Statements</u>: On May 8, 2015, the Company filed its 1Q15 Form 10-Q with the SEC, repeating the false financial results reported in the May 5, 2015 press release and

1   conference call.  The Form 10-Q included the false Sarbanes-Oxley certifications of, and was signed

2   by, Goldfield and Porter.

3        119.   <u>False and Misleading Statements</u>: On May 18, 2015, defendants participated in the

4   JPMorgan Global Technology, Media and Telecom Conference.  During the call, defendants

5   admitted that the Company did not, in fact, have visibility and risk management capability into large

6   claims which had "inherent volatility" and had not been collecting the data necessary to support its

7   confidently stated visibility into forecasted results despite prior reassurance to the contrary.

8   Defendants nevertheless continued to falsely assure investors that the problems TriNet experienced

9   in 1Q15 were unrelated to those in 4Q14, and had been resolved (or did not require resolution

10   because there was no need to change TriNet's underwriting standards, which were fine, and the

11   problems originated only in acquired businesses):

> [Porter:] In Q1, we had $4 million of higher workers comp costs than we were forecasting.  And the genesis of it, it came out of our blue and gray color book.  We did see some increased development as we were closing out the fourth quarter, and it looked like it was coming from some of the ***higher cost states that we were doing business and expecting to grow***.  ***So what we did is we took our actuarial, outside actuarial view down to do a state-by-state analysis***. . . .
>
>    . . . ***[W]e need to do a better job of getting headlights from our own perspective*** on looking at how those claims are developing and building that into our outlook. . . .  ***We are building some increased capability internally*** to do that.
>
> *   *   *
>
> ***So separate in Q4 [i.e. from 1Q15], what we did see was that there is inherent volatility in large medical claims***. . . .  So what we did is we took our forecast, we broke it down from just claims and premiums to run rate claims, large claims . . . .
>
>    . . . There's ***inherent lags*** when you have large complex claims at a carrier, and what we saw was ***we did not have enough visibility into those claims as they were developing***.  And it could take up to six months for a claim to be incurred before it's paid.  So we went out to all of our carriers and asked them to provide us with large claims pipelines greater than $50,000.  So ***now*** every month, they are giving us a report that tells us for claims that are not yet paid, that are above $50,000, how many of them are there and what's their estimated type of diagnostic there is.  ***So we are getting that now*** from all of our large carriers.

25        120.   One analyst asked defendants directly about the Company's risk methodology

26   because he had seen prior instances where other companies used low pricing to induce growth

27   compromising good risk management:

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF

[Analyst:] So Burton, I guess maybe just around it out, big picture question around sort of your philosophy on risk. It sounds like a lot of this is more methodology, more sort of business process as opposed to, say, a pricing issue. Because I know we've seen in the past pricing being used as a tool to drive growth. It doesn't sound like it's the case here but maybe if you can just broadly talk about philosophy around risk, we can then move on to some of the funner stuff.

[Goldfield:] So *we need to accurately forecast our business*, both in terms of the risk side of the business and in terms of the service fee side of the business. So I believe that *there's methodology aspects to this*, there's other aspects to it, but the bottom line is we need to do better in the future. So my feeling is *we have the systems. We're evolving the processes. We are adding in-house actuarial support*. And ultimately this is not what drives the business and *it is not a pricing issue*. And the workers comp issue had to do with a book that we acquired in the past. In fact, the claims were all – *none of those claims were underwritten by us. We've still got to forecast them*, but that's not part of our pricing methodology or ongoing business methodology.

121.    In light of defendants' statements and 1Q15 earnings coming in more or less in line (Net insurance revenue of $142.4 million on guidance of $142-$147 million), J.P. Morgan, in a May 18, 2015 report that provided takeaways from these analyst conferences, concluded that the prior 4Q14 miss was due in part to increasing FY14 guidance throughout 2014 without having visibility, but that defendants had already improved their forecasting:

- **Methodology tweaked for medical claims**. F4Q saw a miss on higher-than-expected medical claims, partially due to increased guidance given lighter medical claims throughout the beginning of FY14. Because of this, TNET broke out its medical claim forecasting methodology into large claims, run rate claims and pharmacy claims, *which has improved its forecasting (1Q in line)*. The company also is working to get better data visibility from its medical insurance carriers, establishing a large claims (>$50k) pipeline that gives insight into upcoming costs.

122.    Following the May 18, 2015 JPMorgan Global Technology Conference, the Company's stock price continued to trade at artificially inflated levels above $25.00.

123.    Following the __False and Misleading Statements__: On June 10, 2015, Goldfield and Porter participated in the William Blair Annual Growth Stock Conference where they discussed the Company's financial results and prospects, and reassured investors that defendants had taken adequate steps and were already receiving sufficient information from carriers to manage TriNet's claims risk:

[Porter:] So over the past three years 85% of our revenue comes from our installed base as we enter a year. *So it's a fairly predictable revenue stream*.

*We have an experienced risk management team and we manage the insurance element of our business*.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF                                                                                    - 54 -

*     *     *

>*We also do have some variability on this part of the business as I mentioned because there is a deductible element to it. We see that particularly on the medical side in large medical claims*. That is where there is some element of variability.

And also as we saw in Q1 we did have some variability because we had to realign our Workers' Comp. book from an acquisition that we did back in October 2012 for SOI and the blue and gray collar. And that's because some of the severity of claims that we acquired in 2012 were running a bit higher than we had been forecasting and the actuaries had estimated. So we trued that up in the first quarter and then estimated what that would be for the rest of 2015.

>*When we look at our risk management the thing that we do I think fairly well is our whole philosophy is to price to risk and to manage that and annually reprice it based on our clients' experience both on the medical side and on the Workers' Comp. side. On the medical side we use state-of-the-art analytics*. It's through a service that's called Truven.

124. On June 12, 2015, William Blair issued a report titled "Highlights From William Blair's 35th Annual Growth Stock Conference," which explained that "[t]he issues over the last two quarters highlight the risk inherent in the business and put a dent in management's credibility with the Street." William Blair nevertheless maintained an outperform rating for the Company, based in part on management's stated confidence from recent claim trends and additional investments in "claims management/prediction capabilities."

125. <u>Reasons Why Statements in ¶¶109-123 Were Knowingly False and Misleading</u>: Defendants' statements above, including those concerning: (i) the purported forecasting improvements the Company had made, reaffirming not only fiscal year guidance but the ability to grow revenue at 15% and maintain 33%-34% EBITDA in the long run; (ii) claims that 1Q15 workers' compensation insurance problems were unrelated to the medical benefits insurance problems of 4Q14; and (iii) statements that "we have an experienced risk management team and we manage the insurance element of our business" with access to "state-of-the-art analytics" were each materially false and misleading when made as defendants knew, or recklessly disregarded and failed to disclose, the following facts (which are discussed in greater detail at ¶¶82, 96, 108):

(a) The adverse medical claims experience reported in 4Q14 and the adverse workers' compensation claims experience reported in 1Q15 both stemmed from the same

1    deficiencies in risk management and timely data acquisition, which defendants – despite their

2    statements to the contrary – still had not remedied.

3              (b)    The Company had been prioritizing growth at the expense of profitability and

4    stability, including pursuing growth opportunities in high-risk markets like California and New York

5    in an attempt to capitalize on what defendants claimed to be a historic market opportunity.

6              (c)    Defendants had neither the limited exposure nor the purported stability of

7    fully insured plans, as represented.  The Company did not have sufficient risk management policies,

8    procedures and personnel in place to manage risk effectively and failed to perform sufficient due

9    diligence and risk assessment on prior acquisitions (in particular the SOI book of business acquired

10   in 2012).

11             (d)    The Company's forecasting process failed to properly incorporate relevant

12   historical and current claims trends due to the Company's failure to obtain timely data or analyze its

13   risk exposure and thus the Company's financial forecast lacked a reasonable basis.

14             (e)    The Company's internal controls suffered from wide spread material

15   weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and

16   collectively impaired the Company's ability to ensure accuracy and control over financial reporting.

17   In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs,

18   workers' compensation and liabilities.  *See* ¶148.

19        •      Certain reconciliations of claim payments per the Company's actuarial analyses to
20               actual amounts paid were  not operating effectively.

21        •      [C]ontrols over the review of health premium expenses did not operate at a level of
22               precision that would detect material errors.

23        •      [L]ack of a sufficient complement of personnel with an appropriate level of
               knowledge, experience and training . . . .

24   TriNet Announces Third Consecutive Revenue and Earnings Miss, Reveals Systemic and
     Continuing Inability to Forecast, Stock Plummets

25        126.    On August 3, 2015, the Company issued a press release announcing its 2Q15

26   financial results, which missed both revenue and EPS estimates by a wide margin due to another

27

28   increase in large medical claims, demonstrating once and for all that Company did not have stability,

1   predictability or visibility but in fact had a systemic problem in its inability to manage risk and

2   forecast claim costs.  In particular, net Insurance Service revenues for the quarter were down $20

3   million compared to forecast, or 43% year-over-year:

4       **TriNet Announces Second Quarter Fiscal 2015 Results**

5                     *        *        *

6   - Total revenues increased 22% to $640.0 million, while Net Service Revenues

7       decreased 2% to $122.0 million . . . due primarily to unexpected large medical claims.

8                     *        *        *

9   - Net loss was $1.3 million, or $0.02 per diluted share, compared to net income

10      of $6.2 million, or $0.09 per diluted share, in the same period last year.

11  - Adjusted Net Income was $10.5 million, or $0.14 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.4 million, or $0.24 per diluted share on a pro forma basis, in the same period last year.

12  - Adjusted EBITDA was $24.7 million, a 37% decrease from the same period

13      last year.

14                    *        *        *

15      Mr. Goldfield added, "While our growth momentum remains robust, our

16  results were ***impacted this quarter by a higher than expected number of large medical claims*** . . . ."

17      . . . TriNet's total revenues for the second quarter of 2015 increased 22% from the second quarter of 2014 to $640.0 million, while Net Service Revenues

18  decreased 2% from the second quarter of 2014 to $122.0 million.  Net Service Revenues consisted of professional service revenues of $97.8 million and Net

19  Insurance Service Revenues of $24.2 million.  Net Insurance Service Revenues consisted of insurance service revenues of $542.2 million, less insurance costs of

20  $518.0 million.  Professional service revenues for the second quarter of 2015 increased 19%, and ***Net Insurance Service Revenues decreased 43%, compared to***

21  ***the second quarter of 2014***.

22      127.    On August 3, 2015, the Company held a conference call with analysts and investors

23  to discuss the disappointing results as well as the net revenue guidance cut of $25 million, which, for

24  FY15, eliminated the entire healthcare performance fee (from which TriNet typically generates 20%

25  of net insurance revenue).  The Company also conceded that it did not have appropriate internal risk

26  management staff or expertise to effectively manage the Company's risk profile as it would hire

27  actuaries and senior insurance executives to help.  These were not one-time costs.  The Company

28  admitted they expected a higher claims level going forward:

1    [Goldfield]: I am disappointed that our second-quarter financial performance was negatively impacted by a higher than usual number of large medical claims.  These claims were well in excess of our expected and historical claims volatility. . . .

2

3    . . . [T]he large claims have been driven by clients joining prior to 2013.

4                          *          *          *

5    *I will strengthen my internal team.  This includes the recruitment of a senior insurance services executive reporting directly to me, as well as additional actuarial and analytical capabilities*.

6

7                          *          *          *

8    [Porter:] *Net insurance service revenues declined 43% to $24.2 million . . . . Net insurance service revenues were affected by a significantly higher number of large medical claims than we had anticipated*.

9

10   . . .  The result in Q2 was an approximate $20 million reduction in our net insurance service revenues compared to our forecast.

11

12   *Our revised 2015 forecast assumes the higher claims level continues and is included in our trend*. . . .   The result is, in addition to the Q2 impact, we are reducing our net insurance service revenues by an additional $10 million for the remainder of the year compared to our prior guidance.

13

14   128.    In addition, analysts challenged defendants' prior statements concerning improved

15   visibility into medical claims noting that guidance issued in 1Q15 whiffed on building these risks

16   into the forecast.  Defendants gave explanations starkly at odds with each other: They said their

17   "system is working," only to say "I need to get the predictability into the system" and that "any and

18   all [changes] are on the table"; They said that they were "getting the reports from the carriers in a

19   timely fashion " and that "[t]he reports are working," only to explain that "our carriers . . . need to

20   give us a visibility" and that "we need clean data from the carriers"; and They alternately blamed

21   "large claims" and "a lot of medium size claims":

22   [Analyst:] [Y]ou mentioned that you had improved the visibility of the medical claims, but clearly the guidance you gave last quarter didn't contemplate these medical claims coming in.  So could you just please clarify what aspect of the visibility you've now gotten more comfort with and what's left to do?

23

24

25   . . . [Goldfield:] So the increase in medical expenses was largely driven by higher than expected and large claims.  So that our system is working, which is getting the reports from the carriers in a reasonable timely fashion.

26

27   . . . So, my issue was a bunching of large claims in Q2.  They were not old claims that were flushed through the system. The reports are working.

28                          *          *          *

*[W]e need to find ways to a, get better visibility and b, to dampen the spike because it's not acceptable, the variability I saw in Q2.*

[Analyst:] Understood.  But at this point, would you consider reevaluating reinsurance options, for example, that give you – *maybe where you give up some net revenue but dramatically improve the predictability of the revenue model going forward*?

[Goldfield:]  *So, absolutely, any and all things are on the table. . . .  I'm going to strengthen the internal team with a senior insurance executive who is right by my side.  I'm going to increase the in-house actuarial and analytical capabilities*. . . .  [U]p till now, reducing the pooling did not seem like a viable option from a cost standpoint.  And frankly, our pooling levels vary, but they go up to about $1 million for some carriers.

\*      \*      \*

*I need to get the predictability in the system.*

\*      \*      \*

We worked with our carriers directly with the Senior Executives . . . . *They need to give us a visibility*.

. . . [The claims] were mostly from Passport, many from California, a lot of people on high-end medical plans.

. . . And I'm still digging claim by claim to understand. . . .  It was a lot of medium size claims.

\*      \*      \*

The clients that drove these large claims in Q2 were here prior to 2013.  And again, they were out of the passport book of business, which has been around for 25 years in the technology vertical and the majority were in California. . . .

To turn to your question, what do I do about this?  I need to directly address this medical claims volatility, number one.  And I need to address the visibility to those medical claims.  So number one is, *we need clean data from the carriers*. . . . Number two is, we rely on outside actuaries and consultants.  I need to bring in some expertise in-house that I can really get aligned with on the overall service model and how it works within TriNet.  *So that includes a senior executive reporting to me additional actuarial and analytical capabilities*.

129.   On August 3, 2015, William Blair downgraded TriNet in a report that concluded that the issues the Company had experienced in 4Q14, 1Q15, and now 2Q15 were related and significant. The report titled, "Strike Three on Insurance Claims; Market Probably Ascribing Minimal Value to Insurance Side of Business; Lowering Rating to Market Perform," explained that the "higher-than-expected number of large medical claims in the second quarter negatively impacted net insurance

revenue growth by over 50 percentage points," and called into question the viability of the

Company's business model and defendants' ability to properly manage risk:

> *We suspect that there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business* . . . .
>
> . . . *We think that the third straight quarter with issues related to insurance claims costs will cause many investors to effectively put minimal or no value on the company's ability to generate profits from the risk-bearing portion of their insurance plans* . . . .
>
> *            *            *
>
> Similar to the healthcare claims issues in the fourth quarter, management said that most of the issues pertained to the midlevel Passport product.  We think the increase in claims costs was *particularly significant in the month of June and in the state of California*.  Management said that the increase in claims late in the quarter was much bigger than they have seen in their history, so they are assuming the increased claims in the second quarter drive a *permanent increase in the annual claims trends for the company (negatively impacted guidance for the second half of the year by about $10 million*, on top of the negative impact to the second quarter).  Given this assumption, the company is now projecting a medical loss ratio (MLR) of about 85% in 2015, up from its normal target of about 82%, *which essentially puts the healthcare insurance business on pace for a break-even net revenue year (i.e., revenue offsets the costs)*.

130.     William Blair also explained that, although management claimed that a carrier of

theirs had experienced a similar spike in claims, TriNet's competitors had not experienced similar

issues, reporting that TriNet's negative net revenue growth (down 2% year-over-year, 11% from

1Q15, 4% from 4Q14, and 19%-22% from the prior three quarters) "rate compares with 9% growth

at Insperity, 16% growth in ADP's PEO segment, and 13% growth at Barrett Business Services'

PEO segment."

131.     On August 4, 2015, J.P. Morgan issued a report explaining the analyst's surprise that

after reducing fiscal year and quarterly guidance during the last earnings call, defendants had

nevertheless failed to clear that low bar.  The report concluded that defendants' credibility had been

tarnished and that TriNet's stock price was likely to stay depressed as a result:

> TriNet missed 2Q expectations by a wide margin due to higher than expected medical claims, *the third claims-related miss in a row*, and *very disappointing as we thought guidance was set conservatively*.  TNET fell short of the low-end of its EBITDA target by $12M (or 33%) and net service revenue by the same dollar amount or 10% primarily due to an unforeseen spike in frequency of large medical claims.  On a brighter note, WSE/unit growth was up 17% (JPMe 14%) and sales rep count reached 486 to exceed its 470 target.  EBITDA guidance was cut 15% for the

1  year at the mid-point, and ***we expect the stock to be down more than that given
2  management credibility concerns***.

3      132.  Following the Company's disclosure of its 2Q15 financial results, the Company's
4  stock price declined a whopping 38%, from a close of $26.69 per share on August 3, 2015, to a close
5  of $16.33 per share on August 4, 2015, on high trading volume of more than 12 million shares.

6      133.  <u>False and Misleading Statements</u>: On August 6, 2015, the Company filed its 2Q15
7  Form 10-Q with the SEC, repeating the financial results reported in the August 3, 2014 press release
8  and conference call.  The Form 10-Q included the false Sarbanes-Oxley certifications of, and was
9  signed by, Goldfield and Porter.  The statements in the Form 10-Q were materially false and
10 misleading for all the reasons set forth in ¶108(f).

11     134.  On August 14, 2015, William Blair issued a report titled "Conclusions From
12 Meetings With Management" that explained the Company's plans to improve its risk management
13 and forecasting, including hiring for the first time internal actuaries and dedicated positions for
14 health benefits and workers' compensation, were as yet unrealized:

> As it noted on its second-quarter conference call, the company is hiring an internal
> insurance executive who will report directly to the CEO, ***which is not a position that
> it has previously had***.  TriNet previously had one person who was in charge of both
> workers' compensation and healthcare insurance (this person previously reported to
> the CFO), but the company is dividing that responsibility among two people now,
> both of whom will report to the new head of insurance.  The company also is adding
> internal actuaries (***which it did not have in the past***) for both sides of the insurance
> business.

15     135.  On September 16, 2015, Goldfield and Porter participated in the Deutsche Bank
16 Technology Conference to discuss the aftermath of the Company's disastrous 4Q14, 1Q15 and 2Q15
17 as well as the yet unfinished efforts to create internal risk management capabilities and gain visibility
18 into the Company's business.  During the call, defendants admitted that they did not have the
19 forecasting tools or data necessary to underwrite their health insurance business, and that the
20 Company had deliberately sacrificed profitability to market share growth by taking higher risk
21 accounts, especially in New York and California, without increasing reserves or raising prices, in
22 order to grow the business:

> [Goldfield:] So our inability to forecast Q2 is absolutely unacceptable, I agree
> with that . . . .

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                 - 61 -

1                                    *          *          *

2          [Porter:] So if we're referring to the situation that we saw in the first quarter, what we did see with it, we had acquired a book in the blue and gray market, ***and as***

3   ***part of our diligence, we didn't go down probably one layer more than we traditionally have been***. We always bring in new actuarial work in sizing potential

4   variability around any comp book that we acquire.

5          ***In this situation, what we've learned is we probably actually should've gone back to the TPA and tested at a claims level what type of reserves were being put***

6   ***on at the TPA***.

7                                    *          *          *

8          It was the open claims. This is, again, it's an acquired book. So this was a book that we had acquired back in October 2012 and their practice was that ***they did***

9   ***not reserve is what we would determine to be industry best practice***, and so even though we did sensitivity around all the loss triangles, ***what we should have done is***

10  ***gone one layer back and found out that the loss triangles probably were skewed based on the reserving practices***.

11
          Now those claims actually developed at a higher rate over time than what we
12  had expected them to be, and that's why we made the adjustment in the first quarter because what we did is we had our outside actuaries go back and do a state-level

13  analysis because we can get a more accurate read on which claims were developing at a higher rate, and it ended up being ***those states that generally you would expect***

14  ***to have higher costs, which would be California and New York. But those also are the opportunity states where we see a lot of business***.

15                                   *          *          *

16          [Goldfield:] ***I don't want to sacrifice the growth opportunity right now. I***
17  ***think that's what this is about***.

18                                   *          *          *

19          I want to do that without sacrificing the growth rate. ***So I would sacrifice a few hundred basis points of profitability to maintain control over the plans because***

20  ***I think pricing is one aspect***.

21                                   *          *          *

22          ***A lot of folks are saying, well, slow your growth and take care of these issues. I believe that the market opportunity won't exist forever***. I've never seen

23  one like this and I want to see if I can prove out that this is as wide open as I believe it is. So that is sort of the product.

24          136.   On November 2, 2015, Goldfield and Porter participated in a conference call with
25
analysts and investors to discuss the Company's 3Q15 financial results. Goldfield was clearly
26
relieved that 3Q15 financial results had come in more or less in line with substantially reduced
27
guidance. During the call, defendants again admitted that TriNet did not have fully insured plans,
28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                                    - 62 -

1   had not yet enacted the changes necessary to improve their forecasting, did not have internal

2   actuaries during the Class Period and were still bringing in new talent, did not have and had not had

3   aggregate pooling limits and were unprepared to say whether they could correct the Company's

4   business model so as to be profitable.  Defendants also ignored a direct question about whether Blue

5   Shield and other carriers had experienced similar spikes in claims:

6          [Goldfield:] *We are bringing in new talent.  I have met with excellent candidates as part of the search* for the Senior VP of Insurance Services. Additionally, *our team is in the advanced stages of selecting from a number of strong candidates for our Chief Medical Actuary position*.

8                    *        *        *

9   *We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business*.

11         The second area is new insurance constructs.  Either on one end of the spectrum would be more fully insured plans, *today 40% of our plans are fully insured, 60% of our plans are high deductible plans.  And whether we should move more towards the fully insured side of the plans*.

13         The opposite end of that spectrum is reinsurance.  Which would be a combination of either reducing pooling limits, today the pooling limits are somewhere between $350,000 and $1 million by carrier.  Reducing those pooling limits and *or putting an aggregate pooling limit in place [i.e. stop loss protection]*, meaning a total limit on the entire claims activity in any one quarter to dampen that volatility.

17                    *        *        *

18   [Analyst:] I know you have a process of reevaluating the strategy.  However, if you're breaking even on that business this year, and you're contemplating changes for next year, *is there any reason for us to think that even if you do pass through some of that lift, that effort or that initiative, would be at least margin breakeven* if not accretive if properly executed?

21         [Porter:] *I think we'll wait to really give our outlook for Q4 once we've finished the work. . . .  And we'll have a lot more to talk about once we have the construct and the team further in place in Q4*.

23                    *        *        *

24   [Analyst:] Based on your past experience, typically, does the step up in worker's comp expense in year one typically translate into another step up in worker's comp expense [in] year two given how actuarial accruals are calculated based on past claims experience?

26         [Porter:] That something that as we work with our actuaries and *now that we actually have our own actuary in house*, we will continue to look at.

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                          - 63 -

137.    Following the after hours disclosures on November 2, 2015, TriNet's stock price declined from a close of $19.29 per share on November 2, 2015, to a close of $18.10 per share on November 3, 2015, on high trading volume.

138.    <u>False and Misleading Statements</u>: On November 6, 2015, the Company filed its 3Q15 Form 10-Q with the SEC, repeating the financial results reported in the November 2, 2015 press release and conference call.  The Form 10-Q included the false Sarbanes-Oxley certifications of, and was signed by, Goldfield and Porter.  The statements in the Form 10-Q were materially false and misleading for all the reasons set forth in ¶108(f).

139.    As of November 10, 2015, defendants were still describing the need to create an internal risk management and forecasting team.  Speaking at the JPMorgan Ultimate Services Investor Conference, defendants explained that only now was it time to bring that capacity in-house, then explained that internal actuaries are critical even under a fully insured model, explaining that whatever the construct of the insurance plans they were offering, defendants needed actuaries and other risk management experts to have enough visibility to manage the Company's liability:

> [Goldfield:] [W]e're hiring in-house actuarial talent.  We rely on great external talent, but ***it's time to bring those models in-house and have more visibility and focus around them***.
>
> As I previously reported, we have a Chief Actuary on the workers' comp side and we're closing on a Chief Actuary on the medical side.  And then, additionally, looking at different processes and services around how we are forecasting the medical and addressing the issues around the volatility associated with it.  And then, finally, we're completing a study with a large outside consulting firm.
>
> *                *                *
>
> [Analyst:] [M]aybe it would be helpful if you can just go through the spectrum of potential changes that you might make to call it out or hedge out the risk around claims volatility.  What could that look like and what would the impact be on the P&L?
>
> [Porter:] So if we start at what guaranteed costs looks like and guaranteed costs or ***some people would call it fully insured***.  So that's effectively a pass through.  So if we and we are going through and exploring that possibility with the carriers, in that situation effectively there is no performance fee, it's complete pass through and that would have a P&L impact on EBITDA margin of around 30%, because performance fees would go away.
>
> *                *                *

1  [Goldfield:]  [O]n a fully-insured plan . . . you would still want to get a really great
2  set of tools and actuaries to understand the performance of the book . . . you would
   take the volatility out of it, but you would still want that data.

3  140.  Then on February 29, 2016, the Company issued a press release announcing the

4  Company's financial results for 4Q15 and FY15, declaring that the Company was unprepared to file

5  its Form 10-K and had sought an extension from the SEC due to the identification of material

6  weaknesses in its internal controls over financial reporting relating to "IT" controls and controls in

7  "key business processes":

8  TriNet also announced that they will file a Form 12b-25 with the SEC today
   providing for a *fifteen (15) calendar day* extension for its Annual Report on Form
9  10-K for the fiscal year ended December 31, 2015.  With this being TriNet's first
   assessment of internal controls over financial reporting pursuant to the Sarbanes-
10  Oxley Act of 2002, and given the multiple technology platforms that require
   evaluation and testing, TriNet requires additional time to complete its assessment of
11  its internal control over financial reporting.

12  In preparing the Company's financial statements as of and for the year ended
   December 31, 2015, *the Company identified material weaknesses in its internal
13  control over financial reporting relating to ineffective information technology
   general controls and ineffective controls in key business processes*.  While these
14  material weaknesses create a reasonable possibility that an error in financial
   reporting may go undetected, after extensive review and analysis, no material
15  adjustments, restatement or other revisions to previously issued financial statements
   are expected to be required.

16
   . . . TriNet currently expects to finalize its financial results and file its Annual
17  Report on Form 10-K prior to the expiration of the extension period and further
   expects that the financial information contained in the Form 10-K will be consistent
18  with the financial results reported in this earnings release.

19  141.  On February 29, 2016, the Company held a conference call with analysts and

20  investors to discuss the 4Q15 and FY15 results.  Porter addressed the Company's failure to timely

21  file its FY15 Form 10-K stating:

22  [Porter:]  For the first time, [our year-end reporting] process included an assessment
   of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act.  In
23  the course of completing our internal control assessment and preparing the FY15
   financial statements, we became aware of material weaknesses in our internal
24  controls over financial reporting, *related to ineffective information technology
   general controls and ineffective controls in key business processes*. *As a result of
25  the material weaknesses in our internal control over financial reporting, we have
   concluded that our disclosure controls and procedures were not effective*.

26
   While these material weaknesses create a reasonable possibility that an error
27  in financial reporting may go undetected, after extensive review and analysis, no
   material adjustments, restatement or other revisions to previously [issued] financial
28  statements are expected to be required.  Furthermore, we're putting in place plans,

and are committed to remediating these deficiencies by implementing changes to our internal control over financial reporting in the future.

With this being our first assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act, and given the multiple platforms that require evaluation and testing, we have been unable to complete our assessment of our internal control over financial reporting.  And as a result, we have filed a Form 12b-25 with the SEC today, providing for a 15-calendar-day extension for our annual report on Form 10-K for the fiscal year ended December 31, 2015.  We currently expect to file our Form 10-K *prior to the expiration of the extension*, and further, that the financial information contained in the Form 10-K will be consistent with financial results in today's earnings release.

142.    During the February 29, 2016 conference call, Goldfield and Porter also made a number of statements concerning the insurance claims volatility that had affected the business. Goldfield announced that TriNet had finally been able to hire some of the internal talent promised, including a Vice President of Insurance Services, a Chief Medical Actuary and a Chief Workers Compensation Actuary.  He also explained that TriNet had been unable to negotiate reinsurance or other liability caps at cost effective prices, particularly because TriNet had never previously approached reinsurers, and that it was still an open question as to whether TriNet "can arrive at the right balance of risk mitigation and costs":

[Goldfield]: With the regard to reinsurance, our goal was focused on capping quarterly claims expense at the appropriate economic cost.  The pricing and attachment points we received from the market to-date were not conducive to achieving this objective at this time.

*          *          *

38% of our plans are fully insured [but] . . . if we went with the fully insured plans, [for all our plans] it reduces the quarter-to-quarter volatility, but it doesn't help the year-over-year because the increase would then be passed directly on to our clients.

*          *          *

*[W]e didn't get face-to-face early enough with the reinsurers*.  I think there is an opportunity as they get to know us and our constructs . . . .

*          *          *

[Analyst:] [Y]ou've brought on new talent in the insurance business, with a lot of experience in health and actuarial analysis.  What new findings have you discovered that you didn't previously know, that caused the elevated medical claims frequency from last year?

[Porter:] *I don't think there's anything* that we have seen *that is going to help us* go back and *understand* when you get *large claims activity*.  But what we are looking at, both as part of the evaluation that we did with the consulting firm, as

1   well as with Ed and the new actuarial talent, is, we're continuing to look at ways to
    get access into analyzed data faster.  And come to insights probably a little sooner,
2   which helps us both identify trends earlier, and that also helps us then to consider
    what the effects are, either positive or negative, on pricing, earlier.  So I think those
3   are some of the things that have already come up, and we're looking at ways we can
    institutionalize that, both internally with the way we handle data, as well as how do
4   we get data from different sources and look at it a little faster than we do today.

5       143.    Following the after hours announcement that TriNet was unprepared to file its Form

6   10-K on February 29, 2016, the Company's stock fell from a close of $13.09 on February 29, 2016,

7   to a close of $12.28 on March 1, 2016.

8       144.    On March 1, 2016, Morgan Stanley issued a report titled "4Q15: Risky for Another

9   Day."  The report noted that "[t]here is an element of faith in forecasting net insurance revenue,

10  since the company's track record is short and inconsistent."  The report also explained that the "[d]e-

11  risked model remains elusive" because brokers were unwilling to provide TriNet with reinsurance at

12  attractive pricing, that the Sarbanes-Oxley delay appears benign given the delay would only last

13  about 15 days, and that TriNet was still hoping to see the benefit from the late additions of internal

14  actuarial experience:

15          **New team of actuaries should help with intangibles**: TNET hired a new
            SVP of Insurance, Chief Medical Actuary, and Chief Worker's Comp Actuary to
16          bolster its insurance business decisionmaking and modeling accuracy. While early,
            the potential benefits are 1) improvements to operations i.e. best practices, 2) more
17          precise reserving, 3) better forecasting of TNET business and industry trends, and
            4) more thoughtful insurance pricing.
18
19      145.    On March 1, 2016, J.P.Morgan issued a report titled "Mixed Qtr, Reasonable

20  Guidance As Plan To Hedge Risk Is Budgeted, But Not Solidified."  The report explained that

    TriNet was still exposed to the same medical claims volatility:
21
            **Medical risk update – status quo, but budgeting for reinsurance**.  After
22          months of review, TNET announced it *would not pursue a fully insured or
            guaranteed cost strategy*, and instead is budgeting to hedge or reinsure its risk, but
23          has not executed said plan yet.  In other words, it is *still exposed to medical claims
            volatility* for now, but has guided to include the cost of hedging volatility and will
24          execute it at the right price under the direction of the new internal risk team. . . .
            *[S]ome may have hoped for more certainty on risk (via fully insured)* . . . .
25
        146.    On March 8, 2016, Morgan Stanley published a report titled "NDR: A Long (but
26
    Doable) 2016 To-Do List," which reported that "*TNET underpriced its insurance premiums by
27
    200bps on an aggregate level, and repricing its entire book will take 12-18 Months*."
28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                            - 67 -

147.    On March 15, 2016 the Company issued a press release announcing that TriNet was still not able to file its FY15 Form 10-K, and could not say when it would be able to do so:

> **SAN LEANDRO, Calif. – March 15, 2016 –** TriNet Group, Inc. (NYSE: TNET) today announced that, despite extensive efforts, TriNet was unable to file its Annual Report on Form 10-K for the year ended December 31, 2015, with the U.S. Securities and Exchange Commission (the "SEC") prior to the extended filing date of March 15, 2016.  TriNet currently expects to finalize its financial results and file its Annual Report on Form 10-K with the SEC as soon as practicable and further expects that the financial information contained in the Form 10-K will be consistent in all material respects with the financial results reported in our press release dated February 29, 2016.  Based on the review and analysis conducted to date, no material adjustments, restatement or other revisions to previously issued financial statements of the Company are currently expected to be required.
>
> As previously disclosed, TriNet was unable to timely file its 2015 Form 10-K with the U.S. Securities and Exchange Commission (the "SEC") on February 29, 2016, due to the fact that the Company required additional time to complete its first assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act of 2002, given the multiple technology platforms that required evaluation and testing.
>
> TriNet continues to work diligently to finalize the assessment of internal controls over financial reporting and to complete the audit of the Company's financial statements as of and for the year ended December 31, 2015, and obtain the related attestation and audit opinion from its auditors.  TriNet currently expects to finalize its financial results and file its Annual Report on Form 10-K with the SEC as soon as practicable.

148.    On April 1, 2016, the Company filed its Form 10-K for the period ending December 31, 2015.  The Form 10-K had been delayed due to the identification of material weaknesses in internal controls over financial reporting and resulted in an SEC Delisting Notice that was filed on March 17, 2016.  The Form 10-K identified and discussed in detail the material weakness over financial reporting which further corroborate the allegations set forth herein, establishing the materially false and misleading nature of the alleged misstatements and stated as follows:

> ***We have identified material weaknesses in our internal control over financial reporting that could, if not remediated, result in material misstatements in our financial statements.***
>
> In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2015, we have identified material weaknesses relating to our internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. As described in Item 9A.  Controls and Procedures, we have concluded that our internal control over financial reporting was

not effective as of December 31, 2015 due to material weaknesses.  Specifically, we identified material weaknesses relating to:

> (i)     ineffective information technology general controls, primarily with respect to computer operations, access controls and change management,
>
> (ii)     ineffective control environment and risk assessment,
>
> (iii)     ineffective management review controls and controls over system-generated reports,
>
> (iv)     ineffective controls over payroll operations,
>
> (v)     ineffective controls over health and workers compensation liabilities and related expenses,
>
> (vi)     ineffective controls over validating accuracy of payroll tax liabilities, and
>
> (vii)     ineffective authorization controls over procurement processes.

149.  In further discussing the control weaknesses, the Company explained that they could not be immediately corrected:

> As further described in Part II, Item 9A "Controls and Procedures" below, we are taking specific steps to remediate the material weaknesses that we identified; however, *the material weaknesses will not be remediated until the necessary controls have been implemented and we have determined the controls to be operating effectively*.  Because the reliability of the internal control process requires repeatable execution, the successful remediation of these material weaknesses will require review and evidence of effectiveness prior to concluding that the controls are effective.  In addition, *we may need to take additional measures to address the material weaknesses or modify the remediation steps*, and we cannot be certain that the measures we have taken, and expect to take, to improve our internal controls will be sufficient to address the issues identified, to ensure that our internal controls are effective or to ensure that the identified material weaknesses will not result in a material misstatement of our annual or interim consolidated financial statements.

\*      \*      \*

**Ineffective information technology (IT) general controls**

> Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our IT general controls (ITGCs) for certain of our key information systems, including our enterprise resource planning (ERP) systems and payroll systems, that are relevant to the preparation of our consolidated financial statements and system of internal control over financial reporting.  In addition, these deficiencies also impact the ability to rely on related interfaces, application controls and reports generated by the systems with ineffective ITGCs.  *The ineffective design and operation of our ITGCs impacts all of our significant financial statement accounts and disclosures*. The deficiencies related to the design and operating effectiveness of our ITGCs fell into the three main categories listed below:

- *Computer Operations*

Design and operating effectiveness of our system of controls related to the monitoring of batch processing and system interfaces to ensure the completeness and accuracy of data movement involving our ERP system and certain payroll systems that process revenue transactions were identified as having deficiencies.

- *Access Controls*

Design and operating effectiveness of our controls to ensure that access to applications and data were adequately restricted to appropriate personnel were identified as having deficiencies. These deficiencies impact a number of our systems that process internal and revenue-generating payroll transactions, fixed assets, stock option and restricted stock unit information, procurement authorizations, insurance expenses, insurance reserves and payroll taxes.

- *Change Management*

Design and operating effectiveness of controls to monitor program change management procedures, including monitoring the activities of individuals who have authority and have been granted access to make changes to programs, were identified as having deficiencies. These deficiencies impacted systems that process procurement authorizations and accumulate claims data that is utilized to estimate worker's compensation liabilities.

**Ineffective control environment and risk assessment**

Our management determined that a material weakness exists due ***to a lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training commensurate with our structure, internal control, and financial reporting requirements***. Additionally, we did not have an adequate process in place to complete our testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner.

**Ineffective management review controls and controls over system-generated reports**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to ensure that key spreadsheets and system-generated reports were properly reviewed for completeness and accuracy. For certain management review controls, controls verifying the accuracy of underlying data used to perform these reviews were not performed or adequately documented. In addition, certain ***management review controls were not performed at a sufficiently precise level to identify errors that could aggregate to a material misstatement of the financial statements. These deficiencies impact substantially all of our significant financial statement accounts***.

**Ineffective controls over payroll operations**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls over the accuracy of certain information that we manually input into the

payroll systems and that is used in the processing of payroll for customers.  Manually input information includes contractual terms, bill rates, benefit elections and other wage data.  Controls identified to prevent or detect inappropriate changes to payroll information and resolve payroll processing errors were not effectively designed to detect material errors.  Additionally, management identified deficiencies related to the design and operating effectiveness of controls over the reconciliation of benefit enrollment data between the Company's payroll systems and the insurance carriers' records. ***The deficiencies impact amounts recorded as professional and insurance service revenues, operating expenses, accrued*** corporate wages, and worksite employee related assets and liabilities.

**Ineffective controls over health and workers compensation liabilities and related expenses**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to ***validate the completeness and accuracy of data utilized in calculating health and workers compensation liabilities and related expenses, including premium expenses and administrative fees***.  Data utilized includes enrollment counts, cost rates, wage data, claim counts and incurred and paid claim amounts. ***Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were not operating effectively.  Additionally, controls over the review of health premium expenses did not operate at a level*** of precision that would detect material errors.  These deficiencies impact insurance costs, workers compensation receivables, workers compensation liabilities, and worksite employee related assets and liabilities.

**Ineffective controls over validating accuracy of payroll tax liabilities**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the accuracy and completeness of tax rates input into our payroll systems, including reconciliation to the general ledger of the payroll taxes payable account at a sufficient level of detail.  In addition, due to the ineffective ITGCs over the system that calculates payroll tax withholdings, compensating controls identified are not sufficiently precise to prevent or detect errors in the amounts recorded as payroll tax liabilities for internal employees and WSEs.

**Ineffective authorization controls over procurement processes**

Our management determined that a material weakness exists related to the design and operating effectiveness of our controls over the initial set up and changes to designated approvers over corporate purchases, including purchasing card limits, expense reimbursements or approving new vendors added to the procurement system.

### TRINET'S IPO REGISTRATION STATEMENT AND SECONDARY OFFERING REGISTRATION STATEMENT WERE MATERIALLY MISSTATED IN VIOLATION OF SEC DISCLOSURE RULES

150.    In addition to the false statements identified above (¶63), defendants were also required, under SEC disclosure rules, to make certain disclosures in the *Management's Discussion*

*and Analysis of Financial Condition and Results of Operations* ("MD&A") section of the Company's IPO Registration Statement.[9] According to the SEC, "The purpose of MD&A is not complicated. It is to provide readers information 'necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations.'" *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, states:

> The MD&A requirements are intended to satisfy three principal objectives:
>
> • to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;
>
> • to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and
>
> • to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance[10]

151. As detailed below, defendants failed to make several key MD&A disclosures in TriNet's IPO Registration Statement.

A.  Defendants Failed to Disclose Significant Trends

152. In its IPO Registration Statement, defendants failed to disclose that the Company was experiencing adverse claims trends in workers' compensation that would negatively affect the Company's future business prospects. Defendants later admitted that, at the time of the IPO, the Company was experiencing adverse claims trends – particularly in its SOI book of business, acquired in 2012. For example, in 1Q15, defendants admitted that "Net insurance service revenues were affected by higher than expected workers compensation costs in our blue- and gray-collar book for older years." An analyst described the 1Q15 disclosures as "***catch-up charges for prior years***."

---

[9]  The SEC's rules and requirements for MD&A disclosure are located in SEC Regulation S-K Item 303 and a series of subsequent interpretations issued by the SEC including *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation*, Release Nos. 33-8350; 34-48960; FR-72 (Dec. 19, 2003).

[10]  Release Nos. 33-8350; 34-48960; FR-72.

1   153.   The existing trend in workers' compensation claims, at the time of the IPO, was

2   exactly the type of information required to be disclosed in the MD&A.  The SEC has plainly stated

3   that "*companies must identify and disclose known trends* . . . *that are reasonably likely to have a*

4   *material effect on financial condition or operating performance*."[11]

5        B.   Defendants Failed to Disclose Significant Uncertainties

6   154.   In its IPO Registration Statement, defendants failed to disclose an accurate picture of

7   the Company's exposure to insurance claim losses including the high degree of uncertainty inherent

8   in the Company's loss exposure.  Instead, defendants emphasized TriNet's superior risk management

9   processes and management's high visibility into future results.  Defendants also emphasized the lack

10  of uncertainty and risk in their insurance business which was purportedly achieved through programs

11  to limit potential loss exposure (*i.e.*, "fully insured plans," "aggregate stop-loss limits," etc.) leaving

12  TriNet with only "modest" deductible risk.

13  155.   As detailed herein, defendants later shocked investors with unexpected health

14  insurance and workers' compensation claim losses.  ¶¶98, 109, 126.  Defendants were forced to

15  admit that risk management was not among the Company's core competencies *i.e.*, TriNet did not

16  have sufficient policies, procedures, and personnel in place to support claims of risk management

17  proficiency as the Company stated in its IPO Registration Statement.  ¶63.  Nor did defendants have

18  a basis to claim the Company had either stability or predictability with respect to the performance of

19  the Company's insurance businesses.  Defendants also admitted that prior to 4Q14, they did not have

20  forward visibility into developing claims and that they had not negotiated aggregate stop-loss limits,

21  as previously claimed.  *See* ¶¶110-111, 119-120, 127-128, 134, 136, 139, 142.  Because of

22  defendants' prior misrepresentations regarding limited exposure, analysts and investors were

23  shocked by these revelations which detailed the level of uncertainty inherent in the Company's claim

24  exposure.

25  156.   The Company's true exposure to claim losses, including the high degree of

26  uncertainty inherent in the Company's exposure, was exactly the type of information required to be

27

28  [11]   Release Nos. 33-8350; 34-48960; FR-72.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF

1  disclosed in the MD&A section of the IPO Registration Statement.  This uncertainty resulted in a

2  high likelihood that past performance of the Company's insurance businesses, as of the time of the

3  IPO, was not indicative of future performance.  The SEC's MD&A disclosure rules state:

> MD&A must specifically focus on known material events and ***uncertainties*** that
> would cause reported financial information not to be necessarily indicative of future
> operating performance or of future financial condition.

>                    *        *        *

> One of the principal objectives of MD&A is to provide information about the
> quality and potential variability of a company's earnings and cash flow, so that
> readers can ascertain ***the likelihood that past performance is indicative of future***
> ***performance***.

>                    *        *        *

> If there is a reasonable likelihood that reported financial information is not
> indicative of a company's future financial condition or future operating performance
> ***due, for example, to the levels of subjectivity and judgment necessary to account***
> ***for highly uncertain matters and the susceptibility of such matters to change,***
> ***appropriate disclosure in MD&A should be considered and may be required***. [12]

157.    As Deutsche Bank subsequently reported, on September 11, 2015, after three

consecutive quarters in which unexpected claims expenses negatively affected TriNet's financial

results, "[w]e think TriNet needs to disclose more information about its gross insurance revenue, so

that investors can better understand the risks TriNet is taking."

Defendants Failed to Disclose Critical Accounting Estimate

158.    In its IPO Registration Statement, defendants failed to make required disclosures

regarding the Company's accounting for insurance loss reserves.  The insurance loss reserves should

have been  identified as "critical accounting estimates" by defendants.  As such, defendants were

required to disclose the following quantitative and qualitative details regarding the Company's loss

reserves and the sufficiency of the Company's loss reserve processes:

- How TriNet calculated the reserves including the underlying assumptions used by
  management;

- How accurate the reserves had been in the past including how much the reserves  had
  been changed in the past;

---

[12]    Release Nos. 33-8350; 34-48960; FR-72.

1      • Whether the reserve was reasonably likely to change in the future and the reason for the potential change (*i.e.*, inherent uncertainty attached to the reserve or other difficulty in measuring); and

2

3      • Analysis of TriNet's sensitivity to a change in the reserve, based on other outcomes that were reasonably likely to occur.

4

5      159.   Instead of making the required disclosures regarding its loss reserves, defendants

6   emphasized TriNet's superior risk management processes and management's high visibility into

7   claims exposure.

8      160.   Defendants later admitted that the Company's reserve estimation process was

9   deficient.  For example:

10     • [W]e just *did not have the visibility that we really should have* to be able to track those large claims . . . .

11

12     • [W]e *didn't have enough visibility* into the claims that we're developing . . . .

13     • And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that *we needed to do a little bit more analysis* than we had previously seen.

14

15     161.   Defendants also admitted that the Company did not have adequate insurance

16   executives or in-house actuarial staff to effectively analyze risk in connection with setting loss

17   reserves for claims experience and exposure.

18     162.   As a critical accounting estimate[13] at the time of the IPO, TriNet was required to

19   make quantitative and qualitative disclosures regarding its insurance loss reserves.  The SEC's

20   MD&A disclosure rules state:

21            When preparing disclosure under the current requirements, companies should consider whether they have made accounting estimates . . . companies should provide disclosure about those *critical accounting estimates* or assumptions in their MD&A.

22

23                              *       *       *

24            A company should address specifically *why its accounting estimates or assumptions bear the risk of change*.  The reason may be that there is an uncertainty attached to the estimate or assumption, or it just may be difficult to measure or value.

25

26   ---
[13]   The SEC staff has emphasized the enhanced disclosure of critical accounting policies including, in particular, "[i]nsurance loss reserves."  *Summary by the Division of Corporation Finance of Significant Issues Addressed in the Review of the Periodic Reports of the Fortune 500 Companies* (Feb. 27, 2003) available at www.sec.gov/divisions/corpfin/fortune500rep.htm.

27

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                          - 75 -

1    Equally important, companies should address the questions that arise once the critical
2    accounting estimate or assumption has been identified, by analyzing, to the extent
     material, such factors *as how they arrived at the estimate, how accurate the*
     *estimate/assumption has been in the past, how much the estimate/assumption has*
3    *changed in the past, and whether the estimate/assumption is reasonably likely to*
     *change in the future*. Since critical accounting estimates and assumptions are based
4    on matters that are highly uncertain, a company should *analyze their specific*
     *sensitivity to change, based on other outcomes that are reasonably likely to occur*
5    and would have a material effect. Companies should provide *quantitative as well as*
     *qualitative disclosure* when quantitative information is reasonably available and will
6    provide material information for investors.[14]

7    163.    Once it was revealed that the Company's reserve estimation process was deficient,

8    investors considered TriNet' failure to disclose measures regarding insurance loss reserves

9    significant. Deutsche Bank, for example, in a subsequent May 6, 2015 report, explained that "[i]t is

10   hard to measure how significant the $10m worker's comp reserve write up is as we do not know how

11   many employee's it is based on or the total current reserve."

12   164.    In addition to the false statements identified above in ¶80, defendants were also

13   required, under SEC disclosure rules, to make certain disclosures in the MD&A section of the

14   Company's Secondary Offering Registration Statement. As detailed below, defendants failed to

15   make several key MD&A disclosures in TriNet's Secondary Offering Registration Statement.

16   Defendants Failed to Disclose Significant Trends

17   165.    In its Secondary Offering Registration Statement, defendants failed to disclose that

18   the Company was experiencing adverse claims trends in workers' compensation and health

19   insurance that would negatively affect the Company's future business prospects. Defendants later

20   admitted that, at the time of the secondary offering the Company was experiencing adverse claims

21   trends in workers' compensation and health insurance.[15] For example, in early 2015 defendants

22   admitted that "*[w]e had a number of large[health insurance] claims develop during the second*

23   *half of 2014*." Likewise, in 1Q15, defendants disclosed workers' compensation "*catch-up charges*

24   *for prior years*."

25

26   [14]   Release Nos. 33-8350; 34-48960; FR-72.

27   [15]   "[C]ompanies must identify and disclose known trends . . . that are reasonably likely to have a
     material effect on financial condition or operating performance." Release Nos. 33-8350; 34-48960;
28   FR-72.

166.    The adverse trends in health insurance and workers' compensation claims that clearly existed at the time of the Secondary Offering were required to be disclosed in the MD&A section of the Secondary Offering Registration Statement.[16]

<u>Defendants Failed to Disclose Significant Uncertainties</u>

167.    In its Secondary Offering Registration Statement, defendants failed to disclose an accurate picture of the Company's exposure to insurance claim losses including the high degree of uncertainty inherent in the Company's exposure.  Instead, defendants emphasized that TriNet's superior risk management processes and management's high visibility into future results. Defendants also emphasized the lack of uncertainty and risk in their insurance business which was purportedly achieved through programs to limit potential loss exposure (*i.e.*, "fully insured plans," "aggregate stop-loss limits," etc.) leaving TriNet with only "modest" deductible risk.

168.    As detailed herein, defendants later shocked investors with unexpected health insurance and workers' compensation claim losses and were forced to admit that the Company was exposed to more than "modest" deductible risk. *See* ¶¶98, 109, 126, 128.  Because of defendants prior misrepresentations regarding limited exposure, analysts and investors were shocked by these revelations which detailed the level of uncertainty inherent in the Company's claim exposure.

169.    The high degree of uncertainty associated with the Company's exposure to insurance claim losses that existed at the time of the secondary offering was required to be disclosed in the MD&A section of the secondary offering registration statement.[17]

<u>Defendants Failed to Disclose Critical Accounting Estimate</u>

170.    In its secondary offering registration statement, defendants failed to make required disclosures regarding the Company's accounting for insurance loss reserves.  The insurance loss

---

[16]    *See* ¶¶152-153 above.

[17]    *See* ¶¶154-157 above.

If there is a reasonable likelihood that reported financial information is not indicative of a company's future financial condition or future operating performance due, for example, to the levels of subjectivity and judgment necessary to account for highly uncertain matters and the susceptibility of such matters to change, appropriate disclosure in MD&A should be considered and may be required. Release Nos. 33-8350; 34-48960; FR-72.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF                                                                        - 77 -

1    reserves should have been identified as "critical accounting estimates" by defendants.  As such,

2    defendants were required to disclose the quantitative and qualitative details regarding the loss

3    reserve and the sufficiency of the Company's loss reserve processes.  *See* ¶¶158-163 above.

4         171.    Instead of making the required disclosures regarding its loss reserves, defendants

5    emphasized TriNet's superior risk management processes and management's high visibility into

6    claims experience and exposure.  Defendants later admitted that the Company's reserve process was

7    deficient.  *See* ¶¶110-113 above.

8         172.    The quantitative and qualitative details of the Company's loss reserves at the time of

9    the secondary offering were required  to be disclosed in the MD&A section of the secondary offering

10   registration statement.[18]

11   **LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS**

12        173.    Plaintiff incorporates ¶¶1-172 above and alleges that during the Class Period

13   defendants materially misrepresented TriNet's true financial condition by issuing false statements

14   concerning the predictability and visibility of the Company's future financial prospects, the

15   proficiency of its controls and risk management processes and the stability of its business resulting

16   from the above, and purportedly fully insured plans, aggregate stop-losses and the data available to

17   and utilized by the Company.  In truth, defendants knew and/or deliberately disregarded that the

18   Company, as a result of known or deliberately disregarded shortcomings forecasting and obtaining

19   data, was experiencing adverse trends in medical and workers' compensation that affected the

20   Company's current and future business prospects.

21        174.    Defendants' false and misleading statements had their intended effect and caused

22   TriNet stock to trade at artificially inflated prices throughout the Class Period and to reach a Class

23   Period high of $38.00 per share on March 3, 2015.

24        175.    On March 3, 2015, the true state of the Company's operations began to be partially

25   revealed when defendants announced (after market hours) 4Q14 earnings, in particular a 19%

26   decline in net Insurance Service revenue due to medical costs.  *See* ¶¶98-101.  This disclosure and

27

28   ---
[18]    *See* ¶¶158-163 above.  *See also* Release Nos. 33-8350; 34-48960; FR-72.

1    follow on disclosures caused TriNet's stock price to decline as some of the prior artificial inflation

2    came out of TriNet's stock price and investors absorbed the significance of the new information and

3    its relationship to the alleged misrepresentations.

4        176.    The March 3, 2015 disclosures consisted of new information which was directly

5    related to, and sharply inconsistent with, defendants' prior misrepresentations.   Indeed, the

6    disclosures revealed that defendants had not effectively limited the Company's liability by offering

7    fully insured plans or negotiating stop-loss limits to the liability, but in fact had assumed significant

8    liability susceptible to volatility.  ¶¶102, 104-105.  As a result, the Company's stock price declined

9    from a close of $37.88 on March 3, 2015, to a close of $33.93 on March 3, 2015, on substantially

10   increased volume.  *See* ¶103.

11       177.    However, defendants mitigated the decline by falsely reassuring investors and

12   analysts that the disappointing financial results were due to a one-time spike in medical claims which

13   would not recur and which was not indicative of systemic failings in the Company's ability to

14   forecast.  *See* ¶¶98-99.  The Company's stock price continued to trade at artificially inflated levels.

15       178.    Investment analysts indeed attributed the stock price decline on March 3, 2015, to this

16   new information, but also reported that the problems the Company experienced in the quarter were

17   non-systemic and did not implicate defendants' ability to forecast.  J.P. Morgan, for example,

18   maintained an overweight rating on TriNet and repeated defendants' claims that the 4Q14 revenue

19   miss was caused by a one-time spike in medical claims that was non-systemic.  *See* ¶102.

20       179.    On May 5, 2015, the true state of the Company's operations and financial condition

21   was further, but still only partially, revealed when defendants announced (after market hours) 1Q15

22   earnings, in particular a meager increase of only 1% in net Insurance Service revenue due to

23   workers' compensation costs, and a corresponding $10 million reduction in FY15 outlook due to the

24   need to accrue for workers' compensation claims which had not been included in the risk

25   management processes or trend analyses.  ¶¶109-110.  This disclosure and follow on disclosures

26   caused TriNet's stock price to decline as more of the prior artificial inflation came out of TriNet's

27   stock price and investors absorbed the significance of the new information and its relationship to the

28   alleged misrepresentations.

180.     The May 5, 2015 disclosures consisted of new information which was directly related to, and sharply inconsistent with, defendants' prior misrepresentations.  ¶¶111-114.  Indeed, the disclosures revealed that defendants' inability to manage risk and forecast claims might be systemic, and not limited to a one-time spike in medical claims.  As a result, the Company's stock price declined from a close of $34.43 on May 5, 2015, to a close of $28.76 on May 6, 2015, on substantially increased volume.  *See* ¶117.

181.     However, defendants mitigated the decline by falsely reassuring investors and analysts that the impairment was due to a one-time spike in workers' compensation claims from a previously acquired book, which was unrelated to the previous quarter's medical claims miss, and that defendants had already taken and were currently taking the steps necessary to improve their forecasting and pay any "catch-up" charges necessary.  *See* ¶¶115, 119.  They also reiterated the false claim that risk management was a core competency.  ¶123.  The Company's stock price continued to trade at artificially inflated levels.

182.     Investment analysts indeed attributed the stock price decline on May 5, 2015, to this new information, but also accepted defendants' representations that the Company had improved its forecasting processes and should be able to deliver more stable financial results in the future.  For example, on May 5, 2015, William Blair issued a report titled "Company's Credibility Is Dented, but Sticking With Story as a Result of Long-Term Growth Potential."  The report explained that the problems at TriNet existed throughout the business (*i.e.*, were systemic), but concluded that they were fixable, and that the Company was making the catch-up charges necessary to set the Company back on a profitable trajectory.  ¶¶114-115.

183.     On August 3, 2015, the true state of the Company's operations was more fully revealed when defendants announced (after market hours) 2Q15 earnings, in particular, and among other things, a 43% decline in net Insurance Service revenue due to medical costs.  ¶¶126-128.  This disclosure caused TriNet's stock price to decline as the prior artificial inflation came out of TriNet's stock price and investors absorbed the significance of the new information and its relationship to the alleged misrepresentations.

184.    The August 3, 2015 disclosures consisted of new information which was directly related to, and sharply inconsistent with, defendants' prior misrepresentations.   Indeed, the disclosures revealed that defendants' inability to manage risk and forecast claims was certainly systemic, was more severe than previously stated, and that defendants had not improved or fixed their ability to forecast and manage risk.   As a result, the Company's stock price declined from a close of $26.69 on August 3, 2015, to a close of $16.33 on August 4, 2015, on substantially increased volume.  *See* ¶132.  The Company's stock price continued to trade at artificially inflated levels.

185.    Investment analysts indeed attributed the stock price decline on August 3, 2015, to this new information, though some held out hope that defendants, despite prior failures, could finally develop risk management capacity and negotiate effective limits to the Company's claims exposure. William Blair, for example, in an August 3, 2015 report titled "Strike Three on Insurance Claims; Market Probably Ascribing Minimal Value to Insurance Side of Business; Lowering Rating to Market Perform" downgraded TriNet, concluding "there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business."

186.    Defendants remained on the defensive following the disappointing 4Q14, 1Q15, and 2Q15 financial results and struggled to reassure investors that they would be able to develop the internal capacity to manage risk or negotiate cost-effective limits to risk.  On September 16, 2015, for example, at an investor conference, defendants admitted that they had not yet finished their analysis of the problems the Company had experienced, had not yet been able to hire new personnel, had not reserved according to "industry best practice," and that their exposure to risk had been and was "skewed" to high cost states, in particular California and New York.

187.    On November 2, 2015, the Company announced its 3Q15 financial results, which more or less came in in-line with substantially reduced guidance.  At the conference call that same day, defendants had to explain that they had not and were still evaluating options for improving the business, saying "We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business."

1        188.    Following the November 2, 2015 disclosures the stock price declined 6%, from

2  $19.29 to $18.10.

3        189.    Then, on February 29, 2016, the Company announced its 4Q15 and FY15 financial

4  results, declaring that the Company was unprepared to file its Form 10-K and had sought an

5  extension from the SEC due to the identification of material weaknesses in its internal controls over

6  financial reporting relating to "IT" controls and controls in "key business processes."  TriNet

7  nevertheless assured investors that the Company would file its Form 10-K within the SEC's

8  extension period for delayed filings, *i.e.*, by March 15, 2016.

9        190.    During the earnings call on February 29, 2016, Goldfield announced that TriNet had

10  hired some of the internal actuarial and other talent necessary to forecast and manage risk.  He also

11  explained that TriNet had been unable to negotiate reinsurance or other liability caps at cost effective

12  prices, in particular because TriNet had never approached reinsurers previously, and that it was still

13  an open question whether TriNet "can arrive at the right balance of risk mitigation and costs."  This

14  disclosure and follow on disclosures caused TriNet's stock price to decline as more of the prior

15  artificial inflation came out of TriNet's stock price and investors absorbed the significance of the

16  new information and its relationship to the alleged misrepresentations.

17        191.    Following the February 29, 2016 disclosures, the stock price declined 6%, from

18  $13.09 to $12.28.

19        192.    On March 1, 2016, Morgan Stanley issued a report which concluded that "[t]here is

20  an element of faith in forecasting net insurance revenue, since the company's track record is short

21  and inconsistent."

22        193.    Also on March 1, 2016, J.P. Morgan issued a report explaining that TriNet was "still

23  exposed to medical claims volatility" and that many investors were disappointed that the Company

24  had not actually adopted fully insured plans, reporting that "some may have hoped for more certainty

25  on risk (via fully insured [plans])."

26        194.    Then, on March 15, 2016, the Company announced that TriNet was still not able to

27  file its FY15 Form 10-K, and could not say when it would be able to do so.

28

195.    Like other members of the Class of purchasers of TriNet stock who purchased at artificially inflated prices during the Class Period, plaintiff suffered an economic loss, *i.e.*, damages, when TriNet's stock prices declined upon the disclosures correcting the alleged misrepresentations.

196.    The timing and magnitude of TriNet's stock price declines negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme and misrepresentations to artificially inflate TriNet's stock price and the subsequent significant decline in the value of TriNet stock when the true state of the Company's operations was revealed to the market correcting the misrepresentations.

## CLASS ACTION ALLEGATIONS

197.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired TriNet common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their family members, directors and officers of TriNet and their families and affiliates.

198.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  TriNet has more than 70 million shares of stock outstanding, owned by hundreds or thousands of persons.

199.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF                                                                            - 83 -

1        (d)     Whether defendants knew or recklessly disregarded that their statements were

2 false and misleading;

3        (e)     Whether the price of TriNet common stock was artificially inflated; and

4        (f)     The extent of damage sustained by Class members and the appropriate

5 measure of damages.

6        200.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

7 sustained damages from defendants' wrongful conduct.

8        201.    Plaintiff will adequately protect the interests of the Class and has retained counsel

9 who are experienced in class action securities litigation. Plaintiff has no interests which conflict

10 with those of the Class.

11        202.    A class action is superior to other available methods for the fair and efficient

12 adjudication of this controversy.

**NO SAFE HARBOR**

13

14        203.    TriNet's verbal "Safe Harbor" warnings accompanying its oral forward-looking

15 statements ("FLS") issued during the Class Period were ineffective to shield those statements from

16 liability.

17        204.    The defendants are also liable for any false or misleading FLS pleaded because, at the

18 time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

19 authorized and/or approved by an executive officer of TriNet who knew that the FLS was false.

20 None of the historic or present tense statements made by defendants were assumptions underlying or

21 relating to any plan, projection or statement of future economic performance, as they were not stated

22 to be such assumptions underlying or relating to any projection or statement of future economic

23 performance when made, nor were any of the projections or forecasts made by defendants expressly

24 related to or stated to be dependent on those historic or present tense statements when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET**

25

26

27        205.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

market doctrine in that, among other things:

28

1          (a)      Defendants made public misrepresentations or failed to disclose material facts

2  during the Class Period;

3          (b)      The omissions and misrepresentations were material;

4          (c)      The Company's stock traded in an efficient market;

5          (d)      The misrepresentations alleged would tend to induce a reasonable investor to

6  misjudge the value of the Company's stock; and

7          (e)      Plaintiff and other members of the Class purchased TriNet common stock

8  between the time defendants misrepresented or failed to disclose material facts and the time the true

9  facts were disclosed, without knowledge of the misrepresented or omitted facts.

10         206.      At all relevant times, the market for TriNet common stock was efficient for the

11  following reasons, among others:

12         (a)      As a regulated issuer, TriNet filed periodic public reports with the SEC; and

13         (b)      TriNet regularly communicated with public investors via established market

14  communication mechanisms, including through regular dissemination of press releases on the major

15  news wire services and through other wide-ranging public disclosures, such as communications with

16  the financial press, securities analysts and other similar reporting services.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Officer Defendants**

207.      Plaintiff incorporates ¶¶1-206 by reference.

208.      During the Class Period, defendants disseminated or approved the false statements

specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading.

209.      Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes and artifices to defraud;

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                              - 85 -

1         (b)     Made untrue statements of material facts or omitted to state material facts

2 necessary in order to make the statements made, in light of the circumstances under which they were

3 made, not misleading; or

4         (c)     Engaged in acts, practices and a course of business that operated as a fraud or

5 deceit upon plaintiff and others similarly situated in connection with their purchases of TriNet

6 common stock during the Class Period.

7      210.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

8 the market, they paid artificially inflated prices for TriNet common stock. Plaintiff and the Class

9 would not have purchased TriNet common stock at the prices they paid, or at all, if they had been

10 aware that the market prices had been artificially and falsely inflated by defendants' misleading

11 statements.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Officer Defendants, Director Defendants**
**and General Atlantic**

15      211.    Plaintiff incorporates ¶¶1-210 by reference.

16      212.    The Officer and Director Defendants and General Atlantic acted as controlling

17 persons of TriNet within the meaning of §20(a) of the 1934 Act. By virtue of their positions with the

18 Company, and ownership of TriNet stock, the Officer and Director Defendants and General Atlantic

19 had the power and authority to cause TriNet to engage in the wrongful conduct complained of

20 herein. TriNet controlled the Officer and Director Defendants and all of its employees. By reason of

21 such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

22      213.    General Atlantic, as a controlling stockholder of TriNet based upon its percentage of

23 shares owned and by virtue of its control over directors Bingham (Director of the Company and

24 Advisory Director of General Atlantic) and Hodgson (Director of the Company and Managing

25 Director of General Atlantic), exercised control over the Company and had a duty to promptly

26 disseminate accurate and truthful information and to correct any previously issued statements that

27 had become materially misleading or untrue. As the Company disclosed in the IPO Registration

28 Statement:

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                               - 86 -

Upon the closing of this offering, funds affiliated with General Atlantic will beneficially own approximately 55.7% of our outstanding common stock, and all of our directors, officers and their affiliates will beneficially own, in the aggregate, approximately 70.5% of our outstanding common stock, in each case, assuming no exercise of the underwriters' option to purchase additional shares.  As a result, *these stockholders will be able to determine substantially all matters requiring stockholder approval*, including the election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets.  This concentration of ownership could limit the ability of other stockholders to influence corporate matters and may have the effect of delaying or preventing a third party from acquiring control over us.

214.   And even after General Atlantic, Hodgson and their affiliates sold 13.8 million shares in the Company's September 11, 2014 Secondary Offering, General Atlantic still maintained the same control.  As the Company disclosed in the Company's FY14 Form 10-K:

As of December 31, 2014, funds affiliated with General Atlantic, our largest stockholder, beneficially own approximately 26.2% of our outstanding common stock, and all of our directors, officers and their affiliates, including the funds affiliated with General Atlantic, beneficially own, in the aggregate, approximately 42.1% of our outstanding common stock.  As a result, *these stockholders will be able to determine substantially all matters requiring stockholder approval*, including the election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets.  This concentration of ownership could limit the ability of other stockholders to influence corporate matters and may have the effect of delaying or preventing a third party from acquiring control over us.

## CLAIMS FOR VIOLATIONS OF SECTIONS 11, 12 AND 15
## OF THE SECURITIES ACT OF 1933

215.   The Securities Act claims set forth herein are based on strict liability and negligence and are not based on any allegation that any defendant engaged in fraud or intentional misconduct.  Plaintiff specifically disclaims any reference to or reliance on allegations of fraud.

216.   These claims are brought on behalf of all persons who purchased or otherwise acquired the common stock of TriNet pursuant or traceable to the Company's false and misleading IPO Registration Statement[19] and Secondary Offering Registration Statement[20] (collectively the "Offering Materials").

217.   Plaintiff seeks to recover damages under §§11 and 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o, for untrue statements of material fact, the omission of facts

---

[19]   On March 26, 2014, at 4:30 p.m., the SEC declared the IPO Registration Statement effective.

[20]   On September 11, 2014, at 4:30 p.m., the SEC declared the Secondary Offering Registration Statement effective.

1    necessary to make statements not misleading and the omission of material facts required to be stated

2    in the Offering Materials.

3    False and Misleading Statements and Omissions in the IPO Registration Statement

4           218.    On March 27, 2014, the Company, through the IPO Registration Statement, offered

5    15,000,000 shares of TriNet common stock to the public at $16 per share, with $1.12 per share

6    representing the "[u]nderwriting discount."  If the underwriters sold more than 15,000,000 shares of

7    the common stock, the underwriters would have the option to purchase 2,250,000 additional shares

8    from the selling stockholders (identified in the IPO Registration Statement as Hodgson and "entities

9    affiliated with General Atlantic"), and from which the Company would not receive the proceeds.

10          219.    The IPO Registration Statement was signed by Goldfield, Porter, Bingham, Babinec,

11   Goldman, Hodgson, Lowell and August-deWilde and contained untrue statements of material fact,

12   omitted to state other facts necessary in order to make the statements made therein not misleading

13   and omitted to state material facts required to be stated therein.  Specifically, the IPO Registration

14   Statement falsely stated that the Company's insurance policies were fully insured and had stop-loss

15   limits to liability, risk management was a core competency of the Company and the Company

16   assessed both workers' compensation and medical risks on an individual client basis:

- ***Risk management is a core competency of our company***.

- We leverage . . . our ***robust risk management capabilities*** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

- We assess all workers compensation and medical benefits risks on ***an individual client basis*** and annually adjust pricing to reflect their ***current risk*** based on HIPAA-compliant analytics.

- Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***.

- Following our initial pricing of these policies, we analyze claims data ***for each client on an ongoing basis*** and seek to adjust our prices as appropriate.

220.    On March 27, 2014, the Company completed the IPO raising approximately $240 million.

False and Misleading Statements and Omissions in the Secondary Offering Registration Statement

221.    On September 11, 2014, through the Secondary Offering Registration Statement which was signed by Goldfield, Porter, August-deWilde, Babinec, Bingham, Goldman, Hodgson, Kispert and Lowell, and identified Hodgson and the same "entities affiliated with General Atlantic LLC" (¶218) as the selling stockholders, the Company and General Atlantic offered shares to the public at $25.50 per share.

222.    On September 11, 2014, the Company issued a press release announcing that it had priced a secondary offering of 12 million shares of TriNet common stock at $25.50 per share:

**TriNet Prices Secondary Offering**

TriNet Group, Inc. today announced the pricing of an underwritten registered public offering of 12,000,000 shares of common stock at a price of $25.50 per share. In addition, the underwriters have been granted a 30-day option to purchase up to an additional 1,800,000 shares of common stock from the selling stockholders. All of the shares in the offering are being offered by entities affiliated with General Atlantic LLC. TriNet will not receive any proceeds from the sale of the shares.

223.    On September 11, 2014, the Company filed an S-1MEF Registration Statement which registered 1,725,000 additional shares to be offered in the same secondary offering:

This Registration Statement is being filed with the Securities and Exchange Commission (the "Commission") with respect to the registration of additional shares of common stock, par value $0.000025 per share, of TriNet Group, Inc., a Delaware corporation, pursuant to Rule 462(b) under the Securities Act of 1933, as amended. This Registration Statement incorporates by reference the contents of, including all amendments and exhibits thereto, the Registration Statement on Form S-1 (Registration No. 333-198293), which was declared effective by the Commission on September 11, 2014, and is being filed solely for the purpose of increasing the number of shares to be offered in the public offering by 1,725,000, including 225,000 shares that may be sold pursuant to the underwriters' option to purchase additional shares.

224.    The Secondary Offering Registration Statement contained untrue statements of material fact, omitted to state other facts necessary in order to make the statements made therein not misleading and omitted to state material facts required to be stated therein. Specifically, the Secondary Offering Registration Statement repeated the claims that defendants' insurance policies were fully insured and had aggregate stop-loss limits to liability, risk management was a core

competency of the Company and the Company assessed both workers' compensation and medical benefits risks on an individual client basis:

- ● **Risk management is a core competency of our company.**

- ● We leverage . . . our **robust risk management capabilities** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- ● **Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses**.

- ● We assess all workers compensation and medical benefits risks on **an individual client basis** and annually adjust pricing to reflect their **current risk** based on HIPAA-compliant analytics.

- ● Our agreements with our health insurance carriers with respect to these policies typically **include** limits to our exposure for individual claims, which we refer to as pooling limits, and **limits to our maximum aggregate exposure for claims in a given policy year**, which we refer to as **stop losses**.

- ● Following our initial pricing of these policies, we analyze claims data **for each client on an ongoing basis** and seek to adjust our prices as appropriate.

225.   The Secondary Offering raised $336 million for the selling stockholders General Atlantic.

226.   <u>Reasons Why Statements in Offering Materials Were Materially False and Misleading</u>:  Defendants' statements above concerning TriNet having fully insured medical and workers' compensation plans that limited the Company's potential losses, risk management being a core competency of the Company and the Company assessing both workers' compensation and medical benefits risks on an individual client basis were each materially false and misleading and failed to disclose the following facts:

(a)     Risk management was not a core competency and TriNet did not have robust risk management capabilities or management sufficient policies, procedures, and personnel in place to support defendants' claims of risk management proficiency.  Contrary to what the Company stated in the Offering Materials, risk management was not a "core competency," *i.e.*, among the Company's primary and unique strengths giving TriNet a competitive advantage.  In fact, defendants failed to disclose (and later admitted) that the Company did not have adequate insurance executives

1   or in-house actuarial staff to effectively analyze risk in connection with the Company's historical or

2   current claims experience and exposure.  *See* ¶¶227, 229, 231-232, 234-235, 237, 241, 243.

3           (b)     The Company had not, at least in some instances, performed a state-by-state

4   risk analysis of clients.  *See* ¶229.

5           (c)     The Offering Materials, and each of them, failed to disclose that TriNet's

6   insurance plans were not fully insured.  As defendants would later admit, only 40% of the

7   Company's plans were fully insured, while 60% were high deductible.  *See* ¶¶235, 241.  And

8   contrary to defendants' statements that the Company's insurance plans were fully insured, and

9   therefore stable and immune from the volatility, TriNet was exposed to similar risk. *See* ¶¶227, 229,

10  231-232.

11          (d)     The Offering Materials, and each of them, failed to disclose that TriNet did

12  not have aggregate stop-loss limits at all, or did not have such limits that would sufficiently cap the

13  Company's exposure to large spikes in claims.  *See* ¶235.

14          (e)     Both the IPO Registration Statement and the Secondary Offering Registration

15  Statement were materially misstated in violation of SEC disclosure rules.  *See* ¶¶150-172.

16          (f)     The Offering Materials, and each of them, failed to disclose that the

17  Company's internal controls suffered from wide spread material weaknesses as detailed in the

18  Company's April 1, 2016, Form 10-K that individually and collectively impaired the Company's

19  ability to ensure accuracy and control over financial reporting.  In particular, TriNet admitted that the

20  Company's ineffective controls impacted insurance costs, workers' compensation and liabilities. *See*

21  *e.g.*, ¶247.

22      •   Certain reconciliations of claim payments per the Company's actuarial analyses to
            actual amounts paid were  not operating effectively.
23

24      •   [C]ontrols over the review of health premium expenses did not operate at a level of
            precision that would detect material errors.
25

26      •   [L]ack of a sufficient complement of personnel with an appropriate level of
            knowledge, experience and training . . . .

27

28

1    Claims Volatility and Revenue Shortfalls Reveal Systemic Inability to Manage Risk

2        227.    On March 3, 2015, the Company issued a press release announcing its 4Q14 financial

3    results, revealing a 19% year-over-year decrease in net Insurance Service revenues and that 4Q14

4    EPS forecasts missed by a whopping 29%.  Defendants attributed the miss to a $10 million increase

5    in large medical claims – the very type of volatility defendants assured investors and analysts that

6    the core competency of risk management and actuarial reviews protected TriNet from.  *See* ¶¶219,

7    224.  The decrease in net Insurance Service revenues in turn caused a more than $10 million miss in

8    forecasted net service revenues.

9        228.    Following the March 3, 2015 disclosures, the stock price declined from a close of

10   $37.88 per share on March 3, 2015, to a close of $33.93 per share on March 4, 2015, on high trading

11   volume.

12       229.    On May 5, 2015, TriNet issued a press release announcing TriNet's 1Q15 financial

13   results.  The Company again reported disappointing financial results and was forced to reduce FY15

14   guidance.   This time the Company reported that it would in fact have to accrue for an extra

15   $10 million in workers' compensation costs in 2015 despite having previously assured investors that

16   its insurance plans were fully insured and had been properly accounted for.  ¶¶219, 224.  Defendants

17   also admitted that they had not done a state-by-state or sufficiently detailed analysis of a workers'

18   compensation book TriNet had previously acquired.

19           [Porter:]  We did see some increased development as we were closing out the fourth
             quarter, and it looked like it was coming from some of the ***higher cost states that we***
20           ***were doing business and expecting to grow***.   ***So what we did is we took our***
             ***actuarial, outside actuarial view down to do a state-by-state analysis***. . . .
21
                 . . . ***[W]e need to do a better job of getting headlights from our own***
22           ***perspective*** on looking at how those claims are developing and building that into our
             outlook. . . .   ***We are building some increased capability internally*** to do that.
23
                                         *         *         *
24
             [Goldfield:]  So my feeling is ***we have the systems.  We're evolving the processes.***
25           ***We are adding in-house actuarial support***.  And ultimately this is not what drives
             the business and ***it is not a pricing issue***.
26

27

28

230.     After the May 5, 2015 disclosures, TriNet's stock price declined from a close of $34.43 per share on May 5, 2015, to a close of $28.76 per share on May 6, 2015, on high trading volume.

231.     On August 3, 2015, the Company issued a press release announcing its 2Q15 financial results, which missed both revenue and EPS estimates by a wide margin due to an increase in large medical claims.  At a conference call the same day, defendants admitted that the Company did not have the internal expertise necessary to forecast claims and manage risk:

> [Goldfield]: I am disappointed that our second-quarter financial performance was negatively impacted by a higher than usual number of large medical claims.  These claims were well in excess of our expected and historical claims volatility.
>
> *       *       *
>
> *I will strengthen my internal team.  This includes the recruitment of a senior insurance services executive reporting directly to me, as well as additional actuarial and analytical capabilities.*
>
> *       *       *
>
> [Porter:] *Net insurance service revenues declined 43% to $24.2 million* . . . . *Net insurance service revenues were affected by a significantly higher number of large medical claims than we had anticipated.*
>
> . . . The result in Q2 was an approximate $20 million reduction in our net insurance service revenues compared to our forecast.
>
> *Our revised 2015 forecast assumes the higher claims level continues and is included in our trend*. . . .   The result is, in addition to the Q2 impact, we are reducing our net insurance service revenues by an additional $10 million for the remainder of the year compared to our prior guidance.

232.     Defendants also acknowledged the need to have an experienced insurance executive and actuarial capability to be part of the team.

> [Goldfield:] *[W]e need to find ways to a, get better visibility and b, to dampen the spike because it's not acceptable, the variability I saw in Q2.*
>
> *       *       *
>
> *I'm going to strengthen the internal team with a senior insurance executive who is right by my side.  I'm going to increase the in-house actuarial and analytical capabilities.*
>
> *       *       *

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

1    *I need to bring in some expertise in-house that I can really get aligned with on the overall service model and how it works within TriNet.  So that includes a senior executive reporting to me additional actuarial and analytical capabilities.*

2

3    233.    Following the Company's disclosure of its 2Q15 financial results, the Company's

4    stock price declined 38%, from a close of $26.69 per share on August 3, 2015, to a close of $16.33

5    per share on August 4, 2015, on high trading volume.

6    234.    On September 16, 2015, Goldfield and Porter participated in the Deutsche Bank

7    Technology Conference to discuss the aftermath of the Company's disastrous 4Q14, 1Q15 and 2Q15

8    as well as the yet unfinished efforts to create internal risk management capabilities and gain visibility

9    into the Company's business.  During the call, defendants admitted that the Company did not have

10   the financial forecasting tools or data necessary to underwrite their health insurance business and

11   that a complete actuarial analysis, including a state-by-state analysis, part of the industry best

12   practices, had not been done:

13   [Porter:] So if we're referring to the situation that we saw in the first quarter, what we did see with it, we had acquired a book in the blue and gray market, *and as*

14   *part of our diligence, we didn't go down probably one layer more than we traditionally have been.*  We always bring in new actuarial work in sizing potential

15   variability around any comp book that we acquire.

16   *In this situation, what we've learned is we probably actually should've gone back to the TPA and tested at a claims level what type of reserves were being put*

17   *on at the TPA.*

18                              *       *       *

19   It was the open claims.  This is, again, it's an acquired book.  So this was a book that we had acquired back in October 2012 and their practice was that *they did*

20   *not reserve is what we would determine to be industry best practice*, and so even though we did sensitivity around all the loss triangles, *what we should have done is*

21   *gone one layer back and found out that the loss triangles probably were skewed based on the reserving practices.*

22

23   Now those claims actually developed at a higher rate over time than what we had expected them to be, and that's why we made the adjustment in the first quarter because *what we did is we had our outside actuaries go back and do a state-level*

24   *analysis because we can get a more accurate read on which claims were developing at a higher rate, and it ended up being those states that generally you*

25   *would expect to have higher costs, which would be California and New York.  But those also are the opportunity states where we see a lot of business.*

26

27   235.    On November 2, 2015, Goldfield and Porter participated in a conference call with

28   analysts and investors to discuss the Company's 3Q15 financial results.  During the call, defendants

1    again admitted that TriNet did not have fully insured plans, instead the majority (60%) were high

2    deductible, and TriNet did not have internal actuaries to forecast and manage risk.  In addition,

3    TriNet did not have and had not had aggregate pooling limits and could not assure investors it had or

4    could acquire the processes or insurance constructs and wherewithal to correct the Company's

5    business model so as to be profitable:

6            [Goldfield:] *We are bringing in new talent.  I have met with excellent
             candidates as part of the search for the Senior VP of Insurance Services.
7            Additionally, our team is in the advanced stages of selecting from a number of
             strong candidates for our Chief Medical Actuary position*.

8                            *       *       *

9            *We will be looking at enhancing our forecasting capabilities and ability to monitor
10           and manage that part of the business*.

11           The second area is new insurance constructs.  Either on one end of the
             spectrum would be more fully insured plans, *today 40% of our plans are fully
12           insured, 60% of our plans are high deductible plans.  And whether we should move
             more towards the fully insured side of the plans*.

13           The opposite end of that spectrum is reinsurance.  Which would be a
14           combination of either reducing pooling limits, today the pooling limits are
             somewhere between $350,000 and $1 million by carrier.  Reducing those pooling
15           limits and *or putting an aggregate pooling limit in place [i.e. stop loss protection]*,
             meaning a total limit on the entire claims activity in any one quarter to dampen that
16           volatility.

17                           *       *       *

18           [Analyst:] I know you have a process of reevaluating the strategy.  However, if
19           you're breaking even on that business this year, and you're contemplating changes
             for next year, *is there any reason for us to think that even if you do pass through
20           some of that lift, that effort or that initiative, would be at least margin breakeven* if
             not accretive if properly executed?

21           [Porter:] *I think we'll wait to really give our outlook for Q4 once we've
             finished the work. . . .  And we'll have a lot more to talk about once we have the
22           construct and the team further in place in Q4*.

23                           *       *       *

24           [Analyst:] Based on your past experience, typically, does the step up in worker's
25           comp expense in year one typically translate into another step up in worker's comp
             expense [in] year two given how actuarial accruals are calculated based on past
26           claims experience?

27           [Porter:] That something that as we work with our actuaries and *now that we
             actually have our own actuary in house*, we will continue to look at.

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                                    - 95

236.     Following the November 2, 2015 disclosures, the stock price declined from a close of $19.29 per share on November 2, 2015, to a close of $18.10 per share on November 3, 2015, on high trading volume.

237.     On November 10, 2015, speaking at the JPMorgan Ultimate Services Investor Conference, defendants explained that only now was it time to bring that capacity in-house, then explained that internal actuaries are critical even under a fully insured model, explaining that whatever the construct of the insurance plans they were offering, defendants needed actuaries and other risk management experts to have enough visibility to manage the Company's liability:

> [Goldfield:] *[W]e're hiring in-house actuarial talent.  We rely on great external talent, but it's time to bring those models in-house and have more visibility and focus around them*.
>
> As I previously reported, we have a Chief Actuary on the workers' comp side and *we're closing on a Chief Actuary on the medical side*.  And then, additionally, looking at different processes and services around how we are forecasting the medical and addressing the issues around the volatility associated with it.  And then, finally, we're completing a study with a large outside consulting firm.
>
> *        *        *
>
> [Analyst:] [M]aybe it would be helpful if you can just go through the spectrum of potential changes that you might make to call it out or hedge out the risk around claims volatility.  What could that look like and what would the impact be on the P&L?
>
> [Porter:] So if we start at what guaranteed costs looks like and guaranteed costs or *some people would call it fully insured*.  So that's effectively a pass through. So if we and we are going through and exploring that possibility with the carriers, in that situation effectively there is no performance fee, it's complete pass through and that would have a P&L impact on EBITDA margin of around 30%, because performance fees would go away.
>
> *        *        *
>
> [Goldfield:] [O]n a fully-insured plan . . . you would still want to get a really great set of tools and actuaries to understand the performance of the book . . . you would take the volatility out of it, but you would still want that data.

238.     After the November 10, 2015 disclosure, the stock price traded at $19.66 per share, down from $20.05 on November 9, 2015, on high trading volume.

239.     Then on February 29, 2016, the Company issued a press release announcing the Company's financial results for the 4Q15 and FY15, declaring that the Company was unprepared to file its Form 10-K and had sought an extension from the SEC due to the identification of material

1  weaknesses in its internal controls over financial reporting relating to "IT" controls and controls in

2  "key business processes":

> TriNet also announced that they will file a Form 12b-25 with the SEC today providing for a *fifteen (15) calendar day* extension for its Annual Report on Form 10-K for the fiscal year ended December 31, 2015.  With this being TriNet's first assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act of 2002, and given the multiple technology platforms that require evaluation and testing, TriNet requires additional time to complete its assessment of its internal control over financial reporting.
>
> In preparing the Company's financial statements as of and for the year ended December 31, 2015, *the Company identified material weaknesses in its internal control over financial reporting relating to ineffective information technology general controls and ineffective controls in key business processes*.  While these material weaknesses create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and analysis, no material adjustments, restatement or other revisions to previously issued financial statements are expected to be required.
>
> . . . TriNet currently expects to finalize its financial results and file its Annual Report on Form 10-K prior to the expiration of the extension period and further expects that the financial information contained in the Form 10-K will be consistent with the financial results reported in this earnings release.

14      240.   On February 29, 2016, the Company held a conference call with analysts and

15  investors to discuss the 4Q15 and FY15 financial results.  Porter addressed the Company's failure to

16  timely file its FY15 Form 10-K stating:

> [Porter:] For the first time, [our year-end reporting] process included an assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act. *In the course of completing our internal control assessment and preparing the FY15 financial statements, we became aware of material weaknesses in our internal controls over financial reporting, related to ineffective information technology general controls and ineffective controls in key business processes.  As a result of the material weaknesses in our internal control over financial reporting, we have concluded that our disclosure controls and procedures were not effective*.
>
> While these material weaknesses create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and analysis, no material adjustments, restatement or other revisions to previously [issued] financial statements are expected to be required.  Furthermore, *we're putting in place plans and are committed to remediating these deficiencies by implementing changes to our internal control over financial reporting in the future*.
>
> With this being our first assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act, and given the multiple platforms that require evaluation and testing, we have been unable to complete our assessment of our internal control over financial reporting.  And as a result, we have filed a Form 12b-25 with the SEC today, providing for a 15-calendar-day extension for our annual report on Form 10-K for the fiscal year ended December 31, 2015.  We currently expect to file our Form 10-K *prior to the expiration of the extension*, and further,

that the financial information contained in the Form 10-K will be consistent with financial results in today's earnings release.

241.    During the February 29, 2016 conference call, Goldfield and Porter discussed the insurance claims volatility that had affected the business.  Goldfield announced that TriNet had finally been able to hire some of the internal talent promised, including a Vice President of Insurance Services, a Chief Medical Actuary and a Chief Workers Compensation Actuary.  He also explained that TriNet had been unable to negotiate reinsurance or other liability caps at cost effective prices, particularly because TriNet had never previously approached reinsurers and that it was still an open question as to whether TriNet "can arrive at the right balance of risk mitigation and costs":

> [Goldfield]: With the regard to reinsurance, our goal was focused on capping quarterly claims expense at the appropriate economic cost.  The pricing and attachment points we received from the market to-date were not conducive to achieving this objective at this time.
>
> *          *          *
>
> 38% of our plans are fully insured [but] . . . if we went with the fully insured plans [for all our plans] it reduces the quarter-to-quarter volatility, but it doesn't help the year-over-year because the increase would then be passed directly on to our clients.
>
> *          *          *
>
> *[W]e didn't get face-to-face early enough with the reinsurers*.  I think there is an opportunity as they get to know us and our constructs . . . .
>
> *          *          *
>
> [Analyst:] [Y]ou've brought on new talent in the insurance business, with a lot of experience in health and actuarial analysis.  What new findings have you discovered that you didn't previously know, that caused the elevated medical claims frequency from last year?
>
> [Porter:] *I don't think there's anything that we have seen that is going to help us go back and understand when you get large claims activity*.  But what we are looking at, both as part of the evaluation that we did with the consulting firm, as well as with Ed and the new actuarial talent is we're continuing to look at ways to get access into analyzed data faster.  And come to insights probably a little sooner, which helps us both identify trends earlier, and that also helps us then to consider what the effects are, either positive or negative, on pricing earlier.  So I think those are some of the things that have already come up, and we're looking at ways we can institutionalize that, both internally with the way we handle data, as well as how do we get data from different sources and look at it a little faster than we do today.

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

1    242.    Following the after hours announcement that TriNet was unprepared to file its Form

2    10-K on February 29, 2016, the Company's stock fell from a close of $13.09 on February 29, 2016,

3    to a close of $12.28 on March 1, 2016, on high trading volume.

4    243.    On March 1, 2016, Morgan Stanley issued a report titled "4Q15: Risky for Another

5    Day."  The report noted that "[t]here is an element of faith in forecasting net insurance revenue,

6    since the company's track record is short and inconsistent."  The report also explained that the "[d]e-

7    risked model remains elusive" because brokers were unwilling to provide TriNet with reinsurance at

8    attractive pricing, that the Sarbanes-Oxley delay appeared benign given the delay would only last

9    about 15 days, and that TriNet was still hoping to see the benefit from the late additions of internal

10   actuarial experience:

11         **New team of actuaries should help with intangibles**: ***TNET hired a new
           SVP of Insurance, Chief Medical Actuary, and Chief Worker's Comp Actuary to***
12         ***bolster its insurance business decisionmaking and modeling accuracy***.  While
           early, the potential benefits are 1) improvements to operations i.e. best practices, 2)
13         more precise reserving, 3) better forecasting of TNET business and industry trends,
           and 4) more thoughtful insurance pricing.
14
15   244.    On March 1, 2016, J.P.Morgan issued a report titled "Mixed Qtr, Reasonable

16   Guidance As Plan To Hedge Risk Is Budgeted, But Not Solidified."  The report explained that

17   TriNet was still exposed to the same medical claims volatility:

18         **Medical risk update – status quo, but budgeting for reinsurance**.  After
           months of review, ***TNET announced it would not pursue a fully insured or***
19         ***guaranteed cost strategy***, and instead is budgeting to hedge or reinsure its risk, but
           has not executed said plan yet.  In other words, it is ***still exposed to medical claims***
20         ***volatility*** for now, but has guided to include the cost of hedging volatility and will
           execute it at the right ***price under the direction of the new internal risk team***. . . .
21         *[S]ome may have hoped for more certainty on risk (via fully insured)* . . . .

22   245.    On March 8, 2016, Morgan Stanley issued a report titled "NDR: A Long (but Doable)

23   2016 To-Do List," which reported that "TNET underpriced its insurance premiums by 200bps on an

24   aggregate level, and repricing its entire book will take 12-18 Months."

25   246.    On March 15, 2016, the Company issued a press release announcing that TriNet was

26   still not able to file its FY15 Form 10-K, and could not say when it would be able to do so because it

27   was still working to complete its audit and obtain the necessary attestations from its auditors:

28         **SAN LEANDRO, Calif. – March 15, 2016 –** TriNet Group, Inc.
           (NYSE: TNET) today announced that, despite extensive efforts, TriNet was unable

1    to file its Annual Report on Form 10-K for the year ended December 31, 2015, with
     the U.S. Securities and Exchange Commission (the "SEC") prior to the extended
2    filing date of March 15, 2016.  TriNet currently expects to finalize its financial
     results and file its Annual Report on Form 10-K with the SEC as soon as practicable
3    and further expects that the financial information contained in the Form 10-K will be
     consistent in all material respects with the financial results reported in our press
4    release dated February 29, 2016.  Based on the review and analysis conducted to
     date, no material adjustments, restatement or other revisions to previously issued
5    financial statements of the Company are currently expected to be required.

6           As previously disclosed, TriNet was unable to timely file its 2015 Form 10-K
     with the U.S. Securities and Exchange Commission (the "SEC") on February 29,
7    2016, due to the fact that the Company required additional time to complete its first
     assessment of internal controls over financial reporting pursuant to the Sarbanes-
8    Oxley Act of 2002, given the multiple technology platforms that required evaluation
     and testing.
9
            TriNet continues to work diligently to finalize the assessment of internal
10   controls over financial reporting and to complete the audit of the Company's
     financial statements as of and for the year ended December 31, 2015, and obtain the
11   related attestation and audit opinion from its auditors. TriNet currently expects to
     finalize its financial results and file its Annual Report on Form 10-K with the SEC as
12   soon as practicable.

13          247.    On April 1, 2016, the Company filed its Form 10-K for the period ending December

14   31, 2015.  The disclosures in the Form 10-K detailed the widespread internal controls weaknesses

15   experienced by the Company which were not disclosed and further corroborate the allegations of

16   factual falsity.  *See* ¶¶148-149.

17          248.    As of the date of this filing, this suit alleges violations of the Securities Act of 1933,

18   TriNet stock is trading below $16.00 per share.

19                                    **COUNT III**

20                   **Violations of Section 11 of the Securities Act Against**
                                    **All Defendants**
21
            249.    Plaintiff incorporates ¶¶150, 172, 215-248 by reference.
22
            250.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is
23
     asserted against all defendants on behalf of themselves and all persons who purchased or otherwise
24
     acquired TriNet common stock pursuant or traceable to the IPO and the Secondary Offering.  For
25
     purposes of this Count, plaintiff affirmatively states that it does not allege that defendants committed
26
     intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.
27

28

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF

251.     Plaintiff purchased 425 shares of TriNet common stock on May 20, 2014 at $23.58 a share, 210 shares on May 27, 2014 at $24.44 a share, 150 shares on June 3, 2014 at $26.04 a share, and 198 shares on June 3, 2014 at $25.76 a share, pursuant to and traceable to the IPO Registration Statement and has been damaged thereby.  Plaintiff also purchased 200 shares of TriNet common stock on September 29, 2014 at $25.61 a share, 170 shares on December 1, 2014 at $29.50 a share, and 100 shares on December 22, 2014 at $31.49 a share, pursuant to and traceable to the Second Offering Registration Statement and has been damaged thereby.

252.     Both the IPO Registration Statement and the Secondary Offering Registration Statement were defective and inaccurate, contained untrue statements of material fact and omitted to state facts necessary to make the statements in the Offering Materials not misleading and omitted to state material facts required to be stated therein.

253.     The IPO Registration Statement was signed by Goldfield, Porter, Bingham, Babinec, Goldman, Hodgson, Lowell, and August-deWilde.

254.     The Secondary Offering Registration Statement was signed by Goldfield, Porter, Bingham, Babinec, Goldman, Hodgson, Kispert, Lowell, and August-deWilde.

255.     Defendant TriNet is the registrant and issuer for both the offerings.  As such, TriNet is strictly liable for the materially false statements contained in the IPO Registration Statement and the Secondary Offering Registration Statement.

256.     Defendant TriNet and the Officer and Director Defendants who signed the IPO Registration Statement and/or Secondary Offering Registration Statement are strictly liable for the false and misleading statements and omissions incorporated into the Offering Materials.

257.     These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading.  In the exercise of reasonable care, the Officer and Director Defendants should have known of the material misstatements and omissions contained in the Offering Materials and also should have known of the omissions of material facts necessary to

1 │ make the statements made therein not misleading.  As such, the Officer and Director Defendants are

2 │ liable to Lead Plaintiff Howard Welgus and the Class.

3 │       258.    J.P. Morgan, Morgan Stanley, Deutsche Bank, Jefferies, Stifel and William Blair

4 │ participated in and served as underwriters to the IPO.

5 │       259.    J.P. Morgan, Morgan Stanley, Deutsche Bank, Stifel and William Blair participated in

6 │ and served as underwriters to the Secondary Offering.

7 │       260.    The Underwriter Defendants helped draft and disseminate the IPO Registration

8 │ Statement and failed to conduct an adequate due diligent investigation, which was a substantial

9 │ factor leading to the harm alleged in this complaint.

10 │       261.    The Underwriter Defendants helped draft and disseminate the Secondary Offering

11 │ Registration Statement and failed to conduct an adequate due diligent investigation, which was a

12 │ substantial factor leading to the harm alleged in this complaint.

13 │       262.    The Underwriter Defendants were each underwriters, as that term is used in §11(a)(5)

14 │ of the Securities Act, and were sellers of TriNet common stock with respect to the IPO and the

15 │ Secondary Offering and the Company's common stock sold through the Offering Materials.  The

16 │ underwriters were paid more than $16.8 million in connection with the IPO and more than

17 │ $13 million in connection with the Secondary Offering.  The Underwriter Defendants were required

18 │ to investigate with due diligence the representations contained therein to confirm that they did not

19 │ contain materially misleading statements or omit material facts.  None of the Underwriter

20 │ Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the

21 │ statements described herein, which were contained in the IPO Registration Statement and the

22 │ Secondary Offering Registration Statement were true, were without omission of any material facts,

23 │ and/or were not misleading.

24 │       263.    None of the untrue statements or omissions alleged herein was a forward-looking

25 │ statement, but rather, each concerned exiting facts.

26 │       264.    Lead Plaintiff Howard Welgus purchased or otherwise acquired TriNet common

27 │ stock in the IPO and the Secondary Offering or traceable thereto in reliance upon the defective IPO

28 │ Registration Statement and the Secondary Offering Registration Statement and without knowledge

of the untruths and/or omissions alleged herein.  Plaintiff and the Class sustained damages when the price of TriNet common stock declined substantially due to material misstatements and/or omissions in the Offering Materials.

265.     By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated §11 of the Securities Act.

266.     This action was brought within one year after plaintiff discovered or reasonably could have discovered the untrue statements and omissions.  Less than three years has elapsed from the date of the Offerings.

**COUNT IV**

**Violations of Section 12(a)(2) of the Securities Act Against
All Defendants**

267.     Plaintiff incorporates ¶¶150-172, 215-266 by reference.

268.     This claim is brought by plaintiff pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. 77l(a)(2), on behalf of all purchasers of TriNet common stock pursuant to the Offering Materials and is asserted against all defendants.  For purposes of this Count, plaintiff does not claim that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

269.     Defendants were sellers and offerors and/or solicitors of purchasers of the TriNet common stock offered pursuant to the Offering Materials for financial gain.  Defendants caused to issue, and/or signed the IPO Registration Statement and the Secondary Offering Registration Statement, each used to induce investors, such as plaintiff and the other members of the Class, to purchase TriNet common stock.

270.     The IPO Registration Statement was filed as an exhibit to the Secondary Offering Registration Statement, and contained the same untrue statements of material fact, omitted to state other facts necessary to make the statements therein made not misleading and omitted material facts required to be stated therein.

271.     Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Offering Materials.

272.    At the time of his purchases or acquisition of TriNet shares, plaintiff and other members of the Class did not know of, or in the exercise of reasonable diligence could not have known, the facts concerning the false statements/omissions alleged herein and could not have reasonably discovered those facts prior to the IPO and the Secondary Offering.

273.    Less than one year has elapsed between the time that plaintiff discovered or reasonably could have discovered the facts upon which this claim is based and the time that plaintiff filed this allegation of violations of §12(a)(2) of the Securities Act.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this claim.

274.    By reason of the false statements/omissions alleged herein, defendants violated §12(a)(2) of the Securities Act and are liable to plaintiff and the Class members who purchased or acquired TriNet common stock pursuant to the Offering Materials, each of whom has been damaged as a result of such violation.

## COUNT V

### Violations of Section 15 of the Securities Act
### Against All Defendants Except the Underwriter Defendants

275.    Plaintiff incorporates ¶¶215-274 by reference.

276.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of plaintiff and other members of the Class who purchased or otherwise acquired TriNet common stock pursuant to the Offering Materials and who were damaged thereby against all defendants except the Underwriter Defendants.  For purposes of this Count, plaintiff affirmatively states that he does not claim that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

277.    Each of the defendants (including General Atlantic) except the Underwriter Defendants acted as controlling persons of TriNet within the meaning of §15 of the Securities Act by virtue of his position as a director and/or senior officer of TriNet.  By reason of their senior management positions and/or directorships at the Company or share ownership in TriNet (¶¶59-62) as alleged above, all defendants except the Underwriter Defendants, individually and acting pursuant

1  to a common plan, had the power to influence and exercise the same to cause TriNet to engage in the

2  conduct complained of herein.  Defendants were able to and did control the contents of the Offering

3  Materials, which contained materially false statements and financial information and were culpable

4  participants in the violation of §§11 and 12 of the Securities Act alleged herein.  By reason of such

5  conduct, each of the defendants except the Underwriter Defendants are liable pursuant to §15 of the

6  Securities Act jointly and severally to plaintiff and other members of the Class.

7  **SAFE HARBOR IS INAPPLICABLE TO INITIAL PUBLIC OFFERINGS**

8  278.    Defendants are liable for any false and misleading forward-looking statement issued

9  in the Offering Materials.  The Safe Harbor provision of §27A of the Securities Act, 15 U.S.C. 77z-

10  2(b)(2)(D), specifically excludes those statements "made in connection with an initial public

11  offering," which includes all of the false and misleading statements at issue.

12  **CLASS ACTION ALLEGATIONS**

13  279.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the

14  Federal Rules of Civil Procedure on behalf of a class consisting of all those who acquired shares of

15  TriNet common stock pursuant or traceable to the Company's false and misleading IPO Registration

16  Statement and the Secondary Offering Registration Statement (the "Offering Class") and who were

17  damaged thereby.  Excluded from the Offering Class are defendants and their families, the officers

18  and directors of the Company, at all relevant times, members of their immediate families and their

19  legal representatives, heirs, successors or assigns and any entity in which defendants have or had a

20  controlling interest.

21  280.    The members of the Offering Class are so numerous that joinder of all members is

22  impracticable.  TriNet stock was actively traded on the NYSE.  While the exact number of Class

23  members is unknown to plaintiff at this time and can only be ascertained through appropriate

24  discovery, plaintiff believes that there are hundreds, if not thousands, of members in the proposed

25  Class.  Record owners and other members of the Class may be identified from records maintained by

26  TriNet or its transfer agent and may be notified of the pendency of this action by mail, using the

27  form of notice similar to those customarily used in securities class actions.  TriNet has more than 68

28  million shares of stock outstanding.

1    281.    Plaintiff's claims are typical of the claims of the members of the Offering Class as all

2    members of the Offering Class are similarly affected by defendants' wrongful conduct in violation of

3    federal law that is complained of herein.

4    282.    Plaintiff will fairly and adequately protect the interests of the members of the

5    Offering Class and has retained counsel competent and experienced in class and securities litigation.

6    283.    Common questions of law and fact exist as to all members of the Offering Class and

7    predominate over any questions solely affecting individual members of the Offering Class.  Among

8    the questions of law and fact common to the Class are:

9         (a)    Whether the Securities Act was violated by defendants' acts as alleged herein;

10        (b)    Whether statements made by defendants to the investing public in the Offering

11   Materials misrepresented material facts about the business, operations and management of TriNet;

12   and

13

14        (c)    To what extent the members of the Offering Class have sustained damages

15   and the proper measure of damages.

16   284.    A class action is superior to all other available methods for the fair and efficient

17   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

18   damages suffered by individual Offering Class members may be relatively small, the expense and

19   burden of individual litigation make it impossible for members of the Class to individually redress

20   the wrongs done to them.  There will be no difficulty in the management of this action as a class

21   action.

22                          **PRAYER FOR RELIEF**

23   WHEREFORE, plaintiff prays for relief and judgment, as follows:

24   A.    Determining that this action is a proper class action and certifying plaintiff as a Class

25   representative under Rule 23 of the Federal Rules of Civil Procedure;

26

27

28

1     B.     Awarding compensatory damages in favor of plaintiff and the other Class members

2  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

3  wrongdoing, in an amount to be proven at trial, including interest thereon;

4     C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

5  action, including counsel fees and expert fees;

6

7     D.     Awarding statutory rescission or a rescissory measure of damages; and

8     E.     Such equitable/injunctive or other relief as deemed appropriate

9                              **JURY DEMAND**

10    Plaintiff demands a trial by jury.

11  DATED:  April 1, 2016                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
12                                           SHAWN A. WILLIAMS
                                             DANIEL J. PFEFFERBAUM
13                                           NADIM G. HEGAZI
                                             KENNETH J. BLACK
14

15
                                                 s/ Shawn A. Williams
16                                           SHAWN A. WILLIAMS

17                                           Post Montgomery Center
                                             One Montgomery Street, Suite 1800
18                                           San Francisco, CA  94104
                                             Telephone:  415/288-4545
19                                           415/288-4534 (fax)

20                                           Lead Counsel for Plaintiff

21                                           HOLZER & HOLZER, LLC
                                             COREY D. HOLZER
22                                           1200 Ashwood Parkway, Suite 410
                                             Atlanta, GA  30338
23                                           Telephone:  770/392-0090
                                             770/392-0029 (fax)
24
                                             Additional Counsel for Plaintiff
25

26

27

28

1129552_1

[PROPOSED] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS – 5:15-cv-03625-BLF                                                          - 107 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| TNET | May 20, 2014 | 425 | $23.58 |
| | May 27, 2014 | 210 | $24.44 |
| | June 3, 2014 | 150 | $26.04 |
| | June 3, 2014 | 198 | $25.76 |
| | Sept. 29, 2014 | 200 | $25.61 |
| | Dec. 1, 2014 | 170 | $29.50 |
| | Dec. 22, 2014 | 100 | $31.49 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| TNET | Sept. 3, 2014 | 90 | $28.04 |
| | Jan. 20, 2015 | 150 | $32.94 |
| | Feb. 23, 2015 | 140 | $36.04 |
| | March 31, 2015 | 140 | $35.36 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _6th_ day of _August_, 2015 in _Ballwin_ , _Missouri_.

                                                        City               State

(Signature) X _Howard Welgus_

(Print Name) _Howard Welgus_