1

2

3              **UNITED STATES DISTRICT COURT**

4            **NORTHERN DISTRICT OF CALIFORNIA**

5                 **SAN JOSE DIVISION**

6

7   HOWARD WELGUS,                        Case No.  15-cv-03625-BLF

                    Plaintiff,
8                                         **ORDER GRANTING IN PART AND**
                                          **DENYING IN PART MOTIONS TO**
9        v.                               **DISMISS WITH LEAVE TO AMEND IN**
                                          **PART AND WITHOUT LEAVE TO**
10  TRINET GROUP, INC., et al.,           **AMEND IN PART**

                    Defendants.
11                                        [Re:  ECF 66, 69, 70, 74, 76, 77, 89]

12

13         Howard Welgus, as lead plaintiff in this securities fraud case, alleges that Defendant

14  TriNet Group, Inc. ("TriNet" or "Company") and its officers and directors falsely claimed to have

15  near invincible risk management capabilities, breakthrough data analytics, and limits on the

16  Company's exposure to excessive insurance claims, which it touted as ensuring significant

17  profitability in its human resources and insurance management business.  When TriNet's stock

18  dropped precipitously three times on the announcement of three unanticipated revenue shortfalls in

19  its core insurance business, this suit followed.

20         Before the Court are four motions to dismiss filed by (1) TriNet, Burton M. Goldfield, and

21  William Porter (collectively, "Officer Defendants"), Officer Defs.' Mot., ECF 89; (2) Martin

22  Babinec, H. Raymond Bingham, David C. Hodgson, Katherine August-deWilde, Kenneth

23  Goldman, John H. Kispert, and Wayne B. Lowell (collectively, "Outside Directors" or "Director

24  Defendants"), Outside Dirs.' Mot., ECF 70; (3) General Atlantic LLC ("General Atlantic"),

25  General Atlantic Mot., ECF 74; and (4) J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC,

26  Deutsche Bank Securities Inc., Jefferies LLC, Stifel, Nicolaus & Company, Incorporated, and

27  William Blair & Company, LLC (collectively, "Underwriter Defendants"), Underwriter Defs.'

28  Mot., ECF 77.  The Court heard oral argument on November 3, 2016.  For the reasons set forth

United States District Court
Northern District of California

1    herein, the motions to dismiss are GRANTED WITH LEAVE TO AMEND IN PART and

2    WITHOUT LEAVE TO AMEND IN PART.  The parties have also filed two requests for judicial

3    notice, which the Court GRANTS.  ECF 72, 97.

4    **I.    BACKGROUND**

5        **A.    Facts**

6        TriNet, founded in 1988, is a professional employer organization ("PEO") that offers

7    outsourced human resources ("HR") services to its client companies, including functions such as

8    payroll processing, employment law compliance, health insurance, and workers' compensation

9    insurance.  First Am. Compl. ("FAC") ¶ 4, ECF 53.  The Company operates under a "co-

10   employment" model, meaning that TriNet and its clients enter into contracts that allocate

11   employment-related responsibilities with respect to the clients' employees—known as worksite

12   employees ("WSEs")—between TriNet and its clients.  *Id.*

13       TriNet derives revenue from two types of business operations: Professional Services and

14   Insurance Services, the latter of which is at issue here.  *Id.* ¶ 5.  The Company's Professional

15   Services segment generates revenue by charging fees for processing HR transactions.  *Id.* ¶ 5(a).

16   TriNet's Insurance Services segment generates revenue by providing risk-based, third-party plans

17   to clients, primarily employee health benefit plans and workers' compensation insurance.  *Id.* ¶

18   5(b).  TriNet contracts with insurers to provide these benefits under TriNet-sponsored plans.  *Id.*

19   Generally, TriNet collects insurance premiums from WSEs, which it then passes on to the

20   insurance companies; however, for a portion of the Insurance Services, TriNet takes on a

21   deductible layer of risk.  *Id.*  When the Company takes on a deductible layer of risk, the insurance

22   company has the first layer of exposure, but if the claim exceeds the negotiated policy limit,

23   TriNet is responsible for the excess.  *Id.*  Taking on the deductible layer of risk offers TriNet the

24   opportunity to capture a "performance fee" or "insurance spread."  *Id.* ¶¶ 5(b), 7.  Capturing the

25   performance fee was and is essential to TriNet's business model—it purportedly allows the

26   Company to generate higher margins than purely "pass through" PEOs.  *Id.* ¶ 7.

27       Between 2005 and 2009, General Atlantic, a private equity firm, invested over $128

28   million in TriNet and thus acquired 72 percent of the Company.  *Id.* ¶ 49.  Since its founding,

United States District Court
Northern District of California

1   TriNet's growth was driven primarily by acquisition, including the October 2012 purchase of SOI

2   Holdings, Inc. ("SOI").  *Id.* ¶ 6.  As of December 31, 2015, TriNet served over 12,700 clients

3   employing 324,000 WSEs.  *Id.* ¶¶ 4, 36.

4          In 2013, TriNet began preparing for an Initial Public Offering ("IPO").  *Id.* ¶ 8.  On March

5   27, 2014, the Company conducted its IPO, selling 15 million shares to the public at $16 per share,

6   and raising $240 million.  *Id.* ¶¶ 8, 64.  TriNet's IPO registration statement stated that the

7   Company was proficient in its risk management capabilities and that TriNet's agreements limited

8   its aggregate exposure in any given policy year.  *Id.* ¶ 63.  During subsequent public statements,

9   the company—mainly through its President and CEO, Burton Goldfield, and its Vice President

10  and CFO, William Porter—claimed to have stable and predictable revenues, visibility into future

11  financial performance, and that the Company was on track to meet its projected earnings.  *Id.* ¶¶

12  67, 74, 76.

13         Six months later, on September 11, 2014, TriNet conducted a Secondary Public Offering

14  ("SPO"), in which General Atlantic[1], as the sole selling stockholder, sold 13.8 million shares to

15  the public at $24.42 per share for a total of approximately $336 million.  *Id.* ¶¶ 49, 81.  The SPO

16  registration statement repeated the same statements regarding TriNet's risk management

17  capabilities and aggregate exposure.  *Id.* ¶ 80.  In subsequent public statements, Company

18  representatives again assured investors that TriNet was on track to achieve its financial goals, and

19  also assured investors that it was different than its competitors in that it had "very consistent fully-

20  insured" programs.  *Id.* ¶¶ 86, 89, 92, 93, 95.

21         On March 3, 2015, TriNet announced its financial results for the fourth quarter of 2014

22  ("4Q14").  *Id.* ¶¶ 17, 98.  The Company had experienced significant growth, but also "higher than

23  expected large medical claims."  *Id.* ¶ 98.  These purportedly unexpected medical claims resulted

24  in higher insurance costs, and Net Insurance Service Revenues were $10 million less than

25  projected, leading to lower Net Service Revenues.  *Id.*  After this disclosure, the Company's stock

26

27  [1] General Atlantic was TriNet's largest stockholder.  FAC ¶ 49.  Two members of TriNet's Board
    of Directors—H. Raymond Bingham and David Hodgson—are affiliated with General Atlantic.
28  *Id.*  General Atlantic executed the Prospectus Supplement in connection with TriNet's SPO on
    September 14, 2014, and sold its 13.8 million shares on September 17, 2014.  *Id.*

United States District Court
Northern District of California

1   price declined from $37.88 per share to $33.93.  *Id.* ¶¶ 18, 103.  During a call announcing the

2   4Q14 results, Goldfield and Porter stated that TriNet's claims data was subject to lag time, but

3   assured investors that they had analyzed the data and the incident was a one-time event.  *Id.* ¶ 99.

4   In ensuing public statements, Company representatives stated that they had only been reviewing

5   claims data on "catastrophic claims," *i.e.*, those over $300,000, but were reducing the threshold to

6   $50,000.  *Id.* ¶ 104.  They also stated that the Company had taken on a "modest amount of

7   deductible risk."  *Id.*

8        Two months later, on May 5, 2015, TriNet released its earnings for the first quarter of

9   fiscal year 2015 ("1Q15").  *Id.* ¶¶ 19, 109.  Total Revenues, Net Service Revenues, Net Income,

10  and Adjusted Net Income were higher than the first quarter of 2014, but TriNet disclosed that a

11  reserve increase was necessary due to unexpected changes in workers' compensation claims.  *Id.*

12  ¶¶ 109–11.  TriNet stated that it increased its forecast for workers' compensation claims by $6

13  million for the remainder of 2015 and by $4 million for 1Q15, and reduced its annual forecast for

14  Net Service Revenues by $10 million.  *Id.* ¶¶ 110–11.  After this disclosure, the Company's stock

15  price declined from $34.43 to $28.76.  *Id.* ¶ 20.  Company representatives repeated many of the

16  same statements regarding risk management capabilities following the announcement of these

17  results.  *Id.* ¶¶ 111–24.

18       On August 3, 2015, TriNet announced its financial results for the second quarter of 2015

19  ("2Q15").  *Id.* ¶¶ 22, 126.  Revenues increased 22 percent over the prior year period, but TriNet

20  had again experienced a higher-than-expected number of large medical claims, resulting in about

21  $20 million more in claims expenses than forecasted.  *Id.* ¶ 126.  As a result, the Company revised

22  its forecast for Net Insurance Service Revenues in 2015 downward by $10 million.  *Id.* ¶ 127.

23  After this disclosure, the Company's stock price declined 38 percent, from a $26.69 to $16.33.[2]

24  *Id.* ¶ 25.  The Company again repeated statements regarding its actuarial and analytical

25  capabilities and claims review process.  *Id.* ¶¶ 127–35.

26       On November 2, 2015, the Company announced its financial results for the third quarter of

27  _____

28  [2] Plaintiff first filed this lawsuit against the Officer Defendants on August 7, 2015.  Compl., ECF 1.

*United States District Court*
*Northern District of California*

2015 ("3Q15").  *Id.* ¶¶ 26, 136.  The 3Q15 financial results came in more or less in line with the substantially reduced guidance.  *Id.* ¶ 136.  In a conference call with analysts and investors to discuss the 3Q15 financial results, Goldfield revealed that the Company was "looking at enhancing [its] forecasting capabilities and ability to monitor and manage that part of the business."  *Id.*  Following the November 2 disclosures, TriNet's stock price decreased from $19.29 per share to $18.10.  *Id.* ¶ 137.

Three months later, on February 29, 2016, TriNet issued a press release announcing the Company's financial results for the fourth quarter of 2015 ("4Q15") and the 2015 fiscal year ("FY15"), and declaring that the Company was unprepared to file its Form 10-K and had sought an extension from the SEC due to the identification of material weaknesses in its internal controls.  *Id.* ¶¶ 28, 140–41.  Following this announcement, TriNet's stock fell from $13.09 to $12.28.  *Id.* ¶¶ 29, 143.

TriNet filed its FY15 Form 10-K on April 1, 2016, providing disclosures concerning the aforementioned weaknesses, including ineffective information technology general controls, ineffective control environment and risk assessment, ineffective controls over payroll operations, and ineffective controls over health and workers' compensation liabilities and related expenses.  *Id.* ¶¶ 31–32.  Despite these material weaknesses, the Company concluded that "no material adjustments, restatements or other revisions to [its] previously issued financial statements were required."  Ex. Q to Def.'s RJN at 21, ECF 73-17.

## B.    This Lawsuit

Lead plaintiff Howard Welgus ("Plaintiff") represents a putative class of investors who purchased or otherwise acquired the common stock of defendant TriNet during a class period beginning March 27, 2014—the IPO—and ending February 29, 2016—when TriNet announced its financial results for FY15.  *Id.* ¶¶ 2, 28.  Plaintiff alleges that higher-than-expected volatility in insurance claims between late 2014 and mid-2015, and a later disclosure of material weaknesses in its internal controls, indicates that hundreds of Defendants' statements on a range of topics were false when made.  Specifically, Plaintiff points to five categories of allegedly false statements made repeatedly during the class period, including those that appear in the two registration

statements.

First, Defendants specifically and repeatedly assured investors and analysts that risk management was a "core competency" of TriNet, and that the Company had an "experienced risk management team." FAC ¶¶ 8–9, 21, 80, 93, 123, 125. In differentiating TriNet from failed PEOs, defendant Goldfield touted the Company's access to "breakthrough" data that gave it the ability to "predict pretty accurately on an annual basis exactly" how the Company was going to do. *Id.* ¶¶ 10, 93, 95. Plaintiff alleges that these statements were false. *Id.* ¶¶ 119, 128.

Second, TriNet claimed to have unprecedented access to claims data, which was "key to the risk portion of the business." *Id.* ¶ 95. Defendants also claimed to receive state-of-the-art analytics on all of TriNet's claims and monthly claims data so that it could assess the risk associated with the medical and workers' compensation insurance claims "on an ongoing basis." *Id.* ¶¶ 10, 92. Plaintiff alleges that this was false. *Id.* ¶¶ 101, 110–11, 135.

Third, Defendants claimed to analyze claims data for each client "on an ongoing basis," and to price every client to the risk it posed. *Id.* ¶¶ 62, 92. Plaintiff alleges that this was false. *Id.* ¶¶ 32, 82(b), 135, 149.

Fourth, Defendants stressed that TriNet had predictability and visibility into TriNet's financial performance and insurance business. For example, Goldfield praised the Company's predictable revenue and visibility into the future. *Id.* ¶¶ 10, 71, 94. Plaintiff alleges that this was false. *Id.* ¶¶ 101, 104.

Finally, the Offering Documents and Defendants' public statements indicated that TriNet was not exposed to the same risk as other failed PEOs because its insurance plans were "fully insured," making them more stable and predictable than TriNet's failed competitors' plans. *Id.* ¶¶ 73, 89. Plaintiff alleges that this too was false. *Id.* ¶ 78, 96(d).

Plaintiff originally filed suit against the Officer Defendants only on August 7, 2015. Compl., ECF 1. In his original complaint, Plaintiff asserted claims under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Compl. ¶¶ 57–62. On December 3, 2015, this Court granted

United States District Court
Northern District of California

Plaintiff's motion for appointment as lead plaintiff.  ECF 24.  Thereafter, on February 1, 2016, Plaintiff filed a consolidated complaint asserting the same claims as in the original complaint and adding General Atlantic and three of the Outside Directors—Babinec, Bingham, and Hodgson—as defendants.  ECF 26.  In April 2016, Plaintiff sought and was granted leave of Court to file the operative complaint, the FAC.  *See* ECF 43, 47.  In the FAC, Plaintiff asserts claims for (1) securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 of the SEC against the Officer Defendants; (2) controlling person liability under § 20(a) of the Exchange Act against the Officer Defendants, Outside Directors, and General Atlantic; (3) violations of § 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, against all Defendants; (4) violations of § 12(2)(2) of the Securities Act, 15 U.S.C. § 77*l*, against all Defendants; (5) and controlling person liability under §15 of the Securities Act, 15 U.S.C. § 77*o*, against the Officer Defendants, Outside Directors, and General Atlantic.

## II.     LEGAL STANDARD

### C.     Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

United States District Court
Northern District of California

### D.    Rule 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701.  Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ."  15 U.S.C. § 78u-4(b)(1)(B).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).  "To satisfy the requisite state of mind element, a complaint must allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness."  *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original).  The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### III.    JUDICIAL NOTICE

Before addressing Plaintiff's claims, the Court considers the two requests for judicial notice filed by the parties.  ECF 72, 97.  While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute."  Courts have previously taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Defendants request judicial notice of numerous reports, press releases, and filings with the

SEC, many of which were referenced by Plaintiff in his complaint. *See* ECF 73, 73-1–73-19. Plaintiff does not object to the Court taking judicial notice of these documents generally, but he requests that judicial notice be taken only of the facts of their existence, not of any allegations made within. Opp'n to Defs.' RJN 1, ECF 96. Defendants' requests are accordingly GRANTED.

Plaintiff requests judicial notice of a portion of three complaints filed in three different cases: *Koesterer v. Wash. Mut., Inc.*, No. 07 CIV 9801 (S.D.N.Y. filed Nov. 5, 2007); *Abrams v. Wash. Mut., Inc.*, No. 07 CIV 9806 (S.D.N.Y. filed Nov. 5, 2007); *Nelson v. Woods*, No. C07-1809 (W.D. Wash. Filed Nov. 7, 2007). Defendants do not object, and this Court may take judicial notice of court filings and other matters of public record. *See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F. 3d 1360, 1364 (9th Cir. 1998); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). Accordingly, Plaintiff's request for judicial notice is GRANTED.

## IV.    CLAIMS AGAINST THE OFFICER DEFENDANTS, DIRECTOR DEFENDANTS, AND GENERAL ATLANTIC

### A.    Section 10(b) and Rule 10b-5 (Against the Officer Defendants Only)

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "To state a securities fraud claim, plaintiff must plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014) (internal quotation marks and citation omitted).

United States District Court
Northern District of California

1      Plaintiff brings this claim against only the Officer Defendants, who assert that Plaintiff has

2   not viably alleged a violation under Section 10(b) of the Exchange Act based on two issues: (1)

3   falsity and (2) scienter.  As explained below, the Court agrees with Defendants.

4          **i.      Falsity**

5      In order to plead falsity, the complaint "shall specify each statement alleged to have been

6   misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

7   the statement or omission is made on information and belief, the complaint shall state with

8   particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Accordingly, a

9   plaintiff must plead "specific facts indicating why" the statements at issue were false.  *Metzler Inv.*

10  *GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable,

11  a statement must be false "at [the] time by the people who made them"); *In re Stratosphere Corp.*

12  *Sec. Litig.*, No. CV-S-96-708, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity,

13  plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading

14  statements from which this court can make inferences permissible under Rule 9(b)").  "A litany of

15  alleged false statements, unaccompanied by the pleading of specific facts indicating why those

16  statements were false, does not meet this standard."  *Metzler Inv. GMBH*, 540 F.3d at 1070.

17      As noted above, the numerous allegedly false and misleading statements can be divided

18  into five main categories: (1) statements regarding risk management capabilities; (2) statements

19  regarding access to claims data; (3) statements that TriNet assesses all claims on an individual

20  basis; (4) assurances that TriNet had predictability and visibility into future financial performance;

21  and (5) statements regarding the use of fully insured plans and aggregate stop loss provisions.

22      The Officer Defendants contend that the FAC fails to allege the falsity of these statements

23  for two reasons.  First, several of these statements are opinions, inactionable puffery, or

24  inactionable forward-looking statements.[3]  Officer Defs.' Mot. 16, 19–20.  Second, the FAC does

25  not contain any particularized allegations demonstrating that any of the statements was materially

26

27  ─────────────────────
    [3] Because the Court agrees with the Officer Defendants' second argument, it declines to address
    this issue.  However, some of the allegedly false statements appear to be little more than Officer
28  Defendants' cheerleading support for their employees.  The Court will wait to fully consider this
    issue until it has the opportunity to review the amended complaint.

United States District Court
Northern District of California

1   false or misleading when made.  *Id.*  Plaintiff argues in opposition, however, that the FAC

2   particularly alleges materially false statements regarding these issues.  Opp'n to Officer Defs.',

3   Director Defs.', and Gen. Atl. Mots. 5–11, ECF 94 (hereinafter "Opp'n to Officer Defs.' Mot.").

4        Reviewing the FAC, the Court finds that Plaintiff's allegations of falsity with respect to

5   statements falling in categories (1), (2), (4), and (5), as delineated above, suffer from the same

6   deficiency—they are missing facts indicating that these allegedly false statements were false at the

7   time they were made.[4]  Without the benefit of hindsight—*i.e.*, the three quarters in which TriNet

8   experienced higher insurance claims—the Court cannot reasonably infer that the statements were

9   false at the time they were made.  *See Ronconi*, 253 F.3d at 430.

10       The Court offers the following analysis of the first false claim alleged by Plaintiff in order

11  to demonstrate the type of deficiencies common to the other claims.  The FAC alleges that

12  Defendants made false statements regarding the Company's risk management capabilities,

13  including: "risk management is a core competency of our company," and TriNet had "robust risk

14  management capabilities" and an "experienced risk management team" on November 21, 2013, in

15  its Form S-1 Registration Statement and subsequent amendments throughout 2014, FAC ¶ 8, on

16  September 12, 2014, in its secondary offering statement, *id.* ¶ 80, on March 30, 2015 in its FY14

17  Form 10-K, and June 10, 2015 at a conference.  *Id.* ¶¶ 106, 123.  Plaintiff points to various

18  disclosures made after the Company announced the higher-than-anticipated insurance claims that

19  he contends demonstrate the Company did not have capable or experienced personnel to perform

20  risk management functions.  Opp'n to Officer Defs.' Mot. 6 (citing FAC ¶¶ 127–28, 136, 139,

21  142, 149, 243).  Plaintiff alleges that through these disclosures, Defendants admitted that the

22  Company's poor financial performance, missed financial goals, and ability to forecast claims was

23  partly attributable to the fact that TriNet did not have an adequately experienced risk management

24  _____

25  [4] Moreover, a review of the registration statement with respect to the fifth category suggests that
    Plaintiff may be mischaracterizing TriNet's public statements regarding the use of fully insured

26  plans and aggregate stop loss provisions.  *See* Ex. A to Defs.' RJN, at 53, ECF 73-1 ("Our
    insurance costs are, in part, a function of the type and terms of agreements that we enter into with

27  the insurance carriers that provide fully-insured coverage for our WSEs.  Approximately 39% of
    our 2013 health insurance premiums were for policies with respect to which our carriers set the

28  premiums and for which we were not responsible for any deductible."); Hr'g Tr. 40:16–43:25,
    ECF 109.

United States District Court
Northern District of California

1  team despite the public statements to the contrary.  *Id.* (citing FAC ¶¶ 32, 99, 101, 120, 149).

2      Plaintiff directs the Court to, for example, TriNet's Form 10-K for FY15 and an August

3  2015 conference call, which he contends demonstrate the falsity of the prior statements.  *Id.*

4  TriNet's Form 10-K for FY15, which identified several material weaknesses in the Company's

5  internal controls, contained the following disclosure, "Our management determined that a material

6  weakness exists due to a lack of a sufficient complement of personnel with an appropriate level of

7  knowledge, experience and training commensurate with our structure, internal control, and

8  financial reporting requirements."  FAC ¶ 149.  Additionally, during the August 3, 2015,

9  conference call with analysts and investors to discuss the "disappointing" financial results for

10  2Q15, Goldfield and Porter announced several steps they were going to take to more effectively

11  manage the risk posed by high medical claims.  *Id.* ¶ 127.  For example, Goldfield announced that

12  he was going to strengthen his internal team, including by hiring a "senior insurance services

13  executive . . ., as well as additional actuarial and analytical capabilities."  Opp'n to Officer Defs.'

14  Mot. 6 (citing FAC ¶¶ 127–28).

15      Reviewing these allegations, however, the Court finds the FAC insufficient to support the

16  assertion that TriNet did not have sufficient policies, procedures, and personnel in place to support

17  Defendants' claims of risk management proficiency or core competency.  Officer Defs.' Mot. 17.

18  The FAC does not include any allegations about TriNet's practices with regard to risk

19  management during the class period, including how or why any given policy, procedure, or

20  personnel was lacking or deficient.  Moreover, Plaintiff does not allege any facts addressing who

21  comprised the risk management department or how those individuals were inexperienced or

22  unable to effectively analyze risk based on the information available to them at the time.  The only

23  particularized facts alleged with respect to TriNet's risk management team suggest that TriNet

24  initially outsourced its risk management work and then developed an in-house risk management

25  department and hired more personnel after the Company began experiencing issues.  *See* FAC ¶¶

26  73, 120, 128, 134, 136.

27      In addition, the facts alleged here contrast with those found sufficient to demonstrate

28  falsity by other courts.  For example, in *Reese v. Malone*, the Ninth Circuit found that plaintiffs

12

had sufficiently pled falsity by citing statements that were directly contradicted by contemporaneous internal documents. 747 F.3d at 569–70 (BP claimed "low and manageable" corrosion rates when inspection data showed objectively high corrosion rates). No such facts are alleged here. Instead, Plaintiff uses disclosures made after a series of financial failings to demonstrate the inadequacy of TriNet's risk management capabilities during the prior period. This is insufficient, as it tells us nothing about the falsity of the statements at the time they were made. At the hearing, Plaintiff argued that nothing in the disclosures suggested that these weaknesses in the risk management competencies of TriNet were recent developments and thus, the statements must have been false at the time they were made. Hr'g Tr. 14:7–12, ECF 109. This, too, is insufficient.

The Court notes that Plaintiff's claims with respect to the third category of statements— statements that TriNet assesses all claims on an individual basis—do not suffer from this deficiency. Plaintiff alleges that Defendants made certain false statements regarding TriNet's access to claims data, for example, "[w]e get state-of-the-art analytics on all of our claims." FAC ¶¶ 10, 92. Plaintiff also alleges, however, that the data TriNet received was limited to "catastrophic" claims, *i.e.*, those over $300,000, and thus, TriNet was not receiving any data on claims under that threshold. *Id.* ¶¶ 82(c), 104. Standing alone, this might be sufficient to allege that the statement that TriNet received analytics on "all" of its claims was false. But that does not remedy the fact that Plaintiff's complaint is inadequate on the whole, in that Plaintiff fails to identify any contemporaneous evidence to show that Defendants' other categories of statements were materially false or misleading when they were made.

All of the other allegedly false statements in categories (2), (4), and (5) suffer from the same type of deficiency discussed in detail above regarding the first group of allegedly false statements. The allegations in the FAC only plausibly show that falsity may be conferred by hindsight and there are no allegations that the statements were false when made.

In sum, the FAC's collection of alleged false statements simply fails to identify with specificity how and why the statements were false, and thus fails to comply with the PSLRA. Accordingly, the Court GRANTS the Officer Defendants' motion to dismiss Plaintiff's claims

under Section 10(b) and Rule 10b-5 WITH LEAVE TO AMEND.

ii.     Scienter

The Officer Defendants next challenge the sufficiency of the allegations with respect to scienter.  Officer Defs.' Mot. 21–25.  Plaintiff relies on the following to support an inference of scienter: allegedly false Sarbanes-Oxley certifications; the same facts establishing falsity because the Officer Defendants "grossly misrepresented the truth"; the Officer Defendants' own statements, which demonstrate they had access to information that contradicted their representations; and the core operations inference.  Opp'n to Officer Defs.' Mot. 14–20.  The Court, however, agrees with the Officer Defendants—even assuming that Plaintiff's allegations regarding falsity were sufficient, Plaintiff has not pled facts sufficient to show that the Officer Defendants knew of or deliberately disregarded the alleged falsity at the time the statements were made.

Scienter requires that the defendants have made false or misleading statements "either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (internal quotations omitted).  To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A "strong inference" of such intentional or deliberate recklessness arises "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added).  Under this standard, a court "must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

"Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701.  Such facts must, however, be considered holistically with all other allegations in the complaint to determine whether, as a whole, the inference of scienter is cogent and at least as compelling as the opposing inference.

1   *Tellabs*, 551 U.S. at 326; *see also Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324

2   (2011) (reiterating the holistic analysis).

3          In the FAC, Plaintiff offers no facts that support an inference of scienter. First, although

4   allegations of insider trading can support a finding of scienter, Plaintiff dropped the insider trading

5   allegations from his prior complaint. *See Ronconi*, 253 F.3d at 435 ("We have considered insider

6   trading as circumstantial evidence that a statement was false when made." (citations omitted));

7   *compare* FAC, *with* ECF 26.

8          Second, Plaintiff's reliance on allegedly false Sarbanes-Oxley ("SOX") certifications filed

9   with TriNet's FY14 Form 10-K is unavailing. *See* FAC ¶ 107; Opp'n to Officer Defs.' Mot. 17.

10  Specifically, Plaintiff points to certifications that Goldfield and Porter designed "disclosure

11  controls . . . to ensure that material information" relating to TriNet "is made known" to them and

12  that they conducted an "evaluation of internal control over financial reporting" and reported "all

13  significant deficiencies and material weaknesses in the design or operation of internal control over

14  financial reporting" to their auditors and audit committee. FAC ¶ 107. Despite this certification,

15  Plaintiff alleges that on April 1, 2016, TriNet revealed extensive material weaknesses related to

16  internal controls over financial reporting. *Id.* ¶¶ 148–49.

17         While certifications made pursuant to SOX can raise an inference of scienter, "[b]oilerplate

18  language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley section

19  302(a) . . . add nothing substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003–04; Reply

20  ISO Officer Defs.' Mot. 10, ECF 101. Rather, the Plaintiff must allege that "the person signing

21  the certification was severely reckless in certifying the accuracy of the financial statements."

22  *Curry v. Hansen Med., Inc.*, No. 09-cv-5094, 2011 WL 3741238, at *7 (N.D. Cal. Aug. 25, 2011)

23  (citing and quoting *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008)).

24  Here, there are no such allegations. Plaintiff merely argues, "[e]ither this information was known

25  to defendants or their certifications were false." Opp'n to Officer Defs.' Mot. 17. Plaintiff does

26  not challenge TriNet's financial statements or plead facts demonstrating that Goldfield and/or

27  Porter signed the SOX certifications while aware of any error. Thus, the current allegations

28  regarding the SOX certifications are insufficient to raise an inference of scienter. *See, e.g., Curry,*

United States District Court
Northern District of California

1    2011 WL 3741238, at *6 (refusing to infer scienter because complaint failed to allege

2    "aware[ness] of improper revenue recognition at the time the SOX certifications were made").

3           In his opposition, Plaintiff offers additional theories based on factual allegations that he

4    argues lead to a strong inference of scienter.  Opp'n to Officer Defs.' Mot. 14–21.  Plaintiff first

5    argues that the divergence between the Officer Defendants statements to investors and the true

6    state of affairs was so vast that scienter can be inferred from the same facts establishing falsity.  *Id.*

7    at 15 (citing *Ronconi*, 253 F.3d at 429; *In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal.

8    2008)).  However, it is not enough for Plaintiff to say simply that the Officer Defendants told

9    investors certain things that were false.  "[T]he complaint must allege that the defendants made

10   false or misleading statements either intentionally or with deliberate recklessness."[5]  *In re Daou*

11   *Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *Reese*, 747 F.3d at 569.

12          Here, Plaintiff does not allege any facts that show that when the relevant statements were

13   made, any Defendant knew or deliberately disregarded the inaccuracy of the allegedly false

14   statements.  Plaintiff simply alleges, for example, that although the Officer Defendants stated that

15   risk management and actuarial capability were core competencies, FAC ¶¶ 63, 80, in truth,

16   TriNet's lack of properly trained, experienced risk management personnel was a material

17   weakness.  *Id.* ¶¶ 127, 136, 139, 142, 149.  These allegations, however, do not support an

18   inference that the Company's statements were known to be false or misleading at the time by the

19   people who made them.  Plaintiff does not specify facts or evidence demonstrating that the Officer

20   Defendants knew that the actuarial team was not properly trained or was inexperienced while they

21   were touting their capabilities and he does not describe the actual qualifications of the members of

22   the actuarial team.  There are no allegations that TriNet knew it was hiring underqualified

23   personnel or delegating risk management to incompetent contractors.  It is not sufficient simply to

24

25   _____

     [5] Recklessness, in this context, "may be defined as a highly unreasonable omission, involving not
26   merely simple, or even inexcusable negligence, but an extreme departure from the standards of
     ordinary care, and which presents a danger of misleading buyers or sellers that is either known to
27   the defendant or is so obvious that the actor must have been aware of it."  *Hollinger v. Titan*
     *Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (internal quotation marks omitted).
28   Plaintiff makes no allegations regarding the standard of ordinary care, and thus cannot rely on
     recklessness.

United States District Court
Northern District of California

1    allege that a statement was false.  This same deficiency applies to each category of alleged false

2    statements.

3        Plaintiff next argues that the Officer Defendants' own statements demonstrate that they had

4    access to information that contradicted their representations.  Opp'n to Officer Defs.' Mot. 16.  In

5    the FAC, Plaintiff cites to various statements where Goldfield or Porter allegedly described their

6    involvement in obtaining insurance claims data, including: "we've asked [the carriers]" for claims

7    data "on a monthly basis" and "[w]e worked with our carriers directly."  FAC ¶¶ 104, 128.

8    Plaintiff alleges that these assertions were later admitted to be false.  *Id.* ¶¶ 128, 149.  Again, these

9    allegations are insufficient.  Plaintiff must specify facts or evidence sufficient to support an

10   inference that the Officer Defendants knew these statements were false or misleading at the time

11   they were made.  While the "strong inference" of scienter required by the PSLRA "need not be

12   irrefutable," a complaint survives a motion to dismiss "only if a reasonable person would deem the

13   inference of scienter cogent and at least as compelling as any opposing inference one could draw

14   from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Without facts suggesting that the Officer

15   Defendants were aware that TriNet did not ask for claims data on a monthly basis or did not work

16   with its carriers directly, the inference of scienter does not defeat the competing inference of non-

17   actionable mistake.  *See* Officer Defs.' Mot. 23–25; Reply ISO Officer Defs.' Mot. 10.

18       Although none of the FAC's allegations individually give rise to a strong inference of

19   scienter, the Court must also "consider the complaint in its entirety" to determine whether "all of

20   the facts alleged, taken collectively," give rise to the required strong inference of scienter.  *In re*

21   *VeriFone Holdings*, 704 F.3d at 701.  As the Ninth Circuit cautioned in *In re VeriFone Holdings*, a

22   district court should avoid "undue discounting" of the claims following an individualized analysis

23   of each allegation of scienter.  *Id.* at 703.  "[A] dual analysis remains permissible so long as it does

24   not unduly focus on the weakness of individual allegations to the exclusion of the whole picture."

25   *Id.*

26       Plaintiff's allegations and arguments concerning Defendants' allegedly misleading

27   statements do not individually support a strong inference of scienter.  Taken together, the facts

28   suggest, at most, corporate mismanagement and negligence, but they do not evince such fraudulent

United States District Court
Northern District of California

17

intent or deliberate recklessness as to make the inference of scienter cogent.  Plaintiff alleges no contemporaneous facts indicating that the Officer Defendants knew of or deliberately disregarded information that was contrary to the statements they were making.  *Cf. Reese*, 747 F.3d at 564 (finding that "BP had been aware of corrosive conditions for over a decade, and yet chose not to address them" and that "BP intentionally adopted corrosion monitoring practices that deviated from industry standards in an effort to cut costs"); Reply ISO Officer Defs.' Mot. 12–13.  The Court is unpersuaded by Plaintiff's argument that these examples of purportedly absent allegations of scienter are red herrings.  Opp'n to Officer Defs. Mot. 18.  It may be the case that TriNet's claims to superior risk management, predictability, and visibility were false and misleading, but that is not enough to support the requisite strong inference of scienter.

Equally absent are allegations of attempts by management to falsify documents or cover up the truth, allegations that Defendants intentionally adopted poor claims monitoring practices that deviated from industry standards, or contemporaneous facts to show that Defendants knew they were not getting accurate data.  *Cf. Reese*, 747 F.3d at 580–81 (finding the inference that BP was, at the least, deliberately reckless as to the false or misleading nature of their public statements "at least as compelling as any opposing inference" where complaint alleged that BP was aware of the corrosive conditions for over a decade but chose not to address them and intentionally adopted monitoring practices that deviated from industry standards in an effort to cut costs).  In addition, as already discussed there is no allegation that the Officer Defendants had a motive to commit fraud.  *See supra*, at 15 (allegations of insider trading dropped in the FAC).

Read as a whole, the allegations in the FAC fall short of an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 323.  The more plausible inference drawn from the allegations is that TriNet experienced unanticipated volatility in the insurance component of its business over a 9-month period, unsuccessfully addressed the risk management team's apparent inability to accurately predict insurance claims despite attempts to rectify the issue, made a bad business judgment by allowing some of its insurance plans to be less than fully insured, and finally realized that the Company suffered from material weaknesses related to its internal controls.  The allegations in the

1    FAC do little to diminish the plausibility of this counter-inference.  Plaintiff's allegations

2    establish, at best, bad judgment, which is not enough to create a strong inference of scienter.  *Cf.*

3    *Tellabs*, 513 F.3d at 711 ("Because the alternative hypotheses—either a cascade of innocent

4    mistakes, or acts of subordinate employees, either or both resulting in a series of false

5    statements—are far less likely than the hypothesis of scienter at the corporate level at which the

6    statements were approved, the latter hypothesis must be considered cogent.").

7         Likewise, Plaintiff's reliance on the core operations doctrine is unavailing.  Opp'n to

8    Officer Defs.' Mot. 18–20.  As the Ninth Circuit explained, "[p]roof under this theory is not easy."

9    *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.* ("*Intuitive*"), 759 F.3d 1051, 1062 (9th Cir.

10   2014).

> Core operations may support a strong inference of scienter under
> three circumstances: "First, the allegations may be used in any form
> along with other allegations that, when read together, raise an
> inference of scienter that is cogent and compelling, thus strong in
> light of other explanations . . . .  Second, such allegations may
> independently satisfy the PSLRA where they are particular and
> suggest that defendants had actual access to the disputed information
> . . . .  Finally, such allegations may conceivably satisfy the PSLRA
> standard in a more bare form, without accompanying particularized
> allegations, in rare circumstances where the nature of the relevant
> fact is of such prominence that it would be absurd to suggest that
> management was without knowledge of the matter."

17   *Id.* at 1062 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008)).  To

18   prevail under this theory, "[a] plaintiff must produce either specific admissions by one or more

19   corporate executives of detailed involvement in the minutia of a company's operations, such as

20   data monitoring; or witness accounts demonstrating that executives had actual involvement in

21   creating false reports."  *Id.* (citations omitted).

22         Here, Plaintiff argues that the following essential attributes of TriNet that the Officer

23   Defendants touted to investors were false: superior risk management, breakthrough data,

24   predictable revenue, and visibility into the future.  Opp'n to Defs.' Mot. 19.  Although Plaintiff

25   contends that it is "absurd to suggest" the Officer Defendants were "unaware" that TriNet did not

26   have internal actuaries, could not get clean data, and was not assessing claims risk on a monthly

27   basis, and as a result, did not have predictability or visibility, *id.*, the FAC does not contain any

28   such allegations.  *See* FAC ¶¶ 82, 96, 108, 126.  Moreover, the FAC contains no allegations that

the Officer Defendants had actual access to information contradicting these alleged falsities at the time the statements were made, and there are no witness accounts or admissions of any kind from confidential witnesses or the Officer Defendants that they were "hands-on" managers who were "monitoring" every aspect of the Company, let alone its systems for analyzing claims data and pricing policies appropriate to the perceived risk.  *Compare* FAC, *with In re VeriFone*, 704 F.3d at 710 (concluding that the fact that defendants were "hands-on managers with respect to operational details and financial statements" supported scienter), *and In re Daou Sys.*, 411 F.3d at 1022–23. As to the latter, Plaintiff argues that the Officer Defendants admissions regarding the importance of TriNet having core competencies in risk management and actuarial capability show that they had first-hand knowledge of and sometimes direct involvement in TriNet's risk management operations.  Opp'n to Officer Defs.' Mot. 19–20.  These admissions, however, are insufficient, particularly because the clear inference of these statements, when considered in context, is that the Officer Defendants were referring to the work that the Company was doing, not what Goldfield or Porter were personally doing.  *See* Reply ISO Officer Defs.' Mot. 12 n.7.

Without more, Plaintiff would simply be inviting the Court to infer, based upon statements made after three quarters of unanticipated, high insurance claims that the Officer Defendants must have known all of these alleged falsities.  That inference, by itself, is insufficiently cogent to satisfy the PSLRA's exacting pleading requirements.  *Zucco*, 552 F.3d at 990, 1000–01.

Even if the Court were to conclude that these statements were admissions of what Goldfield or Porter was personally doing, the cases Plaintiff cites do not support a strong inference of scienter.  In *Patel v. Axesstel, Inc.*, No. 14-cv-1037, 2015 WL 631525 (S.D. Cal. Feb. 13, 2015), the admissions were only one of the many facts alleged that led the court to conclude that plaintiffs had satisfied the PSLRA's requirement of a strong inference of scienter.  Here, in contrast, the purported admissions would be the only relevant facts alleged.  That is not enough. *See Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404, 2013 WL 1947525 (C.D. Cal. May 8, 2013) (concluding that although the admissions alleged supported the core operations inference, that alone was insufficient to allege scienter under the PSLRA).

The Court accordingly GRANTS the motion to dismiss WITH LEAVE TO AMEND to

1   add facts supporting an inference of scienter.

2       **B.    Section 20(a) of the Exchange Act**

3       Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are

4   "controlling persons" of the alleged violations.  *Hollinger*, 914 F.2d at 1572.  In order to prove a

5   prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal

6   securities laws and (2) that the defendant exercised "actual power or control" over the primary

7   violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

8       Because Plaintiff has failed to state a claim for a primary violation of the Exchange Act, he

9   likewise has failed to state a claim for violation of Section 20.

10      The Outside Directors and General Atlantic further urge that the Court dismiss Plaintiff's

11  § 20(a) claim for failure to allege particularized facts regarding their liability as control persons

12  over TriNet.  Outside Dirs.' Mot. 3; General Atlantic Mot. 6.  The "controlling person" analysis is

13  an intensely factual one requiring inquiry into a "defendant's participation in the day-to-day affairs

14  of the corporation and the defendant's power to control corporate actions."  *Howard*, 228 F.3d at

15  1065 (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)).  A plaintiff is not required to

16  show the defendant's "actual participation or the exercise of actual power."  *Id.*  However, the

17  plaintiff must allege specific facts concerning a defendant's responsibilities within the company

18  that demonstrate his involvement in the day-to-day affairs of the company or specific control over

19  the preparation and release of the allegedly false and misleading statements.  *See Paracor Fin.,*

20  *Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163–64 (9th Cir. 1996); *see also In re Immune*

21  *Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031 (S.D. Cal. 2005).

22      The present allegations are sufficient with respect to the Outside Directors but fall short

23  with respect to General Atlantic.  Plaintiff alleges that the Outside Directors were involved in the

24  drafting, preparation, and approval of the alleged statements.  FAC ¶¶ 60–61.  Plaintiff also alleges

25  that the Outside Directors signed the IPO registration statement, SPO registration statement, or

26  both.  *Id.* ¶¶ 40–46.  Other courts in this district have found similar allegations regarding control

27  sufficient to survive a motion to dismiss.  *See, e.g.*, *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F.

28  Supp. 2d 1105, 1131 (N.D. Cal. 2013); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190,

United States District Court
Northern District of California

1208 (N.D. Cal. 2012) ("Although not all courts agree, numerous courts have found that allegations that directors signed the statements which contained the material misrepresentations are sufficient to state Section 20(a) control status."); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 555 (N.D. Cal. 2009) ("Where a board member is alleged to have signed the registration statements at issue, however, courts have presumed that the director exercised actual authority and control, at least over the contents and/or release of those statements."); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) (collecting cases).  Accordingly, to the extent the primary violations, if adequately pled, are based on misstatements or omissions contained in the registration statements the individual directors signed, these allegations would be sufficient at this stage to support that the Outside Directors were controlling persons.

As to General Atlantic, Plaintiff alleges that as the controlling stockholder and by virtue of its control over two members of the Board of Directors, General Atlantic exercised control over TriNet.  FAC ¶ 214; Opp'n to Officer Defs.' Mot. 22–23.  Plaintiff also alleges that General Atlantic participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications containing the alleged misstatements and omissions.  FAC ¶ 60.  However, there are neither factual allegations regarding General Atlantic's authority to exercise decision-making power, nor allegations of its day-to-day involvement in the operation of the Company.  Thus, the allegations are insufficient with respect to control person liability claims.  *See Special Situations Fund III QP, L.P. v. Brar*, No. 14-cv-4717, 2015 WL 1393539, at *10 (N.D. Cal. Mar. 26, 2015) (dismissing control person pleading that defendants "had the power, influence and authority to cause, and did cause, directly or indirectly, others to engage in the wrongful conduct complained of herein, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading," among others, as "boilerplate allegations that courts have typically rejected").

Moreover, Plaintiff's assertion that General Atlantic exercised control over the Company through its two representatives on TriNet's Board of Directors, *id.* ¶ 58, is speculation based on the fact that Hodgson is a Managing Director of General Atlantic and Bingham is a former Managing Director of General Atlantic and remained an Advisory Director during the class period.

*Id.* ¶ 49; *Bao v. SolarCity Corp.*, No. 14-cv-1435, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015).  Without any facts to show that General Atlantic actually had the power to and did control TriNet's activities or direct how Hodgson or Bingham controlled those activities, a reasonable inference cannot plausibly be drawn.  Likewise, the fact that General Atlantic was a controlling shareholder and had to approve TriNet's two share offerings does not indicate that General Atlantic participated in the Company's day-to-day oversight or was authorized to control the preparation of financial statements.  Opp'n to Officer Defs.' Mot. 23; *cf. Howard*, 228 F.3d at 1066.  In short, the present allegations are too conclusory to establish General Atlantic's liability as a control person.

In light of the foregoing, the Court GRANTS the Officer Defendants' and Outside Directors' motions to dismiss this claim WITH LEAVE TO AMEND, in order to plead the primary violations and GRANTS General Atlantic's motion WITH LEAVE TO AMEND in order to plead both the primary violations and to allege facts regarding how General Atlantic exercised control over TriNet.

### C.   Section 11 of the Securities Act

"Section 11 creates a private right of action for any purchaser of a security where 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 914 (N.D. Cal. 2015) (quoting 15 U.S.C. § 77k(a)).  "To prevail on a Section 11 claim, a plaintiff must demonstrate (1) that the registration statement contained a misrepresentation or omission; and (2) that the misrepresentation or omission was material."  *Id.* (citing *In re Daou Sys.*, 411 F.3d at 1027).

The Officer Defendants argue that Plaintiff's claim under Section 11 fails for lack of standing because Plaintiff has not suffered statutory damages and because the claims based on Item 303 are deficient.  Officer Defs.' Mot. 26.  The Outside Directors and General Atlantic join the Officer Defendants' motion on these points, and they cite additional deficiencies specific to each of them.  Outside Dirs.' Mot. 2; General Atlantic Mot. 4.

### i. Standing

"To have standing to bring a Section 11 claim, plaintiffs must be able to trace their shares back to an allegedly misleading registration statement." *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1117 (N.D. Cal. 2014) (citing *In re Century Alum. Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)), *rev'd in part on other grounds*, No. 14-15962, 2016 WL 6156043 (9th Cir. Oct. 24, 2016).  The Ninth Circuit has explained that the "level of factual specificity" needed to trace shares back to a particular statement "will vary depending on the context." *In re Century Alum. Co.*, 729 F.3d at 1107.  For example, "[w]hen all of a company's shares have been issued in a single offering under the same registration statement, this 'tracing' requirement generally poses no obstacle." *Id.* at 1106 (citation omitted).  "But when a company has issued shares under more than one registration statement, the plaintiff must prove that her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement." *Id.* (citation omitted).

In the case of the latter, a plaintiff may satisfy this requirement in one of two ways.  "First, plaintiffs could prove they purchased their shares directly in the secondary offering itself. . . . Second, plaintiffs could prove that their shares, although purchased in the aftermarket, can be traced back to the secondary offering." *Id.* (citation omitted).  To avail themselves of the second method, plaintiffs must "trace the chain of title for their shares back to the secondary offering, starting with their own purchases and ending with someone who bought directly in the secondary offering." *Id.* at 1106–07.  The Ninth Circuit has acknowledge that this method is "difficult," but "is the condition Congress has imposed for granting access to the 'relaxed liability requirements' § 11 affords." *Id.* at 1107 (citation omitted).

#### a. Initial Public Offering

Plaintiff alleges that he purchased 425 shares of TriNet common stock on May 20, 2014 at $23.58 a share, 210 shares on May 27, 2014 at $24.44 a share, 150 shares on June 3, 2014 at $26.04 a share, and 198 shares on June 3, 2014 at $25.76 a share, "pursuant to and traceable to the IPO Registration Statement."  FAC ¶ 251.  Plaintiff argues this is sufficient to show that he purchased these shares pursuant to the IPO because the only shares available to the market before

1    the September 11, 2014 SPO were IPO shares.  Opp'n to Officer Defs.' Mot. 25.

2         Defendants argue that the allegations Plaintiff makes here are nearly identical to those the

3    Ninth Circuit found inadequate in *Century Aluminum*.  729 F.3d 1104.  In *Century Aluminum*, the

4    Ninth Circuit explicitly rejected general allegations that securities purchases are "traceable" to a

5    false registration statement as sufficient pleadings of statutory standing in light of the changes to

6    pleading standards effected by *Twombly*, 550 U.S. 554, and *Iqbal*, 556 U.S. 662.  *In re Century*

7    *Alum. Co.*, 729 F.3d at 1107.  There, the plaintiffs alleged that they "purchased Century

8    Aluminum common stock directly traceable to the Company's Secondary Offering," and argued

9    that additional allegations regarding "the dates on which and the prices at which they purchases

10   their shares, as well as allegations concerning the trading volume of Century Aluminum stock on

11   certain days," was sufficient to meet their statutory standing burden.  *Id.*  The Ninth Circuit

12   disagreed, holding that the plaintiffs' shares "could have come from the secondary offering, but

13   the 'obvious alternative explanation' is that they could instead have come from the pool of

14   previously issued shares," and therefore their allegations were not sufficient to rise above being

15   "'merely consistent with'" their assertion that their shares were traceable to the secondary

16   offering.  *Id.* (citation omitted).

17        The facts alleged here, however, with respect to the IPO, are distinct from *Century*

18   *Aluminum*, where at the time of purchase there had been more than one offering.  *See* Opp'n to

19   Officer Defs.' Mot. 25.  However, because his claims under Section 11 are subject to a Rule 9(b)

20   standard, Plaintiff must specifically allege how his shares are traceable to the IPO.  *See, e.g.*,

21   *Rieckborn*, 81 F. Supp. 3d at 918 ("A plaintiff 'cannot escape the requirements of Rule 9(b) by

22   virtue of a general disclaimer that a [Section 11] claim is based on negligence rather than fraud."

23   (citing and quoting *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1278 (E.D. Wash. 2007))

24   (alteration in original)); *see also In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1104 (D.

25   Nev. 1998) (where "overwhelming majority of allegations in the [complaint] concern the

26   fraudulent concealment or misrepresentation of material information," plaintiffs "cannot avoid the

27   more stringent requirements of Rule 9(b) by merely inserting boilerplate language into their

28   complaint stating that [their Securities Act] claims are based in negligence, not fraud").  Plaintiff

*United States District Court*
*Northern District of California*

25

1 | must specifically allege that the shares he purchased after the IPO were the only shares in the

2 | market.  Although not appearing to be difficult to correct, Plaintiff has not satisfied this

3 | requirement.  *See* Hr'g Tr. 19:24–20:6.  Accordingly, Plaintiff has not sufficiently alleged standing

4 | to assert claims under Section 11 as to the IPO.

5 |                                   b.   Secondary Offering

6 |        Plaintiff's allegations regarding his stock purchases after the secondary offering suffer the

7 | same defect but present a more challenging circumstance.  Plaintiff alleges that he purchased 470

8 | shares of common stock "pursuant to and traceable to the Second Offering Registration

9 | Statement."  FAC ¶ 251 (200 shares on September 29, 2014 at $25.61 a share; 170 shares on

10 | December 1, 2014 at $29.50 a share; and 100 shares on December 22, 2014 at $31.49 a share).

11 | The Officer Defendants argue that Plaintiff cannot plausibly trace his shares to the secondary

12 | offering, in which 14 million shares were sold, because at the time he purchased the shares, there

13 | were 17.25 million shares on the market from the IPO.  Officer Defs.' Mot. 26 (citing Ex. B to

14 | Defs.' RJN, at 47, ECF 73-2; Ex. D to Defs.' RJN, at 1, ECF 73-4).

15 |        Citing to *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), and *NECA-IBEW Health &*

16 | *Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), Plaintiff argues that because

17 | he has standing to pursue his own claims, he may assert, on behalf of a class, claims for which he

18 | cannot allege standing or the requisite elements because the claims implicate a similar set of

19 | concerns against the same defendants.  Opp'n to Officer Defs.' Mot. 25.  However, *Melendres* and

20 | *NECA* address only Article III standing, not statutory standing under Section 11.  *Melendres*, 784

21 | F.3d at 1261–64; *NECA*, 693 F.3d at 158.

22 |        As stated above, the Ninth Circuit has made clear the required allegations a plaintiff must

23 | make to have standing to assert claims under Section 11 when a company has issued shares under

24 | more than one registration.  *In re Century Alum. Co.*, 729 F.3d at 1106–07.  Plaintiff falls short of

25 | those requirements, and thus, has not sufficiently alleged statutory standing as to the secondary

26 | offering.  Additionally, if Plaintiff cannot establish that he has standing to assert a Section 11

27 |

28 |

*United States District Court*
*Northern District of California*

26

United States District Court
Northern District of California

1  claim, he may not seek relief on behalf of himself or any other member of the class.[6]  *See Lierboe*

2  *v. State Farm Mut. Auto Ins.*, 350 F.3d 1018, 1022–23 (9th Cir. 2003).

3       Because the Court concludes that Plaintiff has failed to sufficiently allege statutory

4  standing, the Court GRANTS the Officer Defendants', Outside Directors', and General Atlantic's

5  motions to dismiss Plaintiff's Section 11 claims WITH LEAVE TO AMEND.

6       **ii.**   **Damages**

7       The Officer Defendants, Outside Directors, and General Atlantic also argue that Plaintiff's

8  claims as to the IPO are deficient because he has not suffered damages.  Officer Defs.' Mot. 26;

9  Outside Dirs.' Mot. 2; General Atlantic Mot. 4.  Specifically, they argue that in the IPO, the

10  security was offered to the public at $16 per share, but when Plaintiff filed suit on August 7, 2015,

11  TriNet's stock hit a low of $17.12.  FAC ¶ 8; Ex. R. to Defs.' RJN, ECF 19.  In response, Plaintiff

12  argues that damages should be calculated as of April 1, 2016, the date on which he first asserted

13  claims under Section 11, rather than the date he originally filed a securities action under the

14  Exchange Act against the Officer Defendants.[7]  Opp'n to Officer Defs.' Mot. 26.  On April 1,

15  2016, TriNet's shares closed at $14.68 per share, below the $16 per share offering price.  FAC ¶

16  251.

17       Section 11 damages consist of:

18          the difference between the amount paid for the security (not
19          exceeding the price at which the security was offered to the public)
          and

20          (1) the value thereof as of the time such suit was brought, or

21          (2) the price at which such security shall have been disposed of in
22          the market before suit, or

23          (3) the price at which such security shall have been disposed of after

---

24  [6] Although issues of class standing are generally resolved at the class certification stage, courts
25  have discretion to address standing questions at the outset of litigation.  *See In re Anthem, Inc.
Data Breach Litig.*, 162 F. Supp. 2d 953, 970–71 (N.D. Cal. 2016).
26  [7] Plaintiff additionally argues that a plaintiff need not plead damages to sufficiently allege a § 11
claim.  Opp'n to Officer Defs.' Mot. 26.  While Plaintiff is correct, courts nevertheless
27  "appropriately find a complaint deficient under § 11 when it fails to plead facts demonstrating that
he suffered the particular type of injury contemplated by the statute."  *In re Countrywide Fin.
28  Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1167–68 (C.D. Cal. 2008) (citation and internal quotation
marks omitted).

> suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

15 U.S.C. § 77k(e).  To resolve the dispute regarding damages, the Court must determine whether "the value [of the security] at the time such suit was brought," refers to the original filing date or the date on which Plaintiff first asserted claims under Section 11.  However, because the Court has found that Plaintiff has not sufficiently alleged standing to bring a claim under Section 11, the Court need not decide the issue at this time.  In the event that Plaintiff adequately alleges tracing, the Court would benefit from further development of this legal issue.

### iii.      Section 11 Claims Premised on S-K Item 303[8]

Plaintiff also alleges that TriNet's IPO registration statement and SPO registration statement were materially misstated in violation of Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303.  FAC ¶¶ 150–72.  Specifically, Plaintiff alleges that Defendants were required to make certain disclosures in the *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") section of the Company's registration statements, but failed to do so.  *Id.* ¶¶ 150–51.

Item 303 of Regulation S-K requires that a company disclose "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  "Allegations which state a claim under Item 303(a) of Regulation S-K also sufficiently state a claim under Sections 11 and 12(a)(2)."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).  Here, Plaintiff alleges that Defendants should have disclosed the following known trends and uncertainties:

- The company was experiencing adverse claims trends in workers' compensation and health insurance that would negatively affect the Company's future business prospects (FAC ¶¶ 152, 165);

- The high degree of uncertainty inherent in the Company's loss exposure (FAC ¶¶ 154, 167); and

---

[8] The same analysis applies to Plaintiff's section 12(a)(2) claims premised on Item 303.

United States District Court
Northern District of California

- Quantitative and qualitative details regarding the Company's loss reserves and the sufficiency of the Company's loss reserve processes (FAC ¶¶ 158, 170).

The mere allegation that the aforementioned trends and uncertainties were not disclosed is insufficient.  Plaintiff must also allege sufficient facts to show that the trends and uncertainties were either known to Defendants at the time the registration statement was issued, or could have reasonably been expected to have a material impact on TriNet's net sales, revenues, or income. *See Steckman*, 143 F.3d at 1297–98 (holding that Item 303(a)(3)(iii) "mandates not only knowledge of an adverse trend . . . and material impact . . . , but also that the future material impacts are *reasonably likely to occur* from the present-day perspective" (emphasis in original)). However, the FAC does not include any such allegations.

Accordingly, Plaintiffs have failed to allege sufficient facts to show that the Officer Defendants, Outside Directors, or General Atlantic omitted facts from the MD&A section of TriNet's registration statements that they were required to disclose pursuant to Item 303.  The Court thus GRANTS the motion to dismiss the claims based on Item 303 WITH LEAVE TO AMEND.

### iv.    Argument Specific to the Outside Directors

The Outside Directors also argue that Plaintiff's claim against Mr. Kispert must be dismissed because Mr. Kispert joined the TriNet Board of Directors after the Company's IPO, and does not fall into one of the categories of persons who may be held liable under Section 11. Outside Dirs.' Mot. 2 (stating that Mr. Kispert did not sign the registration statement, was not a director at the time of its filing, and was not named in the registration statement as being or about to become a director).  Plaintiff does not address this argument in his opposition.

Despite Plaintiff's apparent abandonment, the Court briefly considers the issue.  A Section 11 action can be brought only against the following persons or categories of persons:

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which liability is asserted;

United States District Court
Northern District of California

> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
>
> (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
>
> (5) every underwriter with respect to such security.

15 U.S.C. § 77k; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 & n.13 (1983) ("Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement."). Plaintiff has not responded to the contention that Mr. Kispert does not fall into one of these categories.  Because Plaintiff has not alleged facts adequate to support a claim that Mr. Kispert falls into one of the aforementioned categories of persons subject to liability under Section 11 and does not contest the Director Defendants' recitation of the facts, the Court GRANTS the motion to dismiss the Section 11 claim regarding the IPO against Mr. Kispert WITHOUT LEAVE TO AMEND.  *See Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived.").

### v.    Arguments Specific to General Atlantic

General Atlantic also puts forth two arguments specific to it:  (1) the allegations related to Section 11 do not address General Atlantic and (2) General Atlantic does not fall into one of the categories of participants in an offering against which Section 11 claims may be brought.  General Atlantic Mot. 4.  Plaintiff did not address these arguments in his opposition or at the hearing. Again, despite Plaintiff's apparent abandonment, the Court briefly considers the issue.

The Court agrees that Plaintiff's allegations related to claims for violations of Section 11 are insufficient as to General Atlantic and that as pled, it is not clear that General Atlantic falls into one of the categories of participants in an offering against which a Section 11 action can be brought.  *See* 15 U.S.C. § 77k.  As to the latter, however, Plaintiff alleges that General Atlantic

30

United States District Court
Northern District of California

1  "executed the Prospectus Supplement in connection with the Secondary Offerings."  FAC ¶ 49.

2  Thus, despite Plaintiff's inadequate allegations, the Court is not convinced that amendment would

3  be futile as to the SPO.  Accordingly, the Court GRANTS General Atlantic's motion to dismiss

4  the Section 11 claims WITHOUT LEAVE TO AMEND as to the IPO and WITH LEAVE TO

5  AMEND as to the SPO.

6  **D.  Section 12(a)(2) of the Securities Act**

7  Section 12(a)(2) functions as the "sibling" to § 11, allowing plaintiffs to bring suit against

8  parties who are statutory sellers of securities pursuant to misrepresentations in registration

9  statements.  *Id.* at 925.  "To plead a claim under Section 12(a)(2), the plaintiff must allege that (1)

10  the defendant is a statutory seller; (2) the sale was effected by means of a prospectus or oral

11  communication; and (3) the prospectus or oral communication contained a material misstatement

12  or omission."  *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-0302, 2011 WL

13  4389689, at *8 (C.D. Cal. May 5, 2011) (citing 15 U.S.C. § 77*l*(a)(2)).  "A statutory seller is one

14  who either transferred title to the purchaser or successfully solicited the purchase for financial

15  gain."  *Rieckborn*, 81 F. Supp. 3d at 927 (citation, internal quotation marks, and alterations

16  omitted); *Pinter v. Dahl*, 486 U.S. 622, 643 n.21 (1988) (stating that § 12 "imposes liability on

17  only the buyer's immediate seller; remote purchasers are precluded from bringing actions against

18  remote sellers").

19  The Officer Defendants, Outside Directors, and General Atlantic argue that Plaintiff does

20  not have standing to sue under § 12(a)(2) because he does not allege that he purchased shares in

21  the IPO or SPO.  Officer Defs.' Mot. 25; Outside Dirs.' Mot. 2; General Atlantic Mot. 4.  Plaintiff

22  disagrees with this interpretation of §12(a)(2), and contends that aftermarket purchasers—*i.e.*,

23  those who did not purchase shares directly pursuant to a registration statement—are not excluded

24  from pursuing claims under § 12(a)(2).  Opp'n to Officer Defs'. Mot. 28.

25  The Court agrees with the Defendants— statutory standing under Section 12(a)(2) requires

26  that Plaintiff show that he purchased his shares "in a public offering, as opposed to the secondary

27  market."  *In re Ubiquiti Networks*, 33 F. Supp. 3d at 1126 (citing *Gustafson v. Alloyd Co., Inc.*,

28  513 U.S. 561, 577 (1995)).  Courts have thus distinguished between allegations that a plaintiff

1    purchased a security "pursuant or traceable to" a registration statement or similar document, and

2    allegations that a plaintiff purchased a security "pursuant to" the document.  While the latter

3    allegation is sufficient to establish standing under Section 12(a)(2), the former is not.  *See, e.g.*,

4    *Rieckborn*, 81 F. Supp. 3d at 925–26; *Maine State*, 2011 WL 4389689, at*11.

5         Here, Plaintiff alleges that he purchased common stock "pursuant to and traceable to" the

6    IPO registration statement and the SPO.  FAC ¶ 251.  Although Plaintiff also alleges that he brings

7    the § 12(a)(2) claim "on behalf of all purchasers of TriNet common stock *pursuant to* the Offering

8    Materials," he does not allege that he purchased or otherwise acquired the common stock pursuant

9    to the alleged materially inaccurate registration statements.  *Id.* ¶ 268 (emphasis added).  These

10   allegations are not sufficient to allege standing under Section 12(a)(2).  *See Maine State*, 2011 WL

11   4389689, at *11; *In re Century Alum. Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010);

12   *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016).

13   Accordingly, the Court GRANTS the motions to dismiss for lack of standing under Section

14   12(a)(2) WITH LEAVE TO AMEND.

15              **i.    Argument Specific to the Outside Directors**

16        While the Outside Directors join the Officer Defendants' motion, they make one additional

17   argument: because Mr. Kispert joined the TriNet Board of Directors after the Company's IPO, he

18   is not a statutory seller as required to be liable under Section 12(a)(2).  Outside Dirs.' Mot. 2.

19   Plaintiff does not address this argument in his opposition.  For the reasons stated above in relation

20   to Section 11, the Court GRANTS the Outside Directors' motion to dismiss the Section 12(a)(2)

21   claims with respect to the IPO against Mr. Kispert WITHOUT LEAVE TO AMEND.

22              **ii.    Argument Specific to General Atlantic**

23        General Atlantic also disputes whether Plaintiff has adequately alleged that it qualifies as a

24   statutory seller under Section 12(a)(2).  General Atlantic Mot. 4.  In opposition, Plaintiff first

25   contends that the issue is not properly resolved on a motion to dismiss.  Opp'n to Officer Defs.'

26   Mot. 29–30.  Plaintiff further argues that he has adequately alleged that General Atlantic was a

27   seller under § 12(a)(2) because it solicited the sale of more than 16 million shares for a benefit of

28   approximately $370 million and because the IPO and SPO registration statements named General

United States District Court
Northern District of California

32

Atlantic's constituent entities as the "selling stockholders." *Id.* at 30.

Section 12(a)(2) claims may be asserted only against a defendant who "offers or sells a security." 15 U.S.C. § 77*l*(a)(2). The phrase "offers or sells" includes not only traditional sellers—individuals who pass title to another—but also certain individuals who engage in the solicitation of sales:

> The person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale . . . . [L]iability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.

*Pinter*, 486 U.S. at 647 (1988). As the Ninth Circuit has explained, to state a claim based on solicitation, "plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchases of the securities for their own financial gain." *In re Daou Sys.*, 411 F.3d at 1029; *see also In re Charles Schwab Corp.*, 257 F.R.D. at 549 (finding that mere participation in a solicitation or sale does not suffice). Additionally, "the defendant [must] be alleged to have had some 'direct' role in the solicitation of the plaintiff[.]" *In re Charles Schwab Corp.*, 257 F.R.D. at 549 (citing *In re Daou Sys.*, 411 F.3d at 1029).

Here, Plaintiff has adequately alleged that General Atlantic benefited from the sale of securities. FAC ¶¶ 16, 49. However, Plaintiff has not alleged facts indicating that General Atlantic was an immediate seller of TriNet securities, how General Atlantic solicited his purchase[9], or that General Atlantic did anything more than execute the Prospectus Supplement in connection with the SPO and have representatives on TriNet's board of directors. Although the Ninth Circuit has not addressed whether simply alleging that a defendant signed a registration

---

[9] Plaintiff's allegations regarding solicitation are conclusory and not specific to any of the defendants. *See* FAC ¶ 269 ("Defendants were sellers and offerors and/or solicitors of purchasers of the TriNet common stock offered pursuant to the Offering Materials for financial gain."). This is insufficient. *Bridges v. Geringer*, No. 13-cv-1290, 2015 WL 2438227, at *4 (N.D. Cal. May 21, 2015) (plaintiff's "conclusory allegation" that "Defendants . . . solicit[ed] Plaintiff's investments" "will not suffice," because in cases with multiple defendants, plaintiff must at a minimum identify the role of each defendant).

United States District Court
Northern District of California

statement will suffice to state a Section 12 claim, at least one court in this district has found that it would not.  *See In re Harmonic, Inc., Sec. Litig.*, No. C 00-2287, 2006 WL 3591148, at *13–14 (N.D. Cal. Dec. 11, 2006) ("Based on the *Pinter* Court's analysis, this court concludes that § 12(a), unlike § 11(a), does not extend liability to those who simply sign a prospectus, without more."); *cf. In re Charles Schwab Corp.*, 257 F.R.D. at 549–50 (finding that plaintiffs adequately pled solicitation by alleging that defendants signed the registration statement, actively solicited the sale of the fund's shares, and that certain defendants were involved in marketing the fund).  This Court agrees that simply signing a prospectus provides an insufficient legal basis for relief.  Accordingly, Plaintiff's allegations are insufficient.

For this reason, the Court concludes that the complaint does not adequately plead that General Atlantic was a statutory seller under Section 12(a)(2) and GRANTS General Atlantic's motion to dismiss on this issue WITH LEAVE TO AMEND to add allegations regarding solicitation.

### E.   Section 15 of the Securities Act

Section 15, much like Section 20(a) for Exchange Act claims, allows plaintiffs to bring claims against parties who are "control persons" for a primary violation of the Securities Act. *Hollinger*, 914 F.2d at 1578 (stating that the "controlling person analysis" for Section 15 is the same as Section 20(a)).  Plaintiffs must therefore allege (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator.  *Howard*, 228 F.3d at 1065.

Because the Court has concluded that Plaintiff has failed to allege a primary violation under Section 11 or 12(a)(2) and because the allegations regarding control are lacking as to the Outside Directors and General Atlantic, *see supra*, at 21–23, the Court GRANTS Defendants' motion to dismiss the Section 15 claims WITH LEAVE TO AMEND.

## V.   CLAIMS AGAINST THE UNDERWRITER DEFENDANTS

As discussed above, Plaintiff also brings claims under Sections 11 and 12(a)(2) against the Underwriter Defendants.  The Underwriter Defendants challenge the adequacy of the FAC on two grounds: (1) the claims are barred by the statute of limitations and (2) the FAC fails to allege facts

1    supporting a Section 11 or 12(a)(2) claim against them.  *See generally* Underwriter Defs.' Mot.

2    The Court addresses each of these arguments below.

3         **A.    Whether Plaintiff's Claims Against the Underwriter Defendants are Time-Barred**

4              The Underwriter Defendants first argue that Plaintiff's Securities Act claims are time

5    barred.  Underwriter Defs.' Mot. 6–9.  Claims brought under the Securities Act are barred "unless

6    brought within one year after the discovery of the untrue statement or the omission, or after such

7    discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.  The

8    one-year period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff

9    would have discovered the facts constituting the violation—whichever comes first." *Merck & Co.

10   v. Reynolds*, 559 U.S. 633, 653 (2010).[10]  "Plaintiffs are considered to have discovered a fact when

11   a 'reasonably diligent plaintiff would have sufficient information about that fact to adequately

12   plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to

13   dismiss.'" *F.D.I.C. v. Countrywide Fin. Corp.*, No. 12-4353, 2012 WL 5900973, at *2–3 (C.D.

14   Cal. Nov. 21, 2012) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169,

15   175 (2d Cir. 2011)).  This is a "fact intensive" inquiry, and some courts have held it is "usually not

16   appropriate" to conduct it at the pleading stage. *Rafton v. Rydex Series Funds*, No. 10-cv-1171,

17   2011 WL 31114, at *9 (N.D. Cal. Jan. 5, 2011) (citation omitted); *Booth v. Strategic Realty Trust,

18   Inc.*, No. 13-cv-4921, 2014 WL 3749759, at *4 (N.D. Cal. July 29, 2014).  A defendant seeking to

19   establish, on a motion to dismiss, that a plaintiff's Section 11 claim is time-barred faces an

20   "especially high burden." *Rafton*, 2011 WL 31114, at *10.  "At the pleading stage, the question is

21   whether it is plausible that [the] disclosures were insufficient to supply a reasonably diligent

22   plaintiff with the information necessary to plead the Section 11 claims with sufficient detail and

23   particularity to survive a 12(b)(6) motion." *Booth*, 2014 WL 3749759, at *6.

24             The focus of the dispute is whether TriNet's March 3, 2015 disclosure gave reasonably

25   diligent plaintiffs sufficient information to discover the Underwriter Defendants' involvement in

26

27   _____

     [10] Though *Merck* was an Exchange Act case, its reasoning applies equally to the similar timeliness
     requirements for Securities Act claims. *See, e.g.*, *Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-
28   4921, 2014 WL 3749759, at *5 (N.D. Cal. July 29, 2014); *Countrywide Fin. Corp.*, 2012 WL
     5900973, at *2–3.

1    TriNet's alleged misrepresentations.[11]  *See* Underwriter Defs.' Mot. 6–9; Opp'n to Underwriter

2    Defs.' Mot. 2–5, ECF 95.  If so, the Securities Act claims, which were first raised by Plaintiff in

3    April of 2016, would be time barred because they were brought thirteen months after the

4    announcement.

5         Plaintiff alleges that on March 3, 2015, TriNet announced an unexpected $10 million spike

6    in large medical claims.  FAC ¶ 17.  He further alleges that TriNet explained the increase in

7    medical claims by disclosing that the "data collected from insurance carriers was neither timely

8    nor sufficiently detailed, but instead limited and late," acknowledged that its risk management

9    processes were "inadequate," and that TriNet lacked the "actuarial staff sufficient to assess risk

10   and claim trends."  *Id.* ¶¶ 13(i), 17–18, 98.  The Underwriter Defendants argue that because

11   Plaintiff relies on this disclosure as evidence that the statements in the Offering Documents about

12   the insurance component of TriNet's business, its risk management team, and its actuarial reviews

13   were inadequate or otherwise materially misleading, Plaintiff was on notice of any potential

14   securities claims against the Underwriter Defendants by March 3, 2015 and had a full year to bring

15   suit against them but failed to do so.  Underwriter Defs.' Mot. 7.

16        Plaintiff contends, however, that the March 3 disclosure could not, and did not, allow him

17   to discover facts or assert a claim against any defendant under either the Securities Act or the

18   Exchange Act.  Opp'n to Underwriter Defs.' Mot. 3.  Plaintiff further argues that the March 3

19   disclosure did not reveal certain facts that TriNet later discovered and admitted, and that none of

20   these facts were discovered or would have been discovered on March 3, 2015:  (1) TriNet lacked

21   experienced risk management staff; (2) TriNet lacked adequate internal controls to accumulate

22   data and effectively monitor claims; and (3) TriNet said nothing related to the Company's

23   workers' compensation insurance business.  *Id.* at 4.

24        The Underwriter Defendants respond, citing *Rieckborn v. Jefferies*, that the March 3

25   disclosures "provided precisely the information that plaintiff[ ] claim should have been disclosed

26

27   [11] Although the Underwriter Defendants address relation back under Fed. R. Civ. P. 15(c),
     Underwriter Defs.' Mot. 7–8, "Plaintiff does not contend that his § 11 claims 'relate back' to
28   August 7, 2015."  Opp'n to Underwriter Defs.' Mot. 6 n.7.  Thus, the Court need not address the
     issue.

United States District Court
Northern District of California

1   earlier," and therefore, the claims must be dismissed as untimely.  Reply ISO Underwriter Defs.'

2   Mot. 3, ECF 99 (citing and quoting *Rieckborn*, 81 F. Supp. 3d at 916).  In *Rieckborn*, the plaintiffs

3   brought a Section 11 claim against, among others, the underwriters of two public offerings,

4   alleging that the company had improperly excluded accrued contract receivables from its reported

5   Day Sales Outstanding ("DSO"), and that the company's registration statements for its initial and

6   secondary public offerings therefore misstated the company's reserves and revenues.  81 F. Supp.

7   3d at 916.  The defendants argued that the plaintiffs' Section 11 claim was time barred, explaining

8   that more than one year before the plaintiffs brought the claim, the company had disclosed that its

9   DSO "only included trade receivables and excluded accrued receivables," that this disclosure

10  "triggered a significant decline in [the defendant corporation's] stock value," and that the company

11  "announced that it had modified its reported DSO to include accrued contract receivables."  *Id.*

12  Finding that these disclosures "provided precisely the information that plaintiffs claim should have

13  been disclosed earlier," the court dismissed as untimely the Section 11 claims based on the

14  allegations of misrepresented DSO figures.  *Id.*

15          The Court agrees that as alleged, the facts here are analogous to *Rieckborn*.  Most of the

16  facts Plaintiff contends were later discovered were indeed disclosed on March 3.  *See* FAC ¶¶ 17,

17  18.  Moreover, the argument that subsequent disclosures in May and August 2015 and February

18  and April 2016 regarding the magnitude of deficiencies requires denial of the Underwriter

19  Defendant's motion to dismiss the claims as time barred is meritless.  *See Thomas*, 167 F. Supp.

20  3d at 1054 ("[T]he one-year time period does not reset simply because additional information is

21  revealed that could make for a stronger claim.").

22          Accordingly, the Court concludes that the March 3, 2015 disclosure would have put a

23  reasonably diligent investor on notice of potential Securities Act claims against the Underwriter

24  Defendants and GRANTS the motion to dismiss on this ground.  Nevertheless, the Court will

25  grant Plaintiff LEAVE TO AMEND to allege that he was not on notice based on the March 3,

26  2015 disclosure.

27      **B.    Section 11 of the Securities Act**

28          The Underwriter Defendants join the Officer Defendants' motion to dismiss with respect to

37

the Section 11 claim.  *Id.* at 10 n.8.  For the reasons discussed above, the Court GRANTS the

Underwriter Defendants' motion to dismiss the § 11 claims WITH LEAVE TO AMEND.  *See*

*supra*, at 23–29.

### C.     Section 12(a)(2) of the Securities Act

Section 12(a)(2) imposes liability on any person who "offers or sells" a security.  15

U.S.C. § 77*l*(a)(2).  "To plead a claim under Section 12(a)(2), the plaintiff must allege that (1) the

defendant is a statutory seller; (2) the sale was effected by means of a prospectus or oral

communication; and (3) the prospectus or oral communication contained a material misstatement

or omission."  *Maine State*, 2011 WL 4389689, at *8; 15 U.S.C. § 77*l*(a)(2).

As it relates to the Underwriters, the parties dispute whether Plaintiff has adequately

alleged that the Underwriter Defendants qualify as statutory sellers.  Underwriter Defs.' Mot. 10–

15.  Plaintiff first responds that this issue is not properly decided on a motion to dismiss because it

is a question of fact.  Plaintiff further argues that the Underwriters qualify as statutory sellers

because the FAC alleges that they helped draft and disseminate the registration statements,

solicited Plaintiff's and potential class members' purchases, and were paid nearly $30 million for

doing so.  Opp'n to Underwriter Defs.' Mot. 6–7 (citing FAC ¶¶ 260–62, 269).

As detailed above, a defendant is a "seller" of securities in only two circumstances:  (1) if

the defendant directly passed title of the security to the plaintiff; or (2) if the defendant directly

solicited the sale of the security and is motivated in part to serve his or her own financial interests

or the financial interests of the securities owner.  *Pinter*, 486 U.S. at 624, 646–48.  The FAC

makes clear that Plaintiff cannot plead a buyer-seller relationship between Plaintiff and any of the

Underwriter Defendants.  *See* FAC ¶¶ 2, 8, 14–15, 251 (alleging facts indicating that Plaintiff did

not purchase shares in either offering).  Indeed, Plaintiff appears to concede this point.  *See* Opp'n

to Underwriter Defs.' Mot. 6–8 (discussing only solicitation).  Thus, the focus is on whether

Plaintiff has adequately alleged direct solicitation by any of the Underwriter Defendants.

To state a claim under Section 12(a)(2) based upon active solicitation, "the defendant

[must] be alleged to have had some 'direct' role in the solicitation of the plaintiff[.]"  *In re Charles*

*Schwab Corp.*, 257 F.R.D. at 549 (citation omitted).  Thus, "[m]ere participation" in a solicitation

United States District Court
Northern District of California

1   or sale does not suffice.  *Pinter*, 486 U.S. at 650.  Moreover, "[g]enerally, . . . underwriters are not

2   sellers within the meaning of Section 12 unless they actively participate in the negotiations with

3   the plaintiff/purchaser."  *In re Violin Memory Sec. Litig.*, No. 16-cv-5486, 2015 WL 5525946, at

4   *18 (N.D. Cal. Oct. 31, 2014) (citation and internal quotation marks omitted).

5         Defendants argue that the FAC does not allege that Plaintiff had any direct contact or

6   communication with any of the Underwriter Defendants.  Underwriter Defs.' Mot. 13.  Further,

7   they contend that the FAC includes only vague and conclusory allegations regarding the

8   Underwriter Defendants' status as "sellers and offerors and/or solicitors of purchasers of the

9   TriNet common stock[.]"  FAC ¶ 269.  The Court agrees, such conclusory allegations are

10   inadequate to state a claim under Section 12(a)(2).[12]  *In re Century Alum. Co.*, 749 F. Supp. 2d at

11   977.  The FAC contains no allegation that the Underwriter Defendants directly solicited any

12   Plaintiff, either named or class members, for sales of the TriNet stock.  That the Underwriter

13   Defendants "helped draft and disseminate" the Offering Documents is not a sufficient basis for

14   asserting a 12(a)(2) claim based on solicitation, as it merely amounts to a recitation of the

15   professional services rendered, and those who merely provide professional services in connection

16   with a transaction for securities are not considered a "seller" under § 12(a)(2).  *See Pinter*, 486

17   U.S. at 651 (finding  that the buyer does not purchase securities from "securities professionals,

18   such as accountants and lawyers, whose involvement is only the performance of their professional

19   services"); *id.* at 650 n.26 (finding that Congress did not intend to include in § 12 the categories

20   denominated in § 11 of persons who are "participants in the activities leading up to the sale").

21         Accordingly, Plaintiff has failed to allege that any of the Underwriter Defendants were

22   "sellers" within the meaning of Section 12(a)(2) or that the Underwriter Defendants directly

23   solicited his purchase of TriNet stock.  The Court thus GRANTS the motion to dismiss on this

24   ground WITH LEAVE TO AMEND facts regarding solicitation.

25

26

27

28

*United States District Court*
*Northern District of California*

---

[12] Plaintiff cites several out-of-district and out-of-circuit cases to support his argument that the allegations are sufficient to allege that the Underwriter Defendants are sellers under § 12(a)(2). Opp'n to Underwriter Defs.' Mot. 7.  The Court finds none of the cited cases persuasive.

United States District Court
Northern District of California

**VI.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.      The Officer Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND.

2.      The Director Defendants' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND with respect to the §§ 11 and 12 claims related to the IPO against John H. Kispert, and WITH LEAVE TO AMEND as to the remainder of the claims against the Outside Directors.

3.      General Atlantic's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND as to the § 11 claim in relation to the IPO and WITH LEAVE TO AMEND as to the remainder of the claims against General Atlantic.

4.      The Underwriter Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND.

Plaintiff must file a second amended complaint **on or before March 3, 2017**.  The Court requests that the chambers copy of any amended complaint be a redlined version, in color.

**IT IS SO ORDERED.**

Dated: January 17, 2017

_____
BETH LABSON FREEMAN
United States District Judge