ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
NADIM G. HEGAZI (264841)
KENNETH J. BLACK (291871)
JOHN H. GEORGE (292332)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
nhegazi@rgrdlaw.com
kennyb@rgrdlaw.com
jgeorge@rgrdlaw.com

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HOWARD WELGUS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TRINET GROUP, INC., BURTON M. GOLDFIELD, WILLIAM PORTER, KATHERINE AUGUST-DEWILDE, MARTIN BABINEC, H. RAYMOND BINGHAM, DAVID C. HODGSON, KENNETH GOLDMAN, JOHN H. KISPERT, WAYNE B. LOWELL, GENERAL ATLANTIC LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO., LLC, DEUTSCHE BANK SECURITIES INC., JEFFERIES LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, AND WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>Defendants. | Case No. 5:15-cv-03625-BLF<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................................................1

SUMMARY OF AMENDMENTS..................................................................................1

SUMMARY OF THE ACTION ......................................................................................4

BACKGROUND AND OVERVIEW ..............................................................................4

> TriNet's True Financial Condition Begins to Be Disclosed in a Series of Partial Disclosures Resulting in Significant Stock Price Declines..................................10

> Defendants Admit that TriNet Did Not Have Risk Management Capability or Data to Adequately Assess Risk or Forecast Financials.....................................12

JURISDICTION AND VENUE ....................................................................................19

PARTIES .......................................................................................................................19

CONTROL PERSONS ..................................................................................................24

FALSE AND MISLEADING STATEMENTS  ISSUED DURING THE CLASS PERIOD .......................................................................................................................27

TRINET'S IPO REGISTRATION STATEMENT AND SECONDARY OFFERING REGISTRATION STATEMENT WERE MATERIALLY MISSTATED IN VIOLATION OF SEC DISCLOSURE RULES ...........................................................80

> Defendants Failed to Disclose Critical Accounting Estimate.............................82

> Defendants Failed to Disclose Significant Trends..............................................84

> Defendants Failed to Disclose Significant Uncertainties....................................85

> Defendants Failed to Disclose Critical Accounting Estimate.............................86

POST-CLASS PERIOD EVENTS CONFIRM THE COMPANY LACKED COMPETENCY IN RISK MANAGEMENT, VISIBILITY, PREDICTABILITY AND STABILITY ...................................................................................................................86

THE STARK CONTRAST BETWEEN DEFENDANTS' REPRESENTATIONS AND THE LATER ADMISSIONS FURTHER CONFIRMS FALSITY AND SUPPORTS A STRONG INFERENCE OF SCIENTER ........................................................................89

LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS .................91

CLASS ACTION ALLEGATIONS ...............................................................................96

NO SAFE HARBOR .....................................................................................................97

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET..........97

1

2                                                                                                     **Page**

3
COUNT I ...................................................................................................................98

4

COUNT II ..................................................................................................................99

5

CLAIMS FOR VIOLATIONS OF SECTIONS 11, 12 AND 15 OF THE SECURITIES
6   ACT OF 1933 ..........................................................................................................100

7           False and Misleading Statements and Omissions in the IPO Registration
            Statement.......................................................................................................101
8
            False and Misleading Statements and Omissions in the Secondary Offering
9           Registration Statement ..................................................................................102

10          Claims Volatility and Revenue Shortfalls Reveal Systemic Inability to Manage
            Risk ................................................................................................................106
11
    COUNT III...............................................................................................................115
12
    COUNT IV................................................................................................................118
13
    COUNT V .................................................................................................................120
14
    SAFE HARBOR IS INAPPLICABLE TO INITIAL PUBLIC OFFERINGS ...........120
15
    CLASS ACTION ALLEGATIONS ...........................................................................121
16
    PRAYER FOR RELIEF ............................................................................................122
17
    JURY DEMAND .......................................................................................................123
18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                                    - ii -

1
## INTRODUCTION

2    1.    Lead Plaintiff Howard Welgus ("plaintiff"), individually and on behalf of all the other

3 persons similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon

4 personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all

5 other matters based on the investigation conducted by and through plaintiff's attorneys, which

6 included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings

7 by TriNet Group, Inc. ("TriNet" or the "Company"), as well as conference call transcripts and media

8 and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will

9 exist for the allegations set forth herein after a reasonable opportunity for discovery.

10
## SUMMARY OF AMENDMENTS

11    2.    The Second Amended Complaint for Violation of the Federal Securities Laws

12 ("SAC") directly addresses pleading deficiencies identified by the Court during the November 3,

13 2016 oral argument and the January 17, 2017 Order Granting in Part and Denying in Part Motions to

14 Dismiss With Leave To Amend In Part and Without Leave to Amend In Part (Dkt. No. 112) ("MTD

15 Order").[1]

16    3.    First, the SAC reasserts those "Category 3" statements (*i.e.* "statements that TriNet

17 assesses all claims on an individual basis") which this Court previously recognized "might be . . .

18 false" based on the later admissions that the Company only received data on large claims.  MTD

19 Order at 13.  *See* ¶¶79, 96, 108, 122.  The SAC also details other false statements and defendants' later

20 admissions contrasting those statements which demonstrate their falsity at the time they were made.

21 ¶198.

22    4.    Second, the SAC clarifies precisely why defendants' statements that TriNet's

23 insurance plans were "fully insured" were false and misleading by showing that TriNet told investors

24 that fully insured plans reduced the Company's risk exposure when in truth, the fully insured plans

25

26

27    [1]    The Court did not deny any substantive portion of defendants' motions to dismiss, though the
Court indicated that a certain a category of statements regarding timeliness of data was likely false
28 and misleading.  *See* MTD Order at 13.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                           - 1 -

1    offered by TriNet *increased* the Company's risk exposure (*i.e.* the plans were fully insured for the

2    insurance purchaser at the cost of TriNet's exposure).  *See* ¶98(e)-(g).

3         5.    Third, the SAC addresses the Court's concern that plaintiff's allegations of standing

4    were not alleged in sufficient detail.  The SAC now specifically alleges plaintiff's standing to sue

5    under §§11 and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") by alleging that he

6    bought TriNet common stock between the March 27, 2014 initial public offering ("IPO") and the

7    September 11, 2014 Secondary Offering ("Secondary Offering") (collectively the "Offerings"), and

8    because of lock-up agreements in place during that period, the IPO shares were the only TriNet

9    shares available on the market and therefore are traceable to the IPO.  *See* ¶281.  These facts are

10   sufficient to establish standing under §§11 and 15 of the 1933 Act.[2]

11        6.    Fourth, the SAC addresses defendants' challenges and the Court's MTD Order

12   regarding plaintiff's standing to sue on the same material misrepresentations which were repeated in

13   the Secondary Offering by adding allegations that plaintiff has standing to assert §11 claims on

14   behalf of those who bought shares in the Secondary Offering because he and others were harmed in

15   the same way by the same violations arising from the IPO.  The Ninth Circuit has found those

16   allegations sufficient to allege standing.[3]

17        7.    Fifth, the SAC addresses the Court's finding that plaintiff had not adequately alleged

18   General Atlantic's control over TriNet's operations.  The SAC now has specific facts and admissions

19   that by contract, General Atlantic had the ability to, and did, control five of the seven seats on

20   TriNet's Board of Directors via its ability to appoint four board members in addition to the CEO.

21   *See* ¶¶72-73.

22        8.    Sixth, the SAC clarifies that the §10(b) violations of the Securities Exchange Act of

23   1934 ("1934 Act" or "Exchange Act") are brought against TriNet, in addition to Goldfield and

24   Porter.

25

26   _____

     [2]   *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013).

27   [3]   *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), *cert. denied sub nom. Maricopa Cty. v.

28   Melendres*, _U.S._, 136 S. Ct. 799 (2016).

9.     Seventh, the SAC adds new detailed allegations regarding how insurance services revenue and capture of the insurance spread was admittedly at the core of TriNet's business model and accounts for 83% or more of its revenue.  ¶98(l).  In its own words, the Company described risk management as a "core" competency, *i.e.*, among its core operations.  The new detailed and clarified allegations establish knowledge by, among other things, the significance of the three earnings misses that wiped out the entire profit for 2015 on insurance services and jeopardized TriNet's business model as a risk-based professional employer organization ("PEO").

10.     Eighth, because the MTD Order stated that certain unspecified statements may be inactionable puffery, the SAC adds allegations and emphasizes the importance defendants placed on specific terms they used throughout the Class Period.  For example, the SAC specifies that when defendants asked why investors should purchase TriNet stock, defendants specifically said the reason that investors should buy TriNet stock was because of the predictability and visibility – indicating that they viewed these terms as material to the investment decision.  ¶110.

11.     Ninth, the SAC alleges powerful facts demonstrating falsity by specifically alleging that in contrast to Class Period statements, the Company now removed the alleged false statements from their SEC filings.   The Company no longer asserts that: "risk management is a core competency"; and that the Company "leverage[d their] robust risk management capabilities"; the Company no longer states: "[o]ur programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses"; the Company no longer states: "[w]e assess all . . . risks on an individual client basis"; and "analyze claims data for each client on an ongoing basis." The removal of these statements further establishes the falsity of the misrepresentations.  ¶166.

12.     Tenth, the SAC pleads additional facts concerning the dismissal of TriNet's auditor, Ernst & Young LLP ("Ernst & Young"), less than one month after the Company asked shareholders to ratify the selection of Ernst &Young to serve as the Company's 2016 auditor.  ¶167.

13.     Lastly, based on analyst reports published after the FAC, the SAC alleges that, despite telling investors that because they were fully insured TriNet would not be buffeted from unexpected claim spikes, defendants were unable to purchase reinsurance or other coverage to mitigate such risks at an acceptable price point.  These subsequent events further bolster the falsity

1  of defendants' Class Period claims regarding the stability, predictability and visibility of their risk-

2  based PEO business model which has been exposed to be completely fabricated – just as the failed

3  companies that came before TriNet.

4  <div align="center">**SUMMARY OF THE ACTION**</div>

5        14.    This is a securities class action on behalf of all persons who purchased or otherwise

6  acquired the common stock of TriNet between March 27, 2014 and February 29, 2016, inclusive (the

7  "Class Period"), against TriNet and certain of its officers and/or directors for violations under

8  §§10(b), and 20(a) of the 1934 Act, including the Company's President and Chief Executive Officer

9  ("CEO"), Burton M. Goldfield ("Goldfield"), and its Chief Financial Officer ("CFO"), William

10  Porter ("Porter"), as well as the Company's directors and its controlling stockholder, General

11  Atlantic LLC ("General Atlantic"), a private equity firm.  Plaintiff also seeks remedies against

12  TriNet, Goldfield, Porter, the Company's directors and the Company's underwriters under §§11, 12

13  and 15 of the 1933 Act on behalf of persons who purchased or otherwise acquired shares of TriNet's

14  common stock pursuant or traceable to the Company's false and misleading Registration Statements

15  and Prospectuses issued pursuant to the Company's March 27, 2014, IPO and September 11, 2014,

16  Secondary Offering.

17        15.    Plaintiff alleges that defendants violated the securities laws by disseminating

18  materially false and misleading statements and concealing material adverse facts regarding TriNet's

19  current financial condition and growth prospects.

20  <div align="center">**BACKGROUND AND OVERVIEW**</div>

21        16.    TriNet, founded in 1988, is a PEO that offers outsourced human resources ("HR") to

22  its client companies, including functions like payroll processing, employment law compliance,

23  health insurance and workers' compensation insurance.  Defendants portrayed TriNet as a growth

24  story in an under-penetrated PEO market.  According to the Company, complexities in administering

25  HR have made outsourcing of these functions attractive to potential clients, particularly in TriNet's

26  target small/medium business market.  TriNet claims to offer large-company options, flexibility and

27  management tools to these smaller companies in a bundled solution.  TriNet uses a co-employment

28

1   model, in which employees of its client are considered co-employed (or worksite employees

2   ("WSEs")) by TriNet.  As of 2Q15 TriNet had more than 300,000 WSEs.

3       17.    TriNet generates revenue from the Company's platforms in two categories,

4   Professional Services and Insurance Services:

5           (a)    Professional Services:  The Company's Professional Services segment

6   generates revenue by charging fees for processing HR transactions, such as payroll and employment

7   tax withholding (not including the payroll paid in by the client and paid out to WSEs or remitted as

8   taxes), and by providing labor and benefit law compliance services.  More specifically, the Company

9   acts as a pass-through and receives a flat or percentage-based fee on functions like processing HR

10  transactions or withholding state or federal income tax.

11          (b)    Insurance Services:  The Company's Insurance Services segment generates

12  revenue by providing risk-based, third-party plans to clients, primarily employee health benefit plans

13  and workers' compensation insurance.  More specifically, TriNet collects insurance premiums from

14  WSEs and passes those premiums on to the insurance company.  However, for a portion of TriNet's

15  Insurance Services, the Company takes on a deductible layer of risk.  In these instances, when a

16  WSE makes a health care or workers' compensation claim, the insurance company has the first layer

17  of exposure.  If the claim exceeds the insurance company policy limit (as negotiated between TriNet

18  and the insurance company) then TriNet is responsible for the excess.  Taking on this deductible

19  layer offered TriNet potential upside – *i.e.*, the "insurance spread" – which it attempted to capture by

20  pooling WSEs from multiple small business into a single large insurance plan and by negotiating

21  lower administration rates with insurance companies.  During the Class Period, the Company

22  explained this process as follows:

23      •   [If] you have a zero deductible, you pay a higher price.  So we take a deductible
            layer; the way insurance is priced in the industry, for every $1 of premium, $0.85
24          goes to claims; $0.15 effectively goes to the carriers for their profit and admin.

25      •   Because we drive great volume and are very sticky apart from the carriers, we are
            able to negotiate a lower admin fee.  So we are able to capture a bit of the spread of
26          the admin fee.  And that allows us to have very competitive medical benefit plans.

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                        - 5 -

18.     Prior to the Class Period, TriNet's growth was primarily driven by acquisitions.  For example, in June 2009, the Company added 92,000 WSEs through the acquisition of a company called Gevity HR, Inc.  In April 2012, the Company added 14,000 WSEs in the hospitality and manufacturing industries through the acquisition of AccordHR.  In July 2013, it added 13,000 WSEs in the finance industry through the acquisition of Ambrose Employer Group, LLC.  And finally, in October 2012, it added 66,000 WSEs in the property management and food services industries through the acquisition of SOI Holdings, Inc.[4]

19.     TriNet's growth-through-acquisition strategy drove a steady increase in TriNet's revenues as transactions like insurance-related billings and fees were funneled through TriNet and counted as Company revenue, even though such revenue was passed on to third-party insurance carriers.   It also came with substantial debt, as the Company had accumulated more than $800 million in outstanding debt as of December 31, 2013.  Therefore, capturing the insurance spread (or what the Company referred to as its "performance fee") was and is essential to TriNet's business model and allowed the Company to report higher margins – 33%-34%, versus 30% or less for the strictly pass-through model.

20.     On March 27, 2014, TriNet conducted its IPO, selling 15 million shares to the public for $16 a share.  The IPO was conducted pursuant to a Form S-1 Registration Statement initially filed November 21, 2013 (later amended on January 7, February 13, March  4, and March 14, 2014), and Prospectus filed with the SEC on March 27, 2014 (the "IPO Registration Statement").  The IPO Registration Statement was signed by Goldfield and Porter and Company directors H. Raymond Bingham ("Bingham"), Martin Babinec ("Babinec"), Kenneth Goldman ("Goldman"), David C. Hodgson ("Hodgson"), Wayne B. Lowell ("Lowell") and Katherine August-deWilde ("August-deWilde").  The IPO Registration Statement falsely stated that the Company was proficient in its risk management capabilities and that TriNet's agreements limited the Company's aggregate exposure in any given policy year.  These statements included:

---

[4]     Following the acquisitions of Ambrose and SOI, TriNet continued to market those companies' products under the names "TriNet Ambrose" and "TriNet SOI."  However, in communications with analysts and investors, defendants often used the same shorthand (*i.e.* "Ambrose" and "SOI") to refer to either to the acquired company or its respective platform.

- ***Risk management is a core competency of our company***.

- ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

- Our agreements with our health insurance carriers with respect to these policies typically include limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year, which we refer to as stop losses*** . . . .

- Following our initial pricing of these policies, ***we analyze claims data for each client on an ongoing basis*** . . . .

21.   The Company based its purported risk management competency, in part, on the claim that TriNet had access to detailed and timely claims information from insurance carriers.  According to defendants, TriNet's access to this data was "[t]he key to the risk portion of the business" and a "***true breakthrough that was not available*** . . . ***three or four years ago***."  The Company assured investors that, although the PEO industry was "***littered with companies that have blown up*** one way or the other over the years ***because of poor risk management***," TriNet's underwriting process was "***radically different***."

22.   Based on its purported risk management proficiency and breakthrough in data, defendants repeatedly asserted throughout the Class Period that TriNet offered stability, predictability and visibility, which assured analysts and investors that defendants had figured out the risk-based PEO model:

- [TriNet offers] A large, addressable market; ***predictable revenue; visibility into the future***; and a company that is growing and satisfying an important need in HR.

- [W]e are able to predict pretty accurately on an annual basis ***exactly*** how we are going to do . . . .

- We don't take high-risk exposures . . . we know ***exactly*** how that should be priced.

- [W]e look at every client that comes in the door, and we price it to risk.

- [W]e get state-of-the-art analytics on all of our claims.  So every month we are able to get claims data so we can see how our clients are performing.

- We have good visibility from a medical insurance and even better from a Workers' Comp.

23.     Defendants reiterated these misrepresentations while repeatedly increasing financial guidance throughout 2014.  For example, on May 5, 2014, the Company announced its 1Q14 financial results, including year-over-year revenue growth, and issued annual financial guidance for net service revenue of $504-$511 million.   The Company would increase its FY14 financial guidance the next two consecutive quarters: on August 4, 2014, it raised FY14 financial guidance to $512-$516 million; on November 4, 2014, it raised its guidance again to $517-$519 million.   On each occasion defendants reiterated that TriNet was currently on track to meet margin guidance of 33%-34%.

24.     Based on defendants' false and misleading reassurances about the Company's stability, profitability and visibility, on March 3, 2015, the Company's stock price reached a Class Period high of $38.00.

25.     Each of the statements set forth above and repeated throughout the Class Period, including those concerning the Company's quarterly and annually reported financial results, forecasting accuracy and exposure to liability for claims, and adequacy of the Company's internal controls (which defendants certified pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), and Rules 13a-15(e) and 15d-15(e) under the Exchange Act, were materially false and misleading as defendants knew or deliberately disregarded and failed to disclose the following:

(i)      TriNet's risk management processes were woefully inadequate and the Company did not have executive or actuarial staff sufficient to assess risk and claim trends;

(ii)     Far from having access to "breakthrough" data, the Company only received data on the largest catastrophic insurance claims and even this data was delayed by months;

(iii)    TriNet's business operations were neither stable nor predictable and defendants did not have visibility into the Company's current or future financial performance, as they had claimed;

(iv)     The Company's insurance programs were not all fully insured for TriNet, as investors were led to believe, subjecting the Company to volatility risks similar to the workers' compensation risks experienced by Barrett – which materialized for TriNet as well;

1           (v)      The Company's insurance programs did not carry aggregate stop-loss

2 limits to liability, exposing the Company to significant risk from spikes in claims;

3           (vi)     The Company failed to conduct appropriate due diligence on workers'

4 compensation insurance plans acquired from SOI and expected to drive revenues, and the resulting

5 change to earnings caused millions in liability and missed financial projections;

6           (vii)    The Company was trading growth for profit and would be forced to

7 reprice insurance premiums for its entire book of business – a process that would take more than a

8 year; and

9           (viii)   TriNet had widespread material weaknesses in its internal control over

10 financial reporting relating to ineffective information technology general controls; ineffective

11 controls in key business processes; and a lack of personnel with appropriate knowledge, skill or

12 training.

13      26.    On September 11, 2014, the Company issued a press release announcing that a

14 Secondary Offering of 12 million shares of TriNet common stock at $25.50 per share that were held

15 by its controlling 70% shareholder and early stage investor, General Atlantic.  General Atlantic had

16 the authority to, and did, cause TriNet to offer the shares to the public and General Atlantic received

17 the entirety of the proceeds.  The Registration Statement for the Secondary Offering (collectively,

18 with the Prospectus, the "Secondary Offering Registration Statement") was signed by Goldfield,

19 Porter, August-deWilde, Babinec, Bingham, Goldman, Hodgson, John H. Kispert ("Kispert") and

20 Lowell and contained the same untrue statements of material facts made in the IPO Registration

21 Statement.

22      27.    On September 17, 2014, through the Secondary Offering, defendants General Atlantic

23 and Hodgson, Managing Director of General Atlantic and a Director of TriNet, sold 13,800,000

24 shares and cashed in for more than $336 million at prices as high as $24.42.[5]

25

26

---

[5]   General Atlantic was not the only insider that profited by unloading TriNet shares during the
Class Period.  In just over eight months as a public company, insiders sold more than $474 million
worth of TriNet shares as documented in filings with the SEC.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                 - 9

28. On October 28, 2014, a competitor, Barrett Business Services, Inc. ("Barrett"), announced that a review by an outside actuary resulted in an $80 million increase to its workers' compensation reserves. When asked by analysts whether TriNet faced some of the same business risks that had impacted Barrett, defendants rejected any such notion – explaining falsely that TriNet's very stable, "fully insured" plans insulated them from any such risk.

TriNet's True Financial Condition Begins to Be Disclosed in a Series of Partial Disclosures Resulting in Significant Stock Price Declines

29. On March 3, 2015, the Company stunned investors, announcing an "unexpected" $10 million spike in large medical claims – the very type of volatility that defendants claimed TriNet was immune from – causing the Company to miss its 4Q14 earnings per share ("EPS") forecasts (which it had raised in November 2014) by a whopping 29%. Contrary to defendants' claims of "radically different" underwriting and a "breakthrough" in data acquisition, TriNet conceded that the data collected from insurance carriers was neither timely nor sufficiently detailed, but instead limited and late:

- Q4 Net Insurance Service Revenues were below our estimate as a result of higher than expected large medical claims.

- We had a number of large claims develop during the second half of 2014 that we were not aware of until after the close of the year. The result was these claims were not included in our trend as we forecast our fourth-quarter medical claims.

- [W]e didn't have enough visibility into the claims that we're developing . . . .

30. These March 3, 2015 disclosures caused TriNet's stock price to decline from $37.88 to $33.93, but defendants assured analysts and investors that this was an aberrant, one-time event and would have no impact going forward and no effect on the Company's FY15 financial outlook:

- We have also looked carefully at our claims experience and remain confident in the quality of our forecast of net insurance service revenue in 2015.

- ***Our 2015 forecast takes into account a similar frequency of large claims as we experienced in 2014. The result is that our Q4 experience does not have an adverse impact on our 2015 outlook.***

31. On May 5, 2015, the Company announced its 1Q15 financial results and another unexpected charge to earnings. This time the Company revealed an increase to workers'

compensation reserves by $10 million and a reduction to the Company's annual EPS projection due to high workers' compensation claims for which it had failed to accrue.  The reserve increase was for older policies for which the Company had failed to conduct a state-by-state risk analysis:

- Net insurance service revenues were affected by higher than expected workers' compensation costs in our blue- and gray-collar book for older years.

- Based on the impact of the higher worker's comp costs, we are reducing our annual outlook by $10 million.

- I think what it really means is a tighter look at the older years and making sure that we're ticked and tied as they come through the system.

- And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen.

32.     The May 5, 2015 disclosures caused the stock price to decline from $34.43 to $28.76, but TriNet continued to trade at artificially inflated levels and the Company again claimed that the fiscal year forecast remained solid and that defendants had resolved TriNet's problems: "[W]e have got the right analysis now."

33.     As late as June 10, 2015, defendants told investors that the Company had an experienced risk management team and that risk management (of both workers' compensation and medical plans) was something that the Company did fairly well:

- *We have an experienced risk management team and we manage the insurance element of our business.*

- *When we look at our risk management the thing that we do I think fairly well is . . . to  manage [risk] . . . based on our clients' experience both on the medical side and on the Workers' Comp. side.*

34.     On August 3, 2015, the Company announced its 2Q15 financial results, posting yet another earnings charge – this time a $20 million accrual for medical claims – exposing defendants' claims of stability, predictability and visibility as simply false.  As a result, the Company missed both its revenue and EPS estimates for 2Q15 by a wide margin and cut net revenue by $25 million, *which eliminated the entire healthcare performance fee* for FY15  and resulted in the Company operating its entire insurance business merely at break even with revenues entirely offset by costs.

The Company was forced to admit that it lacked the ability to forecast risk and was prone to the same volatility and lack of visibility that had taken down previous risk-based PEOs:

- Net insurance service revenues declined 43% to $24.2 million . . . .

- Net insurance service revenues were affected by a significantly higher number of large medical claims than we had anticipated.

- Our revised 2015 forecast assumes the higher claims level continues and is included in our trend.

35.     On August 3, 2015, William Blair issued a report downgrading the Company's stock and concluding that the issues the Company had experienced in 4Q14, 1Q15, and now 2Q15 were related and significant:

> "*We suspect that there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business* . . . ."

36.     On August 4, 2015, J.P. Morgan issued a report suggesting that management credibility had been called into question and expected the Company's stock price to trade lower as a result of the disclosure:

> "*[T]he third claims-related miss in a row* [was] *very disappointing as we thought guidance was set conservatively* . . . we expect the stock to be down . . . *given management credibility concerns*."

37.     Following the Company's August 3, 2015 disclosure, the stock price declined 38%, from a close of $26.69 on August 3, 2015, to a close of $16.33 on August 4, 2015.

38.     On November 2, 2015, the Company announced its 3Q15 financial results, which more or less came in in-line with substantially reduced guidance and explained that the Company would "be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business."

<u>Defendants Admit that TriNet Did Not Have Risk Management Capability or Data to Adequately Assess Risk or Forecast Financials</u>

39.     Notwithstanding repeated assurances about the predictability and visibility of its recurring revenues and financial results and TriNet's acumen for assessing risk, the Company ultimately admitted (through a combination of disclosures) that none of these assertions were true. *See, e.g.*,:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF                                                                                      - 12 -

- The result was these claims were not included in our trend as we forecast our fourth-quarter medical claims.

- [W]e didn't have enough visibility into the claims that we're developing . . . .

- We've also can [but did not] do aggregate stop-loss . . . .

- [W]e just did not have the visibility that we really should have to be able to track those large claims . . . .

- I'm expecting that we're going to do a better job of forecasting.

- And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen.

- I will strengthen my internal team.  This includes the recruitment of a senior insurance services executive reporting directly to me, as well as additional actuarial and analytical capabilities.

- I need to directly address this medical claims volatility, number one. . . .  So that includes a senior executive reporting to me additional actuarial and analytical capabilities.

- We are bringing in new talent.  I have met with excellent candidates as part of the search for the Senior VP of Insurance Services.  Additionally, our team is in the advanced stages of selecting from a number of strong candidates for our Chief Medical Actuary position.

- We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business.

- [W]e're [still] closing on a Chief Actuary on the medical side.

40.     On February 29, 2016, the Company announced its 4Q15 and FY15 financial results, and reported that it had hired some of the internal actuarial and other talent necessary to forecast and manage risk, but conceded that it was still an open question as to whether TriNet "can arrive at the right balance of risk mitigation and cost."  The Company also reported that it was unprepared to file its Form 10-K and had sought an extension from the SEC due to the identification of material weaknesses in its internal controls over financial reporting relating to "IT" controls and controls in "key business processes."

41.     Following the February 29, 2016 disclosures, the stock price declined 6%, from $13.09 to $12.28.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF                                                                                                    - 13 -

42.     On March 15, 2016, the Company announced that TriNet was still not able to file its Form 10-K for FY15, and could not say when it would be able to do so.

43.     On April 1, 2016, the Company filed its Form 10-K for the period ending December 31, 2015.  The Form 10-K had been delayed due to the identification of material weaknesses in internal controls over financial reporting and resulted in an SEC Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing ("Delisting Notice") that was filed on March 17, 2016.  In a laundry list closely mirroring plaintiff's allegations already then on file (in the form of the consolidated complaint (Dkt. No. 26)) the Form 10-K identified and discussed in detail myriad material weakness over financial reporting which further corroborate the allegations set forth herein, further establishing the materially false and misleading nature of the alleged misstatements regarding risk management as a core competency, defendants' access to accurate data, the lack of appropriate personnel and the inability to accurately assess medical and workers' compensation liabilities.  The Form 10-K (*see* Attachment 3) stated as follows:

> ***We have identified material weaknesses in our internal control over financial reporting that could, if not remediated, result in material misstatements in our financial statements.***
>
> In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2015, we have identified material weaknesses relating to our internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.  As described in Item 9A.  Controls and Procedures, we have concluded that our internal control over financial reporting was not effective as of December 31, 2015 due to material weaknesses.  Specifically, we identified material weaknesses relating to:
>
> (i)     ineffective information technology general controls, primarily with respect to computer operations, access controls and change management,
>
> (ii)    ineffective control environment and risk assessment,
>
> (iii)   ineffective management review controls and controls over system-generated reports,
>
> (iv)    ineffective controls over payroll operations,
>
> (v)     ineffective controls over health and workers compensation liabilities and related expenses,

(vi)    ineffective controls over validating accuracy of payroll tax liabilities, and

(vii)   ineffective authorization controls over procurement processes.

44.    In further discussing the control weaknesses, the Company explained that they could not be immediately corrected:

> As further described in Part II, Item 9A "Controls and Procedures" below, we are taking specific steps to remediate the material weaknesses that we identified; however, *the material weaknesses will not be remediated until the necessary controls have been implemented and we have determined the controls to be operating effectively*. Because the reliability of the internal control process requires repeatable execution, the successful remediation of these material weaknesses will require review and evidence of effectiveness prior to concluding that the controls are effective. In addition, *we may need to take additional measures to address the material weaknesses or modify the remediation steps*, and we cannot be certain that the measures we have taken, and expect to take, to improve our internal controls will be sufficient to address the issues identified, to ensure that our internal controls are effective or to ensure that the identified material weaknesses will not result in a material misstatement of our annual or interim consolidated financial statements.

*       *       *

**Ineffective information technology (IT) general controls**

> Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our IT general controls (ITGCs) for certain of our key information systems, including our enterprise resource planning (ERP) systems and payroll systems, that are relevant to the preparation of our consolidated financial statements and system of internal control over financial reporting. In addition, these deficiencies also impact the ability to rely on related interfaces, application controls and reports generated by the systems with ineffective ITGCs. *The ineffective design and operation of our ITGCs impacts all of our significant financial statement accounts and disclosures*. The deficiencies related to the design and operating effectiveness of our ITGCs fell into the three main categories listed below:

> • ***Computer Operations***

> Design and operating effectiveness of our system of controls related to the monitoring of batch processing and system interfaces to ensure the completeness and accuracy of data movement involving our ERP system and certain payroll systems that process revenue transactions were identified as having deficiencies.

> • ***Access Controls***

> Design and operating effectiveness of our controls to ensure that access to applications and data were adequately restricted to appropriate personnel were identified as having deficiencies. These deficiencies impact a number of our systems that process internal and revenue-generating payroll transactions, fixed assets, stock option and restricted stock unit information, procurement authorizations, insurance expenses, insurance reserves and payroll taxes.

- ***Change Management***

Design and operating effectiveness of controls to monitor program change management procedures, including monitoring the activities of individuals who have authority and have been granted access to make changes to programs, were identified as having deficiencies. These deficiencies impacted systems that process procurement authorizations and accumulate claims data that is utilized to estimate worker's compensation liabilities.

**Ineffective control environment and risk assessment**

Our management determined that a material weakness exists due ***to a lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training commensurate with our structure, internal control, and financial reporting requirements***. Additionally, we did not have an adequate process in place to complete our testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner.

**Ineffective management review controls and controls over system-generated reports**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to ensure that key spreadsheets and system-generated reports were properly reviewed for completeness and accuracy. For certain management review controls, controls verifying the accuracy of underlying data used to perform these reviews were not performed or adequately documented. In addition, certain management review controls were not performed at a sufficiently precise level to identify errors that could aggregate to a material misstatement of the financial statements. These deficiencies impact substantially all of our significant financial statement accounts.

**Ineffective controls over payroll operations**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls over the accuracy of certain information that we manually input into the payroll systems and that is used in the processing of payroll for customers. Manually input information includes contractual terms, bill rates, benefit elections and other wage data. Controls identified to prevent or detect inappropriate changes to payroll information and resolve payroll processing errors were not effectively designed to detect material errors. Additionally, management identified deficiencies related to the design and operating effectiveness of controls over the reconciliation of benefit enrollment data between the Company's payroll systems and the insurance carriers' records. ***The deficiencies impact amounts recorded as professional and insurance service revenues, operating expenses, accrued*** corporate wages, and worksite employee related assets and liabilities.

**Ineffective controls over health and workers compensation liabilities and related expenses**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the completeness and accuracy of data utilized in calculating health and workers compensation liabilities and related expenses, including premium

expenses and administrative fees.  Data utilized includes enrollment counts, cost rates, wage data, claim counts and incurred and paid claim amounts.  Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were not operating effectively.  Additionally, controls over the review of health premium expenses did not operate at a level of precision that would detect material errors.  These deficiencies impact insurance costs, workers compensation receivables, workers compensation liabilities, and worksite employee related assets and liabilities.

**Ineffective controls over validating accuracy of payroll tax liabilities**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the accuracy and completeness of tax rates input into our payroll systems, including reconciliation to the general ledger of the payroll taxes payable account at a sufficient level of detail.  In addition, due to the ineffective ITGCs over the system that calculates payroll tax withholdings, compensating controls identified are not sufficiently precise to prevent or detect errors in the amounts recorded as payroll tax liabilities for internal employees and WSEs.

**Ineffective authorization controls over procurement processes**

Our management determined that a material weakness exists related to the design and operating effectiveness of our controls over the initial set up and changes to designated approvers over corporate purchases, including purchasing card limits, expense reimbursements or approving new vendors added to the procurement system.

45.     Further confirming the accuracy of plaintiff's allegations, the FY15 Form 10-K removed many of the statements which plaintiff alleged to be knowingly false and misleading in prior SEC filings, including claims that: "risk management is a core competency"; they "leverage[d their] robust risk management capabilities"; "[o]ur programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses"; "[w]e assess all . . . risks on an individual client basis"; and "analyze claims data for each client on an ongoing basis."

46.     The disclosures confirming the falsity of the Class Period representations did not end with the Form 10-K.  Since the filing of the First Amended Complaint for Violation of the Federal Securities Laws (Dkt. No. 53) ("FAC"), analysts reported that the Company remained unable to obtain reinsurance, to reduce aggregate deductible layers or pooling limits to reduce their exposure risk and thus was forced to increase prices, which negatively impacted the Company's ability to attract and retain customers.

1      47.     Class members suffered significant economic losses when the true condition of the

2  Company was revealed, as illustrated by the following chart:



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**JURISDICTION AND VENUE**

2       48.     Jurisdiction is conferred by §22 of the Securities Act [15 U.S.C. §77v], §27 of the

3   Exchange Act [15 U.S.C. §77aa] and 28 U.S.C. §§1331 and 1337.  The claims asserted herein arise

4   under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5

5   promulgated thereunder [17 C.F.R. §240.10b-5].

6       49.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because TriNet is

7   headquartered in this District and many of the acts and practices complained of herein occurred in

8   substantial part in this District.

9                                    **PARTIES**

10      50.     Lead Plaintiff Howard Welgus purchased or otherwise acquired TriNet common

11  stock as set forth in the attached certification and was damaged by the conduct alleged herein.

12      51.     Defendant TriNet is incorporated in Delaware and trades on the New York Stock

13  Exchange ("NYSE") under the ticker symbol "TNET."  The Company's corporate headquarters are

14  located at 1100 San Leandro Boulevard, Suite 400, San Leandro, California 94577.

15      52.     Defendant Goldfield is, and was at all relevant times during the Class Period,

16  President, CEO and a director of TriNet.  As CEO, Goldfield spoke on TriNet's behalf in press

17  releases, conference calls and SEC filings.  Goldfield signed the IPO Registration Statement and the

18  Secondary Offering Registration Statement.  Pursuant to §§302 and 906 of Sarbanes-Oxley and

19  Rules 13a-15(e) and 15d-15(e) under the Exchange Act, Goldfield signed and certified the

20  Company's Form 10-K filed with the SEC on March 30, 2015.  Goldfield also certified the

21  Company's Forms 10-Q during the Class Period.  Goldfield sold $8,706,602 in TriNet shares at

22  inflated prices during the Class Period.

23      53.     Defendant Porter is, and was at all relevant times during the Class Period, Vice

24  President and CFO of TriNet.  Porter signed the IPO Registration Statement and the Secondary

25  Offering Registration Statement.  As CFO, Porter spoke on TriNet's behalf in press releases,

26  conference calls and SEC filings.  Pursuant to §302 and §906 of Sarbanes-Oxley and Rules 13a-

27  15(e) and 15d-15(e) under the Exchange Act, Porter signed and certified the Company's Form 10-K

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                    - 19 -

1    filed with the SEC on March 30, 2015.  Porter also certified the Company's Forms 10-Q during the

2    Class Period.  Porter sold $3,773,174 in TriNet shares at inflated prices during the Class Period.

3           54.    Defendant Martin Babinec is a director of TriNet and signed the IPO Registration

4    Statement and the Secondary Offering Registration Statement.  At the time of the IPO Babinec

5    owned 10.2% of the Company's shares and following the IPO owned 7.9% of the Company's shares.

6    Babinec founded the Company in 1988.  In connection with the IPO, the SEC sought an explanation

7    of TriNet's claim that Babinec was an "independent director."  In response, the Company conceded

8    that Babinec was properly "deemed to be [an] affiliate[] of [TriNet] by virtue of [his] significant

9    beneficial ownership or deemed beneficial ownership of the Company's capital stock," his "voting

10   or dispositive control over the shares of Company stock held by General Atlantic funds" and

11   amended the registration statement.  Babinec sold $10,719,558 in TriNet shares at inflated prices

12   during the Class Period.  On or about December 1, 2014, defendant Babinec sold 90,000 shares of

13   TriNet stock at artificially inflated prices; on or about December 1, 2014, Welgus

14   contemporaneously purchased 170 shares of TriNet stock at artificially inflated prices.[6]

15          55.    Defendant H. Raymond Bingham is a director of TriNet and signed the IPO

16   Registration Statement and the Secondary Offering Registration Statement.  Bingham is also an

17   Advisory Director of General Atlantic, a private equity firm that was the Company's majority owner

18   at the beginning of the Class Period.  He formerly served as a Managing Director at General Atlantic

19   from September 2006 to December 2010.  Bingham sold $4,243,274 in TriNet shares at inflated

20   prices during the Class Period.

21          56.    Defendant David C. Hodgson is a director of TriNet and signed the IPO Registration

22   Statement and the Secondary Offering Registration Statement.  Hodgson is also a Managing Director

23   of General Atlantic.  At the time of the IPO, General Atlantic and Hodgson owned 72% of the

24   Company's shares.  Following the IPO, General Atlantic and Hodgson owned 56%.  In connection

25   with the IPO, the SEC sought an explanation of TriNet's claim that Hodgson was an "independent

26

27   _____
     [6] Welgus's purchases and sales of TriNet stock during the Class Period are set forth in his
     Certification of Named Plaintiff Pursuant to Federal Securities Laws, dated August 6, 2015, attached

28   to the FAC.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                    - 20 -

1   director[]."  In response, the Company conceded that Hodgson "may be deemed to be [an] affiliate[]

2   of [TriNet] by virtue of [his] significant beneficial ownership or deemed beneficial ownership of the

3   Company's capital stock," his "voting or dispositive control over the shares of Company stock held

4   by General Atlantic funds" and amended the registration statement.  Hodgson and General Atlantic

5   each filed Forms 4 for the same or joint sales of TriNet shares, and the offering materials for

6   TriNet's public share offerings describe Hodgson and General Atlantic as each selling the same or

7   joint TriNet shares; the Forms 4 state that Hodgson has a pecuniary interest in the sale.  Hodgson

8   directly or indirectly sold more than $428 million in TriNet shares at inflated prices during the Class

9   Period.  On or about September 17, 2014, Hodgson directly or indirectly sold 13,800,000 shares of

10   TriNet stock at artificially inflated prices; on or about September 29, 2014, Welgus

11   contemporaneously purchased 200 shares of TriNet stock at artificially inflated prices.  On or about

12   December 22, 2014, defendant Hodgson directly or indirectly sold 139,073 shares of TriNet stock at

13   artificially inflated prices; on or about December 22, 2014, Welgus contemporaneously purchased

14   100 shares of TriNet stock at artificially inflated prices.

15          57.     Defendant Katherine August-deWilde is a director of TriNet and signed the IPO

16   Registration Statement and the Secondary Offering Registration Statement.

17          58.     Defendant Kenneth Goldman is a director of TriNet and signed the IPO Registration

18   Statement and the Secondary Offering Registration Statement.  Goldman sold $2,942,000 in TriNet

19   shares at inflated prices during the Class Period.  On or about September 23, 2014, defendant

20   Goldman sold 10,000 shares of TriNet stock at artificially inflated prices; on or about September 29,

21   2014, Welgus contemporaneously purchased 200 shares of TriNet stock at artificially inflated prices.

22          59.     Defendant John H. Kispert is a director of TriNet and signed the Secondary Offering

23   Registration Statement.

24          60.     Defendant Wayne B. Lowell is a director of TriNet and signed the IPO Registration

25   Statement and the Secondary Offering Registration Statement.  Lowell sold $2,175,639 in TriNet

26   shares at inflated prices during the Class Period

27          61.     Defendants referenced above in ¶¶52-53 are referred to herein as "Officer

28   Defendants."

1   62.   Defendants referenced above in ¶¶54-60 are referred to herein as "Director

2   Defendants."

3   63.   Defendant General Atlantic, a Delaware limited liability company, is TriNet's largest

4   stockholder, and had the ability to exert control over TriNet.  General Atlantic had the ability to

5   select and did select four of the seven directors on TriNet's Board of Directors and the Company's

6   CEO.  *See* Attachment 1.  General Atlantic has been an investor in the Company since June 2005,

7   when GA TriNet, LLC ("GA TriNet"), an investment entity affiliated with General Atlantic,

8   acquired approximately $59.3 million in shares of TriNet's Series G convertible preferred stock.  In

9   June 2009, GA TriNet and HR Acquisitions, LLC ("HR Acquisitions"), both affiliated with General

10  Atlantic, acquired approximately $68.8 million in shares of TriNet's Series H convertible preferred

11  stock.  By virtue of the 2009 stock holder agreement, General Atlantic had the power to and did

12  demand the execution of the IPO and Secondary Offering.  General Atlantic owned 72% of TriNet's

13  common stock at the time of the Company's IPO and 56% thereafter.  On September 14, 2014

14  General Atlantic caused the issuance of the Prospectus Supplement in connection with the Secondary

15  Offerings and sold all 13.8 million shares at artificially inflated prices on September 17, 2014, for

16  more than $336 million.  Hodgson, a member of the Company's board of directors, is a Managing

17  Director of General Atlantic, an affiliate of GA TriNet and HR Acquisitions.  Further, General

18  Atlantic and Hodgson each filed Forms 4 for the same or joint sales of TriNet shares, and the

19  offering materials for TriNet's public share offerings describes General Atlantic and Hodgson as

20  each selling the same or joint TriNet shares.  Bingham is a former Managing Director of General

21  Atlantic and remained an Advisory Director during the Class Period.  General Atlantic's control over

22  TriNet was so substantial that it was properly conceded in the Company's Form 10-K filed with the

23  SEC for FY14, which stated that General Atlantic is "able to determine substantially all matters

24  requiring stock holder approval."  On or about September 17, 2014, General Atlantic directly or

25  indirectly sold 13,800,000 shares of TriNet stock at artificially inflated prices; on or about

26  September 29, 2014, Welgus contemporaneously purchased 200 shares of TriNet stock at artificially

27  inflated prices.  On or about December 22, 2014, defendants General Atlantic directly or indirectly

28

1    sold 139,073 shares of TriNet stock at artificially inflated prices; on or about December 22, 2014,

2    Welgus purchased 100 shares of TriNet stock at artificially inflated prices.

3          64.   Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is the United States

4    investment banking arm of financial giant J.P. Morgan Chase.  J.P. Morgan provides debt and equity

5    underwriting, mergers and acquisition, and corporate restructuring advisory, securities dealing and

6    brokerage, and trade execution services for large-market companies and institutional investors.  J.P.

7    Morgan participated and served as underwriters to the IPO and the Secondary Offering.

8          65.   Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a multinational

9    financial services corporation.  Morgan Stanley provides securities underwriting and distribution;

10   financial advisory services, including advice on mergers and acquisitions, restructurings, real estate

11   and project finance; and sales, trading, financing and market-making activities in equity securities

12   and related  products, and fixed income securities and related products including foreign exchange

13   and investment activities.  Morgan Stanley participated in and served as underwriters to the IPO and

14   the Secondary Offering.

15         66.   Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank.  Deutsche

16   Bank provides trade execution services for a broad range of domestic and international clients and

17   provides securities brokerage and investment advisory services to private clients and institutions.

18   Deutsche Bank also provides a variety of capital raising, market making and brokerage services for

19   its government, financial institution and corporate clients, including fixed income and equity sales

20   and trading, emerging markets activities, equity market research and investment banking.  Deutsche

21   Bank participated and served as underwriters to the IPO and the Secondary Offering.

22         67.   Jefferies LLC ("Jefferies") is a global investment bank and institutional securities

23   firm headquartered in New York City, New York.  Jefferies provides capital markets and financial

24   advisory services, institutional brokerage, securities research, and asset management.   Jefferies

25   participated and served as underwriters to the IPO.

26         68.   Stifel, Nicolaus & Company, Incorporated ("Stifel") is a boutique investment banking

27   firm that offers financial advisory services.  Stifel offers financial planning, merger and acquisition,

28   capital restructuring, retirement planning, equity sales, public financing, private placement,

1  underwriting and trust services.  Stifel also provides listed option, annuities, insurance, and industrial

2  research services.  Stifel was founded in 1890, is based in St. Louis, Missouri and operates as a

3  subsidiary of Stifel Financial Corp.  Stifel participated and served as underwriters to the IPO and the

4  Secondary Offering.

5         69.     William Blair & Company, LLC ("William Blair") is a financial services firm that

6  offers investment banking, equity research, institutional and private brokerage and asset management

7  to individual, institutional and issuing clients.  William Blair's services include portfolio

8  management, sales and trading, investment banking services, mutual funds, and venture capital

9  financing.  William Blair participated and served as underwriters to the IPO and the Secondary

10  Offering.

11         70.     The defendants referenced above in ¶¶64-69 are referred to herein as "Underwriter

12  Defendants."

13                              **CONTROL PERSONS**

14         71.     As officers and controlling persons of a publicly held company whose common stock

15  was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the

16  Officer and Director Defendants each had a duty to promptly disseminate accurate and truthful

17  information with respect to the Company's financial condition, performance, growth, operations,

18  financial statements, business, markets, management, earnings and present and future business

19  prospects, and to correct any previously issued statements that had become materially misleading or

20  untrue, so that the market price of the Company's common stock would be based upon truthful and

21  accurate information.  The Officer and Director Defendants' misrepresentations and omissions

22  during the Class Period violated these specific requirements and obligations.

23         72.     General Atlantic exercised virtually complete control over TriNet via its stock

24  ownership, board control and placement of its own members on TriNet's Board, including Bingham

25  and Hodgson.  According to the IPO Registration Statement, General Atlantic controlled five of

26  seven board seats:

27                Certain members of our board of directors were elected pursuant to the
                  provisions of our amended and restated stockholders agreement entered into in June
28                2009.  Under this agreement, our stockholders that are party to the agreement have

agreed to vote their shares to elect to our board of directors as follows: (i) four directors designated by GA TriNet LLC; (ii) the person serving as Chief Executive Officer; and (iii) two independent directors. This agreement will terminate effective upon the completion of this offering.

*See* Attachments 1 and 2.

73.     By virtue of their control over the board of directors, General Atlantic also had the authority to select the Company's officers, as stated in the offering documents: "Each of our officers serves at the discretion of our board of directors." The Executive Officers included: Goldfield (President, CEO and Director); Porter (Vice President and CFO); Gregory L. Hammond (Executive Vice President and Chief Legal Officer) and John Turner (Senior Vice President of Sales).

74.     As a controlling stockholder, and by virtue of its control over five of seven members of the board of directors and the Company's officers, General Atlantic exercised control over the Company and had a duty to promptly disseminate accurate and truthful information and to correct any previously issued statements that had become materially misleading or untrue. As the Company disclosed in the IPO Registration Statement:

> Upon the closing of this offering, funds affiliated with General Atlantic will beneficially own approximately 55.7% of our outstanding common stock, and all of our directors, officers and their affiliates will beneficially own, in the aggregate, approximately 70.5% of our outstanding common stock, in each case, assuming no exercise of the underwriters' option to purchase additional shares. As a result, ***these stockholders will be able to determine substantially all matters requiring stockholder approval***, including the election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets. This concentration of ownership could limit the ability of other stockholders to influence corporate matters and may have the effect of delaying or preventing a third party from acquiring control over us.

75.     And even after General Atlantic, Hodgson and their affiliates sold 13.8 million shares in the Company's Secondary Offering, General Atlantic still maintained the same control. As the Company disclosed in the Company's FY14 Form 10-K:

> As of December 31, 2014, funds affiliated with General Atlantic, our largest stockholder, beneficially own approximately 26.2% of our outstanding common stock, and all of our directors, officers and their affiliates, including the funds affiliated with General Atlantic, beneficially own, in the aggregate, approximately 42.1% of our outstanding common stock. As a result, ***these stockholders will be able to determine substantially all matters requiring stockholder approval***, including the election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets. This concentration of ownership could limit the ability of other stockholders to influence corporate matters and may have the effect of delaying or preventing a third party from acquiring control over us.

76.     The Company, Officer and Director Defendants and General Atlantic participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership, executive and managerial positions with TriNet and/or stock ownership, each of the Officer and Director Defendants and General Atlantic had access to the adverse undisclosed information about the Company's financial condition and performance and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about TriNet and its business or adopted by the Company materially false and misleading, as detailed herein.

77.     The Officer and Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, and General Atlantic, because of its stock ownership and control of TriNet directors, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Officer and Director Defendants and General Atlantic is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

78.     The Company, the Officer Defendants, the Director Defendants and General Atlantic are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TriNet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding TriNet's business, operations, management and the intrinsic value of TriNet common stock; and (ii) caused plaintiff and other members of the Class to purchase TriNet common stock at artificially inflated prices.

**FALSE AND MISLEADING STATEMENTS
ISSUED DURING THE CLASS PERIOD**

79.    <u>False and Misleading Statements</u>: On March 27, 2014, TriNet conducted its IPO, selling 15 million shares to the public for $16 a share.  The IPO Registration Statement falsely stated that the Company was in fact proficient in its risk management capabilities and that TriNet's agreements limited the Company's aggregate exposure in any given policy year, a representation that analysts and investors relied upon to differentiate TriNet from its competitors. *See, e.g.*, ¶¶106-107. These statements included:

- Risk management is a core competency of our company.

- We leverage . . . our ***robust risk management capabilities*** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

- We assess all workers compensation and medical benefits risks on ***an individual client basis*** and annually adjust pricing to reflect their ***current risk*** based on HIPAA-compliant analytics.

- Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***.

- Following our initial pricing of these policies, ***we analyze claims data for each client on an ongoing basis*** and seek to adjust our prices as appropriate.

80.    The Company's IPO raised approximately $240 million.

81.    After the IPO, TriNet's stock price traded at artificially inflated prices, closing on March 27, 2014 at $19.10 on high trading volume.

82.    <u>False and Misleading Statements</u>: On May 5, 2014, the Company issued a press release announcing its 1Q14 financial results.  The press release reported year-over-year growth and strong financial performance in insurance revenues and net income.  The press release stated as follows:

**TriNet Announces First Quarter Fiscal 2014 Results**

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                                                    - 27 -

1                        *        *        *

2      •      Total revenues increased 45% to $508.9 million and Net Service Revenues
              increased 31% to $127.8 million.
3
                        *        *        *
4
5      •      Net income for the first quarter was $1.5 million, or $0.03 per diluted
              share . . . .
6      •      Adjusted Net Income for the first quarter was $17.6 million, or $0.24 per
              diluted share on a pro forma basis . . . .
7
8      •      Adjusted EBITDA was $44.3 million, a 23% increase from $36.1 million for
              the first quarter last year.

9      83.    On May 5, 2014, Goldfield and Porter participated in an earnings conference call to

10   discuss the 1Q14 financial results.  During the call, defendants falsely claimed to have stable and

11   predictable revenues, current visibility into the Company's future financial performance, and that the

12   Company was also currently on track to meet projected earnings before interest, taxes, depreciation

13   and amortization ("EBITDA") margin forecasts and guidance for the remainder of 2014:

14        [Goldfield:] *[O]ur vertical channel strategy continues to strengthen our visibility*
          and impact on the chosen verticals.
15
                . . . .  Our first quarter adjusted EBITDA margin was 34.7%, *which puts us*
16        *well on track to achieve our target margin level of 33% to 34% over the medium*
          *term*.
17
                        *        *        *
18
          [Porter:] Turning to our financial guidance for 2014, based on our Q1
19        performance, we expect net service revenue in the range of $504 million to $511
          million for 2014, which represents organic growth of 15% to 17%, with adjusted
20        EBITDA in the range of $171 million to $174 million for the same period, in line
          with our target rate of 33% to 34% and adjusted net income in the range of $75
21        million to $77 million, or $1.03 to $1.06 per share.

22      84.    In addition, in response to analyst inquiries, defendants also assured investors that at

23   that time the sales and revenue mix of products was stable and each segment was individually

24   performing well:

25        [Analyst:] And could you make some comments on the relative growth rates of the
          three products? . . .
26
          [Goldfield:] *I think the mix is pretty stable now that we've got all three*
27        *products and most of the operational integration complete.  So I would expect it to*
          *be fairly stable.*
28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                      - 28 -

85.     On May 6, 2014, Jefferies issued a report titled "Initiate At Hold: Well-Positioned In Attractive End Market; Full Valuation." Echoing defendants' representations, Jefferies reported that "Stable, Recurring Revenues Provide High Visibility":

> In addition to the stable recurring revenue base from existing clients, the **revenue mix between professional services and insurance services also remains very predictable**.

86.     On May 6, 2014, William Blair issued a report titled "Growing Market and Market Share Gains Should Drive Strong Growth," which substantially repeated defendants' statements that TriNet had solid visibility into future revenue due in part to high retention rates:

> **Solid visibility provided by highly recurring revenue**. . . . Because of the high retention rates and the largely non-discretionary nature of its solutions, about 85%-90% of the company's revenue has historically been generated from existing clients, **so TriNet has solid visibility into forward-looking revenue, particularly after the peak selling season ends in January**.

87.     On May 6, 2014, Deutsche Bank issued a report titled "Making HR easier for SMBs is a good ROI; Buy," which repeated defendants' assurances that the Company was different than some competitors in the PEO space and that TriNet did not assume the business risks as their competitors that write workers' compensation policies. According to the Deutsche Bank report, TriNet mitigated those risks through the Company's robust risk management:

> TriNet does take worker's comp risk for their clients, but only about 15% of their co-employees are not working in an office environment.
>
> *             *             *
>
> **We are not overly concerned about the worker's comp issues, which have plagued the PEO industry, as 1) TriNet's exposure to more risky blue collar employees is relatively minor, 2) due to strong risk management policies** . . . .

88.     After the release of TriNet's 1Q14 results, TriNet's stock price traded at artificially inflated prices, increasing from a close of $21.87 per share on May 5, 2014, to a close of $22.87 per share on May 6, 2014, on high trading volume.

89.     <u>False and Misleading Statements:</u> On May 19, 2014, Goldfield and Porter participated in the JPMorgan Global Technology, Media and Telecom Conference to discuss the Company's financial results and profitability prospects. During the conference, defendants assured investors that the Company would achieve growth in its client base without sacrificing profitability (*i.e.*, avoiding

1   writing contracts with lower premiums to gain market share) or stability (*i.e.*, because the Company

2   had strong risk management and good visibility into claims risk):

3          [Goldfield:] We are selling the three different solutions, which has helped us
           from a pricing standpoint.

4

5                                  *        *        *

6   [W]e have the growth and the profitability at the same time, and I will continue to do
    that. ***I'm not going to sacrifice growth for profitability or vice versa.***

7                                  *        *        *

8   So as part of our bundled offering, we offer a bundled medical insurance as well as
    Workers' Comp. ***We use fully insured plans. We're using large group plans for***
9   ***our medical, so we are not buffeted by the same factors that buffet small business***.

10         . . . We have over 200,000 people on our medical plan. ***The 200,000 people***
           ***give us a level of stability and visibility. I have a department that is always looking***
11         ***at those insurance constructs to make sure that, ultimately, there's a stability***
           ***around those plans***.

12         90.     In addition to misrepresentations regarding profitability and stability as a result of its

13  risk management proficiency, the Company was specifically asked by analysts about visibility into

14  the risks associated with the insurance side of the business to which defendants again understated the

15  risk and claimed visibility was good:

16  [Analyst:] How much visibility do you have on the insurance risk side?

17         [Goldfield:] We don't have . . . tremendous risk on the insurance side. ***We***
           ***have good visibility from a medical insurance and even better from a Workers'***
18         ***Comp***.

19         91.     <u>False and Misleading Statements</u>: On August 4, 2014, the Company issued a press

20  release announcing its 2Q14 financial results. The Company reported strong growth in each of its

21  key business segments. The press release stated as follows:

22  **TriNet Announces Second Quarter Fiscal 2014 Results**

23                                  *        *        *

24  •      Total revenues for the second quarter increased 44% to $525.0 million and
           Net Service Revenues increased 32% to $124.8 million . . . .

25

26                                  *        *        *

27  •      Net income for the second quarter was $6.2 million, or $0.09 per diluted
           share . . . .

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                    - 30 -

- • Adjusted Net Income for the second quarter was $17.4 million, or $0.24 per diluted share on a pro forma basis . . . .

- • Adjusted EBITDA for the second quarter was $39.4 million, a 38% increase the same period last year.

92. <u>False and Misleading Statements</u>: On August 4, 2014, the Company held a conference call with analysts and investors to discuss the 2Q14 results. During the call, Goldfield and Porter stated, among other things, that the Company was currently well on track to meet forecasted EBITDA margins of 33%-34%, continued to boast of the Company's financial performance to date and ability to grow profitably going forward and significantly raised FY14 net revenue guidance from $504-$511 million to $512-$516 million and FY14 EPS guidance from $1.03-$1.06 to $1.09-$1.11. Defendants again assured investors that pricing was stable across geographies and products, that the Company was experiencing strong trends in higher cost, high-risk markets in California and New York and was not being pressured to compromise on price in order to drive growth:

[Goldfield:] *We saw healthy trends across multiple business segments and multiple geographies, with particular strength in California, New York, Massachusetts and Florida*.

\* \* \*

[Porter:] *We are well on track in pursuing our target margin level of 33% to 34%*.

\* \* \*

Turning to our financial guidance for 2014. Based on our performance for the first half of the year, we expect net service revenue in the range of $512 million to $516 million for 2014, which represents organic growth of 17% to 18%, with adjusted EBITDA in the range of $174 million to $176 million, for the same period, in line with our target range of 33% to 34%. And adjusted net income in the range of $79 million to $81 million, or $1.09 to $1.11 per share.

93. After the release of TriNet's 2Q14 results and the false and misleading statements, TriNet's stock price traded at artificially inflated prices, increasing from a close of $24.72 per share on August 4, 2014, to a close of $27.08 per share on August 5, 2014, on high trading volume.

94. On August 12, 2014, Morgan Stanley issued a report titled "Takeaways from management meetings," which largely parroted defendants' false and misleading statements and explained that it understood "fully insured" meant plans for which TriNet was not liable for claims

or other variable costs, and that risk should "disappear" so long as the Company continued to grow its WSE base:

> Mgmt also gave some risk-sharing figures – the deductible layer on benefits can range from 60% of risk for larger carriers to **nothing (fully insured)** for smaller carriers.

95.   On September 11, 2014, the Company issued a press release announcing that it had priced a Secondary Offering of 12 million shares of TriNet common stock, all of which would be jointly offered by defendants General Atlantic and Hodgson and their affiliates, at $25.50 per share:

**TriNet Prices Secondary Offering**

> TriNet Group, Inc. today announced the pricing of an underwritten registered public offering of 12,000,000 shares of common stock at a price of $25.50 per share. In addition, the underwriters have been granted a 30-day option to purchase up to an additional 1,800,000 shares of common stock from the selling stockholders. All of the shares in the offering are being offered by entities affiliated with General Atlantic LLC. TriNet will not receive any proceeds from the sale of the shares.

96.   <u>False and Misleading Statements</u>: On September 12, 2014, defendants filed the Secondary Offering Registration Statement with the SEC. The Secondary Offering Registration Statement was signed by Goldfield, Porter, August-deWilde, Babinec, Bingham, Goldman, Hodgson, Kispert and Lowell. The Secondary Offering Registration Statement repeated the false statements that the Company was in fact proficient in its risk management capabilities and that TriNet's agreements limited the Company's aggregate exposure in any given policy year, a representation that analysts and investors relied upon to differentiate TriNet from its competitors. *See, e.g.*, ¶¶106-107. These statements included:

- **Risk management is a core competency of our company.**

- We leverage . . . our **robust risk management capabilities** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- **Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses**.

- We assess all workers compensation and medical benefits risks on **an individual client basis** and annually adjust pricing to reflect their **current risk** based on HIPAA-compliant analytics.

- Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***.

- Following our initial pricing of these policies, we analyze claims data ***for each client on an ongoing basis*** and seek to adjust our prices as appropriate.

97.    Pursuant to the Secondary Offering on September 17, 2014, controlling shareholders General Atlantic and Hodgson and their affiliates, sold all 13,800,000 shares authorized for sale at a price of $24.42, for more than $336 million.

98.    <u>Reasons Why Statements in ¶¶79-96 Were Knowingly False and Misleading</u>: Each of the above statements including those regarding: (i) TriNet's purported revenue growth without sacrificing profitability; (ii) stability, predictability and visibility into its insurance risk; (iii) being currently on track to meet margin forecasts and on overall financial performance prospects; and (iv) that the Company used fully insured[7] insurance plans and analyzed claims data for each client on an ongoing basis which stabilized risk, were materially false and misleading, as defendants knew or deliberately disregarded and failed to disclose the following facts:

(a)    Risk management was not among the Company's core competencies *i.e.*, among the Company's primary and unique strengths giving TriNet a competitive advantage, and TriNet did not have sufficient policies, procedures and personnel in place to support claims of risk management proficiency as the Company stated in both the IPO Registration Statement and the Secondary Offering Registration Statement. ¶¶79, 96.  Nor did defendants have a basis to claim the Company had either stability or predictability with respect to the performance of the Company's insurance businesses.  In fact, defendants knew but failed to disclose (and later admitted) that the Company did not have adequate insurance executives or in-house actuarial staff to effectively analyze risk in connection with the Company's historical or current claims experience and exposure.

---

[7]    Fully insured means not responsible for variable costs.  *See* Christina Merhar, *Fully-Insured vs. Self-Insured (Self-Funded) Health Plans*, zanebenefits.com (Feb. 25, 2014, 2:00 PM), http://www.zanebenefits.com/blog/fully-insured-vs-self-insured-self-funded-health-plans. *See also* Emily Dusablon, *8 Considerations When Selecting a Professional Employer Organization*, insperity.com (June 12, 2014), http://www.insperity.com/blog/8-considerations-when-selecting-a-professional-employer-organization/ ("Under a fully-insured group health plan . . . [t]he employer has no financial risk other than to pay the premium.").

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF                                                                                       - 33 -

1  ¶¶135-136, 143-144, 150, 152, 155.  The Company's "lack of a sufficient complement of personnel

2  with an appropriate level of knowledge, experience and training" was deemed a material weakness.

3  ¶165.

4       (b)    The Company did not have visibility into current or future financial

5  performance because, in addition to the reasons set forth above in subsection (a), defendants knew

6  the Company had not done the necessary or required due diligence on key acquisitions to support

7  claims that its revenue and earnings were predictable and without significant risk (particularly the

8  2012 SOI acquisition of 66,000 workers' compensation plans).   After investors had suffered

9  hundreds of millions in losses due to the alleged misrepresentations, defendants admitted that the

10  Company had not performed its typical due diligence for such an acquisition, such as not reviewing

11  the book of acquired insurance plans at the claims level, and that failure contributed to poor financial

12  performance.  ¶¶126-128, 135, 139, 151.  Had they done so, or disclosed that they had not done so,

13  the Company and/or investors would have known that SOI's reserve practices were "not industry

14  best practice[s]," and the defendants' statements concerning risk associated with its insurance

15  business were false and could not be relied upon.  *See* ¶151.

16       (c)    The Company did not have the stability or current visibility into the business

17  performance of its insurance plans because contrary to defendants' statements that it analyzed claims

18  data for each of its clients, defendants knew but failed to disclose that the data, to the extent it was

19  received at all, was limited to "catastrophic" claims (*i.e.*, claims over $300,000).  The Company had

20  not even sought detailed information on all claims below that threshold.  *See* ¶120.[8]  However, the

21  limited data that was provided was not timely and thus did not to support defendants' claims that

22  their analysis allowed them to accurately predict the Company's financial performance.  In addition,

23  the data the Company received from insurance carriers was subject to significant lag due to reporting

---

24  [8]   The Court previously acknowledged that the "statements that TriNet assesses all claims on an
25  individual basis," (*i.e.* statements that TriNet did not "analyze claims data for each client 'on an
  ongoing basis'" or "assess all workers compensation and medical benefits risks on an individual
26  client basis") may be sufficiently pled to be false in light of defendants' later admission that they
  only obtained data for claims above $300,000.  MTD Order at 6, 13.  "Standing alone, this might be
27  sufficient to allege that the statement that TriNet received analytics on "all" of its claims was false.
  But that does not remedy the fact that Plaintiff's complaint is inadequate on the whole . . ."  MTD
28  Order at 13.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                                                    - 34 -

1    from the service provider to the carrier and again from the carrier to TriNet.  ¶¶115, 117, 135, 144.

2    In fact, as the Company's financial performance began to consistently fall below promised

3    expectations due to the purportedly unexpected increase in claims impacting the financials,

4    defendants admitted that TriNet simply did not have the visibility from the carriers necessary to

5    provide the predictability they had so boldly assured.  *See* ¶¶115, 117, 128, 135, 144, 151.  Thus, as

6    opposed to the predictability and good visibility that the defendants bragged about, they would later

7    admit that in truth, there was "***inherent volatility***" in large medical claims.  ¶135.

8           (d)     Contrary to defendants' claims that all three product lines (*i.e.*, Ambrose,

9    Passport and SOI) were stable and very predictable, defendants knew or deliberately disregarded that

10   the Company was experiencing adverse claims trends in both medical and workers' compensation

11   that would negatively affect the Company's current and future business prospects – particularly

12   adverse trends in its SOI book of business, acquired in 2012.  Moreover, defendants knew that

13   because claims data it purportedly analyzed was limited and not timely, defendants had no basis to

14   state that all product lines were performing well.

15          (e)     TriNet's falsely claimed its insurance plans were fully insured in a manner

16   that reduced their exposure to large claims and volatility risk.  In truth, TriNet's insurance plans

17   were fully insured ***for its WSE customer***, but only 38%-40% of TriNet's insurance plans were fully

18   insured ***for TriNet*** by the insurance carrier TriNet contracted with.  The other 60%-62% of TriNet's

19   insurance plans were ***jointly*** insured by TriNet and the insurance carrier, exposing both TriNet and

20   the insurance carrier to insurance claims liability.  Thus, offering fully insured plans actually

21   ***increased*** TriNet's risk exposure.  Yet defendants claimed in the IPO Registration Statement and

22   elsewhere exactly the opposite, telling investors that all of TriNet's "programs are fully insured by

23   top-rated insurance carriers, ***which limits our ultimate exposure or potential losses***."  This was false

24   in regards to the 60%-62% of the plans jointly insured by TriNet and the carrier.

25          (f)     Analysts and investors were deceived by defendants' use of the fully insured

26   term and defendants made no effort to correct the misleading statements.  The market understood

27   "fully insured" to mean fully insured ***for TriNet***.  ¶94 (Morgan Stanley: "the deductible layer [TriNet

28   pays] on benefits can range from 60% of risk for larger carriers to nothing (fully insured) for smaller

carriers"); ¶161 (J.P. Morgan: "After months of review, TNET announced it would not pursue a fully insured or guaranteed cost strategy. . . .   In other words, it is still exposed to medical claims volatility. . . some may have hoped for more certainty on risk (via fully insured)."  And defendants understood that the market understood the term in that way, with Porter, for example, noting that "*[S]ome people* would call [plans in which carriers paid all claims costs] fully insured.  So that's effectively a pass through."  ¶155 (Porter admitted in the same answer that TriNet was, as of November 10, 2015, "exploring that *possibility* [plans fully insured for TriNet] with the carriers"). Thus, although defendants disclosed that TriNet took on deductible risk for some plans, the market was lead to believe that risk was "limited" in some way by the fully insured plans.  It was not.

(g)     Defendants' later admissions directly contradicting their claims of fully insured plans evidence both their understanding and intent to capitalize on their false and misleading representations:

| Defendants in 2014 | Defendants in 2015 |
|---|---|
| "Our programs are *fully insured by* top-rated insurance *carriers*, which *limits our* ultimate exposure or potential losses."  ¶¶79, 96, 122. | "[T]oday 40% of our plans are fully insured, 60% of our plans are high deductible . . . [The question is] *whether we should move* more *towards* the *fully insured* side of the plans."  ¶152. |
| "We use fully insured plans. We're using large group plans for our medical, *so we are not buffeted* by the same factors that buffet small business."  ¶89. | "So *if* we start at what guaranteed costs looks like and guaranteed costs or *some people would call it fully insured*.  So that's effectively a pass through [*i.e.*, liability is passed through to carriers]."  ¶155. |
| "[W]e have a *very stable, fully insured* workers' comp program . . . I think the example that you're referencing was a self-insured model . . . *for us* it's been a *very stable* program on *all* of our products."  ¶105. | "[O]n a *fully-insured* plan . . . *you would take the volatility* out of it."  ¶155.<br><br>"38% of our plans are fully insured . . . if we went with the fully insured plans [for the other 62% of plans] it reduces the quarter-to-quarter volatility."  ¶158. |

(h)     TriNet did not have aggregate stop-loss limits at all, or did not have such limits that would sufficiently cap the Company's exposure to large spikes in claims.  *See* ¶¶126-127, 158, 191-192, 196.

(i)     Rather than pricing products such that premiums would better cover claims, the Company was in fact prioritizing growth (increasing the number of clients and revenue without

1    raising premiums) at the expense of profitability, including the underpricing of premiums in higher

2    risk markets like New York and California.  As later admitted by Goldfield, defendants intended to

3    capitalize on what they viewed as a historic market opportunity.  ¶151.  Prioritizing growth over

4    profit resulted in a failure to properly price their insurance products and required a complete

5    repricing of TriNet's insurance book of business (a process that would take more than a year to

6    complete).  ¶¶162, 191-195.

7            (j)     The Company's internal controls suffered from wide spread material

8    weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and

9    collectively impaired the Company's ability to ensure accuracy and control over financial reporting.

10   In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs,

11   workers' compensation and liabilities.  *See, e.g.*, ¶¶164-165.

12   •    Certain reconciliations of claim payments per the Company's actuarial analyses to
        actual amounts paid were  not operating effectively.
13

14   •    [C]ontrols over the review of health premium expenses did not operate at a level of
        precision that would detect material errors.
15
     •    [L]ack of a sufficient complement of personnel with an appropriate level of
16       knowledge, experience and training . . . .

17           (k)     Because of the known or deliberately disregarded facts set forth above, the

18   Company was not currently "on track" to meet margin forecasts of 33%-34% and its revenue and

19   earnings forecasts for FY14 lacked a reasonable basis.

20           (l)     The foregoing false and misleading statements were made with knowledge of,

21   or deliberate recklessness with regard to, their falsity as they concerned the most critical operations

22   at the core of TriNet's business model, namely the risk-based insurance operations.  For 2013 and

23   2014, 83% and 84% of TriNet's total revenues, respectively, consisted of insurance service revenues

24   (comprised of the medical and workers' compensation plans at issue in the SAC.)  Capturing the

25   insurance spread was the key differentiator that TriNet used to sell itself to investors and, while it

26   brought increased risk, it allowed TriNet to achieve greater margins (33%-34%) versus a purely pass

27   through PEO that took on no risk (30%).  The key, according to defendants, was that TriNet had

28   solved the risk problems that caused the collapse of the risk-based PEOs that came before them.

Indeed, defendants themselves labeled risk management as a "core" operation and confirmed to analysts that it was "[a]bsolutely" key to TriNet's success to have "risk management capability or your actuarial capability like a core competency."  The impact of TriNet's risk management failures left the Company's entire business model in doubt as its insurance services operated at break-even in 2015 and the Company was forced to reprice its entire book of business.  ¶¶152, 155, 162, 191-195.

TriNet Competitor Barrett Announces $80 Million Workers' Compensation Reserve Increase;
TriNet Falsely Assures Investors It Does Not Face Similar Risk

99.     After trading hours on October 28, 2014, Barrett, a workers' compensation PEO company and TriNet competitor, announced its quarterly financial results.  As part of its announced results, Barrett disclosed that Barrett had recorded an additional increase to its self-insured workers' compensation reserve of $80 million, effectively erasing two to three years of profits.  While Barrett's announcement surprised some investors, only one month prior, a business analyst at Seeking Alpha issued a report titled "Barrett Business Services (BBSI): A Tick-Tick-Ticking Time Bomb," which correctly predicted that Barrett "has systematically under reserved, which has resulted in materially overstated earnings and a high probability of a massive reserve charge."[9]  The announcement sent Barrett's stock plummeting more than 58%, from a close of $43.03 on October 28, 2014, to a close of $17.69 on October 29, 2014, and generated speculation into whether TriNet's stock would suffer the same fate.  It was thus imperative for TriNet to distinguish itself from Barrett and convince investors that TriNet's business was materially different from Barrett.

100.     On November 4, 2014, the Company issued a press release announcing its 3Q14 financial results which beat consensus revenue and earnings expectations, and which included additional false and misleading statements.  The press release stated as follows:

**TriNet Announces Third Quarter Fiscal 2014 Results**

\*          \*          \*

- Total revenues for the third quarter increased 24% to $556.0 million and Net Service Revenues increased 22% to $127.8 million . . . .

---

[9]   *Barrett Business Services (BBSI): A Tick-Tick-Ticking Time Bomb*, Seeking Alpha (Sept. 16, 2014, 12:41 PM), http://seekingalpha.com/instablog/890075-copperfield-research/3269815-barrett-business-services-bbsi-a-tick-tick-ticking-time-bomb.

\*         \*         \*

- Net income for the third quarter was $0.7 million, or $0.01 per diluted share . . . .

- Adjusted Net Income for the third quarter was $20.2 million, or $0.28 per diluted share on a pro forma basis . . . .

- Adjusted EBITDA for the third quarter was $41.5 million, a 50% increase from the same period last year.

\*         \*         \*

Net Service Revenues consisted of professional service revenues of $86.9 million and Net Insurance Service Revenues of $40.9 million. Net Insurance Service Revenues consisted of insurance service revenues of $469.1 million, less insurance costs of $428.2 million.

101.    <u>False and Misleading Statements</u>: On November 4, 2014, the Company held a conference call for analysts and investors to discuss the Company's 3Q14 financial results and outlook. During the call, which was hosted by Goldfield and Porter, defendants addressed demand for the Company's products and services, assured investors that the Company was currently on track to meet revenue and margin targets, that the potential for higher claims costs was already built into TriNet's forecasting process, ***raised*** FY14 net revenue guidance from $512-$516 million to $517-$519 million and ***raised*** FY14 EPS from $1.09-$1.11, to $1.10-$1.13:

[Porter:] ***We are well on track in pursuing our target margin level of 33% to 34%***.

\*         \*         \*

For our financial guidance for Q4, we expect net service revenue in the range of $137 million to $139 million, which represents organic growth of 13% to 14%; adjusted EBITDA in the range of $51 million to $53 million for the same period; and adjusted net income in the range of $25 million to $27 million, or $0.35 to $0.37 per share.

Based on our year-to-date performance and our Q4 guidance, we expect ***net service revenue in the range of $517 million to $519 million for 2014, which represents organic growth of 18% to 19%***, with adjusted EBITDA in the range of $176 million to $178 million for the same period, in line with our target range of 33% to 34%, and adjusted net income in the range of $80 million to $82 million, or $1.10 to $1.13 per share.

102.    <u>False and Misleading Statements</u>: During the call analysts questioned defendants on whether TriNet had risks associated with its workers' compensation policies similar to Barrett and

defendants falsely assured investors that TriNet was fundamentally different because its programs were consistent and "fully insured":

> [Analyst:] Just – there is a competitor . . . that had a pretty significant Worker's Comp charge and issue this quarter. Just wondering can you comment on – I guess – I'm sure a lot of people have been speculating on the risk of that to you, and I guess, to what extent is there risk, of any sort of similar issues? Or what type of checks do you have that make it unlikely that you would see some sort of similar issue here?
>
> . . . [Porter:] We do have a ***very consistent fully-insured high deductible plan, which hasn't changed,*** and ***we carefully review that, and adjust the reserves every quarter***.
>
> ***So we play [sic] close attention to it, we have multiple sets of eyes look at it, and we make adjustments as we see them, which is ongoing. So net, I don't expect any significant increases to that in terms of reserves***.

103. On November 4, 2014, Jefferies issued a report discussing the Company's 3Q14 financial results and its increase to its fiscal 2014 revenue and EPS guidance:

**Impressive Execution In 3Q; Guidance Raised**

*       *       *

> Earlier, TNET posted solid F3Q results (with revs/EPS beat vs. Street) on the back of healthy demand environment, which also led to F14 revs/EPS guidance raise.
>
> . . . Adjusted EBITDA margin for the quarter was 32.5%, +90bps vs. JEFe, which largely led to an adjusted EPS beat ($0.28 vs. JEFe/Street/guidance range at $0.27/$0.26/$0.25-$0.27). . . .
>
> **F14 guidance raised**. On the back of solid F3Q print, and healthy demand environment, TNET raised its F14 net revs guidance range from $512-$516M to $517-$519M (vs. Street/JEFe at $516.7M/$518.3M). . . . ***TNET also raised its F14 adjusted EPS guidance to $1.10-$1.13 (JEFe/Street at $1.11) from $1.09-$1.11 before***, but maintained its F14 adjusted EBITDA margin target range of 33-34%. In addition, TNET provided F4Q net revenues guidance range of $137-$139M (JEFe/Street at $137-$138.2M), adjusted EBITDA guidance range of $51-$53M and adjusted EPS guidance range of $0.35- $0.37 (JEFe/Street at $0.36/$0.35).

104. After the November 4, 2014 release of the Company's financial results and conference call, the Company's stock price continued to trade at artificially inflated prices of above $29.00 per share.

105. <u>False and Misleading Statements</u>: On November 12, 2014, Goldfield and Porter participated in the JPMorgan Ultimate Services Investor Conference. During the conference, in response to analysts' inquiries, defendants stated that TriNet was not exposed to the same claims volatility as their self-insured competitors, specifically Barrett, which had recently increased reserves

for under accrued claims (¶99), and assured investors that the Company maintained visibility into 85% of its future revenue – in part because business models were "fully insured":

> [Goldfield:] The important thing to understand is . . . *I have visibility to 85% of my revenue. 85% of my revenue is from the existing 10,000-plus companies. I have to find 15% a year*.
>
> <div align="center">*       *       *</div>
>
> [Audience Member:] One of your publicly traded peers announced a pretty big increase in their working – workers' comp reserves the other week. I know your models are different, but can you just help me understand how they're different and how you – what your reserve policies are, etc.?
>
> <div align="center">*       *       *</div>
>
> [Porter:] [W]e have a *very stable, fully insured workers' comp program that we've had for multiple years. . . . I think the example that you're referencing was a self-insured model that they're moving to try to get some kind of a fully insured. So for us it's been a very stable program on all of our products. It's something that we look at very carefully every quarter, and we adjust the reserves as necessary every quarter*.
>
> *We have assistance, obviously, from our outside actuaries, from our inside team, and we also have an independent view from outside actuaries at our accounting firm. So we look at it from multiple angles. We adjust as we go. We do not expect any significant reserve adjustments like you're referencing*.

106.    On November 12, 2014, William Blair issued a report on TriNet titled "Analysis of Workers' Comp Trends Reinforces Confidence That Issues Seen at Competitors Will Not Be Replicated." The report directly addressed concerns that TriNet, like Barrett, might not be adequately accruing for workers' compensation costs and thus would need to increase reserves, thereby reducing profits. The risk from not insuring for claims risk was a "hot button issue" and therefore a plainly material issue for investors, in particular because Barrett had just seen two to three years' profits "erased":

> **Summary**. Over the last few months, we have received questions from investors about the implication for TriNet of a "short report" about Barrett Business Services (BBSI $23.10). . . . [T]he report correctly alleged that Barrett had been under-accruing claims expenses related to its workers' compensation policies, and therefore would need to *recognize catch-up expenses at some point*. This assumption was confirmed in the third quarter, as Barrett recorded an $80 million increase in its workers' compensation reserve, which essentially erased the profits earned by Barrett over the last two to three years.
>
> . . . *TriNet's third-quarter results showed no signs of similar issues and management expressed confidence on its conference call in its workers' compensation accruals*.

107.   Morgan Stanley, in a November 14, 2014 report titled "Takeaways from mgmt meetings positive; TNET 'just getting started,'" explained that defendants had assured Morgan Stanley and others that the Company had internal actuaries that they employed to underwrite risk:

- **Increased emphasis on underwriting risk and reserve accounting**: Investors honed in on the processes and controls involved in TNET's underwriting process.  Although mgmt still expects some quarterly volatility in claims costs (+/- $3mn per quarter is typical), it notes that clients have quarterly open enrollment so premiums are adjusted relatively frequently, which is a key reason the annual variance is much more limited.  *For our clarity (and comfort), mgmt noted that TNET's reserves are audited by three different entities: by internal actuaries, by the independent auditor's actuaries, and by insurance carriers' actuaries*.

108.   <u>False and Misleading Statements</u>: On December 17, 2014, Goldfield and Porter participated in the Bernstein Technology Innovation Summit to discuss the Company's financial results and future prospects.  During the call, defendants stated that TriNet was proficient at managing workers' compensation risk and forecasting deductible risk on medical claims.  Defendants also told analysts and investors that they simply do not take on "high-risk exposures":

[Goldfield:] *We have a business model that calls for 15% top-line revenue growth, with 33% to 34% EBITDA margins each and every year for the next three years*.

\*   \*   \*

[Analyst:] So why don't you first just describe what the nature is of the risk that you are taking on; and then, obviously, what TriNet does to mitigate that?

\*   \*   \*

[Porter:] There's about 40% of our insurance revenues which are administrative fees that our clients pay us for providing them a top-tier technology platform to do open enrollment as well as first-line support.  There is no claims element at all to that.  So 40% is a service fee . . . .

\*   \*   \*

And the final set of our net insurance is 40% is for managing workers' comp.  There, we offer fully insured programs.  They are high deductible.  *It is a very predictable portion of the business, as long as you manage the type of businesses that you write, which really gets to the question of how we manage the components of both the benefits and the comp.  What we do is we look at every client that comes in the door, and we price it to risk.*

*. . . We don't take high-risk exposures.  And we look at the demographics and the benefits so we know exactly how that should be priced*.

*[W]e get state-of-the-art analytics on all of our claims.  So every month we are able to get claims data so we can see how our clients are performing . . . .*

*. . . So we make sure that we are always pricing the premiums to the experience that our clients have*.

109.    <u>False and Misleading Statements</u>: Defendants also falsely assured investors who were concerned about how TriNet's risk management processes provided confidence in the predictability of their financial performance that the Company's combination of actuarial review and risk management capability allowed them to accurately predict *exactly* how the business would perform. Defendants also repeated that the Company begins the year with 85% revenue in the bag and recurring revenue allows predictable profits of 33%-34%:

> [Analyst:] [B]eing successful, then, in the PEO *business is essentially having your risk management capability or your actuarial capability like a core competency, essentially, then, of TriNet?*
>
> [Porter:] *Absolutely. . . . [W]e are able to predict pretty accurately on an annual basis exactly how we are going to do on each of those programs*.
>
> *            *            *
>
> [Goldfield:] *I start each and every year with 85% of my revenue in the bank. . . . This makes this the easiest job I have ever had.* As opposed to starting with zero on January 1, *I start January 1 with 85% of my revenue. . . .   And the recurring revenue model allows me to have predictable growth with strong profits of 33% to 34%*.
>
> *            *            *
>
> *To me, it's a great outcome to be able to have predictable 15% organic growth, and to have 33%, 34% profits, and the cash flow to back that up*.

110.    In addition to assuring investors about the Company's proficiency over risk management, defendants sought to induce investors to purchase their stock based on their claims of predictability and visibility:

> [Analyst:] *If you are the investors out there now, like, why now with TriNet?*
>
> [Goldfield:] A large, addressable market; *predictable revenue; visibility into the future*; and a company that is growing and satisfying an important need in HR.

111.    Finally, defendants assured investors during the December 17, 2014 Bernstein Technology Innovation Summit, that TriNet was fundamentally different from PEOs that came before them.  They explained that the Company took not just a different, but a "*radically different*," approach to underwriting risk, which was based upon data that constituted a "true breakthrough" that minimized variability and ensured stable returns:

1    [Goldfield:] The underwriting process is – and the lens we put on these companies – *is radically different*.

2

*        *        *

3

4    [Analyst:] And before we just move off of the risk thing – this industry, I guess, is a bit *littered with companies that have blown* up one way or the other over the years *because of poor risk management*.  Can you describe, like, *how does the investor base get confident that TriNet is different?*  Or that it's different this time around?

5

6    . . . [Goldfield:] The key to the risk portion of the business is the data. . . .

7

8    . . . And having the right data, which we get in a HIPAA-compliant way from the insurance companies, is *a true breakthrough* that was not available to the bundled solution providers at three or four years ago.  So I believe to be really comfortable, you need to really understand that, A, what the overall intention and the growth of the Company is; and, B, is that the data is available to react to as the landscape changes.

9

10

11    112.    <u>Reasons Why Statements in ¶¶100-111 Were Knowingly False and Misleading</u>: Each

12    of defendants' statements set forth above including statements that (i) the Company was not exposed

13    to the same types of risk as Barrett; (ii) all of the Company's insurance products were fully insured

14    making them consistent and stable; (iii) the Company had visibility into 85% of the its annual

15    revenue at the outset of the year; (iv) that the Company was on track to meet its EBITDA margins

16    target of 33%-34%; and (v) the Company was able to accurately predict how it would perform,

17    including achieving its increased financial guidance of $517-$519 million in net service revenues,

18    because of its risk management capabilities and access to state-of-the-art analytics on all claims.

19    Defendants knew or deliberately disregarded and failed to disclose the following:

20        (a)    Risk management was not among the Company's core competencies and it did

21    not have sufficient policies, procedures and personnel in place to support defendants' claims of risk

22    management proficiency or that it was a "core competency" as stated.  ¶¶79, 96.  Nor did defendants

23    have a basis to claim the Company had either stability or predictability with respect to the

24    performance of the Company's insurance businesses.  In fact, defendants knew but failed to disclose

25    (and later admitted) that the Company did not have adequate insurance executives or in-house

26    actuarial staff to effectively analyze risk in connection with the Company's historical or current

27    claims experience and exposure.  ¶¶135-136, 143-144, 150, 152, 155.  Notwithstanding these facts,

28    defendants told analysts and investors that the Company had "a department" that looks at the

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

1    performance of the insurance plans very closely and provided defendants with assurance in the

2    stability of the Company's business operations.  As TriNet later admitted, the Company's "lack of a

3    sufficient complement of personnel with an appropriate level of knowledge, experience and training"

4    was a material weakness.  ¶165.

5             (b)    The Company did not have visibility into current or future financial

6    performance because, in addition to the reasons set forth above in subsection (a), defendants knew

7    the Company had not done the necessary or required due diligence on key acquisitions to support

8    claims that its revenue and earnings were predictable and without significant risk (particularly the

9    2012 SOI acquisition of 66,000 workers' compensation plans).  After investors had suffered

10   hundreds of millions in losses due to the alleged misrepresentations, defendants admitted that the

11   Company had not performed its typical due diligence for such an acquisition, such as not reviewing

12   the book of acquired insurance plans, and that failure contributed to poor financial performance.

13   ¶¶126-128, 135, 139, 151.  Had they done so, or disclosed that they had not done so, the Company

14   and/or investors would have known that SOI's reserve practices were "not industry best practice[s],"

15   and the defendants' statements concerning risk associated with its insurance business were false and

16   could not be relied upon.  *See* ¶151.

17            (c)    The Company did not have the stability or current visibility into the business

18   performance of its insurance plans because contrary to defendants' statements that it analyzed claims

19   data from each of its clients, defendants knew but failed to disclose that the data, to the extent it was

20   received at all, was limited to "catastrophic" claims (*i.e.*, claims over $300,000).  The Company had

21   not even sought detailed information on all claims below that threshold.  *See* ¶¶98(c), 120.

22   However, the limited data that was provided was not timely and thus did not to support defendants'

23   claims that their analysis allowed them to accurately predict the Company's financial performance.

24   In addition, the data the Company received from insurance carriers was subject to significant lag due

25   to reporting from the service provider to the carrier and again from the carrier to TriNet.  *See* ¶¶115,

26   117, 135, 144.  In fact, as the Company's financial performance began to consistently fall below

27   promised expectations due to the purportedly unexpected increase in claims impacting the financials,

28   defendants admitted that TriNet simply did not have the visibility from the carriers necessary to

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                              - 45 -

1   provide the predictability they had so boldly assured.  *See* ¶¶115, 117, 128, 135, 144, 151.  Thus, as

2   opposed to the predictability and good visibility that the defendants bragged about, they would later

3   admit that in truth, there was "***inherent volatility***" in large medical claims.  ¶135.

4         (d)     Contrary to defendants' statements that the Company's insurance plans were

5   fully insured and therefore stable and immune from the volatility that had negatively impacted

6   competitors, such as Barrett (¶99), TriNet was exposed to similar risk on 60%-62% of its insurance

7   plans which increased rather than limited TriNet's liability.  *See* ¶¶126-127; *see also* ¶98(e)-(g).

8         (e)     Defendants knew but failed to disclose that TriNet did not have aggregate

9   stop-loss limits at all, or did not have such limits that would sufficiently cap the Company's

10   exposure to large spikes in claims.  *See* ¶¶126-127, 158, 191-192, 196**.**

11         (f)     Rather than pricing products such that premiums would better cover claims,

12   the Company was in fact prioritizing growth (increasing the number of clients and revenue without

13   raising premiums) at the expense of profitability, including the underpricing of premiums in higher

14   risk markets like New York and California.  As later admitted by Goldfield, defendants intended to

15   capitalize on what they viewed as a historic market opportunity.  ¶151.

16         (g)     The Company's internal controls suffered from wide spread material

17   weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and

18   collectively impaired the Company's ability to ensure accuracy and control over financial reporting.

19   In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs,

20   workers' compensation and liabilities.  *See e.g.*, ¶¶164-165.

21        •     Certain reconciliations of claims payments per the Company's actuarial analyses to
22                actual amounts paid were  not operating effectively.

23        •     Controls over the review of health premium expenses did not operate at a level that
             would detect material errors.

24
25        •     Lacked the sufficient compliment of personnel with an appropriate level of
             knowledge and training.

26         (h)     Because of the known or deliberately disregarded facts set forth above, the

27   Company was not currently "on track" to meet margin forecasts of 33%-34% and its revenue and

28   earnings forecasts for 4Q14 and FY14 were without reasonable basis, as the Company's forecasting

1  process failed to properly incorporate relevant historical and current claims trends due to the

2  Company's failure to obtain timely data or analyze its risk exposure.

3  <u>TriNet Reports 4Q14 Revenue Shortfall Caused by Spike in Health Claims; Falsely Assures</u>
   <u>Investors that Problems Are Non-Systemic, that Liability for Claims Remained Limited and</u>
4  <u>Reiterates False Risk Management Statements and FY15 Guidance</u>

5       113.    By February 27, 2015, when J.P. Morgan issued a report titled "4Q14 Earnings

6  Preview," a number of TriNet's competitors had already announced strong results for 1Q15,

7  indicating favorable market conditions.  As J.P. Morgan reported, the market expected the same

8  from TriNet, writing that "[f]undamentally, ***TNET shouldn't disappoint***, as peers (ADP, NSP and

9  PAYX) reported stable to improving growth in PEO."  On this PEO industry strength, and the belief

10  that TriNet was unique within that industry and had robust risk management practices, TriNet's

11  stock hit a Class Period high of $38.00 on March 3, 2014, the day that TriNet issued (after hours)

12  4Q14 and FY14 financial results.

13       114.    But when on March 3, 2015, the Company issued a press release announcing its 4Q14

14  financial results, the report revealed a 19% year-over-year decrease in net Insurance Service

15  revenues and that 4Q14 EPS forecasts missed by a whopping 29%.  Defendants attributed the miss to

16  a $10 million increase in large medical claims – the very type of volatility defendants assured

17  investors and analysts that their risk management and actuarial reviews protected them from.  *See*

18  ¶¶79, 87, 89, 96.  The decrease in net Insurance Service revenues in turn caused a more than

19  $10 million miss in forecasted net service revenues; defendants nevertheless then assured 15%

20  revenue growth for FY15.  The press release stated as follows:

21      **TriNet Announces Fourth Quarter, Fiscal Year 2014 Results**

22                    *       *       *

23  Fourth quarter highlights include:

24     •    Total revenues increased 25% to $603.7 million and Net Service Revenues
       increased 4% to $126.9 million from the same period last year.

25                    *       *       *

26

27     •    Net income was $7.0 million, or $0.10 per diluted share, compared to net
       income of $6.0 million, or $0.11 per diluted share, in the same period last
       year.

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                      - 47

- Adjusted Net Income was $19.2 million, or $0.26 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.1 million, or $0.24 per diluted share on a pro forma basis, in the same period last year.

- Adjusted EBITDA was $40.1 million, an 8% decrease from the same period last year.

Full year highlights include:

- Total revenues increased 33% to $2.2 billion and Net Service Revenues increased 21% to $507.2 million from fiscal 2013.

- Net income was $15.5 million, or $0.22 per diluted share, compared to net income of $13.1 million, or $0.24 per diluted share, in fiscal 2013.

- Adjusted Net Income for fiscal 2014 was $74.4 million, or $1.03 per diluted share on a pro forma basis, compared to Adjusted Net Income of $57.5 million, or $0.81 per diluted share on a pro forma basis, in fiscal 2013.

- Adjusted EBITDA was $165.3 million, a 22% increase from the same period last year.

"Based on our strong momentum in the market and with January firmly in the books, *we remain confident in our business outlook and believe we can achieve Net Service Revenue growth in excess of 15% for 2015*."

. . .  "*Q4 Net Insurance Service Revenues were below our estimate as a result of higher than expected large medical claims.  We are working closely with our health insurance partners to identify these large claims earlier in the process to improve our ability to more accurately forecast our Net Insurance Services Revenues*."

115.   <u>False and Misleading Statements</u>: On March 3, 2015, the Company held a conference call for analysts and investors to discuss the 4Q14 financial results.  During the call, which was hosted by defendants Goldfield and Porter, defendants sought to shift the blame for the revenue miss on their insurance carriers, revealing for the first time that their data was subject to significant lag time.  However, defendants told investors that they had carefully analyzed the Company's current claims experience, which had adversely affected TriNet's 4Q14 results, and assured analysts and investors that it was a one-time event that would not affect the Company's 2015 financial outlook and was not evidence of a systemic, business-wide problem:

[Goldfield:] *We have also looked carefully at our claims experience and remain confident in the quality of our forecast of net insurance service revenue in 2015*.

\*      \*      \*

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF
- 48

[Porter:] ***Net insurance service revenue was adversely affected by an unexpected impact of large medical claims***.

The nature of these claims is that they develop over a number of months, and there is usually a lag before they're reported to the carriers by the providers. ***We had a number of large claims develop during the second half of 2014 that we were not aware of until after the close of the year. The result was these claims were not included in our trend as we forecast our fourth-quarter medical claims***.

116.   After explaining what reportedly caused the shortfall in FY14, defendants specifically stated that the Company had already taken into account the frequency of large claims and there was no current risk of a recurrence, nor would FY15 be adversely affected:

[Porter:] ***Our 2015 forecast takes into account a similar frequency of large claims as we experienced in 2014. The result is that our Q4 experience does not have an adverse impact on our 2015 outlook***.

\*          \*          \*

Turning now to our 2015 full-year financial guidance, we expect net service revenue in the range of $590 million to $600 million, which represents growth of 16% to 18%; adjusted EBITDA in the range of $192 million to $202 million, in line with our target margin range of 33% to 34%; and adjusted net income in the range of $98 million to $104 million, or $1.32 to $1.40 per share. Based on our 2015 full-year guidance, we expect our first-quarter net service revenue in the range of $142 million to $147 million, which represents growth of 11% to 15%; adjusted EBITDA in the range of $44 million to $49 million; and adjusted net income in the range of $22 million to $25 million or $0.30 to $0.34 per share.

117.   In addition to reporting financial results and missed expectations, defendants admitted that TriNet did not have the visibility that they previously assured investors provided predictable financial outcomes. Moreover, while defendants had previously bragged of visibility into financial results, when asked how many large claims had been received that caused the EPS miss, defendants were mysteriously at a loss, stating that they could not determine how many large claims were received:[10]

[Goldfield:] ***Clearly, we've some work to do in improving our ability to forecast our insurance revenue***.

\*          \*          \*

[Porter:] ***[W]e didn't have enough visibility into the claims that we're developing in the second half to be able to build them into our Q4 forecast***.

---

[10]   Remarkably, later in the Class Period, and after the recurrence of similar large claims being reported, defendants said they were both able to, and did in fact, sift through each claim. ¶120.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                                                - 49 -

1                              *      *      *

2   When we step back and look at what our experience was for these large claims, we
    don't expect it will impact our trend on a significant basis. . . .

3
            *So our pricing, we expect to be fairly stable.  But we look at that every*
4   *quarter*.

5                              *      *      *

6           [Analyst:] And were these large medical claims – were they isolated to any
    one of your three technology platforms?

7
            [Porter:] They're primarily Passport, as we've indicated in the past.  SOI –
8   generally, only 25% of their work-site employees are covered with medical.  And
    with Ambrose, it's a smaller population that's on a guaranteed cost arrangement.  So
9   this is, really, the white-collar book.

10                             *      *      *

11          [Analyst:] And . . . how many claims would that have been?

12          [Porter:] ***It's really difficult to determine how many claims***.

13          118.    On March 4, 2015, J.P. Morgan issued a report titled "TriNet, 4Q Recap: Miss on

14  Medical Claims but 2015 Guidance Intact; Remain OW."  The report discussed the spike in medical

15  claims that caused the Company to miss its fourth quarter fiscal 2014 financial estimates but parroted

16  defendants' talking points and false and misleading statements:

17          ***TriNet reported disappointing 4Q results, as an unusual spike in large***
    ***medical claims drove a revenue/EPS miss of (9%)/(29%), masking strong***
18  ***underlying unit growth of 25%***. . . .

19  •       ***What happened?   4Q missed our estimate by $14M and fell below***
            ***guidance primarily due to an unforeseen jump in large medical claims*** . . . .
20
            119.    Following the March 3, 2015 disclosures, the stock price declined from a close of
21
    $37.88 per share on March 3, 2015, to a close of $33.93 per share on March 4, 2015, on high trading
22
    volume.  The price remained inflated, however, by defendants' false and misleading statements and
23
    omissions which continued to conceal the full truth about the financial condition of the Company.
24
            120.    <u>False and Misleading Statements</u>: On March 5, 2015, Goldfield and Porter
25
    participated in the Morgan Stanley Technology, Media and Telecom Conference to discuss the
26
    Company's financial results and prospects.  During the call, analysts sought an explanation of how
27
    the Company reconciled the risks in its insurance business particularly in light of the losses recently
28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                    - 50 -

1   reported.  Shockingly, defendants admitted that to the extent they previously requested claims data

2   from carriers, that was only data for claims over $300,000.  Defendants also stated that they had not

3   negotiated aggregate stop-loss limits, as previously claimed (¶¶79, 96), but instead sought lower

4   pricing from the insurance carriers in exchange for taking on "modest" deductible risk.  Defendants

5   nevertheless defended the Company's business model and claims forecasting procedures:

> [Analyst:] A few days ago, you reported a much larger loss, driven by some large one-time claims.  Can you talk us through how to get comfort with the risks that you are taking on the insurance line and your expectations for claims variability going forward?

<p style="text-align:center">*        *        *</p>

> [Porter:] So what we're doing is we're separating it out in our forecast so we can actually track each component, large versus run rate.  And then separately, *we're going to our carrier partners and historically, we've asked them for information on any what we call catastrophic claims.  That's historically been claims over $300,000 that could potentially be in their pipeline*.

> *So what we've asked them to do now is to tell us for any claim that they expect to be greater than $50,000, give that to us on a monthly basis so that we can track these through their pipeline*.

<p style="text-align:center">*        *        *</p>

[Analyst:] Are there other ways to cap your losses to specific carriers or regions other than the per-claim limits?

> [Porter:] The most practical way to do it is what's called a pooling limit, which is a per-claim limit.  And again, on our larger carriers, it's up to $1 million.  On others, it's below that.

> But it's really an economic decision.  We look at the pricing that we get from our carriers for these pooling limits and we can choose to bring those down.  But effectively what you do is you are just going to be paying that higher premium to the carriers.

> And for the – *I think the modest amount of deductible risk we take, I think it makes sense for us to have a limited or reasonable return on that*.  Just to quantify, in our insurance revenue, only about 20% historically has been in this deductible.  We call it performance fees.  So it's not a large amount, but it is a number.

> *We've also can [but did not] do aggregate stop-loss*, but again, when you look at that, the cost really isn't outweighing the benefit of doing it.

<p style="text-align:center">*        *        *</p>

[Porter:] *[W]e just did not have the visibility that we really should have to be able to track those large claims on a more granular and basically a monthly basis*.  So that's the real experience that we picked out of that.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                                                   - 51 -

121.   On March 6, 2015, Morgan Stanley issued a report titled "Key Takeaways from TMT Conference," which explained that, contrary to the Company's prior assertions that agreements with carriers would limit the Company's maximum aggregate exposure, TriNet apparently had not negotiated stop-loss limits on the insurance claims it was liable to third party carriers for:

> In considering the level of claims risk it takes, TNET believes it is appropriately balancing risk and costs, and has no intention to broadly lower its deductible limit with carriers.  To further limit the likelihood of a large claims miss, TNET notes that *in theory it could establish an "aggregate stop loss" with carriers, but believes the cost is not worth the benefit*.

122.   <u>False and Misleading Statements</u>: On March 30, 2015, defendants filed its FY14 Form 10-K with the SEC, which repeated the same false and misleading claims about risk management and limits to exposure and potential losses:[11]

- ***Risk management is a core competency of our company.***

- We leverage . . . our ***robust risk management capabilities*** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

- We assess all workers compensation and medical benefits risks on ***an individual client basis*** and annually adjust pricing to reflect their ***current risk*** based on HIPAA-compliant analytics.

- Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***.

- Following our initial pricing of these policies, we analyze claims data ***for each client on an ongoing basis*** and seek to adjust our prices as appropriate.

123.   <u>False and Misleading Statements</u>: The FY14 Form 10-K filed with the SEC on March 30, 2015, was signed and certified pursuant to Sarbanes-Oxley by Goldfield and Porter, whose certifications stated:

1.   I have reviewed this annual report on Form 10-K of TriNet Group, Inc.;

---

[11]   The March 30, 2015 Form 10-K was signed by Goldfield, Porter, August-deWilde, Babinec, Bingham, Goldman, Hodgson, Kispert and Lowell.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us* by others within those entities, particularly during the period in which this report is being prepared;

(b)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

(b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.[12],[13]

---

[12]   During the Class Period, Goldfield and Porter executed substantially identical false Sarbanes-Oxley certifications on May 8, 2015 (¶134), August 6, 2015 (¶149), and November 6, 2015 (¶154).

[13]   As a newly publicly traded company, TriNet was a non-accelerated filer for reporting purposes with the SEC during the first year following its initial public offering. Therefore, TriNet was exempt from the requirement, under section 404(a) of Sarbanes Oxley, to include a Management Report on the Effectiveness of Internal Controls Over Financial Reporting in its first Form 10-K for the year

124.    <u>Reasons Why Statements in ¶¶114-120 Were Knowingly False and Misleading</u>: Each of defendants' statements above including the statements that: (i) defendants looked carefully at the Company's disappointing claims experience from 4Q14 and earlier; (ii) based on a review of the 4Q14 experience, defendants had determined that those or similar claims would not impact 1Q15 or FY15 results; (iii) the Company's financial forecast; and (iv) claims of risk management as a core competency of the Company were each materially false and misleading as defendants knew, or recklessly disregarded and failed to disclose, the following facts:

(a)    Risk management was not among the Company's core competencies and it did not have sufficient policies, procedures, and personnel in place to support defendants' claims of risk management proficiency or that it was a "core competency" as stated in the IPO Registration Statement, the Secondary Offering Registration Statement, and the FY14 Form 10-K, and reiterated by securities analysts.  ¶¶79, 96, 122.  Nor did defendants have a basis to claim the Company had either stability or predictability with respect to the performance of the Company's insurance businesses.  In fact, defendants knew but failed to disclose (and later admitted) that the Company did not have adequate insurance executives or in-house actuarial staff to effectively analyze risk in connection with the Company's historical or current claims experience and exposure.  ¶¶135-136, 143-144, 150, 152, 155.  As the Company later admitted, the Company's "lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training" was a material weakness.  ¶165.

(b)    The Company did not have visibility into current or future financial performance because, in addition to the reasons set forth above in subsection (a), defendants knew the Company had not done the necessary or required due diligence on key acquisitions to support claims that its revenue and earnings were predictable and without significant risk (particularly the

---

ending December 31, 2014.  TriNet was also exempt from having that report attested to by its registered public accountant under section 404(b).  TriNet was also allowed to exclude introductory language from paragraph 4 and all of paragraph 4(b) from the certification signed by Goldfield and Porter, respectively, as required under section 302.  All of these exemptions are inapplicable beginning with TriNet's second Form 10-K for the year ending December 31, 2015.

Notwithstanding these exemptions, the statements contained in each signed certification alleged herein were materially false and misleading.

1    2012 SOI acquisition of 66,000 workers' compensation plans).  After the Class Period, and after

2    investors had suffered hundreds of millions in losses due to the alleged misrepresentations,

3    defendants admitted that the Company had not performed its typical due diligence for such an

4    acquisition, such as not reviewing the book of acquired insurance plans, and that failure contributed

5    to poor financial performance.  ¶¶126-128, 135, 139, 151.  Had they done so, or disclosed that they

6    had not done so, the Company and/or investors would have known that SOI's reserve practices were

7    "not industry best practice[s]," and the defendants' statements concerning risk associated with its

8    insurance business were false and could not be relied upon.  See ¶151.

9              (c)      The Company did not have the stability or current visibility into the business

10   performance of its insurance plans because contrary to defendants' statements that it analyzed claims

11   data from each of its clients, defendants knew but failed to disclose that the data, to the extent it

12   received such data at all, was limited to "catastrophic" claims (i.e., claims over $300,000).  In fact,

13   defendants knew that the Company had not even sought detailed information on all claims below

14   that threshold.  See ¶¶98(c),120.  However, the limited data that was provided was not timely and

15   thus did not to support defendants' claims that their analysis allowed them to accurately predict the

16   Company's financial performance.  In addition, the data the Company received from insurance

17   carriers was subject to significant lag due to reporting from the service provider to the carrier and

18   again from the carrier to TriNet.  See ¶¶115, 117, 135, 144.  In fact, as the Company's financial

19   performance began to consistently fall below promised expectations due to the purportedly

20   unexpected increase in claims impacting the financials, defendants admitted that TriNet simply did

21   not have the visibility from the carriers necessary to provide the predictability they had so boldly

22   assured.  See ¶¶115, 117, 128, 135, 144, 151.  Thus, as opposed to the predictability and good

23   visibility defendants bragged about, they would later admit that in truth, there was "*inherent*

24   *volatility*" in large medical claims that they could not predict or foresee as claimed.  ¶135.

25             (d)      Defendants knew that 60%-62% of TriNet's insurance plans were not fully

26   insured for TriNet, which increased rather than limited TriNet's liability.  See ¶98(e)-(g).

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                           - 55 -

(e)     Defendants knew but failed to disclose that TriNet did not have aggregate stop-loss limits at all, or did not have such limits that would sufficiently cap the Company's exposure to large spikes in claims.  *See* ¶¶126-127, 158, 191-192, 196.

(f)     The Company's internal controls suffered from wide spread material weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and collectively impaired the Company's ability to ensure accuracy and control over financial reporting. In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs, workers' compensation and liabilities.  *See, e.g.*, ¶164-165.

- Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were  not operating effectively.

- [C]ontrols over the review of health premium expenses did not operate at a level of precision that would detect material errors.

- [L]ack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training . . . .

(g)     Because of the known or deliberately disregarded facts set forth above, the Company's earnings forecasts and its reiteration of them, did not have a reasonable basis.

<u>Defendants Report Disappointing 1Q15 Revenue and Reduced FY15 Guidance Caused by Need to Accrue $10 Million Extra in Workers' Compensation Costs; Falsely Assure Investors that Problems Not Related to Previous Quarter's Problems and that Problems from Both 4Q14 and 1Q15 Had Already Been Addressed and Would Not Recur</u>

125.    On May 5, 2015, TriNet issued a press release announcing TriNet's 1Q15 financial results.  The Company again reported disappointing earnings; though quarterly results were generally in line with the Company's conservative guidance, defendants were forced to reduce FY15 guidance.  This time the Company reported that it would in fact have to accrue for an extra $10 million in workers' compensation costs in 2015, despite having previously assured investors that its insurance plans were stable, fully insured and – unlike in Barrett's case – had been properly accounted for.  ¶¶102, 105.  The press release stated as follows:

**TriNet Announces First Quarter Fiscal 2015 Results**

\*     \*     \*

First quarter highlights include:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

- Total revenues increased 23% to $625.6 million and Net Service Revenues increased 11% to $142.4 million . . . .

  \*       \*       \*

- Net income was $15.8 million, or $0.22 per diluted share, compared to net income of $1.5 million, or $0.03 per diluted share . . . .

- Adjusted Net Income was $25.4 million, or $0.35 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.6 million, or $0.24 per diluted share . . . .

  \*       \*       \*

. . . TriNet's total revenues for the first quarter of 2015 increased 23% from the first quarter of 2014 to $625.6 million, while Net Service Revenues increased 11% from the first quarter of 2014 to $142.4 million. Net Service Revenues consisted of professional service revenues of $97.0 million and Net Insurance Service Revenues of $45.4 million. Net Insurance Service Revenues consisted of insurance service revenues of $528.6 million, less insurance costs of $483.2 million. Professional service revenues for the first quarter of 2015 increased 17%, and Net Insurance Service Revenues were relatively flat, compared to the first quarter of 2014.

126. <u>False and Misleading Statements</u>: On May 5, 2015, the Company held a conference call for analysts and investors. During the conference call, defendants revealed that the workers' compensation costs and trends previously claimed to have been stable and predictable had in fact not been properly forecasted for a number of preceding years, negatively affecting the Company's financial results and, more importantly, would continue above forecasts ***through the third and fourth quarters of 2015***. Accordingly, the Company was reducing its annual outlook by $10 million:

> [Porter]: ***Net insurance service revenues were affected by higher than expected workers compensation costs in our blue- and gray-collar book for older years***.
>
> \*       \*       \*
>
> ***[W]e expect Q2 net service revenues in the range of $135 million to $140 million, which represents growth of 10%. . . . Based on the impact of the higher worker's comp costs, we are reducing our annual outlook by $10 million. And we now expect net services revenues in the range of $580 million to $590 million for 2015, which represent organic growth of 14% to 16%***.

127. <u>False and Misleading Statements</u>: During the question and answer session, Goldfield and Porter admitted that new facts were not the cause of the additional accrual in workers' compensation, but instead it was the result of recently commissioned actuarial review of the SOI

book of business (which defendants previously indicated had been done regularly and that its

workers' compensation book was among its most stable), which was acquired in 2012. That review

revealed that the Company was under-accrued, affecting earnings for the next two quarters:

> [Porter:] So to your question on workers comp, we have seen growth in our blue and gray book, particularly in higher cost states. ***So one of the things that we instituted for Q1 was just a more detailed analysis as part of our actuarial review that we received in April.***
>
> ***The result of that was that we had an increase in our blue and gray book of approximately $4 million. That was higher than our Q1 forecast.***
>
> ***Looking at that going forward, we would expect that that will spill over into Q2 and Q3 and Q4. And so we have increased our claims forecast for worker's comp for the next three quarters by approximately $6 million to cover the higher cost of those claims.***

128. Defendants further admitted that its forecasting process was ***not*** as robust as

previously represented and its risk management processes and historical accrual methodologies did

not provide stability and visibility defendants promised. Instead, more analysis had been necessary:

> [Goldfield:] But I think that we need to continue to get better at the forecasting.
>
>           \*      \*      \*
>
> ***I'm expecting that we're going to do a better job of forecasting***. . . .
>
> . . . ***I think what it really means is a tighter look at the older years and making sure that we're ticked and tied as they come through the system.***

129. Defendants conceded that they had not done a sufficient analysis of their blue and

gray collar book (*i.e.*, SOI) including failing to perform a state-by-state analysis, but assured

investors that it had the proper analysis in place going forward:

> [Analyst:] And then just one more thing on the workers comp. You talked about older claims. Does that imply that the issue that arose was in businesses that you would acquire that perhaps the accrual and the methods for the accrual were different than perhaps what you are using today?
>
> Is that reading too much into it?
>
> [Goldfield:] No. I think your intuition is correct. It is the blue and gray collar book, which we have not had for obviously as many years as we have had the Passport book.
>
> So the more experience we have, the more we see the reports, the better we understand what's happening. ***And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that we needed to do a little bit more analysis than we had previously seen.*** So it is

something *I think we have got the right analysis now*, which we've tried to incorporate into our forecast for 2015.

130. On May 5, 2015, William Blair issued a report titled "*Company's Credibility Is Dented*, but Sticking With Story as a Result of Long-Term Growth Potential," that explained although some investors were skeptical of defendants' explanations and ability to manage risk, the fundamentals of the Company, combined with defendants' new efforts to mitigate risk, were still sufficiently strong to maintain the analyst's outperform rating:

> Instead of higher-than-expected health care claims (which was the issue last quarter), management said that it is increasing its workers' compensation claim accruals by $10 million ($0.08 per share) in 2015, including about $4 million of extra accruals in the first quarter (partly to reflect an adjustment to prior-year periods). These higher accruals were deemed appropriate after a more detailed state-by-state analysis showed higher-than-expected claims trends in certain areas (New York and California) of the company's blue-collar-focused SOI product. *Given this issue, management lowered its annual revenue and EPS projections*.

131. In fact, as described further by the William Blair report, TriNet's findings would require the same type of "*catch up charges*" for prior years that Barrett was required to make which defendants virtually assured investors that TriNet was immune to (¶¶102, 105):

> Management said that the company did a more detailed actuarial review in April for its workers' compensation *plans and slightly changed the accrual methodology, which led to some catch-up charges for prior years* which will be realized *throughout 2015*.

132. On May 6, 2015, Deutsche Bank, issued a report titled "Workers' comp & slower WSE growth will pressure shares; remains Buy," that explained the poor 1Q15 results and questioned whether defendants needed to change their pricing, and lamented defendants' failure to disclose more information explaining what caused the revenue impairment:

> **Workers' comp an issue, but it doesn't derail the story completely**
>
> It is hard to measure how significant the $10m worker's comp reserve write up is as we do not know how many employee's it is based on or the total current reserve. *TriNet is partially blaming the SOI acquisition plus more detailed analysis of WSE growth, which is largely in higher worker's comp states like NYC and CA. Revenue per WSE for both service fees and net insurance fees has been trending down for the last two years*. We hope that this second issue on the insurance side pushes mgmt to raise pricing more aggressively.
>
> *      *      *
>
> **Key takeaways, new information from the results**

**Insurance costs were higher than expected for second straight quarter**

> Insurance costs came in $4m higher than expected in 1Q after coming $10-14m higher in 4Q. . . . [W]orkers compensation costs were up due to a reserve write up and new analysis of growth coming from high cost states.

133.    After the May 5, 2015 disclosure of the truth of the Company's 1Q15 financial results, TriNet's stock price declined sharply, from a close of $34.43 per share on May 5, 2015, to a close of $28.76 per share on May 6, 2015, on high trading volume, but remained artificially inflated by defendants' continued false and misleading statements.

134.    <u>False and Misleading Statements</u>: On May 8, 2015, the Company filed its 1Q15 Form 10-Q with the SEC, repeating the false financial results reported in the May 5, 2015 press release and conference call.  The Form 10-Q included the false Sarbanes-Oxley certifications of, and was signed by, Goldfield and Porter.

135.    <u>False and Misleading Statements</u>: On May 18, 2015, defendants participated in the JPMorgan Global Technology, Media and Telecom Conference.  During the call, defendants admitted that the Company did not, in fact, have visibility and risk management capability into large claims which had "inherent volatility" and had not been collecting the data necessary to support its confidently stated visibility into forecasted results despite prior reassurance to the contrary.  Defendants nevertheless continued to falsely assure investors that the problems TriNet experienced in 1Q15 were unrelated to those in 4Q14, and had been resolved (or did not require resolution because there was no need to change TriNet's underwriting standards, which were fine, and the problems originated only in acquired businesses):

> [Porter:] In Q1, we had $4 million of higher workers comp costs than we were forecasting.  And the genesis of it, it came out of our blue and gray color book.  We did see some increased development as we were closing out the fourth quarter, and it looked like it was coming from some of the *higher cost states that we were doing business and expecting to grow*.  *So what we did is we took our actuarial, outside actuarial view down to do a state-by-state analysis*. . . .
>
> . . . *[W]e need to do a better job of getting headlights from our own perspective* on looking at how those claims are developing and building that into our outlook. . . .  *We are building some increased capability internally* to do that.

<div align="center">*      *      *</div>

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

*So separate in Q4 [i.e. from 1Q15], what we did see was that there is inherent volatility in large medical claims*. . . . So what we did is we took our forecast, we broke it down from just claims and premiums to run rate claims, large claims . . . .

. . . There's *inherent lags* when you have large complex claims at a carrier, and what we saw was *we did not have enough visibility into those claims as they were developing*. And it could take up to six months for a claim to be incurred before it's paid. So we went out to all of our carriers and asked them to provide us with large claims pipelines greater than $50,000. So *now* every month, they are giving us a report that tells us for claims that are not yet paid, that are above $50,000, how many of them are there and what's their estimated type of diagnostic there is. *So we are getting that now* from all of our large carriers.

136.   One analyst asked defendants directly about the Company's risk methodology because he had seen prior instances where other companies used low pricing to induce growth compromising good risk management:

[Analyst:] So Burton, I guess maybe just around it out, big picture question around sort of your philosophy on risk. It sounds like a lot of this is more methodology, more sort of business process as opposed to, say, a pricing issue. Because I know we've seen in the past pricing being used as a tool to drive growth. It doesn't sound like it's the case here but maybe if you can just broadly talk about philosophy around risk, we can then move on to some of the funner stuff.

[Goldfield:] So *we need to accurately forecast our business*, both in terms of the risk side of the business and in terms of the service fee side of the business. So I believe that *there's methodology aspects to this*, there's other aspects to it, but the bottom line is we need to do better in the future. So my feeling is *we have the systems. We're evolving the processes. We are adding in-house actuarial support*. And ultimately this is not what drives the business and *it is not a pricing issue*. And the workers comp issue had to do with a book that we acquired in the past. In fact, the claims were all – *none of those claims were underwritten by us. We've still got to forecast them*, but that's not part of our pricing methodology or ongoing business methodology.

137.   In light of defendants' statements and 1Q15 earnings coming in more or less in line (Net insurance revenue of $142.4 million on guidance of $142-$147 million), J.P. Morgan, in a May 18, 2015 report that provided takeaways from these analyst conferences, concluded that the prior 4Q14 miss was due in part to increasing FY14 guidance throughout 2014 without having visibility, but that defendants had already improved their forecasting:

- **Methodology tweaked for medical claims**. F4Q saw a miss on higher-than-expected medical claims, partially due to increased guidance given lighter medical claims throughout the beginning of FY14. Because of this, TNET broke out its medical claim forecasting methodology into large claims, run rate claims and pharmacy claims, *which has improved its forecasting (1Q in line)*. The company also is working to get better data visibility from its medical insurance carriers, establishing a large claims (>$50k) pipeline that gives insight into upcoming costs.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                                   - 61 -

138. Following the May 18, 2015 JPMorgan Global Technology Conference, the Company's stock price continued to trade at artificially inflated levels above $25.00.

139. <u>False and Misleading Statements</u>: On June 10, 2015, Goldfield and Porter participated in the William Blair Annual Growth Stock Conference where they discussed the Company's financial results and prospects, and reassured investors that defendants had taken adequate steps and were already receiving sufficient information from carriers to manage TriNet's claims risk:

> [Porter:] So over the past three years 85% of our revenue comes from our installed base as we enter a year. ***So it's a fairly predictable revenue stream***.
>
> ***We have an experienced risk management team and we manage the insurance element of our business***.
>
> <div align="center">*        *        *</div>
>
> ***We also do have some variability on this part of the business as I mentioned because there is a deductible element to it. We see that particularly on the medical side in large medical claims***. That is where there is some element of variability.
>
> And also as we saw in Q1 we did have some variability because we had to realign our Workers' Comp. book from an acquisition that we did back in October 2012 for SOI and the blue and gray collar. And that's because some of the severity of claims that we acquired in 2012 were running a bit higher than we had been forecasting and the actuaries had estimated. So we trued that up in the first quarter and then estimated what that would be for the rest of 2015.
>
> ***When we look at our risk management the thing that we do I think fairly well is our whole philosophy is to price to risk and to manage that and annually reprice it based on our clients' experience both on the medical side and on the Workers' Comp. side. On the medical side we use state-of-the-art analytics***. It's through a service that's called Truven.

140. On June 12, 2015, William Blair issued a report titled "Highlights From William Blair's 35th Annual Growth Stock Conference," which explained that "[t]he issues over the last two quarters highlight the risk inherent in the business and put a dent in management's credibility with the Street." William Blair nevertheless maintained an outperform rating for the Company, based in part on management's stated confidence from recent claim trends and additional investments in "claims management/prediction capabilities."

141. <u>Reasons Why Statements in ¶¶125-139 Were Knowingly False and Misleading</u>: Defendants' statements above, including those concerning: (i) the purported forecasting improvements the Company had made, reaffirming not only fiscal year guidance but the ability to

grow revenue at 15% and maintain 33%-34% EBITDA in the long run; (ii) claims that 1Q15 workers' compensation insurance problems were unrelated to the medical benefits insurance problems of 4Q14; and (iii) statements that "we have an experienced risk management team and we manage the insurance element of our business" with access to "state-of-the-art analytics" were each materially false and misleading when made as defendants knew, or recklessly disregarded and failed to disclose, the following facts (which are discussed in greater detail at ¶¶98, 112, 124):

(a)     The adverse medical claims experience reported in 4Q14 and the adverse workers' compensation claims experience reported in 1Q15 both stemmed from the same deficiencies in risk management and timely data acquisition, which defendants – despite their statements to the contrary – still had not remedied.

(b)     The Company had been prioritizing growth at the expense of profitability and stability, including pursuing growth opportunities in high-risk markets like California and New York in an attempt to capitalize on what defendants claimed to be a historic market opportunity.

(c)     Defendants had neither the limited exposure nor the purported stability of fully insured plans, as represented.  The Company did not have sufficient risk management policies, procedures and personnel in place to manage risk effectively and failed to perform sufficient due diligence and risk assessment on prior acquisitions (in particular the SOI book of business acquired in 2012).

(d)     The Company's forecasting process failed to properly incorporate relevant historical and current claims trends due to the Company's failure to obtain timely data or analyze its risk exposure and thus the Company's financial forecast lacked a reasonable basis.

(e)     The Company's internal controls suffered from wide spread material weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and collectively impaired the Company's ability to ensure accuracy and control over financial reporting. In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs, workers' compensation and liabilities.  *See* ¶¶164-165.

- Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were  not operating effectively.

- [C]ontrols over the review of health premium expenses did not operate at a level of precision that would detect material errors.

- [L]ack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training . . . .

TriNet Announces Third Consecutive Revenue and Earnings Miss, Reveals Systemic and Continuing Inability to Forecast, Stock Plummets

142.   On August 3, 2015, the Company issued a press release announcing its 2Q15 financial results, which missed both revenue and EPS estimates by a wide margin due to another increase in large medical claims, demonstrating once and for all that Company did not have stability, predictability or visibility but in fact had a systemic problem in its inability to manage risk and forecast claim costs.   In particular, net Insurance Service revenues for the quarter were down $20 million compared to forecast, or 43% year-over-year:

**TriNet Announces Second Quarter Fiscal 2015 Results**

\*      \*      \*

- Total revenues increased 22% to $640.0 million, while Net Service Revenues decreased 2% to $122.0 million . . . due primarily to unexpected large medical claims.

\*      \*      \*

- Net loss was $1.3 million, or $0.02 per diluted share, compared to net income of $6.2 million, or $0.09 per diluted share, in the same period last year.

- Adjusted Net Income was $10.5 million, or $0.14 per diluted share on a pro forma basis, compared to Adjusted Net Income of $17.4 million, or $0.24 per diluted share on a pro forma basis, in the same period last year.

- Adjusted EBITDA was $24.7 million, a 37% decrease from the same period last year.

\*      \*      \*

Mr. Goldfield added, "While our growth momentum remains robust, our results were ***impacted this quarter by a higher than expected number of large medical claims*** . . . ."

. . . TriNet's total revenues for the second quarter of 2015 increased 22% from the second quarter of 2014 to $640.0 million, while Net Service Revenues decreased 2% from the second quarter of 2014 to $122.0 million.   Net Service Revenues consisted of professional service revenues of $97.8 million and Net Insurance Service Revenues of $24.2 million.   Net Insurance Service Revenues consisted of insurance service revenues of $542.2 million, less insurance costs of $518.0 million.   Professional service revenues for the second quarter of 2015

1   increased 19%, and *Net Insurance Service Revenues decreased 43%, compared to the second quarter of 2014*.

2   143.    On August 3, 2015, the Company held a conference call with analysts and investors

3   to discuss the disappointing results as well as the net revenue guidance cut of $25 million, which, for

4   FY15, eliminated the entire healthcare performance fee (from which TriNet typically generates 20%

5   of net insurance revenue).  The Company also conceded that it did not have appropriate internal risk

6   management staff or expertise to effectively manage the Company's risk profile as it would hire

7   actuaries and senior insurance executives to help.  These were not one-time costs.  The Company

8   admitted they expected a higher claims level going forward:

9       [Goldfield]: I am disappointed that our second-quarter financial performance was
10      negatively impacted by a higher than usual number of large medical claims.  These
        claims were well in excess of our expected and historical claims volatility. . . .
11
12          . . . [T]he large claims have been driven by clients joining prior to 2013.

13                              *       *       *

14      *I will strengthen my internal team.  This includes the recruitment of a senior
        insurance services executive reporting directly to me, as well as additional
15      actuarial and analytical capabilities*.

16                              *       *       *

17      [Porter:] *Net insurance service revenues declined 43% to $24.2 million . . . .
        Net insurance service revenues were affected by a significantly higher number of
18      large medical claims than we had anticipated*.

19          . . . The result in Q2 was an approximate $20 million reduction in our net
        insurance service revenues compared to our forecast.

20          *Our revised 2015 forecast assumes the higher claims level continues and is
        included in our trend*. . . .   The result is, in addition to the Q2 impact, we are
21      reducing our net insurance service revenues by an additional $10 million for the
        remainder of the year compared to our prior guidance.

22  144.    In addition, analysts challenged defendants' prior statements concerning improved

23  visibility into medical claims noting that guidance issued in 1Q15 whiffed on building these risks

24  into the forecast.  Defendants gave explanations starkly at odds with each other: They said their

25  "system is working," only to say "I need to get the predictability into the system" and that "any and

26  all [changes] are on the table"; They said that they were "getting the reports from the carriers in a

27  timely fashion " and that "[t]he reports are working," only to explain that "our carriers . . . need to

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                          - 65 -

1   give us a visibility" and that "we need clean data from the carriers"; and They alternately blamed

2   "large claims" and "a lot of medium size claims":

3       [Analyst:] [Y]ou mentioned that you had improved the visibility of the medical
        claims, but clearly the guidance you gave last quarter didn't contemplate these
4       medical claims coming in.  So could you just please clarify what aspect of the
        visibility you've now gotten more comfort with and what's left to do?

5
            . . . [Goldfield:] So the increase in medical expenses was largely driven by
6       higher than expected and large claims.  So that our system is working, which is
        getting the reports from the carriers in a reasonable timely fashion.

7
            . . . So, my issue was a bunching of large claims in Q2.  They were not old
8       claims that were flushed through the system. The reports are working.

9                                   *       *       *

10      **[W]e need to find ways to a, get better visibility and b, to dampen the spike because
        it's not acceptable, the variability I saw in Q2.**

11
        [Analyst:] Understood.  But at this point, would you consider reevaluating
12      reinsurance options, for example, that give you – **maybe where you give up some net
        revenue but dramatically improve the predictability of the revenue model going
13      forward**?

14      [Goldfield:] **So, absolutely, any and all things are on the table. . . .  I'm
        going to strengthen the internal team with a senior insurance executive who is
15      right by my side.  I'm going to increase the in-house actuarial and analytical
        capabilities**. . . .  [U]p till now, reducing the pooling did not seem like a viable option
16      from a cost standpoint.  And frankly, our pooling levels vary, but they go up to about
        $1 million for some carriers.

17
                                    *       *       *
18
        **I need to get the predictability in the system**.
19
                                    *       *       *
20
        We worked with our carriers directly with the Senior Executives . . . .  **They need to
21      give us a visibility**.

22          . . . [The claims] were mostly from Passport, many from California, a lot of
        people on high-end medical plans.
23
            . . . And I'm still digging claim by claim to understand. . . .  It was a lot of
24      medium size claims.

25                                  *       *       *

26      The clients that drove these large claims in Q2 were here prior to 2013.  And again,
        they were out of the passport book of business, which has been around for 25 years
27      in the technology vertical and the majority were in California. . . .

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                              - 66 -

To turn to your question, what do I do about this? I need to directly address this medical claims volatility, number one. And I need to address the visibility to those medical claims. So number one is, *we need clean data from the carriers*. . . . Number two is, we rely on outside actuaries and consultants. I need to bring in some expertise in-house that I can really get aligned with on the overall service model and how it works within TriNet. *So that includes a senior executive reporting to me additional actuarial and analytical capabilities*.

145.    On August 3, 2015, William Blair downgraded TriNet in a report that concluded that the issues the Company had experienced in 4Q14, 1Q15, and now 2Q15 were related and significant. The report titled, "Strike Three on Insurance Claims; Market Probably Ascribing Minimal Value to Insurance Side of Business; Lowering Rating to Market Perform," explained that the "higher-than-expected number of large medical claims in the second quarter negatively impacted net insurance revenue growth by over 50 percentage points," and called into question the viability of the Company's business model and defendants' ability to properly manage risk:

> *We suspect that there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business* . . . .
>
> . . . *We think that the third straight quarter with issues related to insurance claims costs will cause many investors to effectively put minimal or no value on the company's ability to generate profits from the risk-bearing portion of their insurance plans* . . . .
>
> *             *         *
>
> Similar to the healthcare claims issues in the fourth quarter, management said that most of the issues pertained to the midlevel Passport product. We think the increase in claims costs was *particularly significant in the month of June and in the state of California*. Management said that the increase in claims late in the quarter was much bigger than they have seen in their history, so they are assuming the increased claims in the second quarter drive a *permanent increase in the annual claims trends for the company (negatively impacted guidance for the second half of the year by about $10 million*, on top of the negative impact to the second quarter). Given this assumption, the company is now projecting a medical loss ratio (MLR) of about 85% in 2015, up from its normal target of about 82%, *which essentially puts the healthcare insurance business on pace for a break-even net revenue year (i.e., revenue offsets the costs)*.

146.    William Blair also explained that, although management claimed that a carrier of theirs had experienced a similar spike in claims, TriNet's competitors had not experienced similar issues, reporting that TriNet's negative net revenue growth (down 2% year-over-year, 11% from 1Q15, 4% from 4Q14, and 19%-22% from the prior three quarters) "rate compares with 9% growth

at Insperity, 16% growth in ADP's PEO segment, and 13% growth at Barrett Business Services' PEO segment."

147. On August 4, 2015, J.P. Morgan issued a report explaining the analyst's surprise that after reducing fiscal year and quarterly guidance during the last earnings call, defendants had nevertheless failed to clear that low bar. The report concluded that defendants' credibility had been tarnished and that TriNet's stock price was likely to stay depressed as a result:

> TriNet missed 2Q expectations by a wide margin due to higher than expected medical claims, ***the third claims-related miss in a row***, and ***very disappointing as we thought guidance was set conservatively***. TNET fell short of the low-end of its EBITDA target by $12M (or 33%) and net service revenue by the same dollar amount or 10% primarily due to an unforeseen spike in frequency of large medical claims. On a brighter note, WSE/unit growth was up 17% (JPMe 14%) and sales rep count reached 486 to exceed its 470 target. EBITDA guidance was cut 15% for the year at the mid-point, and ***we expect the stock to be down more than that given management credibility concerns***.

148. Following the Company's disclosure of its 2Q15 financial results, the Company's stock price declined a whopping 38%, from a close of $26.69 per share on August 3, 2015, to a close of $16.33 per share on August 4, 2015, on high trading volume of more than 12 million shares.

149. <u>False and Misleading Statements</u>: On August 6, 2015, the Company filed its 2Q15 Form 10-Q with the SEC, repeating the financial results reported in the August 3, 2014 press release and conference call. The Form 10-Q included the false Sarbanes-Oxley certifications of, and was signed by, Goldfield and Porter. The statements in the Form 10-Q were materially false and misleading for all the reasons set forth in ¶124(g).

150. On August 14, 2015, William Blair issued a report titled "Conclusions From Meetings With Management" that explained the Company's plans to improve its risk management and forecasting, including hiring for the first time internal actuaries and dedicated positions for health benefits and workers' compensation, were as yet unrealized:

> As it noted on its second-quarter conference call, the company is hiring an internal insurance executive who will report directly to the CEO, ***which is not a position that it has previously had***. TriNet previously had one person who was in charge of both workers' compensation and healthcare insurance (this person previously reported to the CFO), but the company is dividing that responsibility among two people now, both of whom will report to the new head of insurance. The company also is adding internal actuaries (***which it did not have in the past***) for both sides of the insurance business.

1    151.    On September 16, 2015, Goldfield and Porter participated in the Deutsche Bank

2    Technology Conference to discuss the aftermath of the Company's disastrous 4Q14, 1Q15 and 2Q15

3    as well as the yet unfinished efforts to create internal risk management capabilities and gain visibility

4    into the Company's business.   During the call, defendants admitted that they did not have the

5    forecasting tools or data necessary to underwrite their health insurance business, and that the

6    Company had deliberately sacrificed profitability to market share growth by taking higher risk

7    accounts, especially in New York and California, without increasing reserves or raising prices, in

8    order to grow the business:

9          [Goldfield:] So our inability to forecast Q2 is absolutely unacceptable, I agree
with that . . . .

10                      *      *      *

11          [Porter:] So if we're referring to the situation that we saw in the first quarter,
what we did see with it, we had acquired a book in the blue and gray market, **and as**

12    **part of our diligence, we didn't go down probably one layer more than we
traditionally have been**.  We always bring in new actuarial work in sizing potential

13    variability around any comp book that we acquire.

14          **In this situation, what we've learned is we probably actually should've gone
back to the TPA and tested at a claims level what type of reserves were being put**

15    **on at the TPA**.

16                      *      *      *

17          It was the open claims.  This is, again, it's an acquired book.  So this was a
book that we had acquired back in October 2012 and their practice was that **they did**

18    **not reserve is what we would determine to be industry best practice**, and so even
though we did sensitivity around all the loss triangles, **what we should have done is**

19    **gone one layer back and found out that the loss triangles probably were skewed
based on the reserving practices**.

20          Now those claims actually developed at a higher rate over time than what we
had expected them to be, and that's why we made the adjustment in the first quarter

21    because what we did is we had our outside actuaries go back and do a state-level
analysis because we can get a more accurate read on which claims were developing

22    at a higher rate, and it ended up being **those states that generally you would expect
to have higher costs, which would be California and New York.  But those also are**

23    **the opportunity states where we see a lot of business**.

24                      *      *      *

25

26          [Goldfield:] **I don't want to sacrifice the growth opportunity right now.  I
think that's what this is about**.

27                      *      *      *

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

I want to do that without sacrificing the growth rate. ***So I would sacrifice a few hundred basis points of profitability to maintain control over the plans because I think pricing is one aspect***.

\*       \*       \*

***A lot of folks are saying, well, slow your growth and take care of these issues. I believe that the market opportunity won't exist forever***. I've never seen one like this and I want to see if I can prove out that this is as wide open as I believe it is. So that is sort of the product.

152.     On November 2, 2015, Goldfield and Porter participated in a conference call with analysts and investors to discuss the Company's 3Q15 financial results. Goldfield was clearly relieved that 3Q15 financial results had come in more or less in line with substantially reduced guidance. During the call, defendants again admitted that TriNet did not have fully insured plans, had not yet enacted the changes necessary to improve their forecasting, did not have internal actuaries during the Class Period and were still bringing in new talent, did not have and had not had aggregate pooling limits and were unprepared to say whether they could correct the Company's business model so as to be profitable. Defendants also ignored a direct question about whether Blue Shield and other carriers had experienced similar spikes in claims:

[Goldfield:] ***We are bringing in new talent. I have met with excellent candidates as part of the search*** for the Senior VP of Insurance Services. Additionally, ***our team is in the advanced stages of selecting from a number of strong candidates for our Chief Medical Actuary position***.

\*       \*       \*

***We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business***.

The second area is new insurance constructs. Either on one end of the spectrum would be more fully insured plans, ***today 40% of our plans are fully insured, 60% of our plans are high deductible plans. And whether we should move more towards the fully insured side of the plans***.

The opposite end of that spectrum is reinsurance. Which would be a combination of either reducing pooling limits, today the pooling limits are somewhere between $350,000 and $1 million by carrier. Reducing those pooling limits and ***or putting an aggregate pooling limit in place [i.e. stop loss protection]***, meaning a total limit on the entire claims activity in any one quarter to dampen that volatility.

\*       \*       \*

[Analyst:] I know you have a process of reevaluating the strategy. However, if you're breaking even on that business this year, and you're contemplating changes

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

for next year, *is there any reason for us to think that even if you do pass through some of that lift, that effort or that initiative, would be at least margin breakeven* if not accretive if properly executed?

[Porter:] *I think we'll wait to really give our outlook for Q4 once we've finished the work. . . . And we'll have a lot more to talk about once we have the construct and the team further in place in Q4.*

\*        \*        \*

[Analyst:] Based on your past experience, typically, does the step up in worker's comp expense in year one typically translate into another step up in worker's comp expense [in] year two given how actuarial accruals are calculated based on past claims experience?

[Porter:] That something that as we work with our actuaries and *now that we actually have our own actuary in house*, we will continue to look at.

153.    Following the after hours disclosures on November 2, 2015, TriNet's stock price declined from a close of $19.29 per share on November 2, 2015, to a close of $18.10 per share on November 3, 2015, on high trading volume.

154.    <u>False and Misleading Statements</u>: On November 6, 2015, the Company filed its 3Q15 Form 10-Q with the SEC, repeating the financial results reported in the November 2, 2015 press release and conference call.  The Form 10-Q included the false Sarbanes-Oxley certifications of, and was signed by, Goldfield and Porter.  The statements in the Form 10-Q were materially false and misleading for all the reasons set forth in ¶124(g).

155.    As of November 10, 2015, defendants were still describing the need to create an internal risk management and forecasting team.  Speaking at the JPMorgan Ultimate Services Investor Conference, defendants explained that only now was it time to bring that capacity in-house, then explained that internal actuaries are critical even under a fully insured model, explaining that whatever the construct of the insurance plans they were offering, defendants needed actuaries and other risk management experts to have enough visibility to manage the Company's liability:

[Goldfield:] [W]e're hiring in-house actuarial talent.  We rely on great external talent, but *it's time to bring those models in-house and have more visibility and focus around them*.

As I previously reported, we have a Chief Actuary on the workers' comp side and we're closing on a Chief Actuary on the medical side.  And then, additionally, looking at different processes and services around how we are forecasting the medical and addressing the issues around the volatility associated with it.  And then, finally, we're completing a study with a large outside consulting firm.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

1                              *        *        *

2    [Analyst:] [M]aybe it would be helpful if you can just go through the spectrum of
     potential changes that you might make to call it out or hedge out the risk around
3    claims volatility.  What could that look like and what would the impact be on the
     P&L?

4
     [Porter:] So if we start at what guaranteed costs looks like and guaranteed
5    costs or *some people would call it fully insured*.  So that's effectively a pass through.
     So if we and we are going through and exploring that possibility with the carriers, in
6    that situation effectively there is no performance fee, it's complete pass through and
     that would have a P&L impact on EBITDA margin of around 30%, because
7    performance fees would go away.

8                              *        *        *

9    [Goldfield:] [O]n a fully-insured plan . . . you would still want to get a really great
     set of tools and actuaries to understand the performance of the book . . . you would
10   take the volatility out of it, but you would still want that data.

11       156.     Then on February 29, 2016, the Company issued a press release announcing the

12   Company's financial results for 4Q15 and FY15, and declaring the Company's auditors, Ernst &

13   Young would not attest to TriNet's Annual Report on Form 10-K, and that the Company was

14   unprepared to file its Form 10-K and had sought an extension from the SEC due to the identification

15   of material weaknesses in its internal controls over financial reporting relating to "IT" controls and

16   controls in "key business processes":

17       TriNet also announced that they will file a Form 12b-25 with the SEC today
         providing for a *fifteen (15) calendar day* extension for its Annual Report on Form
18       10-K for the fiscal year ended December 31, 2015.  With this being TriNet's first
         assessment of internal controls over financial reporting pursuant to the Sarbanes-
19       Oxley Act of 2002, and given the multiple technology platforms that require
         evaluation and testing, TriNet requires additional time to complete its assessment of
20       its internal control over financial reporting.

21       In preparing the Company's financial statements as of and for the year ended
         December 31, 2015, *the Company identified material weaknesses in its internal*
22       *control over financial reporting relating to ineffective information technology*
         *general controls and ineffective controls in key business processes*.  While these
23       material weaknesses create a reasonable possibility that an error in financial
         reporting may go undetected, after extensive review and analysis, no material
24       adjustments, restatement or other revisions to previously issued financial statements
         are expected to be required.

25
         TriNet is working diligently to finalize the assessment of internal control over
26       financial reporting and *obtain the related attestation from its auditors*.  TriNet
         currently expects to finalize its financial results and file its Annual Report on Form
27       10-K prior to the expiration of the extension period and further expects that the
         financial information contained in the Form 10-K will be consistent with the
28       financial results reported in this earnings release.

157.    On February 29, 2016, the Company held a conference call with analysts and investors to discuss the 4Q15 and FY15 results.  Porter addressed the Company's failure to timely file its FY15 Form 10-K stating:

> [Porter:] For the first time, [our year-end reporting] process included an assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act.  In the course of completing our internal control assessment and preparing the FY15 financial statements, we became aware of material weaknesses in our internal controls over financial reporting, ***related to ineffective information technology general controls and ineffective controls in key business processes. As a result of the material weaknesses in our internal control over financial reporting, we have concluded that our disclosure controls and procedures were not effective***.
>
> While these material weaknesses create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and analysis, no material adjustments, restatement or other revisions to previously [issued] financial statements are expected to be required.  Furthermore, we're putting in place plans, and are committed to remediating these deficiencies by implementing changes to our internal control over financial reporting in the future.
>
> With this being our first assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act, and given the multiple platforms that require evaluation and testing, we have been unable to complete our assessment of our internal control over financial reporting.  And as a result, we have filed a Form 12b-25 with the SEC today, providing for a 15-calendar-day extension for our annual report on Form 10-K for the fiscal year ended December 31, 2015.  We currently expect to file our Form 10-K ***prior to the expiration of the extension***, and further, that the financial information contained in the Form 10-K will be consistent with financial results in today's earnings release.

158.    During the February 29, 2016 conference call, Goldfield and Porter also made a number of statements concerning the insurance claims volatility that had affected the business.  Goldfield announced that TriNet had finally been able to hire some of the internal talent promised, including a Vice President of Insurance Services, a Chief Medical Actuary and a Chief Workers Compensation Actuary.  He also explained that TriNet had been unable to negotiate reinsurance or other liability caps at cost effective prices, particularly because TriNet had never previously approached reinsurers, and that it was still an open question as to whether TriNet "can arrive at the right balance of risk mitigation and costs":

> [Goldfield]: With the regard to reinsurance, our goal was focused on capping quarterly claims expense at the appropriate economic cost.  The pricing and attachment points we received from the market to-date were not conducive to achieving this objective at this time.

\*       \*       \*

38% of our plans are fully insured [but] . . . if we went with the fully insured plans, [for all our plans] it reduces the quarter-to-quarter volatility, but it doesn't help the year-over-year because the increase would then be passed directly on to our clients.

\*        \*        \*

*[W]e didn't get face-to-face early enough with the reinsurers*.  I think there is an opportunity as they get to know us and our constructs . . . .

\*        \*        \*

[Analyst:] [Y]ou've brought on new talent in the insurance business, with a lot of experience in health and actuarial analysis.  What new findings have you discovered that you didn't previously know, that caused the elevated medical claims frequency from last year?

[Porter:] *I don't think there's anything* that we have seen *that is going to help us* go back and *understand* when you get *large claims activity*.  But what we are looking at, both as part of the evaluation that we did with the consulting firm, as well as with Ed and the new actuarial talent, is, we're continuing to look at ways to get access into analyzed data faster.  And come to insights probably a little sooner, which helps us both identify trends earlier, and that also helps us then to consider what the effects are, either positive or negative, on pricing, earlier.  So I think those are some of the things that have already come up, and we're looking at ways we can institutionalize that, both internally with the way we handle data, as well as how do we get data from different sources and look at it a little faster than we do today.

159.    Following the after hours announcement that TriNet was unprepared to file its Form 10-K on February 29, 2016, the Company's stock fell from a close of $13.09 on February 29, 2016, to a close of $12.28 on March 1, 2016.

160.    On March 1, 2016, Morgan Stanley issued a report titled "4Q15: Risky for Another Day."  The report noted that "[t]here is an element of faith in forecasting net insurance revenue, since the company's track record is short and inconsistent."  The report also explained that the "[d]e-risked model remains elusive" because brokers were unwilling to provide TriNet with reinsurance at attractive pricing, that the Sarbanes-Oxley delay appears benign given the delay would only last about 15 days, and that TriNet was still hoping to see the benefit from the late additions of internal actuarial experience:

**New team of actuaries should help with intangibles**: TNET hired a new SVP of Insurance, Chief Medical Actuary, and Chief Worker's Comp Actuary to bolster its insurance business decisionmaking and modeling accuracy. While early, the potential benefits are 1) improvements to operations i.e. best practices, 2) more precise reserving, 3) better forecasting of TNET business and industry trends, and 4) more thoughtful insurance pricing.

1    161.    On March 1, 2016, J.P. Morgan issued a report titled "Mixed Qtr, Reasonable

2   Guidance As Plan To Hedge Risk Is Budgeted, But Not Solidified."   The report explained that

3   TriNet was still exposed to the same medical claims volatility:

4         **Medical risk update – status quo, but budgeting for reinsurance**.  After
      months of review, TNET announced it ***would not pursue a fully insured or***
5       ***guaranteed cost strategy***, and instead is budgeting to hedge or reinsure its risk, but
      has not executed said plan yet.  In other words, it is ***still exposed to medical claims***
6       ***volatility*** for now, but has guided to include the cost of hedging volatility and will
      execute it at the right price under the direction of the new internal risk team. . . .
7       ***[S]ome may have hoped for more certainty on risk (via fully insured)*** . . . .

8    162.    On March 8, 2016, Morgan Stanley issued a report titled "NDR: A Long (but Doable)

9   2016 To-Do List," which reported that "***TNET underpriced its insurance premiums by 200bps on***

10   ***an aggregate level, and repricing its entire book will take 12-18 Months***."

11    163.    On March 15, 2016 the Company issued a press release announcing that TriNet was

12   still not able to file its FY15 Form 10-K, and could not say when it would be able to do so:

13         **SAN  LEANDRO,  Calif. – March  15,  2016 –** TriNet  Group,  Inc.
      (NYSE: TNET) today announced that, despite extensive efforts, TriNet was unable
14       to file its Annual Report on Form 10-K for the year ended December 31, 2015, with
      the U.S. Securities and Exchange Commission (the "SEC") prior to the extended
15       filing date of March 15, 2016.  TriNet currently expects to finalize its financial
      results and file its Annual Report on Form 10-K with the SEC as soon as practicable
16       and further expects that the financial information contained in the Form 10-K will be
      consistent in all material respects with the financial results reported in our press
17       release dated February 29, 2016.  Based on the review and analysis conducted to
      date, no material adjustments, restatement or other revisions to previously issued
18       financial statements of the Company are currently expected to be required.

19         As previously disclosed, TriNet was unable to timely file its 2015 Form 10-K
      with the U.S. Securities and Exchange Commission (the "SEC") on February 29,
20       2016, due to the fact that the Company required additional time to complete its first
      assessment of internal controls over financial reporting pursuant to the Sarbanes-
21       Oxley Act of 2002, given the multiple technology platforms that required evaluation
      and testing.

22
         TriNet continues to work diligently to finalize the assessment of internal
23       controls over financial reporting and to complete the audit of the Company's
      financial statements as of and for the year ended December 31, 2015, and obtain the
24       related attestation and audit opinion from its auditors.  TriNet currently expects to
      finalize its financial results and file its Annual Report on Form 10-K with the SEC as
25       soon as practicable.

26    164.    On April 1, 2016, the Company filed its Form 10-K for the period ending

27   December 31, 2015.  The Form 10-K had been delayed due to the identification of material

28   weaknesses in internal controls over financial reporting and resulted in an SEC Delisting Notice that

was filed on March 17, 2016.  The Form 10-K identified and discussed in detail the material weakness over financial reporting which further corroborate the allegations set forth herein, establishing the materially false and misleading nature of the alleged misstatements and stated as follows:

> ***We have identified material weaknesses in our internal control over financial reporting that could, if not remediated, result in material misstatements in our financial statements.***
>
> In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2015, we have identified material weaknesses relating to our internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.  As described in Item 9A.  Controls and Procedures, we have concluded that our internal control over financial reporting was not effective as of December 31, 2015 due to material weaknesses.  Specifically, we identified material weaknesses relating to:
>
> (i)  ineffective information technology general controls, primarily with respect to computer operations, access controls and change management,
>
> (ii)  ineffective control environment and risk assessment,
>
> (iii)  ineffective management review controls and controls over system-generated reports,
>
> (iv)  ineffective controls over payroll operations,
>
> (v)  ineffective controls over health and workers compensation liabilities and related expenses,
>
> (vi)  ineffective controls over validating accuracy of payroll tax liabilities, and
>
> (vii)  ineffective authorization controls over procurement processes.

165.    In further discussing the control weaknesses, the Company explained that they could not be immediately corrected:[14]

> As further described in Part II, Item 9A "Controls and Procedures" below, we are taking specific steps to remediate the material weaknesses that we identified; however, ***the material weaknesses will not be remediated until the necessary controls have been implemented and we have determined the controls to be***

---

[14]    In fact, the Company later disclosed on February 28, 2017, in its Form 10-K for the year ended December 31, 2016, that defendants had still not remediated most of the material weaknesses identified on April 1, 2016. *See* ¶197.

*operating effectively*.  Because the reliability of the internal control process requires repeatable execution, the successful remediation of these material weaknesses will require review and evidence of effectiveness prior to concluding that the controls are effective.  In addition, *we may need to take additional measures to address the material weaknesses or modify the remediation steps*, and we cannot be certain that the measures we have taken, and expect to take, to improve our internal controls will be sufficient to address the issues identified, to ensure that our internal controls are effective or to ensure that the identified material weaknesses will not result in a material misstatement of our annual or interim consolidated financial statements.

<div align="center">*     *     *</div>

<u>**Ineffective information technology (IT) general controls**</u>

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our IT general controls (ITGCs) for certain of our key information systems, including our enterprise resource planning (ERP) systems and payroll systems, that are relevant to the preparation of our consolidated financial statements and system of internal control over financial reporting.  In addition, these deficiencies also impact the ability to rely on related interfaces, application controls and reports generated by the systems with ineffective ITGCs.  *The ineffective design and operation of our ITGCs impacts all of our significant financial statement accounts and disclosures*. The deficiencies related to the design and operating effectiveness of our ITGCs fell into the three main categories listed below:

- *Computer Operations*

Design and operating effectiveness of our system of controls related to the monitoring of batch processing and system interfaces to ensure the completeness and accuracy of data movement involving our ERP system and certain payroll systems that process revenue transactions were identified as having deficiencies.

- *Access Controls*

Design and operating effectiveness of our controls to ensure that access to applications and data were adequately restricted to appropriate personnel were identified as having deficiencies.  These deficiencies impact a number of our systems that process internal and revenue-generating payroll transactions, fixed assets, stock option and restricted stock unit information, procurement authorizations, insurance expenses, insurance reserves and payroll taxes.

- *Change Management*

Design and operating effectiveness of controls to monitor program change management procedures, including monitoring the activities of individuals who have authority and have been granted access to make changes to programs, were identified as having deficiencies.  These deficiencies impacted systems that process procurement authorizations and accumulate claims data that is utilized to estimate worker's compensation liabilities.

<u>**Ineffective control environment and risk assessment**</u>

Our management determined that a material weakness exists due *to a lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training commensurate with our structure, internal control, and financial reporting requirements*.  Additionally, we did not have an adequate process in place to complete our testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner.

**Ineffective management review controls and controls over system-generated reports**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to ensure that key spreadsheets and system-generated reports were properly reviewed for completeness and accuracy.  For certain management review controls, controls verifying the accuracy of underlying data used to perform these reviews were not performed or adequately documented.  In addition, certain *management review controls were not performed at a sufficiently precise level to identify errors that could aggregate to a material misstatement of the financial statements. These deficiencies impact substantially all of our significant financial statement accounts*.

**Ineffective controls over payroll operations**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls over the accuracy of certain information that we manually input into the payroll systems and that is used in the processing of payroll for customers.  Manually input information includes contractual terms, bill rates, benefit elections and other wage data.  Controls identified to prevent or detect inappropriate changes to payroll information and resolve payroll processing errors were not effectively designed to detect material errors.  Additionally, management identified deficiencies related to the design and operating effectiveness of controls over the reconciliation of benefit enrollment data between the Company's payroll systems and the insurance carriers' records.  *The deficiencies impact amounts recorded as professional and insurance service revenues, operating expenses, accrued* corporate wages, and worksite employee related assets and liabilities.

**Ineffective controls over health and workers compensation liabilities and related expenses**

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to *validate the completeness and accuracy of data utilized in calculating health and workers compensation liabilities and related expenses, including premium expenses and administrative fees*.  Data utilized includes enrollment counts, cost rates, wage data, claim counts and incurred and paid claim amounts.  *Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were not operating effectively. Additionally, controls over the review of health premium expenses did not operate at a level* of precision that would detect material errors.  These deficiencies impact insurance costs, workers compensation receivables, workers compensation liabilities, and worksite employee related assets and liabilities.

**Ineffective controls over validating accuracy of payroll tax liabilities**

      Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the accuracy and completeness of tax rates input into our payroll systems, including reconciliation to the general ledger of the payroll taxes payable account at a sufficient level of detail.  In addition, due to the ineffective ITGCs over the system that calculates payroll tax withholdings, compensating controls identified are not sufficiently precise to prevent or detect errors in the amounts recorded as payroll tax liabilities for internal employees and WSEs.

**Ineffective authorization controls over procurement processes**

      Our management determined that a material weakness exists related to the design and operating effectiveness of our controls over the initial set up and changes to designated approvers over corporate purchases, including purchasing card limits, expense reimbursements or approving new vendors added to the procurement system.

166.     In addition to disclosing a laundry list of material weaknesses in the Company's FY15 Form 10-K, defendants abandoned their claims that: "risk management is a core competency"; they "leverage[d their] robust risk management capabilities"; "[o]ur programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses"[15]; "[w]e assess all . . . risks on an individual client basis"; and "analyze claims data for each client on an ongoing basis."[16]  These are the false and misleading statements that had appeared, in identical language, in each of the offering materials for TriNet's IPO (¶79) and Secondary Offering (¶96) and in the Company's Form 10-K for the previous year, FY14 (¶122), and which were alleged to be false and misleading in plaintiff's consolidated complaint.

167.     The Company's April 15, 2016, proxy statement asked shareholders to ratify the Company's selection of Ernst & Young to audit TriNet's 2016 financial results and report.  On May 10, 2016, defendants filed an SEC Form 8-K disclosing Ernst & Young's dismissal.

---

[15] Defendants replaced this claim with a disclaimer that rather than limiting TriNet's ultimate exposure or potential losses, the Company's "fully-insured" plans were in fact risk based and administered by TriNet.

[16] The FY14 Form 10-K repeated the false and misleading statements that TriNet's plans "typically include . . . limits to our maximum aggregate exposure for claims in a given policy year," though the statement was modified in TriNet's FY15 Form 10-K to apply only to "non-'guaranteed cost'" plans, a term not used in previous filings.

1

**TRINET'S IPO REGISTRATION STATEMENT AND SECONDARY OFFERING REGISTRATION STATEMENT WERE MATERIALLY MISSTATED IN VIOLATION OF SEC DISCLOSURE RULES**

2

3    168.    In addition to the false statements identified above (¶79), defendants were also

4    required, under SEC disclosure rules, to make certain disclosures in the *Management's Discussion*

5    *and Analysis of Financial Condition and Results of Operations* ("MD&A") section of the

6    Company's IPO Registration Statement.[17]  According to the SEC, "The purpose of MD&A is not

7    complicated.  It is to provide readers information 'necessary to an understanding of [a company's]

8    financial condition, changes in financial condition and results of operations.'"  *Interpretation:*

9    *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition*

10   *and Results of Operations*, states:

11         The MD&A requirements are intended to satisfy three principal objectives:

12   •         to provide a narrative explanation of a company's financial statements that enables
13             investors to see the company through the eyes of management;

14   •         to enhance the overall financial disclosure and provide the context within which
             financial information should be analyzed; and

15   
16   •         to provide information about the quality of, and potential variability of, a company's
             earnings and cash flow, so that investors can ascertain the likelihood that past
             performance is indicative of future performance[18]

17

18         169.    As detailed below, defendants failed to make several key MD&A disclosures in

19   TriNet's IPO Registration Statement.

20         A.    Defendants Failed to Disclose Significant Trends

21         170.    In its IPO Registration Statement, defendants failed to disclose that the Company was

22   experiencing adverse claims trends in workers' compensation that would negatively affect the

23   Company's future business prospects.  Defendants later admitted that, at the time of the IPO, the

24   Company was experiencing adverse claims trends – particularly in its SOI book of business,

25   ───────────────
[17]   The SEC's rules and requirements for MD&A disclosure are located in SEC Regulation S-K
26   Item 303 and a series of subsequent interpretations issued by the SEC including *Interpretation:*
     *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition*
27   *and Results of Operation*, Release Nos. 33-8350; 34-48960; FR-72 (Dec. 19, 2003).

28   [18]   Release Nos. 33-8350; 34-48960; FR-72.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

1   acquired in 2012.  For example, in 1Q15, defendants admitted that "Net insurance service revenues

2   were affected by higher than expected workers compensation costs in our blue- and gray-collar book

3   for older years."  An analyst described the 1Q15 disclosures as "***catch-up charges for prior years***."

4         171.   The existing trend in workers' compensation claims, at the time of the IPO, was

5   exactly the type of information required  to be disclosed in the MD&A.  The SEC has plainly stated

6   that "***companies must identify and disclose known trends*** . . . ***that are reasonably likely to have a***

7   ***material effect on financial condition or operating performance***."[19]

8         B.   <u>Defendants Failed to Disclose Significant Uncertainties</u>

9         172.   In its IPO Registration Statement, defendants failed to disclose an accurate picture of

10   the Company's exposure to insurance claim losses including the high degree of uncertainty inherent

11   in the Company's loss exposure.  Instead, defendants emphasized TriNet's superior risk management

12   processes and management's high visibility into future results.  Defendants also emphasized the lack

13   of uncertainty and risk in their insurance business which was purportedly achieved through programs

14   to limit potential loss exposure (*i.e.*, "fully insured plans," "aggregate stop-loss limits," etc.) leaving

15   TriNet with only "modest" deductible risk.

16         173.   As  detailed  herein,  defendants  later  shocked  investors  with  unexpected  health

17   insurance and workers' compensation  claim losses.  ¶¶114, 125, 142.  Defendants were forced to

18   admit that  risk management was not among the Company's core competencies *i.e.*, TriNet did not

19   have sufficient policies, procedures, and personnel in place to support claims of risk management

20   proficiency as the Company stated in its IPO Registration Statement.  ¶79.  Nor did defendants have

21   a basis to claim the Company had either stability or predictability with respect to the performance of

22   the Company's insurance businesses.  Defendants also admitted that prior to 4Q14, they did not have

23   forward visibility into developing claims and that they had not negotiated aggregate stop-loss limits,

24   as  previously  claimed.   *See*  ¶¶126-127,  135-136,  142-143,  150,  152,  155,  158.   Because  of

25   defendants'  prior  misrepresentations  regarding  limited  exposure,  analysts  and  investors  were

26

27

28   [19]   Release Nos. 33-8350; 34-48960; FR-72.

1 | shocked by these revelations which detailed the level of uncertainty inherent in the Company's claim

2 | exposure.

3 | 174. The Company's true exposure to claim losses, including the high degree of

4 | uncertainty inherent in the Company's exposure, was exactly the type of information required to be

5 | disclosed in the MD&A section of the IPO Registration Statement. This uncertainty resulted in a

6 | high likelihood that past performance of the Company's insurance businesses, as of the time of the

7 | IPO, was not indicative of future performance. The SEC's MD&A disclosure rules state:

8 |       MD&A must specifically focus on known material events and **_uncertainties_** that

9 |       would cause reported financial information not to be necessarily indicative of future
        operating performance or of future financial condition.

10 |                                     *       *       *

11 |       One of the principal objectives of MD&A is to provide information about the

12 |       quality and potential variability of a company's earnings and cash flow, so that
        readers can ascertain **_the likelihood that past performance is indicative of future_**

13 |       **_performance_**.

14 |                                     *       *       *

15 |       If there is a reasonable likelihood that reported financial information is not

       indicative of a company's future financial condition or future operating performance

16 |       **_due, for example, to the levels of subjectivity and judgment necessary to account_**
        **_for highly uncertain matters and the susceptibility of such matters to change,_**

17 |       **_appropriate disclosure in MD&A should be considered and may be required_**.[20]

18 | 175. As Deutsche Bank subsequently reported, on September 11, 2015, after three

19 | consecutive quarters in which unexpected claims expenses negatively affected TriNet's financial

20 | results, "[w]e think TriNet needs to disclose more information about its gross insurance revenue, so

21 | that investors can better understand the risks TriNet is taking."

22 | Defendants Failed to Disclose Critical Accounting Estimate

23 | 176. In its IPO Registration Statement, defendants failed to make required disclosures

24 | regarding the Company's accounting for insurance loss reserves. The insurance loss reserves should

25 | have been identified as "critical accounting estimates" by defendants. As such, defendants were

26 | required to disclose the following quantitative and qualitative details regarding the Company's loss

27 | reserves and the sufficiency of the Company's loss reserve processes:

---

[20]   Release Nos. 33-8350; 34-48960; FR-72.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

- How TriNet calculated the reserves including the underlying assumptions used by management;

- How accurate the reserves had been in the past including how much the reserves had been changed in the past;

- Whether the reserve was reasonably likely to change in the future and the reason for the potential change (*i.e.*, inherent uncertainty attached to the reserve or other difficulty in measuring); and

- Analysis of TriNet's sensitivity to a change in the reserve, based on other outcomes that were reasonably likely to occur.

177.   Instead of making the required disclosures regarding its loss reserves, defendants emphasized TriNet's superior risk management processes and management's high visibility into claims exposure.

178.   Defendants later admitted that the Company's reserve estimation process was deficient.  For example:

- [W]e just **did not have the visibility that we really should have** to be able to track those large claims . . . .

- [W]e **didn't have enough visibility** into the claims that we're developing . . . .

- And the need for us to actually do a slightly different, more detailed analysis state by state for that book just tells us that **we needed to do a little bit more analysis** than we had previously seen.

179.   Defendants also admitted that the Company did not have adequate insurance executives or in-house actuarial staff to effectively analyze risk in connection with setting loss reserves for claims experience and exposure.

180.   As a critical accounting estimate[21] at the time of the IPO, TriNet was required to make quantitative and qualitative disclosures regarding its insurance loss reserves.  The SEC's MD&A disclosure rules state:

---

[21]   The SEC staff has emphasized the enhanced disclosure of critical accounting policies including, in particular, "[i]nsurance loss reserves."  *Summary by the Division of Corporation Finance of Significant Issues Addressed in the Review of the Periodic Reports of the Fortune 500 Companies* (Feb. 27, 2003) available at www.sec.gov/divisions/corpfin/fortune500rep.htm.

When preparing disclosure under the current requirements, companies should consider whether they have made accounting estimates . . . companies should provide disclosure about those *critical accounting estimates* or assumptions in their MD&A.

*          *          *

A company should address specifically *why its accounting estimates or assumptions bear the risk of change*. The reason may be that there is an uncertainty attached to the estimate or assumption, or it just may be difficult to measure or value. Equally important, companies should address the questions that arise once the critical accounting estimate or assumption has been identified, by analyzing, to the extent material, such factors *as how they arrived at the estimate, how accurate the estimate/assumption has been in the past, how much the estimate/assumption has changed in the past, and whether the estimate/assumption is reasonably likely to change in the future*. Since critical accounting estimates and assumptions are based on matters that are highly uncertain, a company should *analyze their specific sensitivity to change, based on other outcomes that are reasonably likely to occur* and would have a material effect. Companies should provide *quantitative as well as qualitative disclosure* when quantitative information is reasonably available and will provide material information for investors.[22]

181.   Once it was revealed that the Company's reserve estimation process was deficient, investors considered TriNet' failure to disclose measures regarding insurance loss reserves significant. Deutsche Bank, for example, in a subsequent May 6, 2015 report, explained that "[i]t is hard to measure how significant the $10m worker's comp reserve write up is as we do not know how many employee's it is based on or the total current reserve."

182.   In addition to the false statements identified above in ¶96, defendants were also required, under SEC disclosure rules, to make certain disclosures in the MD&A section of the Company's Secondary Offering Registration Statement. As detailed below, defendants failed to make several key MD&A disclosures in TriNet's Secondary Offering Registration Statement.

Defendants Failed to Disclose Significant Trends

183.   In its Secondary Offering Registration Statement, defendants failed to disclose that the Company was experiencing adverse claims trends in workers' compensation and health insurance that would negatively affect the Company's future business prospects. Defendants later admitted that, at the time of the Secondary Offering the Company was experiencing adverse claims

---

[22]   Release Nos. 33-8350; 34-48960; FR-72.

1  trends in workers' compensation and health insurance.[23]  For example, in early 2015 defendants

2  admitted that "*[w]e had a number of large[health insurance] claims develop during the second*

3  *half of 2014*."  Likewise, in 1Q15, defendants disclosed workers' compensation "*catch-up charges*

4  *for prior years*."

5       184.  The adverse trends in health insurance and workers' compensation claims that clearly

6  existed at the time of the Secondary Offering were required to be disclosed in the MD&A section of

7  the Secondary Offering Registration Statement.[24]

8  Defendants Failed to Disclose Significant Uncertainties

9       185.  In its Secondary Offering Registration Statement, defendants failed to disclose an

10  accurate picture of the Company's exposure to insurance claim losses including the high degree of

11  uncertainty inherent in the Company's exposure.  Instead, defendants emphasized that TriNet's

12  superior  risk  management  processes  and  management's  high  visibility  into  future  results.

13  Defendants also emphasized the lack of uncertainty and risk in their insurance business which was

14  purportedly achieved through programs to limit potential loss exposure (*i.e.*, "fully insured plans,"

15  "aggregate stop-loss limits," etc.) leaving TriNet with only "modest" deductible risk.

16       186.  As  detailed  herein,  defendants  later  shocked  investors  with  unexpected  health

17  insurance and workers' compensation claim losses and were forced to admit that the Company was

18  exposed to more than "modest" deductible risk.  *See* ¶¶114, 125, 142, 144.  Because of defendants

19  prior misrepresentations regarding limited exposure, analysts and investors were shocked by these

20  revelations which detailed the level of uncertainty inherent in the Company's claim exposure.

21       187.  The high degree of uncertainty associated with the Company's exposure to insurance

22  claim losses that existed at the time of the Secondary Offering was required to be disclosed in the

23  MD&A section of the Secondary Offering Registration Statement.[25]

24

25  [23]  "[C]ompanies must identify and disclose known trends . . . that are reasonably likely to have a
    material effect on financial condition or operating performance."  Release Nos. 33-8350; 34-48960;
26  FR-72.

27  [24]  *See* ¶¶170-171 above.

28  [25]  *See* ¶¶172-175 above.  If there is a reasonable likelihood that reported financial information is
    not indicative of a company's future financial condition or future operating performance due, for

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                          - 85 -

1  Defendants Failed to Disclose Critical Accounting Estimate

2  188.   In its Secondary Offering Registration Statement, defendants failed to make required

3  disclosures regarding the Company's accounting for insurance loss reserves.  The insurance loss

4  reserves should have been identified as "critical accounting estimates" by defendants.  As such,

5  defendants were required to disclose the quantitative and qualitative details regarding the loss

6  reserve and the sufficiency of the Company's loss reserve processes.  *See* ¶¶176-181 above.

7  189.   Instead of making the required disclosures regarding its loss reserves, defendants

8  emphasized TriNet's superior risk management processes and management's high visibility into

9  claims experience and exposure.  Defendants later admitted that the Company's reserve process was

10  deficient.  *See* ¶¶126-129 above.

11  190.   The quantitative and qualitative details of the Company's loss reserves at the time of

12  the Secondary Offering were required to be disclosed in the MD&A section of the Secondary

13  Offering Registration Statement.[26]

14
**POST-CLASS PERIOD EVENTS CONFIRM THE COMPANY LACKED
COMPETENCY IN RISK MANAGEMENT, VISIBILITY,
15  PREDICTABILITY AND STABILITY**

16  191.   On August 1, 2016, Piper Jaffray issued a report explaining TriNet had tried and

17  failed to change the Company's business model: "TNET has been unsuccessful in obtaining

18  reinsurance with favorable terms, reducing aggregate deductible layers or reducing pooling limits to

19  protect against claims risk, leaving pricing as the primary means to manage rising claims costs."  As

20  Piper Jaffray further explained, TriNet had started to raise its prices since it had not been able to

21  improve its visibility into insurance costs or effectively manage its risk, stating "management is still

22  in the early innings of pricing increases and visibility around the long-term impact on retention and

23  new client acquisition is diminished near-term."

24

25

26  example, to the levels of subjectivity and judgment necessary to account for highly uncertain matters
and the susceptibility of such matters to change, appropriate disclosure in MD&A should be
27  considered and may be required. Release Nos. 33-8350; 34-48960; FR-72.

28  [26]   *See* ¶¶176-181 above.  *See also* Release Nos. 33-8350; 34-48960; FR-72.

1    192.    On August 4, 2016, Morgan Stanley issued a report downgrading TriNet, similarly

2    noting that TriNet was unable to move to a business model that provided the stability, visibility and

3    predictability defendants previously falsely touted to investors:

4        [I]t looks increasingly likely that TriNet will not be able to reinsure its insurance
         book to limit revenue and margin downside

5                                        *        *        *

6
         . . . Over the past few months TNET has sought to contract with reinsurers to limit
7        quarterly downside from claims costs and improve EPS visibility.  But pricing from
         reinsurers has come in higher than TNET is willing to accept, and management does
8        not seem optimistic that it will be able to reinsure at a reasonable price.  We think
         this reduces the likelihood of a bull case outcome in which TNET risk is limited and
9        the multiple expands back into the 20s.

10   193.    On the same day, Morgan Stanley further reported that TriNet was raising prices in "a

11   strategy shift away from brute force sales-driven strategy it successfully employed before."  In other

12   words, TriNet had previously prioritized adding clients without understanding or properly

13   underwriting the risk it was adding – a strategy that prioritized growth over profitability.

14   194.    It was not until the very end of 2016 that analysts began to note that TriNet had

15   completed some of the measures taken to address the series of problems that rocked the Company

16   throughout 2015.  On November 2, 2016, Piper Jaffray reported that TriNet had now "completed

17   repricing its *entire* medical insurance book" and that "[w]e believe visibility has increased in

18   TNET's medical book of business with actions taken to speed up insurance reporting of claims

19   activity, reduce reporting thresholds, and conduct more thorough actuarial analysis of claims cost

20   trends."

21   195.    These measures, however, were not without costs.  Morgan Stanley, in a November 2,

22   2016 report, explained that TriNet's "growth outlook continues to hinge on successful pricing

23   contribution vs. prior brute force sales approach" and that the new strategy based on increased prices

24   "continues to flow through TNET's book and is impacting attrition."  Morgan Stanley also noted that

25   TriNet now only expected mid-teens growth, compared to the 20% or more defendants had touted

26   during the Class Period.

27   196.    As late as November 15, 2016, when J.P.Morgan issued a report based on meeting

28   with management at the J.P. Morgan conference, the same analyst reported that TriNet still had not

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                      - 87 -

found an economically viable solution to its insurance problems and was touting the strength of the

Company's "new" (as opposed to improved) risk management team:

> TNET completed its repricing initiative in 3Q and commented that the pricing increases shouldn't have a significant impact on attrition, although the company remains cautious when looking at retention.  Management highlighted that while it continues to seek an economically viable solution, it does not expect to reinsure TNET's medical book, and it continues to highlight the strength of the company's new risk management team.

197.   On February 28, 2017, the Company filed its Form 10-K for the period ending

December 31, 2016.  The Form 10-K identified numerous material weaknesses over financial

reporting the Company disclosed on April 1, 2016 were continuing, and still had not been

remediated as of December 31, 2016.  The Form 10-K (*see* Attachment 4) stated as follows:

> **We have identified material weaknesses in our internal control over financial reporting that could, if not remediated, result in material misstatements in our financial statements.**
>
> In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2016, we have identified and concluded that we continue to have material weaknesses relating to our internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.  Refer to Part II, Item 9A in this Form 10-K for more details.  While the material weaknesses described in that section create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and the performance of additional analysis and other procedures, no material adjustments, restatement or other revisions to our previously issued financial statements were required.
>
> *          *          *
>
> The following material weaknesses have been identified and included in management's assessment:
>
> - Ineffective controls to ensure identification of control activities and monitoring
>
> - Ineffective information technology (IT) general controls over user access
>
> - Ineffective controls over revenue and payroll operations
>
> - Ineffective controls over payroll tax liabilities
>
> - Ineffective controls over insurance costs and insurance liabilities

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

**THE STARK CONTRAST BETWEEN DEFENDANTS' REPRESENTATIONS AND THE LATER ADMISSIONS FURTHER CONFIRMS FALSITY AND SUPPORTS A STRONG INFERENCE OF SCIENTER**

198.    As illustrated in the following non-exhaustive chart of false statements, defendants' statements were wholly incompatible with the truth, as reflected by defendants' own admissions and the reports of analysts, which demonstrate that the statements were false when made:

| False and Misleading Statement | Admission/Acknowledgement of Falsity |
|---|---|
| **Claims Data** | |
| "[W]e get state-of-the-art analytics on all of our claims.  So every month we are able to get claims data so we can see how our clients are performing. . . ."  ¶108. | "[W]e're going to our carrier partners and historically, we've asked them for information on any what we call catastrophic claims.  That's historically been claims over $300,000 that could potentially be in their pipeline. So what we've asked them to do now is to tell us for any claim that they expect to be greater than $50,000, give that to us on a monthly basis so that we can track these through their pipeline."  ¶120. |
| "[Getting] the right data . . . from the insurance companies, is a true breakthrough that was not available to [PEOs] three or four years ago."  ¶111. | "[W]e need clean data from the carriers."  ¶144.  "[W]e're continuing to look at ways to get access [and to] analyze[] data faster."  ¶158. |
| **Risk Management** | |
| "Risk management is a core competency of our company."  ¶¶79, 96, 122. | "**Ineffective control environment and risk assessment** . . . material weakness exists due to a lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training . . . ."  ¶44. |
| "We have an experienced risk management team and we manage the insurance element of our business."  ¶139. | William Blair: "The company also is adding internal actuaries (which it did not have in the past) . . . ."  ¶150. |
| **Visibility** | |
| "[Analyst:] If you are the investors out there now, like, why now with TriNet? [Goldfield:] A large, addressable market; predictable revenue; visibility into the future; and a company that is growing and satisfying an important need in HR."  ¶110. | "So separate in Q4 [*i.e.* from 1Q15], what we did see was that there is inherent volatility in large medical claims."  ¶135.  "[W]e didn't have enough visibility into the claims that we're developing in the second half to be able to build them into our O4 forecast."  ¶117. |
| "We have good visibility from a medical insurance and even better from a Workers' Comp."  ¶90. | "[W]e just did not have the visibility that we really should have to be able to track those large claims on a more granular and basically a monthly basis."  ¶120.  "We worked with our carriers directly with |

| | |
|---|---|
| | the Senior Executives . . . .  They need to give us a visibility."  ¶144. |
| | "There's inherent lags when you have large complex claims at a carrier, and what we saw was we did not have enough visibility into those claims as they were developing."  ¶135. |
| **Predictability** | |
| "[W]e are able to predict pretty accurately on an annual basis exactly how we are going to do on each of those programs."  ¶109. | "I need to get the predictability in the system."  ¶144. |
| **Aggregate Stop Loss** | |
| "Our agreements with our health insurance carriers . . . typically include . . . limits to our maximum aggregate exposure for claims in a given policy year, which we refer to as stop losses."  ¶¶79, 96, 122. | Morgan Stanley: "TNET notes that in theory it could establish an 'aggregate stop loss' with carriers, but believes the cost is not worth the benefit."  ¶121. |
| **Fully Insured Plans** | |
| "[W]e have a very stable, fully insured workers' comp program that we've had for multiple years. . . .  I think the example that you're referencing was a self-insured model that they're moving to try to get some kind of a fully insured. So for us it's been a very stable program on all of our products."  ¶105. | "[Q:] [M]aybe it would be helpful if you can just go through the spectrum of potential changes that you might make to call it out or hedge out the risk around claims volatility. [Porter:] So if we start at what guaranteed costs looks like and guaranteed costs or some people would call it fully insured. So that's effectively a pass through."  ¶155. |
| | J.P. Morgan: "After months of review, TNET announced it would not pursue a fully insured or guaranteed cost strategy, and instead is budgeting to hedge or reinsure its risk, but has not executed said plan yet.  In other words, it is still exposed to medical claims volatility . . . .  [S]ome may have hoped for more certainty on risk (via fully insured) . . . ."  ¶161. |
| **Ongoing Review of Claims** | |
| "Following our initial pricing of these policies, we analyze claims data for each client on an ongoing basis and seek to adjust our prices as appropriate."  ¶79. | "So this was a book that we had acquired back in October 2012 and their practice was that they did not reserve is what we would determine to be industry best practice . . . what we should have done is gone one layer back and found out that the loss triangles probably were skewed based on the reserving practices."  ¶151. |
| "We assess all workers compensation and medical benefits risks on an individual client basis and annually adjust pricing to reflect their current risk . . . ."  ¶79. | "I think what it really means is a tighter look at the older years and making sure that we're ticked and tied as they come through the system."  ¶128. |

**LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS**

199.    Plaintiff incorporates ¶¶1-198 above and alleges that during the Class Period defendants materially misrepresented TriNet's true financial condition by issuing false statements concerning the predictability and visibility of the Company's future financial prospects, the proficiency of its controls and risk management processes and the stability of its business resulting from the above, and purportedly fully insured plans, aggregate stop-losses and the data available to and utilized by the Company.  In truth, defendants knew and/or deliberately disregarded that the Company, as a result of known or deliberately disregarded shortcomings forecasting and obtaining data, was experiencing adverse trends in medical and workers' compensation that affected the Company's current and future business prospects.

200.    Defendants' false and misleading statements had their intended effect and caused TriNet stock to trade at artificially inflated prices throughout the Class Period and to reach a Class Period high of $38.00 per share on March 3, 2015.

201.    On March 3, 2015, the true state of the Company's operations began to be partially revealed when defendants announced (after market hours) 4Q14 earnings, in particular a 19% decline in net Insurance Service revenue due to medical costs.  *See* ¶¶114-117.  This disclosure and follow on disclosures caused TriNet's stock price to decline as some of the prior artificial inflation came out of TriNet's stock price and investors absorbed the significance of the new information and its relationship to the alleged misrepresentations.

202.    The March 3, 2015 disclosures consisted of new information which was directly related to, and sharply inconsistent with, defendants' prior misrepresentations.  Indeed, the disclosures revealed that defendants had not effectively limited the Company's liability by offering fully insured plans or negotiating stop-loss limits to the liability, but in fact had assumed significant liability susceptible to volatility.  ¶¶118, 120-121.  As a result, the Company's stock price declined from a close of $37.88 on March 3, 2015, to a close of $33.93 on March 3, 2015, on substantially increased volume.  *See* ¶119.

203.    However, defendants mitigated the decline by falsely reassuring investors and analysts that the disappointing financial results were due to a one-time spike in medical claims which

1  would not recur and which was not indicative of systemic failings in the Company's ability to

2  forecast.  *See* ¶¶114-115.  The Company's stock price continued to trade at artificially inflated

3  levels.

4       204.  Investment analysts indeed attributed the stock price decline on March 3, 2015, to this

5  new information, but also reported that the problems the Company experienced in the quarter were

6  non-systemic and did not implicate defendants' ability to forecast.  J.P. Morgan, for example,

7  maintained an overweight rating on TriNet and repeated defendants' claims that the 4Q14 revenue

8  miss was caused by a one-time spike in medical claims that was non-systemic.  *See* ¶118.

9       205.  On May 5, 2015, the true state of the Company's operations and financial condition

10  was further, but still only partially, revealed when defendants announced (after market hours) 1Q15

11  earnings, in particular a meager increase of only 1% in net Insurance Service revenue due to

12  workers' compensation costs, and a corresponding $10 million reduction in FY15 outlook due to the

13  need to accrue for workers' compensation claims which had not been included in the risk

14  management processes or trend analyses.  ¶¶125-126.  This disclosure and follow on disclosures

15  caused TriNet's stock price to decline as more of the prior artificial inflation came out of TriNet's

16  stock price and investors absorbed the significance of the new information and its relationship to the

17  alleged misrepresentations.

18       206.  The May 5, 2015 disclosures consisted of new information which was directly related

19  to, and sharply inconsistent with, defendants' prior misrepresentations.  ¶¶127-130.  Indeed, the

20  disclosures revealed that defendants' inability to manage risk and forecast claims might be systemic,

21  and not limited to a one-time spike in medical claims.  As a result, the Company's stock price

22  declined from a close of $34.43 on May 5, 2015, to a close of $28.76 on May 6, 2015, on

23  substantially increased volume.  *See* ¶133.

24       207.  However, defendants mitigated the decline by falsely reassuring investors and

25  analysts that the impairment was due to a one-time spike in workers' compensation claims from a

26  previously acquired book, which was unrelated to the previous quarter's medical claims miss, and

27  that defendants had already taken and were currently taking the steps necessary to improve their

28  forecasting and pay any "catch-up" charges necessary.  *See* ¶¶131, 135.  They also reiterated the

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

1  false claim that risk management was a core competency.  ¶139.  The Company's stock price

2  continued to trade at artificially inflated levels.

3       208.   Investment analysts indeed attributed the stock price decline on May 5, 2015, to this

4  new information, but also accepted defendants' representations that the Company had improved its

5  forecasting processes and should be able to deliver more stable financial results in the future.  For

6  example, on May 5, 2015, William Blair issued a report titled "Company's Credibility Is Dented, but

7  Sticking With Story as a Result of Long-Term Growth Potential."  The report explained that the

8  problems at TriNet existed throughout the business (*i.e.*, were systemic), but concluded that they

9  were fixable, and that the Company was making the catch-up charges necessary to set the Company

10  back on a profitable trajectory.  ¶¶130-131.

11       209.   On August 3, 2015, the true state of the Company's operations was more fully

12  revealed when defendants announced (after market hours) 2Q15 earnings, in particular, and among

13  other things, a 43% decline in net Insurance Service revenue due to medical costs.  ¶¶142-144.  This

14  disclosure caused TriNet's stock price to decline as the prior artificial inflation came out of TriNet's

15  stock price and investors absorbed the significance of the new information and its relationship to the

16  alleged misrepresentations.

17       210.   The August 3, 2015 disclosures consisted of new information which was directly

18  related to, and sharply inconsistent with, defendants' prior misrepresentations.  Indeed, the

19  disclosures revealed that defendants' inability to manage risk and forecast claims was certainly

20  systemic, was more severe than previously stated, and that defendants had not improved or fixed

21  their ability to forecast and manage risk.  As a result, the Company's stock price declined from a

22  close of $26.69 on August 3, 2015, to a close of $16.33 on August 4, 2015, on substantially

23  increased volume.  *See* ¶148.  The Company's stock price continued to trade at artificially inflated

24  levels.

25       211.   Investment analysts indeed attributed the stock price decline on August 3, 2015, to

26  this new information, though some held out hope that defendants, despite prior failures, could finally

27  develop risk management capacity and negotiate effective limits to the Company's claims exposure.

28  William Blair, for example, in an August 3, 2015 report titled "Strike Three on Insurance Claims;

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                      - 93 -

Market Probably Ascribing Minimal Value to Insurance Side of Business; Lowering Rating to Market Perform" downgraded TriNet, concluding "there is now going to be a fairly strong view that management doesn't have strong grasp at the moment on the insurance side of their business."

212. Defendants remained on the defensive following the disappointing 4Q14, 1Q15, and 2Q15 financial results and struggled to reassure investors that they would be able to develop the internal capacity to manage risk or negotiate cost-effective limits to risk. On September 16, 2015, for example, at an investor conference, defendants admitted that they had not yet finished their analysis of the problems the Company had experienced, had not yet been able to hire new personnel, had not reserved according to "industry best practice," and that their exposure to risk had been and was "skewed" to high cost states, in particular California and New York.

213. On November 2, 2015, the Company announced its 3Q15 financial results, which more or less came in in-line with substantially reduced guidance. At the conference call that same day, defendants had to explain that they had not and were still evaluating options for improving the business, saying "We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business."

214. Following the November 2, 2015 disclosures the stock price declined 6%, from $19.29 to $18.10.

215. Then, on February 29, 2016, the Company announced its 4Q15 and FY15 financial results, declaring that the Company was unprepared to file its Form 10-K and had sought an extension from the SEC due to the identification of material weaknesses in its internal controls over financial reporting relating to "IT" controls and controls in "key business processes." TriNet nevertheless assured investors that the Company would file its Form 10-K within the SEC's extension period for delayed filings, *i.e.*, by March 15, 2016.

216. During the earnings call on February 29, 2016, Goldfield announced that TriNet had hired some of the internal actuarial and other talent necessary to forecast and manage risk. He also explained that TriNet had been unable to negotiate reinsurance or other liability caps at cost effective prices, in particular because TriNet had never approached reinsurers previously, and that it was still an open question whether TriNet "can arrive at the right balance of risk mitigation and costs." This

1   disclosure and follow on disclosures caused TriNet's stock price to decline as more of the prior

2   artificial inflation came out of TriNet's stock price and investors absorbed the significance of the

3   new information and its relationship to the alleged misrepresentations.

4       217.    Following the February 29, 2016 disclosures, the stock price declined 6%, from

5   $13.09 to $12.28.

6       218.    On March 1, 2016, Morgan Stanley issued a report which concluded that "[t]here is

7   an element of faith in forecasting net insurance revenue, since the company's track record is short

8   and inconsistent."

9       219.    Also on March 1, 2016, J.P. Morgan issued a report explaining that TriNet was "still

10  exposed to medical claims volatility" and that many investors were disappointed that the Company

11  had not actually adopted fully insured plans, reporting that "some may have hoped for more certainty

12  on risk (via fully insured [plans])."

13      220.    Then, on March 15, 2016, the Company announced that TriNet was still not able to

14  file its FY15 Form 10-K, and could not say when it would be able to do so.

15      221.    Like other members of the Class of purchasers of TriNet stock who purchased at

16  artificially inflated prices during the Class Period, plaintiff suffered an economic loss, *i.e.*, damages,

17  when TriNet's stock prices declined upon the disclosures correcting the alleged misrepresentations.

18      222.    The timing and magnitude of TriNet's stock price declines negates any inference that

19  the loss suffered by plaintiff and other Class members was caused by changed market conditions,

20  macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent

21  conduct.

22      223.    The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the

23  Class, was a direct result of defendants' fraudulent scheme and misrepresentations to artificially

24  inflate TriNet's stock price and the subsequent significant decline in the value of TriNet stock when

25  the true state of the Company's operations was revealed to the market correcting the

26  misrepresentations.

27

28

**CLASS ACTION ALLEGATIONS**

224.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired TriNet common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their family members, directors and officers of TriNet and their families and affiliates.

225.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  TriNet has more than 70 million shares of stock outstanding, owned by hundreds or thousands of persons.

226.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of TriNet common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

227.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

228.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

229.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## NO SAFE HARBOR

230.   TriNet's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

231.   The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of TriNet who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

232.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)   Plaintiff and other members of the Class purchased TriNet common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

233.    At all relevant times, the market for TriNet common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, TriNet filed periodic public reports with the SEC; and

(b)    TriNet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against TriNet and All Officer Defendants**

234.    Plaintiff incorporates ¶¶1-233 by reference.

235.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

236.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TriNet common stock during the Class Period.

237.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TriNet common stock.  Plaintiff and the Class would not have purchased TriNet common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Officer Defendants, Director Defendants**
**and General Atlantic**

238.    Plaintiff incorporates ¶¶1-237 by reference.

239.    The Officer and Director Defendants and General Atlantic acted as controlling persons of TriNet within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of TriNet stock, the Officer and Director Defendants and General Atlantic had the power and authority to cause TriNet to engage in the wrongful conduct complained of herein.  TriNet controlled the Officer and Director Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

240.    General Atlantic, at the time of the IPO and Secondary Offering and throughout the Class Period, had the ability to control and did control TriNet through its majority ownership of outstanding shares and through its control over TriNet's Board of Directors and selection of officers and General Atlantic employees Bingham (Director of the Company and Advisory Director of General Atlantic) and Hodgson (Director of the Company and Managing Director of General Atlantic).  General Atlantic controlled TriNet through its control over and selection of a majority of TriNet's directors:

> Certain members of our board of directors were elected pursuant to the provisions of our amended and restated stockholders agreement entered into in June 2009. Under this agreement, our stockholders that are party to the agreement have agreed to vote their shares to elect to our board of directors as follows: (i) four directors designated by GA TriNet LLC; (ii) the person serving as Chief Executive Officer; and (iii) two independent directors.

TriNet disclosed in the IPO Registration Statement that as a consequence of General Atlantic's ownership of the majority of outstanding shares, General Atlantic had the ability to determine all matters requiring shareholder approval:

> Upon the closing of this offering, funds affiliated with General Atlantic will beneficially own approximately 55.7% of our outstanding common stock, and all of our directors, officers and their affiliates will beneficially own, in the aggregate, approximately 70.5% of our outstanding common stock, in each case, assuming no exercise of the underwriters' option to purchase additional shares. As a result, these stockholders will be able to determine substantially all matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets.  This

1   concentration of ownership could limit the ability of other stockholders to influence
2   corporate matters and may have the effect of delaying or preventing a third party
    from acquiring control over us.

3   By virtue of its control over TriNet, its officers and directors, General Atlantic had a duty to

4   promptly disseminate accurate and truthful information and to correct any previously issued

5   statements that had become materially misleading or untrue.

6   241.   And even after General Atlantic, Hodgson and their affiliates sold 13.8 million shares

7   in the Company's September 11, 2014 Secondary Offering, General Atlantic still maintained the

8   same control.  As the Company disclosed in the Company's FY14 Form 10-K:

9       As of December 31, 2014, funds affiliated with General Atlantic, our largest
        stockholder, beneficially own approximately 26.2% of our outstanding common
10      stock, and all of our directors, officers and their affiliates, including the funds
        affiliated with General Atlantic, beneficially own, in the aggregate, approximately
11      42.1% of our outstanding common stock.  As a result, ***these stockholders will be able
        to determine substantially all matters requiring stockholder approval***, including the
12      election of directors and approval of significant corporate transactions, such as a
        merger or other sale of our company or its assets.  This concentration of ownership
13      could limit the ability of other stockholders to influence corporate matters and may
        have the effect of delaying or preventing a third party from acquiring control over us.

14
                    **CLAIMS FOR VIOLATIONS OF SECTIONS 11, 12 AND 15**
15                          **OF THE SECURITIES ACT OF 1933**

16  242.   The Securities Act claims set forth herein are based on strict liability and negligence

17  and are not based on any allegation that any defendant engaged in fraud or intentional misconduct.

18  Plaintiff specifically disclaims any reference to or reliance on allegations of fraud.

19  243.   These claims are brought on behalf of all persons who purchased or otherwise

20  acquired the common stock of TriNet pursuant or traceable to the Company's false and misleading

21  IPO Registration Statement[27] and Secondary Offering Registration Statement[28] (collectively the

22  "Offering Materials").

23  244.   Plaintiff seeks to recover damages under §§11 and 12(a)(2) and 15 of the Securities

24  Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o, for untrue statements of material fact, the omission of facts

25

26  [27]   On March 26, 2014, at 4:30 p.m., the SEC declared the IPO Registration Statement effective.

27  [28]   On September 11, 2014, at 4:30 p.m., the SEC declared the Secondary Offering Registration
28  Statement effective.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

1  necessary to make statements not misleading and the omission of material facts required to be stated

2  in the Offering Materials.

3  <u>False and Misleading Statements and Omissions in the IPO Registration Statement</u>

4       245.    On March 27, 2014, the Company, through the IPO Registration Statement, offered

5  15,000,000 shares of TriNet common stock to the public at $16 per share, with $1.12 per share

6  representing the "[u]nderwriting discount."  If the underwriters sold more than 15,000,000 shares of

7  the common stock, the underwriters would have the option to purchase 2,250,000 additional shares

8  from the selling stockholders (identified in the IPO Registration Statement as Hodgson and "entities

9  affiliated with General Atlantic"), and from which the Company would not receive the proceeds.

10      246.    The IPO Registration Statement was signed by Goldfield, Porter, Bingham, Babinec,

11  Goldman, Hodgson, Lowell and August-deWilde and contained untrue statements of material fact,

12  omitted to state other facts necessary in order to make the statements made therein not misleading

13  and omitted to state material facts required to be stated therein.  Specifically, the IPO Registration

14  Statement falsely stated that the Company's insurance policies were fully insured and had stop-loss

15  limits to liability, risk management was a core competency of the Company and the Company

16  assessed both workers' compensation and medical risks on an individual client basis:

-     ***Risk management is a core competency of our company***.

-     We leverage . . . our ***robust risk management capabilities*** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

-     ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

-     We assess all workers compensation and medical benefits risks on ***an individual client basis*** and annually adjust pricing to reflect their ***current risk*** based on HIPAA-compliant analytics.

-     Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***.

-     Following our initial pricing of these policies, we analyze claims data ***for each client on an ongoing basis*** and seek to adjust our prices as appropriate.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

1    247.   On March 27, 2014, the Company completed the IPO raising approximately

2  $240 million.

3    248.   For the period from March 27, 2014 (the IPO) until September 11, 2014 (the date of

4  the Secondary Offering), the only shares available to be purchased by Class Members were shares

5  issued in – and thus traceable to – the IPO.[29]  As stated in TriNet's IPO offering documents, lock-up

6  agreements prohibited insiders from selling shares for 180 days after the date of TriNet's IPO

7  prospectus, March 26, 2014: "All of our executive officers, senior management and directors and

8  substantially all of the holders of our capital stock are subject to lock-up agreements that restrict

9  their ability to transfer shares of our capital stock for 180 days from the date of this prospectus."  As

10  a result, no shares existed on the market for purchase (including those purchased by plaintiff) other

11  than those issued pursuant to the false and misleading IPO offering documents until TriNet's

12  Secondary Offering on September 11, 2014.

13  <u>False and Misleading Statements and Omissions in the Secondary Offering Registration Statement</u>

14

15    249.   On September 11, 2014, through the Secondary Offering Registration Statement

16  which was signed by Goldfield, Porter, August-deWilde, Babinec, Bingham, Goldman, Hodgson,

17  Kispert and Lowell, and identified Hodgson and the same "entities affiliated with General Atlantic

18  LLC" (¶245) as the selling stockholders, the Company and General Atlantic offered shares to the

19  public at $25.50 per share.

20    250.   On September 11, 2014, the Company issued a press release announcing that it had

21  priced a Secondary Offering of 12 million shares of TriNet common stock at $25.50 per share:

22

23

24

25

26

27  ---
[29]   The Forms 4 filed by General Atlantic and Hodgson in connection with the Secondary Offering indicate that the sales occurred on September 17, 2014, in which case all shares on the market were traceable to the IPO until this later date.

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

**TriNet Prices Secondary Offering**

TriNet Group, Inc. today announced the pricing of an underwritten registered public offering of 12,000,000 shares of common stock at a price of $25.50 per share. In addition, the underwriters have been granted a 30-day option to purchase up to an additional 1,800,000 shares of common stock from the selling stockholders. All of the shares in the offering are being offered by entities affiliated with General Atlantic LLC. TriNet will not receive any proceeds from the sale of the shares.

251.   On September 11, 2014, the Company filed an S-1MEF Registration Statement which registered 1,725,000 additional shares to be offered in the same Secondary Offering:

This Registration Statement is being filed with the Securities and Exchange Commission (the "Commission") with respect to the registration of additional shares of common stock, par value $0.000025 per share, of TriNet Group, Inc., a Delaware corporation, pursuant to Rule 462(b) under the Securities Act of 1933, as amended. This Registration Statement incorporates by reference the contents of, including all amendments and exhibits thereto, the Registration Statement on Form S-1 (Registration No. 333-198293), which was declared effective by the Commission on September 11, 2014, and is being filed solely for the purpose of increasing the number of shares to be offered in the public offering by 1,725,000, including 225,000 shares that may be sold pursuant to the underwriters' option to purchase additional shares.

252.   The Secondary Offering Registration Statement contained untrue statements of material fact, omitted to state other facts necessary in order to make the statements made therein not misleading and omitted to state material facts required to be stated therein.  Specifically, the Secondary Offering Registration Statement repeated the claims that defendants' insurance policies were fully insured and had aggregate stop-loss limits to liability, risk management was a core competency of the Company and the Company assessed both workers' compensation and medical benefits risks on an individual client basis:

- ***Risk management is a core competency of our company***.

- We leverage . . . our ***robust risk management capabilities*** to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients.

- ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***.

- We assess all workers compensation and medical benefits risks on ***an individual client basis*** and annually adjust pricing to reflect their ***current risk*** based on HIPAA-compliant analytics.

- Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***.

- Following our initial pricing of these policies, we analyze claims data ***for each client on an ongoing basis*** and seek to adjust our prices as appropriate.

253.    The Secondary Offering raised $336 million for the selling stockholders General Atlantic.

254.    <u>Reasons Why Statements in Offering Materials Were Materially False and Misleading</u>: Defendants' statements above concerning TriNet having fully insured medical and workers' compensation plans that limited the Company's potential losses, risk management being a core competency of the Company and the Company assessing both workers' compensation and medical benefits risks on an individual client basis were each materially false and misleading and failed to disclose the following facts:

(a)    Risk management was not a core competency and TriNet did not have robust risk management capabilities or management sufficient policies, procedures, and personnel in place to support defendants' claims of risk management proficiency.  Contrary to what the Company stated in the Offering Materials, risk management was not a "core competency," *i.e.*, among the Company's primary and unique strengths giving TriNet a competitive advantage.  In fact, defendants failed to disclose (and later admitted) that the Company did not have adequate insurance executives or in-house actuarial staff to effectively analyze risk in connection with the Company's historical or current claims experience and exposure.  *See* ¶¶255, 257, 259-260, 262-263, 265, 269, 271.  As later admitted, the Company's "lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training" was a material weakness.  ¶275.

(b)    The Company had not, at least in some instances, performed a state-by-state risk analysis of clients.  *See* ¶257.

(c)    Defendants falsely claimed that TriNet's insurance plans were fully insured in a manner that reduced their exposure to large claims and volatility risk.  TriNet's insurance plans were fully insured ***for the WSE customer***, but only 38%-40% of TriNet's insurance plans were fully

1    insured *for TriNet* by the insurance carrier TriNet contracted with.  The other 60%-62% of TriNet's

2    insurance plans were *jointly* insured by TriNet and the insurance carrier, exposing both TriNet and

3    the insurance carrier to insurance claims liability.  Thus, offering fully insured plans actually

4    *increased* TriNet's risk exposure.  Yet the IPO Registration Statement stated exactly the opposite,

5    telling investors that all of TriNet's "programs are fully insured by top-rated insurance carriers,

6    *which limits our ultimate exposure or potential losses*."  This was false in regards to the 60%-62%

7    of the plans jointly insured by TriNet and the carrier.

8           (d)    Analysts and investors were misled by defendants' use of the fully insured

9    term and defendants did not correct the misleading statements.  The market understood "fully

10   insured" to mean fully insured *for TriNet*.  ¶94 (Morgan Stanley: "the deductible layer [TriNet pays]

11   on benefits can range from 60% of risk for larger carriers to nothing (fully insured) for smaller

12   carriers"); ¶272 (J.P. Morgan: "After months of review, TNET announced it would not pursue a fully

13   insured or guaranteed cost strategy. . . .   In other words, it is still exposed to medical claims

14   volatility. . . some may have hoped for more certainty on risk (via fully insured)."  And defendants

15   acknowledged that the market understood the term in that way, with Porter, for example, noting that

16   "*some people* would call [plans in which carriers paid all claims costs] fully insured.  So that's

17   effectively a pass through."  ¶265 (Porter admitted in the same answer that TriNet was, as of

18   November 10, 2015, "exploring that *possibility* [plans fully insured for TriNet] with the carriers").

19   Thus, although defendants disclosed that TriNet took on deductible risk for some plans, the market

20   was lead to believe that that risk was "limited" in some way by the fully insured plans.  It was not.

21          (e)    Defendants' later admissions directly contradicting their claims of fully

22   insured plans evidence the falsity of the registration statement:

| Defendants in 2014 | Defendants in 2015 |
|---|---|
| IPO Registration Statements: "Our programs are *fully insured by* top-rated insurance *carriers*, which *limits our* ultimate exposure or potential losses." ¶252. | "[T]oday 40% of our plans are fully insured, 60% of our plans are high deductible . . . [The question is] *whether we should move* more *towards* the *fully insured* side of the plans." ¶263.<br><br>"So *if* we start at what guaranteed costs looks like and guaranteed costs or *some people would call it fully insured*.  So that's effectively a pass through [*i.e.*, liability is passed through to carriers]." ¶265. |

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                                                      - 105 -

| Defendants in 2014 | Defendants in 2015 |
|---|---|
|  | "[O]n a ***fully-insured*** plan . . . ***you would take the volatility*** out of it."  ¶265.<br><br>"38% of our plans are fully insured . . . if we went with the fully insured plans [for the other 62% of plans] it reduces the quarter-to-quarter volatility."  ¶269. |

(f)     The Offering Materials, and each of them, failed to disclose that TriNet did not have aggregate stop-loss limits at all, or did not have such limits that would sufficiently cap the Company's exposure to large spikes in claims.  *See* ¶263.

(g)     Both the IPO Registration Statement and the Secondary Offering Registration Statement were materially misstated in violation of SEC disclosure rules.  *See* ¶¶168-190.

(h)     The Offering Materials, and each of them, failed to disclose that the Company's internal controls suffered from wide spread material weaknesses as detailed in the Company's April 1, 2016, Form 10-K that individually and collectively impaired the Company's ability to ensure accuracy and control over financial reporting.  In particular, TriNet admitted that the Company's ineffective controls impacted insurance costs, workers' compensation and liabilities.  *See* ¶¶275-278.

- Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were  not operating effectively.

- [C]ontrols over the review of health premium expenses did not operate at a level of precision that would detect material errors.

- [L]ack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training . . . .

Claims Volatility and Revenue Shortfalls Reveal Systemic Inability to Manage Risk

255.     On March 3, 2015, the Company issued a press release announcing its 4Q14 financial results, revealing a 19% year-over-year decrease in net Insurance Service revenues and that 4Q14 EPS forecasts missed by a whopping 29%.  Defendants attributed the miss to a $10 million increase in large medical claims – the very type of volatility defendants assured investors and analysts that the core competency of risk management and actuarial reviews protected TriNet from.  *See* ¶¶246,

1   252.  The decrease in net Insurance Service revenues in turn caused a more than $10 million miss in

2   forecasted net service revenues.

3   256.   Following the March 3, 2015 disclosures, the stock price declined from a close of

4   $37.88 per share on March 3, 2015, to a close of $33.93 per share on March 4, 2015, on high trading

5   volume.

6   257.   On May 5, 2015, TriNet issued a press release announcing TriNet's 1Q15 financial

7   results.  The Company again reported disappointing financial results and was forced to reduce FY15

8   guidance.   This time the Company reported that it would in fact have to accrue for an extra

9   $10 million in workers' compensation costs in 2015 despite having previously assured investors that

10   its insurance plans were fully insured and had been properly accounted for.  ¶¶246, 252.  Defendants

11   also admitted that they had not done a state-by-state or sufficiently detailed analysis of a workers'

12   compensation book TriNet had previously acquired.

13   [Porter:]  We did see some increased development as we were closing out the fourth
14   quarter, and it looked like it was coming from some of the *higher cost states that we were doing business and expecting to grow*.  *So what we did is we took our actuarial, outside actuarial view down to do a state-by-state analysis*. . . .

15   . . . *[W]e need to do a better job of getting headlights from our own*
16   *perspective* on looking at how those claims are developing and building that into our outlook. . . .  *We are building some increased capability internally* to do that.

17                   *       *       *

18
19   [Goldfield:] So my feeling is *we have the systems.  We're evolving the processes.*
*We are adding in-house actuarial support*.  And ultimately this is not what drives
20   the business and *it is not a pricing issue*.

21   258.   After the May 5, 2015 disclosures, TriNet's stock price declined from a close of

22   $34.43 per share on May 5, 2015, to a close of $28.76 per share on May 6, 2015, on high trading

23   volume.

24   259.   On August 3, 2015, the Company issued a press release announcing its 2Q15

25   financial results, which missed both revenue and EPS estimates by a wide margin due to an increase

26   in large medical claims.  At a conference call the same day, defendants admitted that the Company

27   did not have the internal expertise necessary to forecast claims and manage risk:

28

1   [Goldfield]: I am disappointed that our second-quarter financial performance was
2   negatively impacted by a higher than usual number of large medical claims.  These
    claims were well in excess of our expected and historical claims volatility.

3                          *          *          *

4   ***I will strengthen my internal team.  This includes the recruitment of a senior
    insurance services executive reporting directly to me, as well as additional
5   actuarial and analytical capabilities***.

6                          *          *          *

7   [Porter:] ***Net insurance service revenues declined 43% to $24.2 million*** . . . .
    ***Net insurance service revenues were affected by a significantly higher number of
8   large medical claims than we had anticipated***.

9           . . . The result in Q2 was an approximate $20 million reduction in our net
    insurance service revenues compared to our forecast.

10
            ***Our revised 2015 forecast assumes the higher claims level continues and is
11  included in our trend***. . . .   The result is, in addition to the Q2 impact, we are
    reducing our net insurance service revenues by an additional $10 million for the
12  remainder of the year compared to our prior guidance.

13      260.    Defendants also acknowledged the need to have an experienced insurance executive

14  and actuarial capability to be part of the team.

15  [Goldfield:] ***[W]e need to find ways to a, get better visibility and b, to dampen the
    spike because it's not acceptable, the variability I saw in Q2***.
16
                           *          *          *
17
    ***I'm going to strengthen the internal team with a senior insurance executive who is
18  right by my side.  I'm going to increase the in-house actuarial and analytical
    capabilities***.
19
                           *          *          *
20
    ***I need to bring in some expertise in-***house that I can really get aligned with on the
21  overall service model and how it works within TriNet.  ***So that includes a senior
    executive reporting to me additional actuarial and analytical capabilities***.
22
        261.    Following the Company's disclosure of its 2Q15 financial results, the Company's
23
    stock price declined 38%, from a close of $26.69 per share on August 3, 2015, to a close of $16.33
24
    per share on August 4, 2015, on high trading volume.
25
        262.    On September 16, 2015, Goldfield and Porter participated in the Deutsche Bank
26
    Technology Conference to discuss the aftermath of the Company's disastrous 4Q14, 1Q15 and 2Q15
27
    as well as the yet unfinished efforts to create internal risk management capabilities and gain visibility
28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

into the Company's business.  During the call, defendants admitted that the Company did not have the financial forecasting tools or data necessary to underwrite their health insurance business and that a complete actuarial analysis, including a state-by-state analysis, part of the industry best practices, had not been done:

> [Porter:] So if we're referring to the situation that we saw in the first quarter, what we did see with it, we had acquired a book in the blue and gray market, ***and as part of our diligence, we didn't go down probably one layer more than we traditionally have been***.  We always bring in new actuarial work in sizing potential variability around any comp book that we acquire.
>
> ***In this situation, what we've learned is we probably actually should've gone back to the TPA and tested at a claims level what type of reserves were being put on at the TPA***.
>
> <div align="center">*       *       *</div>
>
> It was the open claims.  This is, again, it's an acquired book.  So this was a book that we had acquired back in October 2012 and their practice was that ***they did not reserve is what we would determine to be industry best practice***, and so even though we did sensitivity around all the loss triangles, ***what we should have done is gone one layer back and found out that the loss triangles probably were skewed based on the reserving practices***.
>
> Now those claims actually developed at a higher rate over time than what we had expected them to be, and that's why we made the adjustment in the first quarter because ***what we did is we had our outside actuaries go back and do a state-level analysis because we can get a more accurate read on which claims were developing at a higher rate, and it ended up being those states that generally you would expect to have higher costs, which would be California and New York.  But those also are the opportunity states where we see a lot of business***.

263.    On November 2, 2015, Goldfield and Porter participated in a conference call with analysts and investors to discuss the Company's 3Q15 financial results.  During the call, defendants again admitted that TriNet did not have fully insured plans, instead the majority (60%) were high deductible, and TriNet did not have internal actuaries to forecast and manage risk.  In addition, TriNet did not have and had not had aggregate pooling limits and could not assure investors it had or could acquire the processes or insurance constructs and wherewithal to correct the Company's business model so as to be profitable:

> [Goldfield:] ***We are bringing in new talent.  I have met with excellent candidates as part of the search for the Senior VP of Insurance Services.  Additionally, our team is in the advanced stages of selecting from a number of strong candidates for our Chief Medical Actuary position***.
>
> <div align="center">*       *       *</div>

*We will be looking at enhancing our forecasting capabilities and ability to monitor and manage that part of the business.*

The second area is new insurance constructs.  Either on one end of the spectrum would be more fully insured plans, *today 40% of our plans are fully insured, 60% of our plans are high deductible plans.  And whether we should move more towards the fully insured side of the plans*.

The opposite end of that spectrum is reinsurance.  Which would be a combination of either reducing pooling limits, today the pooling limits are somewhere between $350,000 and $1 million by carrier.  Reducing those pooling limits and *or putting an aggregate pooling limit in place [i.e. stop loss protection]*, meaning a total limit on the entire claims activity in any one quarter to dampen that volatility.

\*          \*          \*

[Analyst:] I know you have a process of reevaluating the strategy.  However, if you're breaking even on that business this year, and you're contemplating changes for next year, *is there any reason for us to think that even if you do pass through some of that lift, that effort or that initiative, would be at least margin breakeven* if not accretive if properly executed?

[Porter:] *I think we'll wait to really give our outlook for Q4 once we've finished the work. . . .  And we'll have a lot more to talk about once we have the construct and the team further in place in Q4.*

\*          \*          \*

[Analyst:] Based on your past experience, typically, does the step up in worker's comp expense in year one typically translate into another step up in worker's comp expense [in] year two given how actuarial accruals are calculated based on past claims experience?

[Porter:] That something that as we work with our actuaries and *now that we actually have our own actuary in house*, we will continue to look at.

264.    Following the November 2, 2015 disclosures, the stock price declined from a close of $19.29 per share on November 2, 2015, to a close of $18.10 per share on November 3, 2015, on high trading volume.

265.    On November 10, 2015, speaking at the JPMorgan Ultimate Services Investor Conference, defendants explained that only now was it time to bring that capacity in-house, then explained that internal actuaries are critical even under a fully insured model, explaining that whatever the construct of the insurance plans they were offering, defendants needed actuaries and other risk management experts to have enough visibility to manage the Company's liability:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

1    [Goldfield:] *[W]e're hiring in-house actuarial talent.  We rely on great external*
2    *talent, but it's time to bring those models in-house and have more visibility and*
     *focus around them*.

3         As I previously reported, we have a Chief Actuary on the workers' comp side
     and *we're closing on a Chief Actuary on the medical side*.  And then, additionally,
4    looking at different processes and services around how we are forecasting the
     medical and addressing the issues around the volatility associated with it.  And then,
5    finally, we're completing a study with a large outside consulting firm.

6                     *       *       *

7    [Analyst:] [M]aybe it would be helpful if you can just go through the spectrum of
     potential changes that you might make to call it out or hedge out the risk around
8    claims volatility.  What could that look like and what would the impact be on the
9    P&L?

10        [Porter:] So if we start at what guaranteed costs looks like and guaranteed
     costs or *some people would call it fully insured*.  So that's effectively a pass through.
     So if we and we are going through and exploring that possibility with the carriers, in
11    that situation effectively there is no performance fee, it's complete pass through and
     that would have a P&L impact on EBITDA margin of around 30%, because
12    performance fees would go away.

13                     *       *       *

14    [Goldfield:] [O]n a fully-insured plan . . . you would still want to get a really great set
     of tools and actuaries to understand the performance of the book . . . you would take
15    the volatility out of it, but you would still want that data.

16       266.    After the November 10, 2015 disclosure, the stock price traded at $19.66 per share,

17 down from $20.05 on November 9, 2015, on high trading volume.

18       267.    Then on February 29, 2016, the Company issued a press release announcing the

19 Company's financial results for the 4Q15 and FY15, declaring that the Company was unprepared to

20 file its Form 10-K and had sought an extension from the SEC due to the identification of material

21 weaknesses in its internal controls over financial reporting relating to "IT" controls and controls in

22 "key business processes":

23    TriNet also announced that they will file a Form 12b-25 with the SEC today
     providing for a *fifteen (15) calendar day* extension for its Annual Report on Form
24    10-K for the fiscal year ended December 31, 2015.  With this being TriNet's first
     assessment of internal controls over financial reporting pursuant to the Sarbanes-
25    Oxley Act of 2002, and given the multiple technology platforms that require
     evaluation and testing, TriNet requires additional time to complete its assessment of
26    its internal control over financial reporting.

27        In preparing the Company's financial statements as of and for the year ended
     December 31, 2015, *the Company identified material weaknesses in its internal*
28    *control over financial reporting relating to ineffective information technology*

*general controls and ineffective controls in key business processes*.  While these material weaknesses create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and analysis, no material adjustments, restatement or other revisions to previously issued financial statements are expected to be required.

. . . TriNet currently expects to finalize its financial results and file its Annual Report on Form 10-K prior to the expiration of the extension period and further expects that the financial information contained in the Form 10-K will be consistent with the financial results reported in this earnings release.

268.   On February 29, 2016, the Company held a conference call with analysts and investors to discuss the 4Q15 and FY15 financial results.  Porter addressed the Company's failure to timely file its FY15 Form 10-K stating:

[Porter:] For the first time, [our year-end reporting] process included an assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act. *In the course of completing our internal control assessment and preparing the FY15 financial statements, we became aware of material weaknesses in our internal controls over financial reporting, related to ineffective information technology general controls and ineffective controls in key business processes.  As a result of the material weaknesses in our internal control over financial reporting, we have concluded that our disclosure controls and procedures were not effective*.

While these material weaknesses create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and analysis, no material adjustments, restatement or other revisions to previously [issued] financial statements are expected to be required.  Furthermore, *we're putting in place plans and are committed to remediating these deficiencies by implementing changes to our internal control over financial reporting in the future*.

With this being our first assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act, and given the multiple platforms that require evaluation and testing, we have been unable to complete our assessment of our internal control over financial reporting.  And as a result, we have filed a Form 12b-25 with the SEC today, providing for a 15-calendar-day extension for our annual report on Form 10-K for the fiscal year ended December 31, 2015.  We currently expect to file our Form 10-K *prior to the expiration of the extension*, and further, that the financial information contained in the Form 10-K will be consistent with financial results in today's earnings release.

269.   During the February 29, 2016 conference call, Goldfield and Porter discussed the insurance claims volatility that had affected the business.  Goldfield announced that TriNet had finally been able to hire some of the internal talent promised, including a Vice President of Insurance Services, a Chief Medical Actuary and a Chief Workers Compensation Actuary.  He also explained that TriNet had been unable to negotiate reinsurance or other liability caps at cost effective prices,

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

1   particularly because TriNet had never previously approached reinsurers and that it was still an open

2   question as to whether TriNet "can arrive at the right balance of risk mitigation and costs":

> [Goldfield]: With the regard to reinsurance, our goal was focused on capping quarterly claims expense at the appropriate economic cost.  The pricing and attachment points we received from the market to-date were not conducive to achieving this objective at this time.
>
> *        *        *
>
> 38% of our plans are fully insured [but] . . . if we went with the fully insured plans [for all our plans] it reduces the quarter-to-quarter volatility, but it doesn't help the year-over-year because the increase would then be passed directly on to our clients.
>
> *        *        *
>
> *[W]e didn't get face-to-face early enough with the reinsurers*.  I think there is an opportunity as they get to know us and our constructs . . . .
>
> *        *        *
>
> [Analyst:] [Y]ou've brought on new talent in the insurance business, with a lot of experience in health and actuarial analysis.  What new findings have you discovered that you didn't previously know, that caused the elevated medical claims frequency from last year?
>
> [Porter:] *I don't think there's anything that we have seen that is going to help us go back and understand when you get large claims activity*.  But what we are looking at, both as part of the evaluation that we did with the consulting firm, as well as with Ed and the new actuarial talent is we're continuing to look at ways to get access into analyzed data faster.  And come to insights probably a little sooner, which helps us both identify trends earlier, and that also helps us then to consider what the effects are, either positive or negative, on pricing earlier.  So I think those are some of the things that have already come up, and we're looking at ways we can institutionalize that, both internally with the way we handle data, as well as how do we get data from different sources and look at it a little faster than we do today.

270.    Following the after hours announcement that TriNet was unprepared to file its Form

10-K on February 29, 2016, the Company's stock fell from a close of $13.09 on February 29, 2016,

to a close of $12.28 on March 1, 2016, on high trading volume.

271.    On March 1, 2016, Morgan Stanley issued a report titled "4Q15: Risky for Another

Day."  The report noted that "[t]here is an element of faith in forecasting net insurance revenue,

since the company's track record is short and inconsistent."  The report also explained that the "[d]e-

risked model remains elusive" because brokers were unwilling to provide TriNet with reinsurance at

attractive pricing, that the Sarbanes-Oxley delay appeared benign given the delay would only last

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

about 15 days, and that TriNet was still hoping to see the benefit from the late additions of internal actuarial experience:

> **New team of actuaries should help with intangibles**: *TNET hired a new SVP of Insurance, Chief Medical Actuary, and Chief Worker's Comp Actuary to bolster its insurance business decisionmaking and modeling accuracy*.  While early, the potential benefits are 1) improvements to operations i.e. best practices, 2) more precise reserving, 3) better forecasting of TNET business and industry trends, and 4) more thoughtful insurance pricing.

272.   On March 1, 2016, J.P. Morgan issued a report titled "Mixed Qtr, Reasonable Guidance As Plan To Hedge Risk Is Budgeted, But Not Solidified."  The report explained that TriNet was still exposed to the same medical claims volatility:

> **Medical risk update – status quo, but budgeting for reinsurance**.  After months of review, *TNET announced it would not pursue a fully insured or guaranteed cost strategy*, and instead is budgeting to hedge or reinsure its risk, but has not executed said plan yet.  In other words, it is *still exposed to medical claims volatility* for now, but has guided to include the cost of hedging volatility and will execute it at the right *price under the direction of the new internal risk team*. . . . *[S]ome may have hoped for more certainty on risk (via fully insured)* . . . .

273.   On March 8, 2016, Morgan Stanley issued a report titled "NDR: A Long (but Doable) 2016 To-Do List," which reported that "TNET underpriced its insurance premiums by 200bps on an aggregate level, and repricing its entire book will take 12-18 Months."

274.   On March 15, 2016, the Company issued a press release announcing that TriNet was still not able to file its FY15 Form 10-K, and could not say when it would be able to do so because it was still working to complete its audit and obtain the necessary attestations from its auditors:

> **SAN LEANDRO, Calif. – March 15, 2016 –** TriNet Group, Inc. (NYSE: TNET) today announced that, despite extensive efforts, TriNet was unable to file its Annual Report on Form 10-K for the year ended December 31, 2015, with the U.S. Securities and Exchange Commission (the "SEC") prior to the extended filing date of March 15, 2016.  TriNet currently expects to finalize its financial results and file its Annual Report on Form 10-K with the SEC as soon as practicable and further expects that the financial information contained in the Form 10-K will be consistent in all material respects with the financial results reported in our press release dated February 29, 2016.  Based on the review and analysis conducted to date, no material adjustments, restatement or other revisions to previously issued financial statements of the Company are currently expected to be required.
>
> As previously disclosed, TriNet was unable to timely file its 2015 Form 10-K with the U.S. Securities and Exchange Commission (the "SEC") on February 29, 2016, due to the fact that the Company required additional time to complete its first assessment of internal controls over financial reporting pursuant to the Sarbanes-Oxley Act of 2002, given the multiple technology platforms that required evaluation and testing.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 5:15-cv-03625-BLF

TriNet continues to work diligently to finalize the assessment of internal controls over financial reporting and to complete the audit of the Company's financial statements as of and for the year ended December 31, 2015, and obtain the related attestation and audit opinion from its auditors. TriNet currently expects to finalize its financial results and file its Annual Report on Form 10-K with the SEC as soon as practicable.

275.     On April 1, 2016, the Company filed its Form 10-K for the period ending December 31, 2015. The disclosures in the Form 10-K detailed the widespread internal controls weaknesses experienced by the Company which were not disclosed and further corroborate the allegations of factual falsity. *See* ¶¶164-165.

276.     In addition to the laundry list of material weaknesses, the FY15 Form 10-K removed statements plaintiff had previously alleged to be false and misleading in the consolidated complaint including claims that: "risk management is a core competency"; they "leverage[d their] robust risk management capabilities"; "[o]ur programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses"; "[w]e assess all . . . risks on an individual client basis"; and "analyze claims data for each client on an ongoing basis."

277.     As of the date of the filing of the FAC (which was the first complaint in this action to allege violations of the 1933 Act), TriNet's stock was trading below $16.00 per share.

278.     Since the filing of the FAC, subsequent events further support allegations of the falsity of the statements in the offering documents, including analyst reports that the Company remained unable to obtain reinsurance, to reduce aggregate deductible layers or pooling limits to reduce their exposure risk and thus was forced to increase prices, which negatively impacted the Company's ability to attract and retain customers.

## COUNT III

### Violations of Section 11 of the Securities Act Against
### TriNet, the Officer Defendants, the Director Defendants and the Underwriter Defendants

279.     Plaintiff incorporates ¶¶14-20, 26-27, 48-49, 50-78, 168-197, 242-278 by reference.

280.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is asserted against TriNet, the Officer Defendants, the Director Defendants (excluding Kispert with respect to the IPO offering documents) and the Underwriter Defendants on behalf of themselves and all persons who purchased or otherwise acquired TriNet common stock pursuant or traceable to the

1   IPO and the Secondary Offering.  For purposes of this Count, plaintiff affirmatively states that it

2   does not allege that defendants committed intentional or reckless misconduct or that defendants

3   acted with scienter or fraudulent intent.

4        281.    Plaintiff purchased 425 shares of TriNet common stock on May 20, 2014 at $23.58 a

5   share, 210 shares on May 27, 2014 at $24.44 a share, 150 shares on June 3, 2014 at $26.04 a share,

6   and 198 shares on June 3, 2014 at $25.76 a share.  Because of lock-up agreements only IPO shares

7   were available for purchase, the purchases were necessarily made pursuant to and traceable to the

8   IPO Registration Statement, and plaintiff has been damaged thereby.[30]  Plaintiff also purchased 200

9   shares of TriNet common stock on September 29, 2014 at $25.61 a share, 170 shares on December 1,

10  2014 at $29.50 a share, and 100 shares on December 22, 2014 at $31.49 a share, pursuant to and

11  traceable to the Second Offering Registration Statement and has been damaged thereby.[31]

12       282.    Both the IPO Registration Statement and the Secondary Offering Registration

13  Statement were defective and inaccurate, contained untrue statements of material fact and omitted to

14  state facts necessary to make the statements in the Offering Materials not misleading and omitted to

15  state material facts required to be stated therein.

16       283.    The IPO Registration Statement was signed by Goldfield, Porter, Bingham, Babinec,

17  Goldman, Hodgson, Lowell, and August-deWilde.

18       284.    The Secondary Offering Registration Statement was signed by Goldfield, Porter,

19  Bingham, Babinec, Goldman, Hodgson, Kispert, Lowell, and August-deWilde.

20

---

21  [30]  Nothing further is required to plead that plaintiff's purchases are traceable to the IPO.  *See*
22  *Century Aluminum*, 729 F.3d at 1107 ("when all of the company's shares were issued in a single
    offering under a single registration statement," a plaintiff's allegation that his "shares are directly
23  traceable to the offering in question states a claim 'that is plausible on its face'" to allege statutory
    standing "no further factual enhancement is needed because by definition *all* of the company's
24  shares will be directly traceable to the offering in question") (emphasis in original).

25  [31]  Because the misstatements in the IPO were repeated in the Secondary Offering, and as plaintiff
    can trace his share purchases to the IPO, and was damaged thereby, he has standing not only to
26  assert §11 claims pursuant to the IPO, but also on behalf of those who bought shares in the
    Secondary Offering.  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d
27  145, 158 (2d Cir. 2012) ("'class standing' – that is, standing to assert claims *on behalf of*
    purchasers . . . from other Offerings . . . does not turn on whether [plaintiff] would have statutory or
28  Article III standing" for those offerings) (emphasis in original), *Melendres*, 784 F.3d 1254.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF                                                              - 116 -

285.     Defendant TriNet is the registrant and issuer for both the offerings.  As such, TriNet is strictly liable for the materially false statements contained in the IPO Registration Statement and the Secondary Offering Registration Statement.

286.     Defendant TriNet and the Officer and Director Defendants who signed the IPO Registration Statement and/or Secondary Offering Registration Statement are strictly liable for the false and misleading statements and omissions incorporated into the Offering Materials.

287.     These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading.  In the exercise of reasonable care, the Officer and Director Defendants should have known of the material misstatements and omissions contained in the Offering Materials and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  As such, the Officer and Director Defendants are liable to Lead Plaintiff Howard Welgus and the Class.

288.     J.P. Morgan, Morgan Stanley, Deutsche Bank, Jefferies, Stifel and William Blair participated in and served as underwriters to the IPO.

289.     J.P. Morgan, Morgan Stanley, Deutsche Bank, Stifel and William Blair participated in and served as underwriters to the Secondary Offering.

290.     The Underwriter Defendants helped draft and disseminate the IPO Registration Statement and failed to conduct an adequate due diligent investigation, which was a substantial factor leading to the harm alleged in this complaint.

291.     The Underwriter Defendants helped draft and disseminate the Secondary Offering Registration Statement and failed to conduct an adequate due diligent investigation, which was a substantial factor leading to the harm alleged in this complaint.

292.     The Underwriter Defendants were each underwriters, as that term is used in §11(a)(5) of the Securities Act, and were sellers of TriNet common stock with respect to the IPO and the Secondary Offering and the Company's common stock sold through the Offering Materials.  The underwriters were paid more than $16.8 million in connection with the IPO and more than

1  $13 million in connection with the Secondary Offering.  The Underwriter Defendants were required

2  to investigate with due diligence the representations contained therein to confirm that they did not

3  contain materially misleading statements or omit material facts.   None of the Underwriter

4  Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the

5  statements described herein, which were contained in the IPO Registration Statement and the

6  Secondary Offering Registration Statement were true, were without omission of any material facts,

7  and/or were not misleading.

8         293.    None of the untrue statements or omissions alleged herein was a forward-looking

9  statement, but rather, each concerned exiting facts.

10         294.    Lead Plaintiff Howard Welgus purchased or otherwise acquired TriNet common

11  stock in the IPO and the Secondary Offering or traceable thereto in reliance upon the defective IPO

12  Registration Statement and the Secondary Offering Registration Statement and without knowledge

13  of the untruths and/or omissions alleged herein.  Plaintiff and the Class sustained damages when the

14  price of TriNet common stock declined substantially due to material misstatements and/or omissions

15  in the Offering Materials.

16         295.    By reasons of the conduct herein alleged, each defendant violated, and/or controlled a

17  person who violated §11 of the Securities Act.

18         296.    This action was brought within one year after plaintiff discovered or reasonably could

19  have discovered the untrue statements and omissions.  Less than three years has elapsed from the

20  date of the Offerings.

21                              **COUNT IV**

22                 **Violations of Section 12(a)(2) of the Securities Act Against**
                                    **All Defendants**
23

24         297.    Plaintiff incorporates ¶¶14-20, 26-27, 48-49, 50-78, 168-197, 242-296 by reference.

         298.    This claim is brought by plaintiff pursuant to §12(a)(2) of the Securities Act,
25
   15 U.S.C. 77l(a)(2), on behalf of all purchasers of TriNet common stock pursuant to the Offering
26
   Materials and is asserted against all defendants (excluding Kispert with respect to the IPO offering
27

28

1  documents).   For purposes of this Count, plaintiff does not claim that defendants committed

2  intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

3      299.    Defendants were sellers and offerors and/or solicitors of purchasers of the TriNet

4  common stock offered pursuant to the Offering Materials for financial gain.  Defendants caused to

5  issue, and/or signed the IPO Registration Statement and the Secondary Offering Registration

6  Statement, each used to induce investors, such as plaintiff and the other members of the Class, to

7  purchase TriNet common stock.

8      300.    The IPO Registration Statement was filed as an exhibit to the Secondary Offering

9  Registration Statement, and contained the same untrue statements of material fact, omitted to state

10  other facts necessary to make the statements therein made not misleading and omitted material facts

11  required to be stated therein.

12      301.    Plaintiff and the other Class members did not know, nor could they have known, of

13  the untruths or omissions contained in the Offering Materials.

14      302.    At the time of his purchases or acquisition of TriNet shares, plaintiff and other

15  members of the Class did not know of, or in the exercise of reasonable diligence could not have

16  known, the facts concerning the false statements/omissions alleged herein and could not have

17  reasonably discovered those facts prior to the IPO and the Secondary Offering.

18      303.    Less than one year has elapsed between the time that plaintiff discovered or

19  reasonably could have discovered the facts upon which this claim is based and the time that plaintiff

20  filed this allegation of violations of §12(a)(2) of the Securities Act.  Less than three years has

21  elapsed between the time that the securities upon which this Count is brought were offered to the

22  public and the time plaintiff filed this claim.

23      304.    By reason of the false statements/omissions alleged herein, defendants violated

24  §12(a)(2) of the Securities Act and are liable to plaintiff and the Class members who purchased or

25  acquired TriNet common stock pursuant to the Offering Materials, each of whom has been damaged

26  as a result of such violation.

27

28

1

## COUNT V

2

### Violations of Section 15 of the Securities Act
### Against All Defendants Except the Underwriter Defendants

3

305.    Plaintiff incorporates ¶¶14-20, 26-27, 48-49, 50-78, 168-197, 242-304 by reference.

4

306.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on

5

behalf of plaintiff and other members of the Class who purchased or otherwise acquired TriNet

6

common stock pursuant to the Offering Materials and who were damaged thereby against all

7

defendants except the Underwriter Defendants.  For purposes of this Count, plaintiff affirmatively

8

states that he does not claim that defendants committed intentional or reckless misconduct or that

9

defendants acted with scienter or fraudulent intent.

10

307.    Each of the defendants (including General Atlantic) except the Underwriter

11

Defendants acted as controlling persons of TriNet within the meaning of §15 of the Securities Act by

12

virtue of his position as a director and/or senior officer of TriNet.  By reason of their senior

13

management positions and/or directorships at the Company or share ownership in TriNet (¶¶71-78)

14

as alleged above, all defendants except the Underwriter Defendants, individually and acting pursuant

15

to a common plan, had the power to influence and exercise the same to cause TriNet to engage in the

16

conduct complained of herein.  Defendants were able to and did control the contents of the Offering

17

Materials, which contained materially false statements and financial information and were culpable

18

participants in the violation of §§11 and 12 of the Securities Act alleged herein.  By reason of such

19

conduct, each of the defendants except the Underwriter Defendants are liable pursuant to §15 of the

20

Securities Act jointly and severally to plaintiff and other members of the Class.

21

### SAFE HARBOR IS INAPPLICABLE TO INITIAL PUBLIC OFFERINGS

22

308.    Defendants are liable for any false and misleading forward-looking statement issued

23

in the Offering Materials.  The Safe Harbor provision of §27A of the Securities Act, 15 U.S.C. 77z-

24

2(b)(2)(D), specifically excludes those statements "made in connection with an initial public

25

offering," which includes all of the false and misleading statements at issue.

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

**CLASS ACTION ALLEGATIONS**

309.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who acquired shares of TriNet common stock pursuant or traceable to the Company's false and misleading IPO Registration Statement and the Secondary Offering Registration Statement (the "Offering Class") and who were damaged thereby.  Excluded from the Offering Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

310.    The members of the Offering Class are so numerous that joinder of all members is impracticable.  TriNet stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by TriNet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to those customarily used in securities class actions.  TriNet has more than 68 million shares of stock outstanding.

311.    Plaintiff's claims are typical of the claims of the members of the Offering Class as all members of the Offering Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

312.    Plaintiff will fairly and adequately protect the interests of the members of the Offering Class and has retained counsel competent and experienced in class and securities litigation.

313.    Common questions of law and fact exist as to all members of the Offering Class and predominate over any questions solely affecting individual members of the Offering Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the Securities Act was violated by defendants' acts as alleged herein;

1        (b)    Whether statements made by defendants to the investing public in the Offering

2    Materials misrepresented material facts about the business, operations and management of TriNet;

3    and

4        (c)    To what extent the members of the Offering Class have sustained damages

5    and the proper measure of damages.

6

7        314.    A class action is superior to all other available methods for the fair and efficient

8    adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

9    damages suffered by individual Offering Class members may be relatively small, the expense and

10   burden of individual litigation make it impossible for members of the Class to individually redress

11   the wrongs done to them.  There will be no difficulty in the management of this action as a class

12   action.

13   <center>**PRAYER FOR RELIEF**</center>

14   WHEREFORE, plaintiff prays for relief and judgment, as follows:

15   A.    Determining that this action is a proper class action and certifying plaintiff as a Class

16   representative under Rule 23 of the Federal Rules of Civil Procedure;

17   B.    Awarding compensatory damages in favor of plaintiff and the other Class members

18   against all defendants, jointly and severally, for all damages sustained as a result of defendants'

19   wrongdoing, in an amount to be proven at trial, including interest thereon;

20   C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

21   action, including counsel fees and expert fees;

22

23   D.    Awarding statutory rescission or a rescissory measure of damages; and

24   E.    Such equitable/injunctive or other relief as deemed appropriate

25

26

27

28

1

**JURY DEMAND**

2
Plaintiff demands a trial by jury.

3
DATED:  March 3, 2017                    ROBBINS GELLER RUDMAN

4
                                         & DOWD LLP
                                         SHAWN A. WILLIAMS

5
                                         DANIEL J. PFEFFERBAUM
                                         NADIM G. HEGAZI

6
                                         KENNETH J. BLACK
                                         JOHN H. GEORGE

7

8
                                                 s/ Shawn A. Williams

9
                                         SHAWN A. WILLIAMS

10
                                         Post Montgomery Center
                                         One Montgomery Street, Suite 1800

11
                                         San Francisco, CA  94104
                                         Telephone:  415/288-4545

12
                                         415/288-4534 (fax)

13
                                         Lead Counsel for Plaintiff

14
                                         HOLZER & HOLZER, LLC
                                         COREY D. HOLZER

15
                                         1200 Ashwood Parkway, Suite 410
                                         Atlanta, GA  30338

16
                                         Telephone:  770/392-0090
                                         770/392-0029 (fax)

17
                                         Additional Counsel for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

1

<u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on March 3, 2017, I authorized the electronic filing of the foregoing with

3   the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4   e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5   caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6   CM/ECF participants indicated on the attached Manual Notice List.

7          I certify under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.  Executed on March 3, 2017.

9                                                              s/ Shawn A. Williams
                                                        SHAWN A. WILLIAMS
10
                                                        ROBBINS GELLER RUDMAN
11                                                          & DOWD LLP
                                                        Post Montgomery Center
12                                                      One Montgomery Street, Suite 1800
                                                        San Francisco, CA  94104
13                                                      Telephone:  415/288-4545
                                                        415/288-4534 (fax)
14                                                      E-mail: shawnw@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
5:15-cv-03625-BLF

# Mailing Information for a Case  5:15-cv-03625-BLF Welgus v. Trinet Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Allan J Arffa**
  aarffa@paulweiss.com,mao_fednational@paulweiss.com

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com

- **Charles E. Davidow**
  cdavidow@paulweiss.com,mao_fednational@paulweiss.com

- **Richard L. Gallagher**
  richard.gallagher@ropesgray.com,courtalert@ropesgray.com,april.kee@ropesgray.com

- **Nadim Gamal Hegazi**
  nhegazi@rgrdlaw.com

- **Lisa Ann Jacobs**
  ljacobs@sflaw.com,dponiatowski@sflaw.com,martola@sflaw.com,calendar@sflaw.com

- **Anne Johnson Palmer**
  anne.johnsonpalmer@ropesgray.com,courtalert@ropesgray.com

- **Kajsa McLean Minor**
  kminor@sflaw.com,martola@sflaw.com,calendar@sflaw.com

- **Brian O. O'Mara**
  bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Laura Kabler Oswell**
  oswelll@sullcrom.com,muscatellon@sullcrom.com,s&cmanagingclerk@sullcrom.com,hogbergs@sullcrom.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Arthur Joel Shartsis**
  ashartsis@sflaw.com,ljacobs@sflaw.com,wcornell@sflaw.com,calendar@sflaw.com

- **Austin C Thompson**
  AThompson@paulweiss.com,mao_fednational@paulweiss.com

- **Matthew Austen Tolve**
  matthew.tolve@ropesgray.com,nicole.horowitz@ropesgray.com,courtalert@ropesgray.com,rogelio.jose@ropesgray.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,dpfefferbaum@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

ATTACHMENT 1

Table of Contents

As filed with the Securities and Exchange Commission on March 13, 2014

Registration No. 333-192465

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

## Amendment No. 4
to
## FORM S-1
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# TRINET GROUP, INC.
### (Exact name of Registrant as specified in its charter)

| Delaware | 7389 | 95-3359658 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1100 San Leandro Blvd., Suite 400**
**San Leandro, CA 94577**
**(510) 352-5000**
(Address, including zip code and telephone number, including area code, of Registrant's principal executive offices)

**Burton M. Goldfield**
**Chief Executive Officer**
**TriNet Group, Inc.**
**1100 San Leandro Blvd., Suite 400**
**San Leandro, CA 94577**
**(510) 352-5000**
(Name, address, including zip code and telephone number, including area code, of agent for service)

*Copies to:*

| | | |
|---|---|---|
| Jodie M. Bourdet | Gregory L. Hammond | Gordon K. Davidson |
| Craig D. Jacoby | Chief Legal Officer | Daniel J. Winnike |
| Andrew S. Williamson | TriNet Group, Inc. | Fenwick & West LLP |
| Cooley LLP | 1100 San Leandro Blvd., Suite 400 | 801 California Street |
| 101 California Street, 5th Floor | San Leandro, CA 94577 | Mountain View, CA 94041 |
| San Francisco, California 94111 | (510) 352-5000 | (650) 988-8500 |
| (415) 693-2000 | | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered (1) | Proposed Maximum Aggregate Offering Price Per Share | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee(3) |
|---|---|---|---|---|
| Common Stock, $0.000025 par value per share | 17,250,000 | $17 | $293,250,000 | $37,771 |

(1)  Includes an additional 2,250,000 shares that the underwriters have the option to purchase.

(2)  Estimated solely for the purpose of calculating the amount of the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended. Includes the aggregate offering price of the additional shares that the underwriters have the option to purchase.

(3)  The Registrant previously paid $32,200 of this amount in connection with the initial filing of this Registration Statement.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or**

**Table of Contents**

The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**Subject to completion, dated March 13, 2014.**

**Prospectus**

## 15,000,000 Shares



## Common Stock

This is an initial public offering of shares of common stock of TriNet Group, Inc.

We are offering 15,000,000 shares of our common stock. Prior to this offering, there has been no public market for our common stock. It is currently estimated that the initial public offering price per share will be between $15.00 and $17.00. We intend to list our common stock on the New York Stock Exchange under the symbol "TNET."

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discount(1) | $ | $ |
| Proceeds, before expenses, to TriNet | $ | $ |
| Proceeds, before expenses, to the selling stockholders | $ | $ |

(1)   See "Underwriting" for a description of the compensation payable to the underwriters.

The selling stockholders, which are entities affiliated with General Atlantic, have granted the underwriters an option to purchase up to an additional 2,250,000 shares at the initial public offering price, less the underwriting discount. We will not receive any of the proceeds from the sale of the shares sold by the selling stockholders.

**See "Risk Factors" beginning on page 15 to read about factors you should consider before buying shares of our common stock.**

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the shares against payment in New York, New York on               , 2014.

# J.P. Morgan                    Morgan Stanley                    Deutsche Bank Securities

## Jefferies                              Stifel                              William Blair

Prospectus dated               , 2014

**Table of Contents**

All of our executive officers, senior management and directors and substantially all of the holders of our capital stock are subject to lock-up agreements that restrict their ability to transfer shares of our capital stock for 180 days from the date of this prospectus. Approximately 53 million shares of our common stock, based on the number of shares outstanding as of December 31, 2013 (including preferred stock on an as-converted basis), will become eligible for sale upon expiration of the 180-day lock-up period. J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC may, in their sole discretion, permit the parties to these lock-up agreements to sell shares prior to the expiration of the lock-up agreements.

In addition, as of December 31, 2013, there were 6,281,148 shares of common stock subject to outstanding options and 40,000 shares of common stock issuable upon settlement of restricted stock units. We intend to register all of the shares of common stock issuable upon exercise of these outstanding options and settlement of these outstanding restricted stock units, and upon exercise or settlement of any options or other equity incentives we may grant in the future, for public resale under the Securities Act of 1933, as amended. Accordingly, these shares will be able to be freely sold in the public market upon issuance as permitted by any applicable vesting requirements, subject to the lock-up agreements described above. These shares will become eligible for sale in the public market to the extent such options are exercised or such restricted stock units settle, subject to the lock-up agreements described above and compliance with applicable securities laws.

Holders of 38,065,708 shares of common stock issuable upon conversion of outstanding preferred stock as of December 31, 2013, and without giving effect to the sale of shares in this offering by the selling stockholders, have rights, subject to some conditions, to require us to file registration statements for the public resale of the common stock issuable upon conversion of such shares or to include such shares in registration statements that we may file for TriNet or our stockholders.

### *Purchasers in this offering will experience immediate and substantial dilution in the book value of their investment.*

The initial public offering price of our common stock will be substantially higher than the pro forma net tangible book value per share of our common stock outstanding immediately following this offering. Therefore, if you purchase shares of our common stock in this offering at a price of $16.00, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, you will experience immediate dilution of $23.29 per share, the difference between the price per share you pay for our common stock and its pro forma net tangible book value per share as of December 31, 2013, after giving effect to the issuance of shares of our common stock in this offering. This dilution is due in large part to the fact that our earlier investors paid substantially less than the initial public offering price when they purchased their shares of our common stock. In addition, we have issued options and a warrant to acquire our common stock at prices significantly below the initial public offering price. To the extent that outstanding options and the warrant are ultimately exercised, there will be further dilution to investors purchasing our common stock in this offering. In addition, if the underwriters exercise their option to purchase additional shares from us or if we issue additional equity securities, you will experience additional dilution.

### *Future sales and issuances of our capital stock or rights to purchase our capital stock could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to decline.*

We may issue additional securities after this offering. Future sales and issuances of our capital stock or rights to purchase our capital stock could result in substantial dilution to our existing stockholders. We may sell common stock, convertible securities and other equity securities in one or more transactions at prices and in a manner as we may determine from time to time. If we sell any such securities in subsequent transactions, investors may be materially diluted. New investors in these subsequent transactions could gain rights, preferences and privileges senior to those of holders of our common stock.

Table of Contents

## USE OF PROCEEDS

We estimate that we will receive net proceeds from the sale of common stock offered by us of approximately $217.8 million, based upon an assumed initial public offering price of $16.00 per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. We will not receive any proceeds from the sale of common stock by the selling stockholders.

Each $1.00 increase (decrease) in the assumed initial public offering price of $16.00 per share would increase (decrease) the net proceeds to us from this offering by approximately $14.0 million, assuming the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting estimated underwriting discounts and commissions. Similarly, each increase (decrease) of 1,000,000 shares in the number of shares of common stock offered by us would increase (decrease) the net proceeds to us from this offering by approximately $14.9 million, assuming that the assumed initial public offering price remains the same, and after deducting estimated underwriting discounts and commissions.

The principal purpose of this offering is to repay approximately $215.0 million of indebtedness outstanding under our credit facilities, increase our equity capitalization and financial flexibility, increase our visibility in the marketplace and create a public market for our common stock.

Our credit facilities consist of (a) a first lien credit facility, which provides for a $75.0 million revolving credit facility, a $175.0 million tranche B-1 term loan and a $455.0 million tranche B-2 term loan, and (b) a second lien credit facility, which provides for a $190.0 million term loan. As of December 31, 2013, we had an aggregate of $818.4 million of indebtedness outstanding under our senior secured credit facilities. We intend to repay the entire $190.0 million of indebtedness outstanding under our second lien term loan and $25.0 million of the indebtedness outstanding under our $175.0 million tranche B-1 term loan with the net proceeds of this offering. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Credit Facilities."

As of the date of this prospectus, we cannot specify with certainty all of the particular uses for any remaining net proceeds to us from this offering. However, we currently intend to use the net proceeds to us from this offering primarily for general corporate purposes, including working capital, sales and marketing activities, general and administrative matters and capital expenditures. We may also use a portion of the net proceeds from this offering for the acquisition of, or investment in, technologies, solutions or businesses that complement our business, although we have no present commitments or agreements to enter into any such acquisitions or investments. We will have broad discretion over the uses of the net proceeds from this offering. Pending these uses, we intend to invest the net proceeds from this offering in short-term, investment-grade, interest-bearing securities such as money market funds, certificates of deposit, commercial paper and guaranteed obligations of the U.S. government.

Table of Contents

## MANAGEMENT

**Executive Officers, Other Key Employees and Directors**

Our executive officers, other key employees and directors, their respective positions and their respective ages as of December 31, 2013 are as follows:

| Name | Age | Position(s) |
|------|-----|-------------|
| ***Executive Officers*** | | |
| Burton M. Goldfield | 58 | President, Chief Executive Officer and Director |
| William Porter | 59 | Vice President and Chief Financial Officer |
| Gregory L. Hammond | 58 | Executive Vice President and Chief Legal Officer |
| John Turner | 48 | Senior Vice President of Sales |
| ***Other Key Employees*** | | |
| Steven Apfelberg | 43 | Vice President of Marketing |
| James Franzone | 38 | Vice President of Corporate Development |
| Madhukar Govindaraju | 47 | Vice President of Products and Software Development |
| Jonathan Hubley | 46 | Vice President of Operations |
| Meredith Johnson | 51 | Vice President of Human Resources |
| Pasquale ("Patrick") Villella | 52 | Vice President of Client Services |
| ***Non-Employee Directors*** | | |
| H. Raymond Bingham[1][3] | 68 | Chairman |
| Katherine August-deWilde[2][3] | 65 | Director |
| Martin Babinec | 58 | Director |
| Kenneth Goldman[2] | 64 | Director |
| David C. Hodgson[2][3] | 57 | Director |
| Wayne B. Lowell[1][2] | 58 | Director |

(1)   Member of the compensation committee.

(2)   Member of the audit committee.

(3)   Member of the nominating and corporate governance committee.

### *Executive Officers*

**Burton M. Goldfield** joined TriNet in May 2008 succeeding Martin Babinec, TriNet's founder, as Chief Executive Officer. From 2006 to 2008, Mr. Goldfield was Chief Executive Officer of Ketera Technologies, Inc., a provider of on-demand Software-as-a-Service management solutions. From 2004 to 2006, he was the Senior Vice President of Worldwide Field Operations at Hyperion Solutions Corporation, a business performance management software company, which was ultimately acquired by Oracle Corporation. Earlier, he was with Rational Software Corporation for 13 years in a variety of management capacities, and subsequently Vice President of Worldwide Sales for IBM Corporation, Rational Software division upon the acquisition of Rational by IBM. Mr. Goldfield holds a B.S. in biomedical engineering from Syracuse University and an M.B.A. from Villanova University. Mr. Goldfield's significant business experience both inside and outside our industry and role as our Chief Executive Officer brings unique insight to our board of directors.

**William Porter** joined TriNet in August 2010 as Chief Financial Officer. Prior to joining TriNet, Mr. Porter was most recently at Cadence Design Systems, Inc., a computer-aided design company, where he served in a series of executive roles over a 15-year period, including Chief Financial Officer from May 1999 to April 2008 and Executive Vice President and Chief Administrative Officer from April 2008 to October 2008. Prior to Cadence, Mr. Porter spent six years at Apple Inc., where he held various accounting, reporting and operational

103

**Table of Contents**

roles. He began his career at Arthur Andersen, where he served small and medium-sized businesses and high-tech clients and gained 12 years' experience in accounting, audits, business consulting and mergers and acquisitions. Mr. Porter holds a B.A. in accounting and an M.B.A. in finance, both from the University of California at Berkeley.

*Gregory Hammond* has served as our Chief Legal Officer since joining TriNet in 1997. For 20 years prior to joining TriNet, Mr. Hammond practiced outsourced human resources law at various private law firms, including Seyfarth, Shaw, Fairweather & Geraldson, a predecessor to Seyfarth Shaw LLP, Millisor & Nobil, Co., which was subsequently acquired by Fisher & Phillips LLP, Hahn Loeser & Parks LLP and Hammond & Kazaglis Co., L.P.A. From 1987 to 1991, Mr. Hammond served as general counsel to the National Association of Professional Employer Organizations, or NAPEO. Mr. Hammond also serves on the board of directors of Big Sunday, a nonprofit organization. Mr. Hammond holds a B.A. from Mercer University and a J.D. from the University of Chicago.

*John Turner* joined TriNet in April 2012 as the Senior Vice President of Sales. From January 2011 to March 2012, Mr. Turner was the Vice President of American Sales at FalconStor Software, Inc., a provider of data protection and storage virtualization solutions. From 2004 to January 2011, Mr. Turner also served as the Vice President of Sales for Symantec Corporation, a security software company. Mr. Turner joined Symantec in connection with its acquisition of VERITAS, where he served as the Senior Director for Western U.S., Emerging Solutions. Prior to joining VERITAS, he was Vice President of Sales for Gartner CIO Programs. Mr. Turner holds a B.A. in Marketing from Santa Clara University and an M.B.A. from San Jose State University.

*Other Key Employees*

*Steven Apfelberg* joined TriNet in November 2012 as our Vice President of Marketing. From May 2011 to June 2012, he was the Chief Marketing Officer at Skire Solutions Inc., a provider of project management software for capital construction, real estate and facilities that was acquired by Oracle Corporation in 2012. From October 2009 to January 2011, he was the Vice President of Marketing at Yammer Inc., an enterprise social networking solutions company. From October 2004 to September 2009, Mr. Apfelberg held various positions at Callidus Software Inc., a provider of cloud-based sales, marketing, learning and hiring solutions, including serving as the Senior Vice President of Marketing and Business Development from April 2008 to September 2009. He also held senior roles in marketing and finance at Siebel Systems, Remedy and Oracle Corporation. Mr. Apfelberg holds a B.A. in Economics from Stanford University.

*James Franzone* joined TriNet in July 2010 as our Vice President of Corporate Development. From July 2005 to July 2010, Mr. Franzone was Vice President at General Atlantic LLC, a leading global growth equity firm. Mr. Franzone also previously served as senior associate for Technology Crossover Ventures, a venture capital firm. He began his career as a business analyst at McKinsey & Company, a management consulting firm, where he drove growth initiatives through organic and acquisitive means in partnership with senior management teams. Mr. Franzone holds an A.B. in economics from Dartmouth College and an M.B.A. from Stanford University.

*Madhukar Govindaraju* joined TriNet in 2013 as the Vice President of Products and currently serves as the Vice President of Products and Software Development. From 2012 to 2013, Mr. Govindaraju served as the Senior Vice President of Engineering and Technology at Spigit, Inc. From 2010 to 2012, Mr. Govindaraju served as the Senior Vice President of Engineering at Saba Software, Inc. From 2009 to 2010, Mr. Govindaraju was the Chief Development Architect within the Technology and Innovation Platform Group at SAP, where he was responsible for the SAP Business Objects Suite of On-Premise and On-Demand / SaaS BI products. From 2007 to 2009, Mr. Govindaraju served in multiple roles at SAP Labs, LLC and Business Objects, S.A., and from March 2006 to April 2007 he served as Vice President, Engineering at Cloud9 Analytics. Prior to March 2006, Mr. Govindaraju served as Vice President of Engineering at Hyperion Solutions Corporation, CTO and Vice President of Engineering at Promptu Corporation and CTO and Senior Vice President, Engineering at ChipCenter, LLC. Mr. Govindaraju holds a M.S. in Computer Science from the Indian Institute of Science, Bangalore, India. Mr. Govindaraju has also been a Visiting Fellow at the Tsinghua (Peking) University's Business Performance Management Research Institute.

**Table of Contents**

*Jonathan Hubley* joined TriNet in 2009 as Vice President of Service Operations and currently serves as our Vice President of Operations. In 2006, Mr. Hubley began his tenure with Gevity as Director in Service Delivery, and was subsequently promoted to Vice President of Service Delivery, Operations at Gevity, a title he held until 2009. From 2002 to 2006, Mr. Hubley also worked at Ceridian Corporation, a human resources services company, as its Director of Operations. Prior to 2002, Mr. Hubley held management positions at Scholastic Inc., J. Crew and IBM. Mr. Hubley holds a B.B.A. from the University of Notre Dame.

*Meredith Johnson* joined TriNet in 2009 as Vice President of Human Resources and currently serves as our Vice President of Human Resources. From 1996 to 2009, Ms. Johnson served for over 12 years at Gevity in roles including corporate HR, service, sales, and operations, most recently as Chief People Officer. Ms. Johnson holds a B.S. in Journalism from the University of Florida.

*Pasquale ("Patrick") Villella* joined TriNet in January 2007 as our Director of Sales for the Northeast, Midwest and Mid-Atlantic regions. In January 2011, he was promoted to Vice President, Human Capital Services and in July 2012, he was promoted to the newly-created position of Vice President of Client Services. Prior to joining TriNet, Mr. Villella served in a variety of individual contributor and management roles at Insperity, a human resources services company, from April 2002 through January 2007. Mr. Villella holds a B.A. from Providence College, a J.D. from the New England School of Law and a Masters of Law and Letters from Boston University School of Law.

### Board of Directors

*H. Raymond Bingham* has been a director since July 2008 and has served as our Chairman since January 2010. He is an Advisory Director of General Atlantic LLC and served as a Managing Director from September 2006 to December 2009. He was Executive Chairman of the Board of Directors of Cadence Design Systems, Inc., a supplier of electronic design automation software and services, from May 2004 to July 2005, and served as a director of Cadence from November 1997 to July 2005. Prior to his role as Executive Chairman, he served as President and Chief Executive Officer of Cadence from April 1999 to May 2004 and as Executive Vice President and Chief Financial Officer from April 1993 to April 1999. Mr. Bingham also serves as a director of Spansion, Inc., Flextronics International Ltd., Oracle Corporation, Dice Holdings, Inc. and Fusion-io, Inc. Mr. Bingham holds a B.S. in Economics from Weber State University and an M.B.A. from Harvard Business School. Additionally, he was awarded an Honorary Doctorate of Humanities from Weber State University. Mr. Bingham was appointed to serve on our board of directors based on his broad and extensive experience serving in management roles at technology companies, including as chief executive officer and chief financial officer, as well as his experience as an Advisory Director of General Atlantic. Mr. Bingham's significant service on the board of directors of other publicly traded technology companies and his extensive knowledge and experience managing portfolio companies both within and outside our industry brings unique insight to our board of directors.

*Katherine August-deWilde* has been a director since October 2013. Since September 2007, Ms. August-deWilde has served as the President and Chief Operating Officer of First Republic Bank, a commercial bank specializing in private banking, business banking and wealth management. Ms. August-deWilde has served in various roles at First Republic Bank since 1985, including as Chief Financial Officer and Executive Vice President and Chief Operating Officer. Prior to joining First Republic Bank, Ms. August-deWilde served as Vice President and Treasurer, and later as Senior Vice President and Chief Financial Officer, at PMI Mortgage Insurance Co. from 1979 to 1985. From 1975 to 1979, she was an associate at McKinsey & Company. Ms. August-deWilde has also served on the board of directors of First Republic Bank since 1988. She is a Trustee of the Boys & Girls Clubs of San Francisco, a member of the Advisory Council of the Stanford Center on Longevity, and a member of the Stanford Graduate School of Business Advisory Council. Ms. August-deWilde holds a B.A. from Goucher College and an M.B.A. from Stanford University. Ms. August-deWilde was appointed to serve on our board of directors based on her business acumen and financial expertise and her experience as a chief financial officer.

**Table of Contents**

*Martin Babinec* founded TriNet in 1988 and has served on our board of directors since that time, acting as Chairman until December 2009. From 1988 until May 2008, he also served as our Chief Executive Officer. Mr. Babinec also founded and serves as Chairman of Upstate Venture Connect and co-founded and serves as Chairman of the StartFast Venture Accelerator. Prior to founding TriNet, Mr. Babinec served in senior human resources management positions at the Navy Exchange, an international retailer. Mr. Babinec holds a B.S. in Business Administration from Shippensburg University. Mr. Babinec's significant business experience both inside and outside our industry and role as our founder and former Chief Executive Officer brings unique insight to our board of directors.

*Kenneth Goldman* has been a director since August 2009. Since October 2012, Mr. Goldman has served as the Chief Financial Officer of Yahoo! Inc., an internet services company. Prior to joining Yahoo!, Mr. Goldman served as Chief Financial Officer of Fortinet Inc., a provider of unified threat management solutions, from September 2007 to October 2012. From November 2006 to August 2007, Mr. Goldman served as Executive Vice President and Chief Financial Officer of Dexterra, Inc., a provider of mobile enterprise software. From August 2000 until March 2006, Mr. Goldman served as Senior Vice President, Finance and Administration, and Chief Financial Officer of Siebel Systems, Inc., a supplier of customer software solutions and services which was acquired by Oracle Corporation in January 2006. Mr. Goldman serves on the board of directors of Infinera Corporation, NXP Semiconductors N.V., Gigamon Inc. and Yahoo! Japan. Mr. Goldman is also a Trustee Emeritus on the board of trustees of Cornell University. Mr. Goldman holds a B.S. in Electrical Engineering from Cornell University and an M.B.A. from Harvard Business School. Mr. Goldman was appointed to serve on our board of directors based on his significant experience as a chief financial officer of public companies.

*David C. Hodgson* has been a director since 2005 and is a Managing Director of General Atlantic LLC. He joined General Atlantic in 1982, helped found their partnership, and has over 30 years of experience identifying and assisting portfolio companies worldwide in all areas of their development. Mr. Hodgson serves on the boards of directors of a number of public and private companies including Pierpont Securities, Hyperion Insurance Group Limited, and Dice Holdings, Inc. Mr. Hodgson is chairman of the boards of trustees of Johns Hopkins Medicine, Johns Hopkins Hospital System, Manhattan Theatre Club and Echoing Green. He also serves as a trustee of Dartmouth College and Johns Hopkins University. Mr. Hodgson holds an A.B. in Mathematics and Social Sciences from Dartmouth College and a M.B.A. from the Stanford University Graduate School of Business. Mr. Hodgson was appointed to serve on our board of directors based on his experience as a Managing Director of General Atlantic.

*Wayne B. Lowell* has been a director since 2009. Since early 2012, Mr. Lowell has been serving as Chairman and Chief Executive Officer of Senior Whole Health Holdings, Inc., a health insurance company focused on providing health insurance coverage to senior citizens. From October 2007 to July 2008, Mr. Lowell served as Chief Executive Officer of Wellmed Medical Management, Inc., a physician healthcare services company. From 1998 to September 2007 and July 2008 to June 2012, he served as President of Jonchra Associates, LLC, which provides strategic, operating and financial advice to senior management of private-equity funded and publicly held entities. From 1986 to 1998, he worked for PacifiCare Health Systems (now part of United Healthcare). At PacifiCare, he held various positions of increasing authority, ultimately serving as Executive Vice President, Chief Financial Officer and Chief Administrative Officer. From January 2010 to June 2013, Mr. Lowell served on the board of directors of Addus Homecare Corp., and from August 2007 to March 2011, he served on the board of directors of Insight Health Services Holdings Corp. Mr. Lowell holds a B.S. in accounting from the University of Maryland and an M.B.A. from the University of California at Irvine. Mr. Lowell is a Certified Public Accountant. Mr. Lowell was appointed to serve on our board of directors based on his years of experience in the health care industry and his experience as a chief financial officer.

Each of our officers serves at the discretion of our board of directors. Each of our directors holds office until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. There are no family relationships among any of our directors or executive officers.

Table of Contents

## Board Composition

Certain members of our board of directors were elected pursuant to the provisions of our amended and restated stockholders agreement entered into in June 2009. Under this agreement, our stockholders that are party to the agreement have agreed to vote their shares to elect to our board of directors as follows: (i) four directors designated by GA TriNet LLC; (ii) the person serving as Chief Executive Officer; and (iii) two independent directors. This agreement will terminate effective upon the completion of this offering.

Our board of directors may establish the authorized number of directors from time to time by resolution and currently consists of seven members. In accordance with our amended and restated certificate of incorporation that will be effective upon the completion of this offering, our board of directors will be divided into three classes with staggered three-year terms. At each annual general meeting of stockholders, the successors to directors whose terms then expire will be elected to serve from the time of election and qualification until the third annual meeting following election. Our directors will be divided among the three classes as follows:

- the Class I directors will be Mr. Bingham, Ms. August-deWilde and Mr. Goldman, and their terms will expire at the annual general meeting of stockholders to be held in 2014;

- the Class II directors will be Mr. Babinec and Mr. Lowell, and their terms will expire at the annual general meeting of stockholders to be held in 2015; and

- the Class III directors will be Mr. Goldfield and Mr. Hodgson, and their terms will expire at the annual general meeting of stockholders to be held in 2016.

We expect that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one third of the directors. The division of our board of directors into three classes with staggered three-year terms may delay or prevent a change of our management or a change in control. See "Description of Capital Stock—Anti-takeover Provisions—Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws."

## Board of Director Independence

Generally, under the listing requirements and rules of the New York Stock Exchange, or NYSE, independent directors must comprise a majority of a listed company's board of directors within one year of the completion of this offering. Our board of directors has undertaken a review of its composition, the composition of its committees and the independence of each director. Our board of directors has determined that, other than Burton S. Goldfield, by virtue of his position as Chief Executive Officer, none of our directors has a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each is "independent" as that term is defined under the listing requirements and rules of the NYSE. Accordingly, a majority of our directors is independent, as required under applicable NYSE rules. In making this determination, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our capital stock by each non-employee director.

## Lead Independent Director

Our board of directors has appointed Mr. Bingham, our Chairman, to serve as our lead independent director. As lead independent director, Mr. Bingham presides over periodic meetings of our independent directors, serves as a liaison between our Chief Executive Officer and the independent directors and performs such additional duties as our board of directors may otherwise determine and delegate.

## Board Committees

Our board of directors has established an audit committee and a compensation committee and will, prior to the completion of this offering, establish a nominating and corporate governance committee. Our board of directors may establish other committees to facilitate the management of our business. The expected composition

**Table of Contents**

**Registration Rights**

We are party to an amended and restated registration rights agreement that provides that holders of our preferred stock have certain registration rights with regard to the shares of common stock issuable upon conversion of such preferred stock, as set forth below. Our preferred stock will convert into 38,065,708 shares of common stock upon the completion of this offering. The primary holder of our preferred stock is GA TriNet LLC, which holds shares of preferred stock convertible into 35,945,636 shares of common stock. In this section, we refer to GA TriNet LLC and its affiliates and successors as the General Atlantic stockholders.

The registration of shares of our common stock pursuant to the exercise of registration rights described below would enable the holders to sell these shares without restriction under the Securities Act of 1933, or the Securities Act, when the applicable registration statement is declared effective. We will pay the registration expenses, other than the underwriting discounts and commissions, of the shares registered pursuant to the demand, piggyback and Form S-3 registrations described below. The demand, piggyback and Form S-3 registration rights described below will expire as to a given stockholder when such stockholder owns less than 1% of our outstanding common stock on an as-converted, fully-diluted basis and when all of the common stock held by such holder may be sold in a single sale under Rule 144.

*Demand Registration Rights*

At any time beginning six months after the closing of this offering, the General Atlantic stockholders may, on not more than three occasions, demand that we register all or a portion of their shares. In the event of such a demand, we must use our reasonable best efforts to cause such shares to be registered for sale under the Securities Act, subject to exceptions specified in the agreement. Such request for registration must cover shares with an anticipated aggregate offering price, net of the underwriting discounts and commissions, in excess of $10,000,000.

*Piggyback Registration Rights*

In the event that we propose to register any of our securities under the Securities Act in another offering, either for our own account or for the account of security holders other than the General Atlantic stockholders, the General Atlantic stockholders will be entitled to "piggyback" registration rights allowing them to include their shares in such registration. As a result, whenever we propose to file a registration statement under the Securities Act, including a registration statement on Form S-3 as discussed below, other than with respect to a demand registration or a registration statement on Forms S-4 or S-8, the General Atlantic stockholders are entitled to notice of the registration and have the right, subject to limitations that the underwriters may impose on the number of shares included in the registration, to include their shares in the registration.

*Form S-3 Registration Rights*

At any time beginning after we are eligible to use Form S-3 under the Securities Act, the General Atlantic stockholders may demand that we register all or a portion of their shares on Form S-3. In the event of such a demand, we must use our reasonable best efforts to cause such shares to be registered for sale under the Securities Act, subject to exceptions specified in the agreement. Such request for registration must cover shares with an anticipated aggregate offering price, net of the underwriting discounts and commissions, equal to or in excess of $5,000,000.

**Anti-Takeover Provisions**

*Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws to be in Effect upon the Closing of this Offering*

Because our stockholders do not have cumulative voting rights, our stockholders holding a majority of the outstanding shares of common stock outstanding will be able to elect all of our directors. Our amended and restated certificate of incorporation and amended and restated bylaws to be effective upon the closing of this offering will provide that all stockholder actions must be effected at a duly called meeting of stockholders and

133

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement on Form S-1 to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Leandro, State of California, on the 13th day of March, 2014.

**TRINET GROUP, INC.**

By: _____ /S/   BURTON M. GOLDFIELD

Burton M. Goldfield
Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/   BURTON M. GOLDFIELD<br>Burton M. Goldfield | Chief Executive Officer (*principal executive officer*) | March 13, 2014 |
| /S/   WILLIAM PORTER<br>William Porter | Chief Financial Officer (*principal financial and accounting officer*) | March 13, 2014 |
| *<br>H. Raymond Bingham | Director | March 13, 2014 |
| *<br>Martin Babinec | Director | March 13, 2014 |
| *<br>Kenneth Goldman | Director | March 13, 2014 |
| *<br>David C. Hodgson | Director | March 13, 2014 |
| *<br>Wayne B. Lowell | Director | March 13, 2014 |
| *<br>Katherine August-deWilde | Director | March 13, 2014 |

* Pursuant to Power of Attorney

By:  /S/   BURTON M. GOLDFIELD

Burton M. Goldfield
Attorney-in-Fact

II-6

ATTACHMENT 2

**Table of Contents**

**Index to Financial Statements**

As filed with the Securities and Exchange Commission on September 8, 2014

Registration No. 333-198293

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## Amendment No. 1
to
## FORM S-1
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# TRINET GROUP, INC.
#### (Exact name of Registrant as specified in its charter)

---

| Delaware | 7389 | 95-3359658 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1100 San Leandro Blvd., Suite 400**
**San Leandro, CA 94577**
**(510) 352-5000**
**(Address, including zip code and telephone number, including area code, of Registrant's principal executive offices)**

---

**Burton M. Goldfield**
**Chief Executive Officer**
**TriNet Group, Inc.**
**1100 San Leandro Blvd., Suite 400**
**San Leandro, CA 94577**
**(510) 352-5000**
**(Name, address, including zip code and telephone number, including area code, of agent for service)**

---

*Copies to:*

| Jodie M. Bourdet | Gregory L. Hammond | Gordon K. Davidson |
|---|---|---|
| Craig D. Jacoby | Chief Legal Officer | Daniel J. Winnike |
| Andrew S. Williamson | TriNet Group, Inc. | Horace L. Nash |
| Cooley LLP | 1100 San Leandro Blvd., Suite 400 | Fenwick & West LLP |
| 101 California Street, 5th Floor | San Leandro, CA 94577 | 801 California Street |
| San Francisco, California 94111 | (510) 352-5000 | Mountain View, CA 94041 |
| (415) 693-2000 | | (650) 988-8500 |

---

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
|---|---|---|---|---|
| Non-accelerated filer | ☑ (Do not check if a smaller reporting company) | | Smaller reporting company | ☐ |

---

Table of Contents

Index to Financial Statements

MANAGEMENT

**Executive Officers, Other Key Employees and Directors**

Our executive officers, other key employees and directors, their respective positions and their respective ages as of June 30, 2014 are as follows:

| Name | Age | Position(s) |
| --- | --- | --- |
| *Executive Officers* | | |
| Burton M. Goldfield | 58 | President, Chief Executive Officer and Director |
| William Porter | 60 | Vice President and Chief Financial Officer |
| Gregory L. Hammond | 59 | Executive Vice President and Chief Legal Officer |
| John Turner | 49 | Senior Vice President of Sales |
| *Other Key Employees* | | |
| Steven Apfelberg | 44 | Vice President of Marketing |
| James Franzone | 39 | Vice President of Corporate Development |
| Madhukar Govindaraju | 48 | Vice President of Products and Software Development |
| Jonathan Hubley | 46 | Vice President of Operations |
| Jing Liao | 45 | Senior Vice President of Human Resources |
| Pasquale ("Patrick") Villela | 53 | Vice President of Client Services |
| *Non-Employee Directors* | | |
| H. Raymond Bingham[1][3] | 68 | Chairman |
| Katherine August-deWilde[2][3] | 66 | Director |
| Martin Babinec | 59 | Director |
| Kenneth Goldman[2] | 65 | Director |
| David C. Hodgson[3] | 57 | Director |
| John Kispert[1] | 50 | Director |
| Wayne B. Lowell[1][2] | 59 | Director |

(1) Member of the compensation committee.

(2) Member of the audit committee.

(3) Member of the nominating and corporate governance committee.

*Executive Officers*

**Burton M. Goldfield** joined TriNet in May 2008 succeeding Martin Babinec, TriNet's founder, as Chief Executive Officer. From 2006 to 2008, Mr. Goldfield was Chief Executive Officer of Ketera Technologies, Inc., a provider of on-demand Software-as-a-Service management solutions. From 2004 to 2006, he was the Senior Vice President of Worldwide Field Operations at Hyperion Solutions Corporation, a business performance management software company, which was ultimately acquired by Oracle Corporation. Earlier, he was with Rational Software Corporation for 13 years in a variety of management capacities, and subsequently Vice President of Worldwide Sales for IBM Corporation, Rational Software division upon the acquisition of Rational by IBM. Mr. Goldfield holds a B.S. in biomedical engineering from Syracuse University and an M.B.A. from Villanova University. Mr. Goldfield's significant business experience both inside and outside our industry and role as our Chief Executive Officer brings unique insight to our board of directors.

**William Porter** joined TriNet in August 2010 as Chief Financial Officer. Prior to joining TriNet, Mr. Porter was most recently at Cadence Design Systems, Inc., a computer-aided design company, where he served in a series of executive roles over a 15-year period, including Chief Financial Officer from May 1999 to April 2008 and Executive Vice President and Chief Administrative Officer from April 2008 to October 2008. Prior to Cadence, Mr. Porter spent six years at Apple Inc., where he held various accounting, reporting and operational

Table of Contents

Index to Financial Statements

roles. He began his career at Arthur Andersen, where he served small and medium-sized businesses and high-tech clients and gained 12 years' experience in accounting, audits, business consulting and mergers and acquisitions. Mr. Porter holds a B.A. in accounting and an M.B.A. in finance, both from the University of California at Berkeley.

*Gregory Hammond* has served as our Chief Legal Officer since joining TriNet in 1997. For 20 years prior to joining TriNet, Mr. Hammond practiced outsourced human resources law at various private law firms, including Seyfarth, Shaw, Fairweather & Geraldson, a predecessor to Seyfarth Shaw LLP, Millisor & Nobil, Co., which was subsequently acquired by Fisher & Phillips LLP, Hahn Loeser & Parks LLP and Hammond & Kazaglis Co., L.P.A. From 1987 to 1991, Mr. Hammond served as general counsel to the National Association of Professional Employer Organizations. Mr. Hammond also serves on the board of directors of Big Sunday, a nonprofit organization. Mr. Hammond holds a B.A. from Mercer University and a J.D. from the University of Chicago.

*John Turner* joined TriNet in April 2012 as the Senior Vice President of Sales. From January 2011 to March 2012, Mr. Turner was the Vice President of American Sales at FalconStor Software, Inc., a provider of data protection and storage virtualization solutions. From 2004 to January 2011, Mr. Turner also served as the Vice President of Sales for Symantec Corporation, a security software company. Mr. Turner joined Symantec in connection with its acquisition of VERITAS, where he served as the Senior Director for Western U.S., Emerging Solutions. Prior to joining VERITAS, he was Vice President of Sales for Gartner CIO Programs. Mr. Turner holds a B.A. in Marketing from Santa Clara University and an M.B.A. from San Jose State University.

## Other Key Employees

*Steven Apfelberg* joined TriNet in November 2012 as our Vice President of Marketing. From May 2011 to June 2012, he was the Chief Marketing Officer at Skire Solutions Inc., a provider of project management software for capital construction, real estate and facilities that was acquired by Oracle Corporation in 2012. From October 2009 to January 2011, he was the Vice President of Marketing at Yammer Inc., an enterprise social networking solutions company. From October 2004 to September 2009, Mr. Apfelberg held various positions at Callidus Software Inc., a provider of cloud-based sales, marketing, learning and hiring solutions, including serving as the Senior Vice President of Marketing and Business Development from April 2008 to September 2009. He also held senior roles in marketing and finance at Siebel Systems, Remedy and Oracle Corporation. Mr. Apfelberg holds a B.A. in Economics from Stanford University.

*James Franzone* joined TriNet in July 2010 as our Vice President of Corporate Development. From July 2005 to July 2010, Mr. Franzone was Vice President at General Atlantic LLC, a leading global growth equity firm. Mr. Franzone also previously served as senior associate for Technology Crossover Ventures, a venture capital firm. He began his career as a business analyst at McKinsey & Company, a management consulting firm, where he drove growth initiatives through organic and acquisitive means in partnership with senior management teams. Mr. Franzone holds an A.B. in economics from Dartmouth College and an M.B.A. from Stanford University.

*Madhukar Govindaraju* joined TriNet in 2013 as the Vice President of Products and currently serves as the Vice President of Products and Software Development. From 2012 to 2013, Mr. Govindaraju served as the Senior Vice President of Engineering and Technology at Spigit, Inc. From 2010 to 2012, Mr. Govindaraju served as the Senior Vice President of Engineering at Saba Software, Inc. From 2009 to 2010, Mr. Govindaraju was the Chief Development Architect within the Technology and Innovation Platform Group at SAP, where he was responsible for the SAP Business Objects Suite of On-Premise and On-Demand / SaaS BI products. From 2007 to 2009, Mr. Govindaraju served in multiple roles at SAP Labs, LLC and Business Objects, S.A., and from March 2006 to April 2007 he served as Vice President, Engineering at Cloud9 Analytics. Prior to March 2006, Mr. Govindaraju served as Vice President of Engineering at Hyperion Solutions Corporation, CTO and Vice President of Engineering at Promptu Corporation and CTO and Senior Vice President, Engineering at ChipCenter, LLC. Mr. Govindaraju holds a M.S. in Computer Science from the Indian Institute of Science, Bangalore, India. Mr. Govindaraju has also been a Visiting Fellow at the Tsinghua (Peking) University's Business Performance Management Research Institute.

92

Table of Contents

Index to Financial Statements

**Jonathan Hubley** joined TriNet in 2009 as Vice President of Service Operations and currently serves as our Vice President of Operations. In 2006, Mr. Hubley began his tenure with Gevity as Director in Service Delivery, and was subsequently promoted to Vice President of Service Delivery, Operations at Gevity, a title he held until 2009. From 2002 to 2006, Mr. Hubley also worked at Ceridian Corporation, a human resources services company, as its Director of Operations. Prior to 2002, Mr. Hubley held management positions at Scholastic Inc., J. Crew and IBM. Mr. Hubley holds a B.B.A. from the University of Notre Dame.

**Jing Liao** joined TriNet in June 2014 as Senior Vice President of Human Resources and currently serves as our Senior Vice President of Human Resources. Previously, Ms. Liao served as the Vice President of Global Human Resources at Atmel Corporation from August 2007 to June 2014. From March 2005 to July 2007, Ms. Liao served as Vice President of Human Resources for Avanex Corporation. Prior to Avanex, Ms. Liao held various human resources related positions at Hyperion Software, JDS Uniphase and Adaptec. Ms. Liao holds an M.A. in Human Resources and Industrial Relations from the University of Minnesota, Carlson School of Business and a B.S. in Chemistry from Peking University, China.

**Pasquale ("Patrick") Villella** joined TriNet in January 2007 as our Director of Sales for the Northeast, Midwest and Mid-Atlantic regions. In January 2011, he was promoted to Vice President, Human Capital Services and in July 2012, he was promoted to the newly-created position of Vice President of Client Services. Prior to joining TriNet, Mr. Villella served in a variety of individual contributor and management roles at Insperity, a human resources services company, from April 2002 through January 2007. Mr. Villella holds a B.A. from Providence College, a J.D. from the New England School of Law and a Masters of Law and Letters from Boston University School of Law.

### Board of Directors

**H. Raymond Bingham** has been a director since July 2008 and has served as our Chairman since January 2010. He is an Advisory Director of General Atlantic LLC and served as a Managing Director from September 2006 to December 2010. He was Executive Chairman of the Board of Directors of Cadence Design Systems, Inc., a supplier of electronic design automation software and services, from May 2004 to July 2005, and served as a director of Cadence from November 1997 to July 2005. Prior to his role as Executive Chairman, he served as President and Chief Executive Officer of Cadence from April 1999 to May 2004 and as Executive Vice President and Chief Financial Officer from April 1993 to April 1999. Mr. Bingham also serves as a director of Spansion, Inc., Flextronics International Ltd., Oracle Corporation and Dice Holdings, Inc. Mr. Bingham holds a B.S. in Economics from Weber State University and an M.B.A. from Harvard Business School. Additionally, he was awarded an Honorary Doctorate of Humanities from Weber State University. Mr. Bingham was appointed to serve on our board of directors based on his broad and extensive experience serving in management roles at technology companies, including as chief executive officer and chief financial officer, as well as his experience as an Advisory Director of General Atlantic. Mr. Bingham's significant service on the board of directors of other publicly traded technology companies and his extensive knowledge and experience managing portfolio companies both within and outside our industry brings unique insight to our board of directors.

**Katherine August-deWilde** has been a director since October 2013. Since September 2007, Ms. August-deWilde has served as the President and Chief Operating Officer of First Republic Bank, a commercial bank specializing in private banking, business banking and wealth management. Ms. August-deWilde has served in various roles at First Republic Bank since 1985, including as Chief Financial Officer and Executive Vice President and Chief Operating Officer. Prior to joining First Republic Bank, Ms. August-deWilde served as Vice President and Treasurer, and later as Senior Vice President and Chief Financial Officer, at PMI Mortgage Insurance Co. from 1979 to 1985. From 1975 to 1979, she was an associate at McKinsey & Company. Ms. August-deWilde has also served on the board of directors of First Republic Bank since 1988. She is a Trustee of the Boys & Girls Clubs of San Francisco, a member of the Advisory Council of the Stanford Center on Longevity, and a member of the Stanford Graduate School of Business Advisory Council. Ms. August-deWilde holds a B.A. from Goucher College and an M.B.A. from Stanford University. Ms. August-deWilde was appointed to serve on our board of directors based on her business acumen and financial expertise and her experience as a chief financial officer.

Table of Contents

Index to Financial Statements

**Martin Babinec** founded TriNet in 1988 and has served on our board of directors since that time, acting as Chairman until December 2009. From 1988 until May 2008, he also served as our Chief Executive Officer. Mr. Babinec also founded and serves as Chairman of Upstate Venture Connect and co-founded and serves as Chairman of the StartFast Venture Accelerator. Prior to founding TriNet, Mr. Babinec served in senior human resources management positions at the Navy Exchange, an international retailer. Mr. Babinec holds a B.S. in Business Administration from Shippensburg University. Mr. Babinec's significant business experience both inside and outside our industry and role as our founder and former Chief Executive Officer brings unique insight to our board of directors.

**Kenneth Goldman** has been a director since August 2009. Since October 2012, Mr. Goldman has served as the Chief Financial Officer of Yahoo! Inc., an internet services company. Prior to joining Yahoo!, Mr. Goldman served as Chief Financial Officer of Fortinet Inc., a provider of unified threat management solutions, from September 2007 to October 2012. From November 2006 to August 2007, Mr. Goldman served as Executive Vice President and Chief Financial Officer of Dexterra, Inc., a provider of mobile enterprise software. From August 2000 until March 2006, Mr. Goldman served as Senior Vice President, Finance and Administration, and Chief Financial Officer of Siebel Systems, Inc., a supplier of customer software solutions and services which was acquired by Oracle Corporation in January 2006. Mr. Goldman serves on the board of directors of GoPro, Inc., NXP Semiconductors N.V., Gigamon Inc. and Yahoo! Japan. Mr. Goldman is also a Trustee Emeritus on the board of trustees of Cornell University. Mr. Goldman holds a B.S. in Electrical Engineering from Cornell University and an M.B.A. from Harvard Business School. Mr. Goldman was appointed to serve on our board of directors based on his significant experience as a chief financial officer of public companies.

**David C. Hodgson** has been a director since 2005 and is a Managing Director of General Atlantic LLC. He joined General Atlantic in 1982, helped found their partnership, and has over 30 years of experience identifying and assisting portfolio companies worldwide in all areas of their development. Mr. Hodgson serves on the boards of directors of a number of public and private companies including Pierpont Securities, Alignment Healthcare and Hyperion Insurance Group Limited. Mr. Hodgson is chairman of the boards of trustees of Johns Hopkins Medicine, Johns Hopkins Hospital System, Manhattan Theatre Club and Echoing Green. He also serves as a trustee of Dartmouth College and Johns Hopkins University. Mr. Hodgson holds an A.B. in Mathematics and Social Sciences from Dartmouth College and a M.B.A. from the Stanford University Graduate School of Business. Mr. Hodgson was appointed to serve on our board of directors based on his experience as a Managing Director of General Atlantic.

**John H. Kispert** has been a director since May 2014. Mr. Kispert was hired as President and Chief Executive Officer of Spansion, Inc. in February 2009 to oversee that company's reorganization of its business, and has served on its board of directors since February 2009. Mr. Kispert also served as Interim Chief Financial Officer of Spansion from April 29, 2009 through May 19, 2009. From 1995 through January 2009, Mr. Kispert served in a number of finance and operational roles at KLA-Tencor Corporation, a supplier of semiconductor manufacturing process control and yield management solutions, including serving as President and Chief Operations Officer from January 2006 to January 2009 and also serving as Executive Vice President and Chief Financial Officer from March 2000 to December 2005. In 2004, Mr. Kispert also assumed responsibility for Global Service Business, Information Technology and Human Resources at KLA-Tencor. Prior to KLA-Tencor, Mr. Kispert held several senior management positions with IBM Corporation. Mr. Kispert has also served as a director of Extreme Networks, Inc., a network hardware company, since May 2009. Mr. Kispert holds a Master of Business Administration degree from the University of California, Los Angeles and a Bachelor of Arts degree in Political Science from Grinnell College.

**Wayne B. Lowell** has been a director since 2009. Since early 2012, Mr. Lowell has been serving as Chairman and Chief Executive Officer of Senior Whole Health Holdings, Inc., a health insurance company focused on providing health insurance coverage to senior citizens. From October 2007 to July 2008, Mr. Lowell served as Chief Executive Officer of Wellmed Medical Management, Inc., a physician healthcare services company. From 1998 to September 2007 and July 2008 to June 2012, he served as President of Jonchra Associates, LLC, which provides strategic, operating and financial advice to senior management of private-equity funded and publicly held entities. From 1986 to 1998, he worked for PacifiCare Health Systems (now part

94

Table of Contents

Index to Financial Statements

of United Healthcare). At PacifiCare, he held various positions of increasing authority, ultimately serving as Executive Vice President, Chief Financial Officer and Chief Administrative Officer. From January 2010 to June 2013, Mr. Lowell served on the board of directors of Addus Homecare Corp., and from August 2007 to March 2011, he served on the board of directors of Insight Health Services Holdings Corp. Mr. Lowell holds a B.S. in accounting from the University of Maryland and an M.B.A. from the University of California at Irvine. Mr. Lowell is a Certified Public Accountant. Mr. Lowell was appointed to serve on our board of directors based on his years of experience in the health care industry and his experience as a chief financial officer.

Each of our officers serves at the discretion of our board of directors. Each of our directors holds office until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. There are no family relationships among any of our directors or executive officers.

### Board Composition

Certain members of our board of directors were elected pursuant to the provisions of our amended and restated stockholders agreement entered into in June 2009. Under this agreement, our stockholders that were party to the agreement agreed to vote their shares to elect to our board of directors as follows: (i) four directors designated by GA TriNet LLC; (ii) the person serving as Chief Executive Officer; and (iii) two independent directors. This agreement terminated effective upon the completion of our IPO.

Our board of directors may establish the authorized number of directors from time to time by resolution and currently consists of eight members. In accordance with our amended and restated certificate of incorporation, our board of directors is divided into three classes with staggered three-year terms. At each annual general meeting of stockholders, the successors to directors whose terms then expire will be elected to serve from the time of election and qualification until the third annual meeting following election. Our directors are divided among the three classes as follows:

- the Class I directors are Mr. Bingham, Ms. August-deWilde and Mr. Goldman, and their terms will expire at the annual general meeting of stockholders to be held in 2015;

- the Class II directors are Mr. Babinec and Mr. Lowell, and their terms will expire at the annual general meeting of stockholders to be held in 2016; and

- the Class III directors are Mr. Goldfield, Mr. Hodgson and Mr. Kispert, and their terms will expire at the annual general meeting of stockholders to be held in 2017.

We expect that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one third of the directors. The division of our board of directors into three classes with staggered three-year terms may delay or prevent a change of our management or a change in control. See "Description of Capital Stock—Anti-takeover Provisions—Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws."

### Board of Director Independence

Generally, under the listing requirements and rules of the New York Stock Exchange, or NYSE, independent directors must comprise a majority of a listed company's board of directors within one year of the completion of this offering. Our board of directors has undertaken a review of its composition, the composition of its committees and the independence of each director. Our board of directors has determined that, other than Burton M. Goldfield, by virtue of his position as Chief Executive Officer, none of our directors has a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each is "independent" as that term is defined under the listing requirements and rules of the NYSE. Accordingly, a majority of our directors is independent, as required under applicable NYSE rules. In making this determination, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our capital stock by each non-employee director.

95

Table of Contents

Index to Financial Statements

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement on Form S-1 to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Leandro, State of California, on the 8th day of September, 2014.

TRINET GROUP, INC.

By:                  /S/   BURTON M. GOLDFIELD
            Burton M. Goldfield
            Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/ BURTON M. GOLDFIELD<br>Burton M. Goldfield | Chief Executive Officer *(principal executive officer)* | September 8, 2014 |
| /S/ WILLIAM PORTER<br>William Porter | Chief Financial Officer *(principal financial and accounting officer)* | September 8, 2014 |
| *<br>Katherine August-deWilde | Director | September 8, 2014 |
| *<br>Martin Babinec | Director | September 8, 2014 |
| *<br>H. Raymond Bingham | Director | September 8, 2014 |
| *<br>Kenneth Goldman | Director | September 8, 2014 |
| *<br>David C. Hodgson | Director | September 8, 2014 |
| *<br>John H. Kispert | Director | September 8, 2014 |
| *<br>Wayne B. Lowell | Director | September 8, 2014 |

*   Pursuant to Power of Attorney

By:  /S/ GREGORY L. HAMMOND
   Gregory L. Hammond
   Attorney-in-Fact

II-7

# ATTACHMENT 3

10-K 1 tnet-123115x10k.htm FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

---

# FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _____ TO _____**

**Commission File Number: 001-36373**

---

# TRINET GROUP, INC.
**(Exact Name of Registrant as Specified in its Charter)**

---

| | |
|---|---|
| **Delaware** | **95-3359658** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1100 San Leandro Blvd., Suite 400, San Leandro, CA** | **94577** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (510) 352-5000**

---

Securities registered pursuant to Section 12(b) of the Act: Common Stock, Par Value $0.000025 Per Share; Common stock traded on the New York Stock Exchange.

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of common stock on The New York Stock Exchange on June 30, 2015, was $1,055,737,584.

The number of shares of Registrant's Common Stock outstanding as of March 28, 2016 was 70,711,536.

Portions of the Registrant's Definitive Proxy Statement to be issued in connection with its Annual Meeting of Stockholders, scheduled to be held on May 26, 2016, are incorporated by reference into Part III of this Form 10-K.

*We have identified material weaknesses in our internal control over financial reporting that could, if not remediated, result in material misstatements in our financial statements.*

In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2015, we have identified material weaknesses relating to our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. As described in Item 9A. Controls and Procedures, we have concluded that our internal control over financial reporting was not effective as of December 31, 2015 due to material weaknesses. Specifically, we identified material weaknesses relating to (i) ineffective information technology general controls, primarily with respect to computer operations, access controls and change management, (ii) ineffective control environment and risk assessment, (iii) ineffective management review controls and controls over system-generated reports, (iv) ineffective controls over payroll operations, (v) ineffective controls over health and workers compensation liabilities and related expenses, (vi) ineffective controls over validating accuracy of payroll tax liabilities, and (vii) ineffective authorization controls over procurement processes. However, giving full consideration to these weaknesses, and the additional analyses and other procedures we performed to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with U.S. generally accepted accounting principles (GAAP), our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with GAAP. While the material weaknesses described above create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and the performance of additional analysis and other procedures, no material adjustments, restatement or other revisions to our previously issued financial statements were required.

As further described in Part II, Item 9A "Controls and Procedures" below, we are taking specific steps to remediate the material weaknesses that we identified; however, the material weaknesses will not be remediated until the necessary controls have been implemented and we have determined the controls to be operating effectively. Because the reliability of the internal control process requires repeatable execution, the successful remediation of these material weaknesses will require review and evidence of effectiveness prior to concluding that the controls are effective. In addition, we may need to take additional measures to address the material weaknesses or modify the remediation steps, and we cannot be certain that the measures we have taken, and expect to take, to improve our internal controls will be sufficient to address the issues identified, to ensure that our internal controls are effective or to ensure that the identified material weaknesses will not result in a material misstatement of our annual or interim consolidated financial statements. Implementing any appropriate changes to our internal controls may distract our officers and employees and require material cost to implement new process or modify our existing processes. Moreover, other material weaknesses or deficiencies may develop or be identified in the future. If we are unable to correct material weaknesses or deficiencies in internal controls in a timely manner, our ability to record, process, summarize and report financial information accurately and within the time periods specified in the rules and forms of the U.S. Securities and Exchange Commission, will be adversely affected. This failure could negatively affect the market price and trading liquidity of our common stock, lead to delisting, cause investors to lose confidence in our reported financial information, subject us to civil and criminal investigations and penalties, and generally materially and adversely impact our business and financial condition.

*We are subject to legal proceedings that may result in adverse outcomes.*

We are subject to claims, suits, government investigations, and proceedings arising from the ordinary course of our business, including actions with respect to intellectual property claims, privacy, data protection or law enforcement matters, tax matters, labor and employment claims, commercial claims, purported class action lawsuits, and other matters. For example, we are a party to a putative securities class action lawsuit filed by a purported stockholder of our company in the United States District Court for the Northern District of California. Such claims, suits, government investigations, and proceedings are inherently uncertain and their results cannot be predicted with certainty. Regardless of the outcome, such legal proceedings can have an adverse impact on us because of legal costs, diversion of management and other personnel, and other factors. In addition, it is possible that a resolution of one or more such proceedings could result in liability, penalties, or sanctions, as well as judgments, consent decrees, or orders preventing us from offering certain features, functionalities, products, or services, or requiring a change in our business practices, products or technologies, which could in the future materially and adversely affect our business, operating results, and financial condition. See Part I, Item 3, "Legal

Proceedings" below for additional information about the legal proceedings we are currently involved in and future proceedings that we may face.

*Our failure to timely file any periodic reports with the SEC may prevent us from complying with the NYSE rules and may make it more difficult for us to access the public markets to raise debt or equity capital.*

Despite extensive efforts, we were unable to file our Annual Report on Form 10-K for the year ended December 31, 2015 within the time frame required by the SEC (including the extension permitted by Rule 12b-25 under the Exchange Act).

<div align="center">21</div>

---

## Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.

None.

## Item 9A. Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2015. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. Based on the evaluation of our disclosure controls and procedures as of December 31, 2015, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were not effective as a result of the material weaknesses in our internal control over financial reporting described below.

However, giving full consideration to these weaknesses, and the additional analyses and other procedures we performed to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with U.S. generally accepted accounting principles (GAAP), our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with GAAP.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are being made only in accordance with appropriate authorizations; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statements.

Because of its inherent limitations, a system of internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions and that the degree of compliance with the policies or procedures may deteriorate.

Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria established in "Internal Control - Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that assessment, our management has concluded that our internal control over financial reporting as of December 31, 2015 was not effective due to the material weaknesses described below. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. Ernst & Young LLP, an independent registered public accounting firm, has audited our internal control over financial reporting, as stated in their report dated March [15], 2016, which is included in this

Annual Report on Form 10-K.

89

Ineffective information technology (IT) general controls

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our IT general controls (ITGCs) for certain of our key information systems, including our enterprise resource planning (ERP) systems and payroll systems, that are relevant to the preparation of our consolidated financial statements and system of internal control over financial reporting. In addition, these deficiencies also impact the ability to rely on related interfaces, application controls and reports generated by the systems with ineffective ITGCs. The ineffective design and operation of our ITGCs impacts all of our significant financial statement accounts and disclosures. The deficiencies related to the design and operating effectiveness of our ITGCs fell into the three main categories listed below:

- *Computer Operations*

Design and operating effectiveness of our system of controls related to the monitoring of batch processing and system interfaces to ensure the completeness and accuracy of data movement involving our ERP system and certain payroll systems that process revenue transactions were identified as having deficiencies.

- *Access Controls*

Design and operating effectiveness of our controls to ensure that access to applications and data were adequately restricted to appropriate personnel were identified as having deficiencies. These deficiencies impact a number of our systems that process internal and revenue-generating payroll transactions, fixed assets, stock option and restricted stock unit information, procurement authorizations, insurance expenses, insurance reserves and payroll taxes.

- *Change Management*

Design and operating effectiveness of controls to monitor program change management procedures, including monitoring the activities of individuals who have authority and have been granted access to make changes to programs, were identified as having deficiencies. These deficiencies impacted systems that process procurement authorizations and accumulate claims data that is utilized to estimate worker's compensation liabilities.

Ineffective control environment and risk assessment

Our management determined that a material weakness exists due to a lack of a sufficient complement of personnel with an appropriate level of knowledge, experience and training commensurate with our structure, internal control, and financial reporting requirements. Additionally, we did not have an adequate process in place to complete our testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner.

Ineffective management review controls and controls over system-generated reports

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to ensure that key spreadsheets and system-generated reports were properly reviewed for completeness and accuracy. For certain management review controls, controls verifying the accuracy of underlying data used to perform these reviews were not performed or adequately documented. In addition, certain management review controls were not performed at a sufficiently precise level to identify errors that could aggregate to a material misstatement of the financial statements. These deficiencies impact substantially all of our significant financial statement accounts.

Ineffective controls over payroll operations

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls over the accuracy of certain information that we manually input into the payroll systems and that is used in the processing of payroll for customers. Manually input information includes contractual terms, bill rates, benefit elections and other wage data. Controls identified to prevent or detect inappropriate changes to payroll information and resolve payroll processing errors were not effectively designed to detect material errors.

Additionally, management identified deficiencies related to the design and operating effectiveness of controls over the reconciliation of benefit enrollment data between the Company's payroll systems and the insurance carriers' records. The deficiencies impact amounts recorded as professional and insurance service revenues, operating expenses, accrued corporate wages, and worksite employee related assets and liabilities.

90

Ineffective controls over health and workers compensation liabilities and related expenses

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the completeness and accuracy of data utilized in calculating health and workers compensation liabilities and related expenses, including premium expenses and administrative fees. Data utilized includes enrollment counts, cost rates, wage data, claim counts and incurred and paid claim amounts. Certain reconciliations of claim payments per the Company's actuarial analyses to actual amounts paid were not operating effectively. Additionally, controls over the review of health premium expenses did not operate at a level of precision that would detect material errors. These deficiencies impact insurance costs, workers compensation receivables, workers compensation liabilities, and worksite employee related assets and liabilities.

Ineffective controls over validating accuracy of payroll tax liabilities

Our management determined that several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of our controls to validate the accuracy and completeness of tax rates input into our payroll systems, including reconciliation to the general ledger of the payroll taxes payable account at a sufficient level of detail. In addition, due to the ineffective ITGCs over the system that calculates payroll tax withholdings, compensating controls identified are not sufficiently precise to prevent or detect errors in the amounts recorded as payroll tax liabilities for internal employees and WSEs.

Ineffective authorization controls over procurement processes

Our management determined that a material weakness exists related to the design and operating effectiveness of our controls over the initial set up and changes to designated approvers over corporate purchases, including purchasing card limits, expense reimbursements or approving new vendors added to the procurement system.

<div align="center">91</div>

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of
TriNet Group, Inc. and Subsidiaries

We have audited TriNet Group, Inc. and Subsidiaries' internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the COSO criteria). TriNet Group, Inc. and Subsidiaries management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Material weaknesses have been identified in the following categories and included in management's assessment:

- Ineffective information technology (IT) general controls
- Ineffective control environment and risk assessment
- Ineffective management review controls and controls over system-generated reports
- Ineffective controls over payroll operations
- Ineffective controls over health and workers compensation liabilities and related expenses
- Ineffective controls over validating accuracy of payroll tax liabilities
- Ineffective authorization controls over procurement processes

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2015 consolidated financial statements. These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2015 financial statements, and this report does not affect our report dated March 31, 2016 which expressed an unqualified opinion on those financial statements.

In our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, TriNet Group, Inc. and Subsidiaries has not maintained effective internal control over financial reporting as of December 31, 2015, based on the COSO criteria.

/s/ Ernst & Young LLP

San Francisco, California
March 31, 2016

92

**Additional Analyses and Procedures and Remediation Plan**

As a result of the material weaknesses described above, we performed additional analyses and other procedures in order to prepare the financial statements included in this Annual Report on Form 10-K. While the material weaknesses described above create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and the performance of additional analysis and other procedures, no material adjustments, restatement or other revisions to our previously issued financial statements were required.

In addition, we are taking specific steps, as further described below, to remediate the material weaknesses identified by management and described in greater detail in the preceding section. Although we intend to complete the remediation process with respect to these material weaknesses as quickly as possible, we cannot at this time estimate how long it will take, and our remediation plan may not prove to be successful.

With respect to the remediation of our ineffective IT general controls, we are taking a number of steps, which include, but are not limited to:

- designing, adopting or implementing IT governance policies, procedures and general controls across all technology platforms;

- improving the design and operation of control activities and procedures associated with monitoring of batch processing and system interfaces to ensure the completeness and accuracy of data movement;

- establishing a more comprehensive review and approval process for authorizing user access to IT systems , including both preventive and detective control activities;

- improving the design and operation of program change management control activities such as change management control setting configurations across the affected IT systems, including tracking of access and history of change; and

- augmenting and hiring additional IT resources and professionals.

We are also working to integrate our technology platforms and ERP systems to reduce the number of redundant business processes. For example, we completed the integration of our Ambrose technology platform as of February 29, 2016 and we currently expect to complete the integration of our Accord technology platform by the end of 2016.

With respect to the remediation in other areas, we are taking a number of steps, which include, but are not limited to:

- defining and assessing the control deficiency for each of the material weaknesses to ensure a thorough understanding of the "as-is" state, identify relevant process owners, and define and address gaps in the control deficiency;

- designing and evaluating a remediation plan for each of the material weaknesses to validate or improve the related policy and procedures, assess and improve skills of the process owners with regards to the policy and make necessary adjustments as required;

- implementing the remediation plan for each of the material weaknesses and training process owners, evaluating process adoption and monitoring results;

- testing and measuring the design and effectiveness of the remediation plan, and the updated controls;

- management review and acceptance of the remediation effort; and

- augmenting and hiring additional accounting, actuarial, finance and internal audit resources and professionals.

We believe that the foregoing efforts will effectively remediate the material weaknesses identified above. Because the reliability of the internal control process requires repeatable execution, the successful remediation of these material weaknesses will require review and evidence of effectiveness prior to concluding that the controls are effective and there is no assurance that additional remediation steps will not be necessary. As such, as we continue to evaluate and work to improve our internal control over financial reporting, our management may decide to take additional measures to address the material weaknesses or modify the remediation steps described above. As noted above, although we plan to complete the remediation process as quickly as possible, we cannot at this time estimate how long it will take, and our initiatives may not

prove to be successful. Accordingly, until these weaknesses are remediated, we plan to perform additional analyses and other procedures to ensure that our consolidated financial statements are prepared in accordance with GAAP.

93

**Changes in Internal Control Over Financial Reporting**

       Other than the identification of the material weaknesses described above, there were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended December 31, 2015, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information.**

Not applicable.

<div align="center">94</div>

---

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Leandro, State of California, on the 31st day of March, 2016.

<div align="center">

**TRINET GROUP, INC.**

</div>

Date: March 31, 2016　　　　　　　　　　　　　By:　/s/ Burton M. Goldfield

　　　　　　　　　　　　　　　　　　　　　　　　　Burton M. Goldfield
　　　　　　　　　　　　　　　　　　　　　　　　　Chief Executive Officer

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Burton M. Goldfield, William Porter and Brady Mickelsen, and each of them, as his true and lawful attorneys-in-fact and agents, each with the full power of substitution, for him and in his name, place or stead, in any and all capacities, to sign any amendments to this report and to file the same, with exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that any of said attorneys-in-fact and agents, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

<div align="center">97</div>

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ BURTON M. GOLDFIELD<br>Burton M. Goldfield | Chief Executive Officer (*principal executive officer*) | March 31, 2016 |
| /s/ WILLIAM PORTER<br>William Porter | Chief Financial Officer (*principal financial and accounting officer*) | March 31, 2016 |
| /s/ Katherine August-deWilde<br>Katherine August-deWilde | Director | March 31, 2016 |
| /s/ Martin Babinec<br>Martin Babinec | Director | March 31, 2016 |
| /s/ H. Raymond Bingham<br>H. Raymond Bingham | Director | March 31, 2016 |
| /s/ Paul Chamberlain<br>Paul Chamberlain | Director | March 31, 2016 |
| /s/ Kenneth Goldman<br>Kenneth Goldman | Director | March 31, 2016 |
| /s/ David C. Hodgson<br>David C. Hodgson | Director | March 31, 2016 |
| /s/ John H. Kispert<br>John H. Kispert | Director | March 31, 2016 |
| /s/ Wayne B. Lowell<br>Wayne B. Lowell | Director | March 31, 2016 |

98

ATTACHMENT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

---

# FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the year ended December 31, 2016**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**
**Commission File Number: 001-36373**

---



## TRINET GROUP, INC.
**(Exact Name of Registrant as Specified in its Charter)**

---

| | |
|---|---|
| **Delaware** | **95-3359658** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1100 San Leandro Blvd., Suite 400, San Leandro, CA** | **94577** |
| **(Address of principal executive offices)** | **(Zip Code)** |

### Registrant's telephone number, including area code: (510) 352-5000

---

Securities registered pursuant to Section 12(b) of the Act: Common Stock, Par Value $0.000025 Per Share; Common stock traded on the New York Stock Exchange.

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | (do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐  No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of common stock on The New York Stock Exchange on June 30, 2016, was $865,320,029.

The number of shares of Registrant's Common Stock outstanding as of February 23, 2017 was 68,268,207.

Portions of the Registrant's Definitive Proxy Statement to be issued in connection with its Annual Meeting of Stockholders, scheduled to be held on May 18, 2017, are incorporated by reference into Part III of this Form 10-K.

have in the past and could in the future cause us to fail to meet our expectations and the expectations of investors and any industry analysts who cover our shares for revenues or other results of operations for a given period, which could result in a decline in our share price and reduced liquidity in our shares. In addition, the occurrence of one or more of these factors might cause our results of operations to vary widely, which could lead to negative impacts on our margins, short-term liquidity or ability to retain or attract key personnel, and could cause other unanticipated issues, including a downgrade of our shares by or change in opinion of industry analysts and a related decline in our share price. Accordingly, we believe that quarter-to-quarter and annual comparisons of our revenues, results of operations and cash flows may not be meaningful and should not be relied upon as an indication of our future performance.

*Any failure in our business systems could reduce the quality of our business services, which could harm our reputation and expose us to liability.*

Our business systems rely on the complex integration of numerous hardware and software subsystems to manage client transactions including the processing of employee, payroll and benefits data. These systems can be disrupted by, among other things, equipment failures, computer server or systems failures, network outages, malicious acts, software errors or defects, vendor performance problems, power failures, natural disasters, terrorist actions or similar events. Any delay or failure in our systems that impairs our ability to communicate electronically with our clients, employees or vendors or our ability to store or process data could harm our reputation and our business. For example, errors in our products and services, such as the erroneous denial of healthcare benefits or delays in making payroll, could expose our clients to liability claims from improperly serviced WSEs, for which we may be contractually obligated to provide indemnification.

In addition, the software, hardware and networking technologies we use must be frequently and rapidly upgraded in response to technological advances, competitive pressures and consumer expectations. To succeed, we need to effectively develop, or license from third parties, and integrate these new technologies as they become available to improve our services. We rely on enterprise software applications licensed from third parties that are upgraded from time to time. Any difficulties we encounter in adapting application upgrades to our systems could harm our performance, delay or prevent the successful development, introduction or marketing of new services.

New products or upgrades may not be released according to schedule, or may contain defects when released. Difficulties in integrating new technologies could result in adverse publicity, loss of sales, delay in market acceptance of our services, or client claims against us, any of which could harm our business. We could also incur substantial costs in modifying our services or infrastructure to adapt to these changes. In addition, we could lose market share if our competitors develop technologically superior products and services.

*We have identified material weaknesses in our internal control over financial reporting that could, if not remediated, result in material misstatements in our financial statements.*

In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2016, we have identified and concluded that we continue to have material weaknesses relating to our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis. Refer to Part II, Item 9A in this Form 10-K for more details. While the material weaknesses described in that section create a reasonable possibility that an error in financial reporting may go undetected, after extensive review and the performance of additional analysis and other procedures, no material adjustments, restatement or other revisions to our previously issued financial statements were required.

As further described in Part II, Item 9A of this form 10-K below, we are taking specific steps to remediate the material weaknesses that we identified by implementing and enhancing our control procedures. These material weaknesses will not be remediated until all necessary internal controls have been implemented, repeatably tested and determined to be operating effectively. In addition, we may need to take additional measures, including system migration and automation, to address the material weaknesses or modify the remediation steps, and we cannot be certain that the measures we have taken, and expect to take, to improve our internal controls will be sufficient to address the issues identified, to ensure that our internal controls are effective or to ensure that the identified material weaknesses will not result in a material misstatement of our annual or interim consolidated financial statements. Implementing any appropriate changes to our internal controls may distract our officers and employees and require material cost to implement new process or modify our existing processes. Moreover, other material weaknesses or deficiencies may develop or be identified in the future. If we are unable to correct material weaknesses or deficiencies in internal controls

in a timely manner, our ability to record, process, summarize and report financial information accurately and within the time periods specified in the rules and forms of the U.S. Securities and Exchange Commission, will be adversely affected. This failure could negatively affect the market price and trading liquidity of our common stock, lead to delisting, cause investors to lose confidence in our reported financial information, subject us to civil and criminal investigations and penalties, and generally materially and adversely impact our business and financial condition.

*We have acquired, and may in the future acquire, other businesses and technologies, which can divert management's attention and create integration risks and other risks for our business.*

We have completed numerous acquisitions of other businesses and technologies, and we expect that we will continue to grow through similar future acquisitions. Such acquisitions involve numerous other risks, including:

- identifying attractive acquisition candidates,

- over-valuing and over-paying for acquisition candidates,

- integrating the operations, systems, technologies, services and personnel of the acquired companies, including the migration of WSEs from an acquired company's technology platform to ours,

- establishing or maintaining internal controls, procedures and policies relating to the acquired systems and processes, including the potential for actual or perceived control weaknesses associated with or arising from the acquisitions and integration of acquired systems,

- diversion of management's attention from other business concerns,

- litigation resulting from activities of the acquired company, including claims from terminated employees, clients, former stockholders and other third parties,

- insufficient revenues to offset increased expenses associated with the acquisitions and unanticipated liabilities of the acquired companies,

- insufficient indemnification or security from the selling parties for legal liabilities that we may assume in connection with our acquisitions,

- entering markets in which we have no prior experience and may not succeed,

- risks associated with foreign acquisitions, such as communication and integration problems resulting from geographic dispersion and language and cultural differences, compliance with foreign laws and regulations and general economic or political conditions in other countries or regions,

- potential loss of key employees of the acquired companies, and

- impairment of relationships with clients and employees of the acquired companies or our clients and employees as a result of the integration of acquired operations and new management personnel.

If we fail to integrate newly acquired businesses effectively, we might not achieve the growth, service enhancement or operational efficiency objectives of the acquisitions, and our business, results of operations and financial condition could be harmed.

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None

## Item 9A. Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We have, with the participation of our Chief Executive Officer (CEO) and our Chief Financial Officer (CFO), evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2016. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. Based on the evaluation of our disclosure controls and procedures as of December 31, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were not effective as a result of the material weaknesses in our internal control over financial reporting, as further described below. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

Notwithstanding the material weaknesses in our internal control over financial reporting, we have concluded that the consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America. Additionally, the material weaknesses did not result in any restatements of our consolidated financial statements or disclosures for any prior period.

### Management's Report on Internal Control Over Financial Reporting

We are responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act as a process, designed by, or under the supervision of the our principal executive and principal financial officers and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

Due to inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with policies or procedures may deteriorate.

We, with the participation of the CEO and CFO, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2016 based on the framework and criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. This evaluation included review of the documentation of controls, testing of the operating effectiveness of controls and a conclusion on this evaluation.

Based on the foregoing, we concluded that our internal controls over financial reporting as of December 31, 2016 were not effective as a result of the material weaknesses described below.

Deloitte & Touche LLP, our independent registered public accounting firm, has issued an audit report on the effectiveness of our internal control over financial reporting as of December 31, 2016. This audit report appears below.

**DISCLOSURE CONTROLS AND PROCEDURES**

*Information Technology General Controls (ITGC)*

In the course of completing our assessment of internal control over financial reporting as of December 31, 2015, we identified a number of deficiencies related to the design and operating effectiveness of information technology (IT) general controls for information systems that comprised part of our system of internal control over financial reporting and are relevant to the preparation of our consolidated financial statements (such information technology systems are referred to as the "affected IT systems").

These deficiencies in the design and operating effectiveness of the controls involved logical access, program change management and computer operations controls that are intended to ensure that access to financial applications and data is adequately restricted to appropriate personnel, and that changes affecting the financial applications and underlying account records are identified, authorized, tested and implemented appropriately.

We have concluded that deficiencies in ITGC logical access, including controls intended to ensure that access rights are compatible with job duties (segregation of duties) existed at December 31, 2016 and therefore represent a material weakness as of December 31, 2016.

As a result of the deficiencies identified, the following business process controls that are dependent on the affected IT systems or resulting electronic data and financial reports were adversely affected: controls over revenues and insurance costs; insurance liabilities, payroll related costs, payroll tax and WSE related assets and liabilities.  Accordingly, the business process controls that are dependent on affected IT systems or resulting electronic data were also deemed to be deficient and have material weaknesses.

*Revenue and Payroll Operations*

We have determined that we have several control deficiencies aggregating to a material weakness related to the design and operating effectiveness of controls over our revenue platforms as of December 31, 2016.  This was primarily caused by controls over the review and approval of adjustments to revenue, including revenue pricing and SOI benefit elections could not be attested as operating effectively due to control deficiencies.  The deficiencies noted above could impact revenues, insurance costs, insurance liabilities, payroll related costs, payroll tax and WSE related assets and liabilities.

*Payroll Tax Liabilities*

We have determined that we have several control deficiencies aggregating to a material weakness in the design and operating effectiveness of our controls to validate the accuracy and completeness of withholding tax rates updated into our payroll systems as of December 31, 2016.  We receive payroll tax rate updates from an outside vendor which we rely upon.  We do not, however, receive a report of service organization controls to ensure that we timely receive all tax rate updates.  Additionally, our controls over the identification and resolution of reconciling items for our payroll tax liabilities to our general ledger were not operating with a sufficient level of precision to be effective.  Our internal review processes to verify the tax rate updates received from the vendor are not at a sufficient level of precision to conclude all that tax rate updates have been accurately and timely identified.  These deficiencies impact our WSE related liabilities.

*Insurance Costs and Insurance Liabilities*

We have determined that we have several control deficiencies aggregating to a material weakness exist related to the design and operating effectiveness of controls over health and worker's compensation expenses and liabilities as of December 31, 2016.  Controls over the review and reconciliation of input data, spreadsheets and system generated reports were not designed with an appropriate level of precision to provide reasonable assurance that they will prevent or detect a material error in the financial statements. These deficiencies impact insurance costs, workers' compensation collateral receivable, workers' compensation liabilities, and worksite employee related assets and liabilities.

*Entity Level Controls - Control Activities and Monitoring*

We determined that we have several control deficiencies aggregating to a material weakness related to our entity level controls over our identification of certain control activities and the monitoring of our control performance as of December 31, 2016.

**DISCLOSURE CONTROLS AND PROCEDURES**

The control deficiencies included ineffective controls over the evaluation and timely review of controls operating at service organizations and the integration of these controls with our 'user' controls. Additionally, we had inadequate processes to monitor control performance and remediation activities and failed to implement compensating controls for deficiencies in ITGC's.

*Changes in Internal Control over Financial Reporting*

Significant changes in internal control over financial reporting included, but were not limited to

- Improved the design, operating effectiveness, and documentation of certain review controls used to verify the accuracy of data used in financial reporting.  These activities included the development of new review controls, training and education for process owners on audit requirements, and the creation of review templates to properly document evidence of management review.

- Implementation of a new procure-to-pay system that interfaces with internal systems and designed to ensure only authorized individuals can access the system and execute purchases.  Detailed processes and automated controls are maintained in the system in an effort to ensure all approvers and defined dollar limits conform with our expense and authorization policy.  Other control enhancements include vendor contract review and approval prior to purchase requisition set-up and payment.

- We have been actively engaged in the implementation of a remediation plan designed to ensure that controls contributing to remediation of our ITGC material weakness are designed appropriately and will operate effectively. We also engaged external IT specialist consultants to advise us on these remediation activities. The remediation actions we have taken to date to address the material weakness and to improve and strengthen our internal controls include the following:

  - Enhancing IT governance policies and procedures,

  - Designing and implementing control activities and procedures around user and administrator access, program change management and monitoring of batch processing, and

  - Hiring qualified IT resources, and providing sufficient training to the relevant control owners.

- We retired the Ambrose and Accord payroll platforms and implemented a number of controls to improve the effectiveness of revenue processing and to control the manual inputs and data changes to address the material weaknesses identified in 2015.

- We improved the design, operation, and monitoring of control activities and procedures to address internal controls and financial reporting requirements.  These activities included the hiring of senior financial management, improvements to financial reporting processes and control activities, and the significant expansion of the internal audit department as well as hiring outside consultants to facilitate the timely completion of the evaluation of the design and operating effectiveness of internal control over financial reporting.

- We improved reconciliation controls of the payroll taxes payable account, but have not sufficiently addressed controls over the completeness and accuracy of the payroll tax rates input into our Passport platform.

As of December 31, 2016, testing of both the design and operating effectiveness of the new and improved controls was completed, and management concluded that the material weaknesses in internal controls over financial reporting related to ITGC computer operations and change management control, control environment and risk assessment, management review controls, and procurement processes have been fully remediated.

Except for the changes described above there were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the fourth quarter ended December 31, 2016 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Planned Remediation Activities*

We will continue the consolidation of IT platforms, plan to complete the implementation of appropriate access rights and monitor the operation of new controls so management can conclude that they are designed and operating effectively, and the material weakness is remediated.  We plan to implement additional compensating controls over areas of known ITGC access issues while the relevant controls are in remediation, require self-certification as part of an improved

system of control monitoring and improve the process of integrating and testing service organization controls that we rely upon.

In addition, as we continue to evaluate and work to improve our internal control over financial reporting, we may take additional measures to address control deficiencies or determine to modify the remediation plan described above. We will continue to test and evaluate the implementation of these new processes and internal controls during 2017 to ascertain whether they are designed and operating effectively to provide reasonable assurance that they will prevent or detect a material error in our financial statements.

To further strengthen controls around the accuracy and completeness of revenue and payroll processing, we will continue to consolidate platforms in 2017 and retire the SOI platform which will reduce a significant number of manual business process controls.  We intend to improve transaction logging capabilities in an effort to ensure manual adjustments are properly evidenced as authorized and reviewed.  We will develop an additional compensating controls in an effort to ensure the output of payroll processing and recorded revenue is complete and accurate.

We will be implementing a number of control improvements in order to further improve the design and operating effectiveness of controls over health and worker's compensation liabilities and expenses in 2017.  The design of key controls will be addressed to better ensure the completeness and accuracy of information used in a control (key reports) and review controls will be refined to better address both the accuracy and precision of management's review.

We will implement compensating controls over the tax rates provided by the outside vendor in an effort to ensure all tax rate updates are complete, accurate, and timely.

While we intend to resolve all of the material control deficiencies, we cannot provide any assurance that these remediation efforts will be successful or that our internal control over financial reporting will be effective as a result of these efforts by any particular date.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of TriNet Group, Inc.

We have audited the internal control over financial reporting of TriNet Group, Inc. and subsidiaries (the "Company") as of December 31, 2016, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on that risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment:

- Ineffective controls to ensure identification of control activities and monitoring

- Ineffective information technology (IT) general controls over user access

- Ineffective controls over revenue and payroll operations

- Ineffective controls over payroll tax liabilities

- Ineffective controls over insurance costs and insurance liabilities

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2016, of the Company and this report does not affect our report on such financial statements.

**DISCLOSURE CONTROLS AND PROCEDURES**

In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2016, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2016, of the Company and our report dated February 28, 2017 expressed an unqualified opinion on those financial statements and financial statement schedule.

/s/ DELOITTE & TOUCHE LLP

San Francisco, California

February 28, 2017

## Item 9B. Other Information.

Not applicable.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Leandro, State of California, on the 28th day of February, 2017.

<div align="center">TRINET GROUP, INC.</div>

Date: February 28, 2017                          By:  /s/ Burton M. Goldfield

                                                      Burton M. Goldfield
                                                      Chief Executive Officer

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Burton M. Goldfield, William Porter and Brady Mickelsen, and each of them, as his true and lawful attorneys-in-fact and agents, each with the full power of substitution, for him and in his name, place or stead, in any and all capacities, to sign any amendments to this report and to file the same, with exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that any of said attorneys-in-fact and agents, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Burton M. Goldfield<br>Burton M. Goldfield | Chief Executive Officer (*principal executive officer*) | February 28, 2017 |
| /s/ William Porter<br>William Porter | Chief Financial Officer (*principal financial and accounting officer*) | February 28, 2017 |
| /s/ Michael J. Angelakis<br>Michael J. Angelakis | Director | February 28, 2017 |
| /s/ Katherine August-deWilde<br>Katherine August-deWilde | Director | February 28, 2017 |
| /s/ Martin Babinec<br>Martin Babinec | Director | February 28, 2017 |
| /s/ H. Raymond Bingham<br>H. Raymond Bingham | Director | February 28, 2017 |
| /s/ Paul Chamberlain<br>Paul Chamberlain | Director | February 28, 2017 |
| /s/ Kenneth Goldman<br>Kenneth Goldman | Director | February 28, 2017 |
| /s/ David C. Hodgson<br>David C. Hodgson | Director | February 28, 2017 |
| /s/ John H. Kispert<br>John H. Kispert | Director | February 28, 2017 |
| /s/ Wayne B. Lowell<br>Wayne B. Lowell | Director | February 28, 2017 |