# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

HOWARD WELGUS,

        Plaintiff,

   v.

TRINET GROUP, INC., et al.,

        Defendants.

Case No.  15-cv-03625-BLF

**ORDER GRANTING DEFENDANTS'
MOTIONS TO DISMISS THE SECOND
AMENDED COMPLAINT WITHOUT
LEAVE TO AMEND**

[Re:  ECF 116, 120, 121]

      This is the Court's second look at the pleadings in this securities fraud class action brought by lead plaintiff Howard Welgus ("Plaintiff") against Defendant TriNet Group, Inc. ("TriNet" or the "Company") and its officers and directors for violations of federal securities laws.  Plaintiff alleges that TriNet made material misrepresentations regarding, among other things, its risk management capabilities, data analytics capabilities, and the Company's limited exposure to excessive insurance claims.  After TriNet's Initial Public Offering ("IPO") and Secondary Public Offering ("SPO"), its stock price dropped on three separate occassions in response to the Company's announcements of higher-than-expected claims resulting in higher insurance costs and lower revenues.  Plaintiff brought this lawsuit, and Defendants moved to dismiss the First Amended Complaint ("FAC").  The Court dismissed the FAC with leave to amend through a reasoned order specifically outlining the deficiencies in Plaintiff's allegations.  *See* Order Granting in Part and Denying in Part Motions to Dismiss FAC With Leave to Amend in Part and Without Leave to Amend in Part ("Prior Order"), ECF 112.  The Court primarily pointed out the deficiencies in Plaintiff's pleadings with respect to falsity and scienter regarding five categories of TriNet's allegedly false statements.  *See generally* Prior Order.

      In an attempt to address the identified deficiencies, Plaintiff filed a Second Amended Complaint ("SAC").  *See* ECF 115.  Defendants filed three motions to dismiss the SAC with prejudice: First, Defendants TriNet, TriNet's President and Chief Executive Officer Burton M.

United States District Court
Northern District of California

Goldfield, TriNet's Chief Financial Officer William Porter (collectively, "Officer Defendants") and Martin Babinec, H. Raymond Bingham, David C. Hodgson, Katherine August-deWilde, Kenneth Goldman, John H. Kispert, and Wayne B. Lowell (collectively, "Outside Directors" or "Director Defendants") move to dismiss the SAC for failure to plead falsity and scienter sufficient to meet the demanding requirements of the Private Securities Litigation Reform Act ("PSLRA"). *See* TriNet Mot., ECF 116; TriNet Mem., ECF 117. Second, private equity firm General Atlantic LLC ("General Atlantic") joins TriNet's motion to dismiss and separately moves to dismiss the SAC on grounds specific to General Atlantic's role in the events. *See* General Atlantic Mot., ECF 120. Third, J.P. Morgan Securities LLC, Morgan Stanley & Co., LLC, Deutsche Bank Securities Inc., Jefferies LLC, Stifel, Nicolaus & Company, Incorporated, and William Blair & Company, LLC (collectively, "Underwriter Defendants"), join TriNet's motion to dismiss and separately raise arguments unique to the underwriters as independent grounds for dismissal. *See* Underwriter Defs.' Mot., ECF 121.

The Court heard oral argument on all three motions to dismiss on September 20, 2017. For the reasons that follow, the Court finds that the SAC fails to meet the PSLRA's demanding pleading standards for claims alleging violations of federal securities law. Moreover, because Plaintiff has already been afforded leave to amend as well as the opportunity to provide argument at two extensive hearings on his pleadings, and because Defendants would be prejudiced by permitting further amendment, Defendants' motions to dismiss the SAC are GRANTED WITHOUT LEAVE TO AMEND.

## I. BACKGROUND

### A. Procedural History

On August 7, 2015, Plaintiff filed this suit against only TriNet and the Officer Defendants. *See* Compl., ECF 1. In his original complaint, Plaintiff asserted claims under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Compl. ¶¶ 57–62. On December 3, 2015, this Court granted Plaintiff's motion for appointment as lead plaintiff. *See* ECF 24. Thereafter, on February 1, 2016,

United States District Court
Northern District of California

Plaintiff filed a consolidated complaint asserting the same claims as in the original complaint and adding General Atlantic and three of the Outside Directors—Babinec, Bingham, and Hodgson—as defendants. *See* Consolidated Complaint, ECF 26. In April 2016, Plaintiff sought and was granted leave of Court to file the First Amended Complaint which added claims for violations of §§ 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), and added additional Outside Director Defendants as well as the Underwriter Defendants. *See* First Amended Complaint ("FAC"), ECF 53. Defendants filed four separate motions to dismiss the FAC, which the Court granted in part with leave to amend on January 17, 2017. *See* ECF 112 ("Prior Order").[1] Plaintiff filed the SAC on March 3, 2017, asserting claims for (1) securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 of the SEC against TriNet and the Officer Defendants; (2) controlling person liability under § 20(a) of the Exchange Act against the Officer Defendants, Director Defendants, and General Atlantic; (3) violations of § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, against TriNet, the Officer Defendants, Director Defendants, and Underwriter Defendants; (4) violations of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*, against all Defendants; (5) and controlling person liability under §15 of the Securities Act, 15 U.S.C. § 77*o*, against the Officer Defendants, Outside Directors, and General Atlantic. *See* SAC ¶¶ 234-307. Defendants have now filed three motions to dismiss the SAC, this time with prejudice.

**B.      Factual Allegations in the SAC**

The facts of this case are familiar to the Parties and the Court, and the primary focus is therefore on Plaintiff's amendments to his pleadings in the Second Amended Complaint. *See* SAC, ECF 115. TriNet is a professional employer organization ("PEO") that was founded in 1988 and provides outsourced human resources ("HR") to its client companies, which includes functions such as payroll processing, employment law compliance, health insurance and workers' compensation insurance.[2] *Id*. ¶ 16. TriNet uses a co-employment model, whereby employees of

---

[1] The Prior Order dismissed without leave to amend Plaintiff's claims for violations of §§11 and 12 against Defendant Kispert in relation to the IPO, as well as § 11 claim against General Atlantic in relation to the IPO. *See* Prior Order at 30-32. The Court granted Plaintiff leave to amend all other claims. *Id*. at 40.

[2] A more detailed factual background on TriNet's business model, public offerings and allegedly false statements is set forth in the Court's prior order dismissing the FAC. *See* ECF 112 at 2-5.

1    TriNet's clients are considered co-employed as worksite employees ("WSEs") by TriNet. *Id.*

2          In relevant part to Plaintiff's claims, TriNet derives revenues from its Insurance Services

3    segment by entering into contracts with insurance carriers in order to provide TriNet-sponsored

4    plans to clients, primarily employee health benefit plans and workers' compensation insurance.

5    *Id.* ¶ 17(b). Generally, TriNet collects insurance premiums from WSEs, which it then passes on to

6    the insurance companies. For a portion of the Insurance Services plans, TriNet takes on a

7    deductible layer of risk, which means that the insurance company has the first layer of exposure,

8    but TriNet is responsible for any excess if the claim exceeds the negotiated policy limit. *Id.*

9    Taking on the deductible layer of risk has an upside for TriNet, allowing it to capture an

10   "insurance spread" or as TriNet calls it, a "performance fee," which Plaintiff alleges is essential to

11   Tri-Net's business model. *Id.* ¶¶ 17(b), 19. In the simplest terms, for the TriNet-sponsored plans

12   where TriNet takes on a deductible layer of risk, its net insurance service revenues would be

13   higher if claims were smaller or fewer than expected.[3] However, if claims under the plans were

14   larger or higher in volume than expected, then TriNet risked having lower net insurance revenues.

15         TriNet conducted its IPO on March 27, 2014, selling 15 million shares of common stock to

16   the public at $16 per share, raising $240 million. *Id.* ¶ 20. An SPO of TriNet common stock

17   followed on September 17, 2014, whereby private equity firm General Atlantic, an early investor

18   in TriNet, was the sole selling stockholder. General Atlantic and Hodgson, Managing Director of

19   General Atlantic who is also a TriNet Director, sold 13.8 million shares of TriNet stock to the

20   public at prices as high as $24.42 per share, "cashing in" more than $336 million. *Id.* ¶¶ 26-27.

21         For three successive quarters after these offerings, TriNet experienced the downside:

22   unexpected volatility resulting in claims activity that was higher-than-expected and TriNet's

23   financial results fell short of its projections. TriNet made three public announcements on March 3,

24   2015, May 5, 2015, and August 3, 2015, respectively, disclosing the unexpected spikes in medical

25   claims. *See, e.g.*, *id.* ¶¶ 29-35, 114, 118, 125, 142. After each disclosure, TriNet's stock price

26

27   ───────────────
     [3] Defendants explain that insurance plans where TriNet has no deductible risk are sometimes
28   referred to as "guaranteed cost" plans, as opposed to non-guaranteed cost plans where TriNet takes
     on a deductible layer of risk. *See* TriNet Mem. at 4.

dropped. *Id*. ¶¶ 30, 32, 37.

Plaintiff Howard Welgus then brought this putative securities class action on behalf of all persons who purchased or otherwise acquired the common stock of TriNet between March 27, 2014—the date of TriNet's IPO—and February 29, 2016—when TriNet announced its FY15 financial results (the "Class Period").[4] *Id*. ¶ 14. Plaintiff's theory is that Defendants violated federal securities laws by disseminating hundreds of materially false and misleading statements about TriNet's business and concealing material adverse facts regarding its financial condition and growth prospects. *Id*. ¶ 15.

Plaintiff focuses his allegations on five categories of allegedly false statements made repeatedly during the class period, including those that appear in the Registration Statements for TriNet's IPO and the SPO. The Court's prior order dismissing the FAC reviewed Plaintiff's allegations with respect to all five categories, and the Parties continue to use the five-category framework in arguing the motions to dismiss.

The five categories of statements that Plaintiff alleges were false or misleading include: (1) statements regarding TriNet's risk management capabilities, including that "risk management is a core competency"; (2) statements regarding TriNet's unprecedented access to claims data; (3) statements that TriNet assesses all risks on an "individual basis" and analyzes claims data for each client on an "ongoing basis"; (4) assurances to investors that TriNet had predictability and visibility into its future financial performance and insurance business; and (5) statements indicating that TriNet was not exposed to the same risk as other failed PEOs because its insurance plans were "fully insured" and had aggregate stop loss limits.

In its prior order, the Court found that the FAC's allegations regarding the statements in all five categories were deficient with respect to falsity and scienter. The Court concluded that the FAC was "missing facts indicating that these allegedly false statements were false at the time they were made," and thus only plausibly alleged falsity with the benefit of hindsight. *See* Prior Order at 11. The Court further concluded that Plaintiff offered no facts to support an inference of

---

[4] Plaintiff originally filed this action on August 7, 2015. Defendants were added and the Class Period was extended via Plaintiff's amendments to the Complaint.

scienter. *Id*. at 15. With respect to Plaintiff's Section 11 claim, the Court concluded that Plaintiff failed to sufficiently allege statutory standing. *Id*. at 27. Moreover, without a primary violation, Plaintiff's claims for violations of Section 15 and Section 20(a) for control person liability also failed, and the Court indicated that Plaintiff's allegations that General Atlantic controlled TriNet were deficient as well. *Id*. at 21-23, 34.

Plaintiff argues that the allegations in the SAC remedy the previously identified deficiencies. In particular, Plaintiff focuses on Category 3 statements (statements that TriNet assesses all claims on an individual basis), which the Court indicated might be adequately pled with respect to falsity. *Id*. at 13; *see also* SAC ¶ 3. The SAC also adds to Plaintiff's allegations with respect to Category 5 statements (statements that TriNet's insurance plans were "fully insured"), because such statements implied that the plans were fully insured for TriNet, when in reality the plans were fully insured for the client and actually *increased* TriNet's risk exposure. SAC ¶¶ 4, 98(e)-(g). The SAC also includes a chart contrasting Defendants' representations with their later admissions, in an attempt to demonstrate that all of the categories of statements were materially false or misleading when made. *Id*. ¶¶ 3, 198. Moreover, Plaintiff argues that the additional allegations that TriNet removed the alleged false statements from its SEC filings for FY15, and the fact that it dismissed its auditor in 2016, support an inference that the challenged statements were false. *Id*. ¶¶ 11, 166, 167.

As discussed further below, Plaintiff also supplements his allegations with respect to standing under Section 11 of the Securities Act. *Id*. ¶¶ 5, 281. Specifically, the SAC now includes an allegation that due to lock-up agreements in place during the period between the IPO and SPO, the IPO shares were the only TriNet shares available on the market and thus are traceable. *Id*. With respect to General Atlantic's liability, the SAC also adds specific allegations regarding General Atlantic's ability to control five out of seven seats on TriNet's Board of Directors via its ability to appoint four Board Members and TriNet's CEO. *Id*. ¶¶ 7, 72-73.

Defendants move to dismiss the SAC, arguing that it is "largely unchanged" from the FAC, and for the most part Plaintiff simply "repackages the same factual allegations" that were previously deemed insufficient by the Court. *See* TriNet Mem. at 9. With respect to any new

allegations in the SAC, Defendants argue that the addition of public information from post-Class Period events and filings do nothing to move the needle closer to satisfying the PSLRA's requirements with respect to falsity and scienter. *Id*. at 9-10.

The Court has considered the SAC, the briefing on Defendants' motions to dismiss, oral argument from both sides at the September 20, 2017 hearing, as well as relevant case law. For the reasons that follow, Defendants' motions to dismiss are GRANTED WITHOUT LEAVE TO AMEND.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*

### B.    Rule 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a

plaintiff to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701. Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.    JUDICIAL NOTICE

Defendants have also filed two requests for judicial notice, which the Court GRANTS. ECF 118, 130. While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute." Courts have previously taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Defendants request judicial notice of 18 exhibits in support of their motion to dismiss the SAC. These documents consist of financial reports, press releases, and filings with the SEC, many of which were referenced by Plaintiff in the SAC. *See* ECF 118, 119, 119-1–119-18. The Court previously took judicial notice of the majority of these documents in its prior order. *See* Prior Order at 8-9. With respect to the documents for which the Court has not yet taken judicial notice, the Court agrees with Defendants that the Form 4s filed with the SEC by various Defendants

during the Class Period are also appropriate subjects of judicial notice. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012). Defendants also request judicial notice of TriNet's Form 10-K filed with the SEC for fiscal year ending December 31, 2016. *See* ECF 130, 131, 131-1. This document is incorporated by reference into the SAC as it is quoted at SAC ¶ 197.

As before, Plaintiff does not object to the Court taking judicial notice of these documents generally, but he requests that judicial notice be taken only of the fact of their existence, and not of the truth of the matters asserted therein. Opp'n to TriNet MTD at 4 n.5, ECF 124. Defendants' requests for judicial notice are accordingly GRANTED.

## IV. THE COMPANY, OFFICER DEFENDANTS, AND DIRECTOR DEFENDANTS' MOTION TO DISMISS

### A. Section 10(b) and Rule 10b-5

Plaintiff brings a claim for a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against TriNet and the Officer Defendants only. *See* SAC ¶¶ 234-237 (Count I). Section 10(b) prohibits any act or omission that results in fraud or deceit in connection with the purchase or sale of any security. To state a securities fraud claim, Plaintiff must plead the following with particularity: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017)

In its Prior Order, the Court dismissed Plaintiff's § 10(b) claim for failure to adequately plead two of the required elements: (1) falsity and (2) scienter. *See* Prior Order at 9-20. Defendants move to dismiss this claim in the SAC on the same grounds. The arguments on falsity and scienter are set forth in the TriNet Defendants' motion to dismiss. *See* TriNet Mem. at 10-22. However because the claims against General Atlantic and the Underwriter Defendants depend on whether Plaintiff has adequately alleged a primary violation of securities laws, all Defendants join in TriNet's motion to dismiss.

United States District Court
Northern District of California

### 1.      Falsity

In order to plead falsity, the PSLRA requires Plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  As explained previously, the Court examines Plaintiff's pleading for "specific facts indicating why" the challenged statements were false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them"); *In re Stratosphere Corp. Sec. Litig.*, No. CV-S-96-708, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b)").  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH*, 540 F.3d at 1070.

As explained above, Defendants' allegedly false and misleading statements can be grouped into five categories: (1) statements regarding TriNet's risk management capabilities; (2) statements regarding access to claims data; (3) statements that TriNet assesses all claims on an individual basis; (4) assurances that TriNet had predictability and visibility into future financial performance; and (5) statements regarding the use of fully insured plans and aggregate stop loss provisions.

At the outset, the Court corrects any indication in its Prior Order that Plaintiff must succeed on all five categories of statements in order for this case to survive a motion to dismiss and proceed to discovery.  That is not so.  As explained at the hearing, if one category of claims is sufficiently pled under the PSLRA with respect to falsity and scienter, then the Section 10(b) claim moves forward with respect to those statements. *See* September 20, 2017 Hearing Transcript at 6:12-20, ECF 142.  With this in mind, the Court turns to Plaintiff's allegations regarding each category of statements to determine whether the SAC supports a plausible inference that the statements were false when made.

First, Plaintiff alleges that Defendants made false statements regarding TriNet's risk management capabilities during the Class Period that analysts and investors relied upon to differentiate TriNet from its competitors. Plaintiff's theory of falsity is essentially that TriNet boasted risk management as a "core competency" when in reality risk management was actually a material weakness. Specifically, the SAC points to statements in TriNet's IPO and SPO Registration Statements, and repeated in TriNet's FY14 Form 10-K filed with the SEC, emphasizing the Company's proficiency in risk management. These statements include TriNet's assertions that: (1) "Risk management is a core competency of our company," SAC ¶¶ 79, 96, 122; and (2) "We leverage… our robust risk management capabilities to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients," SAC ¶¶ 79, 96, 122. This category also includes statements made by the Officer Defendants at an Annual Growth Stock Conference on June 10, 2015 where they reassured investors that TriNet had "an experienced risk management team." SAC ¶ 139.

Plaintiff argues that at the time the statements were made, rather than having strong risk management capabilities, TriNet did not have appropriate risk management personnel to perform adequate risk management functions. *See* Opp'n to TriNet MTD at 8. To demonstrate falsity, Plaintiff points to "admissions" by the Company beginning in May 2015 after the Company's revenues and stock price declined in response to higher-than-anticipated insurance claims. *Id.* (citing SAC ¶¶ 136, 143, 150, 152, 165). None of the allegations cited by Plaintiff regarding the falsity of the first category of statements is new, despite their different paragraph numbers in the SAC. Rather, Plaintiff tries to reargue the same theory rejected in the Court's Prior Order, and urges the Court to reconsider its findings with respect to these statements and credit the same "well-pled allegations" that the Court previously rejected. *See* Opp'n to TriNet MTD at 8.

Plaintiff's theory is the same as before: that Defendants admitted TriNet's poor financial performance was partly attributable to the fact that TriNet did not have an adequately experienced risk management team despite its prior public statements to the contrary. For example, Plaintiff highlights revelations on August 14, 2015, and November 2, 2015 that TriNet did not previously

employ in-house actuaries for its insurance business. SAC ¶¶ 150, 152. The Court declined to infer falsity from these exact same contentions, finding that these allegations were insufficient to support the assertion that TriNet did not have sufficient policies, procedures, and personnel in place to support Defendants' claims of risk management proficiency or core competency. *See* Prior Order at 12.

As Defendants point out, the SAC remains devoid of allegations regarding who TriNet's risk management personnel were or how those individuals were inexperienced or ineffective at the time that the allegedly false statements were made. *See* TriNet Mem. at 11. At the hearing on the motion to dismiss, counsel for TriNet emphasized the unusualness of this absence, noting that in the SAC, "there are literally no people that are alleged to even exist within TriNet's building." *See* Hearing Transcript at 8:12-14. Plaintiff responds that his inability to allege actual individuals in TriNet's risk management department is due to the fact that "there was no one to fire and no one to scapegoat" since TriNet lacked any personnel in this area. *See* Opp'n to TriNet MTD at 8 n.11.

Yet the SAC concedes that TriNet relied on "outside actuaries and consultants." SAC ¶ 144. Thus, Plaintiff's unchanged allegations that TriNet originally outsourced its risk management capabilities and later added an in-house risk management team of actuaries does not suggest that TriNet's statements touting its robust risk management capabilities were false when made. Plaintiff has no internal documents or other source of contemporaneous information regarding what was actually going on at TriNet in order to contradict TriNet's representations and adequately allege falsity with respect to this category of statements. Plaintiff alleges no facts to suggest that the business decision to outsource risk management functions is, itself, indicative of a lack of risk management capabilities.

Rather than point to new allegations in the SAC, Plaintiff argues that his previous allegation regarding TriNet's disclosure in its FY15 Form 10-K of several material weaknesses in its internal controls is evidence of falsity at the time the Category 1 statements were made. *See* Opp'n to TriNet MTD at 9; *see also* SAC ¶ 164-65 (previously FAC ¶¶ 149-150). The Court rejects this argument, again, and finds that the case cited by Plaintiff is distinguishable on its facts. *In re LendingClub Sec. Litig.* involved SEC filings in which LendingClub made representations

12

about its internal control procedures which would have "prevented self-dealing, processing of improper loan applications, misleading investors, and irresponsible lending practices," which controls the company concluded were "effective at a reasonable assurance level. 254 F. Supp. 3d 1107, 1111 (N.D. Cal. 2017).

In holding that the plaintiff had adequately alleged falsity of such representations, Judge Alsup relied on LendingClub's later disclosures of internal control deficiencies including "two snafus" that (1) the CEO took out thirty-two loans for himself and his family members and (2) the company reported exaggerated loan values which resulted in underpayment to limited partners. *Id*. at 1116. These allegations indicated that LendingClub's internal control failures existed at the time of LendingClub's allegedly false statements in the SEC filings. *Id*. Here, Plaintiff does not challenge any statements made by TriNet with respect to its internal controls, but argues that the later disclosed internal control deficiencies somehow demonstrate the falsity of TriNet's statements of a "robust risk management" capability that is a "core competency." As was required in *LendingClub*, the SAC must contain information about when the purported internal controls deficiencies arose, and how the alleged deficiencies contradicted TriNet's assertions regarding its risk management capabilities. *Id*. at 1120. Without more—and the SAC has added nothing since the Court's prior guidance in this respect—Plaintiff cannot connect TriNet's disclosure of material internal controls weaknesses to its risk management statements.[5]

The Court briefly addresses Plaintiff's new allegation in the SAC that TriNet has since removed a number of representations, including statements regarding "risk management as a core competency," from its SEC filings beginning with TriNet's FY15 Form 10-K. SAC ¶ 166. Without citing to a single case in support of his position, Plaintiff argues that the *removal* of these statements from TriNet's filings is "admissible evidence of prior falsity" rather than a subsequent remedial measure that Courts have rejected. *See e.g.*, Opp'n to TriNet MTD at 6 n.7. The Court is

---

[5] The Court previously withheld ruling on Defendants' argument that the Category 1 statements are classic examples of puffery upon which no reasonable investor relies. *See* Prior Order at 10 n.3. This argument is addressed more fully below in connection with Category 4 statements, where the Court concludes that certain Category 1 and Category 4 statements are textbook examples of puffery that render them inactionable under federal securities law.

not persuaded, and finds that this allegation fails to support an inference of falsity with respect to any of the five categories of allegedly false statements. Rather, as Defendants point out, if the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, "no public company would ever remove disclosures from its filings." TriNet Reply at 2-3, ECF 129.

With respect to Category 1 statements, the SAC fails for the same reasons previously identified by the Court, permitting falsity to be inferred only by hindsight rather than with allegations that the statements were false when made. Plaintiff alleges nothing to indicate what TriNet's risk management capabilities actually were at the time the allegedly false statements were made, leaving the Court unable to infer that such statements were false.

> **b.** **Categories 2 and 3: Statements Concerning TriNet's Access to Claims Data and Whether TriNet Assesses All Claims on an Individual Basis.**

Because they are closely related, the Court considers the allegations in the SAC regarding the second and third categories of statements together. These statements include TriNet's assertions that it has "the right data" on insurance claims that it gets "every month" which is "key to the risk portion of the business," allowing the Company to succeed where other risk-based PEOs have failed. *See, e.g.*, SAC ¶¶ 108, 111. TriNet asserted that these state-of-the-art analytics allowed it to assess the risk associated with insurance claims "on an ongoing basis" in order to price every client to the risk it posed. *Id.* ¶¶ 79, 96, 122. TriNet further made the representation: "We assess all workers compensation and medical benefits risks on an individual client basis." *Id.* Plaintiff alleges that these statements were false because TriNet later admitted that all data it received was six months delayed, inaccurate, and incomplete. *See* Opp'n to TriNet MTD at 10. In particular, the SAC alleges that on March 5, 2015, Defendants admitted that they only received data for claims over $300,000. *See* SAC ¶ 120.

As with the statements in Category 1, these allegations in the SAC are not new. Rather, Plaintiff argues that neither the Court's Prior Order nor Defendants' motion analyzes these statements with respect to whether they support falsity. *See* Opp'n to TriNet MTD at 9-10. Plaintiff also points out that the Court's Prior Order indicated that the Category 3 statements

United States District Court
Northern District of California

specifically—that TriNet assessed "all claims" on an individual basis—might actually be sufficient with respect to falsity. *Id*. at 5-6. As explained at the hearing and above, the Court agrees that the standard for assessing falsity does not require the Court to conduct a holistic analysis. Rather, "a single properly alleged false statement is actionable." *Id*. at 6 (citing *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 1549485, at *4 (N.D. Cal. May 1, 2017)). However, the Court now finds that Plaintiff's falsity allegations remain deficient with respect to Category 3 statements.

Plaintiff points to Defendant Porter's statement on December 17, 2014 that "we get state-of-the-art analytics on all of our claims. So every month we are able to get claims data so we can see how our clients are performing." SAC ¶¶ 108, 198. Plaintiff then argues that his allegation that the data TriNet received was actually limited to "catastrophic" claims—historically claims over $300,000—supports an inference that TriNet was *not* actually receiving data on claims under that threshold. SAC ¶ 120. Specifically, Plaintiff alleges that on March 5, 2015, Defendant Porter disclosed that TriNet had historically asked insurance carriers for information on catastrophic claims (claims over $300,000) that could potentially be in their pipeline, but TriNet would now ask for "any claim that [the carriers] expect to be greater than $50,000, give that to us on a monthly basis so that we can track these through their pipeline." *Id*. Plaintiff asks the Court to interpret this allegation as raising the inference that TriNet was *not previously receiving* monthly data on claims below $300,000, and that its statements to the contrary were false at the time they were made.

Defendants argue that Plaintiff has distorted the statements concerning TriNet's analysis of claims data and that Plaintiff's alleged proof of falsity mischaracterizes the record. *See* TriNet Mem. at 12-13. Defendants explain that Porter's statement "we get state-of-the-art analytics on all of our claims" does not necessarily convey that TriNet was tracking each and every claim for its hundreds of thousands of WSEs employed by its tens of thousands of clients. *Id*.; *see also* Hearing Transcript 9:15-25. The Court agreed at the hearing that receiving "analytics on all claims" could mean that TriNet gets a "synthesized, terse statement" from an analytics company that has been evaluating the characteristics of all claims. *See* Hearing Transcript 35:16-19. As for

the statement that TriNet is "able to get claims data so we can see how our clients are performing," Plaintiff has not adequately alleged facts raising an inference that TriNet does *not* evaluate claims on a client-by-client basis.

In fact, Plaintiff does not allege any facts that tell the Court what claims data TriNet actually received during the Class Period in order for the Court to determine that TriNet's representations were false when made. Rather, Plaintiff relies on Porter's March 5, 2015 statement at an investor conference that indicates TriNet only received data on "catastrophic" claims, *i.e.*, those over $300,000. SAC ¶ 120. Defendants urge the Court to consider Porter's entire statement in context, which was made in response to an analyst's question regarding how TriNet was addressing the large, one-time claims that had resulted in losses reported in Q4 2014. *See* Gallagher Decl. ISO Defendants' Request for Judicial Notice ("RJN"), Ex. 9 at 4, ECF 119-9. The context of the statement makes clear that TriNet would be tracking its data differently: explaining that run rate claims (70% of claims) would now be "split out" or "separated out" in the forecast to improve tracking, and that TriNet would be asking for more granular information from its insurance carriers on the large claims (30% of claims). *Id.*

Without allegations of the type of reports and claims data that TriNet actually reviewed during the Class Period, the Court is unable to infer the falsity of the portion of Porter's December 17, 2014 statement that "every month we are able to get claims data so we can see how our clients are performing." SAC ¶ 108. Plaintiff argues that later "admissions" permit the Court to infer that TriNet never received data "every month" for "all" of its claims. *See* Opp'n to TriNet Mot. at 7. For example, Plaintiff alleges that statements by Goldfield and Porter in conference calls with analysts and investors on March 3, 2015, May 18, 2015, and August 3, 2015 somehow reveal that TriNet had not previously obtained *any data* on claims below $300,000. SAC ¶¶ 115, 120. On these calls, the Officer Defendants further disclosed that the data TriNet received had inherent lags, taking up to six months for a claim to be incurred before it was paid, and prompting a request for "clean data" from TriNet's carriers. *See* SAC ¶¶ 135, 144. These allegations in the SAC, which remain unchanged from the FAC, only support an inference of falsity by hindsight, and do

United States District Court
Northern District of California

not actually contradict TriNet's representations regarding its access to claims data.[6]  Plaintiff repeats his same arguments that TriNet's disclosure of "inherent lags" up to sixth months on claims data, as well as a need for "clean data," renders false TriNet's prior statements that it was receiving the "right data" from insurance companies "every month" which was a "true breakthrough" and a key aspect of its business.  *See* SAC ¶¶ 108, 111 (allegedly false statements); ¶¶ 115, 120, 135, 144 (TriNet's "admissions" regarding access to claims data).

The Court recognizes the theory underlying Plaintiff's argument: that TriNet made allegedly false statements in order to contrast TriNet's business model and superior access to claims data from that of prior risk-based PEOs that had failed.  *See* Opp'n to TriNet Mot. at 9.  But to meet the PSLRA's heightened pleading requirement, Plaintiff still must allege a false or misleading statement with particularity, specifying the reason why each statement was misleading.  *See* 15 U.S.C. § 78u-4(b)(1).  Rather than plead specific facts that render Defendants' representations false or misleading, Plaintiff takes pieces of Defendants' "admissions" out of context, and urges the Court to adopt an implausible inference of falsity.  With respect to statements in Categories 2 and 3 regarding TriNet's access to claims data, Goldfield and Porter's later statements do not indicate that TriNet never received monthly data of any kind on its claims.  Rather, TriNet disclosed to investors at these conferences that it would implement forecasting improvements and request different kinds of data from its carriers going forward, such as "a report that tells us for claims that are not yet paid, that are above $50,000, how many of them are there and what's their estimated type of diagnostic there is." SAC ¶ 135.

TriNet's later request for more granular data on a monthly basis, and its disclosure of delays and issues with the data it did receive, do not plausibly allege that Porter's December 17, 2014 statement that "every month we are able to get claims data so we can see how our clients are performing," was false when made.  The only plausible inference from these later statements is

---

[6] As with the statements regarding risk management, Plaintiff's citation to *In re LendingClub* is also misplaced with respect to the Category 2 statements.  *See* Opp'n to TriNet Mot. at 10-11.  The Court does not find that any of the allegations in the SAC with respect to Category 2 statements (which are the same as those in the previously dismissed FAC) support a plausible inference that later disclosed material weaknesses in TriNet's internal controls must have existed and could have been discovered at the time of the IPO, rendering TriNet's Category 2 statements false.

that TriNet requested additional reporting from its insurance carriers on large claims when it became evident that TriNet did not have enough information on those claims as they were developing. The SAC does not allege falsity with particularity, and none of its allegations raises an inference that TriNet did not receive *any* data on a monthly basis on claims below $300,000.

The Court also cannot draw the inference of falsity that Plaintiff suggests in light of the disclosure in TriNet's Registration Statements that TriNet had reserved for all of its claims, and never misstated its reserves. Thus, it is not plausible that TriNet did not evaluate *any* data on claims below $300,000, which represented 70% of its claims. When pressed at the hearing, Plaintiff argued only that TriNet had not "adequately reserved" because it had not updated its analysis on a claim-by-claim or client-by-client basis. *See* Hearing Transcript 37:2-20. Plaintiff's entire theory of falsity would require the Court to draw an implausible inference from Porter's statement about what claims data TriNet actually received in order for the Court to draw yet another inference that the data was not consistent with TriNet's representations. The Court need not make this leap. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055 (holding that the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."). Plaintiff has alleged no facts regarding the type of claims data that TriNet actually received in order for the Court to infer that TriNet did not actually receive data "every month" and for "all" of its claims. Any inference of falsity would therefore be improperly drawn from another inference, when the PSLRA requires inferences of falsity and scienter to be supported by facts.[7]

The Court recognizes that its previous order indicated that the falsity of the Category 3 statements might be adequately alleged. *See* Prior Order at 13 ("Standing alone, this might be sufficient to allege that the statement that TriNet received analytics on 'all' of its claims was false.") However, for the foregoing reasons, the Court now finds that Porter's statement that TriNet would ask for data on a more granular basis –*i.e.* $50,000 claims as opposed to $300,000 claims—going forward does not sufficiently allege falsity without allegations of what TriNet's

---

[7] As explained above, the Court also rejects Plaintiff's argument that TriNet's removal of representations from its SEC filings raises an inference of falsity.

18

data actually looked like. In the absence of specific facts about the frequency and content of the claims data or reports that TriNet received from its carriers, the falsity of these statements is not alleged with particularity.

The only new allegations in the SAC that Plaintiff points to are post-class period reports by analysts that Plaintiff argues "confirm" the falsity of TriNet's statements such as its access to "breakthrough data." *See* Opp'n to TriNet MTD at 11 (citing SAC ¶¶ 191-197). The fact that TriNet's business model "had failed" because TriNet was forced to "repric[e] its entire medical insurance book" is not sufficient to allege falsity. As the Court explained at the hearing, this theory of falsity suggests that "every General who has lost a battle was making false statements saying that they were going to win the battle." Hearing Transcript at 27:2-6. These post-class period allegations regarding changes to TriNet's business model do not indicate that TriNet's statements regarding the strength of its business in comparison to its competitors and access to "breakthrough" claims data were false when they were made.

### c. Category 4: Statements that TriNet had "Predictability" and "Visibility" into Future Financial Performance

Plaintiff repeats his arguments that the fourth category of statements, that TriNet had predictability and visibility into future financial performance and its insurance business, are false. *See* Opp'n to TriNet MTD at 12 (citing SAC ¶¶ 90, 105, 108-110). Plaintiff also points to the same "concessions" by TriNet in an attempt to demonstrate falsity. *Id*. (citing SAC ¶¶ 117, 120, 135-136, 144, 151-152, 155, 158). None of the allegations that Plaintiff refers to are substantively new, barring one slight variation in wording. *Compare* FAC ¶ 95 *with* SAC ¶ 110.

The Court is not persuaded that it should reconsider its prior ruling with respect to this category of statements. At the hearing, Plaintiff explained that this was a "unique" situation because Goldfield, TriNet's CEO, was given the opportunity to answer the question from an analyst: "If you are the investors out there now…why now with TriNet?" Hearing Transcript 34:18-24; SAC ¶ 110. In response, Goldfield praised TriNet's "predictable revenue [and] visibility into the future." SAC ¶ 110. Plaintiff urges the Court to read this statement as a "guarantee" that TriNet could "predict exactly how [the Company is] going to do in the future."

Hearing Transcript 34:22-24.

"[V]ague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements. *In re Impac Mortg. Holdings, Inc.,* 554 F.Supp.2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 379 (9th Cir. 2003)); *see In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir. 2010) ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.").

Reasonable investors would not believe that Goldfield was reassuring them that TriNet had a crystal ball. The December 17, 2014 statement by Porter that TriNet is "able to predict pretty accurately on an annual basis exactly how we are going to do" explicitly contains the caveat that "predictability" is at most: "pretty accurate." *See* SAC ¶ 109. The statements in Category 4 are textbook examples of non-actionable puffery and corporate optimism that are not capable of objective verification or inducing the reliance of a reasonable investor. *See In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (holding that "expressions of puffery and corporate optimism do not give rise to securities violations.") Even if the Court were to follow Plaintiff's argument that this situation is particularly unique in light of the context of TriNet's statements, Plaintiff has failed to demonstrate with specificity why and how statements that TriNet had some measure of "predictability" and "visibility" into its financial performance were false. The SAC, like the FAC, alleges nothing about TriNet's actual practices for forecasting claims or what kind of visibility it had to track claims at the time the Officer Defendants' challenged statements were made. Thus, even if the Category 4 statements were actionable, the factual allegations are insufficient to raise an inference that these statements were false.

> d.  **Category 5: Statements Regarding TriNet's use of Fully Insured Plans and Aggregate Stop Loss Provisions**

The fifth and final category of allegedly false statements involves TriNet's use of the term "fully insured" plans, and its representations that its insurance contracts included stop loss

provisions. The Court addresses each in turn.

### i.  Fully Insured

The SAC alleges that TriNet's IPO Registration Statement and SPO Registration Statement contained the following representation: "Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses." SAC ¶¶ 20, 79, 96, 122. Plaintiff argues this statement is false and misleading because in reality, less than 40% of TriNet's plans were "fully insured" with respect to TriNet, and for the other 60% of TriNet's plans, TriNet shared liability with the carrier. *See* Opp'n to TriNet Mot. at 13. This disclosure is hardly a revelation— it appears on the very same page of the IPO and SPO Registration statements as the allegedly false statement itself. *See* RJN Ex. 1 at 96, ECF 119-1; Ex. 2 at 84, ECF 119-2 ("Approximately 39% of our 2013 health insurance premiums were for policies with respect to which our carriers set the premiums and for which we were not responsible for any deductible. The remainder of our health insurance premiums are for policies with respect to which we agree to reimburse our carriers for any claims that they pay within our deductible layer.").

Plaintiff does not dispute that all of TriNet's plans are "fully insured" for the WSEs. *See* Opp'n to TriNet MTD at 14. However, he argues that TriNet's statements that its plans were "fully insured," were false or misleading when made because the use of the term insinuated that "all" of its plans were fully insured with respect to TriNet. *Id.* This is implausible in light of the simultaneous disclosure a few sentences later in the Registration Statements that TriNet was only risk-free on 39% of its insurance premiums. Meanwhile, TriNet expressly disclosed that it remained exposed on over 60% of the premiums by agreeing to reimburse carriers for any claims that the carriers paid within TriNet's deductible layer. *See* RJN Ex. 1 at 96, ECF 119-1 at 102. Indeed, Plaintiff alleges that taking on this deductible layer allowed TriNet to capture the "insurance spread" which was the "key differentiator that TriNet used to sell itself to investors" and allowed it to achieve greater margins compared to a purely pass-through PEO. *See* SAC ¶¶ 9, 17(b), 98(l).

Unlike other categories of statements, the SAC does include new allegations on this category of statements, which the Court now analyzes. Plaintiff alleges that "the market

21

understood 'fully insured' to mean fully insured *for TriNet*…and defendants understood that the market understood the term in that way." SAC ¶ 98(f).  However, Plaintiff ignores TriNet's disclosures in its Registration Statements, which were also available to investors and the market as of March 2014.  Ultimately, a plaintiff alleging a violation of Section 10(b) or Rule 10b-5 must "demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 390 (9th Cir. 2010) (citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)).[8]  The Court is cognizant that *Oracle* and *Convergent* articulated the standard for proving falsity on summary judgment, and this case has not yet proceeded beyond the pleading stage to discovery.  Nevertheless, it is detrimental to Plaintiff's claim that he challenges a statement as false or misleading but ignores a clear explanation of the term "fully insured" appearing on the same page of the same public filing.

Plaintiff points to other allegations in the SAC, such as Goldfield and Porter's statements at conferences on May 19, 2014 and November 12, 2014, that he argues were false or misleading in context. *See* Opp'n to TriNet Mot. at 14 (citing SAC ¶¶ 89, 105).  Of course, TriNet's March 2014 Registration Statement with the disclosure that it was only risk-free on 39% of its plans but bore risk on over 60%, predated these allegedly false statements as well.  Plaintiff attempts to argue that TriNet's later substitution of the term "guaranteed cost" for "fully insured" also raises an inference that TriNet's previous use of fully insured to describe its plans was deceptive.  *See* SAC ¶ 155.

Plaintiff provides the following chart to highlight the allegedly misleading nature of TriNet's description of its plans as "fully insured":

| Defendants in 2014 | Defendants in 2015 |
|---|---|
| "Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses." SAC ¶¶ 79, 96, 122 | "[T]oday 40% of our plans are fully insured, 60% of our plans are high deductible . . . [The question is] whether we should move more towards the fully insured side of the plans." SAC ¶ 152. |

---

[8] The Court notes that Plaintiff himself relies on *Convergent* for the relevant legal standard on evaluating false or misleading statements. *See* Opp'n to TriNet Mot. at 14.

| | |
|---|---|
| "We use fully insured plans. We're using large group plans for our medical, so we are not buffeted by the same factors that buffet small business." SAC ¶ 89 | "So if we start at what guaranteed costs looks like and guaranteed costs or some people would call it fully insured. So that's effectively a pass through [*i.e.*, liability is passed through to carriers]." SAC ¶ 155. |
| "[W]e have a very stable, fully insured workers' comp program…I think the example that you're referencing was a self-insured model...for us it's been a very stable program on all of our products." SAC ¶ 105 | "[O]n a fully-insured plan . . . you would take the volatility out of it." SAC ¶ 155.<br><br>"38% of our plans are fully insured . . . if we went with the fully insured plans [for the other 62% of plans] it reduces the quarter-to-quarter volatility." SAC ¶ 158. |

*See* SAC ¶ 98(g).

This new chart of old allegations does not change the Court's determination in its prior order that Plaintiff has not adequately alleged falsity. *See* Prior Order at 11 n.4. In fact, Plaintiff's chart mischaracterizes TriNet's statements as "later admissions" in 2015, when, as discussed above, TriNet disclosed this information to investors beginning with its IPO Registration Statement in March 2014. *See* RJN Ex. 1 at 96. TriNet made this clear disclosure—that TriNet bore risk on certain plans where it agreed to reimburse carriers for claims they paid within a deductible layer—repeatedly throughout the Class Period. *See* RJN Ex. 2 at 84; Ex. 11 at 5, ECF 119-11 at 6. TriNet's statement that "top-rated insurance carriers" fully insure such plans is also not misleading in light of the statement two paragraphs later that TriNet's national network of carriers includes Aetna, Blue Shield of California, Blue Cross and Blue Shield of Florida, Kaiser Permanente, MetLife and United Healthcare, "all of which provide fully insured policies *for our WSEs*." RJN Ex. 1 at 96; RJN Ex. 2 at 84.

In light of these conspicuous disclosures, Plaintiff's contention that investors were misled into believing that TriNet had "zero risk" on any of its plans is not plausible. Rather, when TriNet referred to its plans as "fully insured," it either meant that the plans were fully insured with respect to WSEs, or TriNet was referring to the 39% of its plans where TriNet took on no deductible risk. TriNet's later statements, in response to unexpected volatility, that it should strategically move toward its category of fully insured plans does not support a plausible inference that TriNet's references to fully insured plans were false or misleading at the time they were made.

Similar to the Category 3 statements, falsity is not adequately alleged with respect to the

"fully insured" statements because the existence and disclosure of TriNet's tens of millions of dollars in liability reserves prevents the Court from drawing the inference that Plaintiff suggests: that TriNet's statements somehow meant that *all* of its plans were fully insured for TriNet in the sense that TriNet bore *zero risk*. *See* RJN Ex. 1 at F-10, ECF 119-1 at 162 (disclosing liability reserves of $23.0 million and $46.6 million as of December 31, 2012 and 2013, respectively, "to provide for the estimated costs of reimbursing the carriers for paying claims within the deductible layer in accordance with health insurance policies.") Plaintiff's argument that Defendants somehow "created ambiguity" in their public statements, despite clear disclosures throughout the Class Period that TriNet took on a deductible layer of risk and specifically reserved in order to reimburse carriers if such risk materialized, is not sufficient to satisfy Rule 9(b) or the PSLRA's requirement that a plaintiff plead contemporaneous and specific facts indicating why the challenged statements were false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi*, 253 F.3d at 430.

### ii.    Stop Loss

TriNet's statements regarding stop loss provisions in its insurance agreements present a closer call. The IPO and SPO Registration Statements included the following representation: "Our agreements with our health insurance carriers with respect to these policies typically include limits to our exposure for individual claims, which we refer to as pooling limits, and limits to our maximum aggregate exposure for claims in a given policy year, which we refer to as stop losses." SAC ¶¶ 79, 96. Again, these are not new allegations, but Plaintiff reiterates his arguments that this statement was false when it was made because TriNet later admitted that it did not use aggregate stop losses to limit risk. *See* Opp'n to TriNet MTD at 11.

Plaintiff obscures the fact that there are at least two different types of stop loss. As Defendants explained on the record at the hearing, the Court understands that stop loss provisions can exist to cap losses within a specific policy in a given year, and stop loss can also be used to cap losses with respect to specific carriers or regions. *See* Hearing Transcript 14:24-15:15. Conceptually, a stop loss provision in an individual's policy might place an upper limit on TriNet's obligation to pay that individual's aggregate claims in a certain year, in order to protect

24

TriNet if that individual had an unexpectedly large number of catastrophic claims. Similarly, a PEO such as TriNet may also want to cap losses in the aggregate, and utilize stop losses with respect to a *group of policies* in a specific company or a region, in case the entire group of individuals had an unexpectedly high number of claims. In theory, these stop loss provisions could be complementary, and serve to limit TriNet's maximum exposure with respect to aggregate claims under a policy, as well as aggregate claims in a larger group of policies.

Under a heading titled "Employee Benefit Plans," TriNet made the following representation to investors in its Registration Statements:

> We sponsor a number of fully-insured employee benefit plans, including group health, dental, vision and group and individual life insurance, legal services, commuter benefits, home insurance, critical illness insurance, pet insurance and auto insurance, as an employer plan sponsor under Section 3(5) of ERISA, 29 U.S.C. §1002(5). Approximately 39% of our 2013 health insurance premiums were for policies with respect to which our carriers set the premiums and for which we were not responsible for any deductible. The remainder of our health insurance premiums are for policies with respect to which we agree to reimburse our carriers for any claims that they pay within our deductible layer. Our agreements with our health insurance carriers **with respect to these policies typically include** limits to our exposure for individual claims, which we refer to as pooling limits, and **limits to our maximum aggregate exposure for claims in a given policy year, which we refer to as stop losses.** We manage the risk that we assume in connection with these policies by utilizing group risk assessments and HIPAA-compliant analytics and pricing these policies accordingly. Following our initial pricing of these policies, we analyze claims data for each client on an ongoing basis and seek to adjust our prices as appropriate.

*See* RJN Ex. 1 at 96; Ex. 2 at 84 (emphasis added). This statement clearly refers to (1) pooling limits which cap TriNet's exposure on an individual claim under a policy; and (2) stop loss provisions that limit TriNet's aggregate exposure for claims in a given year under that policy. As Defendants point out, Plaintiff does not actually allege what any of TriNet's agreements looked like during the Class Period, so the Court cannot directly infer that TriNet's agreements did not typically include these provisions.

Plaintiff argues that the above statement is false because TriNet *never* utilized stop losses to mitigate risk. *See* Opp'n to TriNet Mot. at 11. Plaintiff primarily relies on a statement by Porter to investors at a March 5, 2015 Conference to allege falsity with respect to TriNet's

25

statement that its agreements "typically include…stop losses." *Id.* (citing SAC ¶ 120). Porter's statement is hard to decipher and appears to contain a transcription error, and the parties dispute whether Plaintiff's parenthetical in the SAC clarifies or misrepresents Porter's statement. In considering this allegation, the Court looks directly at the transcript from the Conference, which provides as follows:

> [ANALYST]: And just on the topic in workings with the carriers, you have an agreement with the carriers that limit your claim costs for large claims, but a high quantity of large claims can still cause you to miss guidance, like this past quarter. Are there other ways to cap your losses to specific carriers or regions other than the per-claim limits?
>
> PORTER: The most practical way to do it is what's called a pooling limit, which is a per-claim limit. And again, on our larger carriers, it's up to $1 million. On others, it's below that.
>
> But it's really an economic decision. We look at the pricing that we get from our carriers for these pooling limits and we can choose to bring those down. But effectively what you do is you are just going to be paying that higher premium to the carriers.
>
> And for the – I think the modest amount of deductible risk we take, I think it makes sense for us to have a limited or reasonable return on that. Just to quantify, in our insurance revenue, only about 20% historically has been in this deductible. We call it performance fees. So it's not a large amount, but it is a number.
>
> **We've also can do aggregate stop-loss, but again, when you look at that, the cost really isn't outweighing the benefit of doing it.**

RNJ Ex. 9 at 5, 119-9 at 6 (emphasis added).

    The Court agrees that the statement is garbled because it appears to contain a typo, uses two tenses, and, logically, if the benefit outweighs the cost of doing something then the reasonable inference is that it should continue to be done going forward. Plaintiff argues that this statement, along with Morgan Stanley's report from the conference and a statement by Goldfield that TriNet was considering "putting an aggregate pooling limit in place," demonstrate that TriNet did not utilize stop losses at all in any of its agreements. SAC ¶¶ 120, 121, 152.

    Even if the Court interprets Porter's statement as Plaintiff suggests, that TriNet could *but did not* utilize aggregate stop-loss in its agreements with carriers, it does not support an inference that the stop loss representation in the Registration Statements is false. The analyst specifically

asked Porter about ways to cap losses to specific carriers or regions other than "per-claim" limits, and made no mention of TriNet's aggregate exposure for claims in a given policy year, which was the only representation made in the Registration Statements. Porter responded that "aggregate stop-loss" covering a region or with a specific carrier was possible, but given the economics it may be too expensive to justify the cost.

The Court finds that Plaintiff's allegations in the SAC regarding stop loss, which remain entirely unchanged from the FAC, do not sufficiently allege that TriNet had no stop loss of any kind in its agreements with its carriers, which would render its representations in the IPO and SPO Registration Statements false. Other than Porter's confusing statement and Morgan Stanley's summary that TriNet could "in theory…establish an 'aggregate stop loss,'" there are no factual allegations in the SAC regarding the content of TriNet's insurance carrier contracts during the Class Period that would permit the Court to infer that TriNet *never* used stop losses to limit its exposure with respect to any of its policies or clients. Without contemporaneous allegations of the content of TriNet's policies during the Class Period, the plausible inference from the Officer Defendants' statements regarding aggregate stop loss is that TriNet may have used stop loss to cap claim costs in a specific policy in a given year, but perhaps did not utilize stop loss to cap losses to specific carriers or regions—which TriNet concluded was too expensive to justify the cost.

For the foregoing reasons, and without any new allegations in the SAC to consider, the Court does not disturb its prior conclusion that falsity has not been pled with respect to TriNet's stop loss representation in its Registration Statements. With the benefit of the intense scrutiny that has been brought to bear on this statement, the Court can imagine a better way to write the challenged provision. However, Plaintiff has not alleged that it was misleading. Plaintiff's theory of falsity hinges solely on Porter's March 5, 2015 response to an analyst's question, which does not address the specific type of stop loss identified in the Registration Statements. Further, Plaintiff offers no contemporaneous facts of the contents of TriNet's agreements or terms of its policies for the Court to infer that stop loss provisions were entirely absent from them. As discussed further below, the SAC also contains no factual allegations that Defendants intended to deceive or acted with deliberate recklessness when making the statements in Category 5 regarding

27

aggregate stop loss or fully insured plans. *See In re VeriFone Holdings*, 704 F.3d at 701.

### 2. Scienter

The second element of a securities fraud claim requires the plaintiff to plead scienter with particularity. In its prior order, the Court dismissed the FAC for failure to allege a misrepresentation, and further found the allegations of scienter to be insufficient under the PSLRA. *See* Prior Order at 14 (finding that "even assuming that Plaintiff's allegations regarding falsity were sufficient, Plaintiff has not pled facts sufficient to show that the Officer Defendants knew of or deliberately disregarded the alleged falsity at the time the statements were made."). In the SAC, Plaintiff proceeds under largely the same theories as before, attempting to establish scienter through: (1) inferences from the Officer Defendants' own statements; (2) inferences from the temporal proximity of the alleged misrepresentations and "corrective disclosures"; (3) the core operations inference; (4) inconsistent statements regarding fully insured plans; and (5) alleged insider trading and false Sarbanes-Oxley ("SOX") certifications. Opp'n to TriNet MTD 15-21. Plaintiff attempts to bolster these theories of scienter by adding further core operations and insider trading allegations to the SAC. *See, e.g.*, SAC ¶¶ 52-54, 56, 58, 60.

Defendants contend that even with additional allegations in the SAC, Plaintiff has failed to allege a strong inference of scienter to survive a motion to dismiss, which serves as an independent basis for the dismissal of the Section 10(b) and Rule 10b-5 claim. *See* TriNet Mem. at 9. Notably absent from the SAC are any allegations from confidential witnesses, internal emails or memoranda, or any contemporaneous facts that shed light on what was actually going on within TriNet's walls during the Class Period. Rather, Plaintiff doubles down on later developments to attempt to raise an inference that at the time the Officer Defendants made their public statements described above, they knew of or deliberately disregarded information that made those statements false.

Under the PSLRA's heightened standard to allege scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights*, 856

F.3d at 619 (quoting *Schueneman v. Arena Pharm.*, *Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "[D]eliberate recklessness is 'an *extreme* departure from the standards of ordinary care…which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Schueneman*, 840 F.3d at 705. (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), as amended (Feb. 10, 2009)). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). However, "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* In light of this standard, a securities fraud complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

The Court's inquiry is twofold: first, the Court determines whether "any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011); *accord Curry v. Yelp Inc.*, No. 16-15104, 2017 WL 5583889, at *4 (9th Cir. Nov. 21, 2017). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *N.M. State Inv. Council*, 641 F.3d at 1095. Viewing the totality of the circumstances pled, "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006.

The Court considers Plaintiff's allegations of scienter below, but observes that Plaintiff has merely repackaged its falsity allegations, previously dismissed in the FAC and found to be

inadequate above, in an attempt to invoke a cogent inference of scienter. Thus, the Court focuses on the areas where Plaintiff has tried to bolster his allegations, but finds that the new facts cannot save the SAC on scienter grounds and do not adequately address the Court's prior guidance. The Court then considers the SAC holistically and determines that it is deficient with respect to scienter, which provides an independent basis to GRANT Defendants' motion to dismiss Count I for a violation of § 10 and Rule 10b-5 against TriNet and the Officer Defendants.

### a. Insider Trading and SOX Certifications

The Court first addresses the most significant addition to the SAC that has a potential bearing on scienter: allegations of insider trading by the Officer Defendants. Plaintiff previously dropped his insider trading allegations from the FAC, but has revived them in the SAC. These allegations provide that "insiders," (including Director Defendants who are not named in the § 10 claim) sold $474 million in shares in eight months following the IPO. *See, e.g.*, SAC ¶¶ 27 n.5, 52-54, 56, 58, 60. In support of this theory, Plaintiff argues only that selling stock in "suspicious amounts" is probative of scienter, even if the allegations are not sufficient on their own. *See* Opp'n to TriNet MTD at 20.

Insider trading may suffice as circumstantial evidence that a statement was false when made. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). However, in order for stock sales to be suspicious, Plaintiff "must allege sufficient context of insider trading" for the Court to determine whether the trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* at 436-37 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).

Plaintiff's bare allegations that TriNet Officers and Directors sold stock at "inflated prices during the Class Period," without any allegations of trading history, fail to plead that sales of stock were dramatically out of line with their prior trading practices and thus cannot support a strong inference of scienter under the PSLRA. In addition, Plaintiff does not explain how any allegations

of trades by individuals other than the two Officer Defendants, the only individuals charged with a

§ 10 violation and thus the only individuals whose mental states matter, supports an inference of

scienter. With respect to the Officer Defendants, there is simply nothing in the SAC that enables

the Court to compare their stock sales with their trading histories to evaluate whether the trades

were consistent or "dramatically out of line" with past practices. Plaintiff also gives the Court

nothing by way of an explanation of what information the Officer Defendants knew or deliberately

disregarded when they made the alleged trades. Moreover, as exhibited by the various Form 4s

that are subject to judicial notice, the Officer Defendants' trades during the Class Period were

executed pursuant to predetermined 10b5-1 plans without concern for the market, which rebuts an

inference of scienter. *See* RJN Ex. 3-4, 10, 12, 15-16. Plaintiff does not address any of these

arguments in his opposition.

The insider trading allegations do not raise a "strong inference of scienter," especially

when considering the more likely opposing inference that the Officer Defendants executed trades

pursuant to predetermined plans and even acquired rather than sold shares during the Class Period,

evidencing their confidence in TriNet. Stock sales alone are not suspicious when the allegations

"can equally or more likely support the inference that [defendant] was engaging in modest

diversification." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002). Here, there is

simply no suspicious inference from the factual allegations of the trades for the Court to draw.

Because these allegations were not included in the FAC, the Court has not previously granted

Plaintiff leave to amend the insider trading allegations to provide evidence of the Officer

Defendants' prior trading history or additional allegations of suspicious timing of the sales.

However, the Court finds that amendment in this respect would be futile because the SAC also

adds an allegation that the Officer Defendants were subject to lock-up agreements that prevented

them from trading for 180 days following the IPO, so there is no pattern to compare the trades to.

*See* SAC ¶ 248. That the trades were also executed pursuant to predetermined 10b5-1 plans is

further dispositive of this theory of scienter.

Plaintiff has also failed to cure the deficiencies identified in the Prior Order regarding

allegedly false Sarbanes-Oxley ("SOX") certifications by the Officer Defendants. *See* SAC ¶¶

134, 149, 154; Opp'n to TriNet MTD at 20-21. The Court previously explained that although certifications made pursuant to SOX can raise an inference of scienter, "[b]oilerplate language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003–04; Prior Order at 15:8-16:2. There remains no allegation that the Officer Defendants who signed the certification were severely reckless in certifying the accuracy of the financial statements, or support an inference that the Officer Defendants were even aware of any errors contained therein. With no new allegations and the same conclusory arguments, the allegedly false SOX certifications do not raise an inference of scienter.

### b. Core Operations Inference

Next, the Court turns to Plaintiff's second attempt to invoke the core operations inference in support of scienter. The core operations theory of scienter is based on the principle that "corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Core operations may support a strong inference of scienter under three circumstances: (1) "the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations," (2) "such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," and (3) "such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008). As the Ninth Circuit explained, "[p]roof under this theory is not easy." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062. "A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring; or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* (citations omitted).

Plaintiff argues that the SAC now explicitly and particularly pleads the necessary facts to invoke the core operations inference, but the SAC has missed the mark yet again. Plaintiff's only new substantive allegation is that TriNet derived 83% or more of its revenue from its insurance plans and could only maintain its target profit margins by "capturing the insurance spread" on risk-based plans. SAC ¶ 98(l). Plaintiff now concedes that the SAC "does not rely on defendants' personal involvement in the minutia of the business to plead the core operations doctrine." Opp'n to TriNet MTD at 19. Thus, Plaintiff argues only that this is one of those rare circumstances where it would be "absurd" to suggest that Defendants were unaware of the truth that TriNet had no internal actuaries, could not get "clean data," and was only assessing the largest claims on a timely basis. *Id.*[9] This is the same argument previously rejected by the Court. *See* Prior Order at 19-20.

An inference of scienter under this aspect of the core operations doctrine is only permitted where allegedly false information is "readily apparent" to senior management to the point where management "must have known" that the statements to the public were false because it was so "obvious from the operations of the company" and management's awareness of the falsity can be assumed. *Zucco Partners*, 552 F.3d at 1001 (quoting *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 987–89 (9th Cir.2008)). "Nevertheless, reporting false information will only be indicative of scienter where the falsity is patently obvious—where the facts prominent enough that it would be absurd to suggest that top management was unaware of them." *Zucco Partners*, 552 F.3d at 1001 (internal citations and quotations omitted).

Plaintiff argued at the hearing that when a high-level executive is tasked with investigating a problem and reporting to investors, there is an inference that they "know the truth" or should have known the true state of affairs at that point. Hearing Transcript 38:1-22. But Plaintiff's reassurance that that the SAC now "explicitly invokes" this inference ignores the Court's Prior

---

[9] As discussed above with respect to the allegedly false statements regarding risk management capabilities, TriNet's decision to employ outside firms to perform its actuarial function is well within its business judgment. That TriNet later developed a team of internal actuaries does not support an inference of falsity or scienter regarding earlier risk management statements.

Order rejecting Plaintiff's invitation for the Court to infer, "based upon statements made after three quarters of unanticipated, high insurance claims that the Officer Defendants must have known all of these alleged falsities. That inference, by itself, is insufficiently cogent to satisfy the PSLRA's exacting pleading requirements." Prior Order at 20 (citing *Zucco*, 552 F.3d at 990, 1000–01). Even in light of the new allegations in the SAC, this is not the "exceedingly rare" case in which a securities fraud plaintiff may rely solely on the core operations inference without particularized allegations about each defendant's access to the relevant information. *See S. Ferry*, 542 F.3d at 785 n.3. The Court therefore finds once again that the core operations theory, standing alone, does not satisfy the PSLRA under these circumstances.

### c. TriNet's Dismissal of Ernst & Young in 2016

Another new allegation in the SAC is that TriNet dismissed its auditor, Ernst & Young, after the Class Period ended but "less than one month after the Company asked shareholders to ratify the selection of Ernst & Young to serve as the Company's 2016 auditor." *See* SAC ¶¶ 12, 167. Defendants argue that this allegation is a "red herring at best" and is not accompanied by any particular facts regarding Ernst & Young's dismissal, or any connection between TriNet's decision to dismiss its auditor months after the allegedly operative events and the other allegations in the SAC. *See* TriNet Mem. at 20. Plaintiff only discusses this allegation in passing, claiming that the SAC "directly addresses the pleading deficiencies identified by the Court" by demonstrating that TriNet dismissed its auditor. *See* Opp'n to TriNet MTD at 3. Defendants also cite persuasive law to support their proposition that departures of auditors and internal management at or around times of large stock drops are not sufficient evidence of scienter and courts should not penalize directors for these decisions. TriNet Mem. at 20 (citing *Proter v. Medifast, Inc.*, No. 11-720, 2013 WL 1316034, at *17–18 (D. Md. Mar. 28, 2013); *In re Cornerstone Propane Partners, L.P. Sec. Lit.* 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005); *Gammel v. HewlettPackard Co.*, 905 F. Supp. 2d 1052, 1078 (N.D. Cal. 2012)). Without further explanation from Plaintiff regarding the relevancy of TriNet's dismissal of its auditor in 2016, the Court finds that this addition to the SAC is insufficient to allege an inference of scienter.

### d.     Plaintiff's Additional Theories of Scienter

Plaintiff's remaining theories of scienter have either already been considered and rejected by the Court and are not enhanced by additional allegations in the SAC, or they are easily disposed of for failure to support a strong inference of scienter.

First, Plaintiff argues that Defendants' "specific admissions" permit the Court to directly infer that Defendants acted with the requisite state-of-mind at the time of their allegedly misleading statements. *See* Opp'n to TriNet MTD at 16. This is a repeat of Plaintiff's argument that the Officer Defendants' own statements demonstrate that they had access to information that contradicted their representations. Plaintiff cites to statements in the SAC, as well as its new chart collecting the supposed "admissions," to argue that Defendants were at least "deliberately reckless" in claiming that they reviewed all claims on a monthly basis. *Id*. (citing SAC ¶¶ 108, 115, 117, 120, 135, 137, 198). These allegations remain insufficient, and do not include facts or evidence that Defendants *knew of* or *deliberately disregarded* information that TriNet did not receive some sort of analytics that covered all of its claims on a monthly basis. There is no specific allegation about what the Officer Defendants knew at all concerning the claims data TriNet received. Thus, the inference of scienter does not defeat the competing inference of non-actionable mistake. *See* Prior Order at 17.

Without pointing to a single allegation in the SAC, new or old, Plaintiff argues a novel theory that Defendants' allegedly false statements that were "intended to and did induce investor reliance" address the Court's concern that the FAC contains no allegations that the Officer Defendants had actual access to information contradicting these alleged falsities at the time the statements were made. *See* Opp'n to TriNet MTD at 17 (citing Prior Order at 19-20). The Court's "concern" that Plaintiff references was specifically addressing Plaintiff's failure to invoke a core operations inference, discussed above. As such, the Court is at a loss for how Plaintiff's conclusory allegations that Defendants "intended to induce reliance," combined with cherry-picked quotations from inapposite cases, somehow supports a strong inference of scienter.

The Court further rejects Plaintiff's theory that scienter is strongly inferred from the temporal proximity of the alleged misrepresentations and Defendants' later "corrective

disclosures." *See* Opp'n to TriNet MTD at 17. Although temporal proximity can sometimes constitute circumstantial evidence of scienter, the timing of a disclosure alone cannot establish a strong inference of scienter or even contribute strongly to such an inference. *See City of Dearborn Heights*, 856 F.3d at 622 (citing *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (explaining that "temporal proximity of an allegedly fraudulent statement or omission and a later disclosure" is insufficient on its own to establish scienter and can only "bolster" an inference based on other allegations)).

Finally, Plaintiff argues that Defendants' inconsistent statements concerning fully insured plans support a strong inference of scienter. *See* Opp'n to TriNet MTD at 19. This argument relies on the same arguments in support of Plaintiff's theory of falsity that the Court rejected above with respect to the Category 5 statements. Specifically, Plaintiff argues that allegations in the SAC that Defendants referred inconsistently to "fully insured" plans, and later changed their use of the term to "guaranteed cost plans," suggest that scienter has been pled. *Id.* (citing SAC ¶¶ 98(e)-(g), 166). Plaintiff argues that TriNet knew that the market understood "fully insured" to mean limits to TriNet's liability, and its use of different terminology was merely a "substitute" once TriNet's fraud had been exposed. *See* Opp'n to TriNet Mot. at 20.

The authority on which Plaintiff relies is distinguishable from these circumstances, where Plaintiff urges the Court to infer scienter—i.e. that the Officer Defendants knew of or deliberately disregarded information that would render their statements false—based solely on the Officer Defendants' use of different terminology to describe TriNet's plans. Rather, Plaintiff relies on cases where the defendants use an entirely inconsistent term to describe events at a later point. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (referring to "beta" or "testing" agreements that were first announced as normal commercial sales); *but see In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 59, 63 (D. Del. 2002) (dismissing complaint for failure to allege scienter under the PSLRA despite inconsistencies in use of the same term to describe four different concepts). Just as the Court rejects Plaintiff's theory of scienter based on allegations in the SAC that TriNet removed certain statements from its securities filings, TriNet's later use of the term "guaranteed cost" does not, standing alone or when considered holistically, support a strong

inference that the Officer Defendants knew or were severely reckless in not knowing that their statements regarding TriNet's "fully insured" plans were false.

### e. Holistic Review of Plaintiff's Allegations

Plaintiff's failure to plead scienter is even more stark under the required holistic analysis. As *Tellabs* explains, the strength of an inference cannot be considered "in a vacuum." 551 U.S. at 323. "The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24. The Court's job is therefore "not to scrutinize each allegation in isolation, but to assess all the allegations holistically." *Id*. at 326. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"

The Court has determined above that none of Plaintiff's allegations in the SAC, standing alone, is sufficient to create a strong inference of scienter. *City of Dearborn Heights*, 856 F.3d at 620. A holistic review of the SAC's allegations similarly fails to create a strong inference of intentional conduct or deliberate recklessness by TriNet and the Officer Defendants. *Id*.; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48, (2011) (holding that courts "must review all the allegations holistically" to determine whether the plaintiff has met the relevant pleading standards).

The SAC gives rise to competing inferences of non-fraudulent intent that are more compelling than any inference that the Officer Defendants knew or deliberately disregarded information that rendered their public statements false. *Zucco Partners*, 552 F.3d at 991 ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."). For example, in the very Registration Statement that launched TriNet's IPO, TriNet made disclosures of its "Risk Factors" including specific warnings to investors of the possibility of unexpected changes in claims activity

United States District Court
Northern District of California

by WSEs. *See* RJN Ex. 1 at 15-17. Moreover, TriNet disclosed: "If there is an unexpected increase in the severity or frequency of claims, such as due to our WSEs generating additional claims activity, or if we subsequently receive updated information indicating insurance claims were higher than previously estimated and reported, our insurance costs could be higher in that period or subsequent periods as we adjust our reserves accordingly." *Id.*

The allegations in the SAC with respect to the five categories of statements taken as a whole do not diminish the plausibility of the counter-inference of non-fraudulent intent. For example, there are no allegations regarding Defendants' state of mind with respect to the representation in the Registration Statements that TriNet's agreements with its health insurance carriers "typically include…limits to our maximum aggregate exposure for claims in a given policy year, which we refer to as stop losses." SAC ¶¶ 79, 96, 120. Thus, even if Defendants made a technical mistake that rendered this statement misleading, the SAC provides no evidence of any intent to deceive investors into thinking that TriNet had an aggregate stop loss in place that would cap its total losses with respect to specific carriers and regions.[10] A securities fraud action does not arise from the use of imprecise language.

Similarly, TriNet's clear and repeated disclosures in its SEC filings that TriNet bore risk on over 60% of its plans where it agreed to reimburse carriers within the deductible layer, do away with any inference that TriNet and the Officer Defendants used the term "fully insured" with a culpable state of mind under the PSLRA. The SAC does not allege a single fact that counteracts the inference of non-fraudulent intent and demonstrates that TriNet or the Officer Defendants knew that their use of the term "fully insured" would mislead the market into thinking TriNet bore *zero* risk on any of its insurance plans. The Court cannot infer, even under a core operations inference, that the Officer Defendants intended to deceive or defraud investors at the time they made the challenged statements.

When viewed holistically, scienter is not adequately pled with respect to any of the five

---

[10] The Court recognizes that Sections 11 and 12(a)(2) of the Securities Act do not have a scienter requirement. However, the Court concludes that the stop loss and fully insured statements in Category 5 are not material misstatements for the reasons discussed above.

38

categories of statements, which provides an independent basis for dismissal of the Section 10(b) and Rule 10b-5 claim. Rather than raising an equally cogent inference that the Officer Defendants intended to defraud investors during the Class Period, the much more plausible inference remains that when TriNet experienced the exact unanticipated volatility in its insurance business that it warned investors about in the IPO and SPO Registration Statements, the Officer Defendants identified material weaknesses and reconsidered some of their unsuccessful business decisions. By strengthening TriNet's risk management capabilities, requesting data on a more granular basis, moving more plans toward those that are "fully insured" as opposed to those where TriNet took on more risk, and discovering internal controls weaknesses, it is much more compelling to conclude that the Officer Defendants were correcting previously unidentified mistakes rather than evidencing an awareness of, or deliberate disregard of, information that rendered their public statements false or misleading.

Therefore, as the Court held previously with regard to the FAC: "Taken together, the facts suggest, at most, corporate mismanagement and negligence, but they do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent." Prior Order at 17. Despite the additional allegations analyzed above, the SAC merely bolsters its arsenal of later developments in an attempt to raise an inference about what was happening on the ground at TriNet and what the Officer Defendants knew or ignored. There are absolutely no contemporaneous facts that indicate the Officer Defendants knew of or deliberately disregarded information that was contrary to the statements they were making. Unadorned allegations that the Officer Defendants made trades during the Class Period, and irrelevant later developments such as TriNet's dismissal of its auditor and removal of certain statements from its SEC filings, do not raise an inference that the Officer Defendants "knew the truth" and deliberately made false statements, or even that they had an improper financial motive. Poor business judgment does not amount to a "strong inference" of scienter, and Plaintiff fails to establish an inference of scienter that is at least as compelling as the inference drawn from the SAC of non-fraudulent mistakes or imprecise terminology that were later corrected by management. *City of Dearborn Heights*, 856 F.3d at 623.

Even if any category of statements could survive this motion to dismiss on falsity grounds, the SAC remains fatally deficient in that its allegations do not, individually or holistically, support the PSLRA's requisite strong inference of scienter. Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's claim for a violation of section 10(b) and Rule 10b-5 against TriNet and the Officer Defendants on scienter grounds as well as failure to plead a material misrepresentation. The Court previously afforded Plaintiff leave to amend his allegations to support an inference of scienter after the Court dismissed the FAC, and Plaintiff does not indicate how he would be able to further amend to cure deficiencies related to falsity and scienter. At the hearing on Defendants' motion to dismiss the FAC, the Court offered Plaintiff additional time to investigate his claims. Plaintiff did not accept the offer for more time and filed the SAC, which has added no material allegations and does not alter the previous deficiencies laid out in the Court's Order dismissing the FAC. As discussed further below under the *Foman* factors, the Court's dismissal of Count I is now DISMISSED WITHOUT LEAVE TO AMEND.

## B. Section 11 of the Securities Act

The SAC does not salvage Plaintiff's claim for a violation of Section 11 against TriNet, the Officer Defendants, the Director Defendants, and the Underwriter Defendants. *See* SAC ¶¶ 279-296 (Count III). The Court discusses the Section 11 arguments specific to the Underwriter Defendants below in connection with their motion to dismiss. In addition, because the SAC no longer alleges a claim for a violation of Section 11 against General Atlantic, General Atlantic's motion to dismiss the Section 11 claim against it is GRANTED WITHOUT LEAVE TO AMEND.

"Section 11 creates a private right of action for any purchaser of a security where 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 914 (N.D. Cal. 2015) (quoting 15 U.S.C. § 77k(a)). "To prevail on a Section 11 claim, a plaintiff must demonstrate (1) that the registration statement contained a misrepresentation or omission; and (2) that the misrepresentation or omission was material." *Id.* (citing *In re Daou Sys.*, 411 F.3d at 1027).

Defendants argue that Plaintiff has not alleged that TriNet's Registration Statements for its IPO or SPO contained a material misrepresentation or omission, and further that Plaintiff lacks standing with respect to the SPO because he cannot trace his stock purchases to TriNet's SPO. *See* TriNet Mem. at 22. The Parties also dispute whether allegations of damages are required to plead a violation of § 11. *Id*. at 23.

The SAC's allegations remain entirely unchanged from the FAC regarding the challenged statements in TriNet's offering documents. *Compare* SAC ¶¶ 246, 252 *with* FAC ¶¶ 220, 225. Plaintiff again points to the following alleged misrepresentations and omissions in the IPO and SPO Registration Statements: "[1] ***Risk management is a core competency of our company***; [2] We leverage . . . our ***robust risk management*** capabilities to mitigate the risks associated with providing workers compensation and employee benefit plans to our clients; [3] ***Our programs are fully insured by top-rated insurance carriers, which limits our ultimate exposure or potential losses***; [4] We assess all workers compensation and medical benefits risks on ***an individual client basis*** and annually adjust pricing to reflect their ***current risk*** based on HIPAA compliant analytics; [5] Our agreements with our health insurance carriers with respect to these policies typically ***include*** limits to our exposure for individual claims, which we refer to as pooling limits, and ***limits to our maximum aggregate exposure for claims in a given policy year***, which we refer to as ***stop losses***; [6] Following our initial pricing of these policies, we analyze claims data ***for each client on an ongoing basis*** and seek to adjust our prices as appropriate." *Id*. (emphasis in original).

The Court already found these categories of statements to be insufficiently pled in the FAC, and determines above in the context of Plaintiff's section 10(b) claim in the SAC that the false and misleading nature of these allegations remains deficient. Plaintiff would have the Court take these allegations out of context and turn a blind eye to TriNet's disclosures in the same Registration Statements that TriNet bore serious risk from unexpected changes in claims activity. *See* RJN Ex. 1 at 16-17, 96; Ex. 2 at 13-14, 84 (disclosing under "Risk Factors" that "[u]nexpected changes in workers compensation and health insurance claims by worksite employees could harm our business.") Indeed, TriNet reserved millions of dollars to reimburse its carriers in accordance

with the roughly 60% of its policies where TriNet agreed to do so. *Id.*

As before, the SAC hones in on Defendants' alleged violations of Item 303 of Regulation S-K which requires that a company disclose "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "Allegations which state a claim under Item 303(a) of Regulation S-K also sufficiently state a claim under Sections 11 and 12(a)(2)." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

Plaintiff alleges that Defendants failed to make key disclosures including: "negative trends in TriNet's workers' compensation plans, uncertainty and exposure to loss on its insurance plans, loss reserve amounts and reserve-setting processes, and adverse claims trends in its insurance plans." SAC ¶¶ 168-190. He argues that Defendants were aware of the material impact of these adverse trends, some of which went back to 2012, because, for example, TriNet's competitor had failed to reserve for workers' compensation claims and "similarly failed." *See* Opp'n at 22 (citing SAC ¶¶ 170, 173, 185). This one-off allegation does not support an inference that the "adverse trends" were either known to Defendants or could have reasonably been expected to have a material impact on TriNet's net sales, revenues or income. In fact, the SAC does not contain sufficient facts to allow the Court to draw the inference that any of these "negative trends" were "adverse" as Plaintiff suggests.

For these reasons, as well as those discussed above, Plaintiff has not plausibly alleged a material misrepresentation in the Registration Statements under Section 11. Defendants' motion to dismiss the Section 11 claim is GRANTED WITHOUT LEAVE TO AMEND. However, the Court briefly addresses the issue of standing because it previously found standing to be a basis for dismissal of the Section 11 claim, but finds that standing is adequately pled in the SAC.

In its Prior Order, the Court held that Plaintiff did not plead traceability to allege standing to bring a Section 11 claim with respect to either the IPO or the SPO Registration Statements. *See* Prior Order at 24-27. "To have standing to bring a Section 11 claim, plaintiffs must be able to trace their shares back to an allegedly misleading registration statement." *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1117 (N.D. Cal. 2014) (citing *In re Century Alum. Co. Sec.*

*Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)), *rev'd in part on other grounds*, No. 14-15962, 2016 WL 6156043 (9th Cir. Oct. 24, 2016). The Ninth Circuit has explained that the "level of factual specificity" needed to trace shares back to a particular statement "will vary depending on the context." *In re Century Alum. Co.*, 729 F.3d at 1107. For example, "[w]hen all of a company's shares have been issued in a single offering under the same registration statement, this 'tracing' requirement generally poses no obstacle." *Id.* at 1106 (citation omitted). "But when a company has issued shares under more than one registration statement, the plaintiff must prove that her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement." *Id.* (citation omitted).

The SAC now specifically alleges that the TriNet shares Plaintiff purchased after the IPO were the only shares in the market. *See* SAC ¶¶ 248, 281 (alleging that lock-up agreements in place during the period between the IPO and the SPO meant the only shares available to be purchased when Plaintiff bought shares were shares issued in, and thus traceable to, the IPO). Thus, the SAC sufficiently pleads traceability, and thus standing, to assert Section 11 claims as to the IPO. Defendants do not contest that Plaintiff has now alleged standing to assert Section 11 claims in connection with the IPO, but argues that Plaintiff lacks Article III standing for the SPO. *See* TriNet MTD at 23-24.

The Court previously rejected Plaintiff's argument that because he has standing to pursue his own claims, he may assert claims on behalf of the class for which he cannot allege standing because the claims implicate a similar set of concerns against the same defendants. *See* Prior Order at 26-27. Although it is not dispositive of Plaintiff's Section 11 claims in the SAC, which fail on other grounds, the Court revisits its prior ruling and now agrees with Plaintiff that the Section 11 claim for the SPO should not be dismissed for failure to plead standing. Plaintiff's legal argument has persuaded the Court that with respect to the SPO, Plaintiff has alleged his own Article III standing and he has the ability to bring a class action. *See* Opp'n to TriNet MTD at 23-24.

In *Melendres v. Arpaio*, which was a class action but not a securities case, the Ninth Circuit adopted a "class certification approach" as opposed to a "standing approach" to determine whether a lead plaintiff may pursue claims on behalf of unnamed class members. 784 F.3d 1254,

1262 (9th Cir. 2015).  The "class certification approach" requires the Court first to determine

whether at least one named class representative has Article III standing, and then defers until the

class certification stage the question of whether that individual has the representative capacity to

assert the rights of others who have similar, but not identical, interests.  *Id.*  Plaintiff analogizes his

Section 11 claims to *Melendres*, arguing that his IPO Section 11 claims implicate the exact same

set of concerns—indeed the IPO and SPO are alleged to contain the same false statements—as the

SPO Section 11 claims of the absent class members.  *See* Opp'n to TriNet MTD at 23.

This approach has been used expansively in a wide range of class actions, and has even led

to a court in the context of a bond offering to conclude that *Melendres* "clearly forecloses" any

argument that a class representative lacks standing to represent other putative class members who

purchased bonds in different tranches or offerings.  *See In re Volkswagen "Clean Diesel" Mktg.,*

*Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3058563, at *4 (N.D.

Cal. July 19, 2017).  The Court therefore finds it necessary to reconsider its prior order to the

extent it held that Plaintiff failed to allege statutory standing with respect to the SPO.  Because the

SAC now adequately alleges that Plaintiff has standing for the IPO Section 11 claim, the issue of

whether he can bring claims on behalf of absent class members who bought TriNet shares

traceable to the SPO would be deferred to class certification in the event this claim had survived.

The Court provides this analysis only to clarify that it does not dismiss Plaintiff's SPO Section 11

claims for failure to allege standing.[11]

### C.  Section 12(a)(2) of the Securities Act

The SAC alleges a violation of Section 12(a)(2) against all Defendants.  *See* SAC ¶¶ 297-

304 (Count IV).  In order to allege a violation of this provision, Plaintiff must allege that: "(1) the

defendant is a statutory seller; (2) the sale was effected by means of a prospectus or oral

communication; and (3) the prospectus or oral communication contained a material misstatement

or omission."  15 U.S.C. § 77*l*(a)(2).  Defendants argue that this claim must be dismissed for lack

---

[11] However, because Defendants' motion to dismiss the Section 11 claims is granted for failure to
allege materially false or misleading statements in the Registration Statements, the Court declines
to consider Defendants' argument that Plaintiff's IPO Section 11 claim fails because he has not
alleged damages and cannot show that he has been harmed.  *See* TriNet Mem. at 23.

44

of standing and failure to allege falsity.

Plaintiff does not oppose this argument directly in his opposition to the TriNet Defendants' motion to dismiss, but rather he groups his Section 12(a)(2) claims with his Section 11 claims and then only addresses the TriNet Defendants' arguments with respect to Section 11. Plaintiff only expands on these standing arguments in his opposition to General Atlantic's motion to dismiss, arguing that "[a]ftermarket purchasers, like plaintiff, have standing to assert §12(a)(2) claims" and that "Section 12(a)(2) makes no distinction between aftermarket and in-offering purchasers, and the better-reasoned case law recognizes that *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) did not foreclose aftermarket purchasers from pursuing §12(a)(2) claims." *See* Opp'n to General Atlantic MTD at 126. Plaintiff's arguments do not persuade the Court to reconsider its prior reasoning, and the Court finds that Plaintiff lacks standing to bring the Section 12(a)(2) claim because he does not allege that he bought TriNet shares "pursuant to" a public offering. On a separate and independent ground, Plaintiff fails to allege a material misstatement or omission. Accordingly, Defendants' motion to dismiss the Section 12(a)(2) claim in the SAC is GRANTED WITHOUT LEAVE TO AMEND.[12]

With respect to standing under Section 12(a)(2), the Court previously held that Plaintiff must show that he purchased his shares "in a public offering, as opposed to the secondary market." *See* Prior Order at 31-32 (quoting *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1126 (N.D. Cal. 2014)). There is a distinction between allegations that a plaintiff purchased a security "pursuant to or traceable to" a registration statement as required by Section 11, and allegations that a plaintiff purchased a security "pursuant to" the document which is required to establish standing under Section 12(a)(2). *See, e.g.*, *Rieckborn*, 81 F. Supp. 3d at 925–26; *Maine State*, 2011 WL 4389689, at*11. Thus, the additional allegation in the SAC that lock-up agreements were in place during the period in which Plaintiff bought shares do not sufficiently allege that Plaintiff bought his shares "pursuant to" the IPO. SAC ¶¶ 248, 281.

---

[12] General Atlantic and the Underwriter Defendants join the TriNet Defendants' motion to dismiss on these grounds, but further assert an independent basis for dismissal of the Section 12(a)(2) claim on the grounds that they are not statutory sellers. *See* General Atlantic Mot. at 6-8, ECF 120; Underwriter Defs' MTD at 11. This independent ground for relief is addressed below.

Without any material changes to his allegations, the SAC remains deficient with respect to standing under Section 12(a)(2). *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-0302, 2011 WL 4389689, at *11 (C.D. Cal. May 5, 2011); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016). Plaintiff does not even contest this point in his opposition, and, despite this Court's prior guidance on this issue, the SAC does not plausibly allege that Plaintiff purchased his shares "pursuant to" TriNet's IPO or SPO. Accordingly, the Court GRANTS Defendants' motion to dismiss the Section 12(a)(2) claim for lack of standing and failure to allege falsity in line with the above analysis WITHOUT LEAVE TO AMEND.

### D.   Section 20(a) of the Exchange Act

Defendants move to dismiss with prejudice Plaintiff's claim for a violation of Section 20(a) of the Exchange Act, which is brought against all Defendants except the Underwriter Defendants for control person liability. *See* SAC ¶¶ 238-278 (Count II). Section 20(a) of the Exchange Act makes certain "controlling" individuals liable for violations of § 10(b). *Zucco Partners,* 552 F.3d at 990. In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised "actual power or control" over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Because the Court grants Defendants' motion to dismiss Count I for a violation of § 10(b), the § 20(a) claim must also be dismissed for failure to allege a primary violation. Where there is no underlying violation alleged against the "controlled" person, Plaintiff has likewise failed to state a § 20(a) control person liability claim. *See Zucco Partners*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily…if a plaintiff fails to adequately plead a primary violation of section 10(b)."); *accord In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 711 (9th Cir. 2012). The Court therefore GRANTS Defendants' motion to dismiss the Section 20(a) claims WITHOUT LEAVE TO AMEND.

### E.   Section 15 of the Securities Act

Plaintiff's claim for a violation of Section 15 of the Securities Act is also brought against all Defendants except the Underwriter Defendants. *See* SAC ¶¶ 305-307 (Count V). Section 15,

much like Section 20(a) for Exchange Act claims, allows plaintiffs to bring claims against parties who are "control persons" for a primary violation of the Securities Act. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) (stating that the "controlling person analysis" for Section 15 is the same as Section 20(a)).

As explained above, Plaintiff has failed to allege a primary violation under Section 11 or 12(a)(2) of the Securities Act. Because Plaintiff fails to allege a primary violation, and because the allegations regarding control are lacking as to the Director Defendants, the Court GRANTS Defendants' motion to dismiss the Section 15 claims WITHOUT LEAVE TO AMEND.

## V.     GENERAL ATLANTIC'S MOTION TO DISMISS

The Court next addresses General Atlantic's motion to dismiss, although the above analysis granting the TriNet Defendants' motion with respect to all claims eliminates any basis for General Atlantic's liability as well. *See* General Atlantic Mot., ECF 120. General Atlantic is a private equity firm that was TriNet's majority owner at the beginning of the Class Period. *See* SAC ¶ 55. The SAC brings claims against General Atlantic for a primary violation of securities law under Section 12(a)(2) of the Securities Act, and for control person liability under Section 15 of the Securities Act and Section 20(a) of the Exchange Act. General Atlantic joins in the TriNet Defendants' motion to dismiss, but also raises arguments specific to its role in the alleged events that it argues provide an independent basis for dismissal of the claims against General Atlantic.

With respect to primary liability, the SAC notably does not reassert a claim under Section 11 against General Atlantic. On these grounds, General Atlantic's motion to dismiss the Section 11 claim against it is GRANTED WITHOUT LEAVE TO AMEND.

The SAC does, however, reassert a claim for a violation of Section 12(a)(2) against General Atlantic. As explained above, Plaintiff's claim against General Atlantic for a primary violation of Section 12(a)(2) is dismissed for lack of standing and failure to plead falsity. The Court notes however, that in its Prior Order the Court dismissed the Section 12(a)(2) claim in the FAC against General Atlantic due to Plaintiff's failure to allege that General Atlantic was a statutory seller. *See* Prior Order at 34. General Atlantic again moves to dismiss the Section 12(a)(2) claim on these grounds, and the Court agrees that the SAC does not cure the previously

identified deficiencies in this respect.

Section 12(a)(2) claims may be asserted only against a defendant who "offers or sells a security." 15 U.S.C. § 77*l*(a)(2). The phrase "offers or sells" includes not only traditional sellers—individuals who pass title to another—but also certain individuals who engage in the solicitation of sales:

> The person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale . . . . [L]iability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.

*Pinter*, 486 U.S. at 647 (1988). As the Ninth Circuit has explained, to state a claim based on solicitation, "plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchases of the securities for their own financial gain." *In re Daou Sys.*, 411 F.3d at 1029; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009) (finding that mere participation in a solicitation or sale does not suffice). Additionally, "the defendant [must] be alleged to have had some 'direct' role in the solicitation of the plaintiff[.]" *In re Charles Schwab Corp.*, 257 F.R.D. at 549.

The SAC does not allege any facts to support an inference that General Atlantic was an immediate seller of the TriNet securities that Plaintiff bought. Plaintiff argues, without pointing to any new allegations in the SAC, that General Atlantic's role as seller is "undeniable" because, for example, General Atlantic sold 2,250,000 shares in the IPO and sold all 13,800,000 shares in the Secondary Offering. *See* Opp'n to General Atlantic Mot. at 8 (citing SAC ¶¶ 27, 55-56, 63). But these allegations, recycled from the FAC, do not constitute facts that Plaintiff purchased his shares directly from General Atlantic as opposed to another seller or intermediary. Moreover, there are no allegations that General Atlantic *solicited* his purchase of TriNet shares, despite Plaintiff's assertion that General Atlantic's role as a "selling shareholder" means that it "clearly solicited" the sale of TriNet shares. *See* Opp'n to General Atlantic MTD at 8.

Finally, the Court notes that it previously picked up on an allegation in the FAC that

General Atlantic "executed the Prospectus Supplement in connection with the Securities Offerings." FAC ¶ 49; *see* Prior Order at 3 n.1, 30-31, 33. This allegation has been revised, now stating only that "General Atlantic caused the issuance of the Prospectus Supplement." SAC ¶ 63.[13] In light of this weakened allegation, and the absence of additional facts regarding General Atlantic's solicitation or sale of securities to Plaintiff, the Section 12(a)(2) claims against General Atlantic independently fail. Accordingly, General Atlantic's motion to dismiss Plaintiff's Section 12(a)(2) claim against it is GRANTED WITHOUT LEAVE TO AMEND.

Turning to Plaintiff's control person allegations against General Atlantic for violations of Section 20(a) of the Exchange Act and Section 15 of the Securities Act, the Court explained above that these claims are dismissed against all Defendants because the SAC fails to plead a primary violation of the securities laws pursuant to Section 10(b) (required for Section 20(a) control person liability) and for Sections 11 and 12(a)(2) (required for Section 15 control person liability under the Securities Act).

General Atlantic moves to dismiss these claims on the independent ground that the SAC does not adequately allege that General Atlantic is a control person over TriNet. *See* General Atlantic Mot. at 8. Because these claims are dismissed for failure to plead a primary violation, the Court need not reach the issue of whether Plaintiff has adequately alleged control person liability against General Atlantic. However, the Court takes this opportunity to reconsider its Prior Order regarding control person liability to the extent that it may have been too strict when it required Plaintiff to allege "day to day" operations in order to adequately allege control persons liability against General Atlantic. *See* Prior Order at 21-22 (finding that the FAC failed to allege control person liability against General Atlantic because the FAC did not contain "factual allegations regarding General Atlantic's authority to exercise decision-making power, nor allegations of its day-to-day involvement in the operation of the Company.") In his brief and at oral argument, Plaintiff persuasively argued that his allegations might be sufficient to meet the pleading standards.

---

[13] According to General Atlantic, ¶ 49 of the FAC was revised because "it was simply inaccurate." General Atlantic Mot. at 5.

For example, the SAC alleges that General Atlantic owned 72% of TriNet's common stock at the time of the Company's IPO, which was only reduced to 56% after the offering. SAC ¶ 63. Plaintiff points out that TriNet's 2014 IPO Registration Statement and Form 10-K disclosed that the Company was controlled by General Atlantic, the majority shareholder, who was "able to determine substantially all matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, such as [the] sale of . . . company . . . assets." SAC ¶ 74. The SAC also adds a significant new allegation that General Atlantic "had the ability to select and did select four of the seven directors on TriNet's Board of Directors and the Company's CEO." SAC ¶ 63. Due to General Atlantic's control of a majority of the board seats and its majority share ownership, General Atlantic had the power to hire and fire TriNet's executive officers. SAC ¶ 73.

Again, the Court need not resolve this issue because it has dismissed Plaintiff's Section 20(a) and Section 15 claims without leave to amend for failure to allege a primary violation of federal securities laws. However, TriNet's allegations regarding General Atlantic's control over TriNet –now bolstered by the additional allegation that General Atlantic actually exercised its control by selecting a majority of Board Members as well as TriNet's CEO—the Court now finds it likely that had the primary violations of securities laws been adequately pled, General Atlantic would face liability as a control person. However, the Court need not rule on General Atlantic's motion to dismiss Plaintiff's Section 20(a) or Section 15 claims for failure to plead control person liability, as they are deficient for failure to plead a primary violation.

## VI.     THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS

The Court has also considered the Underwriter Defendants' motion to dismiss, which primarily urges the Court to dismiss the Section 11 and Section 12(a)(2) claims against the Underwriter Defendants on the independent grounds that these claims remain time barred, and further argue that Plaintiff does not allege that the Underwriter Defendants were statutory sellers for purposes of Section 12(a)(2). *See* Underwriter Defs.' Mot., ECF 121. The Court finds that despite specific guidance to Plaintiff in its Prior Order on these issues, the SAC remains deficient with respect to the claims against the Underwriter Defendants. Accordingly, the Court now

GRANTS the Underwriter Defendants motion to dismiss these claims WITHOUT LEAVE TO AMEND on the grounds set forth in their motion to dismiss.

The statute of limitations for claims brought under the Securities Act provides that claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The one-year period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010); *see also Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-4921, 2014 WL 3749759, at *5 (N.D. Cal. July 29, 2014).

Plaintiff did not allege claims against the Underwriter Defendants until the First Amended Complaint filed on April 1, 2016. *See* FAC. "Plaintiffs are considered to have discovered a fact when a 'reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss.'" *F.D.I.C. v. Countrywide Fin. Corp.*, No. 12-4353, 2012 WL 5900973, at *2– 3 (C.D. Cal. Nov. 21, 2012) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).

The hurdle that Plaintiff faces is that the SAC alleges on its face that TriNet made a disclosure on March 3, 2015 that "stunned" investors by announcing an unexpected $10 million spike in large medical claims, which the Company disclosed was due in part to untimely and insufficiently detailed data, as well as inadequate risk management processes. SAC ¶¶ 25(i), 29- 30, 114, 255. March 3, 2015 is of course over one year before April 1, 2016 when the FAC first alleged claims against the Underwriter Defendants. Thus, the question is whether TriNet's March 3, 2015 disclosure gave reasonably diligent plaintiffs sufficient information to discover the Underwriter Defendants' involvement in TriNet's alleged misrepresentations.[14] In its Prior Order, the Court concluded that the disclosure would have put a reasonably diligent investor on notice of

---

[14] In contrast, Plaintiff applies an incorrect standard, arguing unconvincingly that the Underwriter Defendants must "identify which of the multiple alleged misrepresentations could have been adequately alleged to be false based solely on the March 3, 2015 disclosure." *See* Opp'n to Underwriter Defs' Mot. at 4.

United States District Court
Northern District of California

United States District Court
Northern District of California

potential Securities Act claims against the Underwriter Defendants, and granted the motion to dismiss with leave to amend to allow Plaintiff "to allege that he was not on notice based on the March 3, 2015 disclosure." Prior Order at 37.

The Underwriter Defendants point out that not only has Plaintiff failed to add allegations that he was not on notice based on the disclosure, but the SAC actually *strengthens* the allegations with respect to the March 3, 2015 against the other Defendants. *See* Underwriter Defs' Mot. at 9 & n.7 (citing SAC ¶ 9). The Court's analysis in its Prior Order analogizing this case to *Rieckborn v. Jefferies* remains sound—not "utter nonsense" as Plaintiff argues—because TriNet's disclosures alleged on the face of the FAC and now bolstered in the SAC "provided precisely the information that plaintiff[] claim[s] should have been disclosed earlier." 81 F. Supp. 3d 902, 916 (N.D. Cal. 2015). Plaintiff's argument that "nothing on the face of the SAC" supports an inference that the statute of limitations has run is unavailing. *See* Opp'n to Underwriter Defs' Mot. at 5-6, ECF 125.

The Court also rejects Plaintiff's suggestion, now for the second time, that subsequent disclosures after TriNet's March 3, 2015 disclosure requires denial of the Underwriter Defendant's motion to dismiss the claims as time barred. *Id*. at 4-6. That SAC pleads on its face that the statute of limitations began to run on Plaintiff's claims against the Underwriter Defendants on March 3, 2015, and does not toll until the company has disclosed every specific allegation that Plaintiff brings in his complaint. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1054 (N.D. Cal. 2016) ("[T]he one-year time period does not reset simply because additional information is revealed that could make for a stronger claim.").

Plaintiff has essentially asked the Court to reconsider its Prior Order, which he also chose not to follow because the SAC lacks any new allegation to support an inference that Plaintiff was not on notice of potential securities fraud claims against the Underwriter Defendants based on TriNet's March 3, 2015 disclosure. The Underwriter Defendants' motion to dismiss the Section 11 and Section 12(a)(2) claims against them is therefore GRANTED WITHOUT LEAVE TO AMEND on the grounds that these claims are time barred.

The Section 12(a)(2) claim against the Underwriter Defendants also independently fails because the SAC does not cure the previously identified failure to allege that the Underwriter

52

Defendants are statutory sellers. *See* Prior Order at 38-39. Plaintiff once again ignores the Court's guidance in this respect and points to identical allegations that the Court previously rejected to reargue the law on what is required to allege solicitation and direct sales of securities under this provision. *See* Opp'n to Underwriter Defs' Mot. at 6-7 (citing SAC ¶¶ 291-92, 299).

Plaintiff has once again failed to plead direct solicitation by the Underwriter Defendants. *See Pinter v. Dahl*, 486 U.S. 622, 643 n.21 (1988) (stating that § 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers"). When it comes to underwriters specifically, courts have found that they are generally not considered sellers within the meaning of Section 12 "unless they *actively participate* in the negotiations with the plaintiff/purchaser." *In re Violin Memory Sec. Litig.*, No. 16-cv-5486, 2015 WL 5525946, at *18 (N.D. Cal. Oct. 31, 2014) (emphasis added).

Plaintiff's repeated allegations that the underwriter defendants "helped draft and disseminate the Registration Statements, solicited plaintiff's and potential class members' purchases and were paid nearly $30 million for doing so," are conclusory and insufficient to allege solicitation such that the Underwriter Defendants are statutory sellers subject to Section 12(a)(2) liability. *See* Opp'n to Underwriter Defs.' Mot. at 7. As made clear in the Court's Prior Order, allegations that the Underwriter Defendants merely did their job and rendered professional services to TriNet in connection with a transaction for securities do not amount to allegations that the underwriters are "sellers" under § 12(a)(2). *See Pinter*, 486 U.S. at 651.

Therefore, Plaintiff's Section 12(a)(2) claim against the Underwriter Defendants fails to allege that they are "sellers" or that they directly solicited Plaintiff's purchase of TriNet stock, providing yet another ground for dismissal of this claim against the Underwriter Defendants.

## VII.    LEAVE TO AMEND

The Court does not deny leave to amend lightly. The Court recognizes that leave to amend "is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet." *Osher v. JNI Corp.*, 183 F. App'x 604, 605–06 (9th Cir. 2006) (citing *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052

United States District Court
Northern District of California

1   (9th Cir.2003)).  In *Foman v. Davis*,  the Supreme Court offered the following factors for a district

2   court to consider in deciding whether to grant leave to amend:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or
> dilatory motive on the part of the movant, repeated failure to cure deficiencies by
> amendments previously allowed, undue prejudice to the opposing party by virtue of
> allowance of the amendment, futility of amendment, etc.—the leave sought should, as the
> rules require, be "freely given."

6   371 U.S. 178 (1962).  Not all of these factors carry equal weight.  The Ninth Circuit has made

7   clear that prejudice to the opposing party carries the greatest weight. *See Eminence Capital*, 316

8   F.3d at 1051 (citing *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 185 (9th Cir. 1987)).  Absent

9   prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption

10  under Federal Rule of Civil Procedure 15(a) in favor of granting leave to amend. *Id*.  A district

11  court's failure to consider the *Foman* factors and "articulate why dismissal should be with

12  prejudice instead of without prejudice may constitute an abuse of discretion." *Id*. at 1052 (citing

13  *Foman,* 371 U.S. at 182).

14  As the Ninth Circuit explained in *Eminence Capital*, a district court's adherence to the

15  *Foman* factors and the presumption of liberality in granting amendment is especially important in

16  the context of a complaint under the PSLRA, which requires a securities fraud plaintiff to plead

17  "an unprecedented degree of specificity and detail" that gives rise to a strong inference of

18  deliberate recklessness." 316 F.3d at 1052 (citing *In re Silicon Graphics,* 183 F.3d 970, 979 (9th

19  Cir. 1999)).  The PSLRA was not intended to be an easy standard to comply with, "and plaintiffs

20  must be held to it." *Id*.  However, pleading a securities fraud complaint can become a matter of

21  "trial and error" until the plaintiff is able to allege sufficient detail to survive a motion to dismiss.

22  *Id*.

23  This Court has considered the factors set forth by the United States Supreme Court in

24  *Foman v. Davis*, and finds that there are sufficient justifications to deny leave to amend under

25  these circumstances. 371 U.S. 178, 182 (1962).  The SAC represents the fourth operative

26  complaint in this securities fraud action against TriNet, and this analysis constitutes the Court's

27  second intensive inquiry into the sufficiency of the pleadings.  When the Court dismissed the

28  FAC, it did so with leave to amend accompanied by specific instructions regarding the type of

United States District Court
Northern District of California

allegations necessary to surpass the PSLRA's high standard. *See* ECF 112. Plaintiff then filed the SAC, which is nearly identical to the FAC, resulting in a renewed round of motion to dismiss briefing where Plaintiff's oppositions at times read more like a motion for reconsideration. As discussed above, Plaintiff's efforts did not result in a successful attempt to meet the heightened pleading requirements and to comply with the Court's previous guidance, given the number of recycled arguments and allegations that Plaintiff attempted to cast in a new light and requested the Court to reevaluate.

After two years, four complaints, two rounds of motions to dismiss and two lengthy oral arguments where Plaintiff had the opportunity to be heard, Plaintiff's failure to correct the identified deficiencies in the SAC "is a strong indication that the plaintiffs have no additional facts to plead." *Zucco Partners, LLC*, 552 F.3d at 1007 (internal quotation marks omitted). "A district court's discretion to deny leave to amend is particularly broad where the plaintiff has previously amended." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (internal quotations omitted). Although Plaintiff generally requests leave to amend in his opposition should the Court dismiss any of his claims, he does not identify any specific allegations or theories that he may be able to strengthen—rather, he found his previous allegations so sufficient that he failed to address many of the Court's concerns with them and simply reargued the law under the same set of facts.

Moreover, when the Court dismissed the FAC with leave to amend, it offered Plaintiff additional time to investigate his claims. Plaintiff did not accept the offer and promptly filed the SAC which has added very few material allegations and did not cure the deficiencies laid out in the Court's Order dismissing the FAC. These circumstances make clear that Plaintiff has evidenced a repeated failure to cure deficiencies by amendments previously allowed. Plaintiff has also not informed the Court that it has, or could obtain with time, any additional evidence that would enable him to add necessary details to his complaint. Given Plaintiff's apparent lack of access to contemporaneous facts sufficient to allege falsity and scienter (and failure to inform the Court otherwise), allowing further amendments of the pleadings would be futile.

This is also not a case where the motion to dismiss is granted on a narrow ground that the Plaintiff may be able to remedy by focusing his amendments on a specific area. As detailed

55

above, all of Plaintiff's claims suffer from pleading deficiencies, with some claims dismissed on as many as three or four separate grounds. *E.g.* Granting Dismissal of Section 12(a)(2).

Most importantly, the weightiest *Foman* factor, prejudice to Defendants, is implicated in this case. Defendants have been litigating this action for over two years since the Complaint was filed on August 7, 2015. Each group of Defendants also faces unique harm. For example, Individual Officers and Directors of TriNet are named in the Complaint in connection with allegations casting doubt on the propriety of their business decisions and even their trading activities during the Class Period, yet they have now (twice) successfully dismissed these claims for failure to allege falsity and scienter under the securities laws. The Company TriNet itself also suffers prejudice from allowing continued amendment of uncorrected deficiencies, as this litigation came on the heels of its IPO. Moreover, the Underwriter Defendants have now filed two nearly identical motions to dismiss addressing the statute of limitations issue and Plaintiff's failure to plead that they are a statutory seller. However, the SAC's allegations remained entirely unchanged from the FAC in this respect. Requiring all of these Defendants to continue to defend this lawsuit when Plaintiff has not demonstrated or represented that he can successfully amend, constitutes undue prejudice. *Foman* makes clear that undue prejudice to the opposing party by virtue of allowance of the amendment can weigh against Rule 15's liberal standard. 371 U.S. 178.

For these reasons, the Court declines to permit Plaintiff leave to amend his complaint.

## VIII. ORDER

For the foregoing reasons, the SAC is DISMISSED WITHOUT LEAVE TO AMEND. The Clerk shall enter judgment for Defendants and against Plaintiff and close the file.

Dated: December 18, 2017

_____
BETH LABSON FREEMAN
United States District Judge